**SIDLEY AUSTIN LLP**

Matthew A. Clemente (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
mclemente@sidley.com

Maegan Quejada (*pro hac vice* pending)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
mquejada@sidley.com

Michael A. Sabino (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
msabino@sidley.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**FOX ROTHSCHILD LLP**

Joseph J. DiPasquale, Esq.
Mark E. Hall, Esq.
Michael R. Herz, Esq.
49 Market Street
Morristown, New Jersey 07960
Telephone: (973) 992-4800
Facsimile: (973) 992-9125
jdipasquale@foxrothschild.com
mhall@foxrothschild.com
mherz@foxrothschild.com

*Proposed Co-Counsel to the Debtors and
Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| BOWFLEX INC., *et al.*,[1] | Case No. 24-12364 (ABA) |
| Debtors. | (Joint Administration Requested) |

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: BowFlex Inc. (2667) and BowFlex New Jersey LLC (3679). The Debtors' service address is 17750 S.E. 6th Way, Vancouver, Washington 98683.

**DEBTORS' MOTION FOR ENTRY OF AN
ORDER (I)(A) APPROVING THE AUCTION AND
BIDDING PROCEDURES, (B) APPROVING STALKING
HORSE BID PROTECTIONS, (C) SCHEDULING BID DEADLINES
AND AN AUCTION, (D) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF, (E) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING
HORSE AGREEMENT, AND (II) (A) ESTABLISHING
NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT
OF CONTRACTS AND LEASES, (B) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF ASSUMED CONTRACTS, (C) AUTHORIZING THE SALE OF
<u>ASSETS AND (D) GRANTING RELATED RELIEF</u>**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

respectfully state the following in support of this motion (the "<u>Motion</u>"):

**<u>Relief Requested</u>**

1.      BowFlex Inc. and its debtor affiliates, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "<u>Company</u>" or the "<u>Debtors</u>"), seek entry of

an order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Bidding Procedures Order</u>"

or the "<u>Order</u>"): (a) approving the proposed marketing, auction, and bidding procedures attached

as <u>Exhibit 1</u> to the Order (the "<u>Bidding Procedures</u>"), by which the Debtors will solicit and select

the highest or otherwise best offer(s) for the sale or sales (the "<u>Sale Transactions</u>") of all,

substantially all of the Debtors' assets (the "<u>Assets</u>"); (b) designating a stalking horse bidder and

approving the Stalking Horse Bid Protections (as defined below); (c) authorizing the Debtors to

enter into that certain Asset Purchase Agreement with Johnson Health Tech Retail, Inc.

(the "<u>Stalking Horse Agreement</u>"); (d) establishing certain dates and deadlines related thereto and

scheduling an auction or auctions, if any, for the Sale Transactions (the "<u>Auction</u>"); (e) approving

the manner of notice of the Auction and sale hearing (the "<u>Sale Hearing</u>") as may be necessary; (f)

approving procedures for the assumption and assignment of certain Executory Contracts (as

defined below) and Unexpired Leases in connection with the Sale Transaction, if any; and (g) granting related relief.

2.      Additionally, the Debtors will seek entry of one or more orders at the Sale Hearing (the "Sale Order") (a) authorizing and approving the Sale Transaction with the Successful Bidder on the terms substantially set forth in the Successful Bid; and (b) authorizing and approving the sale of the Debtors' Assets free and clear of liens, claims, encumbrances, and other interests pursuant to § 363(f) of the Bankruptcy Code, to the extent set forth in an asset purchase agreement with a Successful Bidder; (c) authorizing the assumption and assignment of Executory Contracts and Unexpired Leases as set forth in an asset purchase agreement with a Successful Bidder; and (d) granting any related relief.

3.      In support of this Motion, the Debtors respectfully submit the *Declaration of Shane L. Campbell in Support of the Motion of the Debtors for Entry of an Order Approving the Bid Procedures and Related Relief* (the "Campbell Declaration") and the *Declaration of Aina Konold in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") (filed contemporaneously herewith).[2]

## Jurisdiction and Venue

4.      The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.). The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court,

---

[2]    Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration or the Campbell Declaration, as applicable.

absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and rules 6004-1, 6004-2, and 9013-1(a)(3) of the Local Bankruptcy Rules for the District of New Jersey (the "Local Rules").

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

7.      On March 4, 2024 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases is set forth in greater detail in the First Day Declaration, filed contemporaneously herewith and incorporated by reference herein.

8.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrent with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

### Disclosures Under Local Rules 6004-1 and 6004-2

9.      Local Rule 6004-1 requires, among other things, that a debtor include the "material terms of the proposed sale" in a sale motion. As set forth above, the Debtors and their professionals

4

have conducted a comprehensive marketing of the Debtors' Assets. Additionally, Local Rule 6004-2 requires, among other things, that a debtor include the "material terms" governing a bidder's qualifications, a bid's qualifications, and proposed stalking horse bidder protection, in a motion requesting approval of bidding and auction procedures.

## Introduction

10.    As described in the First Day Declaration, the health and fitness marketplace in which the Debtors operate is extremely competitive and subject to broad market variables and macro-economic conditions, as well as cyclical and unpredictable consumer behavior. The Debtors commenced these chapter 11 cases following a period of financial tumult. Shortly after the development of a transformational strategy, which focused on shifting the Company from a product-led hardware company to a consumer-led, digitally connected company, the COVID-19 pandemic led to a dramatic shift in consumer behavior within the health and fitness industry.

11.    Although this shift in consumer behavior brought potential opportunity for the Company, it also brought on challenges. The increase in demand led to a sharp increase in competition within the "at home" fitness product segment and affected not only market share, but also the supply chain, which was already experiencing severe issues due to the pandemic. Other challenges caused by the pandemic are all too familiar – insufficient supply capacity, pricing headwinds related to commodity prices and foreign exchange rates, global logistics constraints, and chip shortages. In response to the sharp increase in demand from both consumers and retailers, the Company increased its orders from its inventory suppliers and made other adjustments to the business, ultimately increasing costs. However, as demand started to normalize post-pandemic, and retailers were left with excess inventory, the Company was left without sufficient revenue to cover its increased expenses.

12.     In late 2022, the Company's management team began to interview a number of professionals to assist with contingency planning. The Company subsequently hired Evercore Group LLC ("Evercore") to explore the strategic sale of certain of the Company's Assets. In January 2023, the Company hired FTI Consulting, Inc. ("FTI Consulting") to serve as financial advisor and assist with liquidity management and other related financial advisory services.

13.     As Evercore continued its work to find a strategic transaction, the Company focused on working on a deal with a counterparty that was ultimately unable to gain the necessary approvals to consummate the sale. Thereafter, the Company engaged further advisors to explore other strategic alternatives, including bankruptcy. Specifically, FTI Capital Advisors, LLC ("FTICA" and, together with FTI Consulting, "FTI") was hired as investment banker for an in-court sale process in late 2023. FTI Consulting expanded its scope to further evaluate contingency planning efforts. Simultaneously, Sidley Austin LLP ("Sidley Austin") was engaged as restructuring counsel to assist the Company in its contingency planning efforts.

