**SIDLEY AUSTIN LLP**
Matthew A. Clemente (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
mclemente@sidley.com

Maegan Quejada (*pro hac vice* pending)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
mquejada@sidley.com

Michael A. Sabino (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
msabino@sidley.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**FOX ROTHSCHILD LLP**
Joseph J. DiPasquale, Esq.
Mark E. Hall, Esq.
Michael R. Herz, Esq.
49 Market Street
Morristown, New Jersey 07960
Telephone: (973) 992-4800
Facsimile: (973) 992-9125
jdipasquale@foxrothschild.com
mhall@foxrothschild.com
mherz@foxrothschild.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BOWFLEX INC., *et al.*,[1] | Case No. 24-12364 (ABA) |
| Debtors. | (Joint Administration Requested) |

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: BowFlex Inc. (2667) and BowFlex New Jersey LLC (3679). The Debtors' service address is 17750 S.E. 6th Way, Vancouver, Washington 98683.

**DEBTORS' MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (A) AUTHORIZING
DEBTORS TO OBTAIN POSTPETITION FINANCING
AND GRANT SECURITY INTERESTS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c)
AND 364(d); (B) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C.
§ 362; (C) AUTHORIZING DEBTORS TO ENTER INTO AGREEMENTS
WITH CRYSTAL FINANCIAL LLC D/B/A SLR CREDIT SOLUTIONS;
(D) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; AND
(E) SCHEDULING A FINAL HEARING PURSUANT
TO BANKRUPTCY RULE 4001**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

BowFlex Inc. and its debtor affiliate, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), hereby submit this motion (this "**Motion**"),[2] under sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 506(c) (subject to entry of Final Financing Order (as defined below)), 507 and 552 of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 2002, 4001(c), 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 4001-1, 4001-2, 4001-3, 9013-1, 9013-2, 9013-4, and 9013-5 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local Rules**"), for entry of an interim order and a final order: (a) authorizing debtors to obtain postpetition financing and grant security interests and superpriority administrative expense status pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (b) modifying the automatic stay pursuant to 11 U.S.C. § 362; (c) authorizing debtors to enter into agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (d) authorizing debtors to use Cash Collateral; and (e) scheduling a final hearing pursuant to Bankruptcy Rule 4001.  In support of this Motion, the Debtors respectfully submit the First Day Declaration

---

[2]    Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in: (a) the *Declaration of Aina E. Konold in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"); (b) the DIP Credit Agreement (as defined below), filed contemporaneously with this Motion and incorporated by reference herein; and (c) the Interim Order (as defined below).

and the *Declaration of Robert A. Del Genio in Support of the Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "**Del Genio DIP Declaration**"), filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully state as follows:

## Introduction

1.      Over the past several decades, the Company has become a leading marketer, developer, and manufacturer of health and fitness products sold under several marquee fitness brands, including Nautilus, BowFlex, Schwinn, and JRNY. In recent years, the Company has made strategic moves to transform the business, including adopting a consumer-first mindset and developing an adaptive connected-fitness platform.

2.      However, as described in the First Day Declaration, the Company's continued growth and success has faced significant headwinds. The health and fitness marketplace is extremely competitive, and is subject not only to broad market variables and macro-economic conditions, such as supply constraints and borrowing expenses, but also to cyclical consumer behavior and, at times, to unpredictable (and short-lived) trends. The Company maintained a competitive advantage in the health and fitness marketplace for several years, but, as discussed below, unforeseen and dramatic shifts in consumer fitness brought on by the COVID-19 pandemic and related economic and commercial constraints impacted the Company's ability to adjust to diverging consumer preferences and demand.

3.      The COVID-19 pandemic drastically shifted consumer behavior within the health and fitness industry as consumers changed the way they approached fitness by moving from activities and classes based in gyms and studios to the home.  Although this shift in consumer behavior brought potential opportunity for the Company, it also brought on challenges.  Notably, the biggest challenge in this period came from the Company's retail sales.  Reacting to the lack of inventory for the 2020 holiday season due to the "pull-forward" of consumer demand, the Company's retailers ordered record inventory for the 2021 holiday season.  To fulfill its retailers' orders, the Company increased its orders from its inventory suppliers and made other adjustments to the business, ultimately increasing costs.  However, by late 2021, demand started to normalize, and, coupled with the increased offerings in the market, retailers were left with excess inventory and the Company was left without sufficient revenue to cover its increased expenses.  Retailers have not reordered from the Company, as expected, and the marketplace is now saturated with product offerings, which hinders the Company's ability to attain the benchmarks necessary to service its obligations and operate as a going concern.

4.      Interest rate pressures have also impacted the Company's liquidity.  The interest components of the facility provided for under the Prepetition Credit Agreement (as defined below), as amended, fluctuate based on certain base rates (*i.e.*, SOFR).  Due to increased interest rate pressures in the past twelve months, interest rate expense has increased from approximately $1.085 million in FY 2021 to approximately $3.795 million in FY 2023.

5.      In the wake of the shift in consumer behavior and preferences, industry headwinds, continuing liquidity pressures, and anticipated needs for additional funding in the near term, the Company faced an urgent need for restructuring efforts to stabilize the Company and assess the long-term viability of the business.

6.      In late 2022, the Company interviewed professionals to assist with contingency planning.  The Company, assisted by its advisors, focused on exploring deals with various counterparties for most of 2023.  Despite the efforts of the Company and its advisors, the Company was unable to find a counterparty who was able to gain the necessary approvals to consummate a sale out of court.

7.      Working with FTI Capital Advisors, LLC ("**FTICA**") and FTI Consulting, Inc. ("**FTI Consulting**," and, together with FTICA, "**FTI**"), the Company, facing a short liquidity runway and growing payables, explored an in-court sale.  It became clear that there was robust interest in an in-court 363 sale process.  Accordingly, the Company has determined that an expeditious sale process and resolution of these cases is necessary to preserve its limited liquidity and ensure the greatest possible recovery for its stakeholders.

8.      Further, as detailed in the First Day Declaration, prior to the Petition Date, the Debtors access to available cash was limited because both the Debtors' Prepetition Term Loan Lenders and Prepetition Revolver Lenders had exercised dominion over various bank accounts. The Debtors and their advisors spent numerous hours negotiating access to such cases with the Debtors' prepetition lenders which was critical to providing the Debtors with sufficient resources to continue operations prior to the filing while the Debtors negotiated the Stalking Horse Bid as well as to continue operations during the chapter 11 cases through the sale process.

9.      As a result, the Debtors worked with SLR, as agent, as well as the Prepetition Term Loan Lenders, on financing terms designed to minimize any disruption, both in the lead up to these chapter 11 cases and with respect to the Debtors' postpetition operations.  Through discussions with its Prepetition Term Loan Lenders, the Debtors were granted access to sufficient funds to pay in full the Debtors' obligations under the Prepetition Revolver Credit Agreement prior to the

bankruptcy filing, cash collateralize outstanding letters of credit and certain bank products provided by Wells Fargo to ensure access to such critical financial accommodations during these Chapter 11 Cases.  In addition, the DIP Facility provides the Debtors with needed liquidity to fund ongoing operations during these Chapter 11 Cases during the sale process.  Without access to the Prepetition Term Loan Lenders' Cash Collateral—as well as the DIP Facility—the Debtors would not be able to finance these chapter 11 cases.

10.    The continued cooperation of key business partners, including vendors, is critical at the early stage of these chapter 11 cases.  Otherwise, the Debtors risk facing a value-destructive interruption to their businesses and, simultaneously, eliminate their best chance for negotiating and consummating a sale, to the detriment of the Debtors, their estates, and all stakeholders, including the collateral positions of their secured lenders.  It is important to the Debtors' ability to reassure their suppliers, customers, vendors, employees, and other stakeholders that the Debtors have adequate liquidity to fund these chapter 11 cases and have the support.  As such, and due to their current limited liquidity, the Debtors require immediate access to the DIP Facility and use of Cash Collateral to operate their businesses, preserve value, and avoid irreparable harm pending the final hearing.  Without access to the DIP Facility and use of Cash Collateral, the Debtors face liquidation.

11.    Absent immediate access to incremental liquidity in the form of postpetition financing and Cash Collateral, the Debtors risk a disorderly liquidation from the outset of these cases.  Entry into the DIP Facility will preserve and maximize the value of the Debtors' estates in the immediate term, allowing the Debtors to pursue a sale process.

12.    Thus, for the reasons set forth herein, in the First Day Declaration and the Del Genio DIP Declaration, the Debtors believe that approval of the DIP Facility will allow the Debtors to

maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders and

is an exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully

request that the Court approve the relief requested herein and enter an interim order substantially

in the form attached hereto as **Exhibit A** (the "**Interim Order**") and a final order.

### Jurisdiction

13.      The United States Bankruptcy Court for the District of New Jersey (the "**Court**")

has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Standing Order of Reference*

*to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New

Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  This matter

is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their

consent to the entry of a final order or judgment by the Court in connection with this Motion if it

is determined that the Court, absent consent of the parties, cannot enter final orders or judgments

in connection herewith consistent with Article III of the United States Constitution.

14.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364(c)(1),

364(c)(2), 364(c)(3), 364(d), 364(e), 506(c) (subject to entry of Final Financing Order (as defined

below)) 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c), 6003, 6004, and

9014, and Local Rules 4001-1, 4001-2, 4001-3, 9013-1, 9013-2, 9013-4, and 9013-5.

15.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

16.      By this Motion, the Debtors seek entry of the Interim Order, substantially in the

form attached hereto as **Exhibit A**, and the final order, granting, among other things, the following

relief:

i.      authorization for BowFlex to obtain, and for BowFlex New Jersey to
guarantee unconditionally, on a joint and several basis, postpetition loans,

7

advances and other financial accommodations on an interim basis for a period through and including the date of the Final Hearing (as defined in the Interim Order) from the DIP Lenders (as defined below) and Crystal Financial LLC d/b/a SLR Credit Solutions ("**SLR**"), as administrative and collateral agent (in such capacity, together with its successors and permitted assigns, the "**DIP Agent**"), pursuant to the DIP Loan Documents (as defined below) and in accordance with all of the borrowing requirements, terms and conditions set forth in the DIP Credit Agreement (as defined below), and in accordance with the Interim Order, secured by (i) superpriority priming security interests in and liens upon all Prepetition Collateral (as defined in the DIP Credit Agreement) pursuant to section 364(d) of the Bankruptcy Code, subject only to the Permitted Liens and Claims (as defined below), and (ii) senior priority security interests in and liens upon all other Collateral (as defined in the Interim Order) pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, subject only to the Permitted Liens and Claims;

ii.     authorization for the Debtors to enter into (a) that certain Amendment No. 3 to Term Loan Credit Agreement and Loan Documents (the "**Amendment**"), a copy of which is attached hereto as **Exhibit 1** and is incorporated herein (the Prepetition Credit Agreement (as defined below), as amended by the Amendment and as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**" (a copy of which is attached hereto as **Exhibit 1**), by and among the Debtors, the DIP Agent and the Lenders (as defined in the DIP Credit Agreement) (collectively, the "**DIP Lenders**," and together with the DIP Agent, the "**DIP Secured Parties**") and (b) the Loan Documents as defined in the DIP Credit Agreement, including that certain fee letter dated March 5, 2024, delivered from the DIP Agent to the Debtors (the "**SLR Fee Letter**," DIP Budget (as defined below) and the DIP Credit Agreement, as such Loan Documents may be amended, restated or supplemented from time to time, collectively, the "**DIP Loan Documents**") and to perform such other acts as may be necessary, desirable or appropriate in connection with this Interim Order and the DIP Loan Documents;

iii.    authorization for the Debtors to incur obligations in connection with the DIP Credit Agreement in an aggregate principal amount of up to $25,000,000 (the "**DIP Facility**") subject to the terms and conditions set forth in the DIP Credit Agreement, consisting of:

a.      Revolving DIP Loans. A new money senior secured super-priority revolving credit facility in an aggregate principal amount of up to $9,000,000 (the obligations thereunder, the "**Revolving DIP Obligations**"), fully available upon entry of the Interim Order in accordance with the terms and conditions of the DIP Loan Documents; and

8

b.  Term Loans.  A senior secured super-priority term loan facility in an aggregate principal amount of up to $16,000,000 (the "**DIP Term Loan Facility**") that upon entry of the Interim Order, will roll-up on a dollar-for-dollar basis an equal amount of Prepetition Term Loan Obligations (as defined below) so that the Prepetition Term Loan Obligations shall constitute obligations under the DIP Term Loan Facility (the obligations thereunder, the "**Term DIP Obligations**" and collectively with the Revolving DIP Obligations, the "**DIP Obligations**");

iv.  authorization for the Debtors to remit all proceeds of Collateral (as defined in the DIP Credit Agreement), including but not limited to collections and payments made in respect of the Collateral for application to the DIP Obligation as required under the DIP Credit Agreement until such DIP Obligations are fully and indefeasibly repaid;

v.  authorization for the Debtors to use proceeds of the Revolving DIP Loans (as defined in the Interim Order) and Cash Collateral including Eligible Cash (as defined in the DIP Credit Agreement) for payment of the items specified in the DIP Budget and in accordance with the terms of the DIP Loan Documents;

vi.  the grant to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, of superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations;

vii.  approving certain stipulations by the Debtors with respect to the Prepetition Term Loan Documents (as defined below) and the rights, claims, liens and security interests arising therefrom;

viii.  authorizing the Debtors to use Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code), including any Eligible Cash, of the Prepetition Term Loan Lenders (as defined below), if any, in accordance with the Interim Order and the DIP Loan Documents;

ix.  granting adequate protection to (a) the Prepetition Term Loan Agent (as defined below) and the Prepetition Term Loan Lenders  in respect of all diminution in the Prepetition Secured Parties' (as defined below) interests in the Collateral, including, but not limited to, the Debtors' use of Cash Collateral and other Collateral in accordance with and subject to the terms and conditions of the DIP Loan Documents and the Interim Order;

x.  authorizing the Debtors to grant a priming lien and security interest to Wells Fargo Bank, N.A. ("Wells Fargo"), continue the merchant services agreement with Wells Fargo Merchant Services, L.L.C. ("WFMS," and,

such agreement, the "<u>WFMS Agreement</u>"), pay amounts owed with respect to the WFMS Agreement (the "<u>WFMS Obligations</u>"), and grant a priming lien and security interest to WFMS;

xi.    authorizing WFMS to continue to receive or obtain payment for all WFMS Obligations, including, without limitation, by way of recoupment or setoff against sales revenues processed by WFMS on behalf of the Debtors under the WFMS Agreement, or pursuant to the WFMS, the WFMS Cash Collateral (as defined herein);

xii.    modifying the automatic stay as necessary to authorize each of the Prepetition Revolver Loan Agent and the Bank Product Providers to apply: (a) the Letter of Credit Cash Collateral and/or the Expense Reserve to satisfy the Letter of Credit Obligations; (b) the Bank Product Cash Collateral, the WFMS Cash Collateral, and/or the Expense Reserve to satisfy the Bank Product Obligations (including, without limitation, the WFMS Obligations), as applicable; and (c) the Expense Reserve to satisfy the Expense and Indemnity Obligations, in each case, as the same become due and owing;

xiii.    effective upon entry of the Final Financing Order (as defined below), the waiver of the Debtors' rights (i) to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code; and (ii) any "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the Collateral as to the DIP Secured Parties and the Prepetition Secured Parties;

xiv.    modification of the automatic stay to the extent hereinafter set forth;

xv.    the setting of a final hearing on the Motion to be held within 30 days of the entry of the Interim Order to consider entry of a final order (the "**Final Financing Order**") authorizing, among other things, the DIP Loan Documents and all borrowings and deemed borrowing thereunder on a final basis, as set forth in the Motion and the DIP Loan Documents; and

xvi.    the immediate effectiveness of the Interim Order and waiver of any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

### **Background of the Debtors**

17.    On the date hereof (the "**Petition Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

18.     BowFlex Inc., together with its debtor and non-debtor affiliates, is a leading international developer, distributor and manufacturer of health and fitness products sold under several marquee fitness brands across international markets.  The Debtors' product offerings include an assortment of high-quality fitness equipment and accessories, including the digital personal training platform JRNY, for use in consumer and commercial settings.

19.     Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the First Day Declaration, incorporated herein by reference.

**Concise Statement Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-3**

**I.   Concise Statement Regarding the DIP Facility**

20.     The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-3.3.[3]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrowers** Bankruptcy Rule 4001(c)(1)(B) | BowFlex Inc. and Nautilus Fitness Canada, Inc. *See* Amendment, Preamble. |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Nautilus Fitness International B.V. Nautilus Switzerland AG Nautilus Fitness UK LTD BowFlex Delaware LLC BowFlex New Jersey LLC *See* Amendment, Signature Pages. |

---

[3]   The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Credit Agreement or the Interim Order, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Crystal Financial LLC d/b/a SLR Credit Solutions<br><br>*See* Amendment, Preamble. |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Crystal Financial SPV LLC<br>Crystal Financial LLC<br><br>*See* Amendment, Signature Pages. |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement includes standard and customary conditions that require the Borrowers to provide periodic reports to the DIP Agent and their respective professionals regarding the Approved Budget, financial statements of the Borrowers, key performance reports, and certain other matters.<br><br>*See* DIP Credit Agreement §§ 5.1-5.2, 7(c). |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-3 | "**Maturity Date**" shall mean the earliest to occur of (a) six months after the Amendment No. 3 Effective Date, (b) the effective date of an Acceptable Plan of Reorganization, (c) the Disposition, directly or indirectly, of all or substantially all of the assets of any Domestic Loan Party (other than the Equity Interests of any Foreign Loan Party or Foreign Subsidiary) (including, in the case of this clause (c), under Section 363 and/or 365 of the Bankruptcy Code), (d) the first day on which the Interim Financing Order expires by its terms or its terminated, unless the Final Financing Order has been entered and become effective prior thereto, (e) the date which is thirty (30) days after the Petition Date if the Final Financing Order has not been entered by the Bankruptcy Court on or prior to such date, (f) the date the Final Financing Order is vacated, terminated, rescinded, revoked, declared null and void or otherwise ceases to be in full force and effect, (g) the date of a conversion of any of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code, unless otherwise consented to in writing by the Agent and the Required Lenders, (h) the date of dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Agent and the Required Lenders, (i) the date of an appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties and (j) the acceleration of the Loans and the termination of the commitment to make Loans under the Credit Facility in accordance with the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement § 1.1. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | Revolving DIP Loans: $9,000,000<br>Roll-up of Prepetition Term Loan Obligations: $16,000,000<br><br>*See* DIP Credit Agreement Recitals, § 2.1. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The DIP Loan Documents contain conditions that are customary and appropriate for similar debtor in possession financings.<br><br>*See* DIP Credit Agreement §§ 3.1, 3.2. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | **Interest Rate**.  Adjusted Term SOFR *plus* 8.25% (the "**Interest Rate**")<br><br>**Default Rate**.  Interest Rate + 2%.<br><br>*See* DIP Credit Agreement § 2.6(a), (c). |
| **Use of DIP Financing Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-3 | The proceeds of the DIP Facility shall be used to, among other things, (i) pay the fees, costs, and expenses incurred in connection with the DIP Credit Agreement and the other Loan Documents, and (ii) to pay amounts associated with the Term Loan as provided in the Approved Budget and for working capital and general corporate purposes of the Borrowers.<br><br>*See* DIP Credit Agreement § 6.11. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Replacement Liens.  As adequate protection for the diminution in value of their interests in the Collateral (including Cash Collateral) on account of the Debtors' use of such Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out Expenses, the Prepetition Term Loan Agent, for the benefit of itself and Prepetition Term Loan Lenders (each in their respective capacities under the Prepetition Term Loan Documents), is hereby granted pursuant to sections 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "**Term Loan Replacement Lien**").  The Term Loan Replacement Lien shall be subject and subordinate to (i) the Permitted Liens and Claims and (ii) the liens and security interests granted to the DIP Secured Parties in the Collateral securing the DIP Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.<br><br>Section 507(b) Priority Claims.  As adequate protection for the diminution in value of their interests in the Collateral (including Cash Collateral) on account of the Debtors' use of such Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out Expenses, the Prepetition Term Loan Agent, for the benefit of itself and Prepetition Term Loan Lenders (each in their respective capacities under the Prepetition Term Loan Documents), is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "**Adequate Protection Superpriority Claim**").  The Adequate Protection Superpriority Claim shall be subject to the Permitted Liens and Claims and the Superpriority Claim of the DIP Secured Parties, and shall otherwise have priority over all administrative expense claims and unsecured claims against the Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.<br><br>Additional Adequate Protection.<br><br>(1) Fees and Expenses.  As further adequate protection, the Debtors are authorized to pay, without further Court order, reasonable and documented legal fees and expenses, incurred before the Petition Date, of counsel to the Prepetition Term Loan Agent (in its capacity under the Prepetition Term Loan Documents) then owing under the Prepetition Credit Agreement.  In addition, the Debtors are authorized to pay, without further Court order, reasonable and documented legal fees and expenses, incurred after the Petition Date, of counsel to the Prepetition Term Loan Agent (in its capacity under the Prepetition Term Loan Documents); provided, that (a) the U.S. Trustee and the Committee shall have ten (10) days from receipt to |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | review the summary legal invoices of such counsel, and (b) in the event the U.S. Trustee or Committee files with this Court an objection to any such legal invoice within ten (10) days of its receipt thereof, the undisputed portion of such legal invoice shall be paid without further order of the Court whereas the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by this Court and (c) in the event neither the U.S. Trustee nor the Committee shall file with this Court an objection to any such legal invoice within ten (10) days of its receipt thereof, such legal invoice shall be paid without further order of the Court and shall not be subject to any further review, challenge or disgorgement. |
| | (2) <u>Adequate Protection Payments</u>. As further adequate protection, the Prepetition Term Loan Agent, on behalf of itself and the other Prepetition Secured Parties, shall receive, upon entry of the Interim Order, at any time and for so long as any Prepetition Term Loan Obligations remain outstanding, monthly adequate protection payments, as and when due under the applicable Prepetition Term Loan Documents equal to the interest at the contractual non-default rate that would otherwise be owed to the Prepetition Secured Parties under the Prepetition Term Loan Documents during such monthly period in respect of the Prepetition Term Loan Obligations, until such time as the Prepetition Term Loan Obligations are indefeasibly paid in full or constitute DIP Obligations for all purposes and in either case are no longer subject to challenge. Any such payments may be subject to disgorgement or recharacterization as principal repayment to the extent of a successful, final, and non-appealable Objection (as defined in the Interim Order), to the extent ordered by the Court. |
| | (3) <u>Information Rights</u>. The Debtors shall promptly provide the Prepetition Term Loan Agent with all required financial reporting and other periodic reporting that is required to be provided to the DIP Agent under the DIP Loan Documents. |
| | See Interim Order §§ 2.8.4-2.8.6. |
| **Roll-Up**<br>Local Rule 4001-2(a)(i)(E) | Upon entry of the Interim Order, the Borrowers are authorized and empowered to roll up all of the outstanding Prepetition Term Loan Obligations (including interest, fees, indemnities and other expenses provided for in the Prepetition Term Loan Documents), other than the Non-Rollup Obligations (as defined in the Interim Order), into the Term DIP Obligations.<br><br>*See* DIP Credit Agreement Recitals; Interim Order § 1.2.2. |
| **Budget**<br>Bankruptcy<br>Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The Debtors are permitted to use the proceeds of the DIP Facility and the Cash Collateral in accordance with the DIP Budget, substantially in the form attached to the Interim Order as Exhibit 2 thereto.<br><br>*See* DIP Credit Agreement § 7; Interim Order Exhibit 2. |
| **Variance Covenant**<br>Bankruptcy<br>Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | Commencing with the week ending March 8, 2024 and for each calendar week thereafter, the Loan Parties shall not permit (i) Actual Cash Receipts for any Cumulative Two-Week Period or the Cumulative Period to be less than 90% of Budgeted Cash Receipts for any such Cumulative Two-Week Period or Cumulative Period, as applicable, measured on a cumulative basis, or (ii) the Actual Operating Disbursement Amount for any Cumulative Two-Week Period or the Cumulative Period to be greater than 110% of Budgeted Operating Disbursement Amount for |

14

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | any such Cumulative Two-Week Period or Cumulative Period, as applicable, measured on a cumulative basis.<br><br>The Borrowers shall deliver to the Agent on or before 12:00 p.m. Eastern time on Thursday of each week a Compliance Certificate, and such Compliance Certificate shall include such detail as is reasonably satisfactory to the Agent, signed by a Responsible Officer of the Administrative Borrower certifying that (i) the Borrowers are in compliance with the covenants contained in Section 7(b), (ii) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (iii) attaching an Approved Budget Variance Report.<br><br>*See* DIP Credit Agreement §§ 7(b)-7(c). |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | Events of Default. The occurrence of any of the following events shall constitute an "**Event of Default**" under the Interim Order:<br><br>    a.  Any Debtor's failure to perform, in any respect, any of the terms, conditions or covenants or their obligations under the Interim Order; or<br><br>    b.  An "Event of Default" under the DIP Credit Agreement or any of the other DIP Loan Documents.<br><br>*See* DIP Credit Agreement § 8, Interim Order § 3.1. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Loan Documents contain indemnification provisions ordinary and customary for DIP financings of this type by the Borrowers in favor of the Agent-Related Persons, the Lender-Related Persons, and each Participant (each as defined in the DIP Credit Agreement) subject to customary carve-outs.<br><br>*See* DIP Credit Agreement § 10.3. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | As of the Petition Date, the Prepetition Secured Parties have an interest in Cash Collateral.<br><br>*See* Interim Order § 2.8.1. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | Carve Out Expenses. The DIP Secured Parties' liens, claims and security interests in the Collateral and their Superpriority Claim shall each be subject to the following expenses (the "**Carve Out Expenses**"):<br><br>    a.  statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6);<br><br>    b.  fees payable to the Clerk of this Court;<br><br>    c.  fees and expenses of any chapter 7 trustee appointed in any Debtor's bankruptcy cases, not to exceed, in the aggregate, $10,000; |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | d.   subject to the terms and conditions of the Interim Order, Allowed Professional Fees (as defined in the Interim Order) incurred during the period commencing on the Petition Date and ending on the Trigger Date (as defined in the Interim Order) (the "**Pre-Trigger Date Period**") by attorneys, accountants and other professionals retained by the Debtors and any Committee(s) under section 327 or 1103(a) of the Bankruptcy Code (collectively, the "**Professionals**"); <u>provided</u> that the aggregate amount of such Allowed Professional Fees included in the Carve Out Expenses pursuant to this clause (d) shall be the *lesser* of (A) the budgeted amount of Allowed Professional Fees in the DIP Budget for the Pre-Trigger Date Period up to a maximum of $550,000 per week during the Pre-Trigger Date Period for all Professionals and an aggregate of $2,750,000 for all Professionals for all weeks during the Pre-Trigger Date Period and (B) the actual Allowed Professional Fees incurred during the Pre-Trigger Date Period; <u>less</u> the sum of all Allowed Professional Fees incurred during the Pre-Trigger Date Period and paid at any time, and any retainers held by any Professional (the "**Pre-Trigger Date Professional Fee Carve Out**"); and <br><br> e.   subject to the terms and conditions contained in the Interim Order, Allowed Professional Fees incurred by Professionals on or after the Trigger Date in an aggregate amount not to exceed $250,000 (the "**Post-Trigger Date Professional Fee Carve Out**," and together with the Pre-Trigger Date Professional Fee Carve Out, collectively, the "**Professional Fee Carve Out**"). <br><br> *See* Interim Order § 2.5.1. |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-3 | <u>Certain Fees</u>. Borrowers shall pay to Agent, as and when due and payable under the terms of the Amendment No. 3 Fee Letter, the fees set forth in the Amendment No. 3 Fee Letter, specifically the Amendment Fee, Agency Fee, and Early Termination Premium, for the account of applicable parties thereunder. <br><br> <u>Unused Line Fee</u>. Each Borrower agrees to pay to the Agent for the account of each Revolving Lender, an unused line fee (the "**Unused Line Fee**"), which shall accrue at a rate per annum equal to 0.75% per annum on the average daily unused amount of the Revolving Commitment of such Revolving Lender during the period from and including the Amendment No. 3 Effective Date to but excluding the date on which such Revolving Commitment terminates. For purposes of computing Unused Line Fees, the Revolving Commitment of any Revolving Lender shall be deemed to be used on any date of determination to the extent of the aggregate principal amount of its outstanding Revolving Loans. Accrued Unused Line Fees shall be payable in arrears on the first day of each month, each date on which the Revolving Commitments are permanently reduced and on the date on which the Revolving Commitments terminate, commencing on the first such date to occur after the Amendment No. 3 Effective Date. All Unused Line Fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). <br><br> <u>Field Examination and Other Fees</u>.   Subject to any limitations set forth in <u>Section 5.7(c)</u> of Exhibit A of the DIP Credit Agreement, Borrowers shall pay to |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Agent, field examination, appraisal, and valuation fees and charges, as and when incurred or chargeable, as follows (i) the reasonable and documented fees and charges of field examiners, *plus* out-of-pocket expenses (including travel, meals, and lodging) for each field examination of any Loan Party or its Subsidiaries performed by or on behalf of Agent, and (ii) the fees, charges or expenses paid or incurred by Agent if it elects to employ the services of one or more third Persons to appraise the Collateral, or any portion thereof. <br><br> *See* DIP Credit Agreement § 2.10; Amendment No. 3 Fee Letter §§ 1-3. |
| **506(c) Waiver** <br> Bankruptcy Rule 4001(c)(l)(B)(x) <br><br> Local Rule 4001-3 <br><br> **Section 552(b)** Bankruptcy Rule 4001(c)(l)(B) <br><br> Local Rule 4001-3 | Section 506(c) Claims. Subject to entry of the Final Financing Order, no costs or expenses of administration which have or may be incurred in the Cases at any time shall be charged against or recovered from the DIP Secured Parties or the Prepetition Secured Parties, or their respective claims or Collateral, pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the applicable Agent, and no such consent shall be implied from any other action, inaction or acquiescence by any Agent or any DIP Security Party or any Prepetition Secured Party. <br><br> *See* Interim Order § 4.6.1. <br><br> Marshalling; Section 552(b) Waiver. Subject to entry of the Final Financing Order (i) in no event shall any DIP Secured Party be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral, and (ii) the DIP Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to either DIP Agent or any DIP Secured Party with respect to proceeds, products, offspring or profits of any of the Collateral. <br><br> *See* Interim Order § 5.9. |
| **Liens on Avoidance Actions** <br> Local Rule 4001-3 | Liens on Avoidance Action Proceeds subject to entry of the Final Financing Order. <br><br> *See* DIP Credit Agreement § 5.22; Interim Order § 2.1. |
| **Stipulations to Prepetition Liens and Claims** <br> Bankruptcy Rule 4001(c)(1)(B)(iii) <br><br> Local Rule 4001-3 | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition Secured Parties' claims and liens. <br><br> *See* Interim Order ¶ D. |
| **Liens and Priorities** <br> Bankruptcy Rule 4001(c)(1)(B)(i) <br><br> Local Rule 4001-3 | DIP Loans – Postpetition Lien Granting.  To secure the prompt payment and performance of any and all DIP Obligations of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising (including, without limitation, the Prepetition Term Loan Obligations rolled into the Term DIP Obligations in accordance with the terms hereof), the DIP Agent, for the benefit of itself and the other DIP Secured Parties, shall have and is hereby granted, effective as of the Petition Date, (i) valid and perfected, priming first priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' Estates may have (but subject to the Permitted Liens and Claims (as defined below), as and to the extent expressly provided in Sections 2.3 and 4 below) in and upon all Prepetition Collateral now existing or hereafter acquired and (ii) senior priority security interests and liens, superior to all other liens, claims or |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | security interests that any creditor of the Debtors' Estates may have (but subject to the Permitted Liens and Claims, as and to the extent expressly provided in Sections 2.3 and 4 below), in and upon all other Collateral; provided, however, that any lien on property and/or proceeds recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code shall be subject to entry of the Final Financing Order.<br><br>DIP Loan Lien Priority.  The liens and security interests of the DIP Secured Parties granted under the DIP Loan Documents and the Interim Order in the Collateral shall be and shall continue to be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with section 363, 364, or any other section of the Bankruptcy Code or other applicable law; provided, however, that the DIP Secured Parties' liens on and security interests in the Collateral shall be subject only to  (i) the Permitted Encumbrances to the extent such Permitted Encumbrances are senior to, and have not been or are subject to being subordinated to, the DIP Agent's liens on and security interests in the Collateral or otherwise avoided, and only for so long as and to the extent that such Permitted Encumbrances are and remain senior and outstanding and (ii) the Carve Out Expenses solely to the extent provided for in Section 2.7 of the Interim Order (the foregoing clauses (i) and (ii) are collectively referred to herein as the "**Permitted Liens and Claims**").<br><br>Postpetition Lien Perfection.  The Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the postpetition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with any deposit bank or with any other financial institution(s) holding a depository account or other account consisting of or containing Collateral (a "**Perfection Act**").  Notwithstanding the foregoing, if the DIP Agent, shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, the DIP Agent is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or required by such DIP Agent, which act or acts shall be deemed to have been accomplished as of the date and time of entry of the Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law.  The DIP Agent may choose to file, record or present a certified copy of the Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of the Interim Order in accordance with applicable law.  Should the DIP Agent so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of the Interim Order.<br><br>*See* Interim Order §§ 2.1-2.3. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The Borrowers shall comply with the following milestones in connection with the chapter 11 cases:<br><br>1. Not later than twenty-four (24) hours after the Petition Date, the Debtors shall have filed a motion or pleading, in each case in form and substance satisfactory to Agent seeking entry of the Interim Financing Order and the Final Financing Order.<br><br>2. Not later than twenty-four (24) hours after the Petition Date, the Debtors shall have filed motion or pleading (the "**Sale Motion**"), in each case in form and substance satisfactory to Agent, (i) seeking approval of the bidding procedures for the sale of all or substantially all of the Debtors' assets in accordance with section 363 of the Bankruptcy Code (the "**Sale**"); and (ii) providing that all cash proceeds generated by such Sale(s), less reasonable out of pocket fees, costs and expenses directly arising from, and required to be paid by the Loan Parties in connection with, such Sale(s), including without limitation, reasonable broker's and/or investment banker's fees incurred with respect to the Sale(s), in each case pursuant to a retention agreement in form and substance acceptable to Agent, shall be remitted to Agent for application against, and in permanent reduction of, the Obligations (both Pre-Petition Obligations and Postpetition Obligations) within one (1) Business Day of the closing of the sale.<br><br>3. Not later than three (3) Business Days after the Petition Date, the Interim Financing Order shall have been entered by the Bankruptcy Court authorizing the secured financing under the Credit Facility on the terms and conditions contemplated by the DIP Credit Agreement and otherwise on terms acceptable to Agent and Lenders, and, inter alia, modifying the automatic stay, authorizing and granting the super-priority security interests and liens described herein and in the other Loan Documents, and granting a super-priority administrative expense claim to Agent and Lenders with respect to all obligations to Agent and Lenders (including the Obligations and including that the Pre-Petition Term Loan is determined to be a Postpetition Obligation), subject to no priority claim or administrative expenses of the Chapter 11 Cases (but subject to the Carve Out Expenses).<br><br>4. Not later than ten (10) days after the Petition Date, the Debtors shall have filed a motion requesting the entry of an order to be entered not later than thirty (30) days after the Petition Date, extending the Debtors' non-residential real property lease assumption/rejection period such that the Debtors' non-residential real property lease assumption/rejection period shall be 210 days from the Petition Date (the "**Lease Assumption/Rejection Period**").<br><br>5. Not later than fifteen (15) days after the Petition Date, the Debtors shall obtain the entry of an order of the Bankruptcy Court, in form and substance satisfactory to Agent, approving bid procedures, including, without limitation, an acceptable form of asset purchase agreement to be used for the Sale (the "**Bid Procedures Order**").<br><br>6. Not later than thirty (30) days after the Petition Date, the Final Financing Order shall have been entered by the Bankruptcy Court. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | 7. Not later than thirty (30) days after the Petition Date, the Debtors shall have obtained an order of the Bankruptcy Court extending the Debtors' Lease Assumption/Rejection Period such that the Debtors' Lease Assumption/Rejection Period shall be 210 days from the Petition Date.<br><br>8. Not later thirty-five (35) days after the Petition Date, the Debtors shall conduct an auction (the "**Auction**") in accordance with the Bid Procedures Order to select the highest and best bid(s) for the sale of all or substantially all of the Debtors' assets in accordance with the Bid Procedures Order, which bid shall provide for, among other things, a minimum cash amount not less than the amount required to satisfy the Obligations owed to Agent and Lenders in full in cash, and copies of which shall be provided to Agent.<br><br>9. Not later than forty-two (42) days after the Petition Date, an order, in form and substance satisfactory to Agent, shall have been entered by the Bankruptcy Court approving the Sale(s) (the "**Sale Order**").<br><br>10. Not later than forty-nine (49) days after the Petition Date, the closing of the Bankruptcy Court-approved Sale(s) shall have occurred.<br><br>11. Not later than forty-nine (49) days after the Petition Date, the Obligations shall have been paid in full.<br><br>*See* Amendment, Schedule 5.21. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | Objection must be properly filed by the earlier of (y) seventy-five (75) calendar days from the date of entry of the Interim Order, and (z) the hearing on the sale of substantially all of the Debtors' assets.<br><br>*See* Interim Order § 4.1. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | <u>Relief from Automatic Stay</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application or order of the Court to the extent necessary to permit the DIP Agent and each DIP Secured Party to perform any act authorized or permitted under or by virtue of the Interim Order, or the DIP Loan Documents, as applicable, including, without limitation, (a) to implement the postpetition financing arrangements authorized by the Interim Order and pursuant to the terms of the DIP Loan Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, as applicable, (c) to assess, charge, collect, advance, deduct and receive payments with respect to the DIP Obligations, as applicable, including, without limitation, all interests, fees, costs and expenses permitted under the DIP Loan Documents, and apply such payments to the DIP Obligations pursuant to the DIP Loan Documents and the Interim Order, as applicable, and (d) subject to the terms and conditions of this <u>Section 3.5</u>, immediately upon the occurrence of an Event of Default, to take any action and exercise all rights and remedies provided to it by the Interim Order, the DIP Loan Documents, or applicable law other than those rights and remedies against the Collateral as provided in the following sentence. In addition, upon the occurrence of an Event of Default and after providing five (5) business days' (the "**Default Notice Period**") prior written notice (the "**Enforcement Notice**") to counsel for the Debtors, counsel for the Committee (if any), and the U.S. Trustee, the DIP Agent, acting on behalf of itself and the DIP Secured Parties, shall be entitled to take any action and exercise all rights and |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | remedies provided to it by the Interim Order, the DIP Loan Documents or applicable law as the DIP Agent may deem appropriate in its sole discretion to proceed against and realize upon the Collateral or any other assets or properties of Debtors' Estates upon which the DIP Agent, for the benefit of itself and the DIP Secured Parties, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all DIP Obligations.  Notwithstanding anything to the contrary, any action taken by the DIP Agent to (A) terminate the commitments under the DIP Loan Documents, (B) accelerate the DIP Loans, (C) send blocking notices or activation notices to any depository bank, and (D) repay any amounts owing in respect of the DIP Obligations (including, without limitation, fees, indemnities and expense reimbursements), in each case, shall not require any advance notice to the Debtors.  In any hearing regarding the exercise of rights or remedies (which hearing must take place during the Default Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing. The Debtors shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agents or the other DIP Secured Parties set forth in the Interim Order or the DIP Loan Documents; provided, further, that during the Default Notice Period, the Debtors shall be entitled to use Cash Collateral solely for payment of the following DIP Budget expenses due and payable during such the Default Notice Period: any accrued and unpaid employee wage, benefit or independent contractor obligations and sales and uses and payroll taxes included in the DIP Budget through the Termination Date and any such other amounts consented to by the DIP Agent, in its sole discretion.<br><br>*See* Interim Order § 3.5. |

## II. The Debtors' Prepetition Capital Structure

### A.    The Prepetition Credit Agreement.

21.    Prior to the commencement of the Cases, SLR, as administrative agent and collateral agent (in such capacity, the "**Prepetition Term Loan Agent**"), the term lenders party thereto (the "**Prepetition Term Loan Lenders**," and together with the Prepetition Term Loan Agent, the "**Prepetition Secured Parties**"), in their respective capacities under the Prepetition Credit Agreement (as defined below), made terms loans, advances and provided other financial accommodations to Debtor BowFlex and its affiliates, pursuant to the terms and conditions set forth in: (i) the Term Loan Credit Agreement, dated November 30, 2022 (as amended by the Limited Consent and Amendment No. 1 to Term Loan Credit Agreement and Loan Documents, dated April 25, 2023 ("**Amendment No. 1**") and the Amendment No. 2 to Term Loan Credit

Agreement and Loan Documents, dated July 28, 2023 ("**Amendment No. 2**") (the "**Prepetition Credit Agreement**")); (ii) the Guaranty and Security Agreement, dated November 30, 2022 (as amended by Amendment No. 1, Amendment No. 2, Joinder No. 1 and Amendment to Guaranty and Security Agreement, dated as of February 16, 2023, Joinder No. 2 and Amendment to Guaranty and Security Agreement, dated as of March 14, 2023, Joinder No. 3 and Amendment to Guaranty and Security Agreement, dated as of April 14, 2023, and Joinder No. 4 to Guaranty and Security Agreement, dated as of January 22, 2024, and Joinder No. 5 to Guaranty and Security Agreement, dated as of February 19, 2024, the "**Prepetition Guaranty and Security Agreement**"); and (iii) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of the Prepetition Term Loan Agent or any Prepetition Term Lender in connection with or related to the Prepetition Credit Agreement and the Prepetition Guaranty and Security Agreement (collectively, the "**Prepetition Term Loan Documents**"). Copies of the operative Prepetition Term Loan Documents are on file with counsel to the Debtors and available upon reasonable request.

22.    *Prepetition Term Loan Obligations Amount*. As of the Petition Date, the Debtors were indebted to the Prepetition Secured Parties under the Prepetition Term Loan Documents in an aggregate outstanding principal amount of not less than $15,999,234.76, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses), premiums and other charges accrued, accruing or chargeable with respect thereto (collectively, the "**Prepetition Term Loan Obligations**").

**III. The Debtors' Dealings with Wells Fargo and WFMS**

23.    As described in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Use of Their Existing Cash Management System, Bank Accounts, Credit Card Program, and Business Forms, (B) Continue Intercompany Transactions,*

and (C) *Pay Related Prepetition Obligations, (II) Waiving Certain Investment and Deposit Guidelines, and (III) Granting Related Relief* (the "**Cash Management Motion**"), filed contemporaneously herewith, the Debtors maintain the Credit Card Program (as defined in the Cash Management Motion). The indebtedness owed by the Debtors to Wells Fargo from time to time in respect of the Card Agreement (as defined in the Cash Management Motion) (the "**Card Agreement Obligations**") is secured by the Bank Product Cash Collateral (as defined herein).

24.    As described in the Cash Management Motion, the Debtors are party to the WFMS Agreement[4] with WFMS. Indebtedness owed to WFMS from time to time in respect of the WFMS Agreement (including fees, charges, refunds, chargebacks, and all other amounts owed under the WFMS Agreement) (the "**WFMS Obligations**) is secured by the Bank Product Cash Collateral and an additional cash collateral reserve of $1,200,000, pursuant to the terms of the WFMS Agreement (such cash collateral, the "**WFMS Cash Collateral**"). The Debtors seek authority for WFMS to continue to receive or obtain payment for all WFMS Obligations, including, without limitation, by way of recoupment or setoff against sales revenues processed by WFMS on behalf of the Debtors under the WFMS Agreement or, pursuant to the WFMS Agreement, the Merchant Services Cash Collateral, subject to the terms of the DIP Order or any subsequent orders approving postpetition financing or authorizing the use of cash collateral.

25.    Prior to the commencement of the Debtors' chapter 11 cases, Wells Fargo, as administrative agent and collateral agent (in such capacity, the "**Prepetition Revolver Loan Agent**") and the lenders party to the Prepetition Revolver Credit Agreement (as defined below) (the "**Prepetition Revolver Lenders**," and together with the Prepetition Revolver Loan Agent and

---

[4]    The "**WFMS Agreement**" is that certain *Merchant Services Agreement* (comprised of that certain *Merchant Processing Application* and accompanying *Program Guide*), dated on or around July 28, 2020 (as amended, restated, supplemented, or otherwise modified from time to time).

the Bank Product Providers (as defined below), the "**Revolver Secured Parties**") made asset-based revolving loans, issued letters of credit, and provided bank products and other financial accommodations to Parent and its affiliates, pursuant to the terms and conditions set forth in that certain *Credit Agreement*, dated January 31, 2020 (as amended,[5] the "**Prepetition Revolver Credit Agreement**").

26.    Prior to the Petition Date, the Debtors and Prepetition Revolver Loan Agent executed that certain *Amended and Restated Payoff Letter*, dated as of March 4, 2024 (the "**Payoff Letter**"), pursuant to which, *inter alia*, the Debtors paid in full and/or cash collateralized all obligations owing under the Prepetition Revolver Credit Agreement (other than certain contingent liabilities, which by the terms of the Prepetition Revolver Credit Agreement, remain continuing).

27.    In connection with the Payoff Letter, the Prepetition Revolving Loan Agent holds: (a) $1,196,860 in cash collateral for the benefit of the Prepetition Revolver Lenders with respect to obligations regarding "**Letters of Credit**" issued under and as defined in the Prepetition Revolver Credit Agreement (the "**Letter of Credit Obligations**"), which amount is equal to 103% of the "**Letter of Credit Usage**" (as such term is defined in the Prepetition Revolver Credit Agreement) existing on February 26, 2024 (the "**Letter of Credit Cash Collateral**"); (b) $1,650,000 representing cash collateral for the benefit of the "**Bank Product Providers**," with respect to obligations regarding "**Bank Products**," and Wells Fargo, with respect to obligations regarding the "**Continuing Cash Management Services**" (as such terms are defined in the

---

[5]    The Prepetition Revolver Credit Agreement has been amended by: (i) that certain Omnibus Release, Amendment, Limited Waiver, and Reaffirmation Agreement, dated October 14, 2020, (ii) that certain Consent and Amendment No. 1 to Credit Agreement, dated December 30, 2020, (iii) that certain Amendment to Loan Documents, dated May 13, 2021, (iv) that certain Consent Under Credit Agreement, dated September 15, 2021, (v) that certain Amendment to Loan Documents, dated October 29, 2021, (vi) that certain Amendment No. 4 to Credit Agreement and Loan Documents, dated November 30, 2022, (vii) that certain Limited Consent and Amendment No. 5 to Credit Agreement and Loan Documents, dated April 25, 2023, and (viii) that certain Amendment No. 6 to Credit Agreement and Loan Documents, dated July 28, 2023.

Prepetition Revolver Credit Agreement) (such obligations described in this clause (b), collectively, the "**Bank Product Obligations**," and such cash collateral described in this clause (b), the "**Bank Product Cash Collateral**"); and (c) $100,000 representing cash collateral as expense reserve (the "**Expense Reserve**," and together with the Letter of Credit Cash Collateral and the Bank Product Cash Collateral, collectively, the "**Prepetition Revolver Cash Collateral**"), which may be applied by the Prepetition Revolving Loan Agent in its discretion to satisfy any obligations owing in respect of the Letter of Credit Obligations, the Bank Product Obligations, and/or any other continuing indemnity or cost and expense reimbursement obligations under the Payoff Letter and/or the Prepetition Revolver Credit Agreement (the "**Expense and Indemnity Obligations**"), subject to the terms of the DIP Order or any subsequent orders approving postpetition financing or authorizing the use of cash collateral.

## **The DIP Facility**

### I.    **The Debtors' Need for Access to Financing and the Use of Cash Collateral.**

28.    As described in the First Day Declaration and the Del Genio DIP Declaration, the Debtors enter these cases after facing unforeseen and dramatic shifts in consumer fitness brought on by the COVID-19 pandemic.  As of the Petition Date, the Debtors' total cash balance is insufficient to operate their enterprise in the immediate term.  *See* Del Genio DIP Decl. ¶ 11.  As a result of a changing consumer preferences, increased competition in the marketplace, lack of retail orders, and increased interest rates, the Debtors effectively have little to no access to liquidity under their prepetition facilities.  Cash in accounts subject to security interests and possessed by the Prepetition Term Loan Lenders constitutes Cash Collateral, and accordingly, the Debtors will not be able to meet their near-term liquidity needs without access to the additional financing afforded by the DIP Facility or without use of Cash Collateral.  *See* Del Genio DIP Decl. ¶¶ 11-13.

29.     As discussed above, the Company received notices from the Prepetition Term Loan Lenders and Prepetition Revolver Lenders asserting a cash dominion event had occurred.  *See* Del Genio DIP Decl. ¶ 11.

30.     Through these cases, the Debtors seek to effectuate a sale of substantially all of their assets.  Without the DIP Facility and access to Cash Collateral, the Debtors face liquidation, to the detriment of their estates, including the collateral positions of their secured lenders. *Id*. at ¶ 13.

31.     Prior to the Petition Date, the Debtors, in consultation with their proposed financial advisor, FTI Consulting, reviewed and analyzed their projected cash needs and prepared the DIP Budget of postpetition cash needs of the Debtors over the period set forth in the DIP Budget.  *Id*. at ¶¶ 14-15.  The Debtors' current liquidity needs are illustrated in the DIP Budget, attached to the Interim Order as **Exhibit 2**.  The Debtors believe that the DIP Budget and the projections therein provide a good faith estimate of their funding requirements over the identified period and are reasonable and appropriate under the circumstances.  *See id*. at ¶ 15.  The Debtors relied on these forecasts to determine the amount of postpetition financing required to administer these chapter 11 cases.

32.     Immediate access to the DIP Facility and Cash Collateral is essential to not only meet working capital and business operating needs, but also to fund the administration of these chapter 11 cases, enabling the Debtors to pursue a sale of their assets.  *Id*. at ¶¶ 31-32.  Further, the Debtors require the continued cooperation of vendors, customers, employees, and other stakeholders for these chapter 11 cases.  *Id.* at ¶ 13.  Without access to the DIP Facility and use of Cash Collateral, the Debtors will be unable to reassure these stakeholders that the Debtors have adequate liquidity to fund these chapter 11 cases.  *See id*. at ¶¶ 13, 33.

26

33.    Therefore, the Debtors believe the DIP Facility is essential to preserve and maximize the value of their estates and responsibly administer these chapter 11 cases.

**A.    Alternative Sources of Financing Are Not Available on Better Terms.**

34.    In anticipation of these chapter 11 cases, and in an effort to support a marketing and sale process, the Debtors commenced a marketing process to obtain postpetition financing and solicit interest in a going-concern sale transaction.

35.    Despite the interest and the best efforts of the Company and its advisors, the Company was unable to find a counterparty to complete a viable out-of-court transaction.  In late 2023, the Company engaged FTICA as investment banker for an in-court sale process.

36.    To preserve liquidity and preserve the greatest possible recovery for stakeholders, the Company has determined that an expeditious sale process and resolution of these cases is necessary.  Accordingly, FTI Consulting conducted an outreach process to solicit offers for DIP financing in preparation for these chapter 11 filings.  *Id*. at ¶ 17.  FTI Consulting contacted over twenty parties based on the size of the financing need, industry, and parties who provide financing in similar situations to the Debtors.  *Id.*  FTI Consulting contacted many of these parties in a prior out of court financing process the Company and its advisors conducted for the company in 2023. *Id.*  While the marketing process garnered some initial interest from third parties, these third parties passed due to size, speed of the process, collateral, priority of the DIP and the uncertainty of quickly identifying a stalking horse bidder.  *Id.* Ultimately, the Debtors, assisted by FTI Consulting, determined that the proposed DIP financing structure from SLR was most favorable to support the Debtors in these chapter 11 cases.  *Id.*

37.    The Debtors lack sufficient unencumbered assets to secure the magnitude of financing required to meet the Debtors' near-term liquidity needs.  *Id.* at ¶ 24.  No party that FTI Consulting engaged with as part of the postpetition financing process (other than the DIP Lenders)

was interested in providing a postpetition financing package to fund the Debtors' liquidity needs, either on a junior, unsecured, *pari passu*, or priming basis. *Id*.

38.     There were no third-party priming proposals. *Id*. at ¶ 26. During discussions with the advisors to the DIP Lenders, the DIP Lenders made it clear that that they would not consent to the Debtors' incurrence of priming financing by any other party. *Id*.

39.     Furthermore, given the lack of alternatives available, the Debtors believe that providing roll-up of loan obligations under the Prepetition Term Loan Obligations in the aggregate amount of $16 million (the "**Roll-Up**") is a sound exercise of their business judgment. *Id.* at ¶ 27. The Roll-Up was a necessary prerequisite to the provision of loans set forth in the DIP Facility by the DIP Lenders. *Id.* Absent the $25 million in financing from the DIP Lenders, it is likely that the Debtors would have no alternative other than to launch a value-destructive, disorderly liquidation of their businesses at the outset of these chapter 11 cases. *See id*. at ¶¶ 13, 27.

    **B.     Negotiation of the DIP Facility.**

40.     In the days leading up to the Petition Date, the Debtors and their advisors engaged in negotiations with the DIP Lenders around the terms of the DIP Facility. *Id*. at ¶ 19.

41.     The Debtors shared numerous draft term sheets and mark-ups, and held multiple telephone conferences with both the advisors to, and principals of, the DIP Lenders. *Id*. Despite the necessarily condensed timeframe for reaching a deal on postpetition financing, the Debtors marshaled information as quickly as possible and provided a number of critical due diligence items to the DIP Lenders. *Id*. The parties engaged in hard-fought, arm's-length negotiations in an effort to reach the best available material terms under the circumstances. *Id*.

**Basis for Relief**

28

**I.     The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Loan Documents.**

**A.     Entry into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

42.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and use Cash Collateral.   Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.   Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

43.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment

made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

44.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus*., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "'hard' bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc*., the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. ***Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization***. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

45.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arm's length process and careful evaluation of available alternatives.  Specifically, the Debtors and their advisors determined that the Debtors

would require postpetition financing to meet their near-term liquidity needs, and to achieve a sale. Without the DIP Facility, the Debtors would have been unable to pursue an orderly sale of their business.  The financing was critical to the Debtors' strategy for entering these cases on stable footing.  The proceeds of the DIP Facility shall be used to, among other things, (i) pay the fees, costs, and expenses incurred in connection with the DIP Credit Agreement and the other Loan Documents, and (ii) to pay amounts associated with the Term Loan as provided in the Approved Budget and for working capital and general corporate purposes.  The Debtors negotiated the DIP Facility and other DIP Loan Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available under the circumstances.  Accordingly, the Court should authorize the Debtors' entry into the DIP Credit Agreement, as it is a reasonable exercise of the Debtors' business judgment.

      **B.**      **The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

46.      The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders postpetition security interest in and liens on the Collateral that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order.

47.      The above-described liens on encumbered and unencumbered assets are common features of postpetition financing facilities, and were a necessary feature to provide security for the proposed financings.  Indeed, postpetition financing facilities approved in this Circuit and elsewhere routinely are secured by the proceeds of a debtor's unencumbered assets such as

Case 24-12364-ABA   Doc 37   Filed 03/05/24   Entered 03/05/24 06:54:59   Desc Main
Document      Page 32 of 50


leaseholds that are subject to leases that prohibit the impositions of liens thereon. *See*, *e.g.*, *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Mar. 1, 2024) (approving DIP liens in substantially all of the property, assets, and other interests in property and assets of the debtors, including an equity pledge of foreign subsidiaries and all prepetition property and post-petition property and the proceeds thereof, on an interim basis); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024) (approving DIP liens on collateral including any equity interests of subsidiaries and affiliates or the proceeds thereof as permitted by applicable law); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. July 19, 2023) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. June 15, 2023) (approving DIP liens on collateral including all proceeds of leased real property and proceeds of any avoidance actions); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. May 24, 2023) (same); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (approving DIP liens on collateral including cash, accounts, inventory, and intercompany claims).[6]

48.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c); *see In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained) (citing 11 U.S.C. § 364(c)). Courts have articulated a three-part test to

---

[6]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

     i.      the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

     ii.     the credit transaction is necessary to preserve the assets of the estate; and

     iii.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011); *see also In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

49.    As described above and as set forth in the Del Genio DIP Declaration, no third-party lender indicated it would be willing to provide postpetition DIP financing on an unsecured, *pari passu*, or junior-lien basis to the Prepetition Secured Parties.  *See* Del Genio DIP Decl. ¶ 24. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders.  Absent the DIP Facility, which will provide assurances that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the Debtors would likely need to launch a value-destructive, disorderly liquidation of their businesses at the outset of these chapter 11 cases.  *See id.* at ¶ 13. Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of these chapter 11 cases.  *See id.* at ¶¶ 11-13.  Given the Debtors' financial circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents, are reasonable as more fully set forth above and in the Del Genio DIP Declaration.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

50.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court

> may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  The Debtors are unable to obtain unsecured credit.  Therefore, approving a superpriority claim in favor of the DIP Lenders is reasonable and appropriate.

51.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  The Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties have consented or (b) Prepetition Secured Parties interest in collateral are adequately protected.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc*., 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) their Prepetition Secured Parties have consented or (b) Prepetition Secured Parties interests in collateral are adequately protected.

52.     Here, the DIP Lenders have facilitated $9 million of new money financing.  Given that no third party would provide the same amount or terms for such financing, the liens, claims, and other forms of adequate protection afforded to the DIP Lenders and Prepetition Secured Parties

are both reasonable and necessary. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

53.     Further, pursuant to section 364(d)(1) of the Bankruptcy Code, the Debtors propose to provide to: (a) WFMS a postpetition priming lien and security interest with respect to the WFMS Cash Collateral; and (b) Wells Fargo a postpetition priming lien and security interest with respect to the Prepetition Revolver Cash Collateral. The DIP Lender has consented to the priming of its prepetition and postpetition liens, if any, in respect of the WFMS Cash Collateral and Prepetition Revolver Cash Collateral.

### C.     No Comparable Alternative to the DIP Facility Is Reasonably Available on More Favorable Overall Terms.

54.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also In re Snowshoe* at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

55.     As noted above, the Debtors do not believe that a more favorable alternative DIP financing is reasonably available given the realities imposed by the Debtors' existing capital structure, the Debtors' lack of significant unencumbered value, and the Debtors' solicitation of alternative financing proposals.  *See* Del Genio DIP Decl. ¶¶ 23-24.  Thus, the Debtors have determined that the DIP Facility provides the only viable means through which the Debtors can secure critical liquidity in the near term.  Simply put, the DIP Facility provides the Debtors with the liquidity they need at the lowest cost available while ensuring that the Debtors have runway to achieve a sale transaction.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**D.     The Repayment Features of the DIP Facility Are Appropriate.**

56.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  *See* 11 U.S.C. § 363(b).  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies of Pennsylvania, Inc*., 788 F.2d 143, 150 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp*., 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

57.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements.  Courts in this Circuit have approved similar DIP

features, including on the first day of the case. *See, e.g., In re Rite Aid Corp.,* No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 17, 2023) (authorizing an interim roll-up of the prepetition FILO loans); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. April 24, 2023) (authorizing a $240 million DIP facility, including a roll-up of approximately $200 million of prepetition principal); *In re Cyxtera Techs.*, Inc., No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (authorizing an approximately $200 million DIP financing that included a roll-up of up to $36 million in prepetition first lien term loans debt pursuant to interim order); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 5, 2018) (authorizing an approximately $1,230 million DIP, including a full roll-up of the prepetition ABL outstanding principal of $639 million and a roll-up of prepetition FILO loans of $57 million); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114 million upon entry of the interim order).[7]

58.     The DIP Facility will roll up $16 million in indebtedness outstanding under the Prepetition Term Loan Obligations.  The Roll-Up is a sound exercise of the Debtors' business judgment, is a material component of the DIP Facility, and was required by the DIP Lenders as a condition to their commitments to provide postpetition financing.  *See* Del Genio DIP Decl. ¶ 27. By entering into the DIP Facility and agreeing to the Roll-Up with the support of the DIP Lenders and the Prepetition Term Loan Lenders, the Debtors will receive immediate access to Cash Collateral of the Prepetition Secured Parties, which the Debtors likely could not have secured under a postpetition financing provided by a third-party. *Id.*

---

[7]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

59.     Critically, the roll up of loans under the Prepetition Term Loan Obligations will not prejudice other parties in interest.  All secured creditors have consented to the Roll-Up provided under the DIP Facility.  Importantly, the Roll-Up will not prejudice any rights a party may otherwise have to challenge the amount, validity, perfection, enforceability, priority, or extent of the debt or liens associated therewith.  Pursuant to the procedures set forth in the Interim DIP Order, any official committee appointed in these chapter 11 cases and any other parties in interest have the ability to bring a challenge proceeding in accordance with applicable law.  Interim DIP Order § 4.1.  These procedures were developed to ensure that no party in interest would be prejudiced by the relief requested herein and to provide the Court with comfort that any amounts provided on account of the refinancing can be disgorged, refunded, or repaid to the extent the DIP Facility debt or liens are successfully challenged.  Given these circumstances, the Roll-Up is a sound exercise of the Debtors' business judgment and should be approved.

## II.     The Debtors Should Be Authorized to Use the Cash Collateral.

60.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use Cash Collateral with the consent of the secured party.  *See* 11 U.S.C. § 363(c)(2)(A).  Here, the DIP Lenders and the Prepetition Secured Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

61.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses Cash Collateral.  *See* 11 U.S.C. § 363(e).  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See* 11 U.S.C. § 362(d)(1); *In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts

decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *11 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

### A.    Adequate Protection Provided to the Prepetition Secured Parties.

62.    As set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with a variety of adequate protection to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay, including:

> i.    Replacement Liens.  As adequate protection for the diminution in value of their interests in the Collateral (including Cash Collateral) on account of the Debtors' use of such Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out Expenses, the Prepetition Term Loan Agent, for the benefit of itself and Prepetition Term Loan Lenders (each in their respective capacities under the Prepetition Term Loan Documents), is hereby granted the Term Loan Replacement Lien.  The Term Loan Replacement Lien shall be subject and subordinate to (i) the Permitted Liens and Claims and (ii) the liens and security interests granted to the DIP Secured Parties in the Collateral securing the DIP Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

ii.    Section 507(b) Priority Claims.  As adequate protection for the diminution in value of their interests in the Collateral (including Cash Collateral) on account of the Debtors' use of such Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out Expenses, the Prepetition Term Loan Agent, for the benefit of itself and Prepetition Term Loan Lenders (each in their respective capacities under the Prepetition Term Loan Documents), is hereby granted the Adequate Protection Superpriority Claim.  The Adequate Protection Superpriority Claim shall be subject to the Permitted Liens and Claims and the Superpriority Claim of the DIP Secured Parties, and shall otherwise have priority over all administrative expense claims and unsecured claims against the Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.

iii.    Additional Adequate Protection.

a.    Fees and Expenses.  As further adequate protection, the Debtors are authorized to pay, without further Court order, reasonable and documented legal fees and expenses, incurred before the Petition Date, of counsel to the Prepetition Term Loan Agent (in its capacity under the Prepetition Term Loan Documents) then owing under the Prepetition Credit Agreement.  In addition, the Debtors are authorized to pay, without further Court order, reasonable and documented legal fees and expenses, incurred after the Petition Date, of counsel to the Prepetition Term Loan Agent (in its capacity under the Prepetition Term Loan Documents); provided, that (a) the U.S. Trustee and the Committee shall have ten (10) days from receipt to review the summary legal invoices of such counsel, and (b) in the event the U.S. Trustee or Committee files with this Court an objection to any such legal invoice within ten (10) days of its receipt thereof, the undisputed portion of such legal invoice shall be paid without further order of the Court whereas the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by this Court and (c) in the event neither the U.S. Trustee nor the Committee shall file with this Court an objection to any such legal invoice within ten (10) days of its receipt thereof, such legal invoice shall be paid without further order of the Court and shall not be subject to any further review, challenge or disgorgement.

b.    Adequate Protection Payments.  As further adequate protection, the Prepetition Term Loan Agent, on behalf of itself and the other Prepetition Secured Parties, shall receive, upon entry of the Interim Order, at any time and for so long as any Prepetition Term Loan Obligations remain outstanding, monthly adequate protection payments, as and when due under the applicable Prepetition Term

40

Loan Documents equal to the interest at the contractual non-default rate that would otherwise be owed to the Prepetition Secured Parties under the Prepetition Term Loan Documents during such monthly period in respect of the Prepetition Term Loan Obligations, until such time as the Prepetition Term Loan Obligations are indefeasibly paid  in full or constitute DIP Obligations for all purposes and in either case are no longer subject to challenge.  Any such payments may be subject to disgorgement or recharacterization as principal repayment to the extent of a successful, final, and non-appealable Objection (as defined in the Interim Order), to the extent ordered by the Court.

c.    <u>Information Rights</u>. The Debtors shall promptly provide the Prepetition Term Loan Agent with all required financial reporting and other periodic reporting that is required to be provided to the DIP Agent under the DIP Loan Documents.

**III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders Under the DIP Loan Documents.**

63.    Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders.  In particular, the Debtors have agreed to pay the fees set forth in the Amendment No. 3 Fee Letter, attached hereto as **<u>Exhibit B</u>**, in addition to the other economics set forth in the DIP Credit Agreement.

64.    Courts in this district and others have approved similar aggregates in fees in large chapter 11 cases.  *See, e.g., In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Mar. 1, 2024) (approving original issue discount of 2 percent, maturity extension fee of 1 percent, and a backstop payment of 7.5 percent of the new money loans on an interim basis); *In re Careismatic Brands*, LLC, No. 24-10561 (VFP) (Bankr. D.N.J. Jan. 24, 2024) (approving an 11 percent backstop premium, a 3.5 percent commitment premium, and a 3.5 percent exit premium on $50 million in DIP commitments on an interim basis); *In re Cyxtera Techs, Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (approving a 6.0 percent backstop fee and 3.0 percent commitment fee); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2020) (approving a commitment fee of approximately 3.0 percent of the DIP loans, a backstop fee of

approximately 3.0 percent of the DIP loans, and a fronting premium of approximately 0.50% of the aggregate principal amount); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 5, 2018) (approving a cash fee approximately 2.0 percent of the overall DIP facility).[8]

65.    It is understood and agreed by all parties, that these fees are an integral component of the overall terms of the DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing.  *See* Del Genio DIP Decl. ¶¶ 29-30.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Loan Documents in connection with entering into those agreements.

## IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).

66.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

67.    As explained herein, in the Del Genio DIP Declaration, the DIP Loan Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Lenders provided the best postpetition financing alternative available under the circumstances; and

---

[8]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

(b) extended arm's length, good-faith negotiations between the Debtors and the DIP Lenders.  The

Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable under the

circumstances, and the proceeds of the DIP Facility and Cash Collateral, including Eligible Cash,

will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no

consideration is being provided to any party to the DIP Loan Documents other than as described

herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within

the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections

afforded by that section.

**V.     The Automatic Stay Should Be Modified on a Limited Basis.**

68.     The proposed Interim Order provides that the automatic stay provisions of

section 362 of the Bankruptcy Code will be modified to:

i.      allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order;

ii.     allow the Prepetition Revolver Loan Agent and the Bank Product Providers (including, without limitation, WFMS) to apply: (i) the Letter of Credit Cash Collateral and/or the Expense Reserve to satisfy the Letter of Credit Obligations; (ii) the Bank Product Cash Collateral, the WFMS Cash Collateral, and/or the Expense Reserve to satisfy the Bank Product Obligations (including, without limitation, the WFMS Obligations), as applicable; and (iii) the Expense Reserve to satisfy the Expense and Indemnity Obligations, in each case, as the same become due and owing;

43

      iii.      preserve Wells Fargo's rights under the Card Agreement, including to reduce the credit limit or otherwise modify or amend the Card Agreement, which such rights shall not be waived, modified, or impaired;

      iv.      authorize WFMS to receive or obtain payment for the WFMS Obligations, including, without limitation, by way of recoupment or setoff against sales revenues processed by WFMS on behalf of the Debtors under the WFMS Agreement or the reserve of $1,200,000 currently held by WFMS thereunder, without further order of the Court, regardless of whether such obligations arose prepetition or postpetition;

      v.      authorize the Debtors to pay or reimburse all WFMS Obligations to the extent the amount of the WFMS Obligations owed to WFMS by the Debtors exceeds the sales revenue being processed by WFMS and exceeds the amounts available in reserve; and preserve WFMS's rights under the WFMS Agreement, including to modify or amend the WFMS Agreement, which such rights shall not be waived, modified, or impaired.

69.    The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default (as defined in the Interim Order) and an appropriate opportunity for the Debtors to obtain appropriate relief from the Court, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Loan Documents or applicable law.

70.    Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See*, *e.g.*, *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Mar. 1, 2024) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. Jan. 24, 2024); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 24, 2023) (same); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. Apr. 17, 2023) (same); *ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 5, 2018) (same).[9]

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

71.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the Motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

72.    For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral and access the liquidity provided by the DIP Facility.  Absent access to the DIP Facility and the use of Cash Collateral, the Debtors will likely need to launch a value-destructive liquidation at the outset of these chapter 11 cases.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash.  The

---

[9]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

Debtors will use cash to fund the operation of their business for a sufficient amount of time to conduct a sale transaction. Substantially all of the Debtors' available cash constitutes the Cash Collateral of the Prepetition Secured Parties or other secured parties who hold Permitted Liens (as defined in the DIP Credit Agreement). The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. *See* Del Genio DIP Decl. ¶ 13. In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

73. The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility. The Debtors require the initial funding under the DIP Facility prior to the Final Hearing and entry of the Final Order to continue operating, and to implement the relief requested in the Debtors' other "first day" motions. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## **Request for Final Hearing**

74. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after 30 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## **Request for Bankruptcy Rule 6003 Waiver**

75.     The Debtors assert that immediate relief is necessary to avoid immediate and irreparable harm. Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one (21) days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, entry of the proposed interim order is integral to the Debtors' ability to successfully transition into chapter 11 and avoid a severe disruption of the Debtors' operations at this critical juncture and, in turn, to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion.

## **Request for Bankruptcy Rule 6004 Waivers**

76.     The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## **Waiver of Memorandum of Law**

77.     The Debtors request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and this Motion does not raise any novel issues of law.

## **Reservation of Rights**

78.     Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute any claim; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (f) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

## **Notice**

79.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the District of New Jersey; (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c) counsel to the Stalking Horse Bidder; (d) counsel to the DIP Agent, Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10174, Attn: Marc R. Leduc (marc.leduc@morganlewis.com), Jennifer Feldsher (jennifer.feldsher@morganlewis.com), and McGrail & Bensinger LLP, 888-C Eighth Avenue, #107, New York, NY 10009, Attn: Ilana Volkov (ivolkov@mcgrailbensinger.com); (e) the United States Attorney's Office for the District of New Jersey; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission;

(h) the state attorneys general for states in which the Debtors conduct business; (i) all appropriate state taxing authorities; (j) all landlords, owners, and/or operators of premises at which any of the Debtors' inventory and/or equipment is located; (k) certain other parties identified in the certificate of service filed with the Court, including, without limitation, all creditors who have filed or recorded pre-petition liens or security interests against any of the Debtors' assets; (l) any other party entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order, substantially in the form attached hereto as **Exhibit A**, and the Final Financing Order (a) granting the relief requested herein and (b) granting such other relief as is just and proper under the circumstances.

Dated: March 5, 2024

*/s/ Joseph J. DiPasquale*

**FOX ROTHSCHILD LLP**
Joseph J. DiPasquale, Esq.
Mark E. Hall, Esq.
Michael R. Herz, Esq.
49 Market Street
Morristown, NJ 07960
Telephone: (973) 992-4800
Facsimile: (973) 992-9125

jdipasquale@foxrothschild.com
mhall@foxrothschild.com
mherz@foxrothschild.com

**SIDLEY AUSTIN LLP**
Matthew A. Clemente (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
mclemente@sidley.com

*and*

Maegan Quejada (*pro hac vice* pending)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
mquejada@sidley.com

*and*

Michael A. Sabino (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
msabino@sidley.com

*Proposed Counsel for the Debtors and Debtors in Possession*