**SIDLEY AUSTIN LLP**
Matthew A. Clemente (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
mclemente@sidley.com

Maegan Quejada (*pro hac vice* pending)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
mquejada@sidley.com

Michael A. Sabino (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
msabino@sidley.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**FOX ROTHSCHILD LLP**
Joseph J. DiPasquale, Esq.
Mark E. Hall, Esq.
Michael R. Herz, Esq.
49 Market Street
Morristown, New Jersey 07960
Telephone: (973) 992-4800
Facsimile: (973) 992-9125
jdipasquale@foxrothschild.com
mhall@foxrothschild.com
mherz@foxrothschild.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BOWFLEX INC., *et al.*,[1] | Case No. 24-12364 (ABA) |
| Debtors. | (Joint Administration Requested) |

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: BowFlex Inc. (2667) and BowFlex New Jersey LLC (3679). The Debtors' service address is 17750 S.E. 6th Way, Vancouver, Washington 98683.

**DECLARATION OF ROBERT A. DEL GENIO
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS
TO OBTAIN POSTPETITION FINANCING AND GRANT SECURITY
INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d); (B) MODIFYING THE
AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; (C) AUTHORIZING DEBTORS
TO ENTER INTO AGREEMENTS WITH CRYSTAL FINANCIAL LLC D/B/A
SLR CREDIT SOLUTIONS; (D) AUTHORIZING DEBTORS TO USE CASH
COLLATERAL; AND (E) SCHEDULING A FINAL HEARING
<u>PURSUANT TO BANKRUPTCY RULE 4001</u>**

I, Robert A. Del Genio, hereby declare under penalty of perjury:

1. I am a Senior Managing Director and the co-leader of the New York Metro Region for Corporate Finance and Restructuring at FTI Consulting, Inc. ("<u>FTI Consulting</u>"), which has its principal office located at 1166 Avenue of the Americas 15th Floor, New York, New York 10036. I am a resident of FTI Consulting's New York City office. Since January 2023, FTI Consulting has been serving as financial advisor to the above-captioned debtors and debtors in possession (the "<u>Debtors</u>" and together with their non-debtor wholly owned subsidiaries, the "<u>Company</u>"), which is an engagement I lead. I submit this declaration ("<u>Declaration</u>") in support of the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) And 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "<u>DIP Motion</u>"),[2] filed contemporaneously herewith, seeking authority to, among other things: (a) obtain senior secured postpetition financing

---

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the DIP Motion, the Interim DIP Order, or the DIP Credit Agreement, as applicable.

2

on a super priority basis provided by Crystal Financial LLC d/b/a SLR Credit Solutions ("SLR") as administrative agent and the lenders party thereto consisting of (i) a senior secured super-priority revolving credit facility in an aggregate principal amount of up to $9 million in new money and (ii) a senior secured super-priority term loan facility in an aggregate principal amount of up to $16 million that upon entry of the Interim Order, will roll-up on a dollar-for-dollar basis an equal amount of Prepetition Term Loan Obligations (collectively, the "DIP Facility"); and (b) immediately use the cash collateral of the Prepetition Term Loan Lenders on a consensual basis.[3]

2. Based on my work with the Debtors, I am generally familiar with the Debtors' businesses, financial condition, day-to-day operations, and books and records. Except as otherwise noted herein, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from my review of the Debtors' business records and from the Debtors' employees and retained advisors (including members of my team that report to me) in the ordinary course of my responsibilities.

3. I am over the age of eighteen (18), and the Debtors have authorized me to submit this Declaration on their behalf. I am not being specifically compensated for this testimony other than through payments received by FTI Consulting, as a proposed professional to be retained by the Debtors. If called upon to testify, I could and would testify competently as to the facts set forth in this Declaration.

---

[3] Any description of the proposed terms of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the DIP Credit Agreement and the Interim DIP Order.

**I.     Professional Background and Qualifications**

4.     I joined FTI Consulting in 2017 when it acquired CDG Group, a financial advisory firm I co-founded.   Before that, I was a corporate finance partner and a national director at Ernst & Young.  I have more than forty years of experience in restructuring and mergers and acquisitions and have advised companies, lenders, creditors, corporate boards, and equity sponsors across a diverse range of industries both domestically and internationally.   I hold a Bachelor of Business Administration with high honors from the University of Notre Dame and a Master of Management from the Kellogg Graduate School of Management at Northwestern University.  I am a Certified Public Accountant (inactive status), Certified Turnaround Professional and a fellow in the American College of Bankruptcy.

5.     I have advised companies, lenders, and investors both in and outside of chapter 11 in a variety of complex restructuring engagements.   I acted as the financial advisor to GNC Holdings Inc., Catalina Marketing Corporation, Frontier Communications Corporation, ESSAR Steel, Algoma Steel Inc., Audacy, Inc., AgileThought, Reichhold Holdings US, Inc., Milacron, Inc., Caraustar Industries, Inc., MicroAge, Inc., OSG Group, CST Industries, Dan River, Inc., Wheeling-Pittsburgh Steel Corp., Waypoint, US Internetworking, Factory Card Outlet, Malden Mills, and Metal Forming Technologies during their chapter 11 cases.  I also served as the Strategic Planning Officer of RHI Entertainment, Inc., the Chief Restructuring Officer of The Weinstein Company Holdings LLC during its chapter 11 proceedings, the Chief Restructuring Officer of CHC Group Ltd. during its chapter 11 proceedings, the Chief Restructuring Officer of PHI, Inc. during its chapter 11 proceedings, The Chief Restructuring Officer of Voyager Aviation Holdings, Inc. and the Co-Chief Restructuring Officer of F&W Media and Western Global Airlines during its chapter 11 proceedings.  I also served as the Chief Strategic Officer of Production Resources Group.  I currently serve on the board of directors of Panavision, Inc. after having served as an

4

interim Chief Executive Officer. I have previously served on the boards of Washington Group International, Inc., CHC Group Ltd., Lazare Kaplan International, Inc., and Buffets, Inc. As relevant to my testimony today, my decades of restructuring experience includes liquidity review and cash forecasting, working capital management, chapter 11 planning and administration, and assisting companies with first day and other matters necessary to avoid any unnecessary disruption of their businesses and to protect value as companies transition into their roles as chapter 11 debtors in possession.[4]

6. Pursuant to the DIP Motion, Debtors seek entry of the Interim Order and the Final Financing Order approving, among other things, the Debtors' entry into the DIP Facility and the consensual use of the Cash Collateral.

## II. FTI Retention

7. I understand that the Company faced challenges following the COVID-19 pandemic. In response to these challenges, the Company hired FTI Consulting in January 2023 to serve as financial advisor and assist with liquidity management and other related financial advisory services.

8. In late 2023, the Company engaged FTI Capital Advisors, LLC ("FTICA" and, together with FTI Consulting, "FTI") as investment banker for an in-court sale process. FTICA contacted or received inbound interest from parties regarding a potential transaction. FTI Consulting also expanded its scope of work during this time to further evaluate contingency planning efforts. FTI Consulting conducted outreach in preparation for these chapter 11 filings to solicit offers for the DIP financing.

---

[4] Further information on my professional background is available on FTI Consulting's website at: https://www.fticonsulting.com/experts/robert-del-genio.

5

**III.    The Debtors' Prepetition Capital Structure**

9.     As of the Petition Date, the Debtors have approximately $16.0 million in total funded debt obligations, consisting of approximately $16.0 million in aggregate principal amount outstanding under the Prepetition Term Loan Documents.

10.    As noted in the First Day Declaration, obligations arising under the Prepetition Credit Agreement are secured by a first priority lien on substantially all assets of the Debtors and certain of their non-Debtor affiliates.

**IV.    The Debtors' Prepetition Marketing and Financing Efforts**

   **A.    Need for Access to Financing and the Use of Cash Collateral**

11.    Prior to the Petition Date, the Debtors access to available cash was limited because both the Debtors' Prepetition Term Loan Lenders and Prepetition Revolver Lenders had exercised dominion over various bank accounts. The Debtors and their advisors spent numerous hours negotiating access to such cash with the Debtors' prepetition lenders which was critical to providing the Debtors with sufficient resources to continue operations prior to the filing while the Debtors negotiated the Stalking Horse Bid as well as to continue operations during these chapter 11 cases through the sale process. Without access to the Prepetition Term Loan Lenders' Cash Collateral—as well as the DIP Facility—the Debtors would not be able to finance these chapter 11 cases. Moreover, its Prepetition Term Loan Lenders would have had the ability to exercise remedies against the Debtors' non-Debtor foreign affiliates.

12.    As a result, the Debtors worked with SLR, as agent, as well as the Prepetition Term Loan Lenders, on financing terms designed to minimize any disruption, both in the lead up to these chapter 11 cases and with respect to the Debtors' postpetition operations. Through discussions with its Prepetition Term Loan Lenders, the Debtors were granted access to sufficient funds to pay in full the Debtors' obligations under the Prepetition Revolver Credit Agreement prior to the

6

bankruptcy filing and to cash collateralize outstanding letters of credit and certain bank products provided by Wells Fargo to ensure access to such critical financial accommodations during these chapter 11 cases. In addition, the DIP Facility provides the Debtors with needed liquidity to fund ongoing operations during these chapter 11 cases during the sale process.

13. The continued cooperation of key business partners, including vendors, is critical at the early stage of these chapter 11 cases. Otherwise, the Debtors risk facing a value-destructive interruption to their businesses and, simultaneously, eliminate their best chance for negotiating and consummating a sale, to the detriment of the Debtors, their estates, and all stakeholders, including the collateral positions of their secured lenders. It is important to the Debtors' ability to reassure their suppliers, customers, vendors, employees, and other stakeholders that the Debtors have adequate liquidity to fund these chapter 11 cases and have the support. As such, and due to their current limited liquidity, the Debtors require immediate access to the DIP Facility and use of Cash Collateral to operate their businesses, preserve value, and avoid irreparable harm pending the final hearing. Without access to the DIP Facility and use of Cash Collateral, the Debtors face liquidation.

14. The Debtors' current liquidity needs are illustrated in the DIP Budget, a true and correct copy of which is attached to the Interim Order as **Exhibit B**, showing the operating cash flow and working capital needs of the Debtors over the period set forth in the DIP Budget (the "DIP Term"). The DIP Budget includes anticipated cash receipts and disbursements during the DIP Term and considers several factors, including, but not limited to, the effect of the chapter 11 filing on the Debtors' businesses, professional fees, customer and vendor relationships, and required operational payments.

15. The DIP Budget was developed by the Debtors, with the assistance of their advisors and through negotiations with the DIP Lenders to permit the Debtors to have adequate liquidity to consummate their anticipated sale. The DIP Budget contains line items for the primary categories of cash flows anticipated to be received or disbursed during the period for which the DIP Budget is prepared. I believe that the DIP Budget includes all reasonable, appropriate, necessary, and foreseeable expenses to be incurred in connection with the operation of the Debtors' businesses for the period set forth in the DIP Budget. I also believe that the DIP Budget demonstrates that the Debtors will have adequate liquidity during the DIP Term if allowed to access and use the Cash Collateral and proceeds of the DIP Facility.

**B.    Outreach to Potential Transaction Counterparties**

16. As described above and in the First Day Declaration, the Company's growth and success has faced significant headwinds in recent years as shifts in consumer behavior, macro-economic trends and market wide interest rate pressures have impacted the Company's sales and its liquidity position. The Company faced an urgent need for restructuring efforts to stabilize the Company and assess the long-term viability of the business. The Company has since determined that an expeditious sale process and resolution of these cases is necessary to preserve its limited liquidity and ensure the greatest possible recovery or its stakeholders.

17. Accordingly, FTI Consulting conducted an outreach process to solicit offers for DIP financing in preparation for these chapter 11 filings. FTI Consulting contacted over twenty parties based on the size of the financing need, industry, and parties who provide financing in similar situations to the Debtors. Many of these parties we contacted in a prior out of court financing process we conducted for the company in 2023. While the marketing process garnered some initial interest from third parties, these third parties passed due to size, speed of the process, collateral, and the uncertainty of identifying a stalking horse bidder. Ultimately, the Debtors,

8

assisted by FTI Consulting, determined that the proposed DIP financing structure from SLR was most favorable to support the Debtors in these chapter 11 cases.

18. As part of my work with the Debtors, I have developed an understanding of the Debtors' cash flows and liquidity needs. The Debtors have an urgent need to continue using Cash Collateral and to obtain postpetition financing at the outset of these chapter 11 cases.

C. **Negotiation of the DIP Facility**

19. In the days leading up to the Petition Date, the Debtors and their advisors engaged in negotiations with the DIP Lenders around the terms of the DIP Facility. The Debtors shared numerous draft term sheets and mark-ups, and held multiple telephone conferences with both the advisors to, and principals of, the DIP Lenders. Despite the necessarily condensed timeframe for reaching a deal on postpetition financing, the Debtors marshaled information as quickly as possible and provided a number of critical due diligence items to the DIP Lenders. The parties engaged in hard-fought, arm's-length negotiations in an effort to reach the best available material terms under the circumstances. In addition, through the negotiations, the Debtors were able to secure sufficient cash to pay down Wells Fargo, and to cash collateralize its bank products and outstanding letters of credit in advance of filing. This was particularly significant as Wells Fargo had indicated that they were unwilling to continue to extend additional funding with respect to these chapter 11 cases.

20. In particular, the Company agreed (a) that the indebtedness owed by the Debtors to Wells Fargo under the Debtors' Credit Card Program would be secured by the Bank Product Cash Collateral; (b) that the indebtedness owed to Wells Fargo Merchant Services L.L.C. ("WFMS") under the WFMS Agreement would be secured by Bank Product Cash Collateral and an additional cash collateral reserve of $1,200,000; (c) to provide cash collateral to secure obligations under certain letters of credit; (d) this seems redundant to paragraph b to provide cash collateral to secure continuing cash management services; and (e) to provide cash collateral as an expense

9

reserve. Additionally, Wells Fargo has insisted that its collateral interests be granted super priority status in connection with the post-petition financing. The DIP Lenders and Debtors have agreed to seek authorization to grant postpetition priming liens and security interests to Wells Fargo and WFMS, as more fully described in the DIP Motion and DIP Order, in the cash collateral provided to Wells Fargo described above.

21. In the ordinary course, the Debtors accept certain forms of non-cash payment. Acceptance of various forms of non-cash payment is an integral part of the Debtors' business. To facilitate such payments, the Debtors are parties to agreements with payment processing companies, including WFMS. For such non-cash payments, the Debtors receive the proceeds of the customer sales less any chargebacks, returns, reserves, and processing fees charged by the payment processing companies. The payment processing companies, including WFMS, are critical to the Debtors' operations and cash flows. Because credit and debit card sales account for a significant percentage of the Debtors' direct-to-consumer sales, it is critical that there be no disruptions in these payments.

V.  **The Terms of the Proposed DIP Facility Are the Best Terms Available Under the Circumstances and Should Be Approved**

    A.  **Alternative Sources of Financing on Better Terms Than the DIP Facility Are Not Available to the Debtors**

22. The proposed DIP Facility consists of (a) a new money revolving credit facility in the aggregate principal amount of up to $9 million, and (b) a term loan facility in the aggregate principal amount of up to $16 million that will roll-up on a dollar-for-dollar basis an equal amount of Prepetition Term Loan Obligations (the "Roll-Up"), pursuant to the terms and conditions of the Interim Order and the DIP Credit Agreement. Additionally, the DIP Lenders agreed to reduce and ultimately eliminate the $7 million reserves that was required under the Prepetition Revolver

Credit Agreement, resulting in $7 million of incremental availability for the Debtors' use of postpetition.

23. Based on the Debtors' efforts to secure postpetition financing, my experience in obtaining postpetition financing, current market conditions, the Debtors' circumstances, and my participation in the negotiations around the proposed DIP Facility, I believe that there are no alternative sources of financing available on both better and more executable terms than the DIP Facility. Accordingly, the terms of the DIP Facility are fair and reasonable under the circumstances. I believe that the DIP Facility represents the best option available to address the Debtors' near-term liquidity needs and provide near-term runway for the Debtors to finalize a sale.

24. The Debtors did not receive any actionable postpetition financing proposals from parties outside their existing capital structure. This is due, in part, to the fact that the Debtors have limited unencumbered assets capable of collateralizing postpetition financing. Such unencumbered assets are insufficient to secure the magnitude of financing required to meet the Debtors' near-term liquidity needs. No party that FTI Consulting engaged with as part of the postpetition financing process (other than the DIP Lenders) was interested in providing a postpetition financing package to fund the Debtors' liquidity needs, either on a junior, unsecured, or *pari passu* basis.

25. I therefore believe that the DIP Lenders are particularly well-positioned to provide postpetition financing because they hold obligations and commitments under the Prepetition Term Loan Obligations, and first liens on the Prepetition Collateral. I understand that pursuant to section 364(d)(1) of the Bankruptcy Code, a priming lien may only be granted (a) with the consent of the affected secured lenders, or (b) if adequate protection exists for such priming lien. The

consent of the DIP Lenders is, therefore, required before the Debtors obtain senior secured debtor in possession financing from any source.

26. There were no third-party priming proposals. Further, during discussions with the advisors to the DIP Lenders, the DIP Lenders made it clear that that they would not consent to the Debtors' incurrence of priming financing by any other party.

27. Furthermore, given the lack of alternatives available, the Debtors believe (and I agree) that providing the Roll-Up is a sound exercise of their business judgment. The Roll-Up is a necessary prerequisite to the provision of postpetition financing by the DIP Lenders. Absent the $25 million in financing from the DIP Lenders, the Debtors would have no path to the sale process provided in these chapter 11 cases. By entering into the DIP Facility and agreeing to the Roll-Up with the support of the DIP Lenders and the Prepetition Term Loan Lenders, the Debtors, subject to the terms of the DIP Loan Documents, will receive immediate access to the full availability of the Revolving DIP Loans and Cash Collateral of the Prepetition Secured Parties, including $7 million that was not previously available due to the required reserves under the Prepetition Revolver Credit Agreement, all which the Debtors likely could not have secured under a postpetition financing provided by a third party. The Debtors, in a sound exercise of their business judgment, have determined that the benefit of securing immediate access to cash collateral (which will be used to effectuate the sale transaction) outweighs the costs associated with effectuating the Roll-Up.

28. The array of services provided by Wells Fargo and WFMS, including maintaining letters of credit and merchant processing services, are critical to the Debtors' operations. Therefore, granting Wells Fargo and WFMS priming liens in the collateral held by Wells Fargo and WFMS is in the best interests of the Debtors and has been agreed to by the DIP Lenders.

  **B. The Economic Terms of the DIP Facility Are Competitive and the Fees and Milestones Provided Thereunder Are Reasonable**

  29. The Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent pursuant to the DIP Loan Documents as consideration for the extension of postpetition financing. Additionally, the proposed DIP Facility provides for certain milestones that the Debtors must meet through the chapter 11 cases. Failure to meet any such milestones constitutes an event of default under the DIP Credit Agreement.

  30. These fees and milestones were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing. Under the Debtors' circumstances, I believe that the fees and milestones provided for in the DIP Facility are reasonable and appropriate, and are the best terms available.

**VI. Proposed DIP Facility Provide Crucial Access to Liquidity**

  31. The DIP Facility will enable the Debtors to strengthen their cash position to fund working capital, general corporate purposes, and the expenses of administering the chapter 11 cases and will provide the Debtors with a term loan and a functioning revolving credit facility that will enable the Debtors to prudently manage their liquidity as they did prior to the Petition Date, subject to the DIP Budget.

  32. These facilities will send a positive and credible message to the Debtors' workforce and commercial counterparties that the Debtors will have appropriate liquidity and creditor support to maintain ordinary-course operations and meet their financial commitments throughout these chapter 11 cases. Further, the additional liquidity provided by the DIP Facility will facilitate the Debtors' sale, which will inure to the benefit of all the Debtors' stakeholders.

33. Without immediate access to the proceeds of the DIP Facility and continued use of Cash Collateral, the Debtors will be unable to continue to operate their businesses as a going concern and preserve and maximize the value of their assets for the benefit of all stakeholders. The Debtors, as a leading international developer, distributor and manufacturer of health and fitness products, have important supplier and customer relationships across the industry. The lack of adequate funding will cause a disruption in the Debtors' supply chain, which would adversely impact not only the Debtors' businesses but also those of their customers and suppliers.

34. Any failure to secure postpetition financing will cause immediate and irreparable harm to the Debtors and their stakeholders and will diminish the value of the Debtors' estates to the detriment of their creditors. Moreover, the Debtors' inability to access the proceeds of the DIP Facility and continue using Cash Collateral would severely impede the Debtors' ability to pay employees, insurance, suppliers, lessors, taxes, or other operating expenses. This would cause substantial long-term harm to revenues and business relationships.

## VII. Conclusion

35. A significant cash infusion, in the form of the DIP Facility and proceeds is critically necessary to the continued operation of the Debtors' businesses, the preservation of going concern value, and the maintenance of the Debtors' valuable business relationships. Based on discussions with the Debtors' management, I believe that failure to access the DIP Facility and Cash Collateral will cause immediate and irreparable harm to the Debtors and their estates.

36. Based on my experience in general and my involvement in and supervision of the marketing and negotiation of the DIP Facility in this matter, it is my view that the DIP Facility (and the access to Cash Collateral contemplated in the Interim DIP Order) is the best available postpetition financing option for the Debtors. The DIP Facility offers necessary liquidity. I also believe that the DIP Facility contains terms that are reasonable given the circumstances. Further,

I believe that the negotiation process was full and fair, was comprehensive, and produced the best available financing options under the circumstances.

37. Therefore, I believe that the Court should approve the DIP Facility as requested by the Debtors and authorize the use of Cash Collateral.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 5, 2024

                                          */s/ Robert A. Del Genio*
                                          Robert A. Del Genio
                                          Senior Managing Director
                                          FTI Consulting, Inc.