**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BOWFLEX INC., *et al.*[1] | Case No. 24-12364 (ABA) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF AINA KONOLD
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Aina Konold, hereby declare under penalty of perjury:

1.    I am the Chief Financial Officer, of BowFlex Inc. ("BowFlex Parent"), and an officer of BowFlex New Jersey LLC, each an above-captioned debtor and debtor-in-possession (collectively, the "Debtors" and together with their non-debtor wholly owned subsidiaries, the "Company").  I have more than 25 years of diversified experience in specialty retail and consumer-facing brands focused on fashion, fitness, health and lifestyle.  Prior to joining the Company, I was a Vice President of Finance and Strategy of Gap Inc. and previously CFO of Gap Inc. China.  I hold a Bachelor of Arts degree from Stanford University.

2.    I joined BowFlex Parent as Chief Financial Officer in 2019.  As an officer of the Debtors, I am familiar with the Debtors' businesses and financial affairs, debt structure, assets, contractual arrangements, day-to-day operations, restructuring efforts, and books and records.  Except as otherwise indicated herein, the facts set forth in this declaration (this "Declaration") are based on my personal knowledge, my review of relevant documents and the Debtors' books and

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: BowFlex Inc. (2667) and BowFlex New Jersey LLC (3679).  The Debtors' service address is 17750 S.E. 6th Way, Vancouver, Washington 98683.

records, information provided to me by the Debtors, or advisors to the Debtors, or my opinion

based upon my experience, knowledge, and information concerning the Debtors.  If called upon to

testify, I would testify competently to the facts set forth in this Declaration.  I am duly authorized

to submit this Declaration on behalf of the Debtors.

3.      On March 4, 2024 (the "Petition Date"), the Debtors each commenced with the

United States Bankruptcy Court for the District of New Jersey (the "Court") a voluntary case

(collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  I submit this declaration to provide an overview of the Debtors, their

businesses, and these Chapter 11 Cases, as well as to support the Debtors' petitions and the motions

and applications that the Debtors have filed with the Court, including the "first-day pleadings"

(the "First Day Pleadings").

4.      This Declaration is divided into five sections:

a.  Section I provides an overview of the Debtors and these Chapter 11 Cases;

b.  Section II describes the Debtors' business, its history, and its corporate
    structure;

c.  Section III summarizes the Debtors' prepetition capital structure;

d.  Section IV describes the financial and operational circumstances leading to the
    need for the filing of these Chapter 11 Cases; and

e.  Section V summarizes the relief requested in the First Day Motions.

## I.      Overview

5.      Over the past several decades, the Company has become a leading marketer,

developer and manufacturer of health and fitness products sold under several marquee fitness

brands, including Nautilus, BowFlex, Schwinn, and JRNY.  These product offerings are distributed

2

through diversified direct and retail sales channels, both domestically and internationally, and have made the Company a global leader in innovative home and connected fitness solutions.  In recent years, however, the Company's continued growth and success has faced significant headwinds. As discussed more fully below, post-pandemic demand reduction, retailer over-inventorying, shifts in consumer behavior, macro-economic trends and market-wide interest rate pressures have impacted the home fitness section and the Company's sales and liquidity position.  In response to these dynamics, in the summer of 2021, the Company initiated a process to explore strategic partnerships and sources of capital infusion.  This process failed to result in an out-of-court transaction.  In light of a poor M&A environment in the home fitness sector and macroeconomic headwinds faced by the Company, in December 2023, the Company and its advisors began soliciting interest in an in-court sale of the assets of the Company.  That process resulted in the Stalking Horse Bid (defined below) which requires consummation through a bankruptcy process. The Debtors therefore have commenced these Chapter 11 Cases to effect such a sale (subject to higher and better bids pursuant to the auction process) and liquidate any remaining assets, resolve claims and make distributions pursuant to a chapter 11 plan of liquidation.

6.     Given the Company's liquidity position, moving expeditiously through the sale process is critical.  The milestones contained in the DIP Facility require the Debtors to run an efficient sale process.  As a result, the Debtors are seeking approval of a postpetition sale process for some or all of its assets, which continues the robust prepetition sale process (the "Sale Process") undertaken by the Debtors and their advisors.  The Sale Process, including the selection of the proposed stalking horse bidder, is designed to maximize the value of the Debtors' assets and is in the best interests of its creditors, the estate, and all parties in interest.

## II.    The Company's Business, Corporate Structure and History

7.    The Company, founded in 1986, began with a single strength training machine and steadily grew through acquisition and innovation to offer an array of cardiovascular and strength training equipment and related fitness products for consumer use in an "at-home" setting.  In recent years, the Company has made strategic moves to transform the business, including adopting a consumer-first mindset and developing an adaptive connected-fitness platform.  The Company has developed and incorporated a new subscription-based digital fitness strategy to enhance the competitiveness of its fitness equipment by integrating its digital learning platforms to its equipment and offering users personalized cardio, strength, and whole-body workouts.

8.    In November 2023, after a number of years operating as Nautilus, Inc., the Company changed its name to BowFlex Inc.  The rebranding followed the Company's sale of the Nautilus brand trademark assets and related licenses as part of an ongoing and comprehensive strategic realignment.

9.    The Company is headquartered in Vancouver, Washington, and employs approximately 330 individuals in the United States, as well as 70 individuals internationally (including individuals employed by non-Debtor affiliates).  Through its operations based in Canada, China, Switzerland, the Netherlands, and the United Kingdom, the Company provides products to thousands of customers in over 70 countries, with the mission of empowering healthier living through individualized connected fitness experiences.

10.    As of the Petition Date, the Company's primary product offerings may be placed into the following categories: (i) cardiovascular equipment; (ii) strength training systems; and (iii) connected fitness technology.  The Company sells its products through both direct to consumer and retail channels, partnering with online-only retailers, sporting goods stores, electronics stores,

furniture stores, large-format and warehouse stores, as well as smaller specialty retailers and independent bike dealers.

11.    The Company's cardiovascular equipment and strength training systems are sold under such strongly recognized brands as BowFlex and Schwinn and are deployed primarily in private home settings.  With respect to the BowFlex line, product offerings include: C6® and VeloCore® bikes, the Max Trainer® line, several treadmills variations, as well as strength products such as the SelectTech® dumbbells, kettlebells, and barbells, and a range of home gyms. The Schwinn brand, known for its exercise bikes, similarly offers several cardiovascular related products that are compatible with the Company's connected fitness offerings.



12.    The JRNY brand is the Company's connected fitness offering, assisting subscribers to achieve self-directed fitness goals by offering curated workout recommendations and entertainment options.  The JRNY platform uses machine learning to create a myriad of

personalized workouts based on an initial fitness assessment and thereafter adapts those workouts as the progress in the fitness program is made.  The JRNY platform's advanced motion tracking technology enhances the experience of members using the Company's dumbbells.  The technology delivers immediate feedback and personalized form coaching, repetition counting and weight recommendations, further enriching and maximizing the user's workouts.  The Company has integrated JRNY into the Company's other products, such as its BowFlex cardio equipment and exercise bike offerings from the Schwinn brand.



13.    In connection with its product lines, the Company maintains a strong intellectual property portfolio, holding a number of trademarks, as well as ownership or licenses over patents and design registrations covering dumbbells, kettlebells, barbells, treadmills, exercise bikes, elliptical machines, and software.

14.    All of the Company's products are produced by third-party manufacturers, primarily located in Asia and, generally, have a lead time of two to three months, which requires active management and strategic planning with respect to forecasting and meeting consumer demand.  In the United States, the Company operates distribution facilities in Ohio and California and contracts with third-party warehouses and logistics providers to fulfill orders.

15.    An illustrative chart of the Company's corporate structure as of the Petition Date is below.[2]



### III.    BowFlex's Prepetition Capital Structure

16.    As of the Petition Date, the Debtors have approximately $16 million in total funded debt obligations.  The outstanding principal amounts and collateral of the existing debt obligation is set forth herein are as follows:

| Funded Debt | Maturity | Outstanding Principal Amount | Collateral |
| --- | --- | --- | --- |
| SLR Term Loan Facility | October 29, 2026 | Approx. $16 million | First priority lien on substantially all assets of BowFlex Inc., BowFlex Delaware LLC, BowFlex |

---

[2]    Non-Debtor Pacific Direct LLC holds the intellectual property associated with the Schwinn brand.  Through a joint venture, Pacific Direct LLC has granted licenses to use the Schwinn brand for indoor fitness equipment to BowFlex Inc., while licenses to use the Schwinn brand for wheeled vehicles were granted to Pacific Cycle, LLC.

| | | | New Jersey LLC, Nautilus Fitness Canada, Inc., Nautilus Fitness International B.V., Nautilus Fitness UK Ltd, and Nautilus Switzerland AG. |
|---|---|---|---|
| | **Total Funded Debt** | $16 million | |

### 1.    The Wells Fargo Facility

17.    On January 31, 2020, BowFlex Parent entered into a Credit Agreement (as amended, the "Wells Fargo Credit Agreement") by and among BowFlex Parent as borrower (the "WF Borrower"), Wells Fargo Bank, National Association, a national banking association ("Wells Fargo"), as administrative agent and the lenders from time to time party thereto (the "WF Lenders").

18.    As discussed below, BowFlex Parent and Nautilus Fitness Canada, Inc. entered into the SLR Credit Agreement (as defined below), which provided for the SLR Term Loan Facility (as defined below).  The proceeds of the SLR Term Loan Facility were utilized by BowFlex Parent to extinguish the then-existing $9.1 million term loan extended under the Wells Fargo Credit Agreement, to pay transaction expenses, and for general corporate purposes.

19.    Thereafter, prior to the Petition Date, the Debtors and Wells Fargo executed that certain *Payoff Letter*, dated as of February 26, 2024 (the "Payoff Letter"), pursuant to which, *inter alia*, the Debtors paid in full and/or cash collateralized all obligations owing under the Wells Fargo Credit Agreement (other than certain contingent liabilities, which by the terms of the Prepetition Revolver Credit Agreement, remain continuing).

### 2.    The SLR Term Loan Facility

20.    On November 30, 2022, BowFlex Parent and Nautilus Fitness Canada, Inc. entered into that certain Term Loan Credit Agreement (the "Initial SLR Credit Agreement"), which was subsequently amended by that certain Amendment No. 1, dated as of April 25, 2023, Amendment

No. 2, dated as of July 28, 2023, and as may be further amended, supplemented or otherwise modified from time to time (the Initial SLR Credit Agreement, as so amended, the "SLR Credit Agreement"), with the lender parties thereto (the "SLR Lenders" or the "Prepetition Lenders") and Crystal Financial LLC d/b/a SLR Credit Solutions, as administrative agent (the "SLR Agent").[3] The SLR Credit Agreement provides for a term loan facility in the initial aggregate principal amount of $30.0 million (the "SLR Term Loan Facility" or the "Prepetition Facility").

21.    The SLR Credit Agreement will mature on October 29, 2026, provided that the maturity is not accelerated pursuant to the terms set forth in the SLR Credit Agreement. Obligations arising under the SLR Credit Agreement and the SLR Term Loan Facility are secured by a first lien on substantially all of the Debtors' assets.[4]  Interest on the SLR Term Loan Facility accrues at the Secured Overnight Financing Rate, plus a margin of 7.75% to 8.25% per annum based on a fixed charge coverage ratio calculation.

22.    As of the Petition Date, the amount outstanding under the SLR Credit Agreement is approximately $16 million in unpaid principal, plus accrued and unpaid interest, fees and other expenses, including a $499,000 early termination premium which became payable on the Petition Date.

### 3.    Trade and Related Debt

23.    As stated herein, the majority of the Company's products and their components are manufactured and sourced from third-party vendors primarily located in Asia.  The Company places orders with those vendors based on actual and forecasted consumer demand and distributes

---

[3]    Each of Nautilus Fitness International B.V., Nautilus Fitness UK Ltd, Nautilus Switzerland AG, Nautilus (Shanghai) Fitness Equipments Co., Ltd., BowFlex Delaware LLC and BowFlex New Jersey LLC are guarantors of the SLR Term Loan Facility.

[4]    Obligations arising under the SLR Credit Agreement and the SLR Term Loan Facility are also secured by a lien on substantially all of the assets of non-Debtors Nautilus Fitness International B.V., Nautilus Fitness UK Ltd, Nautilus Switzerland AG or Nautilus (Shanghai) Fitness Equipments Co., Ltd..

those products through its retail and direct channels.  As of the Petition date, the Debtors estimate that they have approximately $60,000,000 in obligations to trade and other general unsecured creditors.  These amounts consist primarily of accounts payable to various trade creditors, utility providers, and other third-party service providers.

### 4.    Equity Interests

24.    As of the Petition Date, BowFlex Parent has approximately 36,361,526 shares of common stock issued and outstanding.  BowFlex Parent is publicly traded on the New York Stock Exchange (the "NYSE") and, as of the Petition Date, was trading at approximately $0.20 per share. On September 21, 2023, the NYSE issued a notice of non-compliance to BowFlex Parent because the average share price of BowFlex Parent's common stock was less than $1.00 per share over a period of 30 trading-day.  The notice indicated the NYSE would initiate procedures to delist the common stock of BowFlex Parent unless the non-compliance was cured within the prescribed period. On November 27, 2023, the NYSE issued a second notice of non-compliance to BowFlex Parent because its average global market capitalization over a consecutive 30 trading-day period was less than $50.0 million and, at the same time, its last reported stockholders' equity was less than $50.0 million.

## IV.    Circumstances Leading to Commencement of These Chapter 11 Case

25.    The health and fitness marketplace is extremely competitive and is subject not only to broad market variables and macro-economic conditions, such as supply constraints and borrowing expenses, but also to cyclical consumer behavior and, at times, to unpredictable (and short-lived) trends.  While the Company fostered and maintained a competitive advantage for a number of years through its continued development and acquisition of innovative fitness products and offerings, unforeseen and dramatic shifts in consumer fitness brought on by the COVID-19

pandemic, and related economic and commercial constraints that accompanied it, severely hindered the Company's ability to adjust to diverging consumer preferences and demand.

26.     As set forth in more detail below, the Company's declining liquidity, along with its inability to raise additional adequate capital, required it to engage advisors to explore additional strategic alternatives.  The Company pursued a marketing process to find a buyer for its assets or a source of new capital.  This process ultimately resulted in the Stalking Horse Bid.  During the marketing process, several weeks before the Petition Date, the Prepetition Lenders instituted cash dominion under the loan documents based on events which the Company disputes.  Ultimately, the Company determined that filing these Chapter 11 Cases was the best path to maximizing the value of its assets and operations for the benefit of its creditors and all parties in interest.

A.     **North Star Strategic Shift**

27.     In 2019, with new leadership in place, the Company began diagnosing its key issues.  This led to the development of a transformational strategy, *North Star: Journey to 2026*, which began in 2020 and was formally announced to the public in 2021.  The five strategic pillars of the North Start strategy are: (a) adopt a consumer first mindset; (b) scale a differentiated digital offering; (c) focus investments on core businesses; (d) evolve supply chain to be a strategic advantage; and (e) build organizational capabilities to win by unleashing the power of the team.

28.     The strategic realignment was focused on shifting the Company from a product-led hardware company to a consumer-led, digitally connected company.  The Company aimed to leverage its core strengths to transform into a business that propelled healthier consumer lifestyles through individualized connected fitness experiences.  In order to accomplish its goals, the Company determined that it needed to search for a strategic partner or additional sources of capital, leading to its hiring of Evercore Group LLC ("Evercore") in the summer of 2021.  Evercore worked with the Company's management team to conduct diligence on the assets, develop a

targeted buyer list, prepare marketing materials, and executed on a communication strategy meant to attract the attention of strategically positioned potential counterparties.  This process resulted in the sale by the Company in the spring of 2023 of the Nautilus brand trademark assets and related licenses for approximately $10.5 million.

### B.    Change in Consumer Preferences and Increased Competition

29.    The COVID-19 pandemic drastically shifted consumer behavior within the health and fitness industry.  In response to lock-downs and restriction on in-facility use, consumers changed the way they approached fitness; moving from activities and classes based in gyms and studios to the home.[5]



Q: Where have you worked out on a weekly basis in the past 3 months (ie., since [date])? Please select all that apply.

30.    Although this shift in consumer behavior brought potential opportunity for the Company, it also brought on challenges.  Those challenges caused by the pandemic are all too familiar—insufficient supply capacity, pricing headwinds related to commodity prices and foreign exchange rates, global logistics constraints, and chip shortages.  Notably, the biggest challenge in

---

5    *See* Sarah Marion, *Moving Past the Pandemic: How Fitness Habits Have Changed*, The Global Health & Fitness Association (January 26, 2023).

this period came from the Company's retail sales.  Reacting to the lack of inventory for the 2020 holiday season due to the "pull-forward" of consumer demand, the Company's retailers ordered record inventory for the 2021 holiday season.  To fulfill its retailers' orders, the Company increased its orders from its inventory suppliers and made other adjustments to the business, ultimately increasing costs.  However, in 2022, demand started to normalize, and, coupled with the increased offerings in the market, retailers were left with excess inventory and the Company was left without sufficient revenue to cover its increased expenses.  In response to the reduction in sales in FY23, the Company implemented a cost cutting plan in February 2023 which included a reduction in force and resulted in annualized cost reductions of $30 million.

31.     To date, while the overall consumer fitness segment has settled post-pandemic, the marketplace is now saturated with product offerings from a number of sellers and retailers. Moreover, challenging macroeconomic conditions have strongly influence consumer discretionary spending—further reducing sales and supply.  The Company's retailers continue to work through their existing inventory and have not reordered as expected.  These factors further hinder the Company's ability to attain the benchmarks necessary to service its obligations and operate as a going concern.

### C.     Interest Rate Pressures

32.     The Company has primarily relied upon cashflows generated by its ongoing activities and the issuance of debt (*e.g.*, the SLR Term Loan Facility) to fund its operations and strategic initiatives over the past several years.  As discussed in Section III.B., the Company has approximately $16 million in principal amount outstanding as of the Petition Date under the Prepetition Facility.  The interest component of the Prepetition Facility, as amended, fluctuate based on certain base rates (*i.e.*, SOFR).  As interest rates have steadily increased over the last several months, so too have the Company's debt obligations.

33.     Due to increased interest rate pressures in the past 12 months, interest rate expense has increased from approximately $1.085 million in FY 2021 to approximately $3.795 million in FY 2023.  The steady increase in interest rates and costs of capital, with minimal to no relief in the near term, has detrimentally impacted BowFlex's ability to service its debt obligations.

### D.     Exploration of Strategic Alternatives

34.     In the wake of the shift in consumer behavior and preferences, industry headwinds, continuing liquidity pressures, and anticipated needs for additional funding in the near term, the Company faced an urgent need for restructuring efforts to stabilize the Company and assess the long-term viability of the business.  The Company is confident that the business remains a unique investment opportunity and has been in search of a transaction counterparty to capitalize on the Company's potential.  In connection with these efforts, the Company engaged with its various stakeholders on its current situation and potential solutions.

### 1.     Board Hires Advisors

35.     In late 2022 the Company's management team began to interview a number of professionals to assist with contingency planning.  The Company subsequently hired FTI Consulting, Inc. ("FTI Consulting") in January 2023 to serve as financial advisor and assist with liquidity management and other related financial advisory services.  Evercore continued its work to find a strategic transaction, and the Company focused on exploring deals with various counterparties for most of 2023, with one counterparty emerging as a strategic investor near the end of 2023.  However, the counterparty was unable to gain the necessary approvals to consummate the deal and the Company was forced to begin its marketing process anew in late 2023.  The Company engaged further advisors to explore other strategic alternatives, including bankruptcy.  Specifically, FTI Capital Advisors, LLC ("FTICA" and, together with FTI Consulting, "FTI") was hired as investment banker for an in-court sale process and FTI Consulting

expanded its scope to further evaluate contingency planning efforts.  Simultaneously, Sidley Austin LLP's ("Sidley Austin") existing engagement was expanded to include assisting the Company in its contingency planning efforts.

### 2.    Prepetition Sale and Marketing Process

36.    While the Company continued its search for an out-of-court transaction guided by Evercore, faced with a short liquidity runway and growing payables, the Company also worked with FTICA to explore interest in an in-court sale.  FTICA contacted or received inbound interest from approximately 132 strategic and financial parties regarding a potential transaction, primarily comprising large-cap and mid-cap public and private companies with strategic interests in consumer facing fitness offerings with possible commercial applications.  With respect to this outreach process, FTICA prioritized parties with both adequate commercial infrastructure and sufficient capital resources—or a reasonable likelihood of being able to obtain such capital—to consummate a transaction that would maximize the value of the Debtors or their assets.

37.    Despite the best efforts of the Company and its advisors, the strategic alternative exploration and evaluation process—including the marketing process—the Company was unable to find any counterparty to consummate a viable out-of-court transaction.  However, it has robust interest in an in-court 363 sale process. Accordingly, the Company has determined that an expeditious sale process and resolution of these cases is necessary to preserve its limited liquidity and ensure the greatest possible recovery for its stakeholders. The Company was able to secure a stalking horse bidder, Johnson Health Tech Retail, Inc. (the "Stalking Horse Bidder"), and executed a stalking horse asset purchase agreement on March 4, 2024 (the "Stalking Horse Bid").

38.    The Debtors intend to maximize the value of their assets for stakeholders in this case by building upon the prepetition marketing process and expeditiously selling its assets to the highest and best bidder(s) in a public auction.

### 3.    Compensation Plan

39.    In January 2024, the Company and its advisors developed a plan designed to retain certain key employees with knowledge to assist the Debtors' in these Chapter 11 Cases to maximize the value for all the Debtors' stakeholders (the "Compensation Plan").    The Compensation Plan contemplated the continued employment of thirty-eight (38) rank-and-file employees whose positions were imperative to either maintaining the Debtors' continued operations or guide the company through the strategic review process, including any potential sale or bankruptcy proceeding.    It also contemplated the retention of five (5) senior executive employees, all of whom hold critical knowledge or expertise necessary to continue operations of the Company during the strategic review process and assist the Company in maximizing the value of its assets through a sale or other strategic transaction.    Eligible employees who participate in the Compensation Plan forgo any amounts that are payable or may be granted to them in the future under any other retention agreement or arrangement with the company.    Moreover, if any eligible employee voluntarily leaves before their retention period is realized, the retention payments made under the Compensation Plan are subject to clawback.    Additionally, an eligible employee forgoes any unvested amount under the Compensation Plan if that employee leaves before that unvested amount becomes due.

40.    The Compensation Plan awarded approximately $2 million to the retained employees, and was approved by the Board following extensive discussions on January 31, 2024. The Company disclosed its entry into the Compensation Plan and the payments made thereunder to the public in an 8-K filed with the Securities and Exchange Commission on February 2, 2024.

### 4.    Lenders Institute Cash Dominion

41.    On or about February 12 and February 13, 2024, the Company received notices from the Prepetition Lenders asserting that a cash dominion event had occurred due to (1) an

alleged event of default and (2) the Company's failure to maintain adequate availability, as required under Prepetition Facility.  The Company disputed both bases.  Thereafter, the Debtors and their advisors spent numerous hours negotiating access to such cash with the Debtors' prepetition lenders which was critical to providing the Debtors with sufficient resources to continue operations prior to the filing while the Debtors negotiated the Stalking Horse Bid as well as to continue operations during these Chapter 11 Cases through the sale process.

### 5.    Post Petition Financing

42.    As stated in the DIP Declaration,[6] the Debtors worked with SLR, as agent, as well as the prepetition term lenders, on financing terms designed to minimize any disruption, both in the lead up to these Chapter 11 Cases and with respect to the Debtors' postpetition operations.  The current cash balance is insufficient to operate the Debtors' enterprises in the immediate term.  Accordingly, FTI Consulting conducted an outreach process to solicit offers for DIP financing in preparation for these chapter 11 filings.  I understand that FTI Consulting contacted over twenty parties based on the size of the financing need, industry, and parties who provide financing in similar situations to the Debtors.  Ultimately, the Debtors, assisted by FTI Consulting, determined that the proposed DIP financing structure from Crystal Financial LLC d/b/a SLR was most favorable to support the Debtors in these Chapter 11 Cases.

43.    In the days leading up to the Petition Date, the Debtors and their advisors engaged in negotiations with the DIP Lenders around the terms of the DIP Facility (as defined in the DIP Declaration).  The parties engaged in hard-fought, arm's-length negotiations in an effort to reach

---

[6]    "DIP Declaration" shall mean the *Declaration of Robert A. Del Genio in Support of Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) And 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral;[6] and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001.*

the best available material terms under the circumstances.  I understand that the DIP Facility

represents the best option available to address the Debtors' near-term liquidity needs and provide

near-term runway for the Debtors to finalize a sale.

## V.    First Day Motions

44.    Contemporaneously herewith, the Debtors have filed a number of First Day

Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business

operations, facilitate the efficient administration of these Chapter 11 Cases, and expedite a swift

and smooth restructuring of the Debtors' balance sheet, including the following:

- "Postpetition Financing and Cash Collateral Motion":  Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expenses Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001

- "Cash Management Motion":  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Use of Their Existing Cash Management System, Bank Accounts, Credit Card Program, and Business Forms, (B) Continue Intercompany Transactions, and (C) Pay Related Prepetition Obligations, (II) Waiving Certain Investment and Deposit Guidelines, and (III) Granting Related Relief;

- "Creditor Matrix Motion":  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix and (B) File a Consolidated List of 30 Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of All Equity Security Holders of BowFlex Inc. and Provide Notices Directly to Equity Security Holders, (III) Authorizing Debtors to Redact Certain Personally Identifiable Information in the Creditor Matrix and Certain Other Documents, (IV) Approving the Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, And (V) Granting Related Relief;

- "Automatic Stay Motion":  Debtors' Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and *Ipso Facto* Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief;

- "Insurance Motion":  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Maintain Certain Insurance Policies and Programs and to Pay All Obligations with Respect Thereto, (II) Authorizing Continuation of Insurance

Premium Financing Agreements, (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (IV) Granting Related Relief;

- "<u>Joint Administration Motion</u>": Debtors' Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief;

- "<u>Schedules and Statements Motion</u>": Debtors' Motion for Entry of an Order (I) Extending the Deadline to File (A) Schedules of Assets and Liabilities and Statements of Financial Affairs and (B) Initial Rule 2015.3 Financial Reports, and (II) Granting Related Relief;

- "<u>Epiq Retention Application</u>": Debtors' Application for Entry of an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date;

- "<u>NOL Motion</u>": Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief;

- "<u>Taxes Motion</u>":  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes & Fees, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief;

- "<u>Utilities Motion</u>":  Debtors' Motion for Entry of Interim and Final Orders Prohibiting the Debtors' Utility Providers from Altering, Refusing, or Discontinuing Services, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Utility Services, (II) Approving Procedures for Resolving Further Adequate Assurance Requests, and (IV) Granting Related Relief;

- "<u>Critical Vendors Motion</u>":  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to Pay or Honor Certain Prepetition Trade Claims in the Ordinary Course of Business, (II) Authorizing the Debtors to Pay Claims in Respect of Outstanding Purchase Orders, and (III) Granting Related Relief;

- "<u>Customer Programs</u>": Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Maintain and Administer Prepetition Customer Programs and Practices, (II) Authorizing Debtors to Pay and Honor Related Prepetition and Postpetition Obligations, (III) Authorizing Debtors to Pay and Honor Processing Obligations, (IV) Authorizing Debtors to Utilize Electronic Means of Communications to Provide Notice to Direct Consumers and (V) Granting Related Relief;

- "<u>Wages and Benefits Motion</u>": Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Compensation, and Benefit Obligations and (B) Continue Employee Compensation and Benefits Programs and (II) Granting Related Relief;

- "Case Management": Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures, and (II) Granting Related Relief.

45.     Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored its requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

46.     I have consulted with the Debtors' advisors regarding the relief requested in the First Day Motions, and understand each of the First Day Motions and the relief requested therein. To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate, and each such factual statement is incorporated herein by reference.

47.     I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption and maximize value preservation during the pendency of these Chapter 11 Cases.  Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtors, their businesses, and their estates. Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated this 5th day of March, 2024

/s/ Aina Konold
Aina Konold
Chief Financial Officer
BowFlex Inc.