14.     While the Company continued its search for an out-of-court transaction guided by Evercore, now faced with a short liquidity runway and growing payables, the Company also worked with FTICA to explore interest in an in-court sale. FTICA contacted or received inbound interest from approximately 132 strategic and financial parties regarding a potential transaction, primarily comprising large-cap and mid-cap public and private companies with strategic interests in consumer facing fitness offerings with possible commercial applications. With respect to this outreach process, FTICA prioritized parties with both adequate commercial infrastructure and sufficient capital resources—or a reasonable likelihood of being able to obtain such capital—to consummate a transaction that would maximize the value of the Debtors or their assets.

15.     As set forth further in the First Day Declaration and the Campbell Declaration, the prepetition sale process resulted in the choice of Johnson Health Tech Retail, Inc. as stalking horse bidder (the "Stalking Horse Bidder") along with gaining the interest of other parties who have expressed an interest in continuing their participation in the marketing process. Through the filing of these chapter 11 cases and this Motion, the Debtors seek to continue the process to sell any portion, all, or substantially all of the Debtors' Assets by building upon the prepetition marketing process and expeditiously selling its Assets to the highest and best bidder(s) in a public Auction.

16.     The Debtors commenced these chapter 11 cases with committed postpetition financing granting the Debtors with runway to pursue a sale transaction while in bankruptcy but subject to timing milestones. Thus, time is of the essence. Pursuant to the DIP Credit Agreement setting forth the terms of the DIP Facility (both as defined in the DIP Order), the Debtors must satisfy certain milestones (the "DIP Milestones") for the sale of their Assets, including:

- any Bid Deadline (as defined below) must be no more than thirty-four (34) days from the Petition Date.

- the Bankruptcy Court shall have entered an order or orders approving the sale(s) of all or substantially all of the Debtors' Assets no later than forty-two (42) days from the Petition Date.

- the Sale Transaction must close no more than forty-nine (49) days from the Petition Date.

17.     Conducting a thorough yet expedited bidding process and consummating a Sale Transaction are vitally important to the Debtors' efforts to maximize value by selling the Assets. Failure to comply with the DIP Milestones would place the Debtors in default under the DIP Loan. Such a result can, and should, be avoided in order to provide the Debtors with the best chance to maximize the value of their estates through the sale of some or all of the Assets. Such a Sale

Transaction would benefit not only the Debtors, but their vendors, lenders, dedicated employees, and other key stakeholders, as well.

18.     The Bidding Procedures provide substantial flexibility with respect to the structure of any transaction(s). The Debtors will consider all viable options in accordance with the Bidding Procedures before determining if selling Assets will, in their business judgment, maximize value for the estates. Any delay would hinder the Debtors' efforts to maximize value. Additionally, the Bidding Procedures were heavily negotiated with the Stalking Horse Bidder and approval of the Bidding Procedures and the timeline therein is a condition to the Stalking Horse Bid. Accordingly, the proposed Bidding Procedures should be approved.

### Proposed Sale Process and Selection of Stalking Horse Bidder

**I.      The Bidding Procedures**

19.     The Debtors seek approval of the Bidding Procedures to establish an open process for the solicitation, receipt, and evaluation of Bids (as defined below) in a fair, accessible, and expeditious manner. Additionally, the Stalking Horse Bid is conditioned upon entry of the Bidding Procedures and the timelines set forth therein. The Bidding Procedures contemplate that all parties that execute confidentiality agreements in accordance with the Bidding Procedures will continue to have access to the virtual data room throughout the sale process.

20.     The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties in interest and any person or entity interested in purchasing the Assets (a "Potential Bidder") with the need to run an expeditious and efficient sale process or processes consistent with the DIP Milestones. The Bidding Procedures are designed to generate the highest or otherwise best available recoveries to the Debtors' stakeholders by encouraging prospective bidders to submit competitive, value-maximizing Bids. As set forth in the Campbell

8

Declaration, given the extensive marketing that has occurred prior to the Petition Date and the high level of interest in the Assets and number of parties that have been actively diligencing the Assets, the Debtors believe that the Bidding Procedures and the timeline set forth therein are in the best interests of the Debtors' estates, will establish the extent of the market for the Debtors' Assets, and provide interested parties with sufficient opportunity to participate. Because the Bidding Procedures are attached as Exhibit 1 to the Order, they are not restated in their entirety herein. Generally speaking, however, the Bidding Procedures establish the following, among other things:[3]

  a. **Public Announcement of Auction**. As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall (i) serve on the parties that receive notice of this Motion, including the Consultation Parties (as defined in the Bidding Procedures), a notice (A) setting forth (I) the date, time, and place of the (a) Auction and (b) the Sale Hearing (as defined below) and (II) the deadlines and procedures for objecting to the proposed Sale Transaction(s), (B) the Bidding Procedures Order and the Bidding Procedures in the form attached to the Bidding Procedures as Schedule 1 (the "Auction Notice"), (ii) publish the Auction Notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times (National Edition)*, *The Seattle Times*, and *The Columbian*, to provide notice to any other potential interested parties, and (iii) post the Auction Notice on their case website, https://dm.epiq11.com/Bowflex. The Auction Notice shall include a complete list and general description of the Assets for sale.

   *See* Bid. Proc., at § II.

  b. **Potential Bidder Qualifications**. Each Potential Bidder must deliver or have previously delivered to the Debtors the following preliminary documentation:

   1. an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance acceptable to the Debtors;

---

[3] This summary is provided in accordance with Local Rule 6004-2(b) and for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Bidding Procedures, the Bidding Procedures govern in all respects.

2. sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close a purchase of any portion, all, or substantially all of the Debtors' Assets, the adequacy of which must be acceptable to the Debtors, in consultation with the Consultation Parties; and

3. a statement detailing whether the Potential Bidder is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

*See* Bid. Proc., at § III.

c.  **Qualified Bid Requirements**. To participate in the Auction, Potential Bidders that have submitted necessary and acceptable documentation (each, an "<u>Acceptable Bidder</u>") must submit to the Debtors and their advisors an irrevocable offer for the purchase of some or all of the Assets (each, a "<u>Bid</u>") meeting the criteria set forth in the Bidding Procedures prior to the Bid Deadline, (each, a "<u>Qualified Bid</u>"), including:

1. (a) the particular Assets, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt and cure costs to be assumed; and (c) as applicable, whether the Acceptable Bidder intends to operate the Debtors' business as a going concern or to liquidate the business;

2. cash deposit in an amount equal to 10% of the aggregate purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "<u>Good Faith Deposit</u>"). To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals 10% of the increased aggregate purchase price promptly and in no event later than one (1) business day following the conclusion of the Auction;

3. the Bid must (a) clearly set forth the purchase price to be paid, assuming a purchase of the applicable Assets and any assumption of liabilities (the "<u>Purchase Price</u>"), (b) identify separately the cash and non-cash components of the Purchase Price, and (c) indicate the allocation of the Purchase Price among the applicable Assets; *provided* that, for the avoidance of doubt, such allocation shall not prejudice the rights of any party in interest to contest such allocation. The Purchase Price should be a single point value in U.S. Dollars for the applicable Assets on a cash-free, debt-free basis. Any Bid for

substantially all of the Assets must also include a statement as to whether the Bid is conditioned on purchasing all Assets or whether the Qualified Bid should be viewed as a separate Bid for one or more sets of Assets;

4.  to the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtors' satisfaction, in consultation with the Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale Transaction and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors;

5.  each Bid must include duly executed and non-contingent, where applicable, transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents"). The Bid Documents shall include: (a) a form of asset purchase agreement, (b) a schedule of contracts and leases to be assumed to the extent applicable to the Bid, (c) with respect to the purchase agreement, a redline of such agreement marked to reflect the amendments and modifications made to the form of the Stalking Horse Agreement to the Bidding Procedures as Schedule 2, (d) any other material documents integral to such Bid, and (e) a statement from the Acceptable Bidder that (i) it is prepared to enter into and consummate the transactions contemplated in the form purchase agreement, no later than five (5) business days after the conclusion of the Auction, subject to any necessary regulatory approvals, as specified by the Acceptable Bidder (or, if no Auction is held, the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline")) and (ii) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or next highest or otherwise best Bid (the "Back-Up Bid") until the consummation of the Sale Transaction;

6.  the Bid must indicate whether the Acceptable Bidder intends to hire all employees who are primarily employed in connection with the applicable Assets included in such Bid. If the Acceptable Bidder does not intend to hire all employees who are primarily employed in connection with the applicable Assets included in such Bid, the

Acceptable Bidder must include a description of the Acceptable Bidder's intentions with respect to the relevant members of the Debtors' current management team and other employees who are primarily employed in connection with the applicable Assets, and a description of any contemplated incentive plan, to the extent applicable;

7. evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid;

8. acknowledgement in writing (a) that it has not engaged in any collusion with respect to any Bids or the Sale Transaction, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price; and (b) agreeing not to engage in any collusion with respect to any Bids, the Auction, or the Sale Transaction. For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent, in consultation with the Consultation Parties (email shall suffice);

9. the Bid includes a statement that in the event a Bid is chosen as the Back-Up Bid (as defined below), it shall remain irrevocable until the Debtors and the Successful Bidder consummate the applicable Sale Transaction;

10. providing that the Acceptable Bidder will serve as a back-up bidder (the "Back-Up Bidder") if the Acceptable Bidder's Bid is the next highest or otherwise best Bid (the "Back-Up Bid");

11. each Bid must (i) identify any executory contracts (the "Executory Contracts") and any unexpired leases (the "Unexpired Leases" and with the Executory Contracts, the "Contracts") to be assumed or assumed and assigned in connection with the proposed Sale Transaction, (ii) provide for the payment of all cure amounts (the "Cure Amounts") related to such Executory Contracts and Unexpired Leases by the Acceptable Bidder, (iii) demonstrate, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, that the Acceptable Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code; and

12

> 12. submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Plan, the Sale documents, and the closing of the Sale Transaction, as applicable.

*See* Bid. Proc., at § IV.

**d.    Stalking Horse Bid Protections**. Pursuant to the Stalking Horse Agreement, the Debtors are authorized to select the Stalking Horse Bidder in connection with the Auction, and in connection with the Auction, and provide a break-up fee of three and a half percent (3.5%) of the proposed Purchase Price (the "Break-Up Fee") and agree to reimburse the reasonable and documented out of pocket fees and expenses, subject to a cap of $ 600,000 (the "Expense Reimbursement"). No other bidder at the Auction shall be entitled to any bid protections.

*See* Bid. Proc., at § IX.

21. Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize value, and, as such, do not impair the Debtors' ability to consider all Qualified Bid proposals, and preserve the Debtors' right to modify, in consultation with the Consultation Parties, the Bidding Procedures in accordance with its terms as necessary or appropriate to maximize value for their estates.

### The Stalking Horse Agreement and Bid Protections

22. Following arm's-length and good faith negotiations, the Debtors and the Stalking Horse Bidder have agreed upon the Stalking Horse Agreement, including the Stalking Horse Bid Protections, whereby the Stalking Horse Bidder will purchase the Assets. A true and correct copy of the Stalking Horse Agreement is attached hereto as **Exhibit B**. The Debtors submit that the Stalking Horse Agreement promotes competitive bidding and maximize value by establishing a baseline bid for the Assets, which is subject to higher or otherwise better offers at the Auction.

23. The material terms of the Stalking Horse Agreement as summarized in the following table:[4]

| Summary of Stalking Horse Agreement | |
|---|---|
| **Parties**<br><br>*See* **Preamble** | <u>Seller</u>: BowFlex Inc.<br><br><u>Purchaser</u>: Johnson Health Tech Retail, Inc. |
| **Purchase Price**<br><br>**Local Bankr. R. 6004-1(b)(iv)(N)** | The aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) subject to adjustment pursuant to Section 2.5, a cash payment of $37,500,000 (the "<u>Closing Cash</u>"). |
| **Acquired Assets**<br><br>*See* §§ 1.1, 2.1 | "<u>Acquired Assets</u>" means each Seller's United States and foreign assets as specified on <u>Schedule A</u> attached to the Stalking Horse Agreement. The Acquired Assets shall include all of Seller's right, title, and interest in:<br><br>(a)    all Contracts, agreements, licenses, leases, warranties, commitments, and purchase and sale orders with respect to personal property, Intellectual Property, real property or otherwise (collectively, "Executory Contracts and Unexpired Leases"), solely to the extent that such Executory Contracts and Unexpired Leases are listed on <u>Schedule 2.1</u> as designated by Purchaser to be assumed and assigned on the Closing Date in accordance with the Bidding Procedures Order and provided further that Purchaser shall have provided adequate assurance of future performance under Section 365(b)(1)(C) of the Bankruptcy Code with respect to any designated contract (collectively, "<u>Assigned Contracts</u>"), together with the right to receive income in respect of such Assigned Contracts on and after the Closing Date, and any causes of action which may be brought by Seller relating to past or current breaches of the Assigned Contracts; and |

---

[4]    The following summary is provided for convenience only. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meaning ascribed to such terms in the Stalking Horse Agreement attached to the Bidding Procedures Order as Exhibit _. To the extent any of the terms below are inconsistent with the Stalking Horse Agreement, the Stalking Horse Agreement shall control in all respects.

| | |
|---|---|
| | (b)      the IP Maintenance Capital.<br><br>. |
| **Assumption of Certain Liabilities** | Upon the terms and subject to the conditions set forth herein, at the Closing, Purchaser shall assume and shall timely perform and discharge in accordance with their respective terms, solely:  (a) all Liabilities and Cure Amounts with respect to the Assigned Contracts, (b) all Liabilities (including for any Tax) that arise on and after the Closing Date with respect to Purchaser's operation of the Business or ownership or operation of the Acquired Assets on and after the Closing Date, and (c) the Pro Rata Expenses (collectively "Assumed Liabilities"). |
| **Excluded Assets**<br><br>*See* § 2.2 | Notwithstanding the provisions of Section 2.1 or any other provision of the Stalking Horse Agreement, the Acquired Assets do not include, and Seller shall not transfer to Purchaser any of the following assets, properties, rights, interests, benefits, and privileges (collectively, the "Excluded Assets"):<br><br>(a)      all cash, bank deposits, securities and cash equivalents, including for this purpose, all cash and cash equivalents if credited to Seller's bank accounts prior to or on the Closing Date, other than the IP Maintenance Capital;<br><br>(b)      all Executory Contracts and Unexpired Leases and the rights associated therewith other than Assigned Contracts;<br><br>(c)      all corporate minute books and records of internal corporate proceedings, stock transfer ledgers, blank stock certificates, corporate seals, tax and accounting records, work papers and other records relating to the organization or maintenance of the legal existence of Seller;<br><br>(d)      any books, records or other information related solely and exclusively to the Excluded Assets;<br><br>(e)      all records that Seller is required by law to retain;<br><br>(f)      all refunds or credits or deposits of Taxes receivable by Sellers with respect to any Pre-Closing Tax Period, including without limitation any refunds, credits or deposits of Taxes arising as a result of Sellers' operation of the Business or ownership, operation, utilization or |

<table>
<tr>
<td></td>
<td>maintenance of the Acquired Assets prior to the Closing Date;</td>
</tr>
</table>

|  | (g) | all Estate Causes of Action, which shall mean any avoidance or recovery action that belongs to or could have been raised by the Debtor or the debtor-in-possession or its Estate under Article 5 of the Bankruptcy Code; and any and all causes of action, defenses, and counterclaims accruing to the Debtor or that is property of its Estate, based upon facts, circumstances and transactions that occurred prior to the Closing Date, except for (i) Estate Causes of Action that relate to an Assigned Contract or as designated in writing by Purchaser two Business Days prior to the Auction date, and (ii) causes of action, defenses and counterclaims arising from breaches of warranty relating to the Acquired Assets; |
|---|---|---|
|  | (h) | D&O Claims; |
|  | (i) | all equity interests, or interests convertible into or exchangeable for equity interests, held by Seller (including with respect to subsidiaries); |
|  | (j) | all claims, cause(s) of action and benefits related to any and all employment agreement(s), Employee Benefit Plans and any arrangement(s) in respect of the foregoing of whatever nature, and including cash and equity; |
|  | (k) | all assets related to any Employee Benefit Plan; and |
|  | (l) | all assets, properties and rights identified on <u>Schedule 2.2(l)</u> of the Stalking Horse Agreement. |
| **Excluded Liabilities**<br><br>*See* § 2.4 |  | Purchaser, by its execution and delivery of the Stalking Horse Agreement and the Ancillary Agreements and its performance of the transactions contemplated by the Stalking Horse Agreement and the Ancillary Agreements (the "<u>Transactions</u>"), shall not assume or otherwise be responsible for any Liability other than the Assumed Liabilities. For clarification, the following Liabilities shall be excluded, without limitation:  (a) all post-petition accounts payable and accrued post-petition expenses of Seller for work done in the ordinary course of Business (excluding any expenses incurred with respect to the administration of the Bankruptcy Case) which would qualify as administrative priority expenses under Section 503(b) of the Bankruptcy Code, (b) all Liabilities with respect to Employee Benefit Plans, (c) all Liabilities for wages, compensation, bonuses, |

| | |
|---|---|
| | deferred compensation, overtime, profit sharing benefits workers' compensation, 401(k) matching, sick pay, vacation, personal days and severance benefits for Transferred Employees for periods of service occurring prior to the Closing Date, (d) all Liabilities with respect to Assumed Trade Payables, and (e) all third party litigation expenses, settlement costs and attorneys' fees of the Seller that arise from or related to its shareholders, employees, suppliers, customers, other bidder(s) and/or government authorities. |
| **Good Faith Deposit**<br><br>**Local Bankr. R. 6004-1(b)(iv)(F)**<br><br>*See* § 2.6 | Purchaser (or its affiliate) shall deposit with an escrow agent satisfactory to Purchaser (the "Escrow Agent") $3,750,000 Dollars, representing ten percent (10%) of the Closing Cash (the "Deposit"), by wire transfer which shall be held in escrow pursuant to the Bidding Procedures Order. Purchaser shall enter into an escrow agreement in such form and substance as shall be reasonably agreed upon by Seller, Purchaser, and the Escrow Agent. The Deposit shall be credited against the Closing Cash at the Closing if Purchaser is the Successful Bidder for the Acquired Assets. If the Stalking Horse Agreement is terminated, then the Deposit shall be forfeited to Seller as liquidated damages, or returned to Purchaser, as applicable, as provided in Article VII of the Stalking Horse Agreement.<br><br>Pursuant to Section 7.1, the Stalking Horse Agreement may be terminated: (a) by mutual consent of Purchaser and Seller; (b) by Seller or Purchaser in the event the Closing has not occurred on or before 49 days after filing of the Bankruptcy Petition; (c) by Seller if, incident to the Bidding Procedures Order, Seller accepts and closes on a competing bid for the purchase of all or part of the Acquired Assets; (d) by Purchaser if (i) the US Seller consummates a sale of all or part of the Acquired Assets to a Third Party other than Purchaser, or (ii) the US Seller's Bankruptcy Case is dismissed or converted to one under Chapter 7 of the Bankruptcy Code; or (e) by the non-breaching party upon a material breach of any provision of the Stalking Horse Agreement; provided that such breach has not been waived by the non-breaching party and has continued after notice to the breaching party by the non-breaching party, without cure for a period of three (3) Business Days (provided that the non-breaching party shall have an immediate right to terminate if the breaching party has willfully breached any provision of the Stalking Horse Agreement, which such breach is not cured).<br><br>If the Stalking Horse Agreement is terminated pursuant to Section 7.1, (a) Purchaser shall have no Liability or obligations under the Stalking Horse Agreement except for the forfeiture of the Deposit on the terms and conditions set forth in Section 7.3 of the Stalking Horse |

|  | Agreement, and (b) Seller shall have no Liabilities under this Agreement; provided, however, that the obligations in Section 8.2 of the Stalking Horse Agreement shall survive.<br><br>If Seller terminates the Stalking Horse Agreement pursuant to Section 7.1(b) (solely due to Purchaser's inability or refusal to pay the Closing Cash) or (e), then the Deposit shall be forfeited to Seller. If the Stalking Horse Agreement is terminated pursuant to Section 7.1(a), (b), (c) or for any other reason, the Deposit shall be returned to Purchaser. |
|---|---|
| **Sell Free and Clear**<br><br>**Local Bankr. R. 6004-1(b)(iv)(M)**<br><br>*See* § 2.1 | Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the proposed Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances |
| **Tax Exemption**<br><br>**Local Bankr. R. 6004-1(b)(iv)(I)**<br><br>*See* § 6.9 | All sales, use, transfer, stamp, conveyance, value added, or other similar Taxes, duties, excises or governmental charges imposed by any Tax authority, domestic or foreign, and all recording or filing fees, notarial fees and other similar costs of Closing ("Transfer Taxes") will be borne by Purchaser and the Purchase Price is exclusive of Transfer Taxes. All unpaid Pre-Closing Taxes shall be borne by the Seller. If any Seller is required by Law to collect any Transfer Taxes from Purchaser, Purchaser shall pay such Transfer Taxes to the applicable Seller concurrent with the payment of any amount payable pursuant to this Agreement. The applicable Seller shall remit all Transfer Taxes to the relevant Governmental Body in accordance with applicable Law.  If Purchaser is required to collect any Transfer Taxes from either Seller or such Seller has not paid any Transfer Taxes it is obligated to pay, such Seller shall pay such Transfer Taxes to the Purchaser concurrent with the payment of any amount payable pursuant to this Agreement, or Purchaser may deduct such Transfer Taxes from the Closing Cash (the "Sellers' Transfer Tax Reimbursement"). |
| **Representations and Warranties of Sellers**<br><br>*See* § Art. IV | The Stalking Horse Agreement contains customary representations and warranties, including, but not limited to, representations of Sellers regarding: (a) organization and qualification; (b) authorization of agreement; (c) conflicts and consents; (d) contracts; (e) litigation; (f) permits and compliance with laws; (g) intellectual property; and (l) title to property. |

| | |
|---|---|
| **Representations and Warranties of Purchaser**<br><br>*See* **Art. V** | The Stalking Horse Agreement contains customary representations and warranties, including, but not limited to, representations of the Purchaser regarding: (a) organization and qualification; (b) authorization of agreement; (c) conflicts and consents; and (d) financial ability. |
| **Transferred Employees**<br><br>*See* § 6.8 | Purchaser reserves the right to make offers of employment with or to provide consulting services to Purchaser or an affiliate of Purchaser to certain employees of Seller, effective only as of the Closing, and subject to certain rights of the Purchaser (such employees who are hired or retained by Purchaser or an affiliate, the "<u>Transferred Employees</u>").<br><br>Seller shall terminate the employment of all Transferred Employees as of immediately prior to the Closing and reasonably assist Purchaser in effecting the change of employment or service of the Transferred Employees as of the Closing in an orderly fashion. Purchaser's obligations under this Agreement are not conditioned upon any particular employees agreeing to employment with or to provide consulting services to Purchaser. All claims and liabilities, of whatever nature, arising from any relationship between the Seller (and its affiliates), on the one hand, and any of the Transferred Employees, on the other hand, including any unpaid compensation and several obligations, shall be the sole responsibility of the Seller |
| **Releases** | Effective as of the Closing, the Seller, on behalf of itself, its Affiliates and each of their respective successors and assigns (each of the foregoing, a "<u>Seller Releasing Party</u>"), shall fully, irrevocably and unconditionally release and forever discharge Purchaser and its respective past and present directors, managers, officers, employees, agents, stockholders, members, representatives and Affiliates from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, any and all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity, whether existing as of the Closing or arising thereafter, that a Seller Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date.<br><br>Effective as of the Closing, Purchaser, on behalf of itself, its Affiliates and each of their respective successors and assigns (each |

| | |
|---|---|
| | of the foregoing, a "<u>Purchaser Releasing Party</u>"), shall fully, irrevocably and unconditionally release and forever discharge the Seller, the Seller's Affiliates and its and their respective past and present directors, managers, officers, agents, stockholders, members, representatives and Affiliates from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity, whether existing as of the Closing or arising thereafter, that a Purchaser Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date. |
| **Record Retention** | From the Closing Date through and including the seventh (7th) anniversary of the Closing Date, Purchaser shall grant Sellers, the Trustee, and their respective representatives reasonable access to the books and records transferred to Purchaser pursuant to the Stalking Horse Agreement during regular business hours and upon reasonable notice for the purpose of allowing Sellers or its successors, the Trustee or their respective representatives to perform the duties necessary for the liquidation of the Debtor's Estate, in the case of the US Seller, or of the remaining assets of the Foreign Seller, in the case of the Foreign Seller. |
| **Successor Liability**<br><br>**Local Bankr. R. 6004-1(b)(iv)(L)**<br><br>*See* § 2.1 | Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the proposed Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Liens other than Permitted Liens. |

24.     As set forth above, the Stalking Horse Agreement contains certain key provisions, each of which were specifically negotiated by the Stalking Horse Bidder and which are a condition required by the Stalking Horse Bidder for the deal. The Stalking Horse Agreement contains (a) a provision for reimbursement of reasonable and documented fees and expenses of the Stalking

Horse Bidder (the "Purchaser Expense Reimbursement"), subject to a cap of $600,000, and (b) the Break-Up Fee (together with the Purchaser Expense Reimbursement, the "Stalking Horse Bid Protections"), payable in the event that, under certain circumstances, an Alternative Transaction (as defined in the Stalking Horse Agreement) is consummated. Based on the marketing process and arm's-length negotiations between the Debtors and the Stalking Horse Bidder, the Debtors determined that the key provisions set forth above, including the Stalking Horse Bid Protections, were necessary to secure the Stalking Horse Bidder's commitment to the consummation of the Sale Transaction according to the terms of the Stalking Horse Agreement. Further, the payment of the Stalking Horse Bid Protections will not diminish the Debtors' estates as any competing bid must exceed the bid set forth in the Stalking Horse Agreement by an amount that exceeds the sum of the Break-Up Fee and Purchaser Expense Reimbursement, increasing the ultimate value of the sale to the benefit of the Debtors' stakeholders and parties in interest.

25. The Debtors submit that the terms set forth above and in the Stalking Horse Agreement are the result of extensive, good-faith, arm's-length negotiations, and the Stalking Horse Agreement is currently the highest and best proposal. Accordingly, the Debtors' proposed entry into the Stalking Horse Agreement is in the best interest of the Debtors' estates, constitutes a sound exercise of the Debtors' business judgment, and should be approved.

**II.  The Sale and Auction Dates and Deadlines Schedules.**

26. The Debtors are seeking approval of the Bidding Procedures and the following proposed timeline for the sale process (the dates set forth below, respectively, the "Sale Schedule") to establish a clear and open process for the solicitation, receipt, and evaluation of third-party Bids on a timeline that allows the Debtors to consummate a Sale Transaction. Moreover, the Debtors, in their sound business judgment, reserve the right, in consultation with the Consultation Parties

to alter the timing of the Sale Schedule as necessary under the circumstances, or to conduct

multiple Sale Transactions across one or more Auctions in order to maximize the value of the

estates, in each case in accordance with the Bidding Procedures. The Debtors respectfully request

that the Court approve the Sale Schedule.

### The Sale Schedule

| Action | Description | Deadline |
|---|---|---|
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures. | April 6, 2024 at 12:00 p.m. prevailing Eastern Time. |
| Auction | The date and time of the Auction, if one is needed, which will be held at the offices of Sidley Austin, LLP, 787 Seventh Avenue New York, New York 10019. | April 8, 2024 at 10:00 a.m. prevailing Eastern Time, if needed. |
| Notice of Successful Bidder | As soon as reasonably practicable after the conclusion of the Auction, the Debtors will file on the docket, but not serve, a notice identifying the Successful Bidder (as defined in the Bidding Procedures) (the "Notice of Successful Bidder"), identifying the applicable Successful Bidder, Assets, and key terms of the agreement. | As soon as reasonably practicable after the conclusion of the Auction (if necessary). |
| Assumption and Assignment Service Deadline | The deadline by which the Debtors shall serve the contract assumption notice informing each recipient of the timing and procedures relating to such assumption and assignment. | Within three (3) business days from the entry of the Bidding Procedures Order. |
| Cure Amounts Objection Deadline | The deadline by which objections, if any, to the proposed assumption and assignment or the proposed | At 4:00 p.m. prevailing Eastern Time on the date that is fourteen (14) days after the |

| Action | Description | Deadline |
|---|---|---|
| | Cure Payment (as defined in the Bidding Procedures) must be received. | Assumption and Assignment Service Deadline. |
| Sale Objection Deadline | The deadline by which objections, if any, to the Sale must be received. | April 9, 2024 at 4:00 p.m. prevailing Eastern Time. |
| Sale Hearing | The hearing before the Court to consider approval of the winning Bid or Bids, pursuant to which the Debtors and the Successful Bidder or Successful Bidders will consummate the Sale. | April 15, 2024 at 10:00 a.m. prevailing Eastern Time, or as soon thereafter as the Debtors may be heard. |

27.     The timelines contemplated in the foregoing Sale Schedule are essential to maximize value for the Debtors' estates. The Debtors believe that the relief sought by this Motion appropriately balances the need to provide all parties in interest with notice and due process, affords the Debtors sufficient time to generate interest in any or all of the Assets, and provides the Debtors with an expeditious process commensurate with the Debtors' liquidity constraints and DIP Milestones. In short, the relief sought by this Motion is the Debtors' best chance to preserve and maximize value to stakeholders. Accordingly, the Debtors believe the relief requested herein is in the best interest of the Debtors' estates, will provide interested parties with sufficient opportunity to participate in the process, and, therefore, should be approved.

### III.    Form and Manner of Auction Notice.

28.     The Auction, if needed, will be held on April 8, 2024 at 10:00 a.m. prevailing Eastern Time (or such other date as selected by the Debtors) at the offices of the proposed co-counsel to the Debtors: Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019.

29.     As soon as practicable after entry of the Order, the Debtors will cause the Auction Notice to be served on the parties that receive notice of this Motion. In addition, as soon as

practicable after entry of the Order, the Debtors will post the Auction Notice on their restructuring website, https://dm.epiq11.com/Bowflex and publish the Auction Notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times* (National Edition), *The Seattle Times*, and *The Columbian*, to provide notice to any other potential interested parties. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

30.     The Auction Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale Transaction, including the date, time, and place of the Auction (if any), the Bidding Procedures, and the dates and deadlines related thereto. Accordingly, the Debtors request that the form and manner of the Auction Notice be approved and no other or further notice of the Auction be required.

## Basis for Relief

### I.     The Relief Sought in the Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.

31.     "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold." John J. Jerome & Robert D. Drain, Bankruptcy Court is Newest Arena for M&A Action, N.Y.L.J., June 3, 1991; *see In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Adams Res. Expl. Corp.*, No. 17-10866, 2017 WL 5493616, at *1 (Bankr. D. Del. May 24, 2017) ("The Sale Procedures are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtor's estates under the circumstances of this case."). In furtherance of that goal, bidding procedures and bid protections, such as those proposed here, may be used in court-supervised asset

sales because they streamline the acquisition process, "help to provide an adequate basis by which to compare offers," and maximize value. Jerome & Drain (1991) at 8, col. 4; *see In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) (recognizing that bid protections "encourage a prospective bidder to do the due diligence that is the prerequisite to any bid by assuring the prospective bidder that it will receive compensation for that undertaking if it is unsuccessful"); *In re Dura Automotive Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) (recognizing that bidding procedures "intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales"); *Off. Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures and bid protections "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Metaldyne Corp.,* 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("[b]idder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer"). In overseeing an asset sale subject to an auction process, the bankruptcy court must weigh:

> on the one hand, providing for an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the bankrupt estate.

*In re Fin. News Network, Inc.*, 980 F.2d 165, 166 (2d Cir. 1992). Because the bankruptcy court must perform this balancing act, "a bankruptcy judge's broad discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly followed" that

"reduce the broad discretion and flexibility a bankruptcy court must necessarily have to enhance the value of the estates before it." *Id.* at 169–70; *see Dura Automotive*, 2007 WL 7728109, at *90 ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.").

32.     Here, the Debtors submit that the Bidding Procedures are a valid exercise of their business judgment, fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this circuit, and in the best interest of their estates. Courts have consistently held that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale, or lease of property of the estate under Section 363, courts require the [debtor] to show that a sound business purpose justifies such actions.' If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991)); *Schipper*, 933 F.2d at 515 ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ." (internal citations and quotations omitted)); *see Integrated Res.*, 147 B.R. at 656 (applying business judgment rule to bidding procedures and incentives and noting that "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence").

33.     The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will maximize the value of their Assets for the benefit of the Debtors' estates. The proposed Bidding Procedures will allow the Debtors to conduct any Sale Transactions in a controlled, fair, and open fashion that will encourage participation by

financially capable bidders who can demonstrate the ability to close a Sale Transaction. In particular, the Bidding Procedures contemplate an open and public marketing process with minimum barriers to entry and provide Potential Bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed Bid. In addition, the Order provides that the Debtors may alter the Sale Schedule and/or run multiple Auctions as necessary, thereby preserving the Debtors' ability to run a tailored, value-maximizing process for any particular group of Assets.

34.    Approval of bidding procedures following first-day hearings shortly after the petition date has been approved on many occasions by courts in this district where the debtors have demonstrated that such approval maximizes estate value. *See, e.g.*, *In re Invitae Corporation*, No. 24-11362 (MBK) (Bankr. D.N.J. Feb. 16, 2024); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 18, 2023); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. April 25, 2023); *In re David's Bridal, LLC*¸ No. 23-13131 (CMG) (Bankr. D.N.J. April 17, 2023); *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. July 13, 2020).

35.    Accordingly, the Debtors respectfully submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings in bankruptcy proceedings, and are consistent with the controlling legal standard in the Third Circuit. Accordingly, the Debtors request that the Court approve the Bidding Procedures as a valid exercise of the Debtors' business judgment.

II.    **Entry Into the Stalking Horse Agreement and the Bid Protections Have a Sound Business Purpose and Should Be Approved.**

36.    The Debtors seek authority to enter into the Stalking Horse Agreement and offer customary bid protections, consisting of the Break-Up Fee and Expense Reimbursement. The use

of a stalking horse in a public auction process for the sale of a debtor's assets is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitate[ing] a realization of that value." *Off. Comm. Of Unsecured Creditors v. Interforum Holding LLC*, No. 11-CV-219, 2011 WL 2671254, at *1 (E.D. Wis. July 7, 2011).

37.     Generally, bidding protections, such as break-up fees, are a normal and, in many cases, necessary component of significant sales under the Bankruptcy Code. *See Integrated Res.*, 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. . .. In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value.") (emphasis added). As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate." (internal quotations omitted) (alterations in original)); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *O'Brien*, 181 F.3d 527. The Debtors believe that the allowance of the Stalking Horse Bid Protections are in the best interests of the Debtors' estates and their creditors, as a Stalking Horse Bidder, if designated, will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates.

38.     In the Third Circuit, bidding protections, such as those proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313 (citing *O'Brien*, 181 F.3d at 535); *Reliant Energy*, 594 F.3d at 206

(holding that the general standard used for all administrative expenses applies to break-up fees). Thus, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (quoting *O'Brien*, 181 F.3d at 535) (internal quotations omitted).

39.    Courts in this district have routinely approved break-up fees and/or expense reimbursements offered to stalking horse bidders. *See, e.g.*, *In re Alliant Techs., L.L.C.*, No. 21-19748 (JKS) (Bankr. D.N.J. Jan. 21, 2022) [Docket No. 101] (approving bidding procedures and bidding protections including an expense reimbursement payable to the stalking horse bidder); *In re RTW Retailwinds, Inc.*, No. 20-18445 (JKS) (Bankr. D.N.J. Aug. 8, 2020) [Docket No. 192] (approving bidding procedures and bidding protections including a break-up fee payable to the stalking horse bidder); *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. July 13, 2020) [Docket No. 72] (same); *In re New England Motor Freight, Inc.*, No. 19-12809 (JKS) (Bankr. D.N.J. April 8, 2019) [Docket No. 427] (same); *in re Aceto Corp.*, No. 19-13448 (VFP) (Bankr. D.N.J. Mar. 19, 2019) [Docket No. 174] (same).

40.    Without the Stalking Horse Bid Protections, the Stalking Horse Bidder may elect not to participate in the process at all to the detriment of the Debtors' estates. The participation of the Stalking Horse Bidder is necessary to foster a competitive bidding process that will maximize the value of the Debtors' estates. In that instance, the value created for the Debtors' estates will likely greatly outweigh the cost of any Stalking Horse Bid Protections. Moreover, granting the Debtors authority to enter into the Stalking Horse Agreement and provide the Stalking Horse Bid Protections sends a strong signal to the market that the Debtors are serious about running a competitive sale process to generate the best result for the Debtors and their estates.

29

41.    The Stalking Horse Bid Protections are within market for transactions of this type, and which has been routinely approved by courts in this district. *See, e.g.*, *In re RTW Retailwinds, Inc.*, No. 20-18445 (JKS) (Bankr. D.N.J. Aug. 8, 2020) [Docket No. 192] (approving break-up fee of up to three percent of the proposed purchase price); *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. July 13, 2020) [Docket No. 72] (same); *In re New England Motor Freight, Inc.*, No. 19-12809 (JKS) (Bankr. D.N.J. April 8, 2019) [Docket No. 427] (same); *In re Aceto Corp.*, No. 19-13448 (VFP) (Bankr. D.N.J. Mar. 19, 2019) [Docket No. 174] (approving break-up fee of up to two percent of the cash component of the proposed purchase price); *In re East Orange Gen. Hosp.*, No. 15-31232 (VFP) (Bankr. D.N.J. Dec. 15, 2015) [Docket No. 171] (approving break-up fee of approximately four percent of the proposed aggregate consideration).

42.    Accordingly, for the reasons set forth above, the Debtors respectfully submit that the Court grant the Debtors the authority to enter into the Stalking Horse Agreement and incur and pay the Stalking Horse Bid Protections in order to preserve the value of the Debtors' estates.

**III.    The Form and Manner of Notice Should Be Approved.**

43.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Auction. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the deadline for filing any objections to such a sale.

44.    As soon as reasonably practicable following entry of the Order, the Debtors will cause the Auction Notice to be served upon (a) the United States Attorney's Office for the District of New Jersey, (b) the Internal Revenue Service, (c) the attorneys general for the states in which the Debtors operate, (d) any parties known or reasonably believed to have expressed an interest in the Debtors' Assets, (e) all entities known or reasonably believed to have asserted a lien,

encumbrance, claim, or other interest in or on any of the Debtors' Assets, and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002.

45.     The Debtors submit that the Auction Notice constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, no further notice is necessary and the Debtors request that this Court approve the form and manner of the notice of the Auction Notice.

## IV.    The Assumption and Assignment Procedures Are Appropriate and Should be Approved.

46.     As set forth above, the Sale Transaction contemplates the assumption and assignment of Executory Contracts and Unexpired Leases to the Successful Bidder. In connection with this process, the Debtors believe it is necessary to establish Assumption and Assignment Procedures by which: (a) the Debtors and Contract Counterparties (as defined below) can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of the Contracts and/or related cure payments (the "Assumption and Assignment Procedures"). As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure payments identified in the Contract Assumption Notice (as defined below). *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *In re Boy Scouts of Am.*, 642 BR 504, 569 (Bankr. D. Del. 2022) ("The lack of objection of a [creditor] is also consensual for purposes of § 363 and,

again, permissible under § 363(f)(2).”); *In re Christ Hosp.*, No. CIV.A. 14-472 ES, 2014 WL

4613316, at *14 (D.N.J. Sept. 12, 2014) (same); *In re Congoleum Corp.*, No. 03-51524, 2007 WL

1428477, at * 1 (Bankr. D.N.J. May 11, 2007) (same); *Pelican Homestead v. Wooten (In re Gabel)*,

61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

47.    The Debtors believe that the Assumption and Assignment Procedures are fair and

reasonable, provide sufficient notice to parties to the Contracts, and provide certainty to all parties

in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors

request the Court approve the Assumption and Assignment Procedures set forth in the Bidding

Procedures Order.

## V.    The Sale Transaction Should be Approved as an Exercise of Sound Business Judgment.

48.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, “after notice and

a hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate.” 11 U.S.C. § 363(b)(1). A sale of a debtor’s assets should be authorized pursuant to section

363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See,

e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) (“Under Section 363, the debtor in possession

can sell property of the estate . . . if he has an ‘articulated business justification’ . . ..”); *see also In

re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm, of Equity Sec. Holders v. Lionel

Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc’s, Inc.*,

179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

49.    Once the Debtors articulate a valid business justification, “[t]he business judgment

rule ‘is a presumption that in making the business decision the directors of a corporation acted on

an informed basis, in good faith, and in the honest belief that the action was in the best interests of

the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted);

*In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr.

29, 2014) ("If a valid business justification exists, then a strong presumption follows that the

agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations

omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16

(Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management

decisions").

50.     Generally, courts within the Third Circuit have applied four factors in determining

whether a sale of a debtor's assets should be approved: (a) whether a sound business purpose exists

for the sale; (b) whether the proposed sale price is fair; (c) whether the debtor has provided

adequate and reasonable notice; and (d) whether the buyer acted in good faith. *See In re Summit

Glob. Logistics, Inc.*, No. 08-11566, 2008 WL 819934, at *9 (Bankr. D.N.J. Mar. 26, 2008) (citing

In re Exaeris, Inc., 380 B.R. 741, 744 (Bankr. D. Del. 2008)); *see also In re Abbotts Dairies of

Pennsylvania, Inc.*, 788 F.2d 143, 149–50 (3d Cir. 1986) (noting that the element of "good faith"

is of particular importance in the Third Circuit); *In re Delaware & Hudson Ry.*, 124 B.R. 169, 176

(D. Del. 1991) ("Once a court is satisfied that there is a sound business reason or an emergency

justifying the pre-confirmation sale the court must also determine that the trustee has provided the

interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and

that the purchaser is proceeding in good faith.").

    **a.     A Sound Business Purpose Exists for the Sale.**

51.     Here, a sound business purpose exists for the Sale Transaction because the Debtors

believe that the Sale Transaction will maximize the value of their Assets, exposing them to the

market as part of a competitive, arms' length process. Consequently, the ultimately successful bid,

after being subject to a "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . [t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction."). Also, because any sale of the Debtors' Assets will likely contemplate the assumption of certain of the Debtors' Executory Contracts and Unexpired Leases, it will result in payment in full for a number of the Debtors' creditors.

52.     Thus, the Debtors submit that the Successful Bid will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into a purchase agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

**b.     Adequate and Reasonable Notice of the Auction and Sale Will be Provided.**

53.     The Auction Notice: (a) will be served in a manner that provides parties in interest notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale Transaction. Significantly, the form and manner of the Auction Notice will have been approved

34

by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served

on parties in interest.

<strong>c.      The Sale and Purchase Price Reflects a Fair Value Transactions.</strong>

54.     It is well-settled that, where there is a court-approved auction process, a full and

fair price is presumed to have been obtained for the assets sold, as the best way to determine value

is exposure to the market. *See Bank of Am. Nat 'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*,

526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL

1820326, *4 (Bankr. D. Del. 2001) (While a "section 363(b) sale transaction does not require an

auction procedure[,] [t]he auction procedure has developed over the years as an effective means

for producing an arm's length fair value transaction.").

55.     As noted above, prior to the Bid Deadline, FTICA will continue to market the

Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by

contacting previously solicited parties, continuing to provide Acceptable Bidders with data room

access and requested information, considering a variety of alternative transaction structures, and

otherwise assisting the Debtors with all efforts to increase transaction value. In this way, the

number of bidders that are eligible to participate in a competitive Auction process will be

maximized, or, if no Auction is held because no Auction is necessary the purchase price will,

conclusively, be deemed fair value.

<strong>d.      The Sale Transaction Has Been Proposed in Good Faith Without Collusion,
and the Successful Bidder Is a "Good-Faith Successful Bidder."</strong>

56.     The Debtors request that the Court find the Successful Bidder is entitled to the

benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with

the sale of Assets.

35

57.    Section 363(m) of the Bankruptcy Code provides in pertinent part:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

58.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made. *See, e.g.*, *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

59.    The Debtors submit that the Stalking Horse Bidder or any Successful Bidder(s), will be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse Agreement with the Stalking Horse Bidder is a good-faith, arms'-length

agreement entitled to the protections of section 363(m) of the Bankruptcy Code.[5] *First,* as detailed above, the consideration to be received by the Debtors from a Successful Bidder will be substantial, fair, and reasonable. *Second,* any sale agreement with a Successful Bidder will presumably be the culmination of a competitive Auction process in which all parties will be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. *Third,* at the Sale Hearing, the facts will demonstrate no "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code. And, with respect to Potential Bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. *Finally,* any Bids that the Debtors ultimately determine to be Successful Bids will have been evaluated and approved by the Debtors in consultation with their advisors. Accordingly, the Debtors believe that the Successful Bidder, if any, and any purchase agreement associated with a Successful Bid should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

   **e.    The Sale Transaction Should be Approved "Free and Clear" Under Section 363(f).**

   60.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale

---

[5]    The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder. Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures. In addition, the Debtors will not choose as the Successful Bidder or Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

61.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free and clear of all encumbrances, except with respect to any interests that may be assumed liabilities under the applicable purchase agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 354 (E.D. Pa. 1988) (holding that a sale "free and clear" may be approved provided the requirements of at least one subsection are met).

62.     The Debtors submit that any interest in the Assets that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors accordingly request authority to convey the Assets to the Successful Bidder, if any, free and clear of all encumbrances, with any such encumbrances to attach to the proceeds of the Sale Transaction.

**VI.     The Assumption and Assignment of the Contracts Should be Approved.**

     **a.     The Assumption and Assignment of the Executory Contracts and Unexpired Leases Reflects the Debtors' Reasonable Business Judgment.**

63.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the

defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject an Executory Contract or Unexpired Lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to section 365 of the Bankruptcy Code, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *In re S.A. Holding Co., LLC*, 357 B.R. 51, 56 (Bankr. D.N.J. 2006) (applying the business judgment test in determining whether to approve a contract rejection); *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002) ("Although the [Bankruptcy Code] does not provide the standard to be applied in determining the propriety of the [debtor's] decision [to assume or reject a contract], most Circuits, including the Third Circuit have adopted the business judgment test."); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard.")

64.    Here, the Court should approve the decision to assume and assign certain designated Executory Contracts and Unexpired Leases (the "Assumed Contracts") in connection with the Sale Transaction as a sound exercise of the Debtors' business judgment. *First,* certain of the Executory Contracts and Unexpired Leases are necessary to operate the Assets and, as such,

they are essential to inducing the best offer for the Assets. *Second,* it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the Executory Contracts and Unexpired Leases needed to manage the Debtors' day-to-day operations were included in the transaction. *Third,* the Stalking Horse Agreement and any asset purchase agreement submitted by Potential Bidder provides that the assumption and assignment of the Assumed Contracts is integral to, and inextricably integrated in, a proposed Sale. *Finally,* the Assumed Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

65.     Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

**b.      Defaults Under the Assumed Contracts Will Be Cured Through the Sale Transaction.**

66.     Upon finding that a debtor has exercised its business judgment in determining that assuming an Executory Contract or Unexpired Lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1988). Section 365 "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's

creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

67.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Stalking Horse Agreement and any asset purchase agreement submitted by Potential Bidder will require that the Debtors cure all defaults associated with, or that are required to properly assume, any Executory Contracts or Unexpired Leases. Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over cure payments or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of Executory Contract or Unexpired Lease counterparties (the "Contract Counterparties").

### c.     Contract Counterparties Will Be Adequately Assured of Future Performance.

68.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *Carlisle Homes*, 103 B.R. at 538 (internal citations omitted). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has

financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

69.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Successful Bidder will be satisfied. As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under any Contracts to be assumed) and will demonstrate such financial wherewithal, willingness, and ability to perform under any Contracts to be assumed and assigned to a Successful Bidder. Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Contracts or proposed cure payments. The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the any Executory Contract or Unexpired Lease to be assumed and assigned to any Successful Bidder.

## VII.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.

70.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

71.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

72.     To maximize the value received for the Assets, the Debtors seek to close the Sale Transaction as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Request of Waiver of Stay

73.     To the extent that the relief sought in the Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h). As explained herein, the relief requested in this Motion is immediately necessary for the Debtors to be able to continue to operate their business and preserve the value of their estates.

## Waiver of Memorandum of Law

74.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

**Reservation of Rights**

75.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the Motion are valid, and the rights of all parties are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to this Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**No Prior Request**

76.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

**Notice**

77.     The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the office of the United States Trustee for the District of New Jersey; (b) the Debtors' 30 largest unsecured creditors (on a consolidated basis); (c) counsel to

Stalking Horse Bidder; (d) counsel to Crystal Financial LLC d/b/a SLR Credit Solutions (the "DIP

Agent"); (e) the United States Attorney's Office for the District of New Jersey; (f) the Internal

Revenue Service; (g) the U.S. Securities and Exchange Commission; (h) the attorneys general in

the states where the Debtors conduct their business operations; and (i) any party that has requested

notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the

relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, in substantially the form submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: March 5, 2024

*/s/ Joseph J. DiPasquale*

**FOX ROTHSCHILD LLP**
Joseph J. DiPasquale, Esq.
Mark E. Hall, Esq.
Michael R. Herz, Esq.
49 Market Street
Morristown, NJ 07960
Telephone: (973) 992-4800
Facsimile: (973) 992-9125

jdipasquale@foxrothschild.com
mhall@foxrothschild.com
mherz@foxrothschild.com

**SIDLEY AUSTIN LLP**
Matthew A. Clemente (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
mclemente@sidley.com

*and*

Maegan Quejada (*pro hac vice* pending)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
mquejada@sidley.com

*and*

Michael A. Sabino (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
msabino@sidley.com

*Proposed Counsel for the Debtors and Debtors in Possession*