Caption in Compliance with D.N.J. LBR 9004-1(b)

| |
|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** |
| In Re: <br><br> BOWFLEX INC., *et al.*,[1] <br><br>         Debtors. |

Order Filed on March 6, 2024
by Clerk
U.S. Bankruptcy Court
District of New Jersey

Chapter 11

Case No. 24-12364 (ABA)

(Joint Administration Requested)

## INTERIM ORDER
## (A) AUTHORIZING DEBTORS
## TO OBTAIN POSTPETITION FINANCING
## AND GRANT SECURITY INTERESTS AND SUPERPRIORITY
## ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105,
## 364(c) AND 364(d); (B) MODIFYING THE AUTOMATIC STAY PURSUANT
## TO 11 U.S.C. § 362; (C) AUTHORIZING DEBTORS TO ENTER INTO AGREEMENTS
## WITH CRYSTAL FINANCIAL LLC D/B/A SLR CREDIT SOLUTIONS;
## (D) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; AND
## (E) SCHEDULING A FINAL HEARING PURSUANT
## <u>TO BANKRUPTCY RULE 4001</u>

The relief set forth on the following pages, numbered three (3) through sixty-one (62), is

hereby ORDERED.

**DATED: March 6, 2024**

Honorable Andrew B. Altenburg, Jr.
United States Bankruptcy Court

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: BowFlex Inc. (2667) and BowFlex New Jersey LLC (3679).  The Debtors' service address is 17750 S.E. 6th Way, Vancouver, Washington 98683.

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**SIDLEY AUSTIN LLP**
Matthew A. Clemente (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
mclemente@sidley.com

Maegan Quejada (*pro hac vice* pending)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
mquejada@sidley.com

Michael A. Sabino (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
msabino@sidley.com

**FOX ROTHSCHILD LLP**
Joseph J. DiPasquale, Esq.
Mark E. Hall, Esq.
Michael R. Herz, Esq.
49 Market Street
Morristown, NJ 07960
Telephone: (973) 992-4800
Facsimile:  (973) 992-9125
jdipasquale@foxrothschild.com
mhall@foxrothschild.com
mherz@foxrothschild.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

(Page | 3)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al.* |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Upon the motion (the "**Motion**") dated March 5, 2024 of BowFlex Inc. f/k/a Nautilus, Inc. ("**BowFlex**") and BowFlex New Jersey LLC ("**BowFlex New Jersey**") (each, a "**Debtor**" and collectively, the "**Debtors**"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Cases**"), for entry of an order (the "**Interim Order**") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 506(c) (subject to entry of Final Financing Order (as defined below)), 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), rules 2002, 4001(c), 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 4001-1, 4001-2, 4001-3, 9013-1, 9013-2, 9013-4, and 9013-5 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local Rules**"), seeking among other things:[2]

    i.       authorization for BowFlex to obtain, and for BowFlex New Jersey to guarantee unconditionally, on a joint and several basis, postpetition loans, advances and other financial accommodations on an interim basis for a period through and including the date of the Final Hearing (as defined below) from the DIP Lenders (as defined below) and Crystal Financial LLC d/b/a SLR Credit Solutions ("**SLR**"), as administrative and collateral agent (in such capacity, together with its successors and permitted assigns, the "**DIP Agent**"), pursuant to the DIP Loan Documents (as

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the DIP Credit Agreement (as defined below), as applicable.

(Page | 4)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

defined below) and in accordance with all of the borrowing requirements, terms and conditions set forth in the DIP Credit Agreement (as defined below), and in accordance with this Interim Order, secured by (i) superpriority priming security interests in and liens upon all Prepetition Collateral (as defined in the DIP Credit Agreement) pursuant to section 364(d) of the Bankruptcy Code, subject only to the Permitted Liens and Claims (as defined below), and (ii) senior priority security interests in and liens upon all other Collateral (as defined below) pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, subject only to the Permitted Liens and Claims;

ii.     authorization for the Debtors to enter into (a) that certain Amendment No. 3 to Term Loan Credit Agreement and Loan Documents (the "**Amendment**"), a copy of which is attached hereto as **Exhibit 1** and is incorporated herein (the Prepetition Credit Agreement (as defined below), as amended by the Amendment and as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**" (a copy of which is attached hereto as **Exhibit 1**), by and among the Debtors, the DIP Agent and the Lenders (as defined in the DIP Credit Agreement) (collectively, the "**DIP Lenders**," and together with the DIP Agent, the "**DIP Secured Parties**") and (b) the Loan Documents as defined in the DIP Credit Agreement, including that certain fee letter dated March 6, 2024,

(Page | 5)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

delivered from the DIP Agent to the Debtors (the "**SLR Fee Letter,**" DIP Budget (as defined below) and the DIP Credit Agreement, as such Loan Documents may be amended, restated or supplemented from time to time, collectively, the "**DIP Loan Documents**") and to perform such other acts as may be necessary, desirable or appropriate in connection with this Interim Order and the DIP Loan Documents;

iii.     authorization for the Debtors to incur obligations in connection with the DIP Credit Agreement in an aggregate principal amount of up to $25,000,000 (the "**DIP Facility**") subject to the terms and conditions set forth in the DIP Credit Agreement, consisting of:

a.      Revolving DIP Loans.  A new money senior secured super-priority revolving credit facility in an aggregate principal amount of up to $9,000,000 (the obligations thereunder, the "**Revolving DIP Obligations**"), fully available upon entry of this Interim Order in accordance with the terms and conditions of the DIP Loan Documents; and

b.      Term Loans.  A senior secured super-priority term loan facility in an aggregate principal amount of up to $16,000,000 (the "**DIP Term Loan Facility**") that upon entry of this Interim Order, will roll-up on a dollar-for-dollar basis an equal amount of Prepetition Term Loan Obligations (as defined below) so that the Prepetition Term Loan Obligations shall

(Page | 6)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

constitute obligations under the DIP Term Loan Facility (the obligations thereunder, the "**Term DIP Obligations**" and collectively with the Revolving DIP Obligations, the "**DIP Obligations**");

iv.      authorization for the Debtors to remit all proceeds of Collateral (as defined in the DIP Credit Agreement), including but not limited to collections and payments made in respect of the Collateral for application to the DIP Obligations (as defined below) as required under the DIP Credit Agreement until such DIP Obligations are fully and indefeasibly repaid;

v.      authorization for the Debtors to use proceeds of the Revolving DIP Loans (as defined below) and Cash Collateral including Eligible Cash (as defined in the DIP Credit Agreement) for payment of the items specified in the DIP Budget and in accordance with the terms of the DIP Loan Documents;

vi.      the grant to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, of superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations;

vii.      as set forth below, approval of certain stipulations by the Debtors with respect to the Prepetition Term Loan Documents (as defined below) and the rights, claims, liens and security interests arising therefrom;

(Page | 7)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

viii.    authorizing the Debtors to use Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code), including any Eligible Cash, of the Prepetition Term Loan Lenders (as defined below), if any, in accordance with this Interim Order and the DIP Loan Documents;

ix.    as set forth below, granting adequate protection to (a) the Prepetition Term Loan Agent (as defined below) and the Prepetition Term Loan Lenders in respect of all diminution in the Prepetition Secured Parties' (as defined below) interests in the Collateral, including, but not limited to, the Debtors' use of Cash Collateral and other Collateral in accordance with and subject to the terms and conditions of the DIP Loan Documents and this Interim Order;

x.    authorizing the Debtors to grant a priming lien and security interest to Wells Fargo, continue the WFMS Agreement, pay the WFMS Obligations, and grant a priming lien and security interest to WFMS;

xi.    authorizing WFMS to continue to receive or obtain payment for all WFMS Obligations, including, without limitation, by way of recoupment or setoff against sales revenues processed by WFMS on behalf of the Debtors under the WFMS Agreement, or pursuant to the WFMS, the WFMS Cash Collateral;

xii.    modifying the automatic stay as necessary to authorize each of the Prepetition Revolver Loan Agent and the Bank Product Providers to apply: (a) the Letter of

(Page | 8)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al.* |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Credit Cash Collateral and/or the Expense Reserve to satisfy the Letter of Credit Obligations; (b) the Bank Product Cash Collateral, the WFMS Cash Collateral, and/or the Expense Reserve to satisfy the Bank Product Obligations (including, without limitation, the WFMS Obligations), as applicable; and (c) the Expense Reserve to satisfy the Expense and Indemnity Obligations, in each case, as the same become due and owing;

xiii.     effective upon entry of the Final Financing Order (as defined below), the waiver of the Debtors' rights (i) to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code; and (ii) any "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the Collateral as to the DIP Secured Parties and the Prepetition Secured Parties;

xiv.     modification of the automatic stay to the extent hereinafter set forth;

xv.     the setting of a final hearing on the Motion to be held within 30 days of the entry of the Interim Order to consider entry of a final order (the "**Final Financing Order**") authorizing, among other things, the DIP Loan Documents and all borrowings and deemed borrowing thereunder on a final basis, as set forth in the Motion and the DIP Loan Documents; and

xvi.     the immediate effectiveness of this Interim Order and waiver of any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

(Page | 9)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al.* |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

The initial hearing on the Motion having been held by this Court on March 6, 2024 (the "**Interim Hearing**").

It appearing that due and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "**Notice**") having been served by the Debtors in accordance with Bankruptcy Rule 4001(c) on (i) counsel to the DIP Agent, (ii) the United States Trustee for the District of New Jersey (the "**U.S. Trustee**"), (iii) the holders of the thirty (30) largest unsecured claims against the Debtors' Estates (as defined below), (iv); the Internal Revenue Service, (v) all appropriate state taxing authorities, (vi) all landlords, owners, and/or operators of premises at which any of the Debtors' inventory and/or equipment is located, and (vii) certain other parties identified in the certificate of service filed with the Court, including, without limitation, all creditors who have filed or recorded prepetition liens or security interests against any of the Debtors' assets (collectively, the "**Notice Parties**").

Upon the record made by the Debtors at the Interim Hearing, including the Motion and the *Declaration of Aina Konold in Support of Chapter 11 Petitions and First Day Pleadings*, and the filings and pleadings in the Cases, and good and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.   <u>Petition</u>.   On March 4, 2024 (the "**Petition Date**"), each Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code with this Court.  The Debtors continue

(Page | 10)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.     Jurisdiction and Venue.  The Court has jurisdiction of this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion is a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D), and (M).  Venue of the Cases and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     Notice.  The Notice given by the Debtors of the Motion, the Interim Hearing and the relief granted under this Interim Order complies with Bankruptcy Rules 4001(b) and 4001(c) and Local Rule 9013-2.

D.     Debtors' Acknowledgments and Agreements.  Without prejudice to the rights of any official committee that may be appointed in these Cases under section 1102 of the Bankruptcy Code (the "**Committee**") and other parties-in-interest as and to the extent set forth in Section 4 of this Interim Order, the Debtors admit, stipulate, acknowledge and agree that:

(i)     *Prepetition Term Loan Documents*.  Prior to the commencement of the Cases, SLR, as administrative agent and collateral agent (in such capacity, the "**Prepetition Term Loan Agent**"), the term lenders party thereto (the "**Prepetition Term Loan Lenders**," and together with the Prepetition Term Loan Agent, the "**Prepetition Secured Parties**"), in their respective capacities under the Prepetition Credit Agreement (as defined below), made terms loans, advances and provided other financial accommodations to Debtor BowFlex and its affiliates,

(Page | 11)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

pursuant to the terms and conditions set forth in (a) the Term Loan Credit Agreement, dated November 30, 2022, as amended by the Limited Consent and Amendment No. 1 to Term Loan Credit Agreement and Loan Documents, dated April 25, 2023 ("**Amendment No. 1**") and the Amendment No. 2 to Term Loan Credit Agreement and Loan Documents, dated July 28, 2023 ("**Amendment No. 2**")(the "**Prepetition Credit Agreement**"); (b) the Guaranty and Security Agreement, dated November 30, 2022 (as amended by Amendment No. 1, Amendment No. 2, Joinder No. 1 and Amendment to Guaranty and Security Agreement, dated as of February 16, 2023, Joinder No. 2 and Amendment to Guaranty and Security Agreement, dated as of March 14, 2023, Joinder No. 3 and Amendment to Guaranty and Security Agreement, dated as of April 14, 2023, and Joinder No. 4 to Guaranty and Security Agreement, dated as of January 22, 2024, and Joinder No. 5 to Guaranty and Security Agreement, dated as of February 19, 2024, the "**Prepetition Guaranty and Security Agreement**"); and (c) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of the Prepetition Term Loan Agent or any Prepetition Term Lender in connection with or related to the Prepetition Credit Agreement and the Prepetition Guaranty and Security Agreement (collectively, the "**Prepetition Term Loan Documents**"). Copies of the operative Prepetition Term Loan Documents are on file with counsel to the Debtors and available upon reasonable request.

       (ii)    *Prepetition Term Loan Obligations Amount*. As of the Petition Date, the Debtors were indebted to the Prepetition Secured Parties under the Prepetition Term

| (Page | 12) | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Loan Documents in an aggregate outstanding principal amount of not less than $15,999,234.76, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses), premiums and other charges accrued, accruing or chargeable with respect thereto (collectively, the "**Prepetition Term Loan Obligations**"). The Prepetition Term Loan Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Debtors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Prepetition Term Loan Obligations.

(iii) *Prepetition Secured Parties.* No claims, objections, challenges, counterclaims, causes of action and/or choses in action, defenses or setoff rights of any Debtor exist against the Prepetition Secured Parties under the Prepetition Term Loan Documents or the Prepetition Term Loan Obligations under any contract or tort (including, without limitation, lender liability) theories of recovery, whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 (including, without limitation, sections 510, 544, 547, 548, 549, or 550) of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, and to the extent any

(Page | 13)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

claims, objections, challenges, counterclaims, causes of action and/or choses in action, defenses or setoff rights are deemed to have existed as to any of the foregoing, the Debtors hereby forever waive, discharge and release any right they may have to challenge any of the Prepetition Term Loan Obligations, and to assert any setoff rights, defenses, claims, objections, challenges, counterclaims, causes of action and/or choses of action whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against the Prepetition Secured Parties, and as to each of the foregoing, their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors, in each case in connection with any matter related to the Prepetition Term Loan Obligations and the Prepetition Term Loan Documents, or the financing and transactions contemplated thereby, or the Prepetition Collateral.

(iv)     *Prepetition Term Loan Collateral.*  As of the Petition Date, the Prepetition Term Loan Obligations were fully secured pursuant to the Prepetition Term Loan Documents by valid, perfected, enforceable and non-avoidable first priority security interests and liens on all Prepetition Collateral, including all assets of the Debtors, granted by the Debtors to the Prepetition Term Loan Agent, for the benefit of itself and the other Prepetition Secured Parties, subject only to the liens specifically permitted under the Prepetition Term Loan Documents to the extent that such liens, security interests or encumbrances are (i) valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date, and (ii) senior to, and have not been or are subject to being subordinated to, the Prepetition Secured Parties' liens on and

(Page | 14)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

security interests in the Prepetition Collateral or otherwise avoided, and, in each instance, only for so long as and to the extent that such encumbrances are and remain senior and outstanding (hereinafter referred to as the "**Permitted Encumbrances**"). The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Prepetition Secured Parties' liens, claims or security interests in the Prepetition Collateral.

(v)   *Prepetition Term Loan Proof of Claim*. The acknowledgment by the Debtors of the Prepetition Term Loan Obligations and the liens, rights, priorities and protections granted to or in favor of the Prepetition Secured Parties as set forth herein and in the Prepetition Term Loan Documents shall be deemed a timely filed proof of claim by the Prepetition Term Loan Agent on behalf of itself and the other Prepetition Secured Parties in these Cases.

E.   Findings Regarding the Postpetition Financing.

(i)   *Postpetition Financing*. The Debtors have requested from the DIP Secured Parties, and the DIP Secured Parties are willing to extend certain loans and other financial accommodations on the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

(ii)   *Need for Postpetition Financing*. The Debtors do not have sufficient available sources of working capital, including Cash Collateral, to operate their businesses in the ordinary course of their business without the financing requested under the Motion. The Debtors'

(Page | 15)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of the Debtors' bankruptcy estates (the "**Estates**") for the benefit of all creditors of the Debtors. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Secured Parties, as set forth in this Interim Order and the DIP Loan Documents, is vital to the preservation and maintenance of the going concern values of the Debtors. Accordingly, the Debtors have an immediate need to obtain the postpetition financing to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' Estates.

(iii) *No Credit Available on More Favorable Terms*. The Debtors are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to section 364(c)(1), (2), or (3) of the Bankruptcy Code, without the grant of liens on assets. The Debtors have been unable to procure the necessary financing on terms more favorable taken as a whole, than the financing offered by the DIP Secured Parties pursuant to the DIP Loan Documents.

(Page | 16)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

(iv)     *DIP Budget*.  The Debtors have prepared and delivered to the DIP Secured Parties an initial 13-week budget, a copy of which is annexed hereto as **Exhibit B** (as may be amended, modified, extended or replaced in accordance with the DIP Loan Documents, the "**DIP Budget**"), which has been approved by the DIP Secured Parties.  Such DIP Budget has been thoroughly reviewed by the Debtors and their management and sets forth, among other things, the Debtors' projected cash receipts and disbursements for the periods covered thereby.  The Debtors represent that, to the best of their knowledge, the DIP Budget is achievable and is anticipated to allow the Debtors to operate at all times during these Cases without the accrual of unpaid administrative expenses.  The DIP Secured Parties are relying upon the Debtors' compliance with the DIP Budget, subject to, and in accordance with, the terms of the DIP Loan Documents and this Interim Order in determining to enter into the postpetition financing arrangements provided for herein.  Any and all cash and cash equivalents shall be used by the Debtors solely in accordance with this Interim Order and the DIP Budget, subject to permitted variances as provided for in the DIP Credit Agreement.  Other than as expressly set forth in this Interim Order, the consent of the DIP Secured Parties to the DIP Budget shall not be construed as consent to the use of any cash after the occurrence of an Event of Default (as defined below), regardless of whether the aggregate funds on hand shown on the DIP Budget have been exhausted.

(v)     *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The terms of the DIP Loan Documents and this Interim Order are fair, just and reasonable under the

(Page | 17)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Loan Documents and this Interim Order have been negotiated in good faith and at arms' length by and among the Debtors, on one hand, and the applicable DIP Secured Parties, on the other hand, with all parties being represented by counsel. Any credit extended under the terms of this Interim Order and the DIP Loan Documents shall be deemed to have been extended in good faith by the applicable DIP Secured Parties, as that term is used in section 364(e) of the Bankruptcy Code.

(vi)     *Good Cause*. The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (a) minimize disruption to the Debtors' businesses and ongoing operations, (b) preserve and maximize the value of the Debtors' Estates, and (c) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

(vii)     *Immediate Entry*. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(c)(2). No party appearing in the Cases has filed or made an objection to the relief sought in the Motion or the entry of this Interim Order, or any

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED, THAT:**

Section 1.   Authorization and Conditions to Financing.

1.1   Motion Granted.   The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order.   Except as otherwise expressly provided in this Interim Order, any objection to entry of this Interim Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

1.2   DIP Loans – Authorization to Borrow and Use Loan Proceeds.

1.2.1   Revolving DIP Loans.   The Debtors are hereby authorized and empowered to borrow and obtain the Revolving Loans (as defined in the DIP Credit Agreement, the "**Revolving DIP Loans**") and to incur indebtedness and obligations under the Revolving DIP Loans owing to the DIP Secured Parties subject to the terms and conditions of this Interim Order, the DIP Credit Agreement, and the other DIP Loan Documents in the amount of up to $9,000,000 (which represents the Revolving Credit Maximum Amount under the DIP Credit Agreement), during the period commencing on the date of this Interim Order through and including the date of the Final Hearing, in accordance with the terms and conditions set forth in the DIP Loan Documents.   Subject to the terms and conditions contained in this Interim Order and the DIP Loan

(Page | 19)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Documents, the Debtors shall use the proceeds of the Revolving DIP Loans and any other credit accommodations provided to the Debtors pursuant to this Interim Order and the DIP Loan Documents solely for payment of the items specified in the DIP Budget and in accordance with the terms of the DIP Loan Documents.  The Revolving DIP Loans may be repaid and reborrowed pursuant to the terms of the DIP Loan Documents.

       1.2.2   <u>DIP Term Loans</u>.  Upon entry of this Interim Order, the Debtors are also authorized and empowered to immediately borrow and obtain the Term Loans (as defined in the DIP Credit Agreement, the "**DIP Term Loans**," and together with the Revolving DIP Loans, the "**DIP Loans**") and to incur indebtedness and obligations owing under the DIP Term Loans to roll up on a dollar-for-dollar basis the Prepetition Term Loan Obligations (including interest, fees, indemnities and other expenses provided for in the Prepetition Term Loan Documents) into DIP Term Loans as of the date of this Interim Order (it being understood that such Prepetition Term Loan Obligations shall continue in all respects and be deemed Term DIP Obligations), other than the Early Termination Premium (pursuant to the Prepetition Term Loan Documents), fees and expenses under the Prepetition Term Loan Documents and any accrued attorney's fees through the Petition Date which shall be payable in full and cash to the Prepetition Term Loan Lenders upon entry of this Interim Order (the "**Non-Roll Up Obligations**").

(Page | 20)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

## 1.3    DIP Loan Documents

1.3.1    <u>Authorization</u>.  The Debtors are hereby authorized to enter into, execute, deliver, perform, and comply with the terms, conditions and covenants of the DIP Loan Documents, pursuant to which, *inter alia*, each Debtor ratifies, reaffirms, extends, assumes, adopts, amends, and restates the Prepetition Term Loan Documents to which it is a party.  The Debtors are further authorized to pay the fees set forth in the SLR Fee Letter and the Non-Roll Up Obligations, to the extent not in duplication.

1.3.2    Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Loan Documents and this Interim Order.  No obligation, payment, transfer or grant of security under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or be subject to any defense, reduction, setoff, recoupment or counterclaim.  The Debtors are hereby authorized, pursuant to this Interim Order, to pay any accrued and unpaid fees and expenses of the DIP Secured Parties as of the Petition Date in accordance with the terms and conditions of the DIP Loan Documents and without further order of the Court.

(Page | 21)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

1.3.3   <u>Approval</u>.  The DIP Loan Documents and each term set forth therein are approved to the extent necessary to implement the terms and provisions of this Interim Order. All of such terms, conditions and covenants shall be sufficient and conclusive evidence of the borrowing arrangements by and among the Debtors and the DIP Secured Parties, and of each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all DIP Obligations arising thereunder including, without limitation, principal, interest, monitoring fees, upfront fees, unused line fees, DIP facility fees, and other fees and expenses thereunder.

1.3.4   <u>Payments and Application of Payments</u>.  Subject to the terms of the DIP Loan Documents and this Interim Order, the Debtors are authorized and directed to make all payments and transfers of Estate property, including all proceeds of Collateral, to the DIP Secured Parties as provided, permitted and/or required under the DIP Loan Documents, which payments and transfers shall not be avoidable or recoverable from the DIP Secured Parties under the Bankruptcy Code, or any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law or otherwise.  Without limiting the generality of the foregoing, the Debtors are authorized, without further order of this Court, to pay or reimburse the DIP Secured Parties for all past, present and future costs and expenses, including, without limitation, all professional fees, consultant fees, appraisal fees, field examiner fees, and legal fees and expenses, paid or incurred by the DIP Secured Parties in connection with the financing transactions as

(Page | 22)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

provided in this Interim Order and the DIP Loan Documents, all of which shall be secured by the Collateral; provided, that (a) the U.S. Trustee and the Committee (if appointed) shall have ten (10) days from receipt to review the summary legal invoices of counsel to the DIP Secured Parties incurred after the Petition Date for reasonableness; (b) in the event the U.S. Trustee or the Committee files with this Court an objection to any such legal invoice within ten (10) days of its receipt thereof, the undisputed portion of such legal invoice shall be paid without further order of the Court, and the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by the parties or this Court; and (c) in the event neither the U.S. Trustee nor the Committee shall file with this Court an objection to any such legal invoice within ten (10) days of its receipt thereof, such legal invoice shall be paid without further order of the Court and shall not be subject to any further review, challenge or disgorgement.

    1.3.5    Continuation of Prepetition Procedures.    Except to the extent expressly set forth in the DIP Loan Documents or as otherwise agreed between the DIP Agent and the Debtors, all prepetition practices and procedures for the payment and collection of proceeds of the Collateral, the turnover of cash, the delivery of property to the DIP Secured Parties by the Debtors and their U.S. and foreign affiliates, and fundings pursuant to the DIP Documents, including deposit account control agreements and any other similar lockbox or blocked depository bank account arrangements, are hereby approved and shall continue without interruption after the commencement of the Cases.

(Page | 23)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

1.4    <u>DIP Loan Amendment</u>.    Subject to the terms and conditions of the applicable DIP Loan Documents, the Debtors and the DIP Secured Parties (each in their respective capacities under the DIP Loan Documents) may amend, modify, supplement or waive any provision of the DIP Loan Documents (a "**DIP Loan Amendment**") without further approval or order of the Court so long as (i) such DIP Loan Amendment is not material (for purposes hereof, a "material" DIP Loan Amendment shall mean, any DIP Loan Amendment that operates to increase the interest rate other than as currently provided in the applicable DIP Loan Document, increase the Revolving Credit Maximum Amount (as defined in the DIP Credit Agreement), add specific new events of default or enlarge the nature and extent of default remedies available to any DIP Secured Party following an Event of Default, or otherwise modify any terms and conditions in any DIP Loan Document in a manner materially less favorable to the Debtors) and is undertaken in good faith by any of the DIP Secured Parties and the Debtors, and (ii) the Debtors provide prior written notice of the DIP Loan Amendment to (x) the U.S. Trustee, (y) counsel to the Committee (if any), and (z) counsel to the DIP Agent.   Any material DIP Loan Amendment to the DIP Loan Documents must be approved by the Court to be effective.   All non-material DIP Loan Amendments shall be filed by the Debtors with the Court promptly following the execution thereof.

(Page | 24)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Section 2.    <u>Postpetition Liens; Superpriority Administrative Claim Status.</u>

2.1    <u>DIP Loans – Postpetition Lien Granting</u>.  To secure the prompt payment and performance of any and all DIP Obligations of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising (including, without limitation, the Prepetition Term Loan Obligations rolled into the Term DIP Obligations in accordance with the terms hereof), the DIP Agent, for the benefit of itself and the other DIP Secured Parties, shall have and is hereby granted, effective as of the Petition Date, (i) valid and perfected, priming first priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' Estates may have (but subject to the Permitted Liens and Claims (as defined below), as and to the extent expressly provided in Sections 2.3 and 4 below) in and upon all Prepetition Collateral now existing or hereafter acquired and (ii) senior priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' Estates may have (but subject to the Permitted Liens and Claims, as and to the extent expressly provided in Sections 2.3 and 4 below), in and upon all other Collateral; <u>provided</u>, <u>however</u>, that any lien on property and/or proceeds recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code shall be subject to entry of the Final Financing Order.

2.2    <u>DIP Loan Lien Priority</u>.  The liens and security interests of the DIP Secured Parties granted under the DIP Loan Documents and this Interim Order in the Collateral shall be

(Page | 25)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

and shall continue to be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with section 363, 364, or any other section of the Bankruptcy Code or other applicable law; provided, however, that the DIP Secured Parties' liens on and security interests in the Collateral shall be subject only to  (i) the Permitted Encumbrances to the extent such Permitted Encumbrances are senior to, and have not been or are subject to being subordinated to, the DIP Agent's liens on and security interests in the Collateral or otherwise avoided, and only for so long as and to the extent that such Permitted Encumbrances are and remain senior and outstanding and (ii) the Carve Out Expenses solely to the extent provided for in Section 2.7 of this Interim Order (the foregoing clauses (i) and (ii) are collectively referred to herein as the "**Permitted Liens and Claims**").

2.3     Postpetition Lien Perfection.

2.3.1    This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the postpetition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with any deposit bank or with any other financial institution(s) holding a depository account or other account consisting of or containing Collateral (a "**Perfection**

(Page | 26)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Act"). Notwithstanding the foregoing, if the DIP Agent, shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, the DIP Agent is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or required by such DIP Agent, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law.  The DIP Agent may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law.  Should the DIP Agent so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.

2.3.2   Nullifying Prepetition Restrictions to Postpetition Financing.

Notwithstanding anything to the contrary contained in any prepetition agreement, contract, lease, document, note or instrument to which any Debtor is a party or under which any Debtor is obligated, except as otherwise permitted under any DIP Loan Documents, as applicable, any provision that restricts, limits or impairs in any way any Debtor from granting the DIP Agent

(Page | 27)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

security interests in or liens upon any of the Debtors' assets or properties (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) under the DIP Loan Documents or this Interim Order, as applicable, or otherwise entering into and complying with all of the terms, conditions and provisions hereof or of the DIP Loan Documents, shall not (i) be effective and/or enforceable against any such Debtor(s), the DIP Agent or any other DIP Secured Parties, as applicable, or (ii) adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to the DIP Agent and the other DIP Secured Parties pursuant to this Interim Order or the DIP Loan Documents, in each case, to the maximum extent permitted under the Bankruptcy Code and other applicable law.

2.4     Superpriority Administrative Expenses.  For all DIP Obligations (including, without limitation, the Prepetition Term Loan Obligations rolled into the Term DIP Obligations in accordance with the terms hereof), now existing or hereafter arising pursuant to this Interim Order, the DIP Loan Documents or otherwise the DIP Agent, for the benefit of itself and the other DIP Secured Parties (each in their respective capacities under the DIP Loan Documents), is granted an allowed superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter*

(Page | 28)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

*alia*, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113, or 1114 of the Bankruptcy Code (and subject to entry of the Final Financing Order, priority over all claims brought under sections 506(c) or 552 of the Bankruptcy Code), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof (the "**Superpriority Claim**"), subject only to the Carve Out Expenses.  The Superpriority Claim shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order (or, after entry thereof, the Final Financing Order) or any provision thereof is vacated, reversed, amended or otherwise modified, on appeal or otherwise.

2.5     Carve Out Expenses.

2.5.1    Carve Out Expenses.  The DIP Secured Parties' liens, claims and security interests in the Collateral and their Superpriority Claim shall each be subject to the following expenses (the "**Carve Out Expenses**"):

a.     statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6);

b.     fees payable to the Clerk of this Court;

c.     fees and expenses of any chapter 7 trustee appointed in any Debtor's bankruptcy cases, not to exceed, in the aggregate, $10,000;

(Page | 29)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

d.      subject to the terms and conditions of this Interim Order, Allowed Professional Fees (as defined below) incurred during the period commencing on the Petition Date and ending on the Trigger Date (as defined below) (the "**Pre-Trigger Date Period**") by attorneys, accountants and other professionals retained by the Debtors and any Committee(s) under section 327 or 1103(a) of the Bankruptcy Code (collectively, the "**Professionals**"); <u>provided</u> that the aggregate amount of such Allowed Professional Fees included in the Carve Out Expenses pursuant to this clause (d) shall be the *lesser* of (A) the budgeted amount of Allowed Professional Fees in the DIP Budget for the Pre-Trigger Date Period up to a maximum of $550,000 per week during the Pre-Trigger Date Period for all Professionals and an aggregate of $2,750,000 for all Professionals for all weeks during the Pre-Trigger Date Period and (B) the actual Allowed Professional Fees incurred during the Pre-Trigger Date Period; <u>less</u> the sum of all Allowed Professional Fees incurred during the Pre-Trigger Date Period and paid at any time, and any retainers held by any Professional (the "**Pre-Trigger Date Professional Fee Carve Out**"); and

e.      subject to the terms and conditions contained in this Interim Order, Allowed Professional Fees incurred by Professionals on or after the Trigger Date in an aggregate amount not to exceed $250,000 (the "**Post-Trigger Date Professional Fee Carve Out**," and together with the Pre-Trigger Date Professional Fee Carve Out, collectively, the "**Professional Fee Carve Out**").

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

For purposes of this Interim Order, (a) the term "**Allowed Professional Fees**" shall mean the unpaid and outstanding reasonable fees and expenses of Professionals (i) actually incurred on or after the Petition Date and (ii) allowed at any time by a final order of the Court pursuant to sections 326, 328, 330, or 331 of the Bankruptcy Code (but excluding any transaction, restructuring, completion, success or similar fees); and (b) the term "**Trigger Date**" shall mean the date upon which the DIP Agent provides written notice to the Debtors of the occurrence of an Event of Default.  In the event that the Trigger Date occurs prior to the end of any week set forth in the DIP Budget, then for purposes of calculating the portion of the Pre-Trigger Date Professional Fee Carve Out available for such week, the amount of the "professional fee" line item in the DIP Budget for such week shall be multiplied by a fraction, the numerator of which shall be the number of days in such week prior to the Trigger Date, and the denominator of which shall be seven (7).

2.5.2    <u>Excluded Professional Fees</u>.  Notwithstanding anything to the contrary in this Interim Order, neither the Professional Fee Carve Out nor the proceeds of any DIP Loan or the Collateral shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following: (a) an assertion or joinder in (but excluding any investigation into, subject to the Committee Challenge DIP Budget (as defined below)) any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of the Prepetition Term

(Page | 31)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Loan Obligations, the DIP Obligations or the prepetition or postpetition liens on and security interests in the Collateral of the DIP Agent and any other DIP Secured Parties, and the Prepetition Secured Parties, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Prepetition Term Loan Obligations, the DIP Obligations or the prepetition or postpetition liens on and security interests in the Collateral of the DIP Agent and any other DIP Secured Parties, and the Prepetition Secured Parties, or (iii) preventing, hindering or delaying the DIP Secured Parties' assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of this Interim Order; (b) a request to use Cash Collateral other than as provided in this Interim Order, without the prior written consent of the DIP Agent; (c) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than as provided in this Interim Order, without the prior written consent of the DIP Agent; (d) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against the DIP Agent, and Prepetition Term Loan Agent (in any capacity under the Prepetition Term Loan Documents or the DIP Loan Documents, as applicable), or any other DIP Secured Party (in any capacity under the DIP Loan Documents) (each a "**Secured Party**," and collectively, the "**Secured Parties**"), or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from any Secured Party under chapter 5 of the Bankruptcy

(Page | 32)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Code; or (e) any act which has or could materially and adversely modify or compromise the rights and remedies of any Secured Party, or which results in the occurrence of an Event of Default under the DIP Loan Documents or this Interim Order. Notwithstanding the foregoing, up to $25,000 (the "**Committee Challenge DIP Budget**") in the aggregate of the Carve Out Expenses may be used by any Committee (if appointed) to investigate (but not prosecute) an objection in accordance with, and subject to, Section 4.1 of this Interim Order.

2.6     Carve Out Reserve. The DIP Agent, at its discretion, may at any time and in any increment, establish a reserve (the "**Reserve**") against the amount of DIP Loans or other credit accommodations, as applicable, that would otherwise be made available to the Debtors pursuant to the lending formulae contained in the DIP Loan Documents in respect of the Carve Out Expenses set forth in Section 2.7; provided that the Reserve shall be reduced on a dollar-for-dollar basis with any reduction of the Carve Out Expenses.

2.7     Payment of Carve Out Expenses.

2.7.1     Prior to the Trigger Date and subject to the terms and conditions contained in this Interim Order, the Debtors shall be authorized to utilize a portion of the DIP Loans and Cash Collateral made available to the Debtors in accordance with the DIP Budget and the terms and conditions of the DIP Loan Documents and this Interim Order to fund Allowed Professional Fees up to the amounts set forth in the DIP Budget. Any such amounts paid prior to

(Page | 33)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

the Trigger Date shall permanently reduce the Pre-Trigger Date Professional Fee Carve Out on a dollar-for-dollar basis.

2.7.2    Any payment or reimbursement made either directly by the DIP Secured Parties at any time, or by or on behalf of the Debtors on or after the Trigger Date in respect of any Allowed Professional Fees prior to or after the Trigger Date shall permanently reduce the Professional Fee Carve Out and Reserve, each on a dollar-for-dollar basis.  Any funding by any of the DIP Secured Parties of the Professional Fee Carve Out or any other Carve Out Expenses shall be added to and made a part of the DIP Obligations, secured by the Collateral, and entitle the DIP Secured Parties to all of the rights, claims, liens, priorities and protections under this Interim Order, the applicable DIP Loan Documents, the Bankruptcy Code or applicable law.  Payment of any Carve Out Expenses, whether by or on behalf of any DIP Secured Party, shall not and shall not be deemed to reduce the DIP Obligations, and shall not and shall not be deemed to subordinate any DIP Secured Parties' liens and security interests in the Collateral or their Superpriority Claim to any junior pre- or postpetition lien, interest or claim in favor of any other party.  The DIP Secured Parties shall not, under any circumstance, be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Cases under any chapter of the Bankruptcy Code, and nothing in Section 2.7 of this Interim Order shall be construed to obligate any of the DIP Secured Parties in any way, to pay compensation to or to reimburse expenses of any Professional, or to ensure that the Debtors have sufficient funds to pay such

(Page | 34)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

compensation or reimbursement. For the avoidance of doubt, the DIP Agent may satisfy its obligation to fund any Carve Out Expenses or the Post-Trigger Date Professional Fee Carve Out by depositing into escrow or by permitting the Debtors (in the DIP Agent's sole discretion) to utilize Cash Collateral to deposit into escrow with counsel for the Debtors or with an escrow agent mutually acceptable to the parties, the Carve Out Expenses, including the Post-Trigger Date Professional Fee Carve Out at which time the DIP Agent shall be automatically released and forever discharged from any obligation to fund the Carve Out Expenses or the Post-Trigger Date Professional Fee Carve Out . If any funds escrowed for Carve Out Expenses are used for any purpose other than for payment of Allowed Professional Fees subject to, and in accordance with, the terms and conditions of this Interim Order, the amount of such funds so used shall nevertheless permanently reduce the amount of the Carve Out Expenses on a dollar-for-dollar basis. For the avoidance of doubt, nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described herein.

2.8   Use of Cash Collateral; Adequate Protection.

2.8.1   Authorization to Use Cash Collateral. For the avoidance of doubt, to the extent any cash constitutes Cash Collateral subject to the prepetition liens and security interests granted to the Prepetition Secured Parties (each in their capacities under the Prepetition Term Loan Documents), the Debtors shall be and are hereby authorized to use such Cash Collateral, including any Eligible Cash in the Eligible Cash Account, but solely in accordance with

(Page | 35)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

the DIP Loan Documents (including the DIP Budget) and this Interim Order.  Nothing in this

Interim Order shall authorize the disposition of any assets of the Debtors or their Estates outside

the ordinary course of business, or any Debtor's use of Cash Collateral or other proceeds resulting

therefrom, except as permitted in this Interim Order, the DIP Loan Documents and in accordance

with the DIP Budget, subject to any permitted variances as and to the extent set forth in the DIP

Loan Documents.

2.8.2  Treatment of Certain Cash Collateral.  Immediately after the

effective date of the DIP Credit Agreement, funds referred to in Section 5(a)(iii) of the Amendment

shall be applied by the DIP Agent as provided in Section 2.4(e)(i)(A) of the DIP Credit Agreement.

2.8.3  Authorization to use Eligible Cash.  For the avoidance of doubt and

subject to the terms of the DIP Credit Agreement, at the Debtor's option, not more than once per

week and upon not less than one (1) Business Day's prior written notice to the DIP Agent, the

Debtor may request from the Eligible Cash Account a distribution of Eligible Cash.  The DIP

Agent shall distribute such Eligible Cash to the Designated Account as long as (i) no Default or

Event of Default has occurred and is continuing or would result therefrom, (ii) the Eligible Cash

Account contains Eligible Cash sufficient to make such distribution, (iii) immediately before and

after giving effect to such distribution the Total Revolving Outstandings are $0.00, (iv) the Debtor

has delivered to the DIP Agent a Borrowing Base Certificate as of the date of such proposed

withdrawal reflecting that, after giving effect to such withdrawal, the Total Outstandings do not

| | |
|---|---|
| (Page \| 36) | |
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

exceed the Line Cap and (v) after giving effect to such withdrawal, the amount of cash, Cash Equivalents, Collections or amounts credited to all DDAs or Securities Accounts of the Domestic Loan Parties and their Domestic Subsidiaries (for the avoidance of doubt, other than the Eligible Cash Account) shall not exceed for all such DDAs and Securities Accounts the sum of (x) $1,500,000 and (y) the Budgeted Disbursement Amount for the week in which such withdrawal is made.

2.8.4   Replacement Liens.  As adequate protection for the diminution in value of their interests in the Collateral (including Cash Collateral) on account of the Debtors' use of such Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out Expenses, the Prepetition Term Loan Agent, for the benefit of itself and Prepetition Term Loan Lenders (each in their respective capacities under the Prepetition Term Loan Documents), is hereby granted pursuant to sections 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "**Term Loan Replacement Lien**").  The Term Loan Replacement Lien shall be subject and subordinate to (i) the Permitted Liens and Claims and (ii) the liens and security interests granted to the DIP Secured Parties in the Collateral securing the DIP Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

2.8.5   Section 507(b) Priority Claims.  As adequate protection for the diminution in value of their interests in the Collateral (including Cash Collateral) on account of

(Page | 37)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

the Debtors' use of such Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out Expenses, the Prepetition Term Loan Agent, for the benefit of itself and Prepetition Term Loan Lenders (each in their respective capacities under the Prepetition Term Loan Documents), is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "**Adequate Protection Superpriority Claim**").  The Adequate Protection Superpriority Claim shall be subject to the Permitted Liens and Claims and the Superpriority Claim of the DIP Secured Parties, and shall otherwise have priority over all administrative expense claims and unsecured claims against the Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.

2.8.6    <u>Additional Adequate Protection</u>.

(1)    <u>Fees and Expenses</u>.  As further adequate protection, the Debtors are authorized to pay, without further Court order, reasonable and documented legal fees and expenses, incurred before the Petition Date, of counsel to the Prepetition Term Loan Agent (in its capacity under the Prepetition Term Loan Documents) then owing under the Prepetition Credit Agreement.  In addition, the Debtors are authorized to pay, without further Court order, reasonable and documented legal fees and expenses, incurred after the Petition Date, of counsel to the Prepetition Term Loan Agent (in its capacity under the Prepetition Term Loan Documents); <u>provided</u>, that (a) the U.S. Trustee and the Committee shall have ten (10) days from receipt to

(Page | 38)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

review the summary legal invoices of such counsel, and (b) in the event the U.S. Trustee or Committee files with this Court an objection to any such legal invoice within ten (10) days of its receipt thereof, the undisputed portion of such legal invoice shall be paid without further order of the Court whereas the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by this Court and (c) in the event neither the U.S. Trustee nor the Committee shall file with this Court an objection to any such legal invoice within ten (10) days of its receipt thereof, such legal invoice shall be paid without further order of the Court and shall not be subject to any further review, challenge or disgorgement.

(2) <u>Adequate Protection Payments</u>. As further adequate protection, the Prepetition Term Loan Agent, on behalf of itself and the other Prepetition Secured Parties, shall receive, upon entry of this Interim Order, at any time and for so long as any Prepetition Term Loan Obligations remain outstanding, monthly adequate protection payments, as and when due under the applicable Prepetition Term Loan Documents equal to the interest at the contractual non-default rate that would otherwise be owed to the Prepetition Secured Parties under the Prepetition Term Loan Documents during such monthly period in respect of the Prepetition Term Loan Obligations, until such time as the Prepetition Term Loan Obligations are indefeasibly paid in full or constitute DIP Obligations for all purposes and in either case are no longer subject to challenge. Any such payments may be subject to disgorgement or recharacterization as principal repayment

| (Page | 39) | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

to the extent of a successful, final, and non-appealable Challenge (as defined below), to the extent ordered by the Court.

(3)     Information Rights.  The Debtors shall promptly provide the Prepetition Term Loan Agent with all required financial reporting and other periodic reporting that is required to be provided to the DIP Agent under the DIP Loan Documents.

Section 3.     Default; Rights and Remedies; Relief from Stay.

3.1     Events of Default.  The occurrence of any of the following events shall constitute an "**Event of Default**" under this Interim Order:

a.     Any Debtor's failure to perform, in any respect, any of the terms, conditions or covenants or their obligations under this Interim Order; or

b.     An "Event of Default" under the DIP Credit Agreement or any of the other DIP Loan Documents.

3.2     Rights and Remedies Upon Event of Default.  Upon the occurrence of and during the continuance of an Event of Default, (i) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Order and the DIP Loan Documents, and (ii) the DIP Agent shall be entitled to take any act or exercise any right or remedy (subject to Section 3.5 below) as provided in this Interim Order or any DIP Loan Document, as applicable, including, without limitation, declaring all DIP Obligations immediately due and payable, accelerating the DIP Obligations, ceasing to extend Revolving DIP Loans, setting off any DIP

(Page | 40)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Obligations (including, without limitation, the Prepetition Term Loan Obligations rolled into the Term DIP Obligations in accordance with the terms hereof) with Collateral or proceeds in the DIP Agent's possession, and enforcing any and all rights with respect to the Collateral. The DIP Agent and any other DIP Secured Parties shall have no obligation to lend or advance any additional funds to or on behalf of the Debtors, or provide any other financial accommodations to the Debtors, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

3.3     Expiration of Revolving DIP Loan Commitment or Maturity of the DIP Loans. Upon the expiration of the Debtors' authority to borrow and obtain other credit accommodations from the DIP Secured Parties pursuant to the terms of this Interim Order and the DIP Loan Documents (except if such authority shall be extended with the prior written consent of the DIP Agent, which consent shall not be implied or construed from any action, inaction or acquiescence by the DIP Secured Parties), or upon maturity of the DIP Loans, unless an Event of Default set forth in Section 3.1 above occurs sooner and the automatic stay has been lifted or modified pursuant to Section 3.5 of this Interim Order, all of the DIP Obligations shall immediately become due and payable, and the DIP Agent and any other DIP Secured Party (each in their respective capacities under the DIP Loan Documents) shall be automatically and completely relieved from the effect of any stay under section 362 of the Bankruptcy Code, any other restriction

(Page | 41)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

on the enforcement of its liens upon and security interests in the Collateral or any other rights granted to the DIP Secured Parties pursuant to the terms and conditions of the DIP Loan Documents or this Interim Order, and the DIP Agent, acting on behalf of itself and the other DIP Secured Parties (each in their respective capacities under the DIP Loan Documents), shall be and is hereby authorized, in its sole discretion, to take any and all actions and remedies provided to it in this Interim Order, the DIP Loan Documents or applicable law which the DIP Agent (in its capacity under the DIP Loan Documents) may deem appropriate and to proceed against and realize upon the Collateral or any other property of the Debtors' Estates.

3.4     [Reserved.]

3.5     <u>Relief from Automatic Stay</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application or order of the Court to the extent necessary to permit the DIP Agent and each DIP Secured Party to perform any act authorized or permitted under or by virtue of this Interim Order, or the DIP Loan Documents, as applicable, including, without limitation, (a) to implement the postpetition financing arrangements authorized by this Interim Order and pursuant to the terms of the DIP Loan Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, as applicable, (c) to assess, charge, collect, advance, deduct and receive payments with respect to the DIP Obligations, as applicable, including, without limitation, all interests, fees,

(Page | 42)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al.* |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

costs and expenses permitted under the DIP Loan Documents, and apply such payments to the DIP

Obligations pursuant to the DIP Loan Documents and this Interim Order, as applicable, and (d)

subject to the terms and conditions of this Section 3.5, immediately upon the occurrence of an

Event of Default, to take any action and exercise all rights and remedies provided to it by this

Interim Order, the DIP Loan Documents, or applicable law other than those rights and remedies

against the Collateral as provided in the following sentence.  In addition, upon the occurrence of

an Event of Default and after providing five (5) business days' (the "**Default Notice Period**") prior

written notice (the "**Enforcement Notice**") to counsel for the Debtors, counsel for the Committee

(if any), and the U.S. Trustee, the DIP Agent, acting on behalf of itself and the DIP Secured Parties,

shall be entitled to take any action and exercise all rights and remedies provided to it by this Interim

Order, the DIP Loan Documents or applicable law as the DIP Agent may deem appropriate in its

sole discretion to proceed against and realize upon the Collateral or any other assets or properties

of Debtors' Estates upon which the DIP Agent, for the benefit of itself and the DIP Secured Parties,

has been or may hereafter be granted liens or security interests to obtain the full and indefeasible

repayment of all DIP Obligations.  Notwithstanding anything to the contrary, any action taken by

the DIP Agent to (A) terminate the commitments under the DIP Loan Documents, (B) accelerate

the DIP Loans, (C) send blocking notices or activation notices to any depository bank, and (D)

repay any amounts owing in respect of the DIP Obligations (including, without limitation, fees,

indemnities and expense reimbursements), in each case, shall not require any advance notice to

(Page | 43)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al.* |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

the Debtors. In any hearing regarding the exercise of rights or remedies (which hearing must take place during the Default Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing. The Debtors shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agents or the other DIP Secured Parties set forth in this Interim Order or the DIP Loan Documents; provided, further, that during the Default Notice Period, the Debtors shall be entitled to use Cash Collateral solely for payment of the following DIP Budget expenses due and payable during such the Default Notice Period: any accrued and unpaid employee wage, benefit or independent contractor obligations and sales and uses and payroll taxes included in the DIP Budget through the Termination Date and any such other amounts consented to by the DIP Agent, in its sole discretion.

Section 4.  Representations; Covenants; and Waivers.

4.1  Objections to Prepetition Term Loan Obligations.  Notwithstanding anything to the contrary in this Interim Order, any action, claim, defense, complaint, motion or other written opposition (hereinafter, a "**Challenge**") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind: (a) the existence, validity or amount of the Prepetition Term Loan Obligations, or (b) the extent, legality, validity, perfection or enforceability of the Prepetition

(Page | 44)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Secured Parties' prepetition liens on and security interests in the Prepetition Collateral, must be properly filed with the Court by any party in interest, including any Committee, with requisite standing within seventy-five (75) days (the "**Challenge Period**") from the date of entry of this Interim Order (and subject to entry of the Final Financing Order, such Challenge must be properly filed by the earlier of (y) seventy-five (75) calendar days from the date of entry of this Interim Order, and (z) the hearing on the sale of substantially all of the Debtors' assets).  If any such Challenge is timely filed and successfully pursued, nothing in this Interim Order shall prevent the Court from granting appropriate relief with respect to the Prepetition Obligations or the Prepetition Secured Parties' liens on and security interests in the Prepetition Collateral.  If no Challenge is timely filed, or if a Challenge is timely filed but denied, (a) the Prepetition Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time (including, without limitation the Prepetition Obligations rolled into DIP Obligations pursuant to this Interim Order), and the Prepetition Secured Parties' prepetition liens on and security interest in the Prepetition Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject to only the Permitted Encumbrances, as applicable, and (b) the Prepetition Secured Parties and each of their respective participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns shall be deemed released and discharged from any and all claims and causes of action

(Page | 45)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

related to or arising out of the Prepetition Term Loan Documents and shall not be subject to any further objection or challenge by any party at any time (including, but not limited to, a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates). In the event the Chapter 11 Cases are converted to chapter 7 prior to expiration of the Challenge Period, (a) the chapter 7 trustee shall have until the later of expiration of the Challenge Period and the twentieth (20th) day after the conversion of the Chapter 11 Cases to chapter 7 to commence a Challenge. If the Committee has asserted a Challenge prior to the Challenge Deadline, the chapter 7 trustee may stand in the shoes of the Committee in such Challenge. The timely filing of a motion by the Committee seeking standing to file a Challenge on or before expiration of the Challenge Period, which attaches the proposed complaint for any Challenge, shall toll the Challenge Period only as to the Committee and the Challenge asserted in such proposed complaint until two business days after such motion is resolved and adjudicated by the Court, provided, the Committee seeks a hearing on any standing motion on an expedited basis.

4.2     If any Challenge is timely filed prior to the expiration of the Challenge Period, (a) the stipulations and admissions contained in this Interim Order shall nonetheless remain binding and preclusive on the Committee and any other party in these Chapter 11 Cases, including any trustee, except as to any stipulations or admissions that are challenged in such Challenge and any other objections or claims shall be forever barred; provided that, if and to the extent any

(Page | 46)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on all parties.

4.3    Upon a successful Challenge brought pursuant to this Section 4, including but not limited to a Challenge to the liens held by the Prepetition Secured Parties for obligations included in the roll-ups granted in this Interim Order, the Court may fashion an appropriate remedy.

4.4    Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including the Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenge.

4.5    Nothing contained in this Section 4.1 or otherwise shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to the DIP Secured Parties in connection with all DIP Obligations provided by the DIP Secured Parties to the Debtors in reliance on section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this Interim Order and the DIP Loan Documents.

4.6    <u>Debtors' Waivers</u>.  At all times during the Cases, and whether or not an Event of Default has occurred, the Debtors irrevocably waive any right that they may have to seek authority (i) to use Cash Collateral under section 363 of the Bankruptcy Code other than as expressly provided for in this Interim Order, (ii) to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, other than as expressly

(Page | 47)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

provided for in this Interim Order or as may be otherwise expressly permitted pursuant to the DIP Loan Documents, (iii) to challenge the application of any payments authorized by this Interim Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Prepetition Collateral is less than the Prepetition Term Loan Obligations, (iv) to propose, support or have a plan of reorganization or liquidation that does not provide for the indefeasible payment in cash in full and satisfaction of all DIP Obligations on the effective date of such plan in accordance with the terms and conditions set forth in the DIP Loan Documents, or (v) to seek relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of the DIP Agent or any DIP Secured Party as provided in this Interim Order and the DIP Loan Documents or any DIP Agent's or any DIP Secured Parties' exercise of such rights or remedies; provided, however, that the DIP Agent may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent or any DIP Secured Party, and the consent of the DIP Agent shall be required to relieve the Debtors of their obligations under this Section 4.2.

4.7     Section 506(c) Claims.

4.7.1     Subject to entry of the Final Financing Order, no costs or expenses of administration which have or may be incurred in the Cases at any time shall be charged against or recovered from the DIP Secured Parties or the Prepetition Secured Parties, or their respective

(Page | 48)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

claims or Collateral, pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the applicable Agent, and no such consent shall be implied from any other action, inaction or acquiescence by any Agent or any DIP Security Party or any Prepetition Secured Party.

4.8     Collateral Rights.

4.8.1     Until all of the DIP Obligations shall have been indefeasibly paid and satisfied in full:

1)     except to the extent permitted in this Interim Order and the DIP Loan Documents, no other party shall foreclose or otherwise seek to enforce any junior lien or claim in any Collateral; and

2)     upon and after the declaration of the occurrence of an Event of Default, the DIP Agent (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, at the sole cost and expense of the Debtors, to: (i) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by the Debtors and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses. The DIP Agent and the other DIP Secured Parties will be responsible for payment of any applicable fees, rentals, royalties or other amounts due any lessor, licensor or owner of such property for the period of time that DIP Agent actually uses the equipment or the intellectual property (but in no event for

(Page | 49)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al.* |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that DIP Agent actually occupies or uses such assets or properties).

4.9    Releases.

4.9.1    In consideration of the DIP Agent and the DIP Secured Parties making the DIP Loans and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the DIP Loan Documents and this Interim Order, each Debtor, on behalf of itself and its successors and assigns, (collectively, the "**Releasors**"), shall, forever release, discharge and acquit each DIP Secured Party and each Prepetition Secured Party and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (collectively, the "**Releasees**") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that the Releasors had, have or hereafter can or may have against the Releasees as of the date hereof, in respect of events that occurred on or prior to the date hereof with respect to the Debtors, the Prepetition Term Loan Obligations, the Prepetition Term Loan Documents, the DIP Loan Documents and any loans (as set forth in the Prepetition Term Loan Documents) or other financial accommodations made by the Prepetition Secured Parties to the Debtors pursuant to the Prepetition Term Loan Documents.  In addition, upon the repayment of all DIP Obligations owed

| | |
|---|---|
| (Page \| 50) | |
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

to the DIP Secured Parties by the Debtors, and termination of the rights and obligations arising under the DIP Loan Documents (which payment and termination shall be on terms and conditions acceptable to the DIP Agent), the DIP Secured Parties shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the DIP Loan Documents, this Interim Order, any extended Interim Order or the Final Financing Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve Out Expenses in accordance with Section 2.7 of this Interim Order or otherwise), on terms and conditions acceptable to the DIP Agent.

Section 5.    <u>Other Rights and DIP Obligations</u>.

5.1    <u>No Modification or Stay of this Interim Order</u>.  Notwithstanding (i) any stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim Order, the DIP Loan Documents or any term hereunder or thereunder, (ii) the failure to obtain a Final Financing Order pursuant to Bankruptcy Rule 4001(c)(2), or (iii) the dismissal or conversion of one or more of the Cases (each, a "**Subject Event**"), (x) the acts taken by each DIP Secured Party in accordance with this Interim Order, and (y) the DIP Obligations incurred or arising prior to the DIP Agent's actual receipt of written notice from the Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Interim Order, and the acts taken by each DIP Secured Party in accordance with this Interim

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Order, and the liens granted to each DIP Secured Party in the Collateral, as applicable, and all other rights, remedies, privileges, and benefits in favor of each DIP Secured Party pursuant to this Interim Order and the DIP Loan Documents shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code.  For purposes of this Interim Order, the term "appeal," as used in section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Interim Order by this Court or any other tribunal.

5.2     <u>Power to Waive Rights; Duties to Third Parties</u>.

5.2.1    The DIP Agent shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order in respect of the DIP Secured Parties (the "**Lender Rights**"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s).  Any waiver by the DIP Agent of any Lender Rights shall not be or constitute a continuing waiver.  Any delay in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, subject the DIP Agent or any DIP Secured Party to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the DIP Agent or any DIP Secured Party such delay or failure.

5.3     <u>Disposition of Collateral</u>.

(Page | 52)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

5.3.1    Subject to the terms and conditions of the DIP Loan Documents and this Interim Order, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of the DIP Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent or any DIP Secured Party) and an order of this Court, except for sales of the Debtors' Inventory in the ordinary course of their business.  The Debtors shall remit to the DIP Agent, or cause to be remitted to the DIP Agent, all proceeds of the Collateral for application by the DIP Agent to the DIP Obligations, in such order and manner as the DIP Agent may determine in its discretion, in accordance with the terms of this Interim Order and the DIP Loan Documents.

5.4    <u>Inventory</u>.  Debtors shall not, without the consent of the DIP Agent, (a) enter into any agreement to return any inventory to any of their creditors for application against any prepetition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its prepetition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

5.5    <u>Reservation of Rights</u>.  The terms, conditions and provisions of this Interim Order are in addition to, and without prejudice to the rights of each of the DIP Secured Parties and the Prepetition Secured Parties, to pursue any and all rights and remedies under the Bankruptcy Code, the Prepetition Term Loan Documents, the DIP Loan Documents or any other applicable agreement or law, including, without limitation, the rights to seek adequate protection and/or

(Page | 53)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of Cash Collateral or granting of any interest in the Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estate.

### 5.6    Binding Effect.

5.6.1    The provisions of this Interim Order and the DIP Loan Documents, the DIP Obligations, the Superpriority Claim, and any and all rights, remedies, privileges and benefits in favor of each DIP Secured Party provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, including without limitation any order which may be entered confirming any plan of reorganization, converting one or more of the Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Cases.

5.6.2    Any order dismissing one or more of the Cases under section 1112 or otherwise shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (a) the Superpriority Claim and DIP Secured Parties' liens on and security interests in the Collateral shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full, and (b) this Court shall retain

(Page | 54)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and liens in the Collateral.

      5.6.3    In the event this Court modifies any of the provisions of this Interim Order or the DIP Loan Documents following a Final Hearing, (a) such modifications shall not affect the rights or priorities of the DIP Secured Parties pursuant to this Interim Order with respect to the Collateral or any portion of the DIP Obligations which arises or is incurred or is advanced prior to such modifications, and (b) this Interim Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

      5.6.4    This Interim Order shall be binding upon the Debtors, all parties-in-interest in the Cases and their respective successors and assigns, including any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor.  This Interim Order shall also inure to the benefit of each DIP Secured Party, and each Debtor and its respective successors and assigns.

      5.7    <u>Restrictions on Cash Collateral Use, Additional Financing, Plan Treatment</u>.

      5.7.1    All postpetition advances and other financial accommodations under the DIP Loan Documents are made in reliance on this Interim Order, and as such, the Debtors (together with the Debtors' successors and assigns, including, without limitation, any chapter 11 trustee or chapter 7 trustee appointed in any Debtor's bankruptcy case) irrevocably waive the right to, seek at any time from this Court, or in any subsequently converted case under chapter 7 of the

(Page | 55)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al.* |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Bankruptcy Code, any order (other than the Final Financing Order) which (a) authorizes the use of Cash Collateral of the Debtors in which the DIP Secured Parties have an interest, or the sale, lease, or other disposition of property of any Debtor's Estate in which the DIP Secured Parties have a lien or security interest, except as expressly permitted hereunder or in the DIP Loan Documents, or (b) except to the extent permitted pursuant to the terms and conditions of the DIP Loan Documents and this Interim Order, authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which the DIP Agent or the DIP Secured Parties hold a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to the DIP Secured Parties herein; unless, in each instance (i) the DIP Agent shall have given its express prior written consent with respect thereto, no such consent being implied from any other action, inaction or acquiescence by the DIP Agent or any DIP Secured Party, or (ii) such other order requires that all DIP Obligations shall first be indefeasibly paid and satisfied in full in accordance with the terms of the DIP Loan Documents, including, without limitation, all debts and obligations of the Debtors to the DIP Secured Parties which arise or result from the obligations, loans, security interests and liens authorized herein, on terms and conditions acceptable to the DIP Agent.  The security interests and liens granted to or for the benefit of the DIP Secured Parties hereunder and the rights of the DIP Secured Parties pursuant to this Interim Order and the DIP Loan Documents are cumulative and shall not be

| (Page \| 56) | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of the Debtors and, if the DIP Agent shall expressly consent in writing that the DIP Obligations shall not be repaid in full upon confirmation thereof, shall continue after confirmation and consummation of any such plan.

5.8    No Owner/Operator Liability.

5.8.1    In determining to make any DIP Loan under any of the DIP Loan Documents, this Interim Order or the Final Financing Order, or in exercising any rights or remedies as and when permitted pursuant to the DIP Loan Documents, this Interim Order or the Final Financing Order, the DIP Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).

5.9    Marshalling; Section 552(b) Waiver.  Subject to entry of the Final Financing Order (i) in no event shall any DIP Secured Party be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral, and (ii) the DIP Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to

| (Page | 57) | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

either DIP Agent or any DIP Secured Party with respect to proceeds, products, offspring or profits of any of the Collateral.

5.10    Right of Setoff.

5.10.1  To the extent any funds were on deposit with the DIP Agent or any DIP Secured Party as of the Petition Date, including, without limitation, all funds deposited in, or credited to, an account of any Debtor with the DIP Agent or any DIP Secured Party immediately prior to the Petition Date (regardless of whether, as of the Petition Date, such funds had been collected or made available for withdrawal by any such Debtor), such funds (the "**Deposited Funds**") are subject to rights of setoff, subject to the DIP Loan Documents.  By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor of the DIP Agent or the applicable DIP Secured Party pursuant to sections 506(a) and 553 of the Bankruptcy Code.

5.11    Right to Credit Bid.

5.11.1  Subject to section 363(k) of the Bankruptcy Code and the rights of the Committee and all other parties-in-interest set forth in Section 4.1 of this Interim Order, the DIP Secured Parties and the Prepetition Secured Parties shall have the right to "credit bid" the amount of their claims arising under the terms of the DIP Loan Documents or the Prepetition Term Loan Documents (as applicable) during any sale of all or substantially all of the Debtors' assets, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or

(Page | 58)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)–(iii) of the Bankruptcy Code.

5.12    <u>Term; Termination</u>.

5.12.1  Notwithstanding any provision of this Interim Order to the contrary, the term of the financing arrangements among the Debtors and the DIP Secured Parties authorized by this Interim Order may be terminated pursuant to the terms of the applicable DIP Loan Documents.

5.13    <u>Limited Effect</u>.  In the event of a conflict between the terms and provisions of the DIP Loan Documents and this Interim Order, the terms and provisions of this Interim Order shall govern, interpreted as most consistent with the terms and provisions of the DIP Loan Documents.

5.14    <u>Objections Overruled</u>.  All objections to the entry of this Interim Order are, to the extent not withdrawn, hereby overruled.

Section 6.    <u>Provisions Relating to Wells Fargo and WFMS</u>.  The following relief relates only to Wells Fargo and WFMS.

6.1.1   Wells Fargo has and shall continue to have a valid and perfected, non-avoidable first-priority lien in Bank Product Cash Collateral and any proceeds thereof. Notwithstanding anything herein or any other order to the contrary, such lien shall not be primed by any lien granted to any post-petition lender or other person. To satisfy any requirement that Wells Fargo continue to have a valid and perfected, non-avoidable first-priority lien in such Bank

| Debtors: | BOWFLEX INC., *et al*. |
|---|---|
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Product Cash Collateral and any proceeds thereof, Debtors grant Wells Fargo a priming lien and security interest pursuant to section 364(d)(1) of the Bankruptcy Code solely with respect to such Bank Product Cash Collateral. Wells Fargo's rights under the Card Agreement, including to reduce the credit limit or otherwise modify or amend the Card Agreement shall not be waived, modified, or impaired by entry of this Interim Order.

6.1.2    WFMS is authorized to receive or obtain payment for all WFMS Obligations, including, without limitation, by way of recoupment or setoff against sales revenues processed by WFMS on behalf of the Debtors under the WFMS Agreement or the reserve of $1,200,000 currently held by WFMS thereunder, without further order of the Court regardless of whether such obligations arose prepetition or postpetition. Subject to the DIP Budget, all WFMS Obligations are authorized to be paid or reimbursed by the Debtors to WFMS to the extent the amount of the WFMS Obligations owed to WFMS by the Debtors exceeds the sales revenue being processed by WFMS and exceeds the amounts available in reserve. In addition to the Bank Product Cash Collateral, the WFMS Obligations are also secured by the WFMS Cash Collateral. WFMS's rights under the WFMS Agreement shall not be waived, modified, or impaired by entry of this Interim Order but WFMS acknowledges such rights shall be subject to the Termination Date provided in that certain Updated Termination Letter from WFMS to the Debtor dated as of February 20, 2024 to ensure a smooth transition and replacement of the services subject thereto. WFMS has and shall continue to have a valid and perfected, non-avoidable first-priority lien in the

(Page | 60)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

WFMS Cash Collateral and any proceeds thereof.  Notwithstanding anything in this Interim Order, or any other order to the contrary, such lien shall not be primed by any lien granted to any postpetition lender or other person. To satisfy the requirement that WFMS continue to have a valid and perfected, non-avoidable first-priority lien in such WFMS Cash Collateral and any proceeds thereof, the Debtors grant WFMS a priming lien and security interest pursuant to section 364(d)(1) of the Bankruptcy Code solely with respect to such WFMS Cash Collateral. To the extent the WFMS Cash Collateral or the Bank Product Cash Collateral is insufficient to pay in full any WFMS Obligations owed by the Debtors to WFMS, WFMS shall have an allowed administrative expense in the amount of such unpaid WFMS Obligations pursuant to section 364(b) of the Bankruptcy Code; *provided*, *however*, that any such administrative expense claim will be junior to any administrative expense claim granted to the DIP Secured Parties and the Prepetition Secured Parties pursuant to this Interim Order.

6.1.3    The Prepetition Revolver Loan Agent has and shall continue to have a valid and perfected, non-avoidable first-priority lien in Prepetition Revolver Cash Collateral and any proceeds thereof.  Notwithstanding anything herein or any other order to the contrary, such lien shall not be primed by any lien granted to any post-petition lender or other person.  To satisfy any requirement that Prepetition Revolver Loan Agent continue to have a valid and perfected, non-avoidable first-priority lien in such Prepetition Revolver Cash Collateral and any proceeds thereof, the Debtors grant Prepetition Revolver Loan Agent a priming lien and security interest pursuant

(Page | 61)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

to Bankruptcy Code section 364(d)(1) solely with respect to such Prepetition Revolver Cash Collateral.

6.1.4    Each of the Prepetition Revolver Loan Agent and Bank Product Providers (including, without limitation, WFMS), are authorized, and the automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application, or order of the Court to permit each of the Prepetition Revolver Loan Agent and Bank Product Providers (including, without limitation, WFMS), as applicable, to apply: (a) the Letter of Credit Cash Collateral and/or the Expense Reserve to satisfy the Letter of Credit Obligations; (b) the Bank Product Cash Collateral, the WFMS Cash Collateral, and/or the Expense Reserve to satisfy the Bank Product Obligations (including, without limitation, the WFMS Obligations), as applicable; and (c) the Expense Reserve to satisfy the Expense and Indemnity Obligations, in each case, as the same become due and owing.  For the avoidance of doubt, nothing in this Order shall prevent Wells Fargo and WFMS from applying the Bank Product Cash Collateral, the WFMS Cash Collateral, and/or the Expense Reserve to satisfy the Bank Product Obligations arising out of any accounts maintained by any of the Debtors' non-Debtor affiliates.

Section 7.    <u>Final Hearing and Response Dates</u>.

7.1    The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for March 28, 2024, at 10 a.m. ET before this Court (the "**Final Hearing**").  The

(Page | 62)

| | |
|---|---|
| Debtors: | BOWFLEX INC., *et al*. |
| Case No. | 24-12364 (ABA) |
| Caption of Order: | Interim Order (A) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 |

Debtors shall promptly mail copies of this Interim Order to the Notice Parties, and to any other party that has filed a request for notices with this Court and to any Committee after same has been appointed, or Committee counsel, if same shall have filed a request for notice.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) counsel for the Debtors, (b) counsel to the DIP Agent, (c) counsel to Wells Fargo and WFMS, and (d) U.S. Trustee to allow actual receipt of the foregoing no later than March 21, 2024, at 4 p.m. prevailing Eastern time.

Dated: March __, 2024
        _____, NJ

_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 1

**DIP Credit Agreement**

## **EXHIBIT 2**

**DIP Budget**

*Execution Version*

## AMENDMENT NO. 3 TO TERM LOAN CREDIT AGREEMENT AND LOAN DOCUMENTS

This **AMENDMENT NO. 3 TO TERM LOAN CREDIT AGREEMENT AND LOAN DOCUMENTS** (this "<u>Agreement</u>"), dated as of March 6, 2024, is among **BOWFLEX INC.** (f/k/a Nautilus, Inc.), a Washington corporation ("<u>BowFlex</u>"), **NAUTILUS FITNESS CANADA, INC.**, a corporation organized under the laws of British Columbia ("<u>Nautilus Canada</u>", and together with BowFlex, each, a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>"), the Lenders identified on the signature pages hereof as Lenders (which Lenders constitute, as applicable, the Required Lenders, the Supermajority Lenders, and all of the Lenders directly affected by the applicable consents and amendments to be effected by this Agreement (as applicable, the "<u>Requisite Lenders</u>")), and **CRYSTAL FINANCIAL LLC D/B/A SLR CREDIT SOLUTIONS**, a Delaware limited liability company, as agent for the Lenders (in such capacity, together with its successors and permitted assigns, "<u>Agent</u>").

### <u>Recitals</u>

The Lenders, Agent, and Borrowers are party to that certain Term Loan Credit Agreement dated as of November 30, 2022 (as amended by that certain Limited Consent and Amendment No. 1 to Term Loan Credit Agreement and Loan Documents, dated as of April 25, 2023 ("<u>Amendment No. 1</u>"), and that certain Amendment No. 2 to Term Loan Credit Agreement and Loan Documents, dated as of July 28, 2023 ("<u>Amendment No. 2</u>"), and as may be further amended, amended and restated, restated, supplemented, modified or otherwise in effect immediately prior to the date hereof, the "<u>Existing Credit Agreement</u>"; the Existing Credit Agreement as modified by this Agreement and as the same may be amended, amended and restated, restated, supplemented, modified or otherwise in effect from time to time is referred to herein as the "<u>Credit Agreement</u>").

Agent and Borrowers are party to a Guaranty and Security Agreement dated as of November 30, 2022 (as amended by Amendment No. 1, Amendment No. 2, that certain Joinder No. 1 and Amendment to Guaranty and Security Agreement, dated as of February 16, 2023, that certain Joinder No. 2 and Amendment to Guaranty and Security Agreement, dated as of March 14, 2023, that certain Joinder No. 3 and Amendment to Guaranty and Security Agreement, dated as of April 14, 2023, and that certain Joinder No. 4 to Guaranty and Security Agreement, dated as of January 22, 2024, and as may be further amended, amended and restated, restated, supplemented, modified or otherwise in effect immediately prior to the date hereof, the "<u>Existing Guaranty and Security Agreement</u>"; the Existing Guaranty and Security Agreement as modified by this Agreement and as the same may be amended, amended and restated, restated, supplemented, modified or otherwise in effect from time to time is referred to herein as the "<u>Guaranty and Security Agreement</u>"), which is the "Guaranty and Security Agreement" under, and as defined in, the Credit Agreement.

Agent and Nautilus Canada are party to a Canadian Guaranty and Security Agreement dated as of November 30, 2022 (as amended, amended and restated, restated, supplemented, modified or otherwise in effect immediately prior to the date hereof, the "<u>Existing Canadian Guaranty and Security Agreement</u>"; the Existing Canadian Guaranty and Security Agreement as modified by this Agreement and as the same may be amended, amended and restated, restated, supplemented, modified or otherwise in effect from time to time is referred to herein as the "<u>Canadian Guaranty and Security Agreement</u>"; and the Existing Canadian Guaranty and Security Agreement, together with the Existing Credit Agreement, the Existing Guaranty and Security Agreement and each of the other Loan Documents (as defined in the Existing Credit Agreement) as in effect immediately prior to the date hereof, the "<u>Existing Loan Documents</u>"), which is the "Canadian Guaranty and Security Agreement" under, and as defined in, the Credit Agreement.

Agent and Nautilus Fitness UK Limited are party to a UK Security Agreement dated as of March 14, 2023 (the "<u>Existing UK Security Agreement</u>"); and Agent and Nautilus Fitness International B.V. are

party to a UK Share Charge dated March 14, 2023 (the "<u>Existing UK Share Charge</u>", and together with the Existing UK Security Agreement, the "<u>Existing UK Security Documents</u>"); the Existing UK Security Documents being Existing Loan Documents for the purpose of this Agreement and shall be designated as Loan Documents for the purpose of this Agreement, the Credit Agreement, and the other Loan Documents.

On March 4, 2024 (the "<u>Petition Date</u>") the Domestic Loan Parties (other than BowFlex Delaware LLC) (collectively, the "<u>Debtors</u>") commenced jointly administered cases (the "<u>Chapter 11 Cases</u>") under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of New Jersey (the "<u>Bankruptcy Court</u>"), and each Debtor has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession.

Prior to Petition Date, certain of the Lenders made a term loan (the "<u>Pre-Petition Term Loan</u>") to the Borrowers secured by substantially all assets and properties of the Loan Parties.

The Debtors and the other Loan Parties have requested that the Lenders (a) roll-up the Pre-Petition Term Loan in an aggregate principal amount not exceeding $15,999,234.76 with such roll-up being approved upon the entry of the Interim Financing Order (as defined in the Credit Agreement) so that such Obligations which constitute Pre-Petition Obligations (as defined in the Credit Agreement) shall continue in all respects as Post-Petition Obligations (as defined in the Credit Agreement) (the "<u>Term Loan</u>") and (b) provide post-petition revolving commitments for loans and advances in an aggregate principal amount not exceeding $9,000,000 in new money (the "<u>Revolving Loans</u>") to repay certain amounts relating to the Pre-Petition Term Loan and to be used for general working capital and other permitted purposes under the Credit Agreement and the Financing Orders (as defined below) and in accordance with the Approved Budget, all of which, together with the other Obligations, will be secured by a lien on substantially all the assets of the Loan Parties, in each case, as further set forth in the Financing Orders and the Loan Documents, and to make certain amendments to the Existing Credit Agreement, the Existing Guaranty and Security Agreement and the Existing Canadian Guaranty and Security Agreement, and the Lenders are willing to do so, subject to (x) entry by the Bankruptcy Court of an Interim Financing Order and (y) the other terms and conditions contained herein.

The Debtors and the other Loan Parties desire to reaffirm their obligations to the Agent and the Lenders pursuant to the Loan Documents and acknowledge their continuing liabilities to Agent and Lenders thereunder in order to induce Agent and Lenders to make such post-petition loans and advances, and provide such other financial accommodations, to the Borrowers.

<u>**Agreement**</u>

The parties agree as follows:

1.      **Definitions**. Defined terms used but not otherwise defined in this Agreement are as defined in the Credit Agreement.

2.      **Amendments to Existing Credit Agreement**.

(a)      Effective as of the Amendment No. 3 Effective Date (as defined below), the Existing Credit Agreement is hereby amended in its entirety to delete the stricken text (indicated textually in the same manner as the following example: <s>stricken text</s>), to add the bold and double-underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u>) and to move from its location the stricken text in green (indicated textually in the same manner as the following example: <s>moved from text</s>) and to move into its new location the double-underlined text in green (indicated textually in the same manner as the following example: <u>moved to text</u>), each as set forth in <u>Exhibit A</u> hereto.  Except

as provided in subsection (b), all Schedules and Exhibits to the Existing Credit Agreement shall constitute Schedules and Exhibits to the Credit Agreement.

(b)    Exhibits B-1 and C-1 and Schedules C-1, 4.1(c), 5.1, and 5.2 to the Existing Credit Agreement are hereby deleted and substituted in their stead are the updated Exhibits B-1 and C-1 and Schedules C-1, 4.1(c), 5.1, and 5.2 attached hereto.  A new Exhibit D-1 and new Schedules 4.14(a) and 5.21 is, in each case, hereby attached to the Existing Credit Agreement in proper alphabetical or numerical order, as applicable, in the form attached as Exhibit D-1 and Schedules 4.14(a) and 5.21 hereto, respectively.

3.    **Amendments to Certain other Loan Documents**.  Effective as of the Amendment No. 3 Effective Date, and in reliance on the representations and warranties of the Loan Parties set forth in this Agreement and in the Credit Agreement:

(a)    **Amendment to Amendment No. 2**.  Section 4 of Amendment No. 2 (Thirteen Week Cash Flow Forecast) is hereby deleted and the text "**Reserved**" is inserted in its stead, and such provision shall be of no further force and effect.

(b)    **Amendment to Existing Guaranty and Security Agreement**.  The Existing Guaranty and Security Agreement is hereby amended in its entirety to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~), to add the bold and double-underlined text (indicated textually in the same manner as the following example: double-underlined text) and to move from its location the stricken text in green (indicated textually in the same manner as the following example: ~~moved from text~~) and to move into its new location the double-underlined text in green (indicated textually in the same manner as the following example: moved to text), each as set forth in Exhibit B hereto.  All Schedules and Exhibits to the Existing Guaranty and Security Agreement shall constitute Schedules and Exhibits to the Guaranty and Security Agreement.

(c)    **Amendment to Existing Canadian Guaranty and Security Agreement**. The Existing Canadian Guaranty and Security Agreement is hereby amended in its entirety to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~), to add the bold and double-underlined text (indicated textually in the same manner as the following example: double-underlined text) and to move from its location the stricken text in green (indicated textually in the same manner as the following example: ~~moved from text~~) and to move into its new location the double-underlined text in green (indicated textually in the same manner as the following example: moved to text), each as set forth in Exhibit C hereto.  All Schedules and Exhibits to the Existing Canadian Guaranty and Security Agreement shall constitute Schedules and Exhibits to the Canadian Guaranty and Security Agreement.

4.    **Representations**.  To induce Agent and the Lenders to enter into this Agreement, Borrowers hereby represent to Agent and the Lenders as follows:

(a)    that each Loan Party and each of its Subsidiaries (i) is duly organized and existing and in good standing under the laws of the jurisdiction of its organization, (ii) is qualified to do business in any jurisdiction where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect, and (iii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into this Agreement and the other Loan Documents to which it is a party and to carry out the transactions contemplated thereby;

(b)        subject to the entry of the Interim Financing Order and the terms thereof, as to each Loan Party, that the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party, as amended by this Agreement, do not and will not (i) violate any material provision of federal, state, provincial, territorial, foreign or local law or regulation applicable to any Loan Party or its Subsidiaries, the Governing Documents of any Loan Party or its Subsidiaries, or any order, judgment, or decree of any court or other Governmental Authority binding on any Loan Party or its Subsidiaries, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract or any other material agreement of any Loan Party or its Subsidiaries where any such conflict, breach or default could individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of any Loan Party, other than Permitted Liens, or (iv) require any approval of any holder of Equity Interests of a Loan Party or any approval or consent of any Person under any Material Contract or any other material agreement of any Loan Party, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of Material Contracts or other material agreements, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Effect;

(c)        subject to the entry of the Interim Financing Order and the terms thereof, that each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms and such Debtor or Loan Party has no valid defense, offset or counterclaim to the enforcement of such obligations, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally;

(d)        that the representations and warranties of each Borrower and, to the extent applicable, each other Loan Party or its Subsidiaries contained in the Credit Agreement or in the other Loan Documents, as amended by this Agreement, are true and correct in all material respects (except that such materiality qualifier is not applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of this Agreement, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties continue to be true and correct as of such earlier date);

(e)        that as of the date of this Agreement, no Default or Event of Default has occurred and is continuing; and

(f)        in addition to the representations contained herein, each of BowFlex and Nautilus Swiss (in addition to any repetition of representations and warranties according to the terms and conditions of each Swiss Security Documents (as hereinafter defined)) makes all representations and warranties made by it in and under each respective Swiss Security Document as of the date of this Agreement and on the Closing Date.

5.        **Acknowledgements and Agreements**.

(a)        **Pre-Petition Obligations; Early Termination Premium; Application of Certain Proceeds; Bank Statements**.

(i)        Each Debtor and each other Loan Party hereby acknowledges, confirms and agrees that, as of the date hereof, each Borrower is indebted to Agent and Lenders in

respect of all Pre-Petition Obligations consisting of term loans made to the Borrowers made pursuant to the Existing Loan Documents in the aggregate principal amount of not less than $15,999,234.76, together with interest accrued and accruing thereon, and all costs, fees, and expenses (including attorneys' fees and legal expenses) accrued and owing by each Borrower pursuant to the terms of the Existing Loan Documents, all of which are unconditionally owing by each Borrower to Agent and Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

(ii)    Debtor and each other Loan Party hereby acknowledges, confirms and agrees that the Early Termination Premium is due and owing as of the Petition Date in the amount set forth in the Amendment No. 3 Fee Letter, which is unconditionally owing by each Borrower to Agent and Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever, and shall be paid in accordance with the terms of the Amendment No. 3 Fee Letter.

(iii)    Notwithstanding anything to the contrary set forth in the Existing Credit Agreement or the other Loan Documents (including, without limitation, the Foreign Account Letter Agreements (as defined in the Credit Agreement after giving effect to this Agreement)), the parties hereto hereby agree that, any funds that were swept from any Controlled Account and/or the Term Loan Priority Account from and after February 28, 2024 and through and including March 5, 2024 pursuant to the Agent's instructions will not be applied to the Obligations pursuant to the terms of the Existing Credit Agreement, but from and after the occurrence of the Amendment No. 3 Effective Date, such funds shall be applied in accordance with the terms of Section 2.4(e)(i)(A) of the Credit Agreement as amended by this Agreement.  For the avoidance of doubt, the foregoing is intended to govern in lieu of the terms of Section 2.4(f) of the Existing Credit Agreement.

(iv)    The parties hereto hereby agree that the weekly bank statements required to be delivered in respect of the bank accounts identified in the Foreign Account Letter Agreements shall be delivered to the Agent no later than 11:59 p.m. Eastern time on Friday and cover a period commencing on 7:00 PM Eastern time on the immediately preceding Friday through and including all transactions occurring immediately prior to 7:00 p.m. Eastern time on the date on which such weekly bank statements are required to be delivered.

(b)    **Guaranteed Obligations**. Each Debtor and each other Loan Party hereby acknowledges, confirms and agrees that, notwithstanding the amendments contemplated by this Agreement: (i) all obligations of such Debtor or Loan Party under the Existing Loan Documents are unconditionally owing by such Debtor or Loan Party to Agent and Lenders without offset, defense or counterclaim of any kind, nature and description whatsoever, and (ii) the absolute and unconditional guarantee of the payment of the Pre-Petition Obligations by such Debtor or Loan Party pursuant to the Loan Documents includes, in addition and not in limitation, all Post-Petition Obligations.

(c)    **Security Interests**. Each Debtor and each other Loan Party hereby acknowledges, confirms and agrees that Agent, for the benefit of itself and the other members of the Lender Group, (a) has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and Liens upon all Collateral heretofore granted to Agent and Lenders pursuant to the Existing Loan Documents as in effect immediately prior to the Petition Date to secure all of the (i) in the case of the Domestic Loan Parties, the Obligations and (ii) in the case of the Foreign Loan Parties, the Pre-Petition Obligations and the Post-Petition Obligations, other than Post-Petition

Obligations constituting the principal, interest and fees of the Revolving Loans and (b) shall have valid and enforceable security interests in and Liens upon all Collateral granted to Agent, for the benefit of itself and the other Lenders, under the Financing Orders or hereunder or under any of the other Loan Documents or otherwise granted to or held by Agent and Lenders having the priorities set forth in the Loan Documents and the Financing Orders, as the case may be, subject only to (i) those Permitted Liens under the Existing Credit Agreement on the Petition Date that have priority by operation of law, (ii) the Carve Out Expenses (to the extent provided for in the Financing Orders), and (iv) any other Liens expressly permitted by the Financing Orders that under the terms thereof have priority over the security interests and Liens in favor of the Lender Group.

(d)     **Binding Effect of Documents**. Subject to the entry of the Interim Financing Order (and when applicable, the Final Financing Order) and the terms thereof, each Debtor and each other Loan Party hereby acknowledges, confirms and agrees that: (a) each of the Existing Loan Documents to which it is a party was duly executed and delivered to Agent and Lenders by such Debtor or Loan Party and each is in full force and effect as of the date hereof, and (b) the members of the Lender Group and shall be entitled to all of the rights, remedies and benefits provided for in (i) subject to the entry and terms of the Financing Orders, the Loan Documents, and (ii) the Financing Orders.

(e)     **Adoption and Ratification for Credit Facility**. Each Debtor and each other Loan Party hereby (a) ratifies, restates, assumes, adopts, affirms and confirms all of the terms and conditions of the Existing Loan Documents, as amended and supplemented pursuant hereto and the Financing Orders, and each Debtor, as Debtor and Debtor-in-Possession, and each other Loan Party agrees to be fully bound, by the terms of the Loan Documents to which such Debtor or Loan Party is a party and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Existing Loan Documents, as amended by this Agreement and the Credit Agreement, and in accordance with the Financing Orders. All of the Existing Loan Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by the Debtors, each as Debtor and Debtor-in-Possession, and the other Loan Parties, and considered as agreements between each of the Debtors and other Loan Parties, on the one hand, and Agent and Lenders, on the other hand.

(f)     **Nautilus Swiss Ratification**.  Notwithstanding anything to the contrary contained herein, with respect to each of (i) that certain Swiss law governed share pledge agreement, dated April 14, 2023, by and between BowFlex (formerly known as Nautilus, Inc.) as Pledgor, the Agent as Agent and pledgee, acting as direct representative (*direkter Stellvertreter*) in the name and for the account of all Secured Parties and the Secured Parties as Pledgees represented for all purposes thereof by the Agent as direct representative (*direkter Stellvertreter*) (each as defined therein), (ii) that certain Swiss law governed security assignment agreement, dated April 14, 2023, by and between Nautilus Swiss as Assignor and the Agent acting in its own name but as fiduciary for the account of the Secured Parties, (iii) that certain Swiss law governed IP pledge agreement, dated April 14, 2023, by and between Nautilus Swiss as Pledgor, the Agent as Agent and pledgee, acting as direct representative (*direkter Stellvertreter*) in the name and for the account of all Secured Parties and the Secured Parties as Pledgees represented for all purposes thereof by the Agent as direct representative (*direkter Stellvertreter*) (each as defined therein), (v) that certain Swiss law governed bank accounts pledge Agreement, dated 14 April 2023 by and between Nautilus Swiss as Pledgor, the Agent acting in its own name but as fiduciary for the account of the Secured Parties (each as defined therein) and the Secured Parties as Pledgees represented for all purposes thereof by the Agent as direct representative (*direkter Stellvertreter*) (each as defined therein), (v) that certain letter agreement, dated as of February 28, 2024, by and between the Agent and Nautilus Swiss in respect of the Domestic Swiss Accounts (as defined therein), and (vi) that certain Deposit

Account Control Agreement (Access Restricted After Notice), dated as of February 28, 2024, by and among Nautilus Swiss, the Agent, and Wells Fargo Bank, National Association (collectively, the "Swiss Security Documents"), each of BowFlex and Nautilus Swiss hereby agrees and confirms to the Agent and any other member of the Lender Group that:

(i)      (1) it has knowledge of, understands and accepts the effects that this Agreement has on the Swiss Security Documents (which will indirectly be amended, in particular in relation to any defined term included in any Swiss Security Documents by reference to the Credit Agreement) and (2) any reference to the Credit Agreement shall be a reference to the Credit Agreement as amended and restated, restated, supplemented, novated or otherwise modified from time to time, in particular by this Agreement;

(ii)      the Swiss Security Documents remain in full force and effect and it is and shall continue to be bound by the obligations as set out in the Swiss Security Documents to which it is a party following this Agreement having come into effect on the Closing Date;

(iii)      as of and from the date of this Agreement, the pledges created pursuant to each of the relevant Swiss Security Documents are and will continue to be in full force and effect and will continue to secure any and all Obligations, as they may be amended, amended and restated, supplemented, or otherwise modified and/or increased from time to time pursuant to the Loan Documents, including in particular this Agreement, in each case subject to the applicable limitations set out in the respective Swiss Security Document;

(iv)      as of and from the date of this Agreement, the assignments made pursuant to each of the relevant Swiss Security Documents are and will continue to be in full force and effect and continue to secure any and all Secured Obligations, as they may be amended, amended and restated, supplemented, or otherwise modified and/or increased from time to time pursuant to the Loan Documents, including in particular this Agreement, in each case subject to the applicable limitations set out in the respective Swiss Security Document;

(v)      it agrees and confirms its understanding (for the avoidance of doubt) that for purposes of the Swiss law security created by each Swiss Security Document and for purposes of art. 116 of the Swiss Code of Obligations and any other applicable laws, notwithstanding the amendments effected by this agreement, nothing in this Agreement shall constitute or be construed as a novation of any rights and obligations under the Swiss Security Documents and that all rights and obligations, including without limitation the Swiss law security, indemnities and other undertakings created pursuant to the Swiss Security Documents shall continue for the benefit of each relevant party, their successors, permitted transferees and permitted assignees, as the case may be; and

(vi)      it undertakes to do any such acts or execute any such documents as the Agent may reasonably require in order to ensure the validity and applicability of the Swiss Security Documents and the Swiss law security thereunder.

(g)      **Nautilus Dutch Ratification**.  Each Loan Party confirms that:

(i)      the amendments by this Agreement and the designation of any new document as a Loan Document, any Dutch Security Right continues in full force and effect and continues to secure the secured liabilities (however described in the relevant Dutch Security Document to which a Dutch Security Provider is a party); and

(ii)    the secured liabilities (however described in the Dutch Security Document to which a Dutch Security Provider is a party) cover the obligations and liabilities of the Loan Parties under the Loan Documents as amended by this Agreement, and

(iii)    the Dutch Security Rights have always been intended to extend to the secured liability (however described in the relevant Dutch Security Documents to which a Dutch Security Provider is a party) of the Loan Parties under the Loan Documents as amended and restated, supplemented, modified or otherwise in effect from time to time, including as amended by this Agreement, and shall so extend thereto in accordance with the terms of the Loan Documents,

in each case, subject to any limitations set out in the Dutch Security Document to which a Dutch Security Provider is a party.

As used in this Section 5(g), the following terms have the following meanings:

"Dutch Security Document" means each of the (i) Dutch law governed security agreement dated February 16, 2023 between Nautilus Fitness International B.V. as pledgor and Crystal Financial LLC D/B/A SLR Credit Solutions as pledgee, including any Supplemental Security Agreement (as defined therein) and (ii) Dutch law governed deed of pledge of shares in the capital of Nautilus Fitness International B.V. dated February 16, 2023 between BowFlex Inc. (f/k/a Nautilus, Inc.), as pledgor, Nautilus Fitness International B.V. as company and Crystal Financial LLC D/B/A SLR Credit Solutions as pledgee.

"Dutch Security Provider" means each of BowFlex Inc. (f/k/a Nautilus, Inc.) and Nautilus Fitness International B.V.

"Dutch Security Right" means any security right created pursuant to a Dutch Security Document.

(h)    **English Ratification**.  Each Loan Party confirms that:

(i)    notwithstanding the amendments made pursuant to this Agreement and the designation of any new document as a Loan Document, the Existing UK Security Documents continue in full force and effect and continue to secure the secured liabilities (however described in the relevant Existing UK Security Document);

(ii)    the secured liabilities (however described in the Existing UK Security Documents) cover the obligations and liabilities of the Loan Parties under the Loan Documents as amended by this Agreement.

(i)    **Nautilus Canada Ratification**.  Notwithstanding anything to the contrary contained herein, with respect to each of (i) that certain Canadian Guarantee and Security Agreement dated as of November 30, 2022 granted by Nautilus Canada in favor of the Agent, (ii) that certain Deposit Account Control Agreement (Access Restricted after Notice), dated as of November 30, 2022, by and among Nautilus Canada, the Agent and Wells Fargo Bank, National Association in respect of the deposit account ending *5100, (iii) that certain Deposit Account Control Agreement (Access Restricted after Notice), dated as of November 30, 2022, by and among Nautilus Canada, the Agent and Wells Fargo Bank, National Association in respect of the deposit account ending *8099, (iv) that certain Blocked Account Control Agreement dated as of November 30, 2022 by and among Nautilus Canada, the Agent and JP Morgan Chase Bank, N.A in respect of the deposit accounts ending *4005 and *3901 (collectively, the "Canadian Security

Documents"), Nautilus Canada hereby agrees and confirms to the Agent and any other member of the Lender Group that:

> (i)       (1) it has knowledge of, understands and accepts the effects that this Agreement has on the Canadian Security Documents (which will indirectly be amended, in particular in relation to any defined term included in any Canadian Security Documents by reference to the Credit Agreement) and (2) any reference to the Credit Agreement shall be a reference to the Credit Agreement as amended and restated, restated, supplemented, novated or otherwise modified from time to time, in particular by this Agreement;

> (ii)      it will derive a corporate benefit from the Term Loans and Revolving Loans to be made in accordance with the Credit Agreement as amended by this Agreement, including, without limitation, centralized administrative services from the other Loan Parties, continued supply of inventory, intercompany funding, the seamless continuing cross-border operations of Nautilus Canada and the other Loan Parties.

> (iii)     the Canadian Security Documents remain in full force and effect and it is and shall continue to be bound by the obligations as set out in the Canadian Security Documents to which it is a party following this Agreement having come into effect on the Closing Date;

> (iv)      as of and from the date of this Agreement, the guarantees, liens, security interests, and pledges created pursuant to each of the relevant Canadian Security Documents are and will continue to be in full force and effect and will continue to secure any and all Obligations, as they may be amended, amended and restated, supplemented, or otherwise modified and/or increased from time to time pursuant to the Loan Documents, including in particular this Agreement; and

> (v)       it agrees and confirms its understanding (for the avoidance of doubt) that for purposes of any applicable laws, notwithstanding the amendments effected by this agreement, nothing in this Agreement shall constitute or be construed as a novation of any rights and obligations under the Canadian Security Documents and that all rights and obligations, including without limitation the guarantees, liens, pledges, security interests, indemnities and other undertakings created pursuant to the Canadian Security Documents shall continue for the benefit of each relevant party, their successors, permitted transferees and permitted assignees, as the case may be.

(j)       **Excluded Assets; Excluded Accounts**.  Other than as set forth in the Guaranty and Security Agreement or as otherwise agreed to by Agent in its sole discretion in writing, notwithstanding anything to the contrary contained in the Credit Agreement or any other Loan Documents, the concepts of Excluded Asset and Excluded Account included and/or defined in any Loan Document (and any provisions giving effect to such defined terms) shall be deemed to be not applicable from and after the Amendment No. 3 Effective Date.

6.       **Waiver of Certain Rights**. For purposes of the Credit Facility, each Loan Party hereby agrees that it shall not, and hereby waives any right that it may have to, seek authority (i) to use cash collateral of Agent and Lenders under section 363 of the Bankruptcy Code, except to the extent provided in any Financing Order, without the prior written consent of Agent, (ii) to obtain post-petition loans or other financial accommodations, other than from Agent and Lenders not otherwise permitted by the Credit Agreement, pursuant to sections 364(c) or (d) of the Bankruptcy Code without the prior written consent of

Agent, (iii) to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of Agent's post-petition liens and claims, (iv) to challenge the application of any payments or collections received by Agent or Lenders to the obligations of the Loan Parties as provided for herein, (v) to propose or support a plan of reorganization in the Chapter 11 Cases that does not provide for (or does not provide each Lender at its election to receive) the indefeasible payment in full in cash and satisfaction of all obligations on the effective date of such plan, (vi) to surcharge the Collateral pursuant to section 506(c) of the Bankruptcy Code, or (vii) to seek relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of Agent or any Lender as provided herein, in the Loan Documents or the Financing Orders.

7.    **Conditions**. The effectiveness of this Agreement is subject to satisfaction of the following conditions (the date on which such satisfaction occurs, the "Amendment No. 3 Effective Date"):

(a)    The Agent has received the following:

(i)    this Agreement executed by Agent, the Lenders and Borrowers and the Ratification of Obligations attached hereto executed by the other Loan Parties;

(ii)    the Amendment No. 3 Fee Letter, executed by the Agent and the Borrowers;

(iii)    (A) the ABL Revolving Loans (as defined in the Existing Credit Agreement) shall have been repaid prior to the date hereof in accordance with the Amended and Restated Payoff Letter, dated as of March 4, 2024 (the "Wells Fargo Payoff Letter"), by and among the ABL Agent (as defined in the Existing Credit Agreement), BowFlex, BowFlex Delaware LLC and BowFlex New Jersey LLC and (B) the ABL Agent, for the ABL Lenders (as defined in the Existing Credit Agreement), shall have delivered documentation reasonably satisfactory in form and substance to the Agent prior to the date hereof evidencing that the ABL Credit Agreement (as defined in the Existing Credit Agreement) has been terminated, all obligations thereunder are being paid in full (other than continuing obligations described therein), all Liens securing obligations under the ABL Credit Agreement and other Loan Documents referenced therein have been or substantially concurrently with the payoff contemplated thereby are being released (other than Liens in connection with cash collateral arrangements described therein) and that the ABL Agent has relinquished its control over the Controlled Accounts pursuant to the terms of the applicable Control Agreements to which the ABL Agent is party;

(iv)    a fully executed Stalking Horse Purchase Agreement attached hereto as Exhibit E and all other material agreements, instruments or documents executed in connection therewith or otherwise related to the Stalking Horse Purchase Agreement, each of which shall be in full force and effect on the Amendment No. 3 Effective Date and on terms and conditions and pursuant to documentation satisfactory to Agent, in its sole discretion, including with respect to any conditionality to, or contingencies with respect to, the closing therein and providing for among other things, the payment of net sale proceeds, in a minimum amount sufficient to fully repay the Obligations in cash upon the closing of such sale;

(v)    (1) copies of each Loan Party's Governing Documents, as amended, modified, or supplemented to the Amendment No. 3 Effective Date, which Governing

Documents shall be (A) certified by the Secretary or other officer of such Loan Party, (B) with respect to Governing Documents that are charter documents of a U.S. Loan Party, certified as of a recent date (not more than 30 days prior to the Amendment No. 3 Effective Date) by the appropriate governmental official, and (C) with respect to Governing Documents of Nautilus Swiss, (I) a copy of its up-to-date articles of association certified by the competent commercial register, and (II) an certified excerpt relating to it certified by the competent commercial register; (2) (A) a certificate of status with respect to each U.S. Loan Party, dated within 10 days of the Amendment No. 3 Effective Date, and (B) a certificate of status (or equivalent) or commercial register excerpt  with respect to each Canadian Borrower and each Foreign Subsidiary, dated within three (3) Business Days of the Amendment No. 3 Effective Date, each such certificate or excerpt, as applicable, to be issued by the appropriate officer of the jurisdiction of organization of such Loan Party, which certificate shall indicate that such Loan Party is in good standing in such jurisdiction (if applicable); and (3) a certificate from the Secretary or other officer or director, as applicable, of each Loan Party (A) attesting to the resolutions of such Loan Party's board of directors, and to extent applicable, shareholders, authorizing its execution, delivery, and performance of the Loan Documents to which it is a party, (B) authorizing specific officers and/or persons of such Loan Party to execute the same, (C) attesting to the incumbency and signatures of such specific officers and/or persons of such Loan Party, and (C) solely with respect to Nautilus Swiss, certifying that each copy document delivered by it and specified in this Section is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of the certificate;

(vi)      opinions of (1) Sidley Austin LLP, New York counsel to the Loan Parties, (2) Hillis Clark Martin & Peterson P.S., Washington counsel to the Loan Parties, (3) Cassels Brock & Blackwell LLP, Canadian counsel to the Loan Parties, (4) Vischer AG, Swiss counsel to the Loan Parties, (5) NautaDutilh New York P.C., Dutch counsel to the Loan Parties and (6) Morgan, Lewis & Bockius LLP, counsel to the Agent, with respect to Nautilus Fitness UK Ltd;

(vii)     a certificate of a Responsible officer of the Administrative Borrower confirming the conditions set forth in this Section 7 are satisfied;

(viii)    a completed Borrowing Base Certificate dated as of the Amendment No. 3 Effective Date;

(ix)      the Initial Budget, which shall be in form and substance satisfactory to the Agent (which shall be attached hereto as Exhibit D);

(x)       fully executed copies of (i) a supplemental security agreement granting supplemental security subsequent to the Existing UK Security Agreement, and (ii) a supplemental share charge granting supplemental security to the Existing UK Share Charge; and

(xi)      a fully executed of that certain letter agreement, dated as of February 28, 2024, by and between the Agent and Nautilus Swiss in respect of the Domestic Swiss Accounts (as defined therein).

(b)      The Debtors shall have commenced the Chapter 11 Cases in the Bankruptcy Court by no later than March 4, 2024 and the Debtors shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner acceptable to Agent and its counsel, with respect

to the Interim Financing Order and Agent shall have received such evidence thereof as it shall reasonably require. No trustee, or other disinterested person with expanded powers pursuant to section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Loan Party or their respective business, properties or assets and no motion shall be pending seeking any such relief. All of the "first day orders" and "second day orders" intended to be entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Cases and prior to the Interim Financing Order shall be in form and substance reasonably satisfactory to Agent, and the Debtors and the other Loan Parties shall have provided to Agent not less than two (2) Business Days' notice (or such lesser time as may be acceptable to Agent) to review and reasonably comment on the forms of such orders. A cash management order approving the cash management arrangements of the Debtors in form and substance reasonably satisfactory to Agent shall have been entered and shall be in full force and effect, and shall reflect that each Debtor, as debtor and debtor-in-possession, is the successor in interest to such Debtor, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations, and that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for in this Agreement and the other Loan Documents.

(c)      The Interim Financing Order shall have been entered by the Bankruptcy Court authorizing the secured financing under the Credit Facility on the terms and conditions contemplated by this Agreement and otherwise on terms acceptable to Agent and Lenders (which entry shall occur not later than three (3) Business Days after the Petition Date), and, inter alia, modifying the automatic stay, authorizing and granting the security interests and liens described above, and granting a super-priority administrative expense claim to Agent and Lenders with respect to all obligations to Agent and Lenders, subject to no priority claim or administrative expenses of the Chapter 11 Cases (but subject to the Carve Out Expenses).

(d)      Agent shall have completed (i) Patriot Act searches, OFAC/PEP searches, Canadian AML Legislation searches, and customary individual background checks and other know-your-customer due diligence for each Loan Party, and (ii) OFAC/PEP searches, Canadian AML Legislation searches, and customary individual background searches and other know-your-customer due diligence for each Loan Party's senior management and key principals, the results of which shall be satisfactory to Agent.

(e)      At least ten Business Days prior to the Amendment No. 3 Effective Date, any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver a Beneficial Ownership Certification in relation to such Loan Party, which such Beneficial Ownership Certificate shall be complete and accurate in all respects.

(f)      There shall not have occurred a Material Adverse Effect or any event or circumstance that could reasonably be expected to result in a Material Adverse Effect since the Petition Date.

(g)      There shall be no material misstatements in or omissions from any materials furnished to the Agent and/or the Lenders by the Loan Parties and/or their Subsidiaries on or prior to the Amendment No. 3 Effective Date. Agent shall not have become aware of any material information or other matter that is inconsistent in a material and adverse manner with any previously provided due diligence, information or materials (including any financial information).

(h)      The Borrower shall have paid to Agent (i) the Early Termination Premium (as defined in the Closing Date Fee Letter), (ii) the Amendment Fee (as defined in the Amendment No. 3 Fee Letter) and (ii) all reasonable fees, charges, and disbursements of counsel to Agent to the

extent invoiced prior to or on the date of this Agreement, plus such additional amounts of such reasonable fees, charges, and disbursements as constitute its reasonable estimate of such reasonable fees, charges, and disbursements incurred or to be incurred by it through the closing of this Agreement (provided, that such estimate will not thereafter preclude a final settling of accounts between Borrowers and Agent).

(i)     The representations herein shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the Amendment No. 3 Effective Date.

(j)     The Loan Parties and each of their respective Subsidiaries shall have received all licenses, approvals or evidence of other actions required by any Governmental Authority in connection with the execution and delivery by the Loan Parties or their respective Subsidiaries of the Loan Documents or with the consummation of the transactions contemplated thereby.

(k)     Except for actions, suits, proceedings, investigations, claims or disputes stayed by Section 362 of the Bankruptcy Code, there shall be no actions, suits, proceedings, investigations, claims or disputes pending or, to the knowledge of the Loan Parties, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of their Subsidiaries or against any of their properties or revenues that (x) purport to affect or pertain to this Agreement or any other Loan Document or (y) could reasonably be expected to result in a Material Adverse Effect.

(l)     No material changes in governmental regulations or policies affecting any Loan Party or any member of the Lender Group shall have occurred prior to the Amendment No. 3 Effective Date.

(m)     No law or regulation shall be applicable that restrains, prevents or imposes materially adverse conditions upon the Agreement, the other Loan Documents, or the Loans made thereunder;

(n)     After giving effect to this Agreement, no Default or Event of Default shall exist, or would result from the Borrowing of the Loans on the Amendment No. 3 Effective Date or from the application of the proceeds therefrom.

(o)     The Amendment No. 3 Effective Date shall have occurred no later than the close of business on the date that is three (3) Business Days following the Petition Date.

(p)     All legal matters incident to the execution and delivery of this Agreement are satisfactory to Agent and its counsel.

8.     **Release of Agent and Lenders by Loan Parties**. Subject to and upon entry of the Interim Financing Order, Loan Party hereby waives and releases any and all current existing claims, counterclaims, defenses, or set-offs of every kind and nature which it has or might have against Agent or any Lender arising out of, pursuant to, or pertaining in any way to the Credit Agreement, the Guaranty and Security Agreement, any other Loan Document, any and all documents and instruments delivered in connection with or relating to the foregoing, or this Agreement. Each Loan Party hereby further covenants and agrees not to sue Agent or any Lender or assert any claims, defenses, demands, actions, or liabilities against Agent or any Lender and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives

(Agent, each Lender and all such other parties, the "Releasees" and individually a "Releasee") which occurred prior to or as of the date of this Agreement arising out of, pursuant to, or pertaining in any way to the Credit Agreement, the Guaranty and Security Agreement, any other Loan Document, any and all documents and instruments delivered in connection with or relating to the foregoing, or this Agreement (the "Pre-Petition Released Claims") . Each Loan Party understands, acknowledges and agrees that the releases set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases. Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth above.  Upon entry of the Interim Financing Order, each Debtor and each other Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, but not on behalf of the bankruptcy estate of any of the Debtors until expiration of a customary challenge period as set forth in the Interim Financing Order, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Debtor and each other Loan Party pursuant to this Section 8. If any Loan Party violates the foregoing covenant, the Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

9.      **Miscellaneous**.

(a)     **THE VALIDITY OF THIS AGREEMENT, THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF, THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR RELATED HERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR RELATED HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW (OTHER THAN THE NEW YORK GENERAL OBLIGATIONS LAW §5-1401)).  SECTIONS 4(F) AND 5(F) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, SWISS LAW.  THE PARTIES TO THIS AGREEMENT AGREE THAT THE COURTS OF THE CITY OF ZURICH, SWITZERLAND SHALL HAVE EXCLUSIVE JURISDICTION TO SETTLE ANY DISPUTE ARISING OUT OF OR IN CONNECTION WITH SECTIONS 4(F) AND 5(F) OF THIS AGREEMENT. SECTIONS 3(c) AND 5(i) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE PROVINCE OF ONTARIO AND THE FEDERAL LAWS OF CANADA APPLICABLE THEREIN. THE PARTIES TO THIS AGREEMENT AGREE THAT THE COURTS SITTING IN THE CITY OF TORONTO, ONTARIO, SHALL HAVE THE NON-EXCLUSIVE JURISDICTION TO SETTLE ANY DISPUTE ARISING OUT OF OR IN CONNECTION WITH SECTIONS 3(c) AND 5(i) OF THIS AGREEMENT.**

(b)     This Agreement binds Agent, the Lenders, and Borrowers and their respective successors and assigns, and will inure to the benefit of Agent, the Lenders, and Borrowers and the successors and assigns of Agent and each Lender.

(c)     Except as specifically set forth herein, all other terms and provisions of the Credit Agreement, the Guaranty and Security Agreement, the Canadian Guaranty and Security Agreement and the other Loan Documents, shall continue in full force and effect and are hereby ratified and confirmed, and the Obligations are and continue to be secured by the Collateral, as modified hereby. Each Borrower, by execution of this Agreement, hereby reaffirms, assumes, and binds itself to all of the obligations, duties, rights, covenants, terms, and conditions that are contained in the Credit Agreement, the Guaranty and

Security Agreement, the Canadian Guaranty and Security Agreement and the other Loan Documents, as amended by this Agreement. Each Loan Party hereby (i) consents to the execution, delivery and performance of this Agreement and agrees that each of the Loan Documents, Swiss Security Documents, Existing UK Security Documents and/or Dutch Security Document (including, but not limited to, the collateral security and guarantees created by it thereunder) to which such Loan Party is party is, and shall continue to be, in full force and effect notwithstanding any additions, amendments or supplements of or to the Loan Documents and the imposition of any amended, new or more onerous obligations under the Loan Documents in relation to any Loan Party (including, without limitation, the amendments and the Commitment increase in the form of the Revolving Commitment contemplated by this Agreement) and is hereby in all respects ratified and confirmed on the date hereof, (ii) confirms that the Obligations will extend to all new obligations assumed by any Loan Party under any amended or new Loan Documents as a result of this Agreement (including, but not limited to, under the Credit Agreement as amended by this Agreement), (iii) confirms that the Loan Documents, Swiss Security Documents, the Existing UK Security Documents and/or Dutch Security Document to which such Loan Party is a party and all of the Liens on Collateral described therein do, shall continue to, and have always been intended to (continue to), secure the payment of all of the Obligations as amended and/or increased (including, but not limited to, under the Credit Agreement as amended by this Agreement) and (iv) confirms that all of the Liens on the Collateral described in the Loan Documents are not in any way adversely affected by the amendments to the Credit Agreement effected by this Agreement. Each Loan Party hereby further ratifies and reaffirms the validity and enforceability of all of the Liens heretofore granted, pursuant to and in connection with the Credit Agreement, Swiss Security Documents, Existing UK Security Documents, Dutch Security Document or any other Loan Document to the Agent on behalf and for the benefit of the members of the Lender Group, as collateral security for the Obligations (including the Commitment increase in the form of the Revolving Commitment contemplated by this Agreement) under the Loan Documents, in accordance with their respective terms, and acknowledges that all of such Liens, and all collateral pledged or otherwise provided as security for such Obligations, continues to be and remain collateral for such obligations from and after the date hereof and further agrees and acknowledges that all collateral secures, and has always been intended to secure, all Obligations (including the Commitment increase in the form of the Revolving Commitment contemplated by this Agreement) and agrees that such security shall continue in full force and effect as continuing security for all the present and future obligations of the Loan Parties.

(d)     Each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," or words of like import, and each reference to the Credit Agreement in any and all instruments or documents delivered in connection therewith, will be deemed to refer to the Credit Agreement, as amended by this Agreement. Each reference in the Guaranty and Security Agreement and in the Canadian Guaranty and Security Agreement to "this Agreement," "hereunder," "hereof," or words of like import, and each reference to the Guaranty and Security Agreement and to the Canadian Guaranty and Security Agreement in any and all instruments or documents delivered in connection therewith, will be deemed to refer to the Guaranty and Security Agreement and the Canadian Guaranty and Security Agreement, each as amended by this Agreement.

(e)     This Agreement is a Loan Document. Borrowers acknowledge that Agent's reasonable costs and out-of-pocket expenses (including reasonable attorneys' fees) incurred in drafting this Agreement and in amending the Loan Documents as provided in this Agreement constitute Lender Group Expenses.

(f)     This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by electronic mail or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party

delivering an executed counterpart of this Agreement by electronic mail or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

10.      **No Novation**. The Loan Parties expressly acknowledge and agree that there has not been and that this Agreement does not constitute or establish, and nothing herein contained shall be construed as, a discharge, substitution or novation in any way, shape or form of the Obligations outstanding under the Existing Loan Documents or instruments securing the same, which shall remain in full force and effect, except as expressly modified hereby.

[*Remainder of Page Intentionally Left Blank; Signature Pages to Follow.*]

The parties are signing this Amendment No. 3 to Term Loan Credit Agreement and Loan Documents as of the date stated in the introductory clause.

**BOWFLEX INC. (F/K/A NAUTILUS, INC.),** as a Domestic Borrower

By: _____

Name: Aina E. Konold
Title: Chief Financial Officer

**NAUTILUS FITNESS CANADA, INC.,** as a Canadian Borrower

By: _____

Name: Aina E. Konold
Title: Chief Financial Officer

**CRYSTAL FINANCIAL LLC D/B/A SLR CREDIT
SOLUTIONS**, as Agent

By: _____
    Name:  Michael Stavrakos
    Title: Director

**CRYSTAL FINANCIAL SPV LLC**, as a Lender

By: _____
    Name: Michael Stavrakos
    Title: Director

**CRYSTAL FINANCIAL LLC**, as a Lender

By:_____
     Name: Michael Stavrakos
     Title: Director

## RATIFICATION OF OBLIGATIONS

Each of the undersigned hereby join in this Agreement to evidence its consent to the execution by the Borrowers, to agree to be bound by the provisions of this Agreement to the extent applicable to the undersigned, to confirm that each Loan Document now or previously executed by the undersigned applies and shall continue to apply to the Credit Agreement (as amended hereby), to acknowledge that without such consent and confirmation, Agent and Lenders would not execute this Agreement, and to agree that each of the Loan Documents remain in full force and effect, and the undersigned confirms and ratifies all of its obligations under each Loan Document (as amended hereby) to which it is a party.

**NAUTILUS FITNESS INTERNATIONAL B.V.**, as a Guarantor

By: _____
    Name: Alan Chan
    Title: Director

**NAUTILUS SWITZERLAND AG**, as a Guarantor

By: _____
    Name: Alan Chan
    Title: President of the Board of Directors

**NAUTILUS FITNESS UK LTD**, as a Guarantor

By: _____
    Name: Alan Chan
    Title: Director

**BOWFLEX DELAWARE LLC**, as a Guarantor

By: _____
    Name: Alan Chan
    Title: Authorized Person

**BOWFLEX NEW JERSEY LLC**, as a Guarantor

By: _____
    Name: Alan Chan
    Title: Authorized Person

Exhibit A

Conformed Credit Agreement

Please see attached.

~~TERM~~TERM LOAN CREDIT AGREEMENT

by and among

CRYSTAL FINANCIAL LLC D/B/A SLR CREDIT SOLUTIONS,
as Agent,

THE LENDERS THAT ARE PARTIES HERETO,
as the Lenders,

~~NAUTILUS, INC.~~BOWFLEX INC. (F/K/A NAUTILUS, INC.),
NAUTILUS FITNESS CANADA, INC.,
and
THOSE ADDITIONAL PERSONS THAT ARE JOINED AS A PARTY HERETO,
as Borrowers

Dated as of November 30, 2022

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 1. | DEFINITIONS AND CONSTRUCTION. | ~~1~~7 |
| | 1.1 **Definitions** | ~~1~~7 |
| | 1.2 **Accounting Terms** | ~~54~~59 |
| | 1.3 **Code and PPSA** | ~~54~~59 |
| | 1.4 **Construction** | ~~54~~60 |
| | 1.5 **Time References** | ~~56~~61 |
| | 1.6 **Schedules and Exhibits** | ~~56~~62 |
| | 1.7 **Divisions** | ~~56~~62 |
| | 1.8 **Rates** | ~~56~~62 |
| | 1.9 **Exchange Rates; Excess Resulting for Exchange Rate Changes.** | ~~56~~62 |
| 2. | LOANS AND TERMS OF PAYMENT | ~~57~~63 |
| | 2.1 ~~**Term Loan**~~ **Loans** | ~~57~~ 63 |
| | 2.2 **Borrowings of Revolving Loans; Overadvances;** ~~Protective Advances~~ | ~~58~~64 |
| | 2.3 **Notation; Independent Obligations** | ~~58~~65 |
| | 2.4 **Payments; Prepayments** | ~~59~~65 |
| | 2.5 **Promise to Pay; Promissory Notes** | ~~63~~70 |
| | 2.6 **Interest Rates; and Rates, Payments, and Calculations** | ~~63~~71 |
| | 2.7 **Crediting Payments** | ~~65~~72 |
| | 2.8 **Designated Account** | ~~65~~73 |
| | 2.9 **Maintenance of Loan Account; Statements of Obligations** | ~~65~~73 |
| | 2.10 **Fees** | ~~65~~73 |
| | 2.11 **Defaulting Lenders** | ~~66~~74 |
| | 2.12 **Adjusted Term SOFR** | ~~67~~75 |
| | 2.13 **Capital Requirements** | ~~68~~76 |
| | 2.14 ~~**Incremental Facilities**~~ ~~69~~**Reserved** 77 |
| | 2.15 **Joint and Several Liability of Borrowers.** | ~~72~~77 |
| | 2.16 **Termination and Reduction of Commitments** | 80 |
| 3. | CONDITIONS; TERM OF AGREEMENT | ~~74~~81 |
| | 3.1 **Conditions Precedent to the Borrowing** | ~~74~~81 |
| | 3.2 ~~**[Intentionally Omitted]**~~**Conditions Precedent to all Extensions of Credit** | ~~74~~81 |
| | 3.3 ~~**[Intentionally Omitted]**~~**Maturity** | ~~74~~82 |
| | 3.4 **Effect of Maturity** | ~~75~~82 |
| | 3.5 **Early Termination by Borrowers** | ~~75~~82 |
| 4. | REPRESENTATIONS AND WARRANTIES | ~~75~~82 |
| | 4.1 **Due Organization and Qualification; Subsidiaries** | ~~75~~83 |
| | 4.2 **Due Authorization; No Conflict** | ~~76~~83 |
| | 4.3 **Governmental Consents** | ~~76~~84 |
| | 4.4 **Binding Obligations; Perfected Liens** | ~~76~~84 |
| | 4.5 **Title to Assets; No Encumbrances** | ~~77~~84 |

DB1/ ~~139987402.3~~144663763.14

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 4.6 | **Litigation** | ~~77~~84 |
| 4.7 | **Compliance with Laws** | ~~77~~84 |
| 4.8 | **No Material Adverse Effect** | ~~77~~85 |
| 4.9 | **Solvency** | ~~77~~85 |
| 4.10 | **Employee Benefits; Canadian Pension Plan Compliance** | ~~78~~85 |
| 4.11 | **Environmental Condition** | ~~78~~85 |
| 4.12 | **Complete Disclosure** | ~~78~~86 |
| 4.13 | **Patriot Act, Etc.** | ~~79~~86 |
| 4.14 | **Indebtedness** | ~~79~~86 |
| 4.15 | **Payment of Taxes** | ~~79~~86 |
| 4.16 | **Margin Stock** | ~~79~~87 |
| 4.17 | **Governmental Regulation** | ~~79~~87 |
| 4.18 | **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws** | ~~80~~87 |
| 4.19 | **Employee and Labor Matters** | ~~80~~87 |
| 4.20 | **Material Customers** | ~~80~~88 |
| 4.21 | **Leases** | ~~80~~88 |
| 4.22 | **Eligible Accounts; Eligible Credit Card Receivables** | ~~81~~88 |
| 4.23 | **Eligible Inventory** | ~~81~~88 |
| 4.24 | **Eligible IP** | ~~81~~88 |
| 4.25 | **Location of Inventory** | ~~81~~88 |
| 4.26 | **Inventory Records** | ~~81~~88 |
| 4.27 | ~~**ABL Loan Documents**~~ | ~~81~~**[Intentionally Omitted].** 89 |
| 4.28 | **[Intentionally Omitted]** | ~~81~~89 |
| 4.29 | **Immaterial Subsidiaries** | ~~81~~89 |
| 4.30 | ~~**Hedge Agreements**~~ | ~~82~~**[Intentionally Omitted]** 89 |
| 4.31 | **Credit Card Arrangements** | ~~82~~89 |
| 4.32 | **Material Contracts** | ~~82~~89 |
| 4.33 | **Approved Budget** | 89 |
| 4.34 | **Certain other Bankruptcy Matters.** | 89 |
| 5. | AFFIRMATIVE COVENANTS | ~~82~~90 |
| 5.1 | **Financial Statements, Reports, Certificates** | ~~82~~90 |
| 5.2 | **Reporting** | ~~83~~90 |
| 5.3 | **Existence** | ~~83~~91 |
| 5.4 | **Maintenance of Properties** | ~~83~~91 |
| 5.5 | **Taxes** | ~~83~~91 |
| 5.6 | **Insurance** | ~~83~~91 |
| 5.7 | **Inspection** | ~~84~~92 |
| 5.8 | **Compliance with Laws** | ~~85~~92 |
| 5.9 | **Environmental** | ~~85~~92 |
| 5.10 | **Disclosure Updates** | ~~86~~93 |
| 5.11 | **Formation of Subsidiaries** | ~~86~~93 |

DB1/ ~~139987402.3~~144663763.14

## TABLE OF CONTENTS

(continued)

**Page**

| | | |
|---|---|---|
| 5.12 | Further Assurances | ~~87~~94 |
| 5.13 | ~~Joinder of Nautilus Dutch and Nautilus Swiss~~ | ~~87~~Intentionally Omitted 94 |
| 5.14 | Location of Inventory; Chief Executive Office | ~~88~~94 |
| 5.15 | Compliance with ERISA and the IRC | ~~88~~95 |
| 5.16 | OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws | ~~89~~95 |
| 5.17 | Material Contracts | ~~89~~95 |
| 5.18 | Post-Closing Obligations | ~~89~~95 |
| 5.19 | Cash Management | ~~89~~96 |
| 5.20 | ~~ABL Borrowing Base~~ | ~~90~~[Intentionally Omitted]. 97 |
| 5.21 | Milestones | 97 |
| 5.22 | Security and Priorities | 97 |
| 5.23 | Certain Other Bankruptcy Matters. | 98 |
| 5.24 | Release of Post-Petition Claims | 99 |
| 6. | NEGATIVE COVENANTS | ~~90~~99 |
| 6.1 | Indebtedness | ~~90~~99 |
| 6.2 | Liens | ~~90~~99 |
| 6.3 | Restrictions on Fundamental Changes | ~~90~~99 |
| 6.4 | Disposal of Assets | ~~91~~100 |
| 6.5 | Nature of Business | ~~91~~100 |
| 6.6 | Prepayments and Amendments | ~~91~~100 |
| 6.7 | Restricted Payments | ~~92~~101 |
| 6.8 | Accounting Methods | ~~93~~101 |
| 6.9 | Investments | ~~93~~101 |
| 6.10 | Transactions with Affiliates | ~~93~~101 |
| 6.11 | Use of Proceeds | ~~93~~101 |
| 6.12 | Limitation on Issuance of Equity Interests | ~~94~~102 |
| 6.13 | Inventory with Bailees | ~~94~~102 |
| 6.14 | ~~Acquisition of ABL Obligations~~ | ~~94~~[Intentionally Omitted] 102 |
| 6.15 | Employee Benefits; Canadian Defined Benefit Plan | ~~94~~102 |
| 6.16 | Credit Card Agreements | ~~95~~103 |
| 6.17 | Immaterial Subsidiary | ~~95~~103 |
| 6.18 | Additional Bankruptcy Matters | 103 |
| 6.19 | Other Superpriority Claim | 103 |
| 6.20 | Reclamation Claims | 103 |
| 6.21 | Bankruptcy Actions | 104 |
| 7. | ~~FINANCIAL COVENANTS~~ | ~~95~~APPROVED BUDGET. 104 |
| 7.1 | ~~Minimum Excess ABL Availability~~ | ~~95~~ |
| 7.2 | ~~Fixed Charge Coverage Ratio~~ | ~~95~~ |
| 8. | EVENTS OF DEFAULT | ~~95~~105 |
| 8.1 | Payments | ~~95~~105 |

DB1/ ~~139987402.3~~144663763.14

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 8.2 | **Covenants** | ~~96~~105 |
| 8.3 | **Judgments** | ~~96~~106 |
| 8.4 | **Voluntary Bankruptcy, etc.** | ~~96~~106 |
| 8.5 | **Involuntary Bankruptcy, etc.** | ~~96~~106 |
| 8.6 | **Default Under Other Agreements** | ~~96~~106 |
| 8.7 | **Representations, etc.** | ~~97~~106 |
| 8.8 | **Guaranty** | ~~97~~106 |
| 8.9 | **Security Documents** | ~~97~~106 |
| 8.10 | **Loan Documents** | ~~97~~107 |
| 8.11 | **Change of Control** | ~~97~~107 |
| 8.12 | **Pension Matters** | ~~97~~107 |
| 8.13 | **Credit Card Agreements** | ~~97~~107 |
| 8.14 | ~~**Intercreditor Provisions**~~ **Intentionally Omitted** ~~98~~107 |  |
| 8.15 | ~~**Term Pushdown Reserve**~~ **Additional Bankruptcy Events of Default.** ~~98~~107 |  |
| 8.16 | **Breach of Contractual Obligations** | ~~98~~110 |
| 8.17 | **Material Customers** | ~~98~~110 |
| 9. | RIGHTS AND REMEDIES | ~~98~~111 |
| 9.1 | **Rights and Remedies** | ~~98~~111 |
| 9.2 | **Remedies Cumulative** | ~~99~~112 |
| 9.3 | **Lift of Stay; Stay of Proceedings** | 112 |
| 10. | WAIVERS; INDEMNIFICATION | ~~99~~112 |
| 10.1 | **Demand; Protest; etc.** | ~~99~~112 |
| 10.2 | **The Lender Group's Liability for Collateral** | ~~99~~112 |
| 10.3 | **Indemnification** | ~~99~~112 |
| 11. | NOTICES | ~~100~~113 |
| 12. | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE PROVISION | ~~101~~114 |
| 13. | ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS | ~~102~~115 |
| 13.1 | **Assignments and Participations** | ~~102~~115 |
| 13.2 | **Successors** | ~~106~~120 |
| 14. | AMENDMENTS; WAIVERS | ~~107~~120 |
| 14.1 | **Amendments and Waivers** | ~~107~~120 |
| 14.2 | **Replacement of Certain Lenders** | ~~108~~122 |
| 14.3 | **No Waivers; Cumulative Remedies** | ~~109~~122 |
| 15. | AGENT; THE LENDER GROUP | ~~109~~123 |
| 15.1 | **Appointment and Authorization of Agent** | ~~109~~123 |
| 15.2 | **Delegation of Duties** | ~~110~~124 |
| 15.3 | **Liability of Agent** | ~~110~~124 |

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 15.4 | Reliance by Agent | ~~110~~125 |
| 15.5 | Notice of Default or Event of Default | ~~111~~125 |
| 15.6 | Credit Decision | ~~111~~125 |
| 15.7 | Costs and Expenses; Indemnification | ~~112~~126 |
| 15.8 | Agent in Individual Capacity | ~~112~~126 |
| 15.9 | Successor Agent | ~~112~~127 |
| 15.10 | Lender in Individual Capacity | ~~113~~127 |
| 15.11 | Collateral Matters | ~~113~~127 |
| 15.12 | Restrictions on Actions by Lenders; Sharing of Payments | ~~115~~129 |
| 15.13 | Agency for Perfection | ~~115~~129 |
| 15.14 | Payments by Agent to the Lenders | ~~115~~129 |
| 15.15 | Concerning the Collateral and Related Loan Documents | ~~115~~130 |
| 15.16 | Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information | ~~116~~130 |
| 15.17 | Several Obligations; No Liability | ~~116~~131 |
| 15.18 | Appointment as Hypothecary Representative~~.~~ | ~~117~~131 |
| 16. | WITHHOLDING TAXES | ~~117~~131 |
| 16.1 | Payments | ~~117~~131 |
| 16.2 | Exemptions | ~~118~~132 |
| 16.3 | Reductions | ~~119~~133 |
| 16.4 | Refunds | ~~120~~134 |
| 17. | GENERAL PROVISIONS | ~~120~~134 |
| 17.1 | Effectiveness | ~~120~~134 |
| 17.2 | Section Headings | ~~120~~134 |
| 17.3 | Interpretation | ~~120~~134 |
| 17.4 | Severability of Provisions | ~~120~~134 |
| 17.5 | [Intentionally Omitted] | ~~120~~134 |
| 17.6 | Debtor-Creditor Relationship | ~~120~~135 |
| 17.7 | Counterparts; Electronic Execution | ~~120~~135 |
| 17.8 | Revival and Reinstatement of Obligations; Certain Waivers | ~~121~~135 |
| 17.9 | Confidentiality | ~~121~~135 |
| 17.10 | Survival | ~~122~~136 |
| 17.11 | Patriot Act; Due Diligence | ~~122~~137 |
| 17.12 | Integration | ~~123~~137 |
| 17.13 | ~~Nautilus~~BowFlex as Agent for Borrowers | ~~123~~137 |
| 17.14 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | ~~124~~138 |
| 17.15 | Acknowledgment Regarding Any Supported QFCs | ~~124~~138 |
| 17.16 | Erroneous Payments | ~~125~~139 |
| 17.17 | ~~Intercreditor Provisions~~ | ~~127~~Intentionally Omitted. 141 |
| 17.18 | Canadian Interest Rate Limitation | ~~127~~141 |

# TABLE OF CONTENTS

(continued)

**Page**

17.19   **Financing Orders** ............................................................................................ 141

**EXHIBITS AND SCHEDULES**

| | |
|---|---|
| Exhibit A-1 | Form of Assignment and Acceptance |
| Exhibit B-1 | Form of ~~Term Loan~~ Borrowing Base Certificate |
| Exhibit C-1 | Form of Compliance Certificate |
| Exhibit D | Initial Approved Budget |
| Exhibit D-1 | Form of Borrowing Request |
| Exhibit J-1 | Form of Joinder |
| Exhibit N-1 | Form of Credit Card Notification |
| Exhibit P-1 | Form of Perfection Certificate |
| | |
| Schedule A-1 | Agent's Account |
| Schedule C-1 | Commitments |
| Schedule C-2 | Customs Brokers |
| Schedule D-1 | Designated Account |
| Schedule P-1 | Permitted Investments |
| Schedule P-2 | Permitted Liens |
| Schedule 3.1 | Conditions Precedent |
| Schedule 4.1(b) | Capitalization of Borrowers |
| Schedule 4.1(c) | Capitalization of Loan Parties' Subsidiaries |
| Schedule 4.1(d) | Subscriptions, Options, Warrants, Calls |
| Schedule 4.6(b) | Litigation |
| Schedule 4.10 | Employee Benefits |
| Schedule 4.11 | Environmental Matters |
| Schedule 4.14 | Permitted Indebtedness |
| Schedule 4.14(a) | Existing Permitted Purchase Money Indebtedness |
| Schedule 4.20 | Material Customers |
| Schedule 4.25 | Location of Inventory |
| Schedule 4.31 | Credit Card Arrangements |
| Schedule 4.32 | Material Contracts |
| Schedule 5.1 | Financial Statements, Reports, Certificates |
| Schedule 5.2 | Collateral Reporting |
| Schedule 5.18 | Post-Closing Obligations |
| Schedule 5.21 | Milestones |
| Schedule 6.5 | Nature of Business |

DB1/ ~~139987402.3~~144663763.14

# CREDIT AGREEMENT

**THIS CREDIT AGREEMENT** is entered into as of November 30, 2022, by and among the lenders identified on the signature pages hereof (each of such lenders, together with its successors and permitted assigns, is referred to hereinafter as a "Lender", as that term is hereinafter further defined), **CRYSTAL FINANCIAL LLC D/B/A SLR CREDIT SOLUTIONS**, a Delaware limited liability company, as administrative agent for each member of the Lender Group (in such capacity, together with its successors and assigns in such capacity, "Agent"), **BOWFLEX INC.** (f/k/a Nautilus, Inc.), a Washington corporation ("~~Nautilus~~BowFlex"), **NAUTILUS FITNESS CANADA, INC.**, a corporation organized under the laws of British Columbia ("Nautilus Canada"), and those additional Persons that are joined as a party hereto by executing the form of Joinder attached hereto as Exhibit J-1 (each, together with ~~Nautilus~~BowFlex and Nautilus Canada, a "Borrower" and individually and collectively, jointly and severally, the "Borrowers").

The parties agree as follows:

1. **DEFINITIONS AND CONSTRUCTION.**

    1.1    **Definitions**.  As used in this Agreement, the following terms shall have the following definitions:

    ~~"2024 Financial Statement Delivery Date" has the meaning specified therefor in the definition of "Adjustment Date".~~

    ~~"ABL Agent" means (a) Wells Fargo, its capacity as agent for the ABL Lenders under the ABL Credit Agreement, (b) any successor to Wells Fargo, by assignment or otherwise, and (c) any other party that may become agent or trustee under the ABL Credit Agreement in connection with a refinancing, renewal or replacement thereof.~~

    ~~"ABL Availability" means "Availability" as such term is defined in the ABL Credit Agreement.~~

    ~~"ABL Borrowing Base" means the "Borrowing Base" as such term is defined in the ABL Credit Agreement.~~

    ~~"ABL Borrowing Base Certificate" means the "Borrowing Base Certificate" as such term is defined in the ABL Credit Agreement as in effect on the date hereof.~~

    ~~"ABL Credit Agreement" means that certain Credit Agreement, dated as of January 31, 2020, by and among the Borrowers, the ABL Lenders, and the ABL Agent, as amended pursuant to that certain Omnibus Release, Amendment, Limited Waiver, and Reaffirmation Agreement dated as of October 14, 2020, as further amended by the Consent and Amendment No. 1 to Credit Agreement dated as of December 30, 2020, as further amended by the Amendment to Loan Documents dated as of May 13, 2021, as further amended by the Consent under Credit Agreement dated as of September 15, 2021, as further amended by the Amendment to Loan Documents dated as of October 29, 2021 and as further amended pursuant to that certain Amendment No. 4 to Credit Agreement and Loan Documents, dated of the Closing Date (the "ABL Fourth Amendment"), and as may be further amended, amended and restated, supplemented, extended or otherwise modified from time to time, and any replacement credit agreement entered into pursuant to any Refinancing Indebtedness in respect thereof, in each case in accordance with the provisions hereof and of the Intercreditor Agreement.~~

1

"ABL Existing Term Loan" means the "Term Loan" as defined in the ABL Credit Agreement as in effect immediately prior to the date hereof.

"ABL Fourth Amendment" has the meaning given to such term in the definition of "ABL Credit Agreement".

"ABL Lenders" means the "Lenders" (or any analogous term) as defined in the ABL Credit Agreement as in effect on the date hereof.

"ABL Line Cap" means the "Line Cap" as defined in the ABL Credit Agreement.

"ABL Liquidity" means "Liquidity" as such term is defined in the ABL Credit Agreement as in effect on the date hereof.

"ABL Loan Documents" means the "Loan Documents" (as defined in the ABL Credit Agreement), as may be amended from time to time in accordance with the provisions hereof and of the Intercreditor Agreement.

"ABL Obligations" means the "Obligations" as such term is defined in the ABL Credit Agreement as in effect on the date hereof.

"ABL Priority Collateral" has the meaning given to such term in the Intercreditor Agreement.

"ABL Reserves" means the "Reserves" as such term is defined in the ABL Credit Agreement.

"ABL Revolving Loans" means the "Revolving Loans" as defined in the ABL Credit Agreement as in effect on the date hereof.

"Acceptable Appraisal" means, with respect to an appraisal of Inventory or IP, the most recent appraisal of such property received by Agent (a) from an appraisal company satisfactory to Agent in Agent's Permitted Discretion (including, without limitation, so long as it is satisfactory to Agent in Agent's Permitted Discretion, Hilco), (b) the scope and methodology (including, to the extent relevant, any sampling procedure employed by such appraisal company) of which are satisfactory to Agent in Agent's Permitted Discretion, and (c) the results of which are satisfactory to Agent in Agent's Permitted Discretion.

"Acceptable Appraiser/Field Examiner" means, with respect to any commercial field examination and/or appraisal of Inventory included in the ABL Borrowing Base and the Borrowing Bases, a field examiner and/or appraiser acceptable to the Agent in its Permitted Discretion.

"Acceptable Plan of Reorganization" means a plan of reorganization that (a) is acceptable to the Agent and the Required Lenders in their sole discretion (including containing a release in favor of the Agent, the Agent (as defined in the Pre-Petition Credit Agreement), the Lenders, the Lenders (as defined in the Pre-Petition Credit Agreement) and their affiliates), and (b) contains a provision for termination of the Commitments and indefeasible repayment in full in cash of all of the Obligations on or before the effective date of such plan, and from and after the Maturity Date.

"Account" means an account (as that term is defined in the Code or PPSA, as applicable) and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, or (b) for services rendered or to be rendered.  The term "Account" does not include (a) rights to payment

evidenced by chattel paper or an instrument, (b) commercial tort claims, (c) deposit accounts, (d) investment property, or (e) letter-of-credit rights or letters of credit.

"Account Debtor" means any Person who is obligated on an Account, chattel paper, or a general intangible, including, without limitation, a Credit Card Issuer or a Credit Card Processor.

"Accounting Changes" means changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions).

"Accounts Advance Rate" means (a) with respect to Domestic Borrowers, ~~15~~97.5%; provided, however, from and after March 31, ~~2023~~2024, such advance rate shall automatically reduce by an amount equal to 0.625% on the last day of each calendar quarter until such advance rate equals ~~10~~95%, and (b) with respect to Canadian Borrowers, ~~90~~87.5%; provided, however, from and after March 31, ~~2023~~2024, such advance rate shall automatically reduce by an amount equal to 0.625% on the last day of each calendar quarter until such advance rate equals 85%.

~~"Acquisition" means (a) the purchase or other acquisition by a Person or its Subsidiaries of all or substantially all of the assets of (or any division or business line of) any other Person, or (b) the purchase or other acquisition (whether by means of a merger, amalgamation, consolidation, or otherwise) by a Person or its Subsidiaries of all of the Equity Interests of any other Person. For the avoidance of doubt, any Acquisition shall require the prior written consent of the Agent in its sole discretion.~~

"Actual Cash Receipts" means the sum of all cash receipts received by the Loan Parties from operations (excluding any borrowings under this Agreement) during the relevant period of determination which corresponds to the budgeted cash receipts described in the line item contained in the Approved Budget across from the heading "Total Receipts", as determined in a manner consistent with the Approved Budget.

"Actual Operating Disbursement Amount" means the sum of all cash operating disbursements made by the Loan Parties during the relevant period of determination which corresponds to each of the budgeted cash operating disbursements described in the line item contained in the Approved Budget across from the heading "Total Operating Disbursements", as determined in a manner consistent with the Approved Budget.

"Additional Documents" has the meaning specified therefor in Section 5.12 of this Agreement.

~~"Additional Portion of the Term Loan" has the respective meanings specified therefor in Section 2.14 of this Agreement.~~

"Adjusted Term SOFR" means, for purposes of any calculation, the rate per annum equal to (a) the greater of (A) Term SOFR for such calculation and (B) 1.00% plus (b) the Term SOFR Adjustment.

~~"Adjustment Date" means the first day of each fiscal month, commencing with the first fiscal month following the receipt by the Agent of the annual audited financial statements of the Loan Parties and their Subsidiaries pursuant to the terms of Section 5.1 and clause (a) of Schedule 5.1 to this Agreement for the fiscal year ending March 31, 2024 (such date referred to herein as the "2024 Financial Statement Delivery Date").~~

"Administrative Borrower" has the meaning specified therefor in Section 17.13 of this Agreement.

"Administrative Questionnaire" has the meaning specified therefor in Section 13.1(a) of this Agreement.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affected Lender" has the meaning specified therefor in Section 2.13(b) of this Agreement.

"Affiliate" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Equity Interests, by contract, or otherwise; provided, that for purposes of the definition of Eligible Accounts, the definition of Eligible Credit Card Receivables, and Section 6.10 of this Agreement: (a) if any Person owns directly or indirectly 15% or more of the Equity Interests having ordinary voting power for the election of directors or other members of the governing body of a Person or 15% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person), then both such Persons shall be Affiliates of each other, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership in which a Person is a general partner shall be deemed an Affiliate of such Person.

"Agent" has the meaning specified therefor in the preamble to this Agreement.

"Agent-Related Persons" means Agent, together with its Affiliates, officers, directors, employees, attorneys, and agents.

"Agent's Account" means the Deposit Account of Agent identified on Schedule A-1 to this Agreement (or such other Deposit Account of Agent that has been designated as such, in writing, by Agent to Borrowers and the Lenders).

"Agent's Liens" means the Liens granted by each Loan Party or its Subsidiaries to Agent under the Loan Documents and securing the Obligations.

"Aggregate Borrowing Base" means ~~the sum of~~, at any date of determination, the result of:

(a)    ~~(a)~~ the Domestic Borrowing Base ~~and~~ *plus*

(b)    ~~(b)~~ the Canadian Borrowing Base. *minus*

(c)    the Availability Block.

"Agreement" means this Term Loan Credit Agreement~~, as amended, restated, amended and restated, supplemented or otherwise modified from time to time~~.

"Amendment No. 1" means that certain Limited Consent and Amendment No. 1 to Credit Agreement and Loan Documents, dated as of the Amendment No. 1 Effective Date, by and among the Borrowers, the Lenders party thereto and the Agent.

"Amendment No. 1 Effective Date" means April 25, 2023.

"Amendment No. 2 Effective Date" means July 28, 2023.

"Amendment No. 3" means that certain Amendment No. 3 to Credit Agreement and Loan Documents, dated as of the Amendment No. 3 Effective Date, by and among the Borrowers, the other Loan Parties party thereto, the Lenders party thereto and the Agent.

"Amendment No. 3 Effective Date" has the meaning specified therefor in Amendment No. 3 (which date is, for the avoidance of doubt, March 6, 2024).

"Amendment No. 3 Fee Letter" means that certain fee letter, dated as of the Amendment No. 3 Effective Date, among the Borrowers and Agent.

"Anti-Corruption Laws" means the FCPA, the U.K. Bribery Act of 2010, as amended, the Corruption of Foreign Public Officials Act (Canada), as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"Anti-Money Laundering Laws" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable ABL Availability Amount" means (a) prior to the consummation of any Specified Transaction, $10,000,000; (b) on and after the consummation of any of the IV Transaction or the Vi Transaction, $9,000,000; and (c) on and after the consummation of both the IV Transaction and the Vi Transaction, $7,000,000.

"Applicable Margin"

(a)    At all times prior to 2024 Financial Statement Delivery Date, the percentage set forth in "Level II" of the pricing grid below; and the Amendment No. 3 Effective Date, the Applicable Margin shall be as provided in this Agreement (prior to giving effect to Amendment No. 3); and

(b)    From and after the Amendment No. 3 Effective Date, the Applicable Margin shall be set at 8.25% per annum.

(b)    At all times from and after the 2024 Financial Statement Delivery Date, upon each Adjustment Date thereafter, the Applicable Margin shall be determined from the following pricing grid based upon the Fixed Charge Coverage Ratio for each 12 month period ending on the last day of each fiscal month ended immediately preceding such Adjustment Date for which financial statements have been delivered;

provided, however, that upon the occurrence of an Event of Default, the Applicable Margin shall immediately be increased to that set forth in "Level II" (even if the Fixed Charge Coverage Ratio requirements for a different Level have been met); provided further if the information set forth in any Compliance Certificate proves to be false or incorrect such that the Applicable Margin would have been higher than was otherwise in effect during any period, without constituting a waiver of any Default or Event of Default arising as a result thereof, interest due under this Agreement shall be immediately recalculated at such higher rate for any applicable periods and shall be due and payable on demand.

| ~~Level~~ | ~~Fixed Charge Coverage Ratio~~ | ~~Applicable Margin~~ |
|---|---|---|
| ~~I~~ | ~~> 1.00 to 1.00~~ | ~~7.75%~~ |
| ~~II~~ | ~~≤1.00 to 1.00~~ | ~~8.25%~~ |

"Application Event" means, subject to the Default Notice Period, the occurrence of (a) a failure by Borrowers to repay all of the Obligations in full on the Maturity Date, or (b) an Event of Default and the election by Agent or the Required Lenders to require that payments and proceeds of Collateral be applied pursuant to Section 2.4(b)(iii) of this Agreement.

"Appraised Value" means, with respect to Eligible IP, the appraised forced liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value, shall be determined from time to time by reference to the most recent reasonably acceptable appraisal received by the Agent conducted by an independent appraiser that is retained by the Agent in its reasonable discretion, or if such Eligible IP was not included in such appraisal, by reference to the appraisal received by the Agent under clause (e) of the definition of Eligible IP.

"Approved Bankruptcy Court Order" shall mean (a) the Financing Orders and the Cash Management Order, as each such order is amended and in effect from time to time in accordance with this Agreement,  (b) any other order entered by the Bankruptcy Court regarding, relating to or impacting (i) any rights or remedies of Agent and Lenders, (ii) the Loan Documents (including the Loan Parties' obligations thereunder), (iii) the Collateral, any Liens thereon or any Superpriority Claims (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or Superpriority Claims), (iv) use of cash collateral, (v) debtor-in-possession financing, (vi) adequate protection or otherwise relating to the Credit Facility, (vii) any plan of reorganization (it being understood that any Acceptable Plan of Reorganization is in form and substance satisfactory to Agent and Lenders), and (c) any other order entered by the Bankruptcy Court that is in form and substance satisfactory to Agent and, in each case for clauses (a), (b) and (c), that (x) has not been vacated, reversed or stayed and (y) has not been amended or modified except in a manner satisfactory to Agent.

"Approved Budget" means the Initial Approved Budget, as the same may be updated, modified or supplemented from time to time as provided in Section 7.

"Approved Budget Variance Report" means a weekly report provided by the Borrowers to the Agent (i) showing, in each case, by line item the Actual Cash Receipts, the Actual Operating Disbursement Amount, Availability and total available liquidity for the last day of the Prior Week, the Cumulative Two-Week Period and the Cumulative Period, noting therein all variances, on a line-item and cumulative basis, from amounts set forth for such period in the Approved Budget, and shall include explanations for all variances in excess of $100,000, and (ii) certified by a Responsible Officer of the Administrative Borrower.  The Approved Budget Variance Report shall be in a form, and shall contain supporting information, satisfactory to the Agent in its reasonable discretion.

"Approved Electronic Communication" means each notice, demand, communication, information, document and other material transmitted, posted or otherwise made or communicated by e-mail, facsimile, or any other electronic service, whether owned, operated or hosted by the Agent, any of its Affiliates or any other Person, that any party is obligated to, or otherwise chooses to, provide to the Agent pursuant to this Agreement or any other Loan Document, including any financial statement, financial and other report, notice, request, certificate and other information or material; provided, that Approved Electronic Communications shall not include any notice, demand, communication,

information, document or other material that the Agent specifically instructs a Person to deliver in physical form.

"Assignee" has the meaning specified therefor in Section 13.1(a) of this Agreement.

"Assignment and Acceptance" means an Assignment and Acceptance Agreement substantially in the form of Exhibit A-1 to this Agreement.

"Availability Test" has the meaning specified therefor in the definition of "Increased Reporting Event."

"Automatic Stay" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"Availability" means, at any time, the difference of (a) the Revolving Line Cap at such time, less (b) the Total Revolving Outstandings at such time.

"Availability Block" means $3,000,000; provided, however, that, not earlier than the weekly period for the week ending April 5 2024 set forth in the Approved Budget, the Availability Block shall be reduced to the amount (not less than zero ($0.00)) set forth in the Approved Budget for the applicable weekly period if (a) no Default or Event of Default has occurred and is continuing (or would result from such reduction), (b) the Debtors have accepted a Successful Bid (as defined in the Bid Procedures Order referred to in Schedule 5.21 hereto) which Successful Bid is satisfactory to the Agent and shall provide for the indefeasible payment in full in cash of the Loans and all other Obligations, (c) such Successful Bid has been approved by the Bankruptcy Court pursuant to a Sale Order (as defined in the Bid Procedures Order referred to in Schedule 5.21 hereto) in form and substance acceptable to the Agent and (d) the Successful Bid is scheduled to close in compliance with the requirements of Section 5.21 (Milestones) and shall be in full force and effect.

"Availability Period" means the period from and including the Amendment No. 3 Effective Date to but excluding the earlier of (a) the Maturity Date and, (b) if different, the date of the termination of the Revolving Commitments in accordance with the provisions of this Agreement.

"Avoidance Action" means any of the actions described in clause (g) of the definition of "Post-Petition Collateral".

"Availability Test Exception PeriodAvoidance Proceeds" has the meaning specified therefor in clause (g) of the definition of "Increased Reporting EventPost-Petition Collateral".

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means titleshall mean the United States Bankruptcy Code, being Title 11 of the United States Code, as in effect from time to time. as enacted in 1978, as the same has heretofore

DB1/ 139987402.3

been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of New Jersey.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.12(a)(iii)(A).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by Agent and Administrative Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for Dollar-denominated syndicated credit facilities and (b) the related Benchmark Replacement Adjustment; provided that if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement shall be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by Agent and Administrative Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)    in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof); or

(b)    in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative or non-compliant with or non-aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks; provided that such non-representativeness, non-compliance or non-alignment will be determined by reference to the most recent statement or publication referenced in such clause (c).

"<u>Benchmark Transition Event</u>" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof), permanently or indefinitely, <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof);

(b)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) permanently or indefinitely, <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof); or

(c)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that such Benchmark (or such component thereof) is not, or as of a specified future date will not be, representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks.

"<u>Benchmark Transition Start Date</u>" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"<u>Benchmark Unavailability Period</u>" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 2.12(a)(i)</u> and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 2.12(a)(i)</u>.

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>BHC Act Affiliate</u>" of a Person means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such Person.

"Board of Directors" means, as to any Person, the board of directors (or comparable managers) of such Person, or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower" and "Borrowers" have the respective meanings specified therefor in the preamble to this Agreement.

"Borrower Intellectual Property" means Intellectual Property owned by a Borrower.

"Borrowing" means the borrowing consisting of (a) Revolving Loans from and after the Amendment No. 3 Effective Date or (b) of the Term Loan on the Closing Date made by each of the Lenders, in each case, to the Borrowers pursuant to Section 2.1 to the Borrowers on the Closing Date2.1(a).

"Borrowing Base" means the Canadian Borrowing Base and/or the Domestic Borrowing Base as the context requires.

"Borrowing Base Certificate" means, collectively, the ABL Borrowing Base Certificate and the Term Loan Borrowing Base Certificate.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit B-1 to this Agreement, which such form of the Borrowing Base Certificate may be amended, restated, supplemented or otherwise modified from time to time (including without limitation, changes to the format thereof), as satisfactory to Agent in Agent's Permitted Discretion.

"Borrowing Request" has the meaning specified in Section 2.2(b).

"BowFlex" has meaning specified in the preamble hereto.

"Budgeted Cash Receipts" means the line item contained in the Approved Budget across from the heading "Total Receipts" during the relevant period of determination.

"Budgeted Disbursement Amount" means the line item contained in the Approved Budget across from the heading "Total Disbursements" during the relevant period of determination.

"Budgeted Operating Disbursement Amount" means the line item contained in the Approved Budget across from the heading "Total Operating Disbursements" during the relevant period of determination.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which the Federal Reserve Bank of New York is closed or on which banks are authorized or required to close in the State of New York or the Commonwealth of Massachusetts.

"Canadian AML Legislation" means the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada), as amended, and any other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" laws in effect in Canada from time to time, including any regulations, guidelines or orders thereunder.

"Canadian Borrowers" means, collectively, Nautilus Canada and each other Canadian Subsidiary who shall from time to time enter into a Joinder as a Canadian Borrower.

"Canadian Borrowing Base" means, as of any date of determination, the result of:

(a)    the Credit Card Receivables Advance Rate *multiplied by* the face amount of the Canadian Borrowers' Eligible Credit Card Receivables, *less* the amount, if any of the Dilution Reserve with respect to such Eligible Credit Card Receivables, *plus*

(b)    the Accounts Advance Rate *multiplied by* of the amount of the Canadian Borrowers' Eligible Accounts, *less* the amount, if any, of the Dilution Reserve with respect to such Eligible Accounts, *plus*

(c)    the product of the Inventory Advance Rate *multiplied by* the Net Recovery Percentage identified in the most recent Acceptable Appraisal of Inventory, *multiplied by* the value (calculated at the lower of cost or market on a basis consistent with the Canadian Borrowers' historical accounting practices) of the Canadian Borrowers' Eligible Finished Goods Inventory (such determination may be made as to different categories of Eligible Finished Goods Inventory based upon the Net Recovery Percentage applicable to such categories) at such time, *plus*

(d)    *the lesser of* (i) $1,000,000 and (ii) the product of the Spare Parts Inventory Advance Rate *multiplied by* the Net Recovery Percentage identified in the most recent Acceptable Appraisal of Inventory, *multiplied by* the value (calculated at the lower of cost or market on a basis consistent with the Canadian Borrowers' historical accounting practices) of the Canadian Borrowers' Eligible Spare Parts Inventory (such determination may be made as to different categories of Eligible Spare Parts Inventory based upon the Net Recovery Percentage applicable to such categories) at such time, *minus*

(e)    the aggregate amount of Reserves, if any, established by Agent from time to time under Section 2.1(c) of this Agreement.

"Canadian Defined Benefit Plan" means any Canadian Pension Plan which contains a "defined benefit provision," as defined in subsection 147.1(1) of the Income Tax Act (Canada).

"Canadian Dollars" or "C$" means Canadian dollars.

"Canadian Guarantors" means, collectively, each Canadian Subsidiary who shall from time to time enter into a joinder to the Canadian Guaranty and Security Agreement as a Canadian Guarantor.

"Canadian Guaranty and Security Agreement" means the Canadian Guaranty and Security Agreement, dated as of the Closing Date, by and among the Canadian Loan Parties and the Agent.

"Canadian Loan Parties" means Canadian Guarantors and any other Loan Party that is a Canadian Subsidiary.

"Canadian Pension Event" means (a) the termination or partial termination of a Canadian Pension Plan or the filing of a notice of interest to terminate in whole or in part a Canadian Pension Plan, or (b) the institution of proceedings by any Governmental Authority to terminate a Canadian Pension Plan in whole or in part or have a replacement administrator appointed to administer a Canadian Pension Plan, or (c) any other event or condition or declaration or application which might constitute grounds for

the termination or winding up of a Canadian Pension Plan, in whole or in part, or the appointment by any Governmental Authority of a replacement administrator or trustee to administer a Canadian Pension Plan.

"Canadian Pension Plan" means each pension plan required to be registered under Canadian federal or provincial laws which is maintained or contributed to by, or to which there is an obligation to contribute by, any Loan Party in respect of any Person's employment in Canada with such Loan Party, but does not include the Canada Pension Plan or the Quebec Pension Plan as maintained by the Government of Canada or the Province of Quebec, respectively, or any similar plan maintained by any other province.

"Canadian Priority Payables Reserve" means reserves, without duplication for any amounts reserved pursuant to the definition of Reserves, for: (a) amounts owing or in respect of which any Loan Party has an obligation to remit to a Governmental Authority of Canada or other Person in Canada pursuant to any applicable law, rule or regulation, with respect to (i) goods and services taxes, sales taxes, employee income taxes, municipal taxes and other taxes payable or to be remitted or withheld; (ii) workers' compensation or employment insurance; (iii) wages, salaries, commissions and vacation pay as provided for under the Wage Earners Protection Program Act (Canada); and (iv) other like charges and demands; in each case in this clause (a), to the extent that any Governmental Authority of Canada or other Person in Canada may claim a lien, security interest, hypothec, trust or other claim or other Lien ranking or which would reasonably be expected to rank in priority to or pari passu with one or more of the Liens granted in the Loan Documents; and (b) the aggregate amount of any other liabilities of any Loan Party (i) in respect of which a trust or deemed trust has been imposed or, in the Permitted Discretion of Agent, may reasonably be likely to be imposed on any Collateral in Canada to provide for payment, (ii) in respect of rights or claims of suppliers under section 81.1 of the Bankruptcy and Insolvency Act (Canada); (iii) in respect of pension fund obligations, including in respect of unpaid or unremitted pension plan contributions, amounts representing any unfunded liability, solvency deficiency or wind-up deficiency whether or not due with respect to a Canadian Pension Plan (including "normal cost", "special payments" and any other payments in respect of any funding deficiency or shortfall), (iv) which are secured by a lien, security interest, pledge, charge, right or claim on any Collateral (other than Permitted Liens that do not have priority over Agent's Liens), or (~~iv~~v) in the event of a bankruptcy or insolvency proceeding in which a Canadian Borrower is an applicant and in respect of amounts secured by charges issued by the applicable Canadian court; in each case in this clause (b), pursuant to any applicable law, rule or regulation in Canada and which such lien, trust, security interest, hypothec, pledge, charge, right, claim or other Lien ranks or in the Permitted Discretion of the Agent, could reasonably be expected to rank in priority to or pari passu with one or more of the Liens granted in the Loan Documents.

"Canadian Subsidiary" means any Subsidiary of any Loan Party, which Subsidiary is organized under the laws of Canada or any province or territory thereof.

"Capital Expenditures" means, with respect to any Person for any period, the amount of all expenditures by such Person and its Subsidiaries during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed, but excluding, without duplication (a) expenditures made during such period in connection with the replacement, substitution, or restoration of assets or properties pursuant to Section 2.4(e)(iii) of this Agreement and (b) with respect to the purchase price of assets that are purchased substantially contemporaneously with the trade-in of existing assets during such period, the amount that the gross amount of such purchase price is reduced by the credit granted by the seller of such assets for the assets being traded in at such time.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Capitalized Lease Obligation" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP.

"~~Cash Dominion Event~~Carve Out Expense" has the meaning ~~specified therefor in the Guaranty and Security Agreement~~given to the term "Carve Out Expense" in the Financing Orders.

"~~Cash Dominion Period~~Carve Out Reserve" has the meaning ~~specified therefor in the Guaranty and Security Agreement~~given to the term "Reserve" in the Financing Orders.

"Cash Advance Rate" means 95%.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $1,000,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or of any recognized securities dealer having combined capital and surplus of not less than $1,000,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"Cash Management Order" means an order, in form and substance satisfactory to Agent, relating to or authorizing, among other things, the continuation of certain cash management services to the Debtors on an emergency, interim or final basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Cases.

"CFC" means a controlled foreign corporation (as that term is defined in the IRC) in which any Loan Party is a "United States shareholder" within the meaning of Section 951(b) of the IRC.

"Change in Law" means the occurrence after the date of this Agreement of: (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, (c) any new, or adjustment to, requirements prescribed by the Board of Governors for

"Eurocurrency Liabilities" (as defined in Regulation D of the Board of Governors), requirements imposed by the Federal Deposit Insurance Corporation, or similar requirements imposed by any domestic or foreign governmental authority or resulting from compliance by Agent or any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority and related in any manner to SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR, or Term SOFR, or (d) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; <u>provided</u>, that notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith, and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States, Canadian, or foreign regulatory authorities shall, in each case, be deemed to be a "<u>Change in Law</u>," regardless of the date enacted, adopted or issued.

"<u>Change of Control</u>" means that:

(a)     any Person or two or more Persons acting in concert shall have acquired beneficial ownership, directly or indirectly, of Equity Interests of Administrative Borrower (or other securities convertible into such Equity Interests) representing 35% or more of the combined voting power of all Equity Interests of Administrative Borrower entitled (without regard to the occurrence of any contingency) to vote for the election of members of the Board of Directors of Administrative Borrower,

(b)     any Person or two or more Persons acting in concert shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of Administrative Borrower or control over the Equity Interests of such Person entitled to vote for members of the Board of Directors of Administrative Borrower on a fully-diluted basis (and taking into account all such Equity Interests that such Person or group has the right to acquire pursuant to any option right) representing 35% or more of the combined voting power of such Equity Interests,

(c)     occupation at any time of a majority of the seats (other than vacant seats) on the Board of Directors of Administrative Borrower by Persons who were not (i) directors of Administrative Borrower on the date of this Agreement, nominated, appointed or approved for consideration by shareholders for election by the Board of Directors of Administrative Borrower, (ii) approved by the Board of Directors of Administrative Borrower as director candidates prior to their election, nor (iii) appointed by directors so nominated, appointed or approved, or

(d)     Borrowers fail to own and control, directly or indirectly, 100% of the Equity Interests of each other Loan Party free and clear of all Liens ~~(other than the Liens in favor of the Agent and the ABL Agent (subject to the Intercreditor Agreement))~~, except where such failure is as a result of a transaction permitted by the Loan Documents ~~or~~.

~~(e)     the occurrence of any "change of control" as defined in the ABL Credit Agreement.~~

"<u>Chapter 11 Cases</u>" means the Chapter 11 cases of the Debtors, which are jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

"<u>Closing Date</u>" means ~~the date of the making of the Term Loan under this Agreement~~November 30, 2022.

"Closing Date Fee Letter" means that certain fee letter, dated as of the Closing Date, among the Borrowers and Agent.

"Code" means the New York Uniform Commercial Code, as in effect from time to time.

"Collateral" means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by any Loan Party or its Subsidiaries in or upon which a Lien is granted by such Person in favor of Agent or the Lenders under any of the Loan Documents (including both the Pre-Petition Collateral and the Post-Petition Collateral).  For the avoidance of doubt, "Collateral" shall not include Excluded Assets or any other assets expressly excluded from the Collateral (as defined in the Guaranty and Security Agreement).

"Collateral Access Agreement" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, third party logistics provider or other Person in possession of, having a Lien upon, or having rights or interests in any Loan Party's or its Subsidiaries' books and records, Equipment, or Inventory, in each case, in form and substance reasonably satisfactory to Agent (it being agreed that, prior to the Discharge of Obligations, the form agreed to by the ABL Agent solely with respect to the Domestic Loan Parties and the Domestic Subsidiaries shall be deemed to be reasonably acceptable to the Agent so long as the Agent is a party thereto and such agreement provides for the same rights in favor of the Agent as provided to the ABL Agent, subject to the Intercreditor Agreement).

"Combined Line Cap" means, as of any date of determination, the sum of (i) the ABL Line Cap, plus (ii) the Line Cap.

"Commitment" means, with respect to each Lender, its Commitment, as the context requires, and, with respect to all Lenders, their Commitments, as the context requires, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 to this Agreement.

"Collections" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, cash proceeds of asset sales, rental proceeds and tax refunds).

"Commitment" means, with respect to any Lender, such Lender's Revolving Commitment.

"Committee" means any official committee of unsecured creditors appointed in any of the Chapter 11 Cases by the U.S. Trustee.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C-1 to this Agreement delivered by the chief financial officer or treasurer of Administrative Borrower to Agent.

"Concentration Account" has the meaning specified therefor in Section 5.19(a).

"Confidential Information" has the meaning specified therefor in Section 17.9(a) of this Agreement.

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Business Day," the

definition of "U.S. Government Securities Business Day," the addition of a concept of "interest period", timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, and other technical, administrative or operational matters) that Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by Agent in a manner substantially consistent with market practice (or, if Agent decides that adoption of any portion of such market practice is not administratively feasible or if Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Control Agreement" means a control agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by a Loan Party, the Agent, ~~the ABL Agent,~~ and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to a Deposit Account).

"Copyright Security Agreement" has the meaning specified therefor in the Guaranty and Security Agreement or the Canadian Guaranty and Security Agreement, as applicable.

"Core Nautilus License Agreement" has the meaning assigned to such term in Amendment No. 1.

"Core Nautilus License Agreement Amendment" has the meaning assigned to such term in Amendment No. 1.

"Core Transaction" has the meaning assigned to such term in Amendment No. 1.

~~"Covenant Testing Period" means a period (a) commencing on the last day of the fiscal month of Borrowers most recently ended prior to a Springing Trigger Event for which Borrowers are required to deliver to Agent monthly, quarterly, or annual financial statements pursuant to Schedule 5.1 to this Agreement, and (b) continuing through and including the first day after such Springing Trigger Event that ABL Availability has equaled or exceeded the greater of (i) 12.5% of the Combined Line Cap (excluding the effect, if any, of any Term Pushdown Reserve), and (ii) the Applicable ABL Availability Amount for 30 consecutive days.~~

"Covered Entity" means any of the following:

(a)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(b)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(c)     a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning specified therefor in Section 17.15 of this Agreement.

"Credit Card Agreements" means all agreements now or hereafter entered into by any Borrower or for the benefit of any Borrower, in each case with any Credit Card Issuer or any Credit Card Processor with respect to sales transactions involving credit card, debit card, or charge card purchases, including, without limitation, the agreements set forth on Schedule 4.31 to this Agreement.

"Credit Card Issuer" means any Person (other than a Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit, debit, or charge cards issued through MasterCard International, Inc., Visa, U.S.A., Inc., or Visa International and American Express, Discover, Diners Club, Carte Blanche, and other non-bank credit, debit, or charge cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., Novus Services, Inc., PayPal, Synchrony, and other issuers approved by the Agent in its Permitted Discretion.

"Credit Card Notification" means a notification substantially in the form of Exhibit N-1 to this Agreement or otherwise in form and substance reasonably satisfactory to Agent executed by a Loan Party and delivered to a Credit Card Issuer or Credit Card Processor of such Loan Party.

"Credit Card Processor" means any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card, debit card, or charge card purchases by customers using credit cards, debit cards, or charge cards issued by any Credit Card Issuer.

"Credit Card Receivables" means each "payment intangible" (as defined in the Code or an "intangible" or "account" as defined in the PPSA, as applicable), together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Loan Party resulting from charges by a customer of a Loan Party on credit, debit, or charge cards issued by such Credit Card Issuer or processed by such Credit Card Processor in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"Credit Card Receivables Advance Rate" means (a) with respect to the Domestic Borrowers, ~~10~~97.5%; provided, however, from and after March 31, ~~2023~~2024, such advance rate shall automatically reduce by an amount equal to 0.625% on the last day of each calendar quarter until such advance rate equals ~~5~~95%, and (b) with respect to the Canadian Borrowers, ~~90~~87.5%; provided, however, from and after March 31, ~~2023~~2024, such advance rate shall automatically reduce by an amount equal to 0.625% on the last day of each calendar quarter until such advance rate equals 85%.

"Credit Facility" means the financing arrangements and other transactions evidenced by this Agreement and the other Loan Documents.

"Cumulative Two-Week Period" means the two-week period up to and through the Friday of the most recent week then ended, or if a two-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Friday of the most recent week then ended.

"Cumulative Period" means the period from the Petition Date through the most recent week ended.

"Customs Brokers" shall mean the persons listed on Schedule C-2 hereto or such other person or persons as may be selected by Administrative Borrower after the ~~date hereof~~Closing Date and after written notice by Administrative Borrower to Agent who are reasonably acceptable to Agent to handle the receipt of Inventory within the United States or to clear Inventory through the Bureau of Customs and Border Protection or other domestic or foreign export control authorities or otherwise perform port of entry services to process Inventory imported by a Borrower from outside the United States (such persons sometimes being referred to herein individually as a "Customs Broker"), provided, that, as to each such person, (a) Agent shall have received a customs broker agreement by such person in favor of Agent (in form and substance satisfactory to Agent ~~(it being agreed that, prior to the Discharge of ABL~~

~~Obligations, the form agreed to by the ABL Agent solely with respect to the Domestic Loan Parties and the Domestic Subsidiaries shall be deemed to be reasonably acceptable to the Agent so long as the Agent is a party thereto and such agreement provides for the same rights in favor of the Agent as provided to the ABL Agent, subject to the Intercreditor Agreement)~~) duly authorized, executed and delivered by such person, (b) such agreement shall be in full force and effect and (c) such person shall be in compliance in all material respects with the terms thereof.

"DBRS" means DBRS, Inc. and its successors.

"DDA" or "Deposit Account" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each ~~DDA~~such account (except for ~~amounts~~funds on deposit in any Excluded Account ~~(as defined the Guaranty and Security Agreement)~~) shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any ~~DDA~~such account.

"Debtors" means the Domestic Loan Parties (other than BowFlex Delaware LLC).

"Debtor Relief Laws" means the Bankruptcy Code, the Bankruptcy and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada), the ~~Winding Up~~Winding-up and Restructuring Act (Canada), the restructuring provisions of applicable Canadian corporate statutes, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, arrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States, Canada or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Default Notice Period" has the meaning given to such term in the applicable Financing Order.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies Agent and Administrative Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default or Event of Default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to Agent, or any other Lender any other amount required to be paid by it hereunder within two ~~(2)~~ Business Days of the date when due, ~~or~~(b) has notified any Borrower or Agent  in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable Default or Event of Default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by Agent or Administrative Borrower, to confirm in writing to Agent and Administrative Borrower that it will comply with its prospective funding obligations hereunder (provided, that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by Agent and Administrative Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of any Insolvency Proceeding, (ii) had appointed for it a receiver, custodian, conservator, trustee,

~~DB1/ 139987402.3~~

administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, or (iii) become the subject of a Bail-in Action; provided, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) ~~and~~through (~~b~~d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to Administrative Borrower and each Lender.

"Deposit Account" means any deposit account (as that term is defined in the Code).

"Designated Account" means the Deposit Account of Administrative Borrower identified on Schedule D-1 to this Agreement (or such other Deposit Account of Administrative Borrower located at Designated Account Bank that has been designated as such, in writing, by Borrowers to Agent).

"Designated Account Bank" has the meaning specified therefor in Schedule D-1 to this Agreement (or such other bank that is located within the United States that has been designated as such, in writing, by Administrative Borrower to Agent).

"Determination Date" means the Closing Date and the first Business Day of each calendar month thereafter.

"Dilution" means (a) with respect to Accounts (other than Credit Card Receivables), as of any date of determination, a percentage, based upon the experience of the immediately prior 12 months, that is the result of dividing the Dollar amount of (i) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to Borrowers' Accounts during such period, by (ii) Borrowers' gross billings with respect to Accounts during such period, and (b) with respect to Credit Card Receivables, as of any date of determination, a percentage, based upon the experience of the immediately prior 12 months, that is the result of dividing the Dollar amount of (i) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to Borrowers' Credit Card Receivables during such period, by (ii) Borrowers' gross billings with respect to Credit Card Receivables during such period.

"Dilution Reserve" means, as of any date of determination, an amount sufficient to reduce the advance rate against Eligible Accounts or Eligible Credit Card Receivables, as applicable, by the extent to which Dilution is in excess of 0%.

~~"Discharge of ABL Obligations" has the meaning set forth for such term in the Intercreditor Agreement.~~

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise) of any property by any Person (including any sale and leaseback transaction and any issuance of Equity Interests by a Subsidiary of such Person), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"<u>Disqualified Equity Interests</u>" means any Equity Interests that, by their terms (or by the terms of any security or other Equity Interests into which they are convertible or for which they are exchangeable), or upon the happening of any event or condition (a) matures or are mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable <u>and the termination of the Commitments</u>), (b) are redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provide for the scheduled payments of dividends in cash, or (d) are or become convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Maturity Date.

"<u>Disqualified Institution</u>" means any Person designated by Administrative Borrower as a "Disqualified Institution" by written notice delivered to, and approved by, Agent prior to the Closing Date together with their respective Affiliates; <u>provided</u>, that "Disqualified Institutions" shall exclude any Person that Administrative Borrower has designated as no longer being a "Disqualified Institution" by written notice delivered to Agent from time to time; <u>provided further</u>, that in connection with any assignment or participation, the Assignee or Participant with respect to such proposed assignment or participation that is an investment bank, a commercial bank, a finance company, a fund, or other Person which merely has an economic interest in any such direct competitor, is not itself such a direct competitor of Administrative Borrower or its Subsidiaries, shall not be deemed to be a Disqualified Institution for the purposes of this definition.  For the avoidance of doubt, SLR and its Affiliates shall not be deemed to be Disqualified Institutions.

"<u>Division</u>" means the division of the assets, liabilities and/or obligations of a Person (the "<u>Dividing Person</u>") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"<u>Dollars</u>" or "<u>$</u>" means United States dollars.

"<u>Domestic Borrowers</u>" means, collectively, the Administrative Borrower and each other Domestic Subsidiary who shall from time to time enter into a Joinder as a Domestic Borrower.

"<u>Domestic Borrowing Base</u>" means, as of any date of determination, the result of:

(a) the Credit Card Receivables Advance Rate *multiplied by* the face amount of the Domestic Borrowers' Eligible Credit Card Receivables, *less* the amount, if any of the Dilution Reserve with respect to such Eligible Credit Card Receivables; <u>provided, that the aggregate amount of the Domestic Borrowers' Eligible Credit Card Receivables included in the Domestic Borrowing Base shall not, at any time, exceed $5,000,000</u>, *plus*

(b) the Accounts Advance Rate *multiplied by* of the amount of the Domestic Borrowers' Eligible Accounts, *less* the amount, if any, of the Dilution Reserve with respect to such Eligible Accounts, *plus*

(c) the product of the Inventory Advance Rate *multiplied by* the Net Recovery Percentage identified in the most recent Acceptable Appraisal of Inventory, *multiplied by* the value (calculated at the lower of cost or market on a basis consistent with the Domestic Borrowers' historical accounting practices) of the Domestic Borrowers' Eligible Finished Goods

Inventory (such determination may be made as to different categories of Eligible Finished Goods Inventory based upon the Net Recovery Percentage applicable to such categories) at such time, *plus*

(d)    the product of the In-Transit Inventory Advance Rate *multiplied by* the Net Recovery Percentage identified in the most recent Acceptable Appraisal of Inventory, *multiplied by* the value (calculated at the lower of cost or market on a basis consistent with Domestic Borrowers' historical accounting practices) of the Domestic Borrower's Eligible In-Transit Inventory consisting of finished goods (such determination may be made as to different categories of finished goods Inventory based upon the Net Recovery Percentage applicable to such categories) at such time; *provided*, that the aggregate amount of the Domestic Borrowers' Eligible In-Transit Inventory included in the Domestic Borrowing Base ~~and the Domestic Borrowers' "Eligible In-Transit Inventory" (as defined in the ABL Credit Agreement) included in the ABL Borrowing Base~~ shall not, at any time, exceed $7,500,000 in the aggregate, *plus*

(e)    the product of the Spare Parts Inventory Advance Rate *multiplied by* the Net Recovery Percentage identified in the most recent Acceptable Appraisal of Inventory, *multiplied by* the value (calculated at the lower of cost or market on a basis consistent with the Domestic Borrowers' historical accounting practices) of the Domestic Borrowers' Eligible Spare Parts Inventory (such determination may be made as to different categories of Eligible Spare Parts Inventory based upon the Net Recovery Percentage applicable to such categories) at such time; *provided*, that the aggregate amount of the Domestic Borrowers' Eligible Spare Parts Inventory included in the Domestic Borrowing Base ~~and the Domestic Borrowers' "Eligible Spare Parts Inventory" (as defined in the ABL Credit Agreement) included in the ABL Borrowing Base~~ shall not, at any time, exceed $1,000,000 in the aggregate, *plus*

(f)    the product of the IP Advance Rate *multiplied by* the Appraised Value (identified in the most recent Acceptable Appraisal of Intellectual Property) of the Domestic Borrowers' Eligible IP at such time, *~~minus~~plus*

(g)    the product of the Cash Advance Rate *multiplied by* the Eligible Cash of the Domestic Loan Parties at such time *minus*

(gh)    the aggregate amount of Reserves, if any, established by Agent from time to time under Section 2.1(c) of this Agreement.

For the avoidance of doubt, (x) ~~solely after the consummation of the IV Transaction,~~ (1) any IP that is the subject of a Disposition pursuant to the IV Transaction shall be deemed not to be Eligible IP, and (2) any Inventory subject to IP disposed of in connection with the IV Transaction shall be deemed ineligible from and after the date that the IV Transaction is consummated notwithstanding anything to the contrary set forth herein or any other Loan Document, and (y) ~~solely from and after the date of the consummation of the Core Transaction,~~ (1) any IP subject to the Core Nautilus License Agreement (as amended by the Core Nautilus License Agreement Amendment) shall be deemed not to be Eligible IP, and (2) any Inventory subject to IP licensed pursuant to the Core Nautilus License Agreement (as amended by the Core Nautilus License Agreement Amendment) shall be deemed not to be Eligible Inventory.

"Domestic Loan Parties" means Domestic Borrowers and any other Loan Party that is a Domestic Subsidiary.

"Domestic Subsidiary" means any Subsidiary of any Loan Party that is not a Foreign Subsidiary.

"Dutch Security Documents" means, collectively, each of the (a) Dutch law governed security agreement dated February 16, 2023 between Nautilus Dutch as pledgor and the Agent as pledgee, including any Supplemental Security Agreement (as defined therein), (b) Dutch law governed deed of pledge of shares in the capital of Nautilus Dutch dated February 16, 2023 between BowFlex, as pledgor, Nautilus Dutch as company and the Agent as pledgee, (c) the German Bank Account Pledge Agreement, and (d) any other Loan Document governed by Dutch law.

"Early Termination Premium" has the meaning specified therefor in the Fee Letter.

"EBITDA" means, with respect to any fiscal period and with respect to Borrowers and their Subsidiaries determined, in each case, on a consolidated basis in accordance with GAAP:

(a)     the consolidated net income (or loss),

*minus*

(b)     without duplication, the sum of the following amounts for such period to the extent included in determining consolidated net income (or loss) for such period:

(i)     unusual or non-recurring gains, and

(ii)     interest income,

*plus*

(c)     without duplication, the sum of the following amounts for such period to the extent deducted in determining consolidated net income (or loss) for such period:

(i) non-cash unusual or non-recurring losses,

(ii) Interest Expense,

(iii) income taxes,

(iv) depreciation and amortization,

(v) to the extent funded or incurred prior to the Closing Date, cash severance payments,

(vi) to the extent funded or incurred prior to the Closing Date, non-recurring restructuring charges,

(vii) to the extent funded or incurred prior to the Closing Date, professional fees, including Board of Directors fees and expenses,

(viii) transaction costs and expenses related to the consummation of the financing transactions contemplated by this Agreement and the ABL Credit Agreement, and any amendments, restatements, amendments and restatements, supplements, modifications, consents or waivers hereto or thereto, and

(ix) non-cash compensation expense (including deferred non-cash compensation expense), or other non-cash expenses or charges, arising from the sale or issuance of

22

Equity Interests, the granting of stock options, and the granting of stock appreciation rights and similar arrangements (including any repricing, amendment, modification, substitution, or change of any such Equity Interests, stock option, stock appreciation rights, or similar arrangements) *minus* the amount of any such expenses or charges when paid in cash to the extent not deducted in the computation of net earnings (or loss).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Accounts" means those Accounts (other than Credit Card Receivables) created by a Borrower in the ordinary course of its business, that arise out of such Borrower's sale of goods or rendition of services, that comply with each of the representations and warranties respecting Eligible Accounts made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any information with respect to the Borrowers' business or assets of which Agent becomes aware after the Closing Date, including any field examination performed by (or on behalf of) Agent from time to time after the Closing Date. In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits, unapplied cash, taxes, finance charges, service charges, discounts, credits, allowances, and rebates. Eligible Accounts shall not include Credit Card Receivables or the following:

(a)     Accounts with selling terms of not more than 75 days that the Account Debtor has failed to pay within 120 days of original invoice date or 60 days of due date,

(b)     Accounts owed by an Account Debtor (or its Affiliates) where 50% or more of all Accounts owed by that Account Debtor (or its Affiliates) are deemed ineligible under clause (a) above,

(c)     Accounts with selling terms of more than 75 days,

(d)     Accounts with respect to which the Account Debtor is an Affiliate of any Borrower or an employee or agent of any Borrower or any Affiliate of any Borrower,

(e)     Accounts (i) arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the Account Debtor may be conditional, or (ii) with respect to which the payment terms are "C.O.D.", cash on delivery or other similar terms,

(f)     Accounts that are not payable in Dollars or Canadian Dollars,

(g)    Accounts with respect to which the Account Debtor either (i) does not maintain its chief executive office in the United States or Canada, or (ii) is not organized under the laws of the United States or Canada or any state or province thereof, or (iii) is the government of any foreign country or sovereign state, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless (A) the Account is supported by an irrevocable letter of credit reasonably satisfactory to Agent (as to form, substance, and issuer or domestic confirming bank) that has been delivered to Agent and, if requested by Agent, is directly drawable by Agent, or (B) the Account is covered by credit insurance in form, substance, and amount, and by an insurer, reasonably satisfactory to Agent,

(h)    Accounts with respect to which the Account Debtor is any of (i) the United States or any department, agency, or instrumentality of the United States (exclusive, however, of Accounts with respect to which Borrowers have complied, to the reasonable satisfaction of Agent, with the Assignment of Claims Act, 31 USC §3727), (ii) any state of the United States or any other Governmental Authority, or (iii) the federal government of Canada or any province or territory of Canada unless the applicable Loan Party has complied with the terms of the Financial Administration Act (Canada) or any other similar applicable provincial or territorial statute and such assignment is enforceable against such Governmental Body,

(i)    Accounts with respect to which the Account Debtor is a creditor of a Borrower, has or has asserted a right of recoupment or setoff, or has disputed its obligation to pay all or any portion of the Account, to the extent of such claim, right of recoupment or setoff,

(j)    Accounts with respect to an Account Debtor whose Eligible Accounts owing to Domestic Borrowers exceed (i) for Dick's Sporting Goods, Inc., and its Affiliates, on a consolidated basis, 50% of all Eligible Accounts so long as Dick's Sporting Goods, Inc., and its Affiliates are an Investment Grade Account Debtor, (ii) for Amazon.com, Inc., and its Affiliates, on a consolidated basis, 65% of all Eligible Accounts so long as Amazon.com, Inc., and its Affiliates (on a consolidated basis), at the time of determination, maintains a corporate credit rating and/or family rating, as applicable, of A1 or higher by S&P or A+ or higher by Moody's; provided, however, if the  corporate credit rating and/or family rating, as applicable, for Amazon.com, Inc., and its Affiliates (on a consolidated basis), at any time falls below A1 in respect of S&P and/or A+ in respect of Moody's, then for Amazon.com, Inc., and its Affiliates, on a consolidated basis, 50% of all Eligible Accounts so long as Amazon.com, Inc., and its Affiliates are an Investment Grade Account Debtor, (iii) for Walmart Inc. and its Affiliates (including Walmart.com), on a consolidated basis, 50% of all Eligible Accounts so long as Walmart Inc. and its Affiliates (including Walmart.com) are an Investment Grade Account Debtor, (iv) for Best Buy Co., Inc., and its Affiliates, on a consolidated basis, 50% of all Eligible Accounts so long as Best Buy Co., Inc., and its Affiliates are an Investment Grade Account Debtor, (v) for Target Corporation and its Affiliates, on a consolidated basis, 50% of all Eligible Accounts so long as for Target Corporation and its Affiliates are an Investment Grade Account Debtor, (vi) for one single Account Debtor (and its Affiliates, on a consolidated basis) that, at the time of determination, maintains a corporate credit rating and/or family rating, as applicable, of BB or higher by S&P, Ba or higher by Moody's, or, solely to the extent a rating by S&P or Moody's is not available, BB or higher by DBRS, in each case at such time 25% of all Eligible Accounts so long as (A) Borrowers provide Agent with not less than three (3) Business Days written notice identifying such Account Debtor and certifying all standards for inclusion under this clause are met and (B) Borrowers may only change the identity of such Account Debtor twice in any calendar year period, and (vii) for any other Account Debtor, 15% of all Eligible Accounts (any such percentage under clauses (i) through (vii), as applied to a particular Account Debtor or consolidated group of Account Debtors, being subject to reduction by Agent in its Permitted Discretion if the creditworthiness of such Account Debtor or consolidated group of Account Debtors deteriorates), to the extent of the obligations owing by such Account Debtor in excess of such percentage; provided, that in

each case, the amount of Eligible Accounts that are excluded because they exceed the foregoing percentage shall be determined by Agent based on all of the otherwise Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limit,

(k)     Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not Solvent, has gone out of business, or as to which any Borrower has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor,

(l)     Accounts, the collection of which, Agent, in its Permitted Discretion, believes to be doubtful, including by reason of the Account Debtor's financial condition,

(m)     Accounts that are not subject to a valid and perfected first-priority (subject only, in the case of Accounts of the Domestic Borrowers, to Liens in favor of the ABL Agent permitted pursuant to the terms hereof and subject to the Intercreditor Agreement) Agent's Lien,

(n)     Accounts with respect to which (i) the goods giving rise to such Account have not been shipped and billed to the Account Debtor, or (ii) the services giving rise to such Account have not been performed and billed to the Account Debtor,

(o)     Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity,

(p)     Accounts (i) that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by the applicable Borrower of the subject contract for goods or services, or (ii) that represent credit card sales, or

(q)     Accounts owned by a target acquired in connection with a Permitted Investment, or Accounts owned by a Person that is joined to this Agreement as a Borrower pursuant to the provisions of this Agreement, until the completion of a field examination with respect to such Accounts, in each case, satisfactory to Agent in its Permitted Discretion.

"Eligible Cash" means unrestricted cash of a Domestic Loan Party held in the Eligible Cash Account with a depositary bank acceptable to the Agent as security for the Obligations, that is not subject to the Lien or claim of any Person other than the Agent's first priority perfected security interest (other than Permitted Liens of the type described in clause (n) of the definition thereof).

"Eligible Cash Account" means a segregated restricted blocked deposit account reasonably acceptable to the Agent in the name and sole dominion and control of the Agent for the deposit of Eligible Cash.

"Eligible Credit Card Receivables" means those Credit Card Receivables of a Borrower that arise out of such Borrower's sale of goods or rendition of services, that comply with each of the representations and warranties respecting Eligible Credit Card Receivables made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any information with respect to the Borrowers' business or assets of which Agent becomes aware after the Closing Date, including any field examination performed by (or on behalf of) Agent from time to time after the Closing Date. In determining the amount to be included, Eligible Credit Card Receivables shall be calculated net of customer deposits, unapplied cash, taxes, finance charges,

service charges, discounts, credits, allowances, and rebates. Eligible Credit Card Receivables shall not include the following:

(a)    any Credit Card Receivable that does not constitute a "payment intangible" (as defined in the Code) or an Account,

(b)    any Credit Card Receivable that has been outstanding for more than five days from the date of sale,

(c)    any Credit Card Receivable with respect to which the Account Debtor is an Affiliate of any Borrower or an employee or agent of any Borrower or any Affiliate of any Borrower,

(d)    any Credit Card Receivable arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the Account Debtor may be conditional,

(e)    any Credit Card Receivable that is not payable in Dollars or Canadian Dollars,

(f)    any Credit Card Receivable with respect to which the Account Debtor is a creditor of a Borrower, has or has asserted a right of recoupment or setoff, or has disputed its obligation to pay all or any portion of the Account, to the extent of such claim, right of recoupment or setoff, or dispute,

(g)    any Credit Card Receivable with respect to which the applicable Credit Card Issuer or Credit Card Processor is subject to an Insolvency Proceeding, is not Solvent, has gone out of business, or as to which any Borrower has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Credit Card Issuer or Credit Card Processor,

(h)    any Credit Card Receivable, the collection of which, Agent, in its Permitted Discretion, believes to be doubtful, including by reason of the financial condition of the applicable Credit Card Issuer or the Credit Card Processor,

(i)    any Credit Card Receivable (i) that is not subject to a valid and perfected first-priority (subject only, in the case of Credit Card Receivables of the Domestic Borrowers, to Liens in favor of the ABL Agent permitted pursuant to the terms hereof and subject to the Intercreditor Agreement) Agent's Lien, or (ii) with respect to which a Borrower does not have good, valid, and marketable title thereto, free and clear of any Lien (other than Agent's Lien and the ABL Agent's Lien),

(j)    any Credit Card Receivable with respect to which the applicable Credit Card Issuer or Credit Card Processor is a Sanctioned Person or Sanctioned Entity,

(k)    any Credit Card Receivable that represents the right to receive progress payments or other advance billings that are due prior to the completion of performance by the applicable Borrower of the subject contract for goods or services,

(l)    any Credit Card Receivable where such Credit Card Receivable or the underlying contract contravenes any laws, rules or regulations applicable thereto, including, without limitation, rules and regulations relating to truth-in-lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices and privacy or any Person party to the underlying contract is in violation of any such laws, rules or regulations,

(m)      any Credit Card Receivable that is not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto,

(n)      any Credit Card Receivable as to which the applicable Credit Card Issuer or Credit Card Processor has the right under certain circumstances to require a Loan Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor

(o)      any Credit Card Receivable that is disputed or with recourse or with respect to which a claim, chargeback, offset, deduction, holdback or counterclaim, dispute or other defense has been asserted (to the extent of such claim, chargeback, offset, deduction or counterclaim, dispute or other defense);

(p)      any Credit Card Receivable that is evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is in the possession of Agent (or ABL Agent, acting as agent for Agent for purposes of perfection under the terms of the Intercreditor Agreement), and to the extent necessary or appropriate, endorsed to Agent,

(q)      any Credit Card Receivable that is subject to any accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Borrower may be obligated to rebate to a customer, Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) (to the extent of such discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances),

(r)      any Credit Card Receivable for which cash has been received in respect of such Credit Card Receivable but not yet applied by the applicable Borrower to reduce the amount of such Credit Card Receivable (but only to the extent of the aggregate amount of cash that has been received in respect of such Credit Card Receivable but not yet applied by the applicable Borrower to reduce the amount of such Credit Card Receivable),

(s)      any portion of Credit Card Receivables that reflect a reasonable reserve for warranty claims or returns or amounts which are owed to Account Debtors, including those for rebates, allowances, co-op advertising, or other deductions, or

(t)      Credit Card Receivables owned by a Person that is joined to this Agreement as a Borrower pursuant to the provisions of this Agreement, until the completion of a field examination with respect to such Credit Card Receivables, in each case, satisfactory to Agent in its Permitted Discretion.

"Eligible Finished Goods Inventory" means Inventory that qualifies as Eligible Inventory and consists of first-quality finished goods held for sale in the ordinary course of Borrowers' business.

"Eligible In-Transit Inventory" means those items of Inventory that do not qualify as Eligible Inventory solely because (i)(A) they are not located at one of the locations of the Domestic Borrowers in the continental United States set forth on Schedule 4.25 to this Agreement (as such Schedule 4.25 may be amended from time to time in accordance with Section 5.14) (or in-transit from one such location to another such location), or (B) they are in transit from a location other than a location set forth on Schedule 4.25 to this Agreement (as such Schedule 4.25 may be amended from time to time in accordance with Section 5.14)) and (ii) a Domestic Borrower does not have actual and exclusive possession thereof, but as to which,

(a)     such Inventory currently is in transit (whether by vessel, air, or land) from an origin location outside of the continental United States to a location of a Domestic Borrower set forth on Schedule 4.25 to this Agreement (as such Schedule 4.25 may be amended from time to time in accordance with Section 5.14),

(b)     title to such Inventory has passed to a Domestic Borrower and Agent shall have received such evidence thereof as it may from time to time require,

(c)     such Inventory is insured against types of loss, damage, hazards, and risks, and in amounts, satisfactory to Agent in its Permitted Discretion, and Agent shall have received a copy of the certificate of marine cargo or casualty insurance in connection therewith in which it has been named as an additional insured and loss payee in a manner acceptable to Agent,

(d)     unless Agent otherwise agrees in writing with respect to any such Inventory with regards to Inventory that is in transit (whether by vessel, air, or land) from an origin location outside of the continental United States to a location of a Domestic Borrower as set forth on Schedule 4.25 to this Agreement (as such Schedule 4.25 may be amended from time to time in accordance with Section 5.14), such Inventory either:

(i)     is the subject of a negotiable bill of lading governed by the laws of a state within the United States (A) that is consigned to Agent or one of its Customs Brokers (either directly or by means of endorsements), (B) that was issued by the carrier (including a non-vessel operating common carrier) in possession of the Inventory that is subject to such bill of lading, and (C) that either is in the possession of Agent or a Customs Broker (in each case in the continental United States), or

(ii)     is the subject of a negotiable forwarder's cargo receipt governed by the laws of a state within the United States and is not the subject of a bill of lading (other than a negotiable bill of lading consigned to, and in the possession of, a consolidator or Agent, or their respective agents) and such negotiable cargo receipt on its face indicates the name of the Customs Broker as a carrier or multimodal transport operator and has been signed or otherwise authenticated by it in such capacity or as a named agent for or on behalf of the carrier or multimodal transport operator, in any case respecting such Inventory (A) consigned to Agent or one of its Customs Brokers that is handling the importing, shipping and delivery of such Inventory (either directly or by means of endorsements), (B) that was issued by a consolidator respecting the subject Inventory, and (C) that is in the possession of Agent or a Customs Broker (in each case in the continental United States),

(e)     such Inventory is in the possession of a common carrier (including on behalf of any non-vessel operating common carrier) that has issued the bill of lading or other document of title with respect thereto or the Customs Broker handling the importing, shipping and delivery of such Inventory,

(f)     the documents of title related thereto are subject to the valid and perfected first-priority (subject only, in the case of documents of title of the Domestic Borrowers, to Liens in favor of the ABL Agent permitted pursuant to the terms hereof and subject to the Intercreditor Agreement) Lien of Agent,

(g)     Agent determines that such Inventory is not subject to (i) any Person's right of reclamation, repudiation, stoppage in transit or diversion or (ii) any other right or claim of any other Person which is (or is capable of being) senior to, or *pari passu* with, the Lien of Agent or Agent determines that any Person's right or claim impairs, or interferes with, directly or indirectly, the ability of

Agent to realize on, or reduces the amount that Agent may realize from the sale or other disposition of such Inventory, unless, in the case of unpaid freight forwarder fees and expenses or customer duties and custom fees associated with such Inventory, Administrative Borrower has provided an estimate of same to Agent in order for Agent to establish an appropriate Reserve with respect thereto,

(h)     Administrative Borrower has provided (i) a certificate to Agent that certifies that, to the best knowledge of such Domestic Borrower, such Inventory meets all of the Domestic Borrowers' representations and warranties contained in the Loan Documents concerning Eligible In-Transit Inventory, that it knows of no reason why such Inventory would not be accepted by such Domestic Borrower when it arrives in the continental United States and that the shipment as evidenced by the documents conforms to the related order documents, and (ii) upon Agent's request, a copy of the invoice, packing slip and manifest with respect thereto, and

(i)     such Inventory shall not have been in transit for more than 45 days.

"Eligible Inventory" means Inventory of a Borrower that complies with each of the representations and warranties respecting Eligible Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any information with respect to the Borrowers' business or assets of which Agent becomes aware after the Closing Date, including any field examination or appraisal performed or received by Agent from time to time after the Closing Date. In determining the amount to be so included, Inventory shall be valued at the lower of cost or market on a basis consistent with Borrowers' historical accounting practices. An item of Inventory shall not be included in Eligible Inventory if:

(a)     a Borrower does not have good, valid, and marketable title thereto,

(b)     a Borrower does not have actual and exclusive possession thereof (either directly or through a bailee or agent of a Borrower),

(c)     it is not located at one of the locations in the continental United States or Canada set forth on Schedule 4.25 to this Agreement (as such Schedule 4.25 may be amended from time to time in accordance with Section 5.14) (or in-transit from one such location to another such location),

(d)     it is stored at locations holding less than $100,000 of the aggregate value of such Borrower's Inventory,

(e)     it is in-transit to or from a location of a Borrower (other than in-transit from one location set forth on Schedule 4.25 to this Agreement to another location set forth on Schedule 4.25 to this Agreement (as such Schedule 4.25 may be amended from time to time in accordance with Section 5.14)),

(f)     it is located on real property leased by a Borrower or in a contract warehouse or with a bailee, in each case, unless either (i) it is subject to a Collateral Access Agreement executed by the lessor or warehouseman, as the case may be (or otherwise subject to the protections granted in any Financing Order), and it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises, or (ii) either (A) Agent has established a Landlord Reserve with respect to such location, or (B) Agent, in its Permitted Discretion, has determined to not establish a Landlord Reserve with respect to such location at such time (which determination shall not limit Agent's ability to establish

a Landlord Reserve with respect to such location at any other time, in its Permitted Discretion and otherwise in accordance with this Agreement),

(g)    it is the subject of a bill of lading or other document of title,

(h)    it is not subject to a valid and perfected first-priority ~~(subject only, in the case of Inventory of the Domestic Borrowers, to Liens in favor of the ABL Agent permitted pursuant to the terms hereof and subject to the Intercreditor Agreement)~~ Agent's Lien,

(i)    it consists of goods returned or rejected by a Borrower's customers,

(j)    it consists of goods that are obsolete, slow moving, spoiled or are otherwise past the stated expiration, "sell-by" or "use by" date applicable thereto, restrictive or custom items or otherwise is manufactured in accordance with customer-specific requirements, work-in-process, raw materials, or goods that constitute packaging and shipping materials, supplies used or consumed in Borrowers' business, bill and hold goods, defective goods, "seconds," or Inventory acquired on consignment,

(k)    it is subject to third-party intellectual property, licensing or other proprietary rights, unless Agent is satisfied that such Inventory can be freely sold by Agent on and after the occurrence of an Event of Default despite such third party rights, or

(l)    such Inventory is owned by a Person that is joined to this Agreement as a Borrower pursuant to the provisions of this Agreement, until the completion of an Acceptable Appraisal of such Inventory and the completion of a field examination with respect to such Inventory that is satisfactory to Agent in its Permitted Discretion.

"Eligible IP" means IP of a Domestic Borrower that complies with each of the representations and warranties respecting IP made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any information with respect to the Borrowers' business or assets of which Agent becomes aware after the Closing Date, including any field examination or appraisal performed or received by Agent from time to time after the Closing Date. Without limiting the foregoing, no IP of the Domestic Borrowers shall be Eligible IP unless:

(a)    a Domestic Borrower has good and valid title to such IP;

(b)    such Domestic Borrower is in compliance with the representations, warranties and covenants set forth in this Agreement and the other Loan Documents relating to the IP of such Domestic Borrower and such Intellectual Property conforms with the covenants or representation and warranties in the Loan Documents;

(c)    such IP shall be validly registered with the U.S Patent and Trademark Office, the U.S. Copyright Office or the Canadian Intellectual Property Office, as applicable, or such other equivalent foreign filing or registration office as applicable;

(d)    Agent shall have received evidence that all actions that the Agent may reasonably deem necessary in its Permitted Discretion in order to create a valid, perfected and enforceable first priority Lien on such IP under applicable law in favor of the Agent (including, without limitation, filings at the U.S. Patent and Trademark Office or such other equivalent foreign filing or

registration office, as applicable) has been taken, and such IP shall not be subject to any other Liens (other than Permitted Liens); and

    (e) with respect to such IP which was not included in the most-recent appraisal received by the Agent under this Agreement or over which the Agent has not completed its legal and business due diligence in its Permitted Discretion, the Agent (i) shall have received an Acceptable Appraisal of such IP and (ii) shall have completed such legal and business due diligence that is required in Agent's Permitted Discretion, and with the results of such due diligence satisfactory to the Agent in its Permitted Discretion; provided, however, that any such appraisals or legal or business due diligence shall be at the expense of the Borrowers and shall not be subject to (and shall not be included in) the limitations set forth in Section 5.7 on the number of collateral audits, examinations, or appraisals for which the Agent is entitled to be reimbursed in any period.

"Eligible Spare Parts Inventory" means Inventory that qualifies as Eligible Inventory and consists of goods that are first-quality spare parts and that are not located in open pallets or containers.

"Employee Benefit Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (a) that is or within the preceding six (6) years has been sponsored, maintained or contributed to by any Loan Party or ERISA Affiliate or (b) to which any Loan Party or ERISA Affiliate has, or has had at any time within the preceding six (6) years, any liability, contingent or otherwise.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials (a) from any assets, properties, or businesses of any Borrower, any Subsidiary of any Borrower, or any of their predecessors in interest, (b) from adjoining properties or businesses, or (c) from or onto any facilities which received Hazardous Materials generated by any Borrower, any Subsidiary of any Borrower, or any of their predecessors in interest.

"Environmental Law" means any applicable federal, state, provincial, territorial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on any Loan Party or its Subsidiaries, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Equipment" means equipment (as that term is defined in the Code or the PPSA, as applicable).

"Equity Interests" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting

or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"Equivalent Amount" means, on any date of determination, with respect to obligations or valuations denominated in one currency (the "first currency"), the amount of another currency (the "second currency") which would result from the conversion of the relevant amount of the first currency into the second currency at the Spot Rate on the applicable date of determination, or at such other rate as the Agent may determine in its sole discretion.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of any Loan Party under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of any Loan Party under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which any Loan Party is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with any Loan Party and whose employees are aggregated with the employees of such Loan Party under IRC Section 414(o).

"Erroneous Payment" has the meaning specified therefor in Section 17.16 of this Agreement.

"Erroneous Payment Deficiency Assignment" has the meaning specified therefor in Section 17.16 of this Agreement.

"Erroneous Payment Impacted Loans" has the meaning specified therefor in Section 17.16 of this Agreement.

"Erroneous Payment Return Deficiency" has the meaning specified therefor in Section 17.16 of this Agreement.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified therefor in Section 8 of this Agreement.

"Excess" has the meaning specified therefor in Section 2.14 of this Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Excluded Accounts" has the meaning specified therefor in the Guaranty and Security Agreement.

"Excluded Assets" has the meaning specified therefor in the Guaranty and Security Agreement.

"Excluded Swap Obligation" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Loan Party of (including by virtue of the joint and several liability provisions of Section 2.15), or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity

Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guaranty of such Loan Party or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guaranty or security interest is or becomes illegal.

"Excluded Taxes" means any of the following taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (i) any tax imposed on net income (including any branch profits taxes), in each case imposed by the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Recipient is organized or the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Recipient's principal office is located or as a result of a present or former connection between such Recipient and the jurisdiction or taxing authority imposing the tax (other than any such connection arising solely from such Recipient having executed, delivered, become a party to, or performed its obligations or received payment under, received or perfected a security interest under, enforced its rights or remedies under, or engaged in any other transaction pursuant to this Agreement or any other Loan Document, or sold or assigned an interest in any Loan or Loan Document), (ii) in the case of a Lender, withholding taxes that would not have been imposed but for a Lender's failure to comply with the requirements of Section 16.2 of this Agreement, (iii) any United States federal withholding taxes that would be imposed on amounts payable to a Foreign Lender based upon the applicable withholding rate in effect at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office, other than a designation made at the request of a Loan Party), except that Excluded Taxes shall not include (A) any amount that such Foreign Lender (or its assignor, if any) was previously entitled to receive pursuant to Section 16.1 of this Agreement, if any, with respect to such withholding tax at the time such Foreign Lender becomes a party to this Agreement (other than pursuant to an assignment request by the Borrowers) or designates a new lending office, and (B) additional United States federal withholding taxes that may be imposed after the time such Foreign Lender becomes a party to this Agreement (other than pursuant to an assignment request by the Borrowers) or designates a new lending office, as a result of a change in law, rule, regulation, treaty, order or other decision or other Change in Law with respect to any of the foregoing by any Governmental Authority, (iv) any United States federal withholding taxes imposed under FATCA, and (v) any Canadian withholding tax that is imposed on amounts payable to a Lender as a result of such Lender (A) not dealing at arm's length (within the meaning of the Income Tax Act (Canada)) with a Loan Party, or (B) being a "specified non-resident shareholder" of a Loan Party or a non-resident person not dealing at arm's length with a "specified shareholder" of a Loan Party (in each case within the meaning of subsection 18(5) of the Income Tax Act (Canada)) (other than where the non-arm's length relationship arises, or where the Lender is a "specified shareholder", or does not deal at arm's length with a "specified shareholder", as a result of the Lender having become a party to, received or perfected a security interest under or received or enforce any rights under, a Loan Document).

"Extraordinary Receipts" means ~~(a) so long as no Event of Default has occurred and is continuing, proceeds of judgments, proceeds of settlements, or other consideration of any kind received in connection with any cause of action or claim, or any Tax refunds, and (b) if an Event of Default has occurred and is continuing,~~ any payments received by any Loan Party or any of its Subsidiaries not in the ordinary course of business ~~(and not consisting of proceeds described in Section 2.4(e)(iii) of this Agreement) consisting of~~, including (i) proceeds of judgments, proceeds of settlements, or other consideration of any kind received in connection with any cause of action or claim (~~and not consisting of proceeds described in Section 2.4(e)(iii) of this Agreement, but~~ including proceeds of business interruption insurance), or any Tax refunds, (ii) indemnity payments (other than to the extent such indemnity payments are immediately payable to a Person that is not an Affiliate of any Loan Party or any

of its Subsidiaries, and (iii) any purchase price adjustment received in connection with any purchase agreement and (iv) any Disposition (whether voluntary or involuntary) that was not made in the ordinary course of business.

"FATCA" means Sections 1471 through 1474 of the IRC, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), and (a) any current or future regulations or official interpretations thereof, (b) any agreements entered into pursuant to Section 1471(b)(1) of the IRC, and (c) any intergovernmental agreement entered into by the United States (or any fiscal or regulatory legislation, rules, or practices adopted pursuant to any such intergovernmental agreement entered into in connection therewith).

"FCCR Financial Covenant Trigger Date" means the first date on which both (i) the Fixed Charge Coverage Ratio for the 12-month period ended on the last day of the fiscal month immediately prior to such date is at least 1.00 to 1.00 and (ii) ABL Availability is equal to or greater than $20,000,000.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent from three Federal funds brokers of recognized standing selected by it (and, if any such rate is below zero, then the rate determined pursuant to this definition shall be deemed to be zero).

"Final Financing Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases authorizing the Credit Facility after a final hearing of the Bankruptcy Court, in form and substance satisfactory to Agent and the Required Lenders, and from which no appeal or motion to reconsider has been filed, together with all extensions, changes, modifications, and amendments thereto consented to by Agent, which, among other matters but not by way of limitation, authorizes, on a final basis, each Borrower and other Loan Party to execute and perform under the terms of Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents, in each case, as ratified and amended by the terms and conditions of Amendment No. 3 and this Agreement, granting to Agent and Lenders the senior security interests and liens described therein and super-priority administrative expense claims described therein, and modifying the Automatic Stay and other provisions reasonably required by Agent and the Required Lenders. The Final Financing Order shall be substantially in the form of the Interim Financing Order, with only such changes as may be satisfactory in form and substance to Agent and the Required Lenders.

"Financing Order" shall mean the Interim Financing Order, the Final Financing Order and such other orders relating thereto or authorizing the granting of credit by Lenders to Borrowers on an emergency, interim or final basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in Chapter 11 Cases.

"Fee Letter" means that certain fee letter, dated as of even date with this Agreement, among Borrowers and Agent, in form and substance reasonably satisfactory to Agent.

"Fixed Charge Coverage Ratio" means, with respect to any fiscal period and with respect to Borrowers and their Subsidiaries determined on a consolidated basis in accordance with GAAP, the ratio

~~of (a) EBITDA for such period *minus* Unfinanced Capital Expenditures made (to the extent not already incurred in a prior period) or incurred during such period, to (b) Fixed Charges for such period.~~

~~"Fixed Charges" means, with respect to any fiscal period and with respect to Borrowers and their Subsidiaries determined on a consolidated basis in accordance with GAAP, the sum, without duplication, of (a) Interest Expense required to be paid (net of interest income of such Person during such period and excluding interest paid in kind, amortization of financing fees, costs, and expenses, and other non-cash Interest Expense) during such period, (b) principal payments in respect of Indebtedness for borrowed money paid (whether voluntary, mandatory, scheduled or otherwise) or that are required to be paid during such period (including any required payments or prepayments from excess cash flow during such period, but excluding, for the avoidance of doubt, (x) principal payments relating to outstanding ABL Revolving Loans and the Term Loan and (y) the repayment of the ABL Existing Term Loan on the Closing Date), (c) all federal, state, and local income taxes required to be paid in cash during such period (net receipt of tax refunds paid in cash), *provided*, that any tax refunds received shall be applied in the inverse order for, and in amounts actually paid in, the period in which the applicable cash outlay for such taxes was made, (d) all Restricted Payments paid (whether in cash or other property, other than common Equity Interests) during such period, and (e) to the extent not otherwise deducted from EBITDA for such period, all payments required to be made during such period in respect of any funding deficiency or funding shortfall with respect to any Pension Plan or for any Withdrawal Liability.~~

"Flood Laws" means the National Flood Insurance Act of 1968, Flood Disaster Protection Act of 1973, and related laws, rules and regulations, including any amendments or successor provisions.

"Floor" means a rate of interest equal to 1.00%.

"Flow of Funds Agreement" means a flow of funds agreement, dated as of even date with this Agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by Borrowers and Agent.

"Foreign Account Letter Agreements" means, collectively, that certain (a) letter agreement, dated as of February 22, 2024, by the Loan Parties in respect of the Deposit Accounts of the Canadian Borrower in Canada, (b) letter agreement, dated as of February 26, 2024, by the Loan Parties in respect of the German Bank Account Pledge Agreement and the Deposit Accounts of Nautilus Dutch in Germany, (c) letter agreement, dated as of February 26, 2024, by the Loan Parties in respect of the Deposit Accounts of the UK Loan Party, and (d) letter agreement, dated as of February 26, 2024, by the Loan Parties in respect of the Deposit Accounts of Nautilus Swiss.

"Foreign Lender" means any Lender that is not a United States person within the meaning of IRC section 7701(a)(30).

"Foreign Loan Party" means a Loan Party that is organized under the laws of any jurisdiction other than the United States, any state thereof or the District of Columbia

"Foreign Subsidiary" means any direct or indirect subsidiary of any Loan Party that is organized under the laws of any jurisdiction other than the United States, any state thereof or the District of Columbia.

"Funding Losses" means the failure to borrow or prepay any SOFR Loan on any date specified by the Borrowers following notice thereof to Agent, or as otherwise required by this Agreement.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"German Bank Account Pledge Agreement" means that certain German law bank account pledge agreement, dated as of February 23, 2024, by Nautilus Dutch, as pledgor, and the Agent.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, or other organizational documents of such Person.

"Governmental Authority" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, county, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantor" means (a) each Person that guaranties all or a portion of the Obligations, including any Person that is a "Guarantor" under the Guaranty and Security Agreement, and (b) each other Person that becomes a guarantor after the Closing Date pursuant to Section 5.11 of this Agreement (including, without limitation, Nautilus Dutch, Nautilus Swiss, and UK Loan Party).

"Guaranty and Security Agreement" means a guaranty and security agreement, dated as of even date with this Agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by each of the Loan Parties to Agent.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Hedge Agreement" means a "swap agreement" as that term is defined in Section 101(53B)(A) of the Bankruptcy Code.

"Hedge Obligations" means any and all obligations or liabilities, whether absolute or contingent, due or to become due, now existing or hereafter arising, of each Loan Party and its Subsidiaries arising under, owing pursuant to, or existing in respect of Hedge Agreements entered into with one or more of the Hedge Providers.

"Hedge Provider" means Wells Fargo or any of its Affiliates.

"Hilco" means Hilco Enterprise Valuation Services, LLC.

"Immaterial Subsidiaries" means, collectively, (a) Nautilus Shanghai Fitness and (b) US Octane Fitness.

"Increase" has the meaning specified therefor in Section 2.14.

"Increase Amendment" has the meaning specified therefor in Section 2.14.

"Increase Date" has the meaning specified therefor in Section 2.14.

"Increased Reporting Event" means if at any time ABL Availability is less than the greater of (a) 15.0% of the Combined Line Cap (excluding the effect, if any, of any Term Pushdown Reserve) and (b) $12,500,000 (the "Availability Test"); provided that from and after the Amendment No. 2 Effective Date and so long as (i) no ABL Revolving Loans are outstanding or have been requested and (ii)(A) commencing on the date the Borrowing Base Certificate for the month of June 2023 is delivered to the Agent in accordance with Section 5.2 of this Agreement to (but not including) the date the Borrowing Base Certificate for the month of July 2023 is delivered to the Agent in accordance with Section 5.2 of this Agreement, ABL Availability is not less than $9,400,000 and (B) commencing on the date the Borrowing Base Certificate for the month of July 2023 is delivered to the Agent in accordance with Section 5.2 of this Agreement and thereafter, ABL Availability is not less than $10,000,000 (the period described in this proviso, the "Availability Test Exception Period"), the failure to meet the foregoing Availability Test shall not result in an Increased Reporting Event but if any ABL Revolving Loans shall thereafter be requested and/or are outstanding, the exception described in this proviso shall cease to have any effect and any failure to meet the foregoing Availability Test will result in an immediate Increased Reporting Event even if no ABL Revolving Loans are outstanding on the date of such failure; provided further that, (x) if ABL Availability is less than $12,500,000, then prior to any borrowing of ABL Revolving Loans by the applicable Borrowers, the Borrowers shall deliver to the Agent an updated Borrowing Base Certificate, which shall include a calculation of the Term Pushdown Reserve, and (y) the foregoing provisos shall not apply with respect to clause (f) of Schedule 5.1 to this Agreement. "Increased Reporting Period" means the period commencing after the continuance of an Increased Reporting Event and continuing until the date when no Increased Reporting Event has occurred for 30 consecutive days.

"Indebtedness" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices and, for the avoidance of doubt, other than royalty payments payable in the ordinary course of business in respect of non-exclusive licenses) and any earn-out or similar obligations, (f) all monetary obligations of such Person owing under Hedge Agreements (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), (g) any Disqualified Equity Interests of such Person, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness which is limited or is non-recourse to a Person or for which recourse is limited to an identified asset shall be valued at the lesser of (A) if applicable, the limited amount of such obligations, and (B) if applicable, the fair market value of such assets securing such obligation.

"Indemnified Liabilities" has the meaning specified therefor in Section 10.3 of this Agreement.

"Indemnified Person" has the meaning specified therefor in Section 10.3 of this Agreement.

"Indemnified Taxes" means, (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by, or on account of any obligation of, any Loan Party under any Loan Document, and (b) to the extent not otherwise described in the foregoing clause (a), Other Taxes.

"Initial Approved Budget" means the budget prepared by the Loan Parties in the form of Exhibit D attached hereto and initially furnished to the Agent on the Amendment No. 3 Effective Date and which is approved by, and in form and substance satisfactory to, the Agent in its sole discretion.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any Debtor Relief Law, each as now and hereafter in effect, any successors to such statutes, and any similar laws in any jurisdiction including, without limitation, any laws relating to assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief and any law permitting a debtor to obtain a stay or a compromise of the claims of its creditors.

"Intellectual Property" means "Intellectual Property" as defined in the Guaranty and Security Agreement or the Canadian Guaranty and Security Agreement, as applicable.

"Intellectual Property Licenses" means "Intellectual Property Licenses" as defined in the Guaranty and Security Agreement or the Canadian Guaranty and Security Agreement, as applicable.

"Intellectual Property Reserves" means such reserves as may be established from time to time by the Agent in its Permitted Discretion with respect to Eligible IP, including, without limitation, (a) to reflect the impediments to the Agent's ability to realize upon Eligible IP, (b) to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Eligible IP, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect the Eligible IP or (d) to reflect costs and expenses associated with the Eligible IP (including any such costs and expenses that the Agent determines in its Permitted Discretion may need to be paid in connection with the realization upon the Eligible IP).

"Intercompany Subordination Agreement" means an intercompany subordination agreement, dated as of even date with this Agreement, executed and delivered by each Loan Party and each of its Subsidiaries, and Agent, the form and substance of which is reasonably satisfactory to Agent.

"Intercreditor Agreement" means (a) that certain Intercreditor Agreement dated as of the Closing Date by and between the ABL Agent and the Agent, and acknowledged and agreed to by the Loan Parties, as amended, modified, restated or replaced from time to time in accordance with the terms thereof or (b) any other intercreditor agreement acceptable to the Agent by and among the Agent and any agent or trustee with respect to the ABL Credit Agreement or any Refinancing Indebtedness thereof, as it may be amended, modified, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof.

"Interest Expense" means, for any period, the aggregate of the interest expense of Borrowers for such period, determined on a consolidated basis in accordance with GAAP.

"Intercreditor Provisions" has the meaning specified in Section 8.14.

"Interest Payment Date" means (i) the first day of each calendar month, (ii) on any date of prepayment, with respect to the principal amount of the ~~Term~~ Loan being prepaid; and (iii) on the Maturity Date.

"Interim Financing Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing, in form and substance satisfactory to Agent and the Required Lenders, together with all extensions, changes, modifications, and amendments thereto consented to by Agent and the Required Lenders, which, among other matters but not by way of limitation, provides for a full roll-up of the Pre-Petition Term Loan in an aggregate principal amount not exceeding $15,999,234.76 into a Term Loan under this Agreement with such roll-up being approved upon the entry of the Interim Financing Order, and authorizes, on an interim basis, each Borrower to execute and perform under the terms of the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents, in each case, as ratified and amended by the terms and conditions of Amendment No. 3 and this Agreement.

"In-Transit Inventory Advance Rate" means ~~10~~92.5%; provided, however, from and after March 31, ~~2023~~2024, such advance rate shall automatically reduce by an amount equal to 0.625% on the last day of each calendar quarter until such advance rate equals ~~5~~90%.

"Inventory" means inventory (as that term is defined in the Code or the PPSA, as applicable).

"Inventory Advance Rate" means (a) with respect to Domestic Borrowers, ~~15~~97.5%; provided, however, from and after March 31, ~~2023~~2024, such advance rate shall automatically reduce by an amount equal to 0.625% on the last day of each calendar quarter until such advance rate equals ~~10~~95% and (b) with respect to Canadian Borrowers, ~~90~~87.5%; provided, however, from and after March 31, ~~2023~~2024, such advance rate shall automatically reduce by an amount equal to 0.625% on the last day of each calendar quarter until such advance rate equals 85%.

~~"Inventory Letter Agreement" means that certain letter agreement in respect of Inventory, dated as of the Closing Date, by and among the Agent, the ABL Agent, the Loan Parties, and the Subsidiaries of the Loan Parties.~~

"Inventory Reserves" means, as of any date of determination, (a) Landlord Reserves in respect of Inventory, (b) in the case of Eligible Inventory, to be consistent with and not duplicative of the calculation of the Net Recovery Percentage with respect to such Inventory, those reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.1(c), to establish and maintain (including reserves for slow moving Inventory and Inventory shrinkage) with respect to Eligible Inventory, including based on the results of appraisals, and (c) in the case of Eligible In-Transit Inventory, to be consistent with and not duplicative of the calculation of the Net Recovery Percentage with respect to such Inventory, those reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.1(c), to establish and maintain with respect to Eligible In-Transit Inventory (i) to the extent not already included in the Net Recovery Percentage with respect to such Inventory, for the estimated costs relating to unpaid freight charges, warehousing or storage charges, taxes, duties, and other similar unpaid costs associated with the acquisition of such Eligible In-Transit Inventory, *plus* (ii) for the estimated reclamation claims of unpaid sellers of such Eligible In-Transit Inventory.

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) *bona fide* accounts receivable arising in the ordinary course of business but including, without limitation, all Special Foreign Subsidiary Investments), or acquisitions of

Indebtedness, Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. The amount of any Investment shall be the original cost of such Investment *plus* the cost of all additions thereto, without any adjustment for increases or decreases in value, or write-ups, write-downs, or write-offs with respect to such Investment.

"Investment Grade Account Debtor" means an account debtor that, at the time of determination, maintains a corporate credit rating and/or family rating, as applicable, of BBB or higher by S&P or Ba or higher in Moody's.

"IP" means, with respect to any Domestic Borrower, Intellectual Property of such Domestic Borrower and Intellectual Property Licenses provided to such Domestic Borrower in or with respect to Intellectual Property owned or controlled by any other Person.

"IP Advance Rate" means 65(a) 60%; provided, however, from and after March 31, 20232024, such advance rate shall automatically reduce by an amount equal to 1.25% on the last day of each calendar quarter until such advance rate equals 55%.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"IV" has the meaning assigned to such term in Amendment No. 1.

"IV Purchase Agreement" has the meaning assigned to such term in Amendment No. 1.

"IV Transaction" has the meaning assigned to such term in Amendment No. 1.

"Joinder" means a joinder agreement substantially in the form of Exhibit J-1 to this Agreement.

"Landlord Reserve" means, as to each location at which a Borrower has Inventory or books and records located and as to which a Collateral Access Agreement has not been received by Agent (or is otherwise not subject to the protections granted in any Financing Order), a reserve in an amount equal to three (3) months' rent, storage charges, fees or other amounts under the lease or other applicable agreement relative to such location or, if greater and Agent so elects, the number of months' rent, storage charges, fess or other amounts for which the landlord, bailee, warehouseman or other property owner will have, under applicable law, a Lien in the Inventory of such Borrower to secure the payment of such amounts under the lease or other applicable agreement relative to such location.; provided, however, solely with respect to any leased location for which such Borrower is paid up-to-date and current on all rent, storage charges, fees or other amounts under the lease or other applicable agreement relative to such location, such reserve shall be in an amount equal one (1) month's rent, storage charges, fees or other amounts under the lease or other applicable agreement relative to such location.

"Lease Rejection Period" means the one hundred twenty (120) day lease rejection/assumption period, as such period may be extended or shortened by the Bankruptcy Court

"Lender" has the meaning set forth in the preamble to this Agreement, shall include any other Person made a party to this Agreement pursuant to the provisions of Section 13.1 of this Agreement and "Lenders" means each of the Lenders or any one or more of them.

"Lender Group" means each of the Lenders and Agent, or any one or more of them.

"Lender Group Expenses" means all (a) reasonable and documented costs or expenses (including taxes and insurance premiums required to be paid by any Loan Party or its Subsidiaries under any of the

Loan Documents that are paid, advanced, or incurred by the Lender Group in accordance with the Loan Documents and the applicable Financing Order, (b) reasonable and documented out-of-pocket fees or charges paid or incurred by Agent in connection with the Lender Group's transactions with each Loan Party and its Subsidiaries under any of the Loan Documents and the applicable Financing Order, including, photocopying, notarization, couriers and messengers, telecommunication, public record searches, filing fees, recording fees, publication, real estate surveys, real estate title policies and endorsements, and environmental audits, (c) Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP and/or Canadian AML Legislation searches related to any Loan Party or its Subsidiaries, (d) Agent's reasonable and documented customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of any Borrower (whether by wire transfer or otherwise), together with any reasonable and documented out-of-pocket costs and expenses incurred in connection therewith, (e) customary charges imposed or incurred by Agent resulting from the dishonor of checks payable by or to any Loan Party, (f) reasonable, documented out-of-pocket costs and expenses paid or incurred by the Lender Group to correct any default or enforce any provision of the Loan Documents or the applicable Financing Order, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (g) field examination, appraisal, and valuation fees and expenses of Agent related to any field examinations, appraisals, or valuation to the extent of the fees and charges (and up to the amount of any limitation) provided in Section 5.7(c) of this Agreement, (h) subject to the limitations in Section 10.3, Agent's and Lenders' reasonable, documented costs and expenses (including reasonable and documented attorneys' fees and expenses) relative to third party claims or any other lawsuit or adverse proceeding paid or incurred, whether in enforcing or defending the Loan Documents or the applicable Financing Order or otherwise in connection with the transactions contemplated by the Loan Documents, Agent's Liens in and to the Collateral, or the Lender Group's relationship with any Loan Party or any of its Subsidiaries, (including, for the avoidance of doubt, the Chapter 11 Cases), (i) Agent's reasonable and documented costs and expenses (including reasonable and documented attorneys' fees and due diligence expenses) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), syndicating (including reasonable costs and expenses relative to the rating of the Term LoanLoans, CUSIP, DXSyndicate™, SyndTrak or other communication costs incurred in connection with a syndication of the loan facilities), or amending, waiving, or modifying the Loan Documents, andthe Interim Financing Order, the Final Financing Order and any transaction contemplated thereby (whether or not the transactions contemplated hereby or thereby shall be consummated) and any refinancing of the obligations hereunder or any "exit financing" requested by the Loan Parties in connection with the Chapter 11 Cases, (j) Agent's and each Lender's reasonable and documented costs and expenses (including reasonable and documented attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding (including the Chapter 11 Cases) concerning any Loan Party or any of its Subsidiaries or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether a lawsuit or other adverse proceeding is brought, or in taking any enforcement action, any action to perfect or maintain priority of the Agent's Lien on the Collateral or any Remedial Action with respect to the Collateral, (k) the preparation and review of pleadings, documents and reports related to the Chapter 11 Cases and any successor cases, attendance at meetings, court hearings or conferences related to the Chapter 11 Cases or any successor cases, and general monitoring of the Chapter 11 Cases and any successor cases and (l) including, as to each of clauses (a) through (k) above, to the extent not already set forth therein, all reasonable and documented attorneys' and other professional and service providers' fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings and reasonable fees, costs and expenses of accountants, sales consultants, financial advisors, environmental advisors, appraisers, investment bankers, management and other consultants and

paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; air express charges; and reasonable expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services (provided, that the fees and expenses of counsel that shall constitute Lender Group Expenses shall in any event be limited to one primary counsel to Agent and one primary counsel to the Lenders, one local counsel to Agent in each reasonably necessary jurisdiction, one specialty counsel to Agent in each reasonably necessary specialty area (including insolvency law), and one or more additional counsel to Lenders if one or more conflicts of interest arise).

"Lender Group Representatives" has the meaning specified therefor in Section 17.9 of this Agreement.

"Lender-Related Person" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Line Cap" means, as of any date of determination, the lesser of (a) the ~~aggregate outstanding principal amount of the Term Loan at such time~~sum of (i) the Revolving Credit Maximum Amount plus (ii) the Total Term Loan Outstandings and (b) the Aggregate Borrowing Base as of such date of determination.

~~"Loan" means the Term Loan made (or to be made) hereunder.~~

"Loan Account" has the meaning specified therefor in Section 2.9 of this Agreement.

"Loan Documents" means this Agreement, the Amendment No. 3 Fee Letter, all Approved Budgets, all Approved Budget Variance Reports, the Compliance Certificates, the Control Agreements, the Copyright Security Agreement, any Borrowing Base Certificate, the Credit Card Notifications, the Closing Date Fee Letter, the Guaranty and Security Agreement, the Intercompany Subordination Agreement, the Mortgages, the Pacific Direct Collateral Assignment, the Patent Security Agreement, the Trademark Security Agreement, the Canadian Guaranty and Security Agreement, the ~~Intercreditor Agreement, the Inventory Letter Agreement,~~Dutch Security Documents, the Swiss Security Documents, the UK Security Documents, the Foreign Account Letter Agreements, any note or notes executed by Borrowers in connection with this Agreement and payable to any member of the Lender Group, and any other instrument or agreement entered into, now or in the future, by any Loan Party or any of its Subsidiaries and any member of the Lender Group in connection with this Agreement.

"Loan Party" means any Borrower or any Guarantor.

"Loans" means the Revolving Loans and the Term Loan.

"Margin Stock" as defined in Regulation U of the Board of Governors as in effect from time to time.

"Material Adverse Effect" means (a) a material adverse effect in the business, operations, results of operations, assets, liabilities or financial condition of the Loan Parties and their Subsidiaries, taken as a whole, (b) a material impairment of the Loan Parties' and their Subsidiaries' ability, taken as a whole, to perform their obligations under the Loan Documents to which they are parties or of the Lender Group's ability to enforce the Obligations or realize upon the Collateral (other than as a result of as a result of an action taken or not taken that is solely in the control of Agent), or (c) a material impairment of the enforceability or priority of Agent's Liens with respect to all or a material portion of the Collateral; provided, that, the commencement of the Chapter 11 Case or any sale or other liquidation of any, all or substantially all of Debtors' assets in such Chapter 11 Case in accordance with the terms of the applicable Financing Order or Amendment No. 3 shall not, individually or collectively, constitute a Material Adverse Effect.

"Material Contract" means, with respect to any Person, (a) the Pacific Direct License Agreement and (b) all other contracts or agreements the loss of which could reasonably be expected to result in a Material Adverse Effect other than the Loan Documents.

"Material Customers" means, collectively, the Persons set forth on Schedule 4.20 to this Agreement.

"Maturity Date" means earlier of (a) October 29, 2026 and (b) the "Maturity Date" under the ABL Credit Agreement.

"Maturity Date" shall mean the earliest to occur of (a) September 5, 2024, (b) the effective date of an Acceptable Plan of Reorganization, (c) the Disposition, directly or indirectly, of all or substantially all of the assets of any Domestic Loan Party (other than the Equity Interests of any Foreign Loan Party or Foreign Subsidiary) (including, in the case of this clause (c), under Section 363 and/or 365 of the Bankruptcy Code), (d) the first day on which the Interim Financing Order expires by its terms or is terminated, unless the Final Financing Order has been entered and become effective prior thereto, (e) the date which is thirty (30) days after the Petition Date if the Final Financing Order has not been entered by the Bankruptcy Court on or prior to such date, (f) the date the Final Financing Order is vacated, terminated, rescinded, revoked, declared null and void or otherwise ceases to be in full force and effect, (g) the date of a conversion of any of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code, unless otherwise consented to in writing by the Agent and the Required Lenders, (h) the date of dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Agent and the Required Lenders, (i) the date of an appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties and (j) the acceleration of the Loans and the termination of the commitment to make Loans under the Credit Facility in accordance with this Agreement.

"Milestones" means each of the covenants set forth on Schedule 5.21.

"Moody's" has the meaning specified therefor in the definition of Cash Equivalents.

"Mortgages" means, individually and collectively, one or more mortgages, charges, deeds of trust, deeds to secure debt, deeds of hypothec, or debentures executed and delivered by a Loan Party or one of its Subsidiaries in favor of Agent, in form and substance reasonably satisfactory to Agent, that encumber the Real Property Collateral.

"Multiemployer Plan" means any multiemployer plan within the meaning of Section 3(37) or 4001(a)(3) of ERISA with respect to which any Loan Party or ERISA Affiliate has an obligation to

contribute or has any liability, contingent or otherwise or could be assessed withdrawal liability assuming a complete withdrawal from any such multiemployer plan.

"Nautilus Dutch" means Nautilus Fitness International, B.V., a company with limited liability organized under the laws of the Netherlands and a wholly ownedwholly owned Subsidiary of NautilusBowFlex.

"Nautilus Dutch Reserve" means $1,000,000 and if Nautilus Dutch is not joined as a Loan Party in accordance with Section 5.13 on or prior to January 15, 2023, such amount shall increase on January 15, 2023 and every fourteen (14) days thereafter by $500,000 until Nautilus Dutch is joined as a Loan Party and satisfies the requirements set forth in Section 5.13(a); provided, however, the amount of the Nautilus Dutch Reserve shall not exceed $4,000,000 in the aggregate, and upon Nautilus Dutch joining as a Loan Party and satisfying the requirements set forth in Section 5.13(a), the Nautilus Dutch Reserve shall automatically be reduced to $0.

"Nautilus Fitness Equipments" means Nautilus (Shanghai) Fitness Equipments Co., Ltd., a company with limited liability organized under the law of the People's Republic of China and a wholly-owned Subsidiary of NautilusBowFlex.

"Nautilus Shanghai Fitness" means Nautilus (Shanghai) Fitness Co., Ltd., a company with limited liability organized under the law of the People's Republic of China and a wholly-owned Subsidiary of NautilusBowFlex.

"Nautilus Swiss" means Nautilus Switzerland AG, a company organized under the laws of Switzerland and a wholly-owned Subsidiary of NautilusBowFlex.

"Net Cash Proceeds" means:

(a)    with respect to any sale or disposition by any Loan Party or any of its Subsidiaries of assets, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Loan Party or such Subsidiary, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Lien on any asset (other than (A) Indebtedness owing to Agent or any Lender under this Agreement and the other Loan Documents and (B) Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such sale or disposition, (ii) reasonable fees, commissions, and expenses related thereto and required to be paid by such Loan Party or such Subsidiary in connection with such sale or disposition, (iii) Taxes paid or payable to any taxing authorities by such Loan Party or such Subsidiary in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of any Loan Party or any of its Subsidiaries, and are properly attributable to such transaction, and (iv) all amounts that are set aside as a reserve (A) for adjustments in respect of the purchase price of such assets, (B) for any liabilities associated with such sale or casualty, to the extent such reserve is required by GAAP, and (C) for the payment of unassumed liabilities relating to the assets sold or otherwise disposed of at the time of, or within 30 days after, the date of such sale or other disposition, to the extent that in each case the funds described above in this clause (iv) are (x) deposited into escrow with a third party escrow agent or set aside in a separate Deposit Account that is subject to a Control Agreement in favor of Agent, and (y) paid to Agent as a prepayment of the applicable Obligations in accordance with Section 2.4(e) of this Agreement at such time when such amounts are no longer required to be set aside as such a reserve; and

DB1/ 139987402.3

(b)      with respect to the issuance or incurrence of any Indebtedness by any Loan Party or any of its Subsidiaries, or the issuance by any Loan Party or any of its Subsidiaries of any Equity Interests, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Loan Party or such Subsidiary in connection with such issuance or incurrence, after deducting therefrom only (i) reasonable fees, commissions, and expenses related thereto and required to be paid by such Loan Party or such Subsidiary in connection with such issuance or incurrence, and (ii) taxes paid or payable to any taxing authorities by such Loan Party or such Subsidiary in connection with such issuance or incurrence, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of any Loan Party or any of its Subsidiaries, and are properly attributable to such transaction.

"Net Recovery Percentage" means, as of any date of determination, the percentage of the book value of Borrowers' Inventory that is estimated to be recoverable in an orderly liquidation of such Inventory net of all associated costs and expenses of such liquidation, such percentage to be determined as to each category of Inventory and to be as specified in the most recent Acceptable Appraisal of Inventory.

"Non-Consenting Lender" has the meaning specified therefor in Section 14.2(a) of this Agreement.

"Non-Defaulting Lender" means each Lender other than a Defaulting Lender.

"Notification Event" means (a) the occurrence of a "reportable event" described in Section 4043 of ERISA for which the 30-day notice requirement has not been waived by applicable regulations issued by the PBGC, (b) the withdrawal of any Loan Party or ERISA Affiliate from a Pension Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the termination of a Pension Plan, the filing of a notice of intent to terminate a Pension Plan or the treatment of a Pension Plan amendment as a termination, under Section 4041 of ERISA, if the plan assets are not sufficient to pay all plan liabilities, (d) the institution of proceedings to terminate, or the appointment of a trustee with respect to, any Pension Plan by the PBGC or any Pension Plan or Multiemployer Plan administrator, (e) any other event or condition that would constitute grounds under Section 4042(a) of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (f) the imposition of a Lien pursuant to the IRC or ERISA in connection with any Pension Plan or the existence of any facts or circumstances that could reasonably be expected to result in the imposition of a Lien, (g) the partial or complete withdrawal of any Loan Party or ERISA Affiliate from a Multiemployer Plan (other than any withdrawal that would not constitute an Event of Default under Section 8.12 of this Agreement), (h) any event or condition that results in the insolvency of a Multiemployer Plan under Sections of ERISA, (i) any event or condition that results in the termination of a Multiemployer Plan under Section 4041A of ERISA or the institution by the PBGC of proceedings to terminate or to appoint a trustee to administer a Multiemployer Plan under ERISA, (j) any Pension Plan being determined to be in "at risk status" within the meaning of IRC Section 430(i), (k) any Multiemployer Plan being determined to be in "endangered status" or "critical status" within the meaning of IRC Section 432(b) or the written determination that any Multiemployer Plan is or is expected to be insolvent within the meaning of Title IV of ERISA, (l) with respect to any Pension Plan, any Loan Party or ERISA Affiliate incurring a substantial cessation of operations within the meaning of ERISA Section 4062(e), (m) an "accumulated funding deficiency" within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA) or the failure of any Pension Plan or Multiemployer Plan to meet the minimum funding standards within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA), in each case, whether or not waived, (n) the filing of an application for a waiver of the minimum funding standards within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA) with respect to any Pension Plan or Multiemployer

Plan, (o) the failure to make by its due date a required payment or contribution with respect to any Pension Plan or Multiemployer Plan, (p) any event that results in or could reasonably be expected to result in a liability by a Loan Party pursuant to Title I of ERISA or the excise tax provisions of the IRC relating to Employee Benefit Plans or any event that results in or could reasonably be expected to result in a liability to any Loan Party or ERISA Affiliate pursuant to Title IV of ERISA or Section 401(a)(29) of the IRC, or (q) any of the foregoing is reasonably likely to occur in the following 30 days; provided, that in each of above clauses (a) through (q), it either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect.

"Obligations" means all loans (including the Revolving Loans (including Overadvances and Protective Advances) and the Term Loan), debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), obligations (including indemnification obligations), fees (including the fees (including, without limitation, the Early Termination Premium) provided for in the Amendment No. 3 Fee Letter), and without duplication of the fees in the Amendment No. 3 Fee Letter, the Closing Date Fee Letter, as applicable), Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), guaranties, and all covenants and duties of any other kind and description owing by any Loan Party arising out of, under, pursuant to, in connection with, or evidenced by this Agreement or any of the other Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that any Loan Party is required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents; provided that, anything to the contrary contained in the foregoing notwithstanding, the Obligations shall exclude any Excluded Swap Obligation. Without limiting the generality of the foregoing, the Obligations of Borrowers under the Loan Documents include the obligation to pay (i) the principal of the Revolving Loans and of the Term Loan, (ii) interest accrued on the Term LoanLoans, (iii) Lender Group Expenses, (iv) fees payable under this Agreement or any of the other Loan Documents, and (v) indemnities and other amounts payable by any Loan Party under any Loan Document. Any reference in this Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding, including the Chapter 11 Cases.  For the avoidance of doubt, "Obligations" shall include all Pre-Petition Obligations (if any) and all DIP Obligations (as defined in the applicable Financing Order).

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Originating Lender" has the meaning specified therefor in Section 13.1(e) of this Agreement.

"Other Taxes" means all present or future stamp, court, excise, value added, or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"Pacific Direct" means Pacific Direct, LLC, a Delaware limited liability company.

"Pacific Direct Collateral Assignment" means that certain Collateral Assignment (including any and all supplements thereto), dated as of the date hereofClosing Date, by and among NautilusBowFlex, Pacific Direct, and Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Pacific Direct License Agreement" means that certain Trademark License Agreement, dated as of September 20, 2001, by and among ~~Nautilus~~BowFlex, Pacific Direct, and Schwinn Acquisition LLC, a Delaware limited liability company, as the same may be amended, restated, supplemented or otherwise modified from time to time as permitted pursuant to the terms of the Pacific Direct Collateral Assignment.

"Participant" has the meaning specified therefor in Section 13.1(e) of this Agreement.

"Participant Register" has the meaning set forth in Section 13.1(i) of this Agreement.

"Patent Security Agreement" has the meaning specified therefor in the Guaranty and Security Agreement or the Canadian Guaranty and Security Agreement, as applicable.

"Patriot Act" has the meaning specified therefor in Section 4.13 of this Agreement.

"Payment Recipient" has the meaning specified therefor in Section 17.16 of this Agreement.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor agency.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to the provisions of Title IV or Section 302 of ERISA or Sections 412 or 430 of the Code sponsored, maintained, or contributed to by any Loan Party or ERISA Affiliate or to which any Loan Party or ERISA Affiliate has any liability, contingent or otherwise.

"Perfection Certificate" means a certificate in the form of Exhibit P-1 to this Agreement.

"Permitted Discretion" means a determination made in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Dispositions" means sales and other dispositions of assets as provided for in the applicable Financing Order and the Approved Budget.

"Permitted Indebtedness" means (a) Indebtedness in respect of the Obligations, (b) obligations arising as a matter of law in respect of customs duties in connection with the importation of goods, and (c) Indebtedness otherwise provided in the applicable Financing Order and the Approved Budget .

~~"Permitted Dispositions" means:~~

~~(a)    sales, abandonment, or other dispositions of Equipment that is substantially worn, damaged, or obsolete or no longer used or useful in the ordinary course of business and leases or subleases of Real Property not useful in the conduct of the business of the Loan Parties and their Subsidiaries;~~

~~(b)    sales of Inventory to buyers in the ordinary course of business,~~

~~(c)    the use or transfer of money or Cash Equivalents and Permitted Policy Investments in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents;~~

~~(d)    the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business,~~

(e)      the granting of Permitted Liens,

(f)      the sale or discount, in each case without recourse, of accounts receivable (other than Eligible Accounts and Eligible Credit Card Receivables) arising in the ordinary course of business, but only in connection with the compromise or collection thereof,

(g)      any involuntary loss, damage or destruction of property,

(h)      any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property,

(i)      the leasing or subleasing of Real Property of any Loan Party or its Subsidiaries in the ordinary course of business,

(j)      the sale or issuance of Equity Interests (other than Disqualified Equity Interests) of Administrative Borrower,

(k)      (i) the lapse of registered patents, trademarks, copyrights and other intellectual property of any Loan Party or any of its Subsidiaries to the extent not economically desirable in the conduct of its business, or (ii) the abandonment of patents, trademarks, copyrights, or other intellectual property rights in the ordinary course of business so long as (in each case under clauses (i) and (ii)), (A) with respect to copyrights, such copyrights are not material revenue generating copyrights, and (B) such lapse is not materially adverse to the interests of the Lender Group,

(l)      the making of Restricted Payments that are expressly permitted to be made pursuant to this Agreement,

(m)      the making of Permitted Investments,

(n)      sales, transfers or other dispositions of assets (i) from a Borrower to another Borrower, (ii) subject to clause (o) of the definition of "Permitted Investments", from any Loan Party or any of its Subsidiaries (other than any Borrower) to a Loan Party, and (iii) from any Subsidiary of any Loan Party that is not a Loan Party to any other Subsidiary of any Loan Party; provided that (x) such sales, transfers and Dispositions from any Domestic Loan Party to any Canadian Loan Party shall not be made in violation of the Inventory Letter Agreement and shall be made only in the ordinary course of business consistent with the past practices of the Loan Parties and (y) no such sales, transfers and Dispositions shall be made from a Loan Party or any of its Subsidiaries to any Immaterial Subsidiary,

(o)      dispositions of Equipment or Real Property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property, or (ii) the proceeds of such disposition are promptly applied to the purchase price of such replacement property; provided, that to the extent the property being transferred constitutes Collateral, such replacement property shall constitute Collateral,

(p)      subject to the terms and conditions of Amendment No. 1, the IV Transaction, the Vi Transaction, and the acceleration of the royalty stream revenues pursuant to the terms of the Core Nautilus License Agreement (as amended by the Core Nautilus License Agreement Amendment);

(q)      dispositions of property pursuant to a Sale-Leaseback that (i) is made for cash consideration in an amount not less than the fair market value of such fixed or capital asset and is consummated within 90 days after such Loan Party or such Subsidiary acquires or completes the

construction of such fixed or capital asset, and (ii) the aggregate fair market value of all assets disposed of pursuant to this clause (q) would not exceed $500,000, and

(r)    sales or dispositions of fixed assets (including intangible property related to such fixed assets) not otherwise permitted in clauses (a) through (q) above so long as made at fair market value and the aggregate fair market value of all assets disposed of in fiscal year (including the proposed disposition) would not exceed $2,000,000;

provided, that if, as of any date of determination, sales or dispositions by the Loan Parties during the period of time from the first day of the month in which such date of determination occurs until such date of determination, either individually or in the aggregate, involve $500,000 or more of assets included in a Borrowing Base and/or the ABL Borrowing Base (based on the fair market value of the assets so disposed) (the "Threshold Amount"), then Borrowers shall have, prior to consummation of the sale or disposition that causes the assets included in a Borrowing Base and/or the ABL Borrowing Base that are disposed of during such period to exceed the Threshold Amount, delivered to Agent updated Borrowing Base Certificates that reflects the removal of the applicable assets from the applicable Borrowing Base and/or the ABL Borrowing Base. Notwithstanding anything to the contrary contained in this definition, (A) except as provided in clause (d), (k) or (n) above, no Borrower Intellectual Property shall be the subject of any transfer, sale or disposition (in each case, pursuant to a Disposition, a Permitted Investment, a Permitted Lien or otherwise) to any non-Loan Party or (B) no other asset included in the determination of any Borrowing Base or any ABL Borrowing Base (other than Dispositions described in clause (d), (k) or (n) above) shall be the subject of any transfer, sale or disposition (in each case, pursuant to a Disposition, a Permitted Investment, a Permitted Lien or otherwise) to any non-Loan Party in compliance with this definition above unless before and after giving effect to any such Disposition, no Event of Default shall have occurred and be continuing and, at least three (3) Business Days prior to the consummation of such Disposition, the Administrative Borrower shall have delivered to the Agent updated Borrowing Base Certificates excluding the assets subject to such Disposition from the calculations thereunder.

"Permitted Indebtedness" means:

(a)    Indebtedness in respect of the Obligations,

(b)    Indebtedness as of the Closing Date set forth on Schedule 4.14 to this Agreement and any Refinancing Indebtedness in respect of such Indebtedness,

(c)    (i) Permitted Purchase Money Indebtedness, (ii) Indebtedness (other than Indebtedness for borrowed money) arising out of Sale-Leaseback permitted under clause (q) of the definition of Permitted Dispositions, and (iii) any Refinancing Indebtedness in respect of any such Indebtedness under the immediately preceding clauses (i) and (ii),

(d)    Indebtedness arising in connection with the endorsement of instruments or other payment items for deposit,

(e)    Indebtedness consisting of (i) unsecured guarantees incurred in the ordinary course of business with respect to surety and appeal bonds, performance bonds, bid bonds, appeal bonds, completion guarantee and similar obligations; (ii) unsecured guarantees arising with respect to customary indemnification obligations to purchasers in connection with Permitted Dispositions; and (iii) unsecured guarantees with respect to Indebtedness of any Loan Party or one of its Subsidiaries, to the extent that the Person that is obligated under such guaranty could have incurred such underlying Indebtedness,

(f) [reserved],

(g) [reserved],

(h) Indebtedness incurred in the ordinary course of business under performance, bid, surety, statutory, or appeal bonds,

(i) Indebtedness owed to any Person providing worker's compensation, health, disability, or other employee benefits or property, casualty, liability, or other insurance to any Loan Party or any of its Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year,

(j) the incurrence by any Loan Party or its Subsidiaries of Indebtedness under Hedge Agreements that is incurred for the bona fide purpose of hedging the interest rate, commodity, or foreign currency risks associated with such Loan Party's or such Subsidiary's operations and not for speculative purposes,

(k) Indebtedness incurred in the ordinary course of business in respect of credit cards, credit card processing services, debit cards, stored value cards, commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards"), or Cash Management Services (as defined in the ABL Credit Agreement as in effect on the date hereof),

(l) unsecured Indebtedness of any Loan Party owing to employees, former employees, former officers, directors, or former directors (or any spouses, ex-spouses, or estates of any of the foregoing) incurred in connection with the repurchase or redemption by such Loan Party of the Equity Interests of Administrative Borrower that has been issued to such Persons as of the Closing Date, so long as (i) no Default or Event of Default has occurred and is continuing or would result from the incurrence of such Indebtedness, (ii) the aggregate amount of all such Indebtedness outstanding at any one time does not exceed $100,000, and (iii) such Indebtedness is subordinated in right of payment to the Obligations on terms and conditions reasonably acceptable to Agent,

(m) contingent liabilities in respect of any indemnification obligation, adjustment of purchase price, non-compete, or similar obligation of any Loan Party incurred in connection with the consummation of one or more Acquisition,

(n) Indebtedness comprising Permitted Investments,

(o) unsecured Indebtedness incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business and "Cash Management Services" under and as defined in the ABL Credit Agreement as in effect on the date hereof,

(p) [reserved],

(q) Indebtedness in an aggregate outstanding principal amount not to exceed $1,000,000 at any time outstanding for all Subsidiaries of each Loan Party that are CFCs; provided, that such Indebtedness is not directly or indirectly recourse to any of the Loan Parties or of their respective assets,

(r)    accrual of interest, accretion or amortization of original issue discount, or the payment of interest in kind, in each case, on Indebtedness that otherwise constitutes Permitted Indebtedness,

(s)    any other unsecured Indebtedness incurred by any Loan Party or any of its Subsidiaries in an aggregate outstanding amount not to exceed $5,000,000 at any one time, and

(t)    the ABL Obligations incurred pursuant to the ABL Loan Documents; provided that the maximum principal amount of the ABL Obligations will not exceed the Maximum ABL Facility Amount (as defined in the Intercreditor Agreement as in effect on the date hereof).

"Permitted Intercompany Advances" means loans made by (a) subject to clause (o) of the definition of "Permitted Investments", a Loan Party to another Loan Party, (b) a Subsidiary of a Loan Party that is not a Loan Party to another Subsidiary of a Loan Party that is not a Loan Party, (c) a Subsidiary of a Loan Party that is not a Loan Party to a Loan Party, so long as the parties thereto are party to the Intercompany Subordination Agreement, or (d) a Loan Party to a Subsidiary of a Loan Party that is not a Loan Party so long as, solely for purposes of this clause (d), (i) the aggregate amount of all such loans (by type, not by the borrower) does not exceed $2,500,000 outstanding at any one time, (ii) at the time of the making of such loan, no Event of Default has occurred and is continuing or would result therefrom and (iii) Borrowers have ABL Availability of $16,000,000 or greater immediately after giving effect to each such loan.

"Permitted Investments" means:

(a)    Investments in cash and Cash Equivalents,

(b)    Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business,

(c)    advances made in connection with purchases of goods or services in the ordinary course of business,

(d)    Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries,

(e)    Investments owned by any Loan Party or any of its Subsidiaries on the Closing Date and set forth on Schedule P-1 to this Agreement,

(f)    guarantees permitted under the definition of Permitted Indebtedness,

(g)    Permitted Intercompany Advances,

(h)    Equity Interests or other securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to a Loan Party or its Subsidiaries (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such Indebtedness or claims,

(i)    deposits of cash made in the ordinary course of business to secure performance of operating leases,

(j)      (i) non-cash loans and advances to employees, officers, and directors of a Loan Party or any of its Subsidiaries for the purpose of purchasing Equity Interests in Administrative Borrower so long as the proceeds of such loans are used in their entirety to purchase such Equity Interests in Administrative Borrower, and (ii) loans and advances to employees and officers of a Loan Party or any of its Subsidiaries in the ordinary course of business for any other business purpose and in an aggregate amount not to exceed $250,000 at any one time,

(k)      [reserved],

(l)      Investments in the form of capital contributions and the acquisition of Equity Interests made by any Loan Party in any other Loan Party (other than capital contributions to or the acquisition of Equity Interests of Administrative Borrower),

(m)      Investments resulting from entering into agreements relative to obligations permitted under clause (j) of the definition of Permitted Indebtedness,

(n)      equity Investments by any Loan Party in any Subsidiary of such Loan Party which is required by law to maintain a minimum net capital requirement or as may be otherwise required by applicable law,

(o)      so long as no Cash Dominion Event has occurred and is continuing or would result therefrom, Special Foreign Subsidiary Investments; provided, however, if a Cash Dominion Event has occurred and is continuing but no Event of Default has occurred and is continuing or would result therefrom, Special Foreign Subsidiary Investments may be made in any month solely for the purpose of funding payroll and/or rent of Nautilus Swiss and/or Nautilus Fitness Equipments, as the case may be, in an aggregate amount not to exceed $850,000 in the ordinary course of business and consistent with past practices; provided, further, from and after the date an Event of Default has occurred and remains continuing or would result therefrom, no Special Foreign Subsidiary Investments may be made. For the avoidance of doubt, the restrictions set forth in this clause (o) shall not apply with respect to Special Foreign Subsidiary Investments from and after the date Nautilus Swiss and Nautilus Fitness Equipments are joined as Loan Parties in accordance with the terms hereof, but until the Discharge of ABL Obligations, such Special Foreign Subsidiary Investments shall continue to be subject to the restrictions set forth in the ABL Credit Agreement,

(p)      Permitted Policy Investments, and

(q)      so long as no Event of Default has occurred and is continuing or would result therefrom, any other Investments in an aggregate amount not to exceed $5,000,000 during the term of this Agreement.

"Permitted Investments" means Investments as provided in the applicable Financing Order and the Approved Budget.  Notwithstanding anything to the contrary contained in this definition, other than Investments constituting Permitted Dispositions of the type described in clausesclause (d) andor (n) of the definition thereofof "Permitted Dispositions" under the Pre-Petition Credit Agreement that also constitute Permitted Dispositions hereunder and exists as of the date hereof or are otherwise consistent with historical practices, (A) no Borrower Intellectual Property shall be the subject of any Investment in any non-Loan Party to any non-Loan Party or (B) no other asset included in the determination of any Borrowing Base or any ABL Borrowing Base shall be the subject of any Investment to any non-Loan Party in compliance with this definition above unless before and after giving effect to any such Disposition, no Event of Default shall have occurred and be continuing and, at least three (3) Business Days prior to the consummation of such Disposition, the Administrative Borrower shall have delivered to

the Agent updated Borrowing Base Certificates excluding the assets subject to such Investment from the calculations thereunder.

Notwithstanding anything to the contrary contained herein, other than Investments permitted pursuant to clause (e), no Loan Party shall, nor permit any of its Subsidiaries to, make any Investments in any Immaterial Subsidiary.

"Permitted Liens" means:

(a)      Liens granted to, or for the benefit of, Agent to secure the Obligations,

(b)      Liens for unpaid taxes, assessments, or other governmental charges or levies that either (i) are not yet delinquent, or (ii) do not have priority over Agent's Liens and the underlying taxes, assessments, or charges or levies are the subject of Permitted Protests,

(c)      judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under Section 8.3 of this Agreement,

(d)      Liens set forth on Schedule P-2 to this Agreement; provided, that to qualify as a Permitted Lien, any such Lien described on Schedule P-2 to this Agreement shall only secure the Indebtedness that it secures on the Closing Date and any Refinancing Indebtedness in respect thereof,

(e)      the interests of lessors under operating leases and non-exclusive licensors under license agreements,

(f)      purchase money Liens on fixed assets or the interests of lessors under Capital Leases to the extent that such Liens or interests secure Permitted Purchase Money Indebtedness and so long as (i) such Lien attaches only to the fixed asset purchased or acquired and the proceeds thereof, and (ii) such Lien only secures the Indebtedness that was incurred to acquire the fixed asset purchased or acquired or any Refinancing Indebtedness in respect thereof,

(g)      Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money, and which Liens either (i) are for sums not yet delinquent, or (ii) are the subject of Permitted Protests,

(h)      Liens on amounts deposited to secure any Borrower's and its Subsidiaries' obligations in connection with worker's compensation or other unemployment insurance,

(i)      Liens on amounts deposited to secure any Borrower's and its Subsidiaries' obligations in connection with the making or entering into of bids, tenders, or leases in the ordinary course of business and not in connection with the borrowing of money,

(j)      Liens on amounts deposited to secure any Borrower's and its Subsidiaries' reimbursement obligations with respect to surety or appeal bonds obtained in the ordinary course of business,

(k)      with respect to any Real Property, easements, rights of way, and zoning restrictions that do not materially interfere with or impair the use or operation thereof,

(l)     to the extent constituting a Lien, non-exclusive licenses of patents, trademarks, copyrights and other intellectual property rights to the extent permitted pursuant to clause (d) of the definition of "Permitted Disposition",

(m)     Liens that are replacements of Permitted Liens to the extent that the original Indebtedness is the subject of permitted Refinancing Indebtedness and so long as the replacement Liens only encumber those assets that secured the original Indebtedness,

(n)     rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such Deposit Accounts in the ordinary course of business,

(o)     Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness,

(p)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods,

(q)     [reserved],Liens in respect of Wells Fargo Cash Collateral

(r)     [reserved],other Liens which do not secure Indebtedness for borrowed money as to which the aggregate amount of obligations secured thereby does not exceed $100,000, and

(s)     Liens or rights of setoff against credit balances of Borrowers with Credit Card Issuers or Credit Card Processors or amounts owing by such Credit Card Issuers or Credit Card Processors to Borrowers in the ordinary course of business, but not Liens on or rights of setoff against any other property or assets of Borrowers, pursuant to the Credit Card Agreements to secure the obligations of Borrowers to the Credit Card Issuers or Credit Card Processors as a result of fees and chargebacks,.

(t)     Liens arising out of Sale-Leaseback permitted under clause (q) of the definition of Permitted Dispositions,

(u)     other Liens which do not secure Indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed $1,000,000, and

(v)     Liens in favor of the ABL Agent securing ABL Obligations subject in all respect to, and to the extent such Liens comply with, the Intercreditor Agreement; provided that any such Liens on any Term Priority Collateral are junior to the Liens on the Term Priority Collateral securing the Obligations.

"Permitted Policy Investments" means Investments permitted in accordance with Administrative Borrower's investment policy delivered to Agent prior to the Closing Date and adopted by the Board of Directors of Administrative Borrower as in effect as of the Closing Date or as otherwise updated from time to time in consultation with Agent and otherwise reasonably satisfactory to Agent.

"Permitted Protest" means the right of any Loan Party or any of its Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), Taxes (other than payroll Taxes or Taxes that are the subject of a United States federal tax lien), or rental payment; provided, that (a) a reserve with respect to such obligation is established on such Loan Party's or its Subsidiaries' books and records in such

amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Loan Party or its Subsidiary, as applicable, in good faith, and (c) Agent is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity (unless Agent has taken a Reserve (or has elected to not take a Reserve at a time that Borrowers have sufficient Availability therefor) for the amount of Tax or rental payment), or priority of any of Agent's Liens.

"Permitted Purchase Money Indebtedness" means, as of any date of determination, Indebtedness (other than the Obligations, but including Capitalized Lease Obligations), incurred after the Closing Date(i) existing as of the Amendment No. 3 Effective Date and set forth on Schedule 4.14(a) or (ii) as otherwise provided in the applicable Financing Order and the Approved Budget and at the time of, or within 20 days after, the acquisition of any fixed assets for the purpose of financing all or any part of the acquisition cost thereof, in an aggregate principal amount outstanding at any one time not in excess of $2,500,000.

"Person" means natural persons, corporations, limited liability companies, unlimited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Petition Date" means the date of the commencement of the Chapter 11 Cases.

"Post-Petition Collateral" means, collectively, all now existing and hereafter acquired real and personal property of each Debtor's and each other Loan Party's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Agent and Lenders pursuant to the Loan Documents or the applicable Financing Order, but in the case of the other Loan Parties, subject to any local law guarantee and security limitations, and shall include, without limitation:

    (a)    all of the Pre-Petition Collateral;

    (b)    all accounts, chattel paper, deposit accounts, documents (as defined in the UCC and "documents of title" as defined in the PPSA, as applicable), equipment, general intangibles (as defined in the UCC and "documents of title" as defined in the PPSA, as applicable), instruments, inventory, investment property and any supporting obligations related to any of the foregoing (including, without limitation, the Stalking Horse Purchase Agreement);

    (c)    the commercial tort claims described on Schedule 1 to the Guaranty and Security Agreement and on any supplement thereto received by Agent pursuant to the terms thereof;

    (d)    all books and records pertaining to the Collateral;

    (e)    all property of such Debtor or such other Loan Party held by any member of the Lender Group, including all property of every description, in the custody of or in transit to such Person for any purpose, including safekeeping, collection or pledge, for the account of such Debtor or such other Loan Party or as to which such Debtor or such other Loan Party may have any right or power, including but not limited to cash;

    (f)    all other goods (including but not limited to fixtures) and personal property of such Debtor or other Loan Party, whether tangible or intangible and wherever located;

    (g)    all proceeds recovered by or on behalf of each Debtor and each other Loan Party or any trustee of any Debtor or any other Loan Party (whether in the Chapter 11 Cases or any subsequent

case to which any of the Chapter 11 Cases is converted) as a result of transfers or obligations avoided or actions maintained or taken pursuant to sections 542, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code or other Debtor Relief Laws, subject to the entry of the Final Financing Order ("Avoidance Proceeds");

(h)     all assets of such Debtor or such Loan Party not otherwise subject to a valid and enforceable Lien in favor of Agent on the Petition Date, subject to the entry of the Interim Financing Order;

(i)     all "Collateral" referred to in the Financing Order, it being understood that "Post-Petition Collateral" shall include all such "Collateral," irrespective of whether any such property was excluded pursuant to the Pre-Petition Credit Agreement or any other Pre-Petition Loan Document; and

(j)     to the extent not otherwise included, all proceeds of the foregoing.

"Post-Petition Obligations" means all Obligations arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Cases, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Cases, and whether arising under or related to this Agreement, the other Loan Documents, a Financing Order, by operation of law or otherwise, and whether incurred by such Debtor or any other Loan Party as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession facility fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

"PPSA" means the Personal Property Security Act (Ontario), including the regulations and minister's orders made pursuant thereto, provided that if perfection or the effect of perfection or non-perfection or the priority of any Lien created hereunder or under any other Loan Document on the Collateral is governed by the personal property security legislation or other applicable legislation with respect to personal property security in effect in a jurisdiction in Canada other than the Province of Ontario, "PPSA" means the Personal Property Security Act or such other applicable legislation (including the Civil Code of Quebec and the regulations thereunder) in effect from time to time in such other jurisdiction in Canada for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Pre-Petition" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"Pre-Petition Collateral" means, collectively, (a) all "Collateral" as such term is defined in the Pre-Petition Credit Agreement as in effect immediately prior to the Petition Date, (b) all "Collateral" as such terms are defined in each of the other Pre-Petition Loan Documents as in effect immediately prior to the Petition Date, and (c) all other security for the Pre-Petition Obligations as provided in the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents immediately prior to the Petition Date.

"Pre-Petition Credit Agreement" shall mean this Agreement as in effect immediately prior to the Amendment No. 3 Effective Date.

"Pre-Petition Loan Documents" shall mean the "Loan Documents" under and as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Obligations" means all Obligations arising at any time before the Petition Date.

"Pre-Petition Term Loan" shall have the meaning specified in Section 2.1(a)(i).

"Pre-Petition Term Loan Commitments" means, with respect to each Term Lender, the commitment of such Term Lender to make the Pre-Petition Term Loan on the Closing Date. The aggregate amount of the Pre-Petition Term Loan Commitments on the Amendment No. 3 Effective Date is $0.00.

"Prior Week" means, as of any date of determination, the immediately preceding week ended on a Friday and commencing on the prior Saturday.

"Projections" means Borrowers' forecasted (a) balance sheets, (b) profit and loss statements, and (c) cash flow statements, all prepared on a basis consistent with Borrowers' historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.

"Pro Rata Share" means, as of any date of determination:

(a)    with respect to ~~a Lender's obligation to make all or a portion of the Term Loan, with respect to such Lender's right to receive payments of interest, fees, and principal with respect to the Term Loan, and with respect to all other computations and other matters related to the Term Loan~~any Revolving Lender, the percentage obtained by dividing (i) ~~the Term Loan of~~ such ~~Lender~~Lender's Revolving Commitment, by (ii) the aggregate amount of ~~the Term Loan of all Lenders,~~all Revolving Commitments of all Revolving Lenders (provided, that if the Revolving Commitments have terminated or expired, the Pro Rata Shares of the Revolving Lenders shall be determined based upon the Revolving Exposure of the Revolving Lenders at such time of determination) and

(b)    with respect to ~~all other matters and for all other matters as to a particular Lender (including the indemnification obligations arising under Section 15.7 of this Agreement)~~the Term Loan, the percentage obtained by dividing (i) the Term Loan of such Lender, by (ii) the aggregate amount of the Term Loan of all Lenders~~, in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to Section 13.1~~.

"Protective Advance" has the meaning specified therefor in Section 2.16.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. § 5390(c)(8)(D).

"QFC Credit Support" has the meaning specified therefor in Section 17.15 of this Agreement.

"Qualified Equity Interests" means and refers to any Equity Interests issued by Administrative Borrower (and not by one or more of its Subsidiaries) that is not a Disqualified Equity Interest.

"Real Property" means any estates or interests in real property now owned or hereafter acquired by any Loan Party or one of its Subsidiaries and the improvements thereto.

"Real Property Collateral" means any Real Property with a fair market value in excess of $500,000 hereafter acquired by any Loan Party or one of its Subsidiaries.

"Receivable Reserves" means, as of any date of determination, Dilution Reserves and those other reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to

Section 2.1(c), to establish and maintain with respect to the Eligible Accounts or the Eligible Credit Card Receivables.

"Recipient" means any Lender and the Agent.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Refinancing Indebtedness" means refinancings, renewals, or extensions of Indebtedness so long as:

(a)    such refinancings, renewals, or extensions do not result in an increase in the principal amount of the Indebtedness so refinanced, renewed, or extended, other than by the amount of premiums paid thereon and the fees and expenses incurred in connection therewith and by the amount of unfunded commitments with respect thereto,

(b)    such refinancings, renewals, or extensions do not result in a shortening of the final stated maturity or the average weighted maturity (measured as of the refinancing, renewal, or extension) of the Indebtedness so refinanced, renewed, or extended, nor are they on terms or conditions that, taken as a whole, are or could reasonably be expected to be materially adverse to the interests of the Lenders,

(c)    if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension must include subordination terms and conditions that are at least as favorable to the Lender Group as those that were applicable to the refinanced, renewed, or extended Indebtedness,

(d)    the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended,

(e)    if the Indebtedness that is refinanced, renewed or extended was unsecured, such refinancing, renewal or extension shall be unsecured, and

(f)    if the Indebtedness that is refinanced, renewed, or extended was secured (i) such refinancing, renewal, or extension shall be secured by substantially the same or less collateral as secured such refinanced, renewed or extended Indebtedness on terms no less favorable to Agent or the Lender Group and (ii) the Liens securing such refinancing, renewal or extension shall not have a priority more senior than the Liens securing such Indebtedness that is refinanced, renewed or extended.

"Register" has the meaning set forth in Section 13.1(h) of this Agreement.

"Registered Loan" has the meaning set forth in Section 13.1(h) of this Agreement.

"Related Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Relevant Governmental Body" means the Board of Governors or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors or the Federal Reserve Bank of New York, or any successor thereto.

"Remaining Term Loan" has the meaning specified therefor in Section 2.1(a)(i) of this Agreement.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Replacement Lender" has the meaning specified therefor in Section 2.13(b) of this Agreement.

"Report" has the meaning specified therefor in Section 15.16 of this Agreement.

"Required Lenders" means, at any time, Lenders having or holding more than 50% of the aggregate amount of the ~~Term Loan~~Total Credit Exposure of all Lenders; provided, that (i) the ~~Term Loan~~Total Credit Exposure of any Defaulting Lender shall be disregarded in the determination of the Required Lenders, and (ii) at any time there are two or more Lenders (who are not Affiliates of one another or Defaulting Lenders), "Required Lenders" must include at least two Lenders (who are not Affiliates of one another).

"Reserves" means, as of any date of determination, the Carve Out Reserve, Inventory Reserves, Intellectual Property Reserves, Receivable Reserves, ~~the Nautilus Dutch Reserve~~, and those other reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.1(c), to establish and maintain (including reserves with respect to (a) sums that any Loan Party or its Subsidiaries are required to pay under any Section of this Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the ~~Term Priority~~ Collateral) and has failed to pay, and (b) amounts owing by any Loan Party or its Subsidiaries to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than a Permitted Lien), which Lien or trust, in the Permitted Discretion of Agent likely would have a priority superior to the Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for ad valorem, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral) with respect to the Aggregate Borrowing Base or any Borrowing Base~~; provided that "Reserves" shall be without duplication of any ABL Reserves~~.  Without limiting the generality of the foregoing, Reserves may include (but are not limited to), without duplication, such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate based on: (i) Landlord Reserves in respect of locations where ~~Term Priority~~ Collateral is located; (ii) salaries, wages and benefits due to employees of any Borrower which may have priority over the interests of the Agent in the ~~Term Priority~~ Collateral; (iii) reasonably anticipated changes in the Appraised Value of Eligible IP between appraisals; (iv) the Intellectual Property Reserves ~~and~~, (~~vii~~v) the Canadian Priority Payables Reserves~~.~~, (vi) the amount of any senior liens or claims in or against the Collateral that, in Lender's determination, have priority over the liens or claims of Agent or any other member of the Lender Group, and (vii) the amount of priority or

administrative expense claims that, in Agent's determination, may be required to be paid by Debtors or their estates at any time during the Chapter 11 Cases.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the director, chief executive officer, president, vice president, chief financial officer, chief legal officer, treasurer, assistant treasurer, or other similar officer of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means (a) any declaration or payment of any dividend or the making of any other payment or distribution, directly or indirectly, on account of Equity Interests issued by Administrative Borrower or any of its Subsidiaries (including any payment in connection with any merger, amalgamation or consolidation involving Administrative Borrower) or to the direct or indirect holders of Equity Interests issued by Administrative Borrower or any of its Subsidiaries in their capacity as such (other than dividends or distributions payable in Qualified Equity Interests issued by Administrative Borrower or any of its Subsidiaries, or (b) any purchase, redemption, making of any sinking fund or similar payment, or other acquisition or retirement for value (including in connection with any merger, amalgamation or consolidation involving Administrative Borrower) any Equity Interests issued by Administrative Borrower or any of its Subsidiaries, or (c) any making of any payment to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire Equity Interests of Administrative Borrower now or hereafter outstanding.

"Revolving Borrowing" means a Borrowing consisting of Revolving Loans.

"Revolving Commitment" means, with respect to each Revolving Lender, the commitment hereunder of such Revolving Lender to make Revolving Loans in an aggregate outstanding amount not exceeding the amount of such Revolving Lender's Revolving Commitment as set forth on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Revolving Lender shall have assumed its Revolving Commitment in accordance with Section 13.1, as applicable, as such Revolving Commitment may be adjusted from time to time pursuant to Section 2.16 or pursuant to assignments by or to such Revolving Lender pursuant to Section 13.1.

"Revolving Credit Maximum Amount" means the aggregate amount of the Revolving Commitments at any time, as such amount may be increased or reduced from time to time pursuant to the terms hereof. The initial Revolving Credit Maximum Amount on the Amendment No. 3 Effective Date is $9,000,000.

"Revolving Exposure" means, as to any Lender at any time, the sum of the outstanding principal amounts of its Revolving Loans.

"Revolving Lender" means a Lender having a Revolving Commitment or, if the Revolving Commitments have expired or terminated, having Revolving Exposure.

"Revolving Line Cap" means, as of any date of determination, the lesser of (a) Revolving Credit Maximum Amount and (b) the result of (i) the Aggregate Borrowing Base as of such date of determination, less (ii) the Total Term Loan Outstandings at such time.

"Revolving Loan" means a loan referred to in Section 2.1(a)(iii) and made pursuant to Section 2.2.

"Sale" has the meaning specified in paragraph 2 of Schedule 5.21.

"Sale–Leaseback" means any transaction or series of related transactions pursuant to which Administrative Borrower or any of its Subsidiaries (a) disposes of any property, real or personal (other than Accounts, Credit Card Receivables, Inventory, or IP), used or useful in its business, whether now owned or hereafter acquired, and (b) as part of such transaction or such series of related transactions, thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property so disposed of.

"Sanctioned Entity" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC or the Government of Canada.

"Sanctioned Person" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority (including the Government of Canada), (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) His Majesty's Treasury of the United Kingdom, (e) the Government of Canada, or (f) any other Governmental Authority with jurisdiction over any member of Lender Group or any Loan Party or any of their respective Subsidiaries or Affiliates.

"S&P" has the meaning specified therefor in the definition of Cash Equivalents.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Securities Account" means a securities account (as that term is defined in the Code or the PPSA, as applicable).

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"SLR" means Crystal Financial LLC d/b/a SLR Credit Solutions and/or any of its Affiliates from time to time party hereto as a Lender.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the Term SOFR Administrator.

"SOFR Loan" means a Loan that bears interest at a rate determined by reference to Adjusted Term SOFR.

"Solvent" means, with respect to any Person as of any date of determination, that (a) at fair valuations, the sum of such Person's debts (including contingent liabilities) is less than all of such Person's assets, (b) such Person is not engaged or about to engage in a business or transaction for which the remaining assets of such Person are unreasonably small in relation to the business or transaction or for which the property remaining with such Person is an unreasonably small capital, (c) such Person has not incurred and does not intend to incur, or reasonably believe that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise), (d) such Person is "solvent" or not "insolvent", as applicable within the meaning given those terms and similar terms under applicable laws relating to fraudulent transfers and conveyances, and (e) as to any Person domiciled in Canada or organized under Canadian ~~Loan Party~~law, such ~~Canadian Loan Party~~Person is not an "insolvent person" as defined in the Bankruptcy and Insolvency Act (Canada).  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Spare Parts Inventory Advance Rate" means (a) with respect to Domestic Borrowers, 92.5%; provided, however, from and after March 31, 2024, such advance rate shall automatically reduce by an amount equal to 0.625% on the last day of each calendar quarter until such advance rate equals 90% and (b) with respect to Canadian Borrowers, 87.5%; provided, however, from and after March 31, 2024, such advance rate shall automatically reduce by an amount equal to 0.625% on the last day of each calendar quarter until such advance rate equals 85%.

"Special Foreign Subsidiary Investments" means any payments, advances, or other Investments made by any Loan Party to Nautilus Swiss and/or Nautilus Fitness Equipments in the ordinary course of business and consistent with past practices, whether pursuant to intercompany service agreements or otherwise, which permit Nautilus Swiss and/or Nautilus Fitness Equipments to fund (i) payroll, rent, and/or miscellaneous nominal travel and office expenses of Nautilus Swiss or Nautilus Fitness Equipments, as the case may be, in the ordinary course of business and consistent with past practices and/or (ii) fees as may be required to maintain the existence or effect the dissolution or liquidation of Nautilus Swiss and/or Nautilus Fitness Equipments or as otherwise required by applicable law.

~~"Spare Parts Inventory Advance Rate" means (a) with respect to Domestic Borrowers, 10%; provided, however, from and after March 31, 2023, such advance rate shall automatically reduce by an amount equal to 0.625% on the last day of each calendar quarter until such advance rate equals 10% and (b) with respect to Canadian Borrowers, 90%; provided, however, from and after March 31, 2023, such advance rate shall automatically reduce by an amount equal to 0.625% on the last day of each calendar quarter until such advance rate equals 85%.~~

"Specified Transactions" has the meaning assigned to such term in Amendment No. 1.

~~"Springing Trigger Event" means if at any time ABL Availability is less than the greater of (i) 12.5% of the Combined Line Cap (excluding the effect, if any, of any Term Pushdown Reserve), and (ii) the Applicable ABL Availability Amount.~~

"Spot Rate" means on any date, as determined by the Agent, the spot selling rate posted by Reuters on its website for the sale of the applicable currency for Dollars at approximately 11:00 a.m., New York City time, on such date; provided, that if, for any reason, no such spot rate is being quoted, the spot selling rate shall be determined by reference to such publicly available services for displaying exchange rates as may be reasonably selected by the Agent, or, in the event no such service is selected, such spot selling rate shall instead be the rate reasonably determined by the Agent as the spot rate of exchange in the market where its foreign currency exchange operations in respect of the applicable currency are then being conducted, at or about 11:00 a.m., New York City time, on the applicable date for the purchase of the relevant currency for delivery two Business Days later.

~~"Subject Holder" has the meaning specified therefor in Section 2.4(e)(v) of this Agreement.~~

"Stalking Horse Purchase Agreement" means that certain Asset Purchase Agreement, dated as of Amendment No. 3 Effective Date, by and among the Stalking Horse Sellers and the Stalking Horse Purchaser.

"Stalking Horse Purchaser" means Johnson Health Tech Retail, Inc., a Washington corporation.

"Stalking Horse Sellers" means BowFlex and Nautilus Canada.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the Equity Interests having ordinary voting power to elect a majority of the Board of Directors of such corporation, partnership, limited liability company, or other entity.

"Supermajority Lenders" means, at any time, Lenders having or holding more than 66-2/3% of the aggregate amount of the ~~Term Loan~~Total Credit Exposure of all Lenders; provided, that (i) the ~~Term Loan~~Total Credit Exposure of any Defaulting Lender shall be disregarded in the determination of the Supermajority Lenders, and (ii) at any time there are two or more Lenders (who are not Affiliates of one another), "Supermajority Lenders" must include at least two Lenders (who are not Affiliates of one another or Defaulting Lenders).

"Superpriority Claim" shall have the meaning specified in Section 5.23(a).

"Supported QFC" has the meaning specified therefor in Section 17.15 of this Agreement.

"Swap Obligation" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swiss Security Documents means, collectively, (a) that certain Swiss law governed share pledge agreement, dated April 14, 2023, by and between BowFlex, as Pledgor, the Agent as Agent and pledgee, acting as direct representative (*direkter Stellvertreter*) in the name and for the account of all Secured Parties and the Secured Parties as Pledgees represented for all purposes thereof by the Agent as direct representative (*direkter Stellvertreter*) (each as defined therein), (b) that certain Swiss law governed security assignment agreement, dated April 14, 2023, by and between Nautilus Swiss as Assignor and the Agent acting in its own name but as fiduciary for the account of the Secured Parties (as defined therein), (c) that certain Swiss law governed IP pledge agreement, dated April 14, 2023, by and between Nautilus Swiss as Pledgor, the Agent as Agent and pledgee, acting as direct representative (*direkter Stellvertreter*) in the name and for the account of all Secured Parties and the Secured Parties as Pledgees represented for all purposes thereof by the Agent as direct representative (*direkter Stellvertreter*) (each as defined therein), (d) that certain Swiss law governed bank accounts pledge Agreement, dated 14 April 2023 by

and between Nautilus Swiss as Pledgor, the Agent acting in its own name but as fiduciary for the account of the Secured Parties (each as defined therein) and the Secured Parties as Pledgees represented for all purposes thereof by the Agent as direct representative (*direkter Stellvertreter*) (each as defined therein), (e) that certain letter agreement, dated as of February 28, 2024, by and between the Agent and Nautilus Swiss in respect of the Domestic Swiss Accounts (as defined therein) governed by the laws of the State of New York, (f) that certain Deposit Account Control Agreement (Access Restricted After Notice), dated as of February 28, 2024, by and among Nautilus Swiss, the Agent, and Wells Fargo Bank, National Association governed by the laws of the State of New York, and (g) any other Loan Document governed by Swiss law.

"Tax Lender" has the meaning specified therefor in Section 14.2(a) of this Agreement.

"Taxes" means any taxes, levies, imposts, duties, fees, assessments, withholdings (including backup withholdings) or other fees or charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein, and all interest, penalties, additions to tax, or similar liabilities with respect thereto.

"Term Loan" has the meaning specified therefor in Section 2.1 of this Agreement.

"Term Lender" means a Lender with an outstanding Term Loan Amount" means $30,000,000.

"Term Loan Borrowing Base Certificate" means a certificate substantially in the form of Exhibit B-1 to this Agreement, which such form of the Term Loan Borrowing Base Certificate may be amended, restated, supplemented or otherwise modified from time to time (including without limitation, changes to the format thereof), as satisfactory to Agent in Agent's Permitted Discretion." has the meaning specified therefor in Section 2.1(a)(ii) of this Agreement.  On the Amendment No. 3 Effective Date, the outstanding principal amount of the Term Loan is $15,999,234.76 (for the avoidance of doubt, exclusive of interest, fees, costs and other non-principal charges).

"Term Loan Exposure" means, with respect to any Lender, as of any date of determination (a) prior to the funding of the Term Loan, the amount of such Lender's Commitment, and (b) after the funding of the Term Loan, the outstanding principal amount of the Term Loan held by such Lender.

"Term Loan Priority Account" shall mean (a) that certain Deposit Account in the name of BowFlex held at Wells Fargo with the account # ending x6574 or (b) any other Deposit Account designated in writing to the Administrative Borrower by the Agent from time to time.

"Term Loan Priority Account" has the meaning set forth for such term in the Intercreditor Agreement.

"Term Priority Collateral" has the meaning set forth for such term in the Intercreditor Agreement.

"Term Pushdown Reserve" means, at any time, an amount equal to the greater of (a) $0 and (b) the amount, if any, by which the outstanding principal amount of the Term Loan (including, for the avoidance of doubt, any Additional Portion of the Term Loan) exceeds the Aggregate Borrowing Base. The Loan Parties hereby agree and acknowledge that the ABL Agent has agreed at all times to implement and maintain the Term Pushdown Reserve against the ABL Borrowing Base, as and when applicable.

"Term SOFR" means for any Determination Date, the Term SOFR Reference Rate for a tenor of three (3) months on the day (such day, the "Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Determination Date, as such rate is

published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator; provided that if Term SOFR as so determined shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor

"Term SOFR Adjustment" means a percentage equal to 0.26161% per annum.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by Agent in its reasonable discretion).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Total Credit Exposure" means, with respect to any Lender at any time, the unused Commitments, Revolving Exposure and the Term Loan Exposure of such Lender at such time.

"Total Outstandings" means at any time, the sum of the Total Revolving Outstandings and the Total Term Loan Outstandings at such time.

"Total Revolving Outstandings" means at any time, the aggregate outstanding principal amount of all Revolving Loans at such time.

"Total Term Loan Outstandings" means, at any time, the aggregate outstanding principal amount of all Term Loans at such time.

"Trademark Security Agreement" has the meaning specified therefor in the Guaranty and Security Agreement or the Canadian Guaranty and Security Agreement, as applicable.

"Transfer" has the meaning specified therefor in Section 2.16.

"Transfer Date" has the meaning specified therefor in Section 2.16.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"UK Security Documents" means (a) the security agreement between the UK Loan Party and the Agent dated March 14, 2023, (b) the share charge between Nautilus Dutch and the Agent dated March 14, 2023, (c) the supplemental security agreement between the UK Loan Party and the Agent dated as of the Amendment No. 3 Effective Date, (d) the supplemental share charge between Nautilus Dutch and the Agent dated Amendment No. 3 Effective Date, and (e) any other Loan Document governed by the laws of the United Kingdom.

"UK Loan Party" means Nautilus Fitness UK Ltd., a private limited company incorporated under the laws of England and Wales with a registered office address of 1 Park Row, Leeds, United Kingdom, LS1 5AB and with registered number 06106451 in the United Kingdom.

"Unadjusted Benchmark Replacement" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"Unfinanced Capital Expenditures" means Capital Expenditures (a) not financed with the proceeds of any incurrence of Indebtedness (other than the incurrence of any ~~ABL Revolving Loans or the Term~~ Loan), the proceeds of any sale or issuance of Equity Interests or equity contributions, the proceeds of any asset sale (other than sale of Inventory in the ordinary course of business) or any insurance proceeds, and (b) that are not reimbursed by a third person (excluding any Loan Party or any of its Affiliates) in the period such expenditures are made pursuant to a written agreement.

"United States" means the United States of America.

"Unused Line Fee" shall have the meaning specified in Section 2.10(b).

"U.S. Government Securities Business Day" means any Business Day, except any Business Day on which any of the Securities Industry and Financial Markets Association, the New York Stock Exchange or the Federal Reserve Bank of New York is not open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable. "U.S. Special Resolution Regimes" has the meaning specified therefor in Section 17.15 of this Agreement.

"U.S. Trustee" means the United States Trustee applicable to the Chapter 11 Cases.

"US Octane Fitness" means US Octane Fitness Limited, a company organized under the laws of Hong Kong and a wholly-owned Subsidiary of ~~Nautilus~~BowFlex.

~~"Vi Purchase Agreement" has the meaning assigned to such term in Amendment No. 1.~~

~~"Vi Transaction" has the meaning assigned to such term in Amendment No. 1.~~

"Voidable Transfer" has the meaning specified therefor in Section 17.8 of this Agreement.

"Wells Fargo" means Wells Fargo Bank, National Association, a national banking association.

"Wells Fargo Cash Collateral" means, collectively, the Letter of Credit Cash Collateral and the Bank Product Cash Collateral under and as defined in the Wells Fargo Payoff Letter as in the effect on the Amendment No. 3 Effective Date.

"Wells Fargo Payoff Letter" has the meaning given to such term in Amendment No. 3.

"Withdrawal Liability" means liability with respect to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part 1 of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any

powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Notwithstanding anything to the contrary herein or in any other Loan Document, any reference to a defined term as defined in the ABL Credit Agreement or any other ABL Facility Document shall refer to the definition of such term as in effect on the date hereof (including with respect to any component definitions (or any sub-component definitions)), except with respect to any amendment or modification thereto (or to any component definitions (or any sub-component definitions)) that is permitted by this Agreement or the Intercreditor Agreement or is otherwise consented to by the Agent.

1.2    **Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, that if Administrative Borrower notifies Agent that Borrowers request an amendment to any provision hereof to eliminate the effect of any Accounting Change occurring after the Closing Date or in the application thereof on the operation of such provision (or if Agent notifies Administrative Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such Accounting Change or in the application thereof, then Agent and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of the Lenders and Borrowers after such Accounting Change conform as nearly as possible to their respective positions immediately before such Accounting Change took effect and, until any such amendments have been agreed upon and agreed to by the Required Lenders, the provisions in this Agreement shall be calculated as if no such Accounting Change had occurred. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrowers" is used in respect of a financial covenant or a related definition, it shall be understood to mean the Loan Parties and their Subsidiaries on a consolidated basis, unless the context clearly requires otherwise. Notwithstanding anything to the contrary contained herein, (a) all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards Board's Accounting Standards Codification Topic 825 (or any similar accounting principle) permitting a Person to value its financial liabilities or Indebtedness at the fair value thereof, (b) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Financial Accounting Standards Board's Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof, and (c) the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that is (i) unqualified, and (ii) does not include any explanation, supplemental comment, or other comment concerning the ability of the applicable Person to continue as a going concern or concerning the scope of the audit.

1.3    **Code and PPSA**.  Any terms used in this Agreement that are defined in the Code or the PPSA shall be construed and defined as set forth in the Code, or the PPSA, as applicable, unless otherwise defined herein; provided, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

1.4    **Construction**.

(a)    Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (a) the payment or repayment in full in immediately available funds of (i) the principal amount of, and interest accrued and unpaid with respect to, all outstanding Loans, together with the payment of any premium applicable to the repayment of the Loans, (including any interest, fees and other charges accruing during the Chapter 11 Cases (whether or not allowed in such proceeding)), (ii) all Lender Group Expenses that have accrued and are unpaid regardless of whether demand has been made therefor, and (iii) all fees or charges that have accrued hereunder or under any other Loan Document and are unpaid, (b) [reserved], (c) [reserved], (d) the receipt by Agent of cash collateral in order to secure any other contingent Obligations for which a claim or demand for payment has been made on or prior to such time or in respect of matters or circumstances known to Agent or a Lender at such time that are reasonably expected to result in any loss, cost, damage, or expense (including attorneys' fees and legal expenses), such cash collateral to be in such amount as Agent reasonably determines is appropriate to secure such contingent Obligations, and (e) the payment or repayment in full in immediately available funds of all other outstanding Obligations other than unasserted contingent indemnification Obligations and (f) the termination of all Commitments of the Lenders. Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.

(b)    For purposes of any Collateral located in the Province of Quebec or charged by any hypothec and for all other purposes pursuant to which the interpretation or construction of this Agreement or any other Loan Document may be subject to the laws of the Province of Quebec or a court or tribunal exercising jurisdiction in the Province of Quebec, (i) "personal property" shall include "movable property", (ii) "real property" shall include "immovable property", (iii) "tangible property" shall include "corporeal property", (iv) "intangible property" shall include "incorporeal property", (v) "security interest", "mortgage" and "lien" shall include a "hypothec", "prior claim" and a "resolutory clause", (vi) all references to filing, registering or recording under the UCC or PPSA shall include publication under the Civil Code of Quebec, (vii) all references to "perfection" of or "perfected" Liens shall include a reference to "opposable" or "set up" Liens as against third parties, (viii) any "right of offset", "right of setoff" or similar expression shall include a "right of compensation", (ix) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (x) an "agent" shall include a "mandatary", (xi) "construction liens" shall include "legal hypothecs in favour of persons having taken part in the construction or renovation of an immovable", (xii) "joint and several" shall include solidary and "jointly and severally" shall include "solidarily", (xiii) "gross negligence or willful misconduct" shall be deemed to be "intentional or gross fault", (xiv) "beneficial ownership" shall include "ownership on behalf of another as mandatary", (xv) "easement"

shall include "servitude", (xvi) "priority" shall include "prior claim" or rank, as applicable, (xvii) "survey" shall include "certificate of location and plan", (xviii) "fee simple title" or "fee owned" shall include "absolute ownership" and "ownership" (including ownership under a right of superficies), (xix) "ground lease" shall include an "emphyteusis" or a "lease with a right of superficies", as applicable, (xx) "account" and "accounts receivable" shall include "claims", (xxi) "guarantee" and "guarantor" shall include "suretyship" and "surety", respectively, (xxii) "foreclosure" shall include "the exercise of a hypothecary right of taking in payment", (xxiii) "leasehold interest" shall include "rights resulting from a lease", ~~and~~ (xxiv) "lease" shall include a "leasing contract (*crédit-bail*)", and (xxv) "deposit account" or "DDA" shall be deemed to include a "financial account (within the meaning of Article 2713.6 of the Civil Code of Quebec).  The parties hereto confirm that it is their wish that this Agreement and any other document executed in connection with the transactions contemplated hereby be drawn up in the English language only and that all other documents contemplated hereunder or relating hereto, including notices, shall also be drawn up in the English language only. *Les parties aux présentes confirment que c'est leur volonté que cette convention et les autres documents de crédit soient rédigés en langue anglaise seulement et que tous les documents, y compris tous avis, envisagés par cette convention et les autres documents peuvent être rédigés en langue anglaise seulement.*

(c)     All references to the terms "Borrowers", "Guarantors" or "Debtors" in the Loan Documents shall be deemed and each such reference is hereby amended to mean and include (as applicable) the Debtors (as defined herein), and their successors and assigns (including any trustee or other fiduciary hereafter appointed as any Debtor's legal representative, as applicable, or with respect to any Debtor the property of the estate of such Debtor whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case or cases and its successor upon conclusion of the Chapter 11 Case of such Debtor, as the case may be).

(d)     All references to the term "Collateral" in this Agreement or the other Loan Documents, or any other term referring to the security for the Pre-Petition Obligations, shall be deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

(e)     All references to the term "Agreement" in the Pre-Petition Credit Agreement or the term "Credit Agreement" in the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean the Agreement, and as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms of Amendment No. 3 and the applicable Financing Order.

(f)     All references to the term "Loan Documents" in the Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, all of the Pre-Petition Loan Documents, as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms of Amendment No. 3, as amended and supplemented thereby, and the applicable Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(g)     All references to the term "Obligations" in this Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

1.5     **Time References**.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, all references to time of day refer to Eastern standard time or Eastern daylight saving time, as in effect in Boston, Massachusetts, on such day. For purposes of the computation of a period of time from a specified date to a later specified date, unless otherwise expressly provided, the word "from" means "from and including" and the words "to" and "until" each means "to and including";

provided, that with respect to a computation of fees or interest payable to Agent or any Lender, such period shall in any event consist of at least one full day.

1.6    **Schedules and Exhibits**.  All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

1.7    **Divisions**.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

1.8    **Rates**.  Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, or with respect to any alternative, successor or replacement rate thereto (including any then-current Benchmark or any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement), as it may or may not be adjusted pursuant to Section 2.12(a)(i), will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark, prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto and such transactions may be adverse to a Borrower. Agent may select information sources or services in its reasonable discretion to ascertain the Term SOFR Reference Rate, Adjusted Term SOFR, or Term SOFR, or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to any Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

1.9    **Exchange Rates; Excess Resulting for Exchange Rate Changes**.

(a)    Unless stated otherwise, all calculations, comparisons, measurements or determinations under this Agreement shall be made in Dollars. For the purpose of such calculations, comparisons, measurements or determinations, amounts or proceeds denominated in other currencies shall be converted to the Equivalent Amount of Dollars on the date of calculation, comparison, measurement or determination. Unless expressly provided otherwise, where a reference is made to a Dollar amount, the amount is to be considered as the amount in Dollars and, therefore, each other currency shall be converted into the Equivalent Amount thereof in Dollars.

(b)    If at any time following one or more fluctuations in the exchange rate of any applicable currency against the Dollar, the aggregate outstanding principal balance of all Loans and Obligations then outstanding exceeds the aggregate amount of the Commitments, the Aggregate Borrowing Base or any other limitations hereunder based on Dollars, the Loan Parties shall, not later than

the next Business Day, make the necessary payments or repayments to reduce such Obligations to an amount necessary to eliminate such excess.

2.    **LOANS AND TERMS OF PAYMENT.**

2.1    ~~Term Loan~~Loans.

(a)    Term Loans; Revolving Commitments.

(i)    On the Closing Date, each Term Lender made to the Borrowers a term loan in the principal amount equal to its pro rata share of Thirty Million Dollars ($30,000,000) (the "Pre-Petition Term Loan"). Upon the making of the Pre-Petition Term Loan on the Closing Date, the Pre-Petition Term Loan Commitments were irrevocably terminated. For the avoidance of doubt, the principal balance of the Pre-Petition Term Loan immediately prior to the Amendment No. 3 Effective Date was $15,999,234.76 (the "Remaining Term Loan").

(ii)    ~~(a)~~ Subject to the terms and conditions set forth herein, ~~on the Closing Date, each Lender shall make to~~ the Borrowers ~~a term loan in the~~ and each Term Lender and the other parties hereto agree, on the Amendment No. 3 Effective Date, that the Remaining Term Loan shall continue in effect as a term loan hereunder with a principal amount ~~equal to its pro rata share of Thirty Million Dollars ($30,000,000)~~ of $15,999,234.76 (the "Term Loan")~~; provided that, in no event shall the Term Loan made by any Lender exceed the lesser of (i) the amount of such Lender's Commitment or (ii) such Lender's Pro Rata Share of the Borrowing Base (based upon the Term Loan Borrowing Base Certificate delivered by the Borrowers to the Agent on the Closing Date~~ (with the same not constituting a substitution, discharge or novation in any way, shape or form). The Term Loan is not a revolving credit facility and if repaid, may not be redrawn, and any repayments or prepayments of principal on a Term Loan shall permanently reduce such Term Loan. ~~The Borrowers irrevocably authorize the Agent and the Lenders to disburse the proceeds of the Term Loan on the Closing Date in accordance with the terms of this Agreement, as set forth in the Flow of Funds Agreement. Upon the making of the Term Loan on the Closing Date, the Commitments shall be irrevocably terminated.~~

(iii)    Subject to the terms and conditions hereof and relying upon the representations and warranties herein set forth, each Revolving Lender agrees, severally and not jointly, to make Revolving Loans to the Borrowers in Dollars from time to time during the Availability Period in an aggregate principal amount that will not result in (i) such Revolving Lender's Revolving Exposure exceeding such Revolving Lender's Revolving Commitment, (ii) the Total Outstandings exceeding the Line Cap (other than any Overadvances or Protective Advances to the extent permitted to remain outstanding hereunder), or (iii) the Total Revolving Outstandings exceeding the Revolving Line Cap. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrowers may borrow, prepay and reborrow Revolving Loans.

(b)    The outstanding unpaid principal balance and all accrued and unpaid interest on the ~~Term Loan~~Loans and all other Obligations shall be due and payable on the earlier of (i) the Maturity Date, and (ii) the date on which the ~~Term Loan~~Loans otherwise ~~becomes~~become due and payable pursuant to the terms of this Agreement. All principal of, interest on, and other amounts payable in respect of the ~~Term Loan~~Loans shall constitute Obligations hereunder.

(c)    Anything to the contrary in this Section 2.1 notwithstanding, Agent shall have the right (but not the obligation) at any time, in the exercise of its Permitted Discretion, to establish and

DB1/ 139987402.3

increase or decrease Reserves and against each Borrowing Base and the Aggregate Borrowing Base; provided, that Agent shall notify Borrowers at the time any such Reserve in a material amount is to be established or increased, but a non-willful failure of Agent to so notify Borrowers shall not be a breach of this Agreement and shall not cause such establishment or increase of any such Reserve to be ineffective. The amount of any Reserve established by Agent, and any changes to the eligibility criteria set forth in the definitions of Eligible Accounts, Eligible Credit Card Receivables, Eligible Inventory, Eligible Finished Goods Inventory, Eligible Spare Parts Inventory, Eligible In-Transit Inventory, and Eligible IP, shall have a reasonable relationship to the event, condition, other circumstance, or fact that is the basis for such reserve or change in eligibility and shall not be duplicative of any other reserve established and currently maintained or eligibility criteria. Upon notice of or establishment or increase in Reserves, Agent agrees to make itself available to discuss the Reserve or increase, and Borrowers may take such action as may be required so that the event, condition, circumstance, or fact that is the basis for such Reserve or increase no longer exists, in a manner and to the extent reasonably satisfactory to Agent in the exercise of its Permitted Discretion. In no event shall such notice and opportunity limit the right of Agent to establish or change such Reserve, unless Agent shall have determined, in its Permitted Discretion, that the event, condition, other circumstance, or fact that was the basis for such Reserve or such change no longer exists or has otherwise been adequately addressed by Borrowers.

~~(d)   The Loan Parties agree that the Term Pushdown Reserve shall be established, increased or decreased against the ABL Borrowing Base by the ABL Agent at all times that the Term Pushdown Reserve is greater than zero.~~

2.2    **Borrowings of Revolving Loans; Overadvances;** **Protective Advances**.

(a)    Each Borrowing of a Revolving Loan shall be made upon the Administrative Borrower's irrevocable notice to the Agent. Each such notice must be received by the Agent not later than 1:00 p.m. two (2) Business Days in advance of the date of the proposed Borrowing.

(b)    Each notice by the Administrative Borrower pursuant to Section 2.2(a) shall be made by submitting such request by delivering, in writing or by an Approved Electronic Communication, a Borrowing Request in the form of Exhibit D-1 (each such request, a "Borrowing Request"), appropriately completed and signed by a Responsible Officer of the Administrative Borrower. Each Borrowing of Revolving Loans shall be in a principal amount of $100,000 or a whole multiple of $100,000 in excess thereof. Each Borrowing Request shall specify (A) the requested date of the Borrowing (which shall be a Business Day) and (B) the principal amount of Loans to be borrowed.

(c)    Following receipt of a Borrowing Request, the Agent shall promptly notify each applicable Lender of the amount of its Pro Rata Share of the requested Loans, and each Lender shall make the amount of its Loan available to the Agent, by transfer in immediately available funds to the account of the Agent most recently designated by it for such purpose by notice to the Lenders, not later than 1:00 p.m. on the Business Day specified in the applicable Borrowing Request. Upon satisfaction or waiver of the applicable conditions set forth in Section 3.2 (and, if such Borrowing is the initial Revolving Loan hereunder, Section 8 of Amendment No. 3), the Agent shall make all funds so received available to the Borrowers in like funds as received by transfer to the Designated Account.

(d)    The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder, provided that the Commitments of the Lenders are several, and no Lender shall be responsible for any other Lender's failure to make Loans as required

(e)    ~~(a)   The~~Notwithstanding anything herein to the contrary, (i) the Administrative Borrower may request, and the Agent may, in its sole and absolute discretion, make, Revolving Loans to

the Borrowers (such Loan or Loans being herein referred to individually as an "Overadvance" and collectively, as "Overadvances") or (ii) the Agent shall be authorized, in its discretion, at any time, after the occurrence of and during the continuation of an Event of Default to make loans, disbursements and advances ("Protective Advances") to make Revolving Loans to the Borrowers, on behalf of all Lenders, that the Agent, in its Permitted Discretion, deems are necessary or desirable (i) to preserve or protect any Collateral or the Loan Parties' business operations, (ii) to enhance the collectability or repayment of the Obligations, or (iii) to pay any other amount chargeable to or required to be paid by the Loan Parties pursuant to the terms of this Agreement, including payments of principal, interest, fees, premiums (including, without limitation, any Early Termination Premium), reimbursable Lender Group Expenses and other sums payable under the Loan Documents; provided that the aggregate outstanding principal amount of such (such Loan or Loans being herein referred to individually as a "Protective Advance" and collectively as "Protective Advances"); provided, that unless otherwise consented to by all Revolving Lenders, no Overadvances or Protective Advances shall not exceed $4,000,000be permitted to the extent that such Overadvances or Protective Advances would cause the Total Revolving Outstandings to exceed the Revolving Credit Maximum Amount. All Protective Advances shall bear interest at the interest rate set forth in Section 2.6(c). All Protective Advances shall be Obligations secured by the Collateral and shall be payable by the Borrowers on demand by the Agent. Any funding of Protective Advances shall not constitute a waiver by the Agent or the Lenders of any Event of Default. In no event shall the Borrowers or any other Loan Party be deemed to be a beneficiary of this Section nor authorized to enforce any of its terms. For the avoidance of doubt, repayments of Protective Advances shall be without premium or penalty.

(f)    (b) Upon the making of an Overadvance or a Protective Advance by the Agent (whether before or after the occurrence of a Default or Event of Default), each Revolving Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Agent without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Pro Rata Share of the Term Loan. Each Lender shall transfer (a "Transfer") the amount of such Lender's Pro Rata Share of the outstanding principal amount of the applicable Overadvance or Protective Advance with respect to such purchased interest and participation promptly when requested to the Agent, to such account of the Agent as the Agent may designate, but in any case not later than 3:00 p.m. (New York City time), on the Business Day notified (if notice is provided by the Agent prior to 12:00 p.m. (New York City time), and otherwise on the immediately following Business Day (the "Transfer Date"). Transfers may occur during the existence of a Default or Event of Default. If any such amount is not transferred to the Agent by any Lender on such Transfer Date, the Agent shall be entitled to recover such amount on demand from such Lender together with interest thereon, for each day from and including the Transfer Date to but excluding the date of payment to the Agent, at the Federal Funds Rate. From and after the date, if any, on which any Lender is required to fund, and funds, its participation in any Overadvance or Protective Advance purchased hereunder, the Agent shall promptly distribute to such Lender, such Lender's Pro Rata Share of all payments of principal and interest and all proceeds of Collateral received by the Agent in respect of such Overadvance or Protective Advance.

2.3    **Notation; Independent Obligations**.

(a)    **Notation**. Consistent with Section 13.1(h), Agent, as a non-fiduciary agent for Borrowers, shall maintain a register showing the principal amount and stated interest of the portion of the Term LoanLoans owing to each Lender, and the interests therein of each Lender, from time to time and such register shall, absent manifest error, conclusively be presumed to be correct and accurate.

(b)    **Independent Obligations**. The Term LoanLoans shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares. It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make the Termany Loan

73

(or other extension of credit) hereunder, nor shall any Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

2.4    **Payments; Prepayments**.

(a)    **Payments by Borrowers**.

(i)    Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent's Account for the account of the Lender Group and shall be made in immediately available funds, no later than 4:30 p.m. on the date specified herein; provided that, for the avoidance of doubt, any payments deposited into a Controlled Account (as defined in the Guaranty and Security Agreement or the Canadian Guaranty and Security Agreement, as applicable) shall be deemed not to be received by Agent on any Business Day unless immediately available funds have been credited to Agent's Account prior to 4:30 p.m. on such Business Day. Any payment received by Agent in immediately available funds in Agent's Account later than 4:30 p.m. shall be deemed to have been received (unless Agent, in its sole discretion, elects to credit it on the date received) on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)    Unless Agent receives notice from Borrowers prior to the date on which any payment is due to the Lenders that Borrowers will not make such payment in full as and when required, Agent may assume that Borrowers have made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent Borrowers do not make such payment in full to Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the default rate specified in Section 2.6(c) below for each day from the date such amount is distributed to such Lender until the date repaid.

(b)    **Apportionment and Application**.

(i)    So long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all principal and interest payments received by Agent shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses received by Agent (other than fees or expenses that are for Agent's separate account) shall be apportioned ratably among the Lenders having a Pro Rata Share of the Obligation to which a particular fee or expense relates.

(ii)    Subject to Section 2.4(b)(v), Section 2.4(d), and Section 2.4(e), all payments to be made hereunder by Borrowers shall be remitted to Agent and all such payments, and all proceeds of Collateral received by Agent, shall be applied, so long as no Application Event has occurred and is continuing, and except as otherwise provided herein with respect to Defaulting Lenders or as the Agent and the Administrative Borrower may agree, first, to reduce the balance of the ~~Term Loan~~Revolving Loans outstanding and ~~thereafter, to Borrowers (to be wired to the Designated~~ second for deposit into the Eligible Cash Account~~) or such other Person entitled thereto under applicable law~~.

(iii)    At any time that an Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders or as otherwise required by the Agent in its sole discretion, all payments remitted to Agent and, all proceeds of Collateral received by Agent and all amounts contained in the Eligible Cash Account shall be applied as follows:

(A)    *first*, to payment of outstanding Protective Advances funded by the Agent,

(B)    *second*, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Agent under the Loan Documents, until paid in full,

(C)    *third*, to pay any fees or premiums then due to Agent under the Loan Documents, until paid in full,

(D)    *fourth*, ratably, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the Loan Documents, until paid in full,

(E)    *fifth*, ratably, to pay any fees or premiums then due to any of the Lenders under the Loan Documents, including, without limitation, the applicable Early Termination Premium, until paid in full,

(F)    *sixth*, ratably, to pay interest accrued in respect of the Term LoanRevolving Loans, until paid in full,

(G)    *seventh*, ratably, to pay the principal of the Term LoanRevolving Loans, until paid in full,

(H)    *eighth, ratably, to pay interest accrued in respect of the Term Loan, until paid in full,*

(I)    *ninth, ratably, to pay the principal of the Term Loan, until paid in full,*

(J)    (H)  *eighthtenth*, to pay any other Obligations other than Obligations owed to Defaulting Lenders,

(K)    (I)  *nintheleventh*, ratably to pay any Obligations owed to Defaulting Lenders, and

(L)    (J)  *tenthtwelfth*, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.;

(iv)    Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive.

(v)    In each instance, so long as no Application Event has occurred and is continuing, Section 2.4(b)(ii) shall not apply to any payment made by Borrowers to Agent and specified by Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement or any other Loan Document.

(vi)    For purposes of Section 2.4(b)(iii), and without limiting Section 1.4(a), "paid in full" of a type of Obligation means payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement of any Insolvency Proceeding, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(vii)    In the event of a direct conflict between the priority provisions of this Section 2.4 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.4 shall control and govern.

~~(c) **Amortization.** The Borrowers shall repay the Term Loan on the first day of each calendar quarter in quarterly amortization payments in the principal amount of $562,500, with the first such payment due on April 1, 2023. For the avoidance of doubt, scheduled principal and interest payments made on account of the Term Loan in accordance with the terms hereof shall be without premium or penalty.~~

(c)    **Eligible Cash Account**. At the Administrative Borrower's option, not more than once per week and upon not less than one (1) Business Day's prior written notice to the Agent, the Administrative Borrower may request from the Eligible Cash Account a distribution of Eligible Cash. The Agent shall distribute such Eligible Cash to the Designated Account as long as (i) no Default or Event of Default has occurred and is continuing or would result therefrom, (ii) the Eligible Cash Account contains Eligible Cash sufficient to make such distribution, (iii) immediately before and after giving effect to such distribution the Total Revolving Outstandings are $0.00, (iv) the Administrative Borrower has delivered to the Agent a Borrowing Base Certificate as of the date of such proposed withdrawal reflecting that, after giving effect to such withdrawal, the Total Outstandings do not exceed the Line Cap and (v) after giving effect to such withdrawal, the amount of cash, Cash Equivalents, Collections or amounts credited to all DDAs or Securities Accounts of the Domestic Loan Parties and their Domestic Subsidiaries (for the avoidance of doubt, other than the Eligible Cash Account) shall not exceed for all such DDAs and Securities Accounts the sum of (x) $1,500,000 and (y) the Budgeted Disbursement Amount for the week in which such withdrawal is made.

(d)    **Optional Prepayments**.

(i)    Revolving Loans may be borrowed, repaid and prepaid, and reborrowed, in each case on the terms and conditions set forth in this Agreement.

(ii)    Borrowers may, upon at least five Business Days prior written notice to Agent, prepay the principal of the Term Loan, in whole or in part~~; provided that the Borrowers shall pay to the Lenders the Early Termination Premium, if applicable, on the amount prepaid concurrently with such prepayment~~. Each prepayment made pursuant to this Section 2.4(d) shall be accompanied by the payment of accrued interest to the date of such payment on the amount prepaid. Each such prepayment shall be applied against the remaining installments of principal

(if any) due on the Term Loan in the inverse order of maturity (for the avoidance of doubt, any amount that is due and payable on the Maturity Date shall constitute an installment).

(e) **Mandatory Prepayments**.  Unless any amount described in clause (e)(iii) below, solely with respect to ABL Priority Collateral is required to reduce the ABL Obligations in accordance with the terms of the ABL Credit Agreement prior to the Discharge of ABL Obligations, and is actually applied to reduce the ABL Obligations in accordance with the terms of the ABL Credit Agreement (and otherwise subject to the terms of the Intercreditor Agreement):

(i) **Cash Dominion Event/Stoppage Notice**. Unless otherwise agreed to by the Agent in its sole discretion, if a Cash Dominion Event has occurred and is continuing or a Stoppage Notice (as defined in the Inventory Letter Agreement) has been delivered by the ABL Agent to Agent, solely with respect to all collections and proceeds of Collateral in any Deposit Account that is a Term Loan Priority Account (including, without limitation, any Net Cash Proceeds of any voluntary or involuntary sale or disposition of any assets by Nautilus Canada), not later than one (1) Business Day following the date of receipt by any Loan Party or any of its subsidiaries of such proceeds, the Borrowers shall make a prepayment of the Term Loans in an amount equal to 100% of the proceeds then received.

(e) **Mandatory Prepayments**.

(i) **Controlled Accounts; Eligible Cash Account**.

(A) All cash held in the Concentration Account and any Term Loan Priority Account shall be swept on a daily basis to the Agent's Account and be applied by the Agent, *first*, to reduce the balance of the Revolving Loans outstanding and *second* for deposit into the Eligible Cash Account.

(B) At any time and from time to time after the occurrence and during the continuance of an Event of Default, the Agent may, in its sole discretion, cause any or all amounts credited to the Eligible Cash Account (including Eligible Cash) to be swept to the Agent's Account to be applied to prepay the outstanding Obligations in accordance with Section 2.4(f).

(ii) ~~Aggregate Borrowing Base~~Line Cap.  If for any reason (other than on account of ~~Overadvances and~~ Protective Advances permitted to remain outstanding by the Agent), the outstanding principal amount of the Term Loan in its sole and absolute discretion), the Total Outstandings at any time exceeds the sum of (x) the Aggregate Borrowing Base and (y) the Term Pushdown Reserve maintained against the ABL Borrowing Base,Line Cap, the Borrower shall immediately prepay the Term Loan in an aggregate amount equal to such excessoutstanding principal amount of the Obligations in accordance with Section 2.4(f).

(iii) **Dispositions**.  Within one Business Day of the date of receipt by any Loan Party or any of its Subsidiaries of the Net Cash Proceeds of any voluntary or involuntary sale or disposition of assets (other than ABL Priority Collateral) of any Loan Party or any of its Subsidiaries (including Net Cash Proceeds of insurance or arising from casualty losses or condemnations and payments in lieu thereof, but excluding Net Cash Proceeds from sales or dispositions which qualify as Permitted Dispositions under clauses (a), (b), (c), (d), (e), (j), (k), (l), (m), (n), or (o) of the definition of Permitted Dispositions)) whether in the ordinary course of business or not, Borrowers shall prepay the outstanding principal amount of the Obligations in

accordance with <u>Section 2.4(f)</u> in an amount equal to 100% of such Net Cash Proceeds received by such Person in connection with such sales or dispositions; <u>provided</u>, that

~~(A) so long as (1) no Default or Event of Default shall have occurred and is continuing or would result therefrom, (2) Borrowers shall have given Agent prior written notice of Borrowers' intention to apply such monies to the costs of replacement of the properties or assets that are the subject of such sale or disposition or the cost of purchase or construction of other assets useful in the business of such Loan Party or its Subsidiaries, (3) the monies are held in a Deposit Account in which Agent has a perfected first-priority security interest (other than Liens in favor of the ABL Agent and permitted pursuant to the terms of hereof and the Intercreditor Agreement, and (4) such Loan Party or its Subsidiary, as applicable, completes such replacement, purchase, or construction within 90 days after the initial receipt of such monies, then the Loan Party or such Loan Party's Subsidiary whose assets were the subject of such disposition shall have the option to apply such monies to the costs of replacement of the assets that are the subject of such sale or disposition or the costs of purchase or construction of other assets useful in the business of such Loan Party or such Subsidiary unless and to the extent that such applicable period shall have expired without such replacement, purchase, or construction being made or completed, in which case, any amounts remaining in the Deposit Account referred to in clause (3) above shall be paid to Agent and applied in accordance with Section 2.4(f); provided that the foregoing shall not prohibit the Agent from issuing an Activation Instruction (as defined in the Guaranty and Security Agreement), initiating cash dominion or otherwise taking remedies with respect to such Deposit Account in accordance with the terms of the Loan Documents; provided further, that no Loan Party nor any of its Subsidiaries shall have the right to use such Net Cash Proceeds to make such replacements, purchases, or construction in excess of $2,500,000 in any given fiscal year; and~~

~~(B)~~ nothing contained in this <u>Section 2.4(e)(iii)</u> shall permit any Loan Party or any of its Subsidiaries to sell or otherwise dispose of any assets other than in accordance with <u>Section 6.4</u>.

(iv)    **Extraordinary Receipts**. Within one Business Day of the date of receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts, Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.4(f)</u> in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts.

(v)    **Indebtedness**. Within one Business Day of the date of incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness (other than Permitted Indebtedness), Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.4(f)</u> in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such incurrence. The provisions of this <u>Section 2.4(e)(v)</u> shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms of this Agreement.

(vi)    **Equity**. Within one Business Day of the date of the issuance by any Loan Party or any of its Subsidiaries of any Equity Interests (other than ~~(A)~~ in the event that any Loan Party or any of its Subsidiaries forms any Subsidiary in accordance with the terms hereof, the issuance by such Subsidiary of Equity Interests to such Loan Party or such Subsidiary, as applicable, ~~(B) the issuance of Equity Interests by Administrative Borrower to any Person that is an equity holder of Administrative Borrower prior to such issuance (a "Subject Holder") so long as such Subject Holder did not acquire any Equity Interests of Administrative Borrower so as to become a Subject Holder concurrently with, or in contemplation of, the issuance of such Equity~~

DB1/ 139987402.3

Interests to such Subject Holder, (C) the issuance of Equity Interests of Administrative Borrower to directors, officers and employees of Administrative Borrower and its Subsidiaries pursuant to employee stock option plans (or other employee incentive plans or other compensation arrangements) approved by the Board of Directors, and (D) the issuance of Equity Interests by a Subsidiary of a Loan Party to its parent or member in connection with the contribution by such parent or member to such Subsidiary of the proceeds of an issuance described in clauses (A) through (E) above), Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.42.4(f) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such issuance. The provisions of this Section 2.4(e)(vi) shall not be deemed to be implied consent to any such issuance otherwise prohibited by the terms of this Agreement.

(vii)    **Revolving Credit Maximum Amount.**  If for any reason the Total Revolving Outstandings (other than any Overadvances or Protective Advances to the extent permitted to remain outstanding by the Agent in its sole and absolute discretion) at any time exceed the Revolving Line Cap then in effect, then the Borrowers shall immediately prepay Revolving Loans in accordance with Section 2.4(f).

(f)    **Application of Payments.**

(i)    So long as no Application Event has occurred and be continuing, each prepayment:

(A)    pursuant to Section 2.4(e)(i), (e)(ii), (e)(iii), (e)(iv), or (e)(vii), shall be applied in the manner set forth in Section 2.4(b)(ii), and

(B)    pursuant to Section 2.4(e)(v) or (e)(vi) shall, unless otherwise agreed to by the Agent and the Administrative Borrower, be applied *first* to the outstanding principal amount of the Term Loan, *second* to the principal amount of the Revolving Loans and *third* for deposit into the Eligible Cash Account.

(ii)    (f)  If an Application of Payments.  EachEvent has occurred and be continuing, each prepayment pursuant to Section 2.4(e), shall, (1) so long as no Application Event shall have occurred and be continuing, be applied to the outstanding principal amount of the Term Loan and (2) if an Application Event shall have occurred and be continuing, shall be applied in the manner set forth in Section 2.4(b)(iii) and (2) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(iii), and in the case of each clauses (1) and (2), 2.4(b)(iii).

(iii)    Any prepayment under Section 2.4(e) shall be accompanied by the payment of (i) accrued interest to the date of such payment on the amount prepaid or repaid and.

(iv)    (ii) the Early Termination Premium, if any, payable in connection with any prepayment or repayment of the Term Loan on the amount of the Term Loan prepaid or repaid. Each such prepayment of the Term Loan shall be applied against the remaining installments of principal of the Term Loan in the inverse order of maturity (for the avoidance of doubt, any amount that is due and payable on the Maturity Date shall constitute an installment).

(g)    Agent's Clawback.

(i)      Funding by Lenders; Presumption by Agent. Unless the Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Agent such Lender's share of such Borrowing, the Agent may assume that such Lender has made such share available on such date in accordance with Section 2.2 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Agent, then the Revolving Lenders and the Borrowers severally agree to pay to the Agent forthwith on demand such corresponding amount with interest thereon for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to such Loans made. If the Borrowers and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays its share of the applicable Borrowing to the Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Agent.

(ii)      Payments by Borrowers; Presumptions by Agent. Unless the Agent shall have received notice from the Administrative Borrower prior to the date on which any payment is due to the Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders, severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

(iii)      Notice by Agent. A notice from the Agent to any Lender or the Borrowers with respect to any amount owing under this paragraph (g) shall be conclusive, absent manifest error.

(h)      Prepayment Premiums.  Immediately after giving effect to Amendment No. 3 and the payment of the Early Termination Premium Amount in accordance with the terms of the Amendment No. 3 Fee Letter, all payments made hereunder or under any other Loan Document shall be without any further Early Termination Premium or any other premium or penalty.

2.5      **Promise to Pay; Promissory Notes**.

(a)      Borrowers agree to pay the Lender Group Expenses on the earlier of (i) the first day of the month following the date on which the applicable Lender Group Expenses were first incurred, or (ii) the date on which demand therefor is made by Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the Loan Account pursuant to the provisions of Section 2.6(c) shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (ii)). Borrowers promise to pay all of the Obligations (including principal, interest, premiums, if any, fees, costs, and expenses (including Lender Group Expenses)) in full on the Maturity Date or, if earlier, on the date on which the Obligations become due and payable pursuant to the terms of

this Agreement. Borrowers agree that their obligations contained in the first sentence of this Section 2.5(a) shall survive payment or satisfaction in full of all other Obligations.

(b)    Any Lender may request that any portion of its Loans made by it be evidenced by one or more promissory notes. In such event, Borrowers shall execute and deliver to such Lender the requested promissory notes payable to the order of such Lender in a form furnished by Agent and reasonably satisfactory to Borrowers. Thereafter, the portion of the Loans evidenced by such promissory notes and interest thereon shall at all times be represented by one or more promissory notes in such form payable to the order of the payee named therein.

(c)    Without limiting the Borrowers' obligations to pay interest, fees, costs, charges and expenses in cash as provided herein, Borrowers hereby agree that all interest, fees, costs, charges and expenses payable hereunder or under any of the other Loan Documents to the extent not otherwise paid by the Borrowers on or prior to the due date thereof may be paid by the Agent and shall thereupon constitute Revolving Loans as fully as if advanced to the Borrowers, which will be reflected in the Loan Account as Revolving Loans

2.6    **Interest Rates; and Rates, Payments, and Calculations**.

(a)    **Interest Rates**.  Except as provided in Section 2.6(c), the ~~Term Loan~~Loans and all other Obligations that have been charged to the Loan Account pursuant to the terms hereof shall bear interest at a *per annum* rate equal to Adjusted Term SOFR *plus* the Applicable Margin.

(b)    **[Reserved]**.

(c)    **Default Rate**.  (i) Automatically upon the occurrence and during the continuation of an Event of Default under Section 8.4 or 8.5 and (ii) upon the occurrence and during the continuation of any other Event of Default (other than an Event of Default under Section 8.4 or 8.5), at the direction of Agent or the Required Lenders, and upon written notice by Agent to Borrowers of such direction (provided, that such notice shall not be required for any Event of Default under Section 8.1), all Loans and all other Obligations that have been charged to the Loan Account pursuant to the terms hereof shall bear interest at a *per annum* rate equal to two percentage points above the per annum rate otherwise applicable thereunder from and after the occurrence of such Event of Default (or such later date in the Agent's sole discretion) (all without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court).

(d)    **Payment**.  Except to the extent provided to the contrary in Section 2.10 or Section 2.12(a), (i) all interest and all other fees payable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on each Interest Payment Date, (ii) [reserved], and (iii) all costs and expenses payable hereunder or under any of the other Loan Documents, and all other Lender Group Expenses shall be due and payable on (x) with respect to Lender Group Expenses outstanding as of the Closing Date, the Closing Date, and (y) otherwise, the earlier of (A) the first day of the month following the date on which the applicable costs, expenses, or Lender Group Expenses were first incurred, or (B) the date on which demand therefor is made by Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the Loan Account pursuant to the provisions of the following sentence shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (B)). Borrowers hereby authorize Agent, from time to time without prior notice to Borrowers, to charge to the Loan Account (A) on the first day of each month, all interest accrued during the prior month on the ~~Term Loan~~Loans hereunder, (B) as and when incurred or accrued, all fees and costs provided for in Section 2.10(a) or (c), (C) as and when due and payable, all other fees payable hereunder or under any of the other Loan Documents, (D) on the Closing Date and thereafter as

DB1/ 139987402.3

and when incurred or accrued, all other Lender Group Expenses, and (E) as and when due and payable all other payment obligations payable under any Loan Document.

(e)      **Computation**.  All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360-day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(f)      **Intent to Limit Charges to Maximum Lawful Rate**.  In no event shall the interest rate or rates payable under this Agreement, _plus_ any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Borrowers and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; _provided_, that anything contained herein to the contrary notwithstanding, if such rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, _ipso facto_, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum amount as is allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

(g)      **Term SOFR Conforming Changes**.  In connection with the use or administration of Term SOFR, Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. Agent will promptly notify Administrative Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

(h)      **Interest Act (Canada).**  For the purpose of complying with the Interest Act (Canada), it is expressly stated that where interest is calculated pursuant hereto at a rate based upon a period of time different from the actual number of days in the year (for the purposes of this Section 2.6(h), the "first rate"), the yearly rate or percentage of interest to which the first rate is equivalent is the first rate multiplied by the actual number of days in the calendar year in which the rate is to be ascertained and divided by the number of days in the shorter period, and the Canadian Loan Parties acknowledge that there is a material distinction between the nominal and effective rates of interest and that they are capable of making the calculations necessary to compare such rates and that the calculations herein are to be made using the nominal rate method and not on any basis that gives effect to the principle of deemed reinvestment of interest.  Each Canadian Loan Party hereby confirms that it fully understands and is able to calculate the rate of interest applicable to the ~~Term Loan~~Loans based on the methodology for calculating per annum rates provided for in this Agreement.  Each Canadian Loan Party hereby irrevocably agrees not to plead or assert, whether by way of defense or otherwise, in any proceeding relating to this Agreement or any other Loan Document, that the interest payable under this Agreement and the calculation thereof has not been adequately disclosed to the Canadian Loan Parties as required pursuant to Section 4 of the Interest Act (Canada).

2.7      **Crediting Payments**.  The receipt of any payment item by Agent shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available funds made to Agent's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into Agent's Account on a Business Day on or before 4:30 p.m. If any payment item is received into Agent's Account on a

non-Business Day or after 4:30 p.m. on a Business Day (unless Agent, in its sole discretion, elects to credit it on the date received), it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

2.8     **Designated Account**.   Borrowers agree to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving the proceeds of the ~~Term Loan~~Loans requested by Borrowers and made by Agent or the Lenders hereunder. Unless otherwise agreed by Agent and Borrowers, the ~~Term Loan~~Loans requested by Borrowers and made by Agent or the Lenders hereunder shall be made to the Designated Account.

2.9     **Maintenance of Loan Account; Statements of Obligations**.  Agent shall maintain an account on its books in the name of Borrowers (the "Loan Account") on which Borrowers will be charged with the ~~Term Loan~~Loans made by Agent or the Lenders to Borrowers, and with all other payment Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses. In accordance with Section 2.7, the Loan Account will be credited with all payments received by Agent from Borrowers or for Borrowers' account. Agent shall make available to Borrowers monthly statements regarding the Loan Account, including the principal amount of the ~~Term Loan~~Loans, interest accrued hereunder, fees accrued or charged hereunder or under the other Loan Documents, and a summary itemization of all charges and expenses constituting Lender Group Expenses accrued hereunder or under the other Loan Documents, and each such statement, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Lender Group unless, within 30 days after Agent first makes such a statement available to Borrowers, Borrowers shall deliver to Agent written objection thereto describing the error or errors contained in such statement.

2.10     **Fees**.

(a)     **Certain Fees.** Borrowers shall pay to Agent, for the account of Agent, as and when due and payable under the terms of the Closing Date Fee Letter and the Amendment No. 3 Fee Letter, the fees set forth in the Closing Date Fee Letter and the Amendment No. 3 Fee Letter.

~~(b)   [Reserved].~~

(b)     **Unused Line Fee.** Each Borrower agrees to pay to the Agent for the account of each Revolving Lender, an unused line fee (the "Unused Line Fee"), which shall accrue at a rate per annum equal to 0.75% per annum on the average daily unused amount of the Revolving Commitment of such Revolving Lender during the period from and including the Amendment No. 3 Effective Date to but excluding the date on which such Revolving Commitment terminates. For purposes of computing Unused Line Fees, the Revolving Commitment of any Revolving Lender shall be deemed to be used on any date of determination to the extent of the aggregate principal amount of its outstanding Revolving Loans. Accrued Unused Line Fees shall be payable in arrears on the first day of each month, each date on which the Revolving Commitments are permanently reduced and on the date on which the Revolving Commitments terminate, commencing on the first such date to occur after the Amendment No. 3 Effective Date. All Unused Line Fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)     **Field Examination and Other Fees**.  Subject to any limitations set forth in Section 5.7(c), Borrowers shall pay to Agent, field examination, appraisal, and valuation fees and charges, as and when incurred or chargeable, as follows (i) the reasonable and documented fees and charges of field examiners, *plus* out-of-pocket expenses (including travel, meals, and lodging) for each field examination of any Loan Party or its Subsidiaries performed by or on behalf of Agent, and (ii) the

fees, charges or expenses paid or incurred by Agent if it elects to employ the services of one or more third Persons to appraise the Collateral, or any portion thereof.

Each Loan Party's obligation to pay the foregoing fees described in this Section 2.10 will not be subject to counterclaim or setoff for, or be otherwise affected by, any claim or dispute such Loan Party may have. All of the fees described above in this Section 2.10 shall be nonrefundable for any reason whatsoever and shall be in addition to any other fees, costs and expenses payable pursuant to this Agreement and the other Loan Documents.

2.11    **Defaulting Lenders**.  Notwithstanding anything to the contrary set forth herein, Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrowers to Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, Agent shall transfer any such payments (A) *first*, to Agent to the extent of any Overadvance or Protective Advances that were made by Agent and that were required to be, but were not, paid by Defaulting Lender, (B) *second*, to each Non-Defaulting Lender ratably in accordance with their ~~Term Loan~~Total Credit Exposure (but, in each case, only to the extent that such Defaulting Lender's portion of ~~a Term Loan~~the Loans (or other funding obligation) was funded by such other Non-Defaulting Lender), and (C) *third*, from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender in accordance with tier (I) of Section ~~2.4(b)(iii)~~2.4(b)(iii)(A) or 2.4(b)(iii)(B), as applicable. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Pro Rata Share in connection therewith), such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's ~~Term Loan~~Total Credit Exposure shall be deemed to be zero; provided, that the foregoing shall not apply to any of the matters governed by Section 14.1(a)(i) through (iii). The provisions of this Section 2.11 shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, Agent, and Borrowers shall have waived, in writing, the application of this Section 2.11 to such Defaulting Lender, or (z) the date on which such Defaulting Lender makes payment of all amounts that it was obligated to fund hereunder, pays to Agent all amounts owing by Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by Agent, provides adequate assurance of its ability to perform its future obligations hereunder. The operation of this Section 2.11 shall not be construed to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to Agent or to the Lenders other than such Defaulting Lender. Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Borrowers, at their option, upon written notice to Agent, to arrange for a substitute Lender to assume the ~~Term Loan~~Total Credit Exposure of such Defaulting Lender, such substitute Lender to be reasonably acceptable to Agent. In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (including all interest, fees, and other amounts that may be due and payable in respect thereof); provided, that any such assumption of the ~~Term Loan~~Total Credit Exposure of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lender Groups' or Borrowers' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund. In the event of a direct conflict between the priority provisions of this Section 2.11 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.11 shall control and govern. No Defaulting Lender shall be entitled to receive any Unused Line Fee for any

period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

2.12    **Adjusted Term SOFR**.

(a)    **Special Provisions Applicable to Adjusted Term SOFR**.

(i)    Adjusted Term SOFR may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs (other than Taxes which shall be governed by Section 16), in each case, due to changes in applicable law, or pursuant to any Change in Law or change in the reserve requirements imposed by the Board of Governors, which additional or increased costs would increase the cost of funding or maintaining loans bearing interest at Adjusted Term SOFR. In any such event, the affected Lender shall give Borrowers and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrowers may, by notice to such affected Lender (A) require such Lender to furnish to Borrowers a statement setting forth in reasonable detail the basis for adjusting Adjusted Term SOFR and the method for determining the amount of such adjustment, or (B) repay the SOFR Loans of such Lender with respect to which such adjustment is made.

(ii)    Subject to the provisions set forth in Section 2.12(ea)(iii) below, in the event that any change in market conditions or any Change in Law shall at any time after the date hereofClosing Date, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain SOFR Loans or to continue such funding or maintaining, or to determine or charge interest rates at the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or SOFR, such Lender shall give notice of such changed circumstances to Agent and Borrowers and Agent promptly shall transmit the notice to each other Lender and Agent, in consultation with the Administrative Borrower, shall establish an alternate rate of interest that gives due consideration to the then prevailing market convention for determining a rate of interest for loans similar to the Loans in the United States at such time, and the Agent and the Administrative Borrower shall endeavor to enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable).

(iii)    *Benchmark Replacement Setting.*

(A)    Benchmark Replacement.    Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, Agent and Administrative Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after Agent has posted such proposed amendment to all affected Lenders and Administrative Borrower so long as Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.12(a)(iii) will occur prior to the applicable Benchmark Transition Start Date.

(B)    Benchmark Replacement Conforming Changes.    In connection with the use, administration, adoption, or implementation of a Benchmark Replacement, Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing

such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(C)    Notices; Standards for Decisions and Determinations.    Agent will promptly notify Administrative Borrower and the Lenders of (1) the implementation of any Benchmark Replacement and (2) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. Agent will promptly notify Administrative Borrower of the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.12(a)(iii)(D). Any determination, decision or election that may be made by Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.12(a)(iii), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.12(a)(iii).

(D)    Benchmark Unavailability Period.    Upon Administrative Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, any outstanding affected SOFR Loans will bear interest at an alternate rate of interest agreed upon by Agent and the Administrative Borrower that gives due consideration to the then prevailing market convention for determining a rate of interest for loans similar to the Loans in the United States at such time.

(b)    **No Requirement of Matched Funding**.    Anything to the contrary contained herein notwithstanding, neither Agent, nor any Lender, nor any of their Participants, is required actually to match fund any Obligation as to which interest accrues at Adjusted Term SOFR or the Term SOFR Reference Rate.

2.13    **Capital Requirements**.

(a)    If, after the date hereofClosing Date, any Lender determines that (i) any Change in Law regarding capital, liquidity or reserve requirements for banks or bank holding companies, or (ii) compliance by such Lender, or their respective parent bank holding companies, with any guideline, request or directive of any Governmental Authority regarding capital adequacy or liquidity requirements (whether or not having the force of law), has the effect of reducing the return on such Lender's or such holding companies' capital or liquidity as a consequence of such Lender's commitments, Loans, participations or other obligations hereunder to a level below that which such Lender or such holding companies could have achieved but for such Change in Law or compliance (taking into consideration such Lender's or such holding companies' then existing policies with respect to capital adequacy or liquidity requirements and assuming the full utilization of such entity's capital) by any amount deemed by such Lender to be material, then such Lender may notify Borrowers and Agent thereof. Following receipt of such notice, Borrowers agree to pay such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within 30 days after presentation by such Lender of a statement in the amount and setting forth in reasonable detail such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error). In determining such amount, such Lender may use any reasonable averaging and attribution methods. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided, that Borrowers shall not be required to compensate a Lender pursuant to this Section for any reductions in return incurred more than 180 days prior to the date that such Lender

notifies Borrowers of such Change in Law giving rise to such reductions and of such Lender's intention to claim compensation therefor; provided further, that if such claim arises by reason of the Change in Law that is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)     If any Lender requests additional or increased costs referred to in Section 2.12(a)(i) or amounts under Section 2.13(a) or sends a notice under Section 2.12(a)(ii) relative to changed circumstances (such Lender, an "Affected Lender"), then, at the request of Administrative Borrower, such Affected Lender shall use reasonable efforts to promptly designate a different one of its lending offices or to assign its rights and obligations hereunder to another of its offices or branches, if (i) in the reasonable judgment of such Affected Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to Section 2.12(a)(i) or Section 2.13(a), as applicable, or would eliminate the illegality or impracticality of funding or maintaining SOFR Loans, and (ii) in the reasonable judgment of such Affected Lender, such designation or assignment would not subject it to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to it. Borrowers agree to pay all reasonable out-of-pocket costs and expenses incurred by such Affected Lender in connection with any such designation or assignment. If, after such reasonable efforts, such Affected Lender does not so designate a different one of its lending offices or assign its rights to another of its offices or branches so as to eliminate Borrowers' obligation to pay any future amounts to such Affected Lender pursuant to Section 2.12(a)(i) or Section 2.13(a), as applicable, or to enable Borrowers to obtain SOFR Loans, then Borrowers (without prejudice to any amounts then due to such Affected Lender under Section 2.12(a)(i) or Section 2.13(a), as applicable) may, unless prior to the effective date of any such assignment the Affected Lender withdraws its request for such additional amounts under Section 2.12(a)(i) or Section 2.13(a), as applicable, or indicates that it is no longer unlawful or impractical to fund or maintain SOFR Loans, may substitute a Lender or prospective Lender, in each case, reasonably acceptable to Agent to purchase the Obligations owed to such Affected Lender and such Affected Lender's commitments hereunder (a "Replacement Lender"), and if such Replacement Lender agrees to such purchase, such Affected Lender shall assign to the Replacement Lender its Obligations and commitments, and upon such purchase by the Replacement Lender, which such Replacement Lender shall be deemed to a "Lender" for purposes of this Agreement and such Affected Lender shall cease to be a "Lender" (for purposes of this Agreement).

(c)     Notwithstanding anything herein to the contrary, the protection of Sections 2.12(a), and 2.13 shall be available to each Lender (as applicable) regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, judicial ruling, judgment, guideline, treaty or other change or condition which shall have occurred or been imposed, so long as it shall be customary for lenders affected thereby to comply therewith. Notwithstanding any other provision herein, no Lender shall demand compensation pursuant to this Section 2.13 if it shall not at the time be the general policy or practice of such Lender (as the case may be) to demand such compensation in similar circumstances under comparable provisions of other credit agreements, if any.

2.14    ~~Incremental Facilities~~Reserved.

~~(a) At any time during the period from and after the Closing Date through but excluding the date that is the six-month anniversary of the Closing Date, at the option of Borrowers (but subject to the conditions set forth in clause (b) below), the Term Loan Amount may be increased on a one (1) time basis in an amount not to exceed $15,000,000 (such increase, the "Increase"). Agent shall invite each Lender to increase its Pro Rata Share of the Term Loan Amount (it being understood that no Lender shall be obligated to increase its Pro Rata Share of the Term Loan Amount) in connection with the proposed Increase at the interest margin agreed by the Agent and the Borrowers, and if sufficient Lenders do not agree to increase their Pro Rata Share of the Term Loan Amount in connection with such proposed~~

Increase, then Agent (in consultation with the Borrowers) may invite any prospective lender who is reasonably satisfactory to Agent and Administrative Borrower to become a Lender in connection with such proposed Increase. For the avoidance of doubt, it is understood and agreed that in no event shall the aggregate amount of the Increase to the Term Loan Amount exceed $15,000,000.

(b) Each of the following shall be conditions precedent to Increase of the Term Loan Amount and the making of the additional portion of the Term Loan (the "Additional Portion of the Term Loan") in connection therewith:

(i) Agent or Borrowers have obtained the commitment of one or more Lenders (or other prospective lenders who are reasonably satisfactory to Agent and Administrative Borrower) satisfactory to Agent and Administrative Borrower to provide the Increase and any such Lenders (or such prospective lenders) and the other Lenders party hereto, Borrowers, and Agent have signed an amendment to this Agreement (an "Increase Amendment"), in form and substance reasonably satisfactory to Agent, to which such Lenders (or prospective lenders) and the other Lenders party hereto, Borrowers, and Agent are party, which shall include (A) joining Nautilus Dutch to this Agreement as a "Borrower" in accordance with clause (vi) below and (B) amending the borrowing base provisions herein to include a borrowing base comprised of certain eligible assets of Nautilus Dutch acceptable to the Agent and similar to the concept of the Canadian Borrowing Base (but on terms and conditions (including eligibility requirements) acceptable to the Agent), including advance rates,

(ii) the representations and warranties of each Loan Party or its Subsidiaries (including, without limitation, Nautilus Dutch) contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the Increase Date, as though made on and as of such Increase Date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date),

(iii) in connection with the Increase, if any Loan Party or any of its Subsidiaries owns or will acquire any Margin Stock, Borrowers shall deliver to Agent an updated Form U-1 (with sufficient additional originals thereof for each Lender), duly executed and delivered by the Borrowers, together with such other documentation as Agent shall reasonably request, in order to enable Agent and the Lenders to comply with any of the requirements under Regulations T, U or X of the Board of Governors,

(iv) Borrowers have delivered to Agent updated pro forma Projections (after giving effect to the applicable Increase) for the Loan Parties and their Subsidiaries evidencing compliance on a pro forma basis with Section 7 for the twelve months (on a month by month basis) immediately following the proposed date of the Increase (calculated as if a Covenant Testing Period was in effect during the entire twelve month period),

(v) Borrowers shall have reached agreement with the Lenders (or prospective lenders) making the Additional Portion of the Term Loan with respect to the interest margins applicable to the Additional Portion of the Term Loan (which interest margins may be higher

than or equal to the interest margins applicable to the Term Loan set forth in this Agreement immediately prior to the date of the making of the Additional Portion of the Term Loan, as applicable (the date of the making of such Additional Portion of the Term Loan, as applicable, the "Increase Date")) and shall have communicated the amount of such interest margins to Agent.  The Increase Amendment may, with the consent of Agent, effect such amendments to this Agreement and the other Loan Documents as may be necessary to effectuate the provisions of this Section 2.14 (including any amendment necessary to effectuate the interest margins for the Additional Portion of the Term Loan).  Anything to the contrary contained herein notwithstanding, if the interest rate (including interest margins) or the all-in yield (including interest margins, interest floors, and any original issue discount or similar yield-related discounts or payments, but excluding any arrangement, underwriting, or similar fees payable in connection therewith that are not paid to all Lenders providing the Additional Portion of the Term Loan) that is to be applicable to the Additional Portion of the Term Loan is higher than the interest rate (including interest margins) or all-in yield (including interest margins, interest floors, and any original issue discount or similar yield-related discounts or payments, but excluding any arrangement, underwriting, or similar fees payable in connection therewith that are not paid to all Lenders providing the Additional Portion of the Term Loan) applicable to the Term Loan hereunder immediately prior to the applicable Increase Date (the amount by which all-in yield is higher, the "Excess"), then the interest margin applicable to the Term Loan immediately prior to the Increase Date shall be increased by the amount of the Excess, effective on the applicable Increase Date, and without the necessity of any action by any party hereto, in a manner determined by the Agent;

(vi) In connection with the Increase, Nautilus Dutch is joined as a Borrower (including for all purposes under Section 2.15) and Loan Party, and (A) the Loan Parties shall have delivered, or cause to be delivered, to Agent all relevant agreements, documents (including, without limitation, customary legal opinions) and/or instruments (in each case in form and substance reasonably satisfactory to the Agent) in accordance with and pursuant to, the terms of Section 5.11 and 5.12 of this Agreement (including taking such steps in order to grant the Agent a first priority perfected security interest in all of the assets and capital stock of Nautilus Dutch), (B) Nautilus Dutch and the other Loan Parties shall have complied with all of the requirements of the terms of Section 5.11 and Section 5.12 of this Agreement, (C) the Loan Parties agree to deliver to Agent such information as Agent and Lenders require to complete their "know your customer" due diligence (in form satisfactory to Agent) on Nautilus Dutch prior to Nautilus Dutch entering into the relevant documents pursuant to Section 5.11 and Section 5.12 of this Agreement, and (D) Agent shall have received an appraisal of the Net Recovery Percentage applicable to Nautilus Dutch's and its Subsidiaries' Inventory, the results of which shall be satisfactory to Agent; and

(vii) No Default or Event of Default shall have occurred and be continuing on the Increase Date, nor shall either result from the making thereof.

(e) Anything to the contrary contained herein notwithstanding, each Additional Portion of the Term Loan shall be repaid in installments on the first day of each calendar quarter commencing with the first full calendar quarter ending after the date that the Additional Portion of the Term Loan is advanced, in an amount equal to 1.875% of the amount of such Additional Portion of the Term Loan (it being understood and agreed that only such installment payments arising after such Additional Portion of the Term Loan is made shall be required to be paid, but such installment payments shall be in addition to the payments required to be paid pursuant to Section 2.1).  The outstanding unpaid principal balance and all accrued and unpaid interest on such Additional Portion of the Term Loan shall be due and payable on

DB1/ 139987402.3

the earlier of (i) the Maturity Date, and (ii) the date of the acceleration of the Term Loan in accordance with the terms hereof.

(d) Unless otherwise specifically provided herein, all references in this Agreement and any other Loan Document to the Term Loan shall be deemed, unless the context otherwise requires, to include any Additional Portion of the Term Loan made pursuant to the increased Term Loan Amount pursuant to this Section 2.14.

(e) The Term Loan and the Term Loan Amount established pursuant to this Section 2.14 shall constitute the Term Loan and Term Loan Amount under, and shall be entitled to all the benefits afforded by this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from any guarantees and the security interests created by the Loan Documents. Borrowers shall take any actions reasonably required by Agent to ensure and demonstrate that the Liens and security interests granted by the Loan Documents continue to be perfected under the Code or otherwise after giving effect to the establishment of any such new Term Loan Amount.

2.15    **Joint and Several Liability of Borrowers**.

(a)    Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lender Group under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)    Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 2.15), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them. Accordingly, each Borrower hereby waives any and all suretyship defenses that would otherwise be available to such Borrower under applicable law.

(c)    If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due, whether upon maturity, acceleration, or otherwise, or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligations until such time as all of the Obligations are paid in full, and without the need for demand, protest, or any other notice or formality.

(d)    The Obligations of each Borrower under the provisions of this Section 2.15 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of the provisions of this Agreement (other than this Section 2.15(d)) or any other circumstances whatsoever.

(e)    Without limiting the generality of the foregoing and except as otherwise expressly provided in this Agreement, each Borrower hereby waives presentments, demands for performance, protests and notices, including notices of acceptance of its joint and several liability, notice of the Term Loan Loans under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Agreement, notices of the existence, creation, or incurring of new or additional

Obligations or other financial accommodations or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Agent or Lenders under or in respect of any of the Obligations, any right to proceed against any other Borrower or any other Person, to proceed against or exhaust any security held from any other Borrower or any other Person, to protect, secure, perfect, or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any other Borrower, any other Person, or any collateral, to pursue any other remedy in any member of the Lender Group's power whatsoever, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement), any right to assert against any member of the Lender Group, any defense (legal or equitable), set-off, counterclaim, or claim which each Borrower may now or at any time hereafter have against any other Borrower or any other party liable to any member of the Lender Group, any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Obligations or any security therefor, and any right or defense arising by reason of any claim or defense based upon an election of remedies by any member of the Lender Group including any defense based upon an impairment or elimination of such Borrower's rights of subrogation, reimbursement, contribution, or indemnity of such Borrower against any other Borrower. Without limiting the generality of the foregoing, each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent or Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of any Agent or Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this <u>Section 2.15</u> afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this <u>Section 2.15</u>, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this <u>Section 2.15</u> shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this <u>Section 2.15</u> shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any other Borrower or any Agent or Lender. Each of the Borrowers waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement hereof. Any payment by any Borrower or other circumstance which operates to toll any statute of limitations as to any Borrower shall operate to toll the statute of limitations as to each of the Borrowers. Each of the Borrowers waives any defense based on or arising out of any defense of any Borrower or any other Person, other than payment of the Obligations to the extent of such payment, based on or arising out of the disability of any Borrower or any other Person, or the validity, legality, or unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any Borrower other than payment of the Obligations to the extent of such payment. Agent may, at the election of the Required Lenders, foreclose upon any Collateral held by Agent by one or more judicial or nonjudicial sales or other dispositions, whether or not every aspect of any such sale is commercially reasonable or otherwise fails to comply with applicable law or may exercise any other right or remedy Agent or any other member of the Lender Group may have against any Borrower or any other Person, or

any security, in each case, without affecting or impairing in any way the liability of any of the Borrowers hereunder except to the extent the Obligations have been paid.

(f)    Each Borrower represents and warrants to Agent and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Borrower further represents and warrants to Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)    The provisions of this Section 2.15 are made for the benefit of Agent, each member of the Lender Group, and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of Agent, any member of the Lender Group, or any of their successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 2.15 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Agent or any Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this Section 2.15 will forthwith be reinstated in effect, as though such payment had not been made.

(h)    Each Borrower hereby agrees that it will not enforce any of its rights that arise from the existence, payment, performance or enforcement of the provisions of this Section 2.15, including rights of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of Agent or any other member of the Lender Group against any Borrower, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from any Borrower, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to any Agent or any member of the Lender Group hereunder are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor. If any amount shall be paid to any Borrower in violation of the immediately preceding sentence, such amount shall be held in trust for the benefit of Agent, for the benefit of the Lender Group, and shall forthwith be paid to Agent to be credited and applied to the Obligations and all other amounts payable under this Agreement, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Obligations or other amounts payable under this Agreement thereafter arising. Notwithstanding anything to the contrary contained in this Agreement, no Borrower may exercise any rights of subrogation, contribution, indemnity, reimbursement or other similar rights against, and may not proceed or seek recourse against or with respect to any property or asset of, any other Borrower (the "Foreclosed Borrower"), including after payment in full of the Obligations, if all or any portion of the Obligations

have been satisfied in connection with an exercise of remedies in respect of the Equity Interests of such Foreclosed Borrower whether pursuant to this Agreement or otherwise.

2.16    **Termination and Reduction of Commitments.**

(a)    The Borrowers may at any time terminate, or from time to time reduce, the Revolving Commitments, without premium or penalty, provided that (i) the Borrowers shall not terminate or reduce the Revolving Commitments if, after giving effect to any concurrent prepayment or repayment of the Revolving Loans in accordance with Section 2.4, the sum of the Total Revolving Outstandings would exceed the Revolving Credit Maximum Amount, and (ii) each such reduction of the Revolving Commitments shall be in an amount that is an integral multiple of $500,000 and not less than $500,000.   If at any time, as a result of such a partial reduction or termination as provided in this Section 2.16(a), the Total Revolving Outstandings would exceed the Revolving Credit Maximum Amount, then the Borrowers shall on the date of such reduction or termination of Revolving Commitments, repay or prepay Revolving Loans in an aggregate amount equal to such excess.

(b)    [Reserved].

(c)    The Administrative Borrower shall notify the Agent of any election to terminate or reduce the Revolving Commitments under paragraph (a) of this Section at least five (5) Business Days prior to the effective date of such termination or reduction, specifying the effective date thereof. Promptly following receipt of any such notice, the Agent shall advise the Revolving Lenders of the amount of such reduction. Each notice delivered by the Administrative Borrower pursuant to this Section shall be irrevocable; provided that a notice of termination of the Revolving Commitments may state that such notice is conditioned upon the effectiveness of another transaction, in which case such notice may be revoked by the Administrative Borrower (by written notice to the Agent on or prior to the specified effective date) if such condition is not satisfied subject to the Borrowers' obligation to indemnify the Lenders pursuant to Section 16 and Administrative Borrower may extend the date of termination at any time with the consent of Agent (which consent shall not be unreasonably withheld or delayed). Each reduction, and any termination, of the Revolving Commitments shall be permanent and each reduction of the Revolving Commitments shall be made ratably among the Revolving Lenders in accordance with their respective Revolving Commitments.

3.    **CONDITIONS; TERM OF AGREEMENT.**

3.1    **Conditions Precedent to the Borrowing.**  The effectiveness of this Agreement and the obligation of each Lender to make the Pre-Petition Term Loan on the Closing Date is was subject to the fulfillment, to the satisfaction of Agent and each Lender, of each of the conditions precedent set forth on Schedule 3.1 to this Agreement.

3.2 **[Intentionally Omitted].**

3.3 **[Intentionally Omitted].**

3.2    **Conditions Precedent to all Extensions of Credit**. The obligation of the Lender Group (or any member thereof) to make any Revolving Loans hereunder (or to extend any other credit hereunder) at any time, and the effectiveness of Amendment No. 3 on the Amendment No. 3 Effective Date, in each case, shall be subject to the following conditions precedent:

(a)    the representations and warranties of each Loan Party or its Subsidiaries contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date);

(b)    no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof nor from the application of the proceeds therefrom;

(c)    the Revolving Loans to be made shall be in accordance with the Approved Budget, subject to any variances permitted by Section 7(b);

(d)    the Revolving Loans to be made shall not exceed the amount of Revolving Loans set forth in the Approved Budget, subject to any variances permitted by Section 7(b);

(e)    the Agent shall have received a Borrowing Request in accordance with the requirements hereof;

(f)    (i) the Interim Financing Order shall have been entered or the Final Financing Order shall have been entered following the expiration of the Interim Financing Order; (ii) the Interim Financing Order or the Final Financing Order, as applicable, shall not have been vacated, stayed, reversed, modified, or amended without the Agent's consent and shall otherwise be in full force and effect; (iii) no motion for reconsideration of the Interim Financing Order or the Final Financing Order, as applicable, shall have been timely filed by a Debtor, any other Loan Party or any of any of its Subsidiaries; and (iv) no appeal of the Interim Financing Order or the Final Financing Order, as applicable, shall have been timely filed;

(g)    after giving effect to such proposed Revolving Loan, (i) the Total Revolving Outstandings shall not exceed the Revolving Line Cap then in effect and (ii) the Total Outstandings (other than any Overadvances or Protective Advances to the extent permitted by the Agent in its sole and absolute discretion) shall not exceed the Line Cap then in effect; and

(h)    immediately prior to giving effect to such Revolving Loan, the amount of cash, Cash Equivalents, Collections or amounts credited to all DDAs or Securities Accounts of the Domestic Loan Parties and their Domestic Subsidiaries (for the avoidance of doubt, other than the Eligible Cash Account) shall not exceed $1,500,000 for all such DDAs and Securities Accounts as of the end of such day;

provided, that the availability under the Revolving Loans and the release of the Revolving Loans to the account of the Borrowers hereunder shall be subject to any hold back amounts required by the Agent in order to fund the Chapter 11 Cases (including, without limitation, the Carve Out Expenses).

3.3    **Maturity**. The Revolving Commitments shall continue in full force and effect for a term ending on the Maturity Date (unless terminated earlier in accordance with the terms hereof).

3.4    **Effect of Maturity**. On the Maturity Date (unless terminated earlier in accordance with the terms hereof), all of the Obligations (including, for the avoidance of doubt, all Loans) immediately shall become due and payable without notice or demand and Borrowers shall be required to repay all of the Obligations in full.  No termination of the obligations of the Lender Group (other than payment in full of the Obligations) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any other Loan Document and Agent's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full.  When all of the Obligations have been paid in full, Agent will, at Borrowers' sole expense, execute and deliver any termination statements (or alternatively, authorize in writing Administrative Borrower or a representative designated by Administrative Borrower to file termination statements, the form of which has been approved in writing by Agent), lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Agent's Liens and all notices of security interests and liens previously filed by Agent and to return pledged collateral in its possession.

3.5    **Early Termination by Borrowers**.  Borrowers have the option, at any time upon five (5) Business Days prior written notice to Agent, to repay all of the Obligations in full subject to the payment of the applicable Early Termination Premium. The foregoing notwithstanding, (a) Borrowers may rescind termination notices relative to proposed payments in full of the Obligations with the proceeds of third party Indebtedness if the closing for such issuance or incurrence does not happen on or before the date of the proposed termination (in which case, a new notice shall be required to be sent in connection with any subsequent termination), and (b) Borrowers may extend the date of termination at any time with the consent of Agent (which consent shall not be unreasonably withheld or delayed).

4.    **REPRESENTATIONS AND WARRANTIES.**

In order to induce the Lender Group to enter into this Agreement, each Borrower makes the following representations and warranties to the Lender Group which shall be true, correct, and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Closing Date and as of the date of the making of each Revolving Loan (or other extension of credit) made thereafter, as though made on and as of the date of such Revolving Loan (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date), and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1    **Due Organization and Qualification; Subsidiaries**.

(a)    Each Loan Party and each of its Subsidiaries (i) is duly organized and existing and in good standing under the laws of the jurisdiction of its organization, (ii) is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect, and (iii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)    Set forth on Schedule 4.1(b) to this Agreement (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement) is a complete and accurate description of the authorized Equity Interests of each Loan Party, by class,

and, as of the Closing Date, a description of the number of shares of each such class that are issued and outstanding.

(c)    Set forth on Schedule 4.1(c) to this Agreement (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement), is a complete and accurate list of the Loan Parties' direct and indirect Subsidiaries, showing: (i) the number of shares of each class of common and preferred Equity Interests authorized for each of such Subsidiaries, and (ii) the number and the percentage of the outstanding shares of each such class owned directly or indirectly by Administrative Borrower. All of the outstanding Equity Interests of each such Subsidiary has been validly issued and is fully paid and non-assessable.

(d)    Except as set forth on Schedule 4.1(d) to this Agreement, there are no subscriptions, options, warrants, or calls relating to any shares of any Loan Party's or any of its Subsidiaries' Equity Interests, including any right of conversion or exchange under any outstanding security or other instrument. No Loan Party is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its Equity Interests or any security convertible into or exchangeable for any of its Equity Interests.

4.2    **Due Authorization; No Conflict.**

.  Subject to the entry of the applicable Financing Order,

(a)    As to each Loan Party, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Loan Party.

(b)    As to each Loan Party, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party do not and will not (i) violate any material provision of federal, state, or local law or regulation applicable to any Loan Party or its Subsidiaries, the Governing Documents of any Loan Party or its Subsidiaries, or any order, judgment, or decree of any court or other Governmental Authority binding on any Loan Party or its Subsidiaries, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract or any other material agreement of any Loan Party or its Subsidiaries where any such conflict, breach or default could individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of any Loan Party, other than Permitted Liens, or (iv) require any approval of any holder of Equity Interests of a Loan Party or any approval or consent of any Person under any Material Contract or any other material agreement of any Loan Party, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of Material Contracts or other material agreements, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Effect.

4.3    **Governmental Consents.** The Subject to the entry of the applicable Financing Order, the execution, delivery, and performance by each Loan Party of the Loan Documents to which such Loan Party is a party and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than registrations, consents, approvals, notices, or other actions that have been obtained and that are still in force and effect and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Agent for filing or recordation, as of the Closing Date.

4.4    **Binding Obligations; Perfected Liens**.

(a)    Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally and the entry of the applicable Financing Order.

(b)    Agent's Liens are validly created, perfected (other than (i) in respect of motor vehicles that are subject to a certificate of title, (ii) money, (iii) letter-of-credit rights (other than supporting obligations), (iv) commercial tort claims (other than those that, by the terms of the Guaranty and Security Agreement, are required to be perfected), and (v) any Deposit Accounts and Securities Accounts not subject to a Control Agreement as permitted by Section 7(k)(iv) of the Guaranty and Security Agreement or as otherwise agreed to by the Agent in its sole discretion ), and subject only to the filing of financing statements, the recordation of the Copyright Security Agreement (if any), and the recordation of the Mortgages, in each case, in the appropriate filing offices), and first-priority Liens, subject only to Permitted Liens which are non-consensual Permitted Liens, permitted purchase money Liens, or the interests of lessors under Capital Leases, or Liens in favor of the ABL Agent and permitted pursuant to the terms hereof and the Intercreditor Agreement.

4.5    **Title to Assets; No Encumbrances**.  Each of the Loan Parties and its Subsidiaries has (a) good, sufficient and legal title to (in the case of fee interests in Real Property), (b) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (c) good and, as applicable, marketable title to (in the case of all other personal property), all of their respective assets reflected in their most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements to the extent permitted hereby. All of such assets are free and clear of Liens except for Permitted Liens.

4.6    **Litigation**. Other than the Chapter 11 Cases,

(a)    There there are no actions, suits, or proceedings pending or, to the knowledge of any Borrower, after due inquiry, threatened in writing against a Loan Party or any of its Subsidiaries that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect.

(b)    Schedule 4.6(b) to this Agreement sets forth a complete and accurate description of each of the actions, suits, or proceedings with asserted liabilities in excess of, or that could reasonably be expected to result in liabilities in excess of, $1,000,000 that, as of the Closing Date, is pending or, to the knowledge of any Borrower, after due inquiry, threatened against a Loan Party or any of its Subsidiaries.

4.7    **Compliance with Laws**.  NoSubject to the entry of the applicable Financing Order, no Loan Party nor any of its Subsidiaries (a) is in violation of any applicable laws, rules, regulations, executive orders, or codes (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**4.8**   **No Material Adverse Effect**.  All historical financial statements relating to the Loan Parties and their Subsidiaries that have been delivered by Borrowers to Agent have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, the Loan Parties' and their Subsidiaries' consolidated financial condition as of the date thereof and results of operations for the period then ended. Since ~~March 31, 2022~~the Petition Date, no event, circumstance, or change has occurred that has or could reasonably be expected to result in a Material Adverse Effect.

**4.9**   **Solvency**~~.~~

~~(a) Each Loan Party is Solvent.~~

~~(b) .~~  No transfer of property is being made by any Loan Party and no obligation is being incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Loan Party.

**4.10**   **Employee Benefits; Canadian Pension Plan Compliance**.

(a)      Except as set forth on Schedule 4.10, no Loan Party, none of their Subsidiaries, nor any of their ERISA Affiliates maintains or contributes to any Pension Plan.  No Loan Party nor any of their Subsidiaries maintains or contributes to any Canadian Pension Plan.

(b)      Except as would not reasonably be expected to result in a Material Adverse Effect, individually or in the aggregate, each Loan Party has complied in all material respects with ERISA, the IRC and all applicable laws regarding each Employee Benefit Plan.

(c)      Except as would not reasonably be expected to result in a Material Adverse Effect, individually or in the aggregate, each Employee Benefit Plan is, and has been, maintained in substantial compliance with ERISA, the IRC, all applicable laws and the terms of each such Employee Benefit Plan.

(d)      Except as would not reasonably be expected to result in a Material Adverse Effect, individually or in the aggregate, no liability to the PBGC (other than for the payment of current premiums which are not past due) by any Loan Party or ERISA Affiliate has been incurred or is expected by any Loan Party or ERISA Affiliate to be incurred with respect to any Pension Plan.

(e)      Except as would not reasonably be expected to result in a Material Adverse Effect, individually or in the aggregate, no Notification Event or Canadian Pension Event exists or has occurred in the past six years.

(f)      Except as would not reasonably be expected to result in a Material Adverse Effect, individually or in the aggregate, no Loan Party or ERISA Affiliate has provided any security under Section 436 of the IRC.

**4.11**   **Environmental Condition**.  Except as set forth on Schedule 4.11 to this Agreement, (a) to each Borrower's knowledge, no Loan Party's nor any of its Subsidiaries' properties or assets has ever been used by a Loan Party, its Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation, in any material respect, of

any applicable Environmental Law, (b) to each Borrower's knowledge, after due inquiry, no Loan Party's nor any of its Subsidiaries' properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) no Loan Party nor any of its Subsidiaries has received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by a Loan Party or its Subsidiaries, and (d) no Loan Party nor any of its Subsidiaries nor any of their respective facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or Environmental Liability that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

4.12  **Complete Disclosure**.  All factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about the industry of any Loan Party or its Subsidiaries) furnished by or on behalf of a Loan Party or its Subsidiaries in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents, and all other such factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about the industry of any Loan Party or its Subsidiaries) hereafter furnished by or on behalf of a Loan Party or its Subsidiaries in writing to Agent or any Lender will be, true and accurate, in all material respects, on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided. The Projections delivered to Agent on November 9, 2022, represent, and as of the date on which any other Projections are delivered to Agent, such additional Projections represent, Borrowers' good faith estimate, on the date such Projections are delivered, of the Loan Parties' and their Subsidiaries' future performance for the periods covered thereby based upon assumptions believed by Borrowers to be reasonable at the time of the delivery thereof to Agent (it being understood that such Projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and their Subsidiaries, and no assurances can be given that such Projections will be realized, and although reflecting Borrowers' good faith estimate, projections or forecasts based on methods and assumptions which Borrowers believed to be reasonable at the time such Projections were prepared, are not to be viewed as facts, and that actual results during the period or periods covered by the Projections may differ materially from projected or estimated results). As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

4.13  **Patriot Act, Etc.**.  To the extent applicable, each Loan Party is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001, as amended) (the "Patriot Act"), and (c) the Canadian AML Legislation.

4.14  **Indebtedness**.  Set forth on Schedule 4.14 to this Agreement is a true and complete list of all Indebtedness of each Loan Party and each of its Subsidiaries outstanding immediately prior to the Closing Date that is to remain outstanding immediately after giving effect to the closing hereunder on the Closing Date and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness as of the Closing Date.

4.15  **Payment of Taxes**.  Except as otherwise permitted under Section 5.5, all Tax returns and reports of each Loan Party and its Subsidiaries required to be filed by any of them have been timely filed, and all Taxes shown on such Tax returns to be due and payable and all other Taxes upon a Loan Party

and its Subsidiaries and upon their respective assets, income, businesses and franchises that are due and payable have been paid when due and payable. Each Loan Party and each of its Subsidiaries have made adequate provision in accordance with GAAP for all Taxes not yet due and payable. No Borrower knows of any proposed Tax assessment against a Loan Party or any of its Subsidiaries that is not being actively contested by such Loan Party or such Subsidiary diligently, in good faith, and by appropriate proceedings; provided, that such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

4.16    **Margin Stock**.  Neither any Loan Party nor any of its Subsidiaries owns any Margin Stock or is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the Loans made to Borrowers will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors. Neither any Loan Party nor any of its Subsidiaries expects to acquire any Margin Stock.

4.17    **Governmental Regulation**.  No Loan Party nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. No Loan Party nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.18    **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**.  No Loan Party or any of its Subsidiaries is in violation of any Sanctions. No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  No proceeds of any Loan made hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person (including any Lender or other individual or entity participating in any transaction).

4.19    **Employee and Labor Matters**.  There is (i) no unfair labor practice complaint pending or, to the knowledge of any Borrower, threatened against any Loan Party or its Subsidiaries before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan Party or its Subsidiaries which arises out of or under any collective bargaining agreement and that could reasonably be expected to result in a material liability, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened in writing against any Loan Party or its Subsidiaries that could reasonably be expected to result in a material liability, or (iii) to the knowledge of any Borrower, after due inquiry, no union representation question existing with respect to the employees of any Loan Party or its Subsidiaries and no union organizing activity taking place with respect to any of the employees of any Loan Party or its Subsidiaries. None of any Loan Party or its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or

similar state law, which remains unpaid or unsatisfied. The hours worked and payments made to employees of each Loan Party and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. All material payments due from any Loan Party or its Subsidiaries on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of Borrowers, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

4.20    **Material Customers**.  Set forth on Schedule 4.20 (as such Schedule may be updated from time to time in accordance with this Agreement) are the Material Customers of each Loan Party and its Subsidiaries as of the most recent date on which Borrowers provided the Compliance Certificate pursuant to Section 5.1; provided, that Borrowers may amend Schedule 4.20 to add additional Material Customers so long as such amendment occurs by written notice to Agent on the date that Borrowers provide the Compliance Certificate.

4.21    **Leases**.  Each Loan Party and its Subsidiaries enjoy peaceful and undisturbed possession under all leases material to which they are parties or under which they are operating, and, subject to Permitted Protests, all of such material leases are valid and subsisting and no material default by the applicable Loan Party or its Subsidiaries exists under any of them.

4.22    **Eligible Accounts; Eligible Credit Card Receivables**.  As to each Account that is identified by Borrowers as an Eligible Account or an Eligible Credit Card Receivable in a Borrowing Base Certificate submitted to Agent, such Account or Credit Card Receivable is (a) a bona fide existing payment obligation of the applicable Account Debtor created by the sale and delivery of Inventory or the rendition of services to such Account Debtor in the ordinary course of a Borrower's business, (b) owed to a Borrower without any known defenses, disputes, offsets, counterclaims, or rights of return or cancellation, other than any portion thereof reflected as being ineligible to the extent of any defenses, disputes, offsets, counterclaims, or rights of return or cancellation reflected in such Borrowing Base Certificate, (c) in the case of Accounts, not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Agent-discretionary criteria) set forth in the definition of Eligible Accounts, and (d) in the case of Credit Card Receivables, not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Agent-discretionary criteria) set forth in the definition of Eligible Credit Card Receivables.

4.23    **Eligible Inventory**.  As to each item of Inventory that is identified by Borrowers as Eligible Finished Goods Inventory, Eligible Spare Parts Inventory, or Eligible In-Transit Inventory in a Borrowing Base Certificate submitted to Agent, such Inventory is (a) of good and merchantable quality, free from known defects, and (b) not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Agent-discretionary criteria) set forth in the definition of Eligible Inventory (in the case of Eligible In-Transit Inventory, after giving effect to any exclusions therefrom specified in the definition of Eligible In-Transit Inventory).

4.24    **Eligible IP**.  As to each item of IP that is identified by Borrowers as Eligible IP in a Borrowing Base Certificate submitted to Agent, such IP is not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Agent-discretionary criteria) set forth in the definition of Eligible IP.

4.25    **Location of Inventory**.  Except as set forth in Schedule 4.25, the Inventory of Borrowers and their Subsidiaries is not stored with a bailee, warehouseman, or similar party and is

located only at, or in-transit between, the locations identified on Schedule 4.25 to this Agreement (as such Schedule may be updated pursuant to Section 5.14).

4.26    **Inventory Records**.  Each Loan Party keeps correct and accurate records itemizing and describing the type, quality, and quantity of its and its Subsidiaries' Inventory and the book value thereof.

4.27    ~~ABL Loan Documents~~[Intentionally Omitted].

~~. Borrowers have delivered to Agent a complete and correct copy of the material ABL Loan Documents, including all schedules and exhibits thereto, executed on the Closing Date.  The execution, delivery and performance of each of the ABL Loan Documents has been duly authorized by all necessary action on the part of each Loan Party who is a party thereto.  Each ABL Loan Document is the legal, valid and binding obligation of each Loan Party who is a party thereto, enforceable against each such Loan Party in accordance with its terms, in each case, except (i) as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting generally the enforcement of creditors' rights, and (ii) the availability of the remedy of specific performance or injunctive or other equitable relief is subject to the discretion of the court before which any proceeding therefor may be brought.~~

4.28    [Intentionally Omitted].

4.29    **Immaterial Subsidiaries**.  None of the Immaterial Subsidiaries (a)  owns any assets, (b) have any liabilities, and (c) engage in any business activity.

4.30    ~~Hedge Agreements~~[Intentionally Omitted].  ~~On each date that any Hedge Agreement is executed by any Hedge Provider, Borrower and each other Loan Party satisfy all eligibility, suitability and other requirements under the Commodity Exchange Act (7 U.S.C. § 1, et seq., as in effect from time to time) and the Commodity Futures Trading Commission regulations.~~

~~.~~

4.31    **Credit Card Arrangements**.  Set forth on Schedule 4.31 is a reasonably detailed description of all arrangements (including, without limitation, all Credit Card Agreements) as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges, debit card charges, and charge card charges for sales made by such Loan Party.

4.32    **Material Contracts**.  Set forth on Schedule 4.32 (as such Schedule may be updated from time to time in accordance with this Agreement) is a reasonably detailed description of the Material Contracts of each Loan Party and its Subsidiaries as of the most recent date on which Borrowers provided the Compliance Certificate pursuant to Section 5.1; provided, that Borrowers may amend Schedule 4.32 to add additional Material Contracts so long as such amendment occurs by written notice to Agent on the date that Borrowers provide the Compliance Certificate. Except for matters which, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, each Material Contract (other than those that have expired at the end of their normal terms) (a) is in full force and effect and is binding upon and enforceable against the applicable Loan Party or its Subsidiary and, to each Borrower's knowledge, after due inquiry, each other Person that is a party thereto in accordance with its terms, (b) has not been otherwise amended or modified (other than amendments or modifications permitted by Section 6.6(b)), and (c) is not in default due to the action or inaction of the applicable Loan Party or its Subsidiary.

**4.33    Approved Budget.**  The Administrative Borrower has heretofore furnished to the Agent the Approved Budget and such Approved Budget was prepared in good faith upon assumptions the Loan Parties believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget. To the knowledge of the Loan Parties, no facts exist that (individually or in the aggregate) would result in any material change in the Approved Budget (taking into account the variances permitted under Section 7(b)).

**4.34    Certain other Bankruptcy Matters.**

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and Final Financing Order, and (ii) the hearing for the entry of the Interim Financing Order.

(b)    The Interim Financing Order (and, following the expiration of the Interim Financing Period defined therein, the Final Financing Order) has been duly entered and (a) has not been vacated, reversed on appeal, or stayed, or modified or amended (other than, in the case of a modification or amendment, as consented to by Agent), and (b) is not subject to any pending appeal or motion for leave to appeal or other proceeding to set aside any such order or other challenge to the relief provided for in such order, except in each case as consented to by Agent.

(c)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Financing Order or the Final Financing Order, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, as set forth in the applicable Financing Order.

5.    **AFFIRMATIVE COVENANTS.**

Each Borrower covenants and agrees that, until the termination of all the Commitments and payment in full of the Obligations:

5.1    **Financial Statements, Reports, Certificates.**  Borrowers (a) will deliver to Agent, with copies to each Lender, each of the financial statements, reports, and other items set forth on Schedule 5.1 to this Agreement no later than the times specified therein, (b) agree that no Subsidiary of a Loan Party will have a fiscal year different from that of Administrative Borrower, (c) agree to maintain a system of accounting that enables Borrowers to produce financial statements in accordance with GAAP, and (d) agree that they will, and will cause each other Loan Party to, (i) keep a reporting system that shows all additions, sales, claims, returns, and allowances with respect to their and their Subsidiaries' sales, and (ii) maintain their billing systems and practices substantially as in effect as of the Closing Date and shall only make material modifications thereto with notice to, and with the consent of, Agent. Notwithstanding anything to the contrary contained herein, financial statements, reports, and other items required to be delivered pursuant to Schedule 5.1 to this Agreement (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (x) on which the Administrative Borrower posts such documents, or provides a link thereto on the Administrative Borrower's website on the Internet                                                                                          at ~~https://www.nautilusinc.com/investors/sec-filings/~~ https://www.corporate.bowflex.com/investors/sec-filings/; or (y) on which such documents are posted on the Administrative Borrower's behalf on EDGAR or another Internet or intranet website, if any, to which each Lender and the Agent have access (whether a commercial, third-party website or whether sponsored by the Agent); provided that:  (1) the Borrowers

shall deliver paper copies of such documents to the Agent or any Lender that requests the Borrowers to deliver such paper copies until a written request to cease delivering paper copies is given by the Agent or such Lender and (2) the Administrative Borrower shall notify the Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance, the Borrowers shall be required to provide paper copies of the Compliance Certificates required by Schedule 5.1 to this Agreement to the Agent. The Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

5.2    **Reporting**. Borrowers (a) will deliver to Agent (and if so requested by Agent, with copies for each Lender) each of the reports set forth on Schedule 5.2 to this Agreement in form, scope and detail reasonably satisfactory to Agent at the times specified therein, and (b) agree to use commercially reasonable efforts in cooperation with Agent to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth on such Schedule. Borrowers and Agent hereby agree that the delivery of the Borrowing Base Certificate through any electronic method as may be approved by Agent from time to time in its sole discretion, or by such other electronic input of information necessary to calculate ~~the~~a Borrowing Bases ~~or the ABL Borrowing Base~~ as may be approved by Agent from time to time in its sole discretion, shall in each case be deemed to satisfy the obligation of Borrowers to deliver such Borrowing Base Certificate, with the same legal effect as if such Borrowing Base Certificate had been manually executed by Borrowers and delivered to Agent.

5.3    **Existence**. Except as otherwise permitted under Section 6.3 or Section 6.4, each Loan Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect such Person's valid existence and good standing in its jurisdiction of organization and, except as could not reasonably be expected to result in a Material Adverse Effect, good standing with respect to all other jurisdictions in which it is qualified to do business and any rights, franchises, permits, licenses, accreditations, authorizations, or other approvals material to their businesses.

5.4    **Maintenance of Properties**. Each Loan Party will, and will cause each of its Subsidiaries to, maintain and preserve all of its assets that are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear, tear, casualty, and condemnation and Permitted Dispositions excepted (and except where the failure to so maintain and preserve assets could not reasonably be expected to result in a Material Adverse Effect).

5.5    **Taxes**. Each Loan Party will, and will cause each of its Subsidiaries to, pay in full before delinquency or before the expiration of any extension period all Taxes imposed, levied, or assessed against it, or any of its assets or in respect of any of its income, businesses, or franchises, other than Taxes not in excess of $500,000 outstanding at any time and other than to the extent that the validity of such Tax is the subject of a Permitted Protest.

5.6    **Insurance**.

(a)    Each Loan Party will, and will cause each of its Subsidiaries to, at Borrowers' expense, maintain insurance respecting each of each Loan Party's and its Subsidiaries' assets wherever located, covering liabilities, losses or damages as ~~are~~ customarily are insured against by other Persons engaged in same or similar businesses and similarly situated and located. All such policies of insurance shall be with financially sound and reputable insurance companies acceptable to Agent (it being agreed

that, as of the Closing Date, the Loan Parties' existing insurance providers as set forth in the certificates of insurance delivered to Agent on or about the Closing Date shall be deemed to be acceptable to Agent) and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and, in any event, in amount, adequacy, and scope reasonably satisfactory to Agent (it being agreed that the amount, adequacy, and scope of the policies of insurance of Borrowers in effect as of the Closing Date are acceptable to Agent). All property insurance policies are to be made payable to Agent for the benefit of Agent and the Lenders, as their interests may appear, in case of loss, pursuant to a standard lender's loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as Agent may reasonably require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies. All certificates of property and general liability insurance are to be delivered to Agent, with the lender's loss payable and additional insured endorsements in favor of Agent and shall provide for not less than thirty days (ten days in the case of non-payment) prior written notice to Agent of the exercise of any right of cancellation. Unless Borrowers provide Agent with evidence of the continuing insurance coverage required by this Agreement, Agent may purchase insurance at Borrowers' expense to protect Agent's and Lenders' interests in the Collateral. This insurance may, but need not, protect each Borrower's and each other Loan Party's interests. The coverage that Agent purchases may, but need not, pay any claim that is made against any Borrower or any other Loan Party in connection with the Collateral. Borrowers may later cancel any insurance purchased by Agent, but only after providing Agent with evidence that Borrowers have obtained the insurance coverage required by this Agreement. If Agent purchases insurance for the Collateral, as set forth above, Borrowers will be responsible for the costs of that insurance, including interest and any other charges that may be imposed with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance and the costs of the insurance may be added to the principal amount of the Loans owing hereunder. The costs of the insurance may be more than the cost of insurance that Borrowers may be able to obtain on their own.

(b)      Borrowers shall give Agent prompt notice of any loss exceeding $500,000 covered by the casualty or business interruption insurance of any Loan Party or its Subsidiaries. Upon the occurrence and during the continuance of an Event of Default, Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(c)      If at any time the area in which any Real Property that is subject to a Mortgage is located is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount and on terms that are satisfactory to Agent and all Lenders from time to time, and otherwise comply with the Flood Laws or as is otherwise satisfactory to Agent and all Lenders.

5.7    **Inspection**.

(a)      Each Loan Party will, and will cause each of its Subsidiaries to, permit Agent, any Lender, and each of their respective duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees (provided, that an authorized representative of a Borrower shall be allowed to be present) at such reasonable times and intervals as Agent or any Lender, as applicable, may designate and, so long as no Default or Event of Default has occurred and is continuing, with reasonable prior notice to Borrowers and during regular business hours, at Borrowers' expense ~~in accordance with this~~

~~Agreement and the provisions of the Fee Letter, subject to the limitations set forth below in Section 5.7(c).~~

(b)    Each Loan Party will, and will cause each of its Subsidiaries to, permit Agent and each of its duly authorized representatives or agents to conduct field examinations, appraisals or valuations at such reasonable times and intervals as Agent may designate, at Borrowers' expense in accordance with this Agreement ~~and the provisions of the Fee Letter, subject to the limitations set forth below in Section 5.7(c).~~

~~(c)    So long as no Event of Default shall have occurred and be continuing during a calendar year, Borrowers shall not be obligated to reimburse Agent for more than (i) two (2) field examinations in such calendar year (decreasing to one (1) field examination per calendar year commencing with the calendar year beginning January 1, 2024 if ABL Availability is not less than 30% of the Combined Line Cap (excluding the effect, if any, of any Term Pushdown Reserve) at all times during such calendar year, (ii) two (2) inventory appraisals in such calendar year (decreasing to one (1) inventory appraisal if per calendar year commencing with the calendar year beginning January 1, 2024 if ABL Availability is not less than 30% of the Combined Line Cap (excluding the effect, if any, of any Term Pushdown Reserve) at all times during such calendar year, and (iii) one (1) appraisal of intellectual property in such calendar year, in each case under this Section 5.7(c), except for field examinations and appraisals conducted in connection with a proposed Acquisition (whether or not consummated); provided, that so long as (A) no Event of Default has occurred and is continuing and (B) the ABL Agent and/or the Borrowers furnish to the Agent any inventory appraisals with respect to the inventory of the Domestic Borrower and field examinations solely with respect to the assets of the Domestic Borrowers conducted by an Acceptable Appraiser/Field Examiner in accordance with the terms of the ABL Credit Agreement, the Agent and the Lenders shall rely on such inventory appraisals and field examinations of the ABL Priority Collateral of the Domestic Borrower conducted by the Acceptable Appraiser/Field Examiner in lieu of conducting independent inventory appraisals and field examinations of the ABL Priority Collateral of the Domestic Borrower pursuant to the terms of this Section 5.7(c) (it being understood that Agent's and the Lenders' reliance on the inventory appraisals and field examinations of the ABL Priority Collateral of the Domestic Borrower conducted by the Acceptable Appraiser/Field Examiner shall not limit or preclude in any way the Agent's and/or the Lenders' ability to conduct, or cause to be conducted, any appraisals and field examinations in respect of any assets of any other Borrower or any appraisal of the IP or of any other Collateral (to the extent applicable)). Notwithstanding anything to the contrary contained herein, the Agent may cause additional inventory appraisals, IP appraisals, and field examinations to be undertaken (i) as it in its reasonable discretion deems necessary or appropriate, at its own expense, or (ii) if an Event of Default shall have occurred and be continuing or if required by applicable law, at the expense of the Loan Parties. For the avoidance of doubt, the appraisals and the commercial finance examination described in clauses (m) and (n) of Schedule 3.1 to this Agreement shall not be included in the determination of whether appraisals or field examinations may be undertaken pursuant to this Section 5.7(c).~~

(c)    Borrowers shall be obligated to reimburse Agent for the reasonable and documented out-of-pocket costs and expenses associated with all field, inventory appraisals and appraisals of intellectual property. Notwithstanding anything to the contrary contained herein, the Agent may cause inventory appraisals, IP appraisals, and field examinations to be undertaken as it in its Permitted Discretion deems necessary or appropriate at the expense of the Loan Parties.

5.8    **Compliance with Laws**. Each Loan Party will, and will cause each of its Subsidiaries to, comply with the requirements of all applicable laws, rules, regulations, and orders of any

Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

5.9    **Environmental**.  Each Loan Party will, and will cause each of its Subsidiaries to,

(a)    Keep any property either owned or operated by any Loan Party or its Subsidiaries free of any Environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens,

(b)    Comply, in all material respects, with Environmental Laws and provide to Agent documentation of such compliance which Agent reasonably requests,

(c)    Promptly notify Agent of any release of which any Loan Party has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Loan Party or its Subsidiaries and take any Remedial Actions required to abate said release or otherwise to come into compliance, in all material respects, with applicable Environmental Law, and

(d)    Promptly, but in any event within five Business Days of its receipt thereof, provide Agent with written notice of any of the following: (i) notice that an Environmental Lien has been filed against any of the real or personal property of a Loan Party or its Subsidiaries, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against a Loan Party or its Subsidiaries, and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority.

5.10    **Disclosure Updates**.  Each Loan Party will, promptly and in no event later than five Business Days after obtaining knowledge thereof, notify Agent if any written information, exhibit, or report furnished to Agent or the Lenders contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made. The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

5.11    **Formation of Subsidiaries**.  Each Loan Party will, at the time that any Loan Party forms or acquires any direct or indirect Subsidiary after the Closing Date, ~~within ten days~~at the time of such event (or such later date as permitted by Agent in its sole discretion) (a) cause such new Subsidiary (i) if such Subsidiary is a Domestic Subsidiary or a Canadian Subsidiary, as applicable, and Administrative Borrower requests, subject to the consent of Agent, that such Domestic Subsidiary or such Canadian Subsidiary, as applicable, be joined as a Borrower hereunder, to provide to Agent a Joinder to this Agreement, and (ii) to provide to Agent a joinder to the Guaranty and Security Agreement or Canadian Guaranty and Security Agreement, as applicable, in each case, together with such other security agreements (including Mortgages with respect to any Real Property owned in fee of such new Subsidiary with a fair market value of greater than $500,000), as well as appropriate financing statements (and with respect to all property subject to a Mortgage, fixture filings), all in form and substance reasonably satisfactory to Agent (including being sufficient to grant Agent a first-priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary (other than any assets expressly excluded from the Collateral (as defined in the Guaranty and Security Agreement or the Canadian Guaranty and Security Agreement, as applicable)) ~~(it being agreed and understood that all Borrowers (as defined in the ABL Credit Agreement as in effect on the date hereof) from time to time party to the ABL Credit Agreement and all Guarantors (as defined in the ABL Credit Agreement as in effect) from time to time party to the ABL Credit Agreement or other ABL Loan Documents shall be party to the Guaranty~~

DB1/ 139987402.3

and Security Agreement and/or the Canadian Guaranty and Security Agreement, as the case may be); provided, that the Joinder, the joinder to the Guaranty and Security Agreement, the joinder to the Canadian Guaranty and Security Agreement (if applicable), and such other security agreements shall not be required to be provided to Agent with respect to any Subsidiary of any Loan Party that is a CFC if providing such agreements would result in material adverse tax consequences or the costs to the Loan Parties of providing such guaranty or such security agreements are unreasonably excessive (as determined by Agent in consultation with Borrowers) in relation to the benefits to Agent and the Lenders of the security or guarantee afforded thereby, (b) provide, or cause the applicable Loan Party to provide, to Agent a pledge agreement (or an addendum to the Guaranty and Security Agreement) and appropriate certificates and powers or financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary in form and substance reasonably satisfactory to Agent; provided, that only 65% of the total outstanding voting Equity Interests of any Subsidiary (other than any Subsidiary that is, or may be, a Loan Party) of a Loan Party that is a CFC shall be required to be pledged if pledging a greater amount would result in material adverse tax consequences or the costs to the Loan Parties of providing such pledge are unreasonably excessive (as determined by Agent in consultation with Borrowers) in relation to the benefits to Agent and the Lenders of the security afforded thereby (which pledge, if requested by Agent, shall be governed by the laws of the jurisdiction of such Subsidiary), and (c) provide to Agent all other documentation, including the Governing Documents of such Subsidiary and one or more opinions of counsel reasonably satisfactory to Agent, which, in its opinion, is appropriate with respect to the execution and delivery of the applicable documentation referred to above (including policies of title insurance, flood certification documentation or other documentation with respect to all Real Property owned in fee and subject to a Mortgage). Any document, agreement, or instrument executed or issued pursuant to this Section 5.11 shall constitute a Loan Document.

5.12    **Further Assurances**.  Each Loan Party will, and will cause each of the other Loan Parties to, at any time upon the reasonable request of Agent, execute or deliver to Agent any and all financing statements, fixture filings, security agreements, pledges, assignments, Mortgages, deeds of trust, opinions of counsel, and all other documents (the "Additional Documents") that Agent may reasonably request in form and substance reasonably satisfactory to Agent, to create, perfect, and continue perfected or to better perfect Agent's Liens in all of the assets of each of the Loan Parties (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal) (other than any assets expressly excluded from the Collateral (as defined in the Guaranty and Security Agreement) pursuant to Section 3 of the Guaranty and Security Agreement), to create and perfect Liens in favor of Agent in any Real Property acquired and owned in fee by any other Loan Party, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents; provided, that the foregoing shall not apply to any Subsidiary (other than any Subsidiary that is, or may be, a Borrower) of a Loan Party  that is a CFC if providing such documents would result in material adverse tax consequences or the costs to the Loan Parties of providing such documents are unreasonably excessive (as determined by Agent in consultation with Borrowers) in relation to the benefits to Agent and the Lenders of the security afforded thereby. To the maximum extent permitted by applicable law, if any Borrower or any other Loan Party refuses or fails to execute or deliver any reasonably requested Additional Documents within a reasonable period of time not to exceed 5 Business Days following the request to do so, each Borrower and each other Loan Party hereby authorizes Agent to execute any such Additional Documents in the applicable Loan Party's name and authorizes Agent to file such executed Additional Documents in any appropriate filing office. In furtherance of, and not in limitation of, the foregoing, each Loan Party shall take such actions as Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by substantially all of the assets of the Loan Parties, including all of the outstanding capital Equity Interests of each Borrower and its Subsidiaries (in each case, other than with respect to any assets expressly excluded from the Collateral (as defined in the Guaranty and Security Agreement) pursuant to Section 3 of the Guaranty and Security Agreement). Notwithstanding anything to the contrary contained herein (including Section 5.11 hereof

and this Section 5.12) or in any other Loan Document, (x) Agent shall not accept delivery of any Mortgage from any Loan Party unless each of the Lenders has received 45 days prior written notice thereof and Agent has received confirmation from each Lender that such Lender has completed its flood insurance diligence, has received copies of all flood insurance documentation and has confirmed that flood insurance compliance has been completed as required by the Flood Laws or as otherwise satisfactory to such Lender and (y) Agent shall not accept delivery of any joinder to any Loan Document with respect to any Subsidiary of any Loan Party that is not a Loan Party, if such Subsidiary that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation unless such Subsidiary has delivered a Beneficial Ownership Certification in relation to such Subsidiary and Agent has completed its Patriot Act searches, Canadian AML Legislation searches (if applicable), OFAC/PEP searches, Canadian AML Legislation searches (if applicable) and customary individual background checks for such Subsidiary, the results of which shall be satisfactory to Agent.

5.13    ~~Joinder of Nautilus Dutch and Nautilus Swiss~~Intentionally Omitted.

~~(a) Upon the earlier of (i) the exercise of the Additional Portion of Term Loan as set forth in Section 2.14 and (ii) January 15, 2023 (or such later date as may be agreed to by Agent in its sole discretion), the Loan Parties shall cause Nautilus Dutch to join this Agreement as a Guarantor (or, solely if the Additional Portion of Term Loan is being exercised pursuant to Section 2.14, as a Borrower), and execute all Additional Documents that Agent may reasonably request in form and substance reasonably satisfactory to Agent, to guarantee (including on a joint and several basis) all of the Obligations and to create and perfect Agent's Liens, and continue perfected or to better perfect Agent's Liens in all of the assets of Nautilus Dutch (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Agent, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents (including, without limitation, any security documentation governed by foreign law that the Agent deems necessary or advisable).~~

~~(b) On or prior to February 28, 2023 (or such later date as may be agreed to by Agent in its sole discretion), the Loan Parties shall cause Nautilus Swiss and Nautilus Fitness Equipments to join this Agreement as a Guarantor, and execute all Additional Documents that Agent may reasonably request in form and substance reasonably satisfactory to Agent, to guarantee (including on a joint and several basis) all of the Obligations and to create and perfect Agent's Liens, and continue perfected or to better perfect Agent's Liens in all of the assets of Nautilus Swiss and Nautilus Fitness Equipments (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Agent, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents (including, without limitation, any security documentation governed by foreign law that the Agent deems necessary or advisable); provided, that such joinder and such other security agreements shall not be required to be provided to Agent with respect to Nautilus Swiss and Nautilus Fitness Equipments if providing such agreements would result in material adverse tax consequences or the costs to the Loan Parties of providing such guaranty or such security agreements are unreasonably excessive (as determined by Agent in consultation with Borrowers) in relation to the benefits to Agent and the Lenders of the security or guarantee afforded thereby.~~

5.14    **Location of Inventory; Chief Executive Office**.  Each Loan Party will, and will cause each of its Subsidiaries to, keep (a) their Inventory only at the locations identified on Schedule 4.25 to this Agreement (provided that Borrowers may amend Schedule 4.25 to this Agreement so long as such amendment occurs by written notice to Agent not less than ten days prior to the date on which such Inventory is moved to such new location and so long as Agent has consented to such amendment and such new location is within the continental United States), and (b) their respective chief executive offices only at the locations identified on Schedule 7 to the Guaranty and Security Agreement or Schedule 7 to the Canadian Guaranty and Security Agreement, as applicable. Subject to Section 5.18, each Loan Party

will, and will cause each of its Subsidiaries to, use their commercially reasonable efforts to obtain Collateral Access Agreements for each of the locations identified on Schedule 7 to the Guaranty and Security Agreement or Schedule 7 to the Canadian Guaranty and Security Agreement, as applicable, and Schedule 4.25 to this Agreement; provided, however, to the extent such protections are granted in any Financing Order, no new Collateral Access Agreements will be required.

5.15    **Compliance with ERISA and the IRC**.  In addition to and without limiting the generality of Section 5.8, (a) comply in all material respects with applicable provisions of ERISA and the IRC with respect to all Employee Benefit Plans, (b) without the prior written consent of Agent and the Required Lenders, not take any action or fail to take action the result of which could result in a Loan Party or ERISA Affiliate incurring a material liability to the PBGC or to a Multiemployer Plan (other than to pay contributions or premiums payable in the ordinary course), (c) allow any facts or circumstances to exist with respect to one or more Employee Benefit Plans that, in the aggregate, reasonably could be expected to result in a Material Adverse Effect, (d) not participate in any prohibited transaction that could result in other than a non-material civil penalty excise tax, fiduciary liability or correction obligation under ERISA or the IRC, (e) operate each Employee Benefit Plan in such a manner that will not incur any material tax liability under the IRC (including Section 4980B of the IRC), and (e) furnish to Agent upon Agent's written request such additional reasonable information about any Employee Benefit Plan for which any Loan Party or ERISA Affiliate could reasonably expect to incur any material liability. With respect to each Pension Plan, except as could not reasonably be expected to result in a Material Adverse Effect, individually or in the aggregate, the Loan Parties and the ERISA Affiliates shall (i) satisfy in full and in a timely manner, without incurring any late payment or underpayment charge or penalty and without giving rise to any Lien, all of the contribution and funding requirements of the IRC and of ERISA, and (ii) pay, or cause to be paid, to the PBGC in a timely manner, without incurring any late payment or underpayment charge or penalty, all premiums required pursuant to ERISA.

5.16    **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**.  Each Loan Party will, and will cause each of its Subsidiaries to comply with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Loan Parties and its Subsidiaries shall implement and maintain in effect policies and procedures reasonably designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

5.17    **Material Contracts**.    Contemporaneously with the delivery of each Compliance Certificate pursuant to Section 5.1, Borrowers will provide Agent with copies of (a) each Material Contract entered into since the delivery of the previous Compliance Certificate, and (b) each material amendment or modification of any Material Contract entered into since the delivery of the previous Compliance Certificate.

5.18    **Post-Closing Obligations**.  The Loan Parties will complete each of the tasks and other items set forth on Schedule 5.18 no later than the times specified therein or such later date as Agent may agree in writing.

5.19    **Cash Management**.

. Subject to the terms of the Intercreditor Agreement:

(a) At all times during a Cash Dominion Period, the Loan Parties shall cause the ABL Agent, in a manner consistent with any Control Agreement, to take all actions with respect to a Cash Dominion Period (as defined in the ABL Loan Documents), including, without limitation, issuing an

~~Activation Instruction (as defined in the ABL Loan Documents) and requiring the Loan Parties to ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to a Deposit Account that is subject to a Control Agreement in favor of Agent all amounts on deposit in each DDA and all payments received from all Credit Card Issuers and Credit Card Processors.~~

(a)     ~~(b)  Each~~Unless otherwise agreed to by the Agent in advance in writing, as otherwise set forth in clause (f) below, or as otherwise set forth in the Foreign Account Letter Agreements, the Loan Parties shall cause, and each Control Agreement shall require, ~~following Agent's notice,~~ the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to a concentration account designated by the Agent (the "Concentration Account"), of all cash receipts and ~~collections~~Collections received by each Loan Party from all sources, including, without limitation, the following:

(i)     all available cash receipts (x) from the sale of Inventory, and (y) ~~subject to the Intercreditor Agreement,~~ from the sale of other assets (whether or not constituting Collateral);

(ii)     all proceeds of collections of Accounts;

(iii)     all Net Cash Proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any Disposition or other transaction or event,

(iv)     the then contents of each DDA; and

(v)     the proceeds of all credit card charges.

(b)     ~~(c)~~ Upon the reasonable request of the Agent, the Loan Parties shall cause bank statements and/ or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Deposit Account subject to a Control Agreement to ensure the proper transfer of funds as set forth above.

(c)     Unless otherwise agreed to by the Agent in advance in writing, as otherwise set forth in clause (g) below, or as otherwise set forth in the Foreign Account Letter Agreements, the Agent shall have sole control and dominion of and a Lien on all funds deposited in any Controlled Account (including the Concentration Account and the Term Loan Priority Accounts), for the ratable benefit of the Lender Group. The Loan Parties shall not maintain any deposit or securities accounts (other than the Excluded Accounts and such other Deposit Accounts as the Agent may agree to in its sole discretion) which are not subject to Control Agreements (or foreign equivalents thereof). The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account and the Term Loan Priority Accounts, (ii) the funds on deposit in the Concentration Account and the Term Loan Priority Accounts shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Concentration Account and the Term Loan Priority Account shall be applied as provided in this Agreement.

(d)     If, notwithstanding the provisions of subsection (a), Section 7(k) of the Guaranty and Security Agreement or Section 7(k) of the Canadian Guaranty and Security Agreement, the Domestic Loan Parties and/or their Domestic Subsidiaries receive or otherwise have dominion and control over any cash, Cash Equivalents, Collections or amounts credited to any DDA or Securities Accounts of the Domestic Loan Parties and/or the Domestic Subsidiaries (for the avoidance of doubt, other than the

Eligible Cash Account) in excess of $1,500,000 in the aggregate for all Domestic Loan Parties and their Domestic Subsidiaries, such excess shall be held in trust by the applicable Domestic Loan Party or such Domestic Subsidiary for the Agent, shall not be commingled with any such Domestic Loan Party's or such Domestic Subsidiary's other funds or deposited in any account of such Domestic Loan Party or such Domestic Subsidiary and shall, not later than one (1) Business Day, be deposited into the Concentration Account for application in accordance with Section 2.4(e)(i)(A).

(e)    To the extent any Foreign Loan Party or Foreign Subsidiary repatriates any funds to BowFlex or any other Loan Party, such funds shall be remitted to the Term Loan Priority Account only.

(f)    Notwithstanding anything to the contrary set forth herein or in any other Loan Document and subject to the terms of the Cash Management Order, the Agent and the Lenders hereby agree, so long as no Event of Default has occurred, (i) to not require a Control Agreement with respect to the Deposit Account of BowFlex at Wells Fargo with account number ending x6059, and (ii) to abstain from sending any activation instructions (if applicable) or exercising remedies solely with respect to Deposit Accounts of BowFlex at Wells Fargo with account numbers ending x6059 and x6125, and permit BowFlex to continue to exercise all rights and powers in respect of such Deposit Accounts in the ordinary course of business consistent with the Approved Budget.

5.20    **[Intentionally Omitted]**.

5.21    **Milestones**. The Loan Parties and their Subsidiaries covenant and agree to satisfy each of the Milestones.

5.22    **Security and Priorities**.  Upon the entry of the applicable Financing Order, all of the Obligations shall, subject to the Carve Out Expenses, at all times:

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed superpriority administrative expense claims against the Loan Parties (without the need to file any proof of claim) with priority over any and all claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment, which allowed claims (the "Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Loan Parties and all proceeds thereof (excluding Avoidance Actions but including, effective upon entry of the Final Financing Order, Avoidance Proceeds), subject only to the Carve Out Expenses. Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Financing Order (or, after entry thereof, the Final Financing Order) or any provision thereof is vacated, reversed, amended or otherwise modified, on appeal or otherwise.

(b)    Pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a valid, perfected, continuing, enforceable, non-avoidable first priority security interest and lien on the Collateral of the Loan Parties, and in each case of this clause (b), (x) to the extent such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date or becomes unencumbered by any such liens in effect as of the Petition Date as a result of the repayment of Pre-Petition Obligations with the proceeds of any extensions of credit hereunder and (y) Avoidance Actions (it being understood that

notwithstanding such exclusion of Avoidance Actions, upon entry of the Final Financing Order, to the extent approved by the Bankruptcy Court, such lien shall attach to any Avoidance Proceeds).

(c)    Pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a valid, perfected, continuing, enforceable, non-avoidable security interest and lien on the Collateral of the Loan Parties, and in each case, senior in priority to all other Liens on such Collateral or any Pre-Petition Obligations.

(d)    Pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a valid, perfected, continuing, enforceable, non-avoidable first priority priming security interest and lien on the Collateral of the Loan Parties, and in each case, senior to existing liens on such Collateral that secure any Pre-Petition Obligations, which priming liens pursuant to this clause (d) shall, for the avoidance of doubt, be senior to any current and future liens granted on such Collateral to or for the benefit of any "Lender Group" under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents (including, without limitation, to provide adequate protection); provided that the liens pursuant to this clause (d) shall be subject as to priority only to (i) the Carve Out Expenses, (ii) Liens on the Collateral that are valid, binding, enforceable, properly perfected, nonavoidable and senior in priority to the Pre-Petition Liens (as defined in the Financing Orders) as of the Petition Date (other than those referred to in the foregoing clauses (i) and (ii)).

5.23    **Certain Other Bankruptcy Matters.**

(a)    Each Loan Party and its Subsidiaries shall comply (i) in all respects, after entry thereof, with all of the requirements and obligations set forth in the Financing Orders and the Cash Management Order, as each such order is amended and in effect from time to time in accordance with this Agreement, (ii) in all respects, after entry thereof, with each order of the type referred to in clause (b) of the definition of "Approved Bankruptcy Court Order", as such orders, if entered by the Bankruptcy Court, must comply with, and only be modified from time to time in accordance with, clause (b) of the definition of "Approved Bankruptcy Court Order," and (iii) in all material respects, after entry thereof, with the orders (to the extent not covered by subclause (i) or (ii) above) approving the Debtors' "first day" and "second day" relief obtained in the Chapter 11 Cases, as such orders, if entered by the Bankruptcy Court, must comply with, and only be modified from time to time in accordance with, clause (c) of the definition of "Approved Bankruptcy Court Order".

(b)    The Borrowers shall provide at least five (5) Business Days' (or such shorter notice acceptable to Agent in its sole discretion) prior written notice to Agent and its advisors prior to any assumption or rejection of any Loan Party's or any other Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected, if such assumption or rejection adversely impacts (i) the Collateral, any Liens thereon or any Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or Superpriority Claims), (ii) any transaction outside of the ordinary course of business with any Affiliate of Borrowers, if Agent informs the Borrowers in writing within three (3) Business Days of receipt of the notice from the Borrowers referenced above that it objects to such assumption or rejection, as applicable.

(c)    The Debtors shall give, on a timely basis as specified in the Interim Financing Order or the Final Financing Order, as applicable, all notices required to be given to all parties specified in the Interim Financing Order or Final Financing Order, as applicable.

(d)    ~~Within ninety (90) days (or such later date as the Agent may agree to in its sole discretion) of the Closing Date, the Loan Parties shall have established the Term Loan Priority Account~~

(subject to a Control Agreement in favor of the Agent).The Debtors shall give, on a timely basis as specified in the Interim Financing Order or the Final Financing Order, as applicable, all notices required to be given to all parties specified in the Interim Financing Order or Final Financing Order, as applicable, any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the Carve Out Expenses and the priorities set forth in the Interim Financing Order or Final Financing Order, as applicable.

(e) Subject to clause (d) above, all proceeds of Term Priority Collateral shall be remitted to the Term Loan Priority Account.

(e)    The Debtors shall comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the rules promulgated thereunder, the Financing Orders and any other order of the Bankruptcy Court.

(f)    After the Discharge of ABL Obligations, all proceeds of the Collateral shall be deposited in the Term Loan Priority Account or as otherwise agreed to by the Agent.The Debtors shall make all adequate protection payments payable in cash on the dates and to the extent required by the Financing Orders.

(g)    The Agent and the Lenders acknowledge and agree that the Control Agreements executed and delivered to the Agent on the Closing Date satisfy the requirements set forth in clause (b) above.Debtors shall cause all proposed "first day orders" submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement in all respects.

5.24    **Release of Post-Petition Claims**. Upon (a) the receipt by Agent, on behalf of itself and the other Lenders, of payment in full of all Obligations, and (b) the termination of the Loan Documents, in consideration of the agreements of Agent and Lenders contained herein and the making of any Loans by Agent and Lenders, but subject to the entry of the applicable Financing Order of any Debtor, each Loan Party hereby covenants and agrees to execute and deliver in favor of Agent, Lenders and the other Indemnified Parties a valid and binding termination and release agreement, in form and substance satisfactory to Agent (which may be part of any Acceptable Plan of Reorganization). If any Loan Party violates such covenant, the Loan Parties agree to pay, in addition to such other damages as any Indemnified Party may sustain as a result of such violation, all attorneys' fees and costs incurred by any Indemnified Party as a result of such violation.  Each Loan Party understands, acknowledges and agrees that the releases set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.  Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth above when made.

5.20 **ABL Borrowing Base**.  If at any time the Term Pushdown Reserve is greater than zero ($0), then the Borrowers shall immediately notify the Agent and the ABL Agent thereof, and cause the ABL Agent to establish and maintain the Term Pushdown Reserve against the ABL Borrowing Base. The Borrowers shall deliver prompt evidence reasonably satisfactory to the Agent that such reserve has been established and is being maintained.

6.    **NEGATIVE COVENANTS.**

Each Borrower covenants and agrees that, until the termination of all of the Commitments and the payment in full of the Obligations:

6.1    **Indebtedness**.  Each Loan Party will not, and will not permit any of its Subsidiaries to, create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

6.2    **Liens**.  Each Loan Party will not, and will not permit any of its Subsidiaries to, create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3    **Restrictions on Fundamental Changes**.  Each Loan Party will not, and will not permit any of its Subsidiaries to,

(a)    enter into any merger, amalgamation, consolidation, reorganization, or recapitalization, or reclassify its Equity Interests, except for (i) any merger or amalgamation between Loan Parties; provided, that a Borrower must be the surviving entity of any such merger or amalgamation to which it is a party and no Default or Event of Default would result therefrom, (ii) any merger or amalgamation between a Loan Party and a Subsidiary of such Loan Party that is not a Loan Party so long as such Loan Party is the surviving entity of any such merger, and (iii) any merger or amalgamation between Subsidiaries of any Loan Party that are not Loan Parties,

(b)    liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), except for (i) the liquidation or dissolution of non-operating Subsidiaries of any Loan Party with nominal assets and nominal liabilities, (ii) the liquidation or dissolution of a Loan Party (other than any Borrower) or any of its wholly-owned Subsidiaries so long as all of the assets (including any interest in any Equity Interests) of such liquidating or dissolving Loan Party or Subsidiary are transferred to a Loan Party that is not liquidating or dissolving, or (iii) the liquidation or dissolution of a Subsidiary of any Loan Party that is not a Loan Party (other than any such Subsidiary the Equity Interests of which (or any portion thereof) is subject to a Lien in favor of Agent) so long as all of the assets of such liquidating or dissolving Subsidiary are transferred to a Subsidiary of a Loan Party that is not liquidating or dissolving,

(c)    suspend or cease operating a substantial portion of its or their business, except as permitted pursuant to clauses (a) or (b) above or in connection with a transaction permitted under Section 6.4, or

(d)    change its classification/status for U.S. federal income tax purposes.

6.4    **Disposal of Assets**.  Other than Permitted Dispositions or transactions expressly permitted by Sections 6.3 or 6.9, each Loan Party will not, and will not permit any of its Subsidiaries to, convey, sell, lease, license, assign, transfer, or otherwise Dispose of any of its or their assets (including by an allocation of assets among newly divided limited liability companies pursuant to a "plan of division" or pursuant to a Sale–Leaseback or other sale-and-leaseback transaction).

6.5    **Nature of Business**.  Each Loan Party will not, and will not permit any of its Subsidiaries to, make any change in the nature of its or their business as described in Schedule 6.5 to this Agreement or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, that the foregoing shall not prevent any Loan Party and its Subsidiaries from engaging in any business that is reasonably related or ancillary to its or their business.

6.6    **Prepayments and Amendments**.  Each Loan Party will not, and will not permit any of its Subsidiaries to,

(a)    Except in connection with Refinancing Indebtedness permitted by Section 6.1,

(i)    optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Loan Party or its Subsidiaries, other than (A) the Obligations in accordance with this Agreement, (B) Hedge Obligations, (C) to the extent not otherwise prohibited by the Intercompany Subordination Agreement, Permitted Intercompany Advances, or (D) (1) mandatory or scheduled payments of the ABL Obligations and (2) all voluntary prepayments of the ABL Obligations, in each case in accordance with the terms of the ABL Loan Documents, oror

(ii)    make any payment on account of Indebtedness that has been contractually subordinated in right of payment to the Obligations if such payment is not permitted at such time under the subordination terms and conditions, or

(b)    Directly or indirectly, amend, modify, or change any of the terms or provisions of:

(i)    any agreement, instrument, document, indenture, or other writing evidencing or concerning Permitted Indebtedness (other than (A) the Obligations in accordance with this Agreement, (B) Hedge Obligations, (C) subject to the Intercompany Subordination Agreement, Permitted Intercompany Advances, (D) Indebtedness permitted under clauses (e), (h), (j) and (k) of the definition of Permitted Indebtedness, and (E) any ABL Loan Document or agreement in respect of any refinancing of any Indebtedness under any ABL Loan Document, to the extent that such amendment, modification or waiver would be permitted under the Intercreditor Agreement without the consent of the Agent),),

(ii)    subject to the limited consent provided in Amendment No. 1, any Material Contract (other than the Pacific Direct License Agreement) except to the extent that such amendment, modification, or change could not, individually or in the aggregate, reasonably be expected to be materially adverse to the interests of the Lenders,

(iii)    any Credit Card Agreement except to the extent that such amendment, modification, or change could not, individually or in the aggregate, reasonably be expected to be materially adverse to the interests of the Lenders,

(iv)    the Governing Documents of any Loan Party or any of its Subsidiaries if the effect thereof, either individually or in the aggregate, could reasonably be expected to be materially adverse to the interests of the Lenders, or

(v)    the Pacific Direct License Agreement, unless such amendment, modification, or change is permitted pursuant to the terms of the Pacific Direct Collateral Assignment, or

(vi)    the Stalking Horse Purchase Agreement without the prior written consent of the Agent.

6.7    **Restricted Payments**.  Each Loan Party will not, and will not permit any of its Subsidiaries to, make any Restricted Payment; provided, that so long as it is permitted by law,

(a)  , other than to the extent specifically set forth in the Approved Budget. Administrative Borrower may make distributions to former employees, officers, or directors of Administrative Borrower (or any spouses, ex-spouses, or estates of any of the foregoing) on account of redemptions of Equity Interests of Administrative Borrower held by such Persons; provided, that (i) the aggregate amount of such redemptions made by Administrative Borrower during the term of this Agreement plus the amount of Indebtedness outstanding under clause (l) of the definition of Permitted Indebtedness, does not exceed $250,000 in the aggregate, and (ii) if such distribution is made in cash, no Default or Event of Default shall have occurred and be continuing or would result therefrom,

(b) so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom, Administrative Borrower may make distributions to former employees, officers, or directors of Administrative Borrower (or any spouses, ex-spouses, or estates of any of the foregoing), solely in the form of forgiveness of Indebtedness of such Persons owing to Administrative Borrower on account of repurchases of the Equity Interests of Administrative Borrower held by such Persons; provided, that such Indebtedness was incurred by such Persons solely to acquire Equity Interests of Administrative Borrower,

(c) Administrative Borrower's Subsidiaries may make distributions to Administrative Borrower (i) in an amount sufficient to pay franchise taxes and other fees required to maintain the legal existence of the Loan Parties and their Subsidiaries to the extent actually used by Administrative Borrower to pay such taxes, costs and expenses, and (ii) so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom, in an amount sufficient to pay out-of-pocket legal, accounting and filing costs and other expenses in the nature of overhead in the ordinary course of business of the Loan Parties and their Subsidiaries,

(d) each of the Borrowers may declare and pay dividends with respect to its common stock payable solely in additional shares of its common stock, and, with respect to its preferred stock, payable solely in additional shares of such preferred stock or in shares of its common stock, or

(e) any Subsidiary may make a Restricted Payment to a Borrower and any Subsidiary which is not a Loan Party may make a Restricted Payment to another Subsidiary.

Notwithstanding anything to the contrary contained herein, no Borrower Intellectual Property or any asset included in the determination of any Borrowing Base or any ABL Borrowing Base shall be the subject of any Restricted Payment to any non-Loan Party without the prior written consent of the Agent.

6.8    **Accounting Methods**.  Each Loan Party will not, and will not permit any of its Subsidiaries to, modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

6.9    **Investments**.  Each Loan Party will not, and will not permit any of its Subsidiaries to, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment except for Permitted Investments.

6.10    **Transactions with Affiliates**.  Each Loan Party will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction with any Affiliate of

any Loan Party or any of its Subsidiaries except ~~for:~~as permitted by the Financing Orders and the Approved Budget.

~~(a) transactions (other than (x) the payment of management, consulting, monitoring, or advisory fees and (y) intercompany activities in the ordinary course of business and consistent with past practices in respect of "cost plus" arrangements and/or transfer pricing arrangements (which clauses (x) and (y) shall not be deemed to include Special Foreign Subsidiary Investments) between such Loan Party or its Subsidiaries, on the one hand, and any Affiliate of such Loan Party or its Subsidiaries, on the other hand, so long as such transactions (i) are fully disclosed to Agent prior to the consummation thereof, if they involve one or more payments by such Loan Party or its Subsidiaries to an Affiliate that is not a Loan Party in excess of $1,000,000 for any single transaction or series of related transactions, and (ii) are no less favorable, taken as a whole, to such Loan Party or its Subsidiaries, as applicable, than would be obtained in an arm's length transaction with a non Affiliate,~~

~~(b) any indemnity provided for the benefit of directors (or comparable managers) of a Loan Party or one of its Subsidiaries so long as it has been approved by such Loan Party's or such Subsidiary's board of directors (or comparable governing body) in accordance with applicable law,~~

~~(c) the payment of reasonable compensation, severance, or employee benefit arrangements to employees, officers, and outside directors of a Loan Party or one of its Subsidiaries in the ordinary course of business and consistent with industry practice so long as it has been approved by such Loan Party's or such Subsidiary's board of directors (or comparable governing body) in accordance with applicable law,~~

~~(d) (i) transactions solely among the Loan Parties, and (ii) transactions solely among Subsidiaries of Loan Parties that are not Loan Parties,~~

~~(e) transactions permitted by Section 6.3, Section 6.7, or Section 6.9, or~~

~~(f) agreements for the non-exclusive licensing of intellectual property, or distribution of products, in each case, among the Loan Parties and their Subsidiaries for the purpose of the counterparty thereof operating its business, and agreements for the assignment of intellectual property from any Loan Party or any of its Subsidiaries to any Loan Party.~~

6.11    **Use of Proceeds**. Each Loan Party will not, and will not permit any of its Subsidiaries to, use the proceeds of any Loan made hereunder for any purpose other than (a) on the Closing Date, (i) to repay, in full, the outstanding principal, accrued interest, and accrued fees and expenses owing under or in connection with the ABL Existing Term Loan (as defined in the Pre-Petition Credit Agreement), (ii) to repay, in part, the ABL Revolving Loans (as defined in the Pre-Petition Credit Agreement) outstanding on the Closing Date in an amount not less than $19,273,541.11 and (iii) to pay the fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, and the transactions contemplated hereby and thereby, in each case, as set forth in the Flow of Funds Agreement, and (b) ~~thereafter~~from the Closing Date to (but excluding) the Amendment No. 3 Effective Date, consistent with the terms and conditions hereof, for their lawful and permitted purposes~~; provided~~ and (c) on the Amendment No. 3 Effective Date and thereafter to pay amounts associated with the Term Loan as provided in the Approved Budget (including the Early Termination Premium (as defined in this Agreement immediately prior to giving effect to Amendment No. 3)) and for working capital and general corporate purposes of the Borrowers, including: (i) to pay obligations arising from or related to the Carve Out Expenses, (ii) to make adequate protection payments, (iii) to pay fees and expenses incurred in connection with the transactions contemplated by this Agreement, (iv) to pay any accrued and unpaid interest and fees under the Pre-Petition Credit Agreement and reimbursement of out-of-pocket fees,

expenses and disbursements of counsel to the Agent, and (v) any other allowed administrative expenses incurred during the Chapter 11 Cases, all consistent with the Approved Budget pursuant to Section 7; provided, that, in no event shall the use of such proceeds result in variances from the Approved Budget that would be an Event of Default; provided, further that (x) no part of the proceeds of the ~~Term Loan~~Loans will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors, (y) no part of the proceeds of the ~~Term Loan~~Loans will be used, directly or, to Borrowers' knowledge after due care and inquiry, indirectly, to make any payments to a Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available to, a Sanctioned Entity or a Sanctioned Person, to fund any operations, activities or business of a Sanctioned Entity or a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Person, and (z) that no part of the proceeds of the ~~Term Loan~~Loans will be used, directly or, to Borrowers' knowledge after due care and inquiry, indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws. Notwithstanding the foregoing, proceeds of the Credit Facility (or any of the Lender Group's cash collateral) shall not be used to affirmatively commence or support, or to pay any professional fees incurred in connection with, any investigation, adversary proceeding, motion or other action that seeks to challenge, contest, dispute, impair or object to the validity, extent, enforceability or priority of any claims, Liens or other rights under the Pre-Petition Credit Agreement or any Loan Document (including this Agreement). Notwithstanding anything to the contrary herein, the Carve Out Expenses shall be senior to all Liens and claims (including administrative and superpriority claims) securing the Obligations, the Loan Parties' pre-petition obligations, adequate protection Liens, and all other Liens or claims (including administrative claims and Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative claims and Superpriority Claims) securing the Obligations and pre-petition obligations granted or recognized as valid, including the Liens, security interests, and claims (including administrative claims and Superpriority Claims) granted to Agent and the Lender Group.

**6.12    Limitation on Issuance of Equity Interests**. Except for the issuance or sale of Qualified Equity Interests by Administrative Borrower, each Loan Party will not, and will not permit any of its Subsidiaries to, issue or sell any of its Equity Interests.

**6.13    Inventory with Bailees**. Each Loan Party will not, and will not permit any of its Subsidiaries to, store its Inventory at any time with a bailee, warehouseman, or similar party except as set forth on Schedule 4.25 (as such Schedule may be amended in accordance with Section 5.14).

**6.14    ~~Acquisition of ABL Obligations~~[Intentionally Omitted]**. ~~No Loan Party shall, and shall not permit any Subsidiary or Affiliate to purchase, redeem, tender for or otherwise acquire, directly or indirectly, any ABL Obligations. Any purchase, redemption or tender for the ABL Obligations in contravention of this Section 6.14 shall be null and void. For the avoidance of doubt, this Section 6.14 is not intended and shall not prevent Borrowers from making any payments or prepayments of the ABL Obligations not otherwise prohibited by this Agreement or the Intercreditor Agreement.~~

.

**6.15    Employee Benefits; Canadian Defined Benefit Plan**. Each Loan Party will not, and will not permit any of its Subsidiaries to

(a)      Terminate, or permit any ERISA Affiliate to terminate, any Pension Plan in a manner, or take any other action with respect to any Pension Plan, which could reasonably be expected to result in any material liability of any Loan Party or ERISA Affiliate to the PBGC.

(b)      Fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Pension Plan, agreement relating thereto or applicable law, any Loan Party or ERISA Affiliate is required to pay if such failure could reasonably be expected to have a Material Adverse Effect.

(c)      Permit to exist, or allow any ERISA Affiliate to permit to exist, any accumulated funding deficiency within the meaning of section 302 of ERISA or section 412 of the Code, whether or not waived, with respect to any Pension Plan which exceeds $2,000,000 with respect to all Pension Plans in the aggregate.

(d)      Sponsor, maintain, contribute to or otherwise incur liability under a Canadian Defined Benefit Plan.

(e)      Contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to, any Multiemployer Plan not set forth on Schedule 4.10.

(f)      Amend, or permit any ERISA Affiliate to amend, a Pension Plan resulting in a material increase in current liability such that a Loan Party is required to provide security to such Pension Plan under the IRC.

6.16    **Credit Card Agreements**.  Each Loan Party will not, and will not permit any of its Subsidiaries to, enter into any arrangements (including, without limitation, Credit Card Agreements) after the Closing Date with respect to the processing and/or payment to such Loan Party or such Subsidiary of the proceeds of any credit card charges, debit card charges, and charge card charges for sales made by such Loan Party or such Subsidiary other than those listed Schedule 4.31 unless Agent has received a Credit Card Notification with respect thereto.

6.17    **Immaterial Subsidiary**.  Each Loan Party will not permit any Immaterial Subsidiary to (a) own any assets, (b) have any liabilities, or (c) engage in any business activity.

6.18    **Additional Bankruptcy Matters**.  Each Loan Party will not, and will not permit any of its Subsidiaries to do any of the following:

(a)      assert or prosecute any claim or cause of action against any of the Lender Group (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against Lender;

(b)      subject to the terms of the Financing Orders and subject to Section 8.01, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Agent or the Lenders with respect to the Collateral following the occurrence of an Event of Default (provided that any Loan Party may contest or dispute whether an Event of Default has occurred); or

(c)      except as expressly provided or permitted hereunder (including, without limitation, to the extent expressly identified in any line item in the Approved Budget or pursuant to any "first day" or "second day" orders complying with the terms of this Agreement) or, with the prior consent

of Lender, as provided pursuant to any other Approved Bankruptcy Court Order, make any payment or distribution to any Affiliate or insider of any of the Borrowers outside of the ordinary course of business.

6.19    **Other Superpriority Claim**.  Incur, create, assume, suffer to exist or permit any other Superpriority Claim which is pari passu with or senior to the claims of the Agent and the Lenders against the Loan Parties hereunder, except for the Carve Out Expenses.

6.20    **Reclamation Claims**.  Enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $100,000.

6.21    **Bankruptcy Actions**.  Seek, consent to, or permit to exist, without the prior written consent of the Agent, any order granting authority to take any action that is prohibited by the terms of this Agreement, the applicable Financing Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the applicable Financing Order or any of the other Loan Documents.

7.    ~~FINANCIAL COVENANTS~~**APPROVED BUDGET.**

(a)    The use of Loans and other extensions of credit by the Loan Parties under this Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget (subject to variances permitted under this Section 7) and the terms hereof.  All items set forth in the Approved Budget for the first thirteen (13) week period from the Amendment No. 3 Effective Date and such initial Approved Budget shall be approved by, and in form and substance satisfactory to, the Agent in its discretion (it being acknowledged and agreed that the Initial Approved Budget is approved by and satisfactory to the Agent).  The Approved Budget shall be updated, modified or supplemented by the Administrative Borrower with the written consent of the Agent, and upon the request of the Agent from time to time, but in any event the Approved Budget shall be updated by the Borrowers no later than five (5) days after the end of each calendar month), and each such updated, modified or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance satisfactory to, the Agent in its sole discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, however, that in the event the Agent, on the one hand, and the Administrative Borrower, on the other hand, cannot agree as to an updated, modified or supplemented budget promptly, but in any event within two (2) days after the delivery thereof, the Approved Budget in effect immediately prior to such requested update, modification or supplement shall govern and control.  Each Approved Budget delivered to the Agent shall be accompanied by such supporting documentation as reasonably requested by the Agent.  Each Approved Budget shall be prepared in good faith based upon assumptions which the Loan Parties believe to be reasonable.

(b)    Commencing with the week ending March 8, 2024 and for each calendar week thereafter, the Loan Parties shall not permit (i) Actual Cash Receipts for any Cumulative Two-Week Period or the Cumulative Period to be less than 90% of Budgeted Cash Receipts for any such Cumulative Two-Week Period or Cumulative Period, as applicable, measured on a cumulative basis, or (ii) the Actual Operating Disbursement Amount for any Cumulative Two-Week Period or the Cumulative Period to be greater than

110% of Budgeted Operating Disbursement Amount for any such Cumulative Two-Week Period or Cumulative Period, as applicable, measured on a cumulative basis.

(c)    The Borrowers shall deliver to the Agent on or before 12:00 p.m. Eastern time on Thursday of each week a Compliance Certificate, and such Compliance Certificate shall include such detail as is reasonably satisfactory to the Agent, signed by a Responsible Officer of the Administrative Borrower certifying that (i) the Borrowers are in compliance with the covenants contained in Section 7(b), (ii) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (iii) attaching an Approved Budget Variance Report.

(d)    Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to the Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Financing Order regardless of whether such amounts exceed such estimates. Nothing in any Approved Budget (including any estimates of a loan balance in excess of borrowing base restrictions) shall constitute an amendment or other modification of any Loan Document or any of the borrowing base restrictions or other lending limits set forth therein.

(e)    The Borrowers shall deliver to the Agent by no later than five (5) days after the end of each calendar month (with the first such delivery due no later than April 5, 2024), a rolling 13-week cash flow forecast for Loan Parties and its Subsidiaries, commencing with such week, all in form and substance reasonably satisfactory to the Agent.

.

Each Borrower covenants and agrees that, until the payment in full of the Obligations:

7.1 **Minimum Excess ABL Availability.** Prior to the FCCR Financial Covenant Trigger Date, the Borrowers and their Subsidiaries shall at all times maintain ABL Availability of not less than the greater of (a) the Applicable ABL Availability Amount and (b) 12.5% of the Combined Line Cap (excluding the effect, if any, of any Term Pushdown Reserve).

7.2 **Fixed Charge Coverage Ratio.** From and after the FCCR Financial Covenant Trigger Date, during the continuance of a Covenant Testing Period, the Borrowers and their Subsidiaries shall maintain a Fixed Charge Coverage Ratio, calculated for the trailing twelve consecutive fiscal months ending on the last day of the fiscal month most recently ended for which financial statements and a Compliance Certificate have been delivered pursuant to Schedule 5.1 prior to the occurrence of the Covenant Testing Period, and for each period of trailing twelve consecutive fiscal months ending on the last day of each fiscal month thereafter, in each case of at least 1.00 to 1.00.

8.    **EVENTS OF DEFAULT.**

AnyNotwithstanding the provisions of Section 362 of the Bankruptcy Code, and without notice, application or motion, hearing before, or order of the Bankruptcy Court or any notice to any Loan Party, one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

8.1    **Payments**.  If Borrowers fail to pay when due and payable, or when declared due and payable, (a) all or any portion of the Obligations consisting of interest, fees, or charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations (including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), and such failure continues for a period of ~~three~~one Business ~~Days~~Day or (b) all or any portion of the principal of the Loans;

8.2    **Covenants**.  If any Loan Party or any of its Subsidiaries:

(a)    fails to perform or observe any covenant or other agreement contained in any of (i) Sections 5.1, 5.2, 5.3 (solely if any Borrower is not in good standing in its jurisdiction of organization), 5.6, 5.7 (solely if any Borrower refuses to allow Agent or its representatives or agents to visit any Borrower's properties, inspect its assets or books or records, examine and make copies of its books and records, or discuss Borrowers' affairs, finances, and accounts with officers and employees of any Borrower), 5.10, 5.11, 5.13, 5.16, 5.18, 5.19 ~~or~~, 5.20, 5.21, 5.22, 5.23 or 5.24 of this Agreement, (ii) Section 6 of this Agreement, (iii) Section 7 of this Agreement, (iv) Section 7 of the Guaranty and Security Agreement, or (v) Section 7 of the Canadian Guaranty and Security Agreement;

(b)    fails to perform or observe any covenant or other agreement contained in any of Sections 5.3 (other than if any Borrower is not in good standing in its jurisdiction of organization), 5.4, 5.5, 5.8, 5.12, or 5.17 of this Agreement and such failure continues for a period of ten days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower, or (ii) the date on which written notice thereof is given to Borrowers by Agent; or

(c)    fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is the subject of another provision of this Section 8 (in which event such other provision of this Section 8 shall govern), and such failure continues for a period of ~~thirty~~five days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower, or (ii) the date on which written notice thereof is given to Borrowers by Agent;

8.3    **Judgments**.  If one or more judgments, orders, or awards for the payment of money involving an aggregate amount of $~~1,000,000~~500,000, or more (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage) is entered or filed against a Loan Party or any of its Subsidiaries, or with respect to any of their respective assets, and either (a) there is a period of thirty consecutive days at any time after the entry of any such judgment, order, or award during which (i) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (ii) a stay of enforcement thereof is not in effect, or (b) enforcement proceedings are commenced upon such judgment, order, or award;

8.4    **Voluntary Bankruptcy, etc.**  If an Insolvency Proceeding is commenced by a Loan Party or any of its Subsidiaries, in each case, other than the Debtors;

8.5    **Involuntary Bankruptcy, etc.**  If an Insolvency Proceeding is commenced against a Loan Party or any of its Subsidiaries, in each case, other than the Debtors, and any of the following events occur: (a) such Loan Party or such Subsidiary consents to the institution of such Insolvency Proceeding against it, (b) the petition commencing the Insolvency Proceeding is not timely controverted, (c) the petition commencing the Insolvency Proceeding is not dismissed within sixty calendar days of the date of the filing thereof, (d) an interim trustee is appointed to take possession of all or any substantial

portion of the properties or assets of, or to operate all or any substantial portion of the business of, such Loan Party or its Subsidiary, or (e) an order for relief shall have been issued or entered therein;

8.6    **Default Under Other Agreements**  If Except for defaults occasioned by the filing of the Chapter 11 Cases or entry into this Agreement or resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party or Subsidiary from complying or permits any Loan Party or Subsidiary not to comply, there is (a) a default in one or more agreements to which a Loan Party or any of its Subsidiaries is a party with one or more third Persons relative to a Loan Party's or any of its Subsidiaries' Indebtedness involving an aggregate amount of $2,000,000500,000 or more (other than a default under the ABL Loan Documents), and such default (i) occurs at the final maturity of the obligations thereunder, or (ii) results in a right by such third Person, irrespective of whether exercised, to accelerate the maturity of such Loan Party's or its Subsidiary's obligations thereunder, (b) a default in or an involuntary early termination of one or more Hedge Agreements to which a Loan Party or any of its Subsidiaries is a party, or (c) an "Event of Default" (as defined in the ABL Credit Agreement) that has occurred, which "Event of Default" (as defined in the ABL Credit Agreement) has not been waived in writing by the ABL Agent and the required ABL Lenders in accordance with the terms of the ABL Credit Agreement;;

8.7    **Representations, etc.**  If any warranty, representation, certificate, statement, or Record made herein or in any other Loan Document or delivered in writing to Agent or any Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

8.8    **Guaranty**.  If the obligation of any Guarantor under the guaranty contained in the Guaranty and Security Agreement or the Canadian Guaranty and Security Agreement is limited or terminated by operation of law or by such Guarantor (other than in accordance with the terms of this Agreement or the joinder applicable to such Guarantor) or if any Guarantor repudiates or revokes or purports to repudiate or revoke any such guaranty;

8.9    **Security Documents**.  If the Guaranty and Security Agreement, any of the Financing Orders or any other Loan Document that purports to create a Lien, shall, for any reason, fail or cease to create a valid and perfected and, (except to the extent of Permitted Liens which are non-consensual Permitted Liens, permitted purchase money Liens or the interests of lessors under Capital Leases) first priority Lien on the Collateral covered thereby having the status and priority provided in the Financing Orders, except (a) as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement, or (b) with respect to Collateral the aggregate value of which, for all such Collateral, does not exceed at any time, $1,000,00050,000;

8.10    **Loan Documents**.  The validity or enforceability of any Loan Document shall at any time for any reason (other than solely as the result of an action or failure to act on the part of Agent) be declared to be null and void, or a proceeding shall be commenced by a Loan Party or its Subsidiaries, or by any Governmental Authority having jurisdiction over a Loan Party or its Subsidiaries, seeking to establish the invalidity or unenforceability thereof, or a Loan Party or its Subsidiaries shall deny that such Loan Party or its Subsidiaries has any liability or obligation purported to be created under any Loan Document; or

8.11    **Change of Control**.  A Change of Control shall occur, whether directly or indirectly.

8.12    **Pension Matters**.  The occurrence of any of the following events: (a) any Loan Party or ERISA Affiliate fails to make full payment when due of all amounts which any Loan Party or ERISA Affiliate is required to pay as contributions, installments, or otherwise to or with respect to a Pension Plan, Canadian Pension Plan or Multiemployer Plan, and such failure could reasonably be expected to result in liability of any Loan Party in excess of $~~2,000,000~~500,000, (b) an accumulated funding deficiency or funding shortfall in excess of $~~1,000,000~~250,000 occurs or exists, whether or not waived, with respect to any Pension Plan, individually or in the aggregate, (c) a Notification Event or Canadian Pension Event, which could reasonably be expected to result in liability of any Loan Party in excess of $2,000,000, either individually or in the aggregate, or (d) any Loan Party or ERISA Affiliate completely or partially withdraws from one or more Multiemployer Plans and incurs Withdrawal Liability in excess of $2,000,000 in the aggregate, or fails to make any Withdrawal Liability payment when due.

8.13    **Credit Card Agreements**.  The occurrence of any of the following events: (a) any Credit Card Issuer or Credit Card Processor shall send notice to any Borrower that it is ceasing to make or suspending payments to such Borrower of amounts due or to become due to such Borrower or shall cease or suspend such payments, or shall send notice to such Borrower that it is terminating its arrangements with such Borrower or such arrangements shall terminate as a result of any event of default under such arrangements, which continues for more than the applicable cure period, if any, with respect thereto, unless such Borrower shall have entered into arrangements with another Credit Card Issuer or Credit Card Processor, as the case may be, within 60 days after the date of any such notice, or (b) any Credit Card Issuer or Credit Card Processor withholds payment of amounts otherwise payable to a Borrower to fund a reserve account or otherwise hold as collateral, or shall require a Borrower to pay funds into a reserve account or for such Credit Card Issuer or Credit Card Processor to otherwise hold as collateral, or any Borrower shall provide a letter of credit, guarantee, indemnity or similar instrument to or in favor of such Credit Card Issuer or Credit Card Processors such that in the aggregate all of such funds in the reserve account, ~~other than~~the amounts held as collateral and the amount of such letters of credit, guarantees, indemnities or similar instruments shall exceed ~~an amount equal to or exceeding 10% of the Credit Card Receivables processed by~~, for all such Credit Card ~~Issuer or~~Issuers and Credit Card ~~Processor in the immediately preceding fiscal year.~~Processors, (x) prior to the payment in full of the ABL Obligations (as defined in the Pre-Petition Credit Agreement), $1,200,000 and (y) at all times thereafter, the sum of (i) $1,200,000 and (ii) the lesser of (A) $1,400,000 and (B) amounts held by the ABL Agent (as defined in the Pre-Petition Credit Agreement) as cash collateral for ABL Obligations (as defined in the Pre-Petition Credit Agreement)in respect of cash management services provided to the Loan Parties in accordance with the Cash Management Order.

8.14    ~~**Intercreditor Provisions**~~**Intentionally Omitted**.  ~~(a) Prior to the Discharge of ABL Obligations, the Intercreditor Agreement or any provision thereof (the "Intercreditor Provisions") shall, in whole or in part, terminate or otherwise fail or cease to be valid and binding on, or enforceable against, any Loan Party, the ABL Agent or any holder of the ABL Obligations (or any Loan Party, the ABL Agent or any such holder shall so state in writing); or (b) any provision of the Intercreditor Agreement shall, at any time after the delivery of such Intercreditor Agreement, fail to be legally valid, binding, or enforceable; or~~

~~8.15   **Term Pushdown Reserve**.  The ABL Agent fails to implement and maintain the Term Pushdown Reserve against the ABL Borrowing Base at any time that the Term Pushdown Reserve is greater than zero ($0).~~

.

8.15    **Additional Bankruptcy Events of Default.**

(a)    The entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 to a case under chapter 7 of the Bankruptcy Code, or any Loan Party files a motion or other pleading seeking entry of such an order or supports or fails to promptly oppose such dismissal or conversion;

(b)    a trustee, responsible officer or an examiner having expanded powers under Bankruptcy Code section 1104 (other than (x) a fee examiner or (y) for purposes of an investigation pursuant to Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed or elected in the Chapter 11 Cases, any Loan Party or applies for, consents to, supports, acquiesces in or fails to promptly oppose, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Agent in its sole discretion;

(c)    (A) the entry of an order staying, reversing or vacating the Interim Financing Order or the Final Financing Order or modifying or amending the Interim Financing Order or Final Financing Order other than in form and substance satisfactory to Agent, or any Loan Party files an application, motion or other pleading seeking entry of such an order or supports or fails to promptly oppose entry of such an order, in each case without the prior written consent of Agent in its sole discretion; (B) the entry of an order in any of the Chapter 11 Cases denying or terminating use of cash collateral by any of the Loan Parties have not obtained use of cash collateral (consensually or non-consensually); (C) the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the Automatic Stay) so as to allow any third party to proceed with foreclosure (or the granting of a deed in lieu of foreclosure or the like) against any assets of the Loan Parties with a value in excess of $100,000 in the aggregate; (D) the entry of a final non-appealable order in the Chapter 11 Cases charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Agent or the commencement of other actions by the Loan Parties that challenges the rights and remedies of any of the Agent or the Agent under the Credit Facility in any of the Chapter 11 Cases or inconsistent with the Loan Documents; (E) without the prior written consent of Agent, any Loan Party shall file a motion seeking or take any action supporting a motion seeking, or the Bankruptcy Court shall enter an order in any of the Chapter 11 Cases authorizing (1) financing under Section 364 of the Bankruptcy Code (other than the Credit Facility) or (2) the sale of all or substantially all of the Loan Parties' assets (unless such order contemplates payment in full in cash of the Obligations upon the closing of such financing or consummation of such sale, whether pursuant to a plan of reorganization or otherwise); or (F) the filing or support of any pleading by any Loan Party (or any direct or indirect parent thereof) seeking, or otherwise consenting to, any of the matters set forth in clauses (A) through (F) above, unless such filing or any pleading is in connection with the enforcement of the Loan Documents against Agent;

(d)    the making of any material payments in respect of prepetition obligations other than (i) to the extent permitted by an Approved Bankruptcy Court Order (and not otherwise prohibited by this Agreement or any other Approved Bankruptcy Court Order then in effect), or (ii) as otherwise agreed to in writing by Agent;

(e)    an order of the Bankruptcy Court granting, other than in respect of the credit facility evidenced by this Agreement and the Carve Out Expenses or as otherwise permitted under the applicable Loan Documents, any claim entitled to superpriority administrative expense claim status in the Chapter 11 Cases pari passu with or senior to the claims of the Agent pursuant to the Loan Documents, or the filing by any Loan Party of a motion or application seeking entry of such an order;

(f)    other than with respect to the Carve Out Expenses, the liens provided for in the Loan Documents, any  Borrower or any other Loan Party shall create or incur, or the Bankruptcy Court enters an order granting, any claim on Collateral which is pari passu with or senior to any liens under the

Pre-Petition Credit Agreement and the Pre-Petition Loan Documents, the adequate protection liens and adequate protection obligations granted under the Financing Orders in contravention of the lien priorities specified in Section 5.23;

(g)     noncompliance by any Loan Party or any of its Subsidiaries with the terms of the Interim Financing Order or, after entry thereof, the Final Financing Order;

(h)     the Loan Parties or any of their Subsidiaries (or any direct or indirect parent of any Loan Party), or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against Agent or any other member of the Lender Group regarding the Credit Facility;

(i)     (A) a plan of reorganization shall be confirmed in any of the Chapter 11 Cases that is not an Acceptable Plan of Reorganization, or any order shall be entered which dismisses any of the Chapter 11 Cases and which order (1) does not provide for termination of the unused commitments under the Credit Facility and payment in full in cash of the Loan Parties' obligations under the Credit Facility, (2) does not provide for release and exculpatory provisions relating to the Agent and the other members of the Lender Group that are satisfactory to Agent and (3) is not otherwise reasonably satisfactory to Agent, or (B) any of the Loan Parties or any of their subsidiaries (or any of their direct or indirect parents) shall file, propose, support, or fail to promptly contest in good faith the filing or confirmation of such a plan or the entry of such an order;

(j)     the occurrence of any condition or event which permits Agent to exercise any of the rights and remedies set forth in the Financing Orders, including, without limitation, any Event of Default (as defined in the applicable Financing Order);

(k)     the termination or non-renewal of the Loan Documents as provided for in the applicable Financing Order;

(l)     except as contemplated in the Loan Documents, any Borrower or Guarantor suspends or discontinues or is enjoined by any court or Governmental Authority from continuing to conduct all or any material part of its business, or a trustee, receiver or custodian is appointed for any Borrower or Guarantor, or any of their respective properties;

(m)     any act, condition or event occurring after the Petition Date that has or would reasonably expect to have a Material Adverse Effect;

(n)     the conversion of any Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(o)     the dismissal of any Chapter 11 Case or any subsequent Chapter 7 case, either voluntarily or involuntarily or the termination, suspension or modification of the stay of proceedings in the Chapter 11 Cases, either voluntarily or involuntarily;

(p)     the grant of a lien on or other interest in any property of any Borrower or Guarantor other than Permitted Lien or by any of the Financing Orders or an administrative expense claim other than such administrative expense claim permitted by any of the Financing Orders or this Agreement by the grant of or allowance by the Bankruptcy Court which is superior to or ranks in parity

with Agent's security interests in or liens upon the Collateral or its Superpriority Claim (as defined in the applicable Financing Order);

(q)      any Financing Order shall be (i) reversed, revoked, remanded, stayed, rescinded, vacated, modified in a manner that is adverse or could reasonably be expected to be adverse to the (A) interests of Agent prior to the Maturity Date, or (ii) amended on appeal or by the Bankruptcy Court without the prior written consent of Agent, and no such consent shall be implied from any other authorization or acquiescence by Agent;

(r)      the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(s)      the appointment of an examiner with expanded powers pursuant to Section 1104(a) of the Bankruptcy Code;

(t)      any Person (including, without limitation, any Borrower or Guarantor or any official creditors' committee appointed in the Chapter 11 Cases) commences any suit or action that seeks to invalidate, reduce, subordinate, impair or otherwise challenge the validity, extent and perfection of the liens and security interests and/or claims of Agent and/or the Lenders under this Agreement and the other Loan Documents, or any Financing Order that any Loan Party supports or fails to promptly oppose;

(u)      prior to the Maturity Date, the filing of a plan of reorganization or liquidation by or on behalf of any Borrower or Guarantor, to which Agent has not consented in writing, which does not provide for the payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein, and from and after the Maturity Date;

(v)      prior to the Maturity Date, the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case of any Borrower or Guarantor that is not an Acceptable Plan of Reorganization;

(w)      any Borrower or Guarantor makes an assignment for the benefit of creditors, makes or sends notice of a bulk transfer or calls a meeting of its creditors or principal creditors in connection with a moratorium or adjustment of the Indebtedness due to them; or

(x)      (i) any default by the Stalking Horse Purchaser under the Stalking Horse Purchase Agreement which permits the Stalking Horse Sellers to terminate the Stalking Horse Purchase Agreement (and such default is not waived in writing by the Stalking Horse Sellers within two (2) Business days after the occurrence thereof), (ii) any default by any Stalking Horse Seller under the Stalking Horse Purchase Agreement which permits the Stalking Horse Purchaser to terminate the Stalking Horse Purchase Agreement (and such default is not waived in writing by the Stalking Horse Purchaser within two (2) Business days after the occurrence thereof), or (iii) the Stalking Horse Purchase Agreement is terminated for any reason (other than as a result of a termination pursuant to Section 7.1(c) or Section 7.1(d)(i) of the Stalking Horse Purchase Agreement in connection with a Successful Bid (as defined in the Bid Procedures Order referred to in Schedule 5.21 hereto) which has been approved by the Bankruptcy Court pursuant to a Sale Order (as defined in the Bid Procedures Order referred to in Schedule 5.21 hereto) in form and substance acceptable to the Agent).

8.16    **Breach of Contractual Obligations.**  Any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Contract or fails to observe or perform any other agreement or condition relating to any such Material Contract or contained in any instrument or

agreement evidencing, securing or relating thereto, or any other event occurs with respect thereto, the effect of which would reasonably be expected to have a Material Adverse Effect.

8.17    **Material Customers**.  All or substantially all of the transactional relationship between a Loan Party or any Subsidiary thereof, and any Material Customer is terminated by such Material Customer, and the loss of such relationship would reasonably be expected to have a Material Adverse Effect.

8.18 ~~Inventory Letter Agreement~~.  ~~Nautilus or any Foreign Subsidiary fails to comply with the terms of the Inventory Letter Agreement or repudiates or terminates or purports to repudiate or terminate the Inventory Letter Agreement.~~

## 9.    RIGHTS AND REMEDIES.

9.1    **Rights and Remedies**.  ~~Upon~~Subject to the Financing Orders, upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of Section 362 of the Bankruptcy Code or any other Debtor Relief Law, Agent may, and, at the instruction of the Required Lenders, shall, in addition to any other rights or remedies provided for hereunder or under any other Loan Document or by applicable law, do any one or more of the following:

(a)    by written notice to Borrowers, declare the principal of, and any and all accrued and unpaid interest and fees in respect of, the Loans and all other Obligations, whether evidenced by this Agreement or by any of the other Loan Documents to be immediately due and payable, whereupon the same shall become and be immediately due and payable and Borrowers shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by each Borrower; ~~and~~

(b)    by written notice to Borrowers, declare the Commitments terminated, whereupon the Commitments shall be immediately be terminated together with any obligation of any Revolving Lender to make Revolving Loans and terminate, reduce or restrict the right or ability of the Loan Parties to use any cash collateral (other than, during the Default Notice Period, cash collateral for payroll and other expenses that the Agent approves as critical to keep the business of the Loan Parties operating in accordance with the Approved Budget);

(c)    subject to the Default Notice Period, direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Agent pursuant to Section 363, Section 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Loan Party to assume and assign any lease or executory contract included in the Collateral to the Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code);

(d)    declare that the application of the Carve Out has occurred by causing the occurrence of the Trigger Date (as defined in the applicable Financing Order); and

(e)    ~~(b)~~ subject to the Default Notice Period (if applicable), exercise all other rights and remedies available to Agent or the Lenders under the Loan Documents, the Financing Orders, under applicable law, or in equity.

The foregoing to the contrary notwithstanding, upon the occurrence of any Event of Default described in Section 8.4 or Section 8.5, in addition to the remedies set forth above, without any notice to Borrowers or any other Person or any act by the Lender Group, the Commitments shall automatically

terminate and the Obligations, inclusive of the principal of, and any and all accrued and unpaid interest and fees in respect of, the Loans and all other Obligations (including Early Termination Premium), whether evidenced by this Agreement or by any of the other Loan Documents, shall automatically become and be immediately due and payable and Borrowers shall automatically be obligated to repay all of such Obligations in full, without presentment, demand, protest, or notice or other requirements of any kind, all of which are expressly waived by Borrowers.

In any hearing regarding any exercise of rights or remedies (which hearing must take place within the Default Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Agent or the other members of the Lender Group set forth in the Financing Orders or the Loan Documents.

9.2    **Remedies Cumulative**.  The rights and remedies of the Lender Group under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Default or Event of Default shall be deemed a continuing waiver. No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

9.3    **Lift of Stay; Stay of Proceedings**.  Subject to the applicable Financing Order, the Automatic Stay shall be modified and vacated to permit the Agent and Lenders to exercise all rights and remedies under this Agreement, the other Loan Documents or applicable law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

# 10.    WAIVERS; INDEMNIFICATION

10.1    **Demand; Protest; etc.**  Each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender Group on which any Borrower may in any way be liable.

10.2    **The Lender Group's Liability for Collateral**.  Each Borrower hereby agrees that: (a) so long as Agent complies with its obligations, if any, under the Code, the Lender Group shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by the Loan Parties.

10.3    **Indemnification**.  Each Borrower shall pay, indemnify, defend, and hold the Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the

execution and delivery (provided, that Borrowers shall not be liable for costs and expenses (including attorneys' fees) of any Lender (other than SLR) incurred in advising, structuring, drafting, reviewing, administering or syndicating the Loan Documents), enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Loan Parties' and their Subsidiaries' compliance with the terms of the Loan Documents (provided, that the indemnification in this clause (a) shall not extend to (i) disputes solely between or among the Lenders that do not involve any acts or omissions of any Loan Party, or (ii) disputes solely between or among the Lenders and their respective Affiliates that do not involve any acts or omissions of any Loan Party; it being understood and agreed that the indemnification in this clause (a) shall extend to Agent (but not the Lenders unless the dispute involves an act or omission of a Loan Party) relative to disputes between or among Agent on the one hand, and one or more Lenders, or one or more of their Affiliates, on the other hand, or (iii) any claims for Taxes, which shall be governed by Section 16, other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim), (b) with respect to any actual or prospective investigation, litigation, or proceeding related to this Agreement, any other Loan Document, the making of any Loans hereunder, or the use of the proceeds of the Loans provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, including the Chapter 11 Cases, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by any Loan Party or any of its Subsidiaries or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any such assets or properties of any Loan Party or any of its Subsidiaries (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, no Borrower shall have any obligation to any Indemnified Person under this Section 10.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents. This provision shall survive the termination of this Agreement and the repayment in full of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrowers were required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrowers with respect thereto. **WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.**

11.    **NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or telefacsimile. In the case of notices or demands to any Loan Party or Agent, as the case may be, they shall be sent to the respective address set forth below:

| | |
|---|---|
| If to any Loan Party: | c/o Administrative Borrower |
| | ~~Nautilus,~~ BowFlex Inc. |
| | 17750 S.E. 6th Way |
| | Vancouver, Washington 98683 |
| | Attn: Aina Konold, Chief Financial Officer |
| | Email: ~~akonold@nautilus.com~~akonold@bowflex.com |
| | Fax no.: 360-859-8357 |
| | Attn: Alan Chan, Chief Legal Officer and Secretary |
| | Email: ~~achan@nautilus.com~~achan@bowflex.com |
| | Fax no.: 360-859-2511 |
| with copies to: | Sidley Austin LLP |
| | 787 Seventh Avenue |
| | New York, New York 10019 |
| | Attn: Leslie Plaskon |
| | Email: lplaskon@sidley.com |
| | Fax No.: 212-839-5599 |
| If to Agent: | Crystal Financial LLC d/b/a SLR Credit Solutions |
| | Two International Place, 17th Floor |
| | Boston, MA 02110 |
| | Attn: Michael Stavrakos |
| | Email: mstavrakos@slrcreditsolutions.com |
| with copies to: | Morgan, Lewis & Bockius LLP |
| | One Federal Street |
| | Boston, MA 02110 |
| | Attn: Marc R. Leduc |
| | Fax No.: (617) 341-7701 |
| | Email: marc.leduc@morganlewis.com |

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this <u>Section 11</u>, shall be deemed received on the earlier of the date of actual receipt or three Business Days after the deposit thereof in the mail; <u>provided</u>, that (a) notices sent by overnight courier service shall be deemed to have been given when received, (b) notices by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment).

12.     **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE PROVISION.**

(a)     **THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED**

UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW (OTHER THAN THE NEW YORK GENERAL OBLIGATIONS LAW §5-1401)), AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)       THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE OF NEW YORK AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK OR THE BANKRUPTCY COURT; PROVIDED, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 12(b).

(c)       TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "CLAIM"). EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(d)       EACH       BORROWER       HEREBY       IRREVOCABLY       AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE OF NEW YORK AND FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK AND THE STATE OF NEW YORK AND THE BANKRUPTCY COURT, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(e)       NO CLAIM MAY BE MADE BY ANY PARTY HERETO AGAINST ANY OTHER PARTY HERETO, OR ANY AFFILIATE, DIRECTOR, OFFICER, EMPLOYEE, COUNSEL, REPRESENTATIVE, AGENT, OR ATTORNEY-IN-FACT OR ANY OF THEM

**FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES OR LOSSES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION THEREWITH, AND EACH PARTY HERETO HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.**

13.     **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.**

13.1     <u>**Assignments and Participations**</u>.

(a)     (i) Subject to the conditions set forth in <u>clause (a)(ii)</u> below, any Lender may assign and delegate all or any portion of its rights and duties under the Loan Documents (including the Obligations owed to it and its Commitments) to one or more assignees (each, an "<u>Assignee</u>"), with the prior written consent (such consent not be unreasonably withheld or delayed) of:

(A)     Borrowers; <u>provided</u>, that (x) no consent of Borrowers shall be required (1) if a Default or Event of Default has occurred and is continuing, or (2) in connection with an assignment to a Person that is a Lender or an Affiliate (other than natural persons) of a Lender and (y) that Borrowers shall be deemed to have consented to a proposed assignment unless they object thereto by written notice to Agent within five Business Days after having received notice thereof; and

(B)     Agent.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     no assignment may be made (I) so long as no Event of Default has occurred and is continuing, to a Disqualified Institution, or (II) to a natural person,

(B)     no assignment may be made to a Loan Party or an Affiliate of a Loan Party,

(C)     the amount of the Commitments and the other rights and obligations of the assigning Lender hereunder and under the other Loan Documents subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to Agent) shall be in a minimum amount (unless waived by Agent) of $5,000,000 (except such minimum amount shall not apply to (I) an assignment or delegation by any Lender to any other Lender, an Affiliate of any Lender, or a Related Fund of such Lender, or (II) a group of new Lenders, each of which is an Affiliate of each other or a Related Fund of such new Lender to the extent that the aggregate amount to be assigned to all such new Lenders is at least $5,000,000),

(D)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement,

(E)     the parties to each assignment shall execute and deliver to Agent an Assignment and Acceptance; <u>provided</u>, that Borrowers and Agent may continue to deal solely

and directly with the assigning Lender in connection with the interest so assigned to an Assignee until written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Borrowers and Agent by such Lender and the Assignee,

(F)     unless waived by Agent, the assigning Lender or Assignee has paid to Agent, for Agent's separate account, a processing fee in the amount of $3,500, and

(G)     the assignee, if it is not a Lender, shall deliver to Agent an Administrative Questionnaire in a form approved by Agent (the "Administrative Questionnaire").

(b)     From and after the date that Agent receives the executed Assignment and Acceptance and, if applicable, payment of the required processing fee, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, shall be a "Lender" and shall have the rights and obligations of a Lender under the Loan Documents, and (ii) the assigning Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to Section 10.3) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto); provided, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Section 15 and Section 17.9(a).

(c)     By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto, (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto, (iii) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (iv) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (v) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers under this Agreement and the other Loan Documents as are delegated to Agent, by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (vi) such Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     Immediately upon Agent's receipt of the required processing fee, if applicable, and delivery of notice to the assigning Lender pursuant to Section 13.1(b), this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Obligations and Commitments arising therefrom. The

Obligations or Commitments allocated to each Assignee shall reduce such Obligations or Commitments of the assigning Lender *pro tanto*.

(e)        Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons (a "Participant") participating interests in all or any portion of its Obligations, the Commitments and the other rights and interests of that Lender (the "Originating Lender") hereunder and under the other Loan Documents; provided, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Obligations, the Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "Lender" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Borrowers, Agent, and the Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or any other Loan Document would (A) extend the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the Obligations hereunder in which such Participant is participating, (C) release all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender (other than a waiver of default interest), or (E) decrease the amount or postpone the due dates of scheduled principal repayments or prepayments or premiums payable to such Participant through such Lender, (v) no participation shall be sold to a natural person, (vi) no participation shall be sold to a Loan Party or an Affiliate of a Loan Party, (vii) all amounts payable by Borrowers hereunder shall be determined as if such Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement and (viii) for the avoidance of doubt, each Borrower agrees that each Participant shall be entitled to the benefits of Section 16 hereof (subject to the requirements and limitations therein, including the requirements under Section 16.2 (it being understood that the documentation required under Section 16.2 shall be delivered to the participating Lender solely)) to the same extent as if it were a Lender and had acquired its interest by assignment; provided that such Participant (shall not be entitled to receive any greater payment under Section 16, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. The rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the other Lenders, Agent, Borrowers, the Collateral, or otherwise in respect of the Obligations. No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves.

(f)        In connection with any such assignment or participation or proposed assignment or participation or any grant of a security interest in, or pledge of, its rights under and interest in this Agreement, a Lender may, subject to the provisions of Section 17.9, disclose all documents and

information which it now or hereafter may have relating to any Loan Party and its Subsidiaries and their respective businesses.

(g)     Any other provision in this Agreement notwithstanding, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement to secure obligations of such Lender, including any pledge in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR §203.24, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under applicable law; provided, that no such pledge shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)     Agent (as a non-fiduciary agent on behalf of Borrowers) shall maintain, or cause to be maintained, a register (the "Register") on which it enters the name and address of each Lender as the registered owner of the ~~Term~~applicable Loan and Commitments (and the principal amount thereof and stated interest thereon) held by such Lender (each, a "Registered Loan"). Other than in connection with an assignment by a Lender of all or any portion of its ~~Term~~ Loan or Commitments to an Affiliate of such Lender or a Related Fund of such Lender (i) a Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide) and (ii) any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any evidencing the same), Borrowers shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary. In the case of any assignment by a Lender of all or any portion of its ~~Term~~ Loan or Commitments to an Affiliate of such Lender or a Related Fund of such Lender, and which assignment is not recorded in the Register, the assigning Lender, on behalf of Borrowers, shall maintain a register comparable to the Register.

(i)     In the event that a Lender sells participations in the Registered Loan, such Lender, as a non-fiduciary agent on behalf of Borrowers, shall maintain (or cause to be maintained) a register on which it enters the name of all participants in the Registered Loans held by it (and the principal amount (and stated interest thereon) of the portion of such Registered Loans that is subject to such participations) (the "Participant Register"). A Registered Loan (and the Registered Note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. No Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement

notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(j)      Agent shall make a copy of the Register  available for review by Borrowers and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(k)      Transactions among Certain Parties.

(i)      Assignment to SPV. Notwithstanding any provision to the contrary, any Lender may assign to one or more special purpose funding vehicles (each, an "SPV") all or any portion of its funded Loans (without, in the case of Revolving Loans, the corresponding Revolving Commitment), without the consent of any Person or the payment of a fee, by execution of a written assignment agreement in a form agreed to by such Lender and such SPV, and may grant any such SPV the option, in such SPV's sole discretion, to provide the Borrowers all or any part of any Loans that such Lender would otherwise be obligated to make pursuant to this Agreement. Such SPVs shall have all the rights which a Lender making or holding such Loans would have under this Agreement, but no obligations. The Lender making such assignment shall remain liable for all its original obligations under this Agreement, including its applicable Commitments (although the unused portion thereof shall be reduced by the principal amount of any Loans held by an SPV). Notwithstanding such assignment, the Agent and Borrowers may deliver notices to the Lender making such assignment (as agent for the SPV) and not separately to the SPV unless the Agent and Administrative Borrower are requested in writing by the SPV (or its agent) to deliver such notices separately to it. The Borrowers shall, at the request of any such Lender, execute and deliver to such Person as such Lender may designate, a promissory note in the amount of such Lender's original promissory note (if any) to evidence the Loans of such Lender and related SPV.

(ii)      (k)  Transactions among SLR Parties.   Notwithstanding anything to the contrary in this Agreement or the other Loan Documents, (i) neither SLR nor any of its Affiliates shall be required to comply with this Section 13.1 in connection with any transaction involving any other Affiliate of SLR or any of its lenders or funding or financing sources, and neither SLR nor any of its Affiliates shall have an obligation to disclose any such transaction to any Person and (ii) there shall be no limitation or restriction on (A) the ability of SLR or its Affiliates to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, the Term LoanLoans or any Obligation to any other Affiliate of SLR or any lender or financing or funding source of SLR or any of its Affiliates or (B) any such lender's or funding or financing source's ability to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, the Term LoanLoans or any Obligation; provided, however, that SLR shall continue to be liable as a "Lender" under this Agreement and the other Loan Documents unless such other Person complies with the provisions of this Agreement to become a "Lender."

13.2    **Successors**.  This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that no Borrower may assign this Agreement or any rights or duties hereunder without the Lenders' prior written consent and any prohibited assignment shall be absolutely void *ab initio*. No consent to assignment by the Lenders shall release any Borrower from its Obligations. A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to Section 13.1 and, except as expressly required pursuant to Section 13.1, no consent or approval by any Borrower is required in connection with any such assignment.

14.     **AMENDMENTS; WAIVERS.**

14.1     <u>**Amendments and Waivers**</u>.

(a)      No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document (other than the <u>Closing Date Fee Letter and the Amendment No. 3</u> Fee Letter), and no consent with respect to any departure by any Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and the Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given; <u>provided</u>, that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders directly affected thereby and all of the Loan Parties that are party thereto, do any of the following:

(i)      increase the amount of or extend the expiration date of any Commitment of any Lender,

(ii)     postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Loan Document,

(iii)    reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document (except (A) in connection with the waiver of applicability of <u>Section 2.6(c)</u> (which waiver shall be effective with the written consent of the Required Lenders), and (B) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or a reduction of fees for purposes of this <u>clause (iii)</u>),

(iv)     amend, modify, or eliminate this Section or any provision of this Agreement providing for consent or other action by all Lenders,

(v)      amend, modify, or eliminate <u>Section 3.1</u>,

(vi)     amend, modify, or eliminate <u>Section 15.11</u>,

(vii)    other than as permitted by <u>Section 15.11</u>, release or contractually subordinate Agent's Lien in and to any of the Collateral,

(viii)   amend, modify, or eliminate the definitions of "Required Lenders," "Supermajority Lenders," or "Pro Rata Share",

(ix)     other than in connection with a merger, amalgamation, liquidation, dissolution or sale of such Person expressly permitted by the terms hereof or the other Loan Documents, release any Borrower or any Guarantor from any obligation for the payment of money or consent to the assignment or transfer by any Borrower or any Guarantor of any of its rights or duties under this Agreement or the other Loan Documents,

(x)    amend, modify, or eliminate any of the provisions of <u>Section 2.4(b)(i)</u>, <u>(ii)</u> or <u>(iii)</u> or <u>Section 2.4(e)</u> or <u>2.4(f)</u>,

(xi)    at any time that any Real Property is included in the Collateral, add, increase, renew or extend the ~~Term Loan~~<u>Loans</u> hereunder until the completion of flood due diligence, documentation and coverage as required by the Flood Laws or as otherwise satisfactory to all Lenders, or

(xii)    amend, modify, or eliminate any of the provisions of <u>Section 13.1</u> with respect to assignments to, or participations with, Persons who are Loan Parties or Affiliates of a Loan Party.

(b)    No amendment, waiver, modification, or consent shall amend, modify, waive, or eliminate,

(i)    the definition of, or any of the terms or provisions of, the <u>Amendment No. 3 Fee Letter or the Closing Date</u> Fee Letter, without the written consent of Agent and Borrowers (and shall not require the written consent of any of the Lenders),

(ii)    any provision of <u>Section 15</u> pertaining to Agent, or any other rights or duties of Agent under this Agreement or the other Loan Documents, without the written consent of Agent, Borrowers, and the Required Lenders;

(c)    (c)    No amendment, waiver, modification, elimination, or consent shall amend, without written consent of Agent, Borrowers and the Supermajority Lenders, do any of the following: (i) amend, modify, or eliminate the definition of <u>Aggregate Borrowing Base,</u> Borrowing Base, Domestic Borrowing Base, Canadian Borrowing Base or any of the defined terms (including the definitions of Eligible Accounts, Eligible Credit Card Receivables, Eligible Inventory, Eligible Finished Goods Inventory, Eligible Spare Parts Inventory, Eligible In-Transit Inventory, ~~and~~ Eligible IP<u> and Availability Block</u>) that are used in such definition to the extent that any such change results in more credit being made available to Borrowers based upon the Borrowing Base, the Domestic Borrowing Base~~,~~ or the Canadian Borrowing Base, but not otherwise; or (ii) change <u>Section 2.1(c)</u>; <u>provided that</u> the foregoing shall not limit the discretion of the Agent to change, establish or eliminate any Reserves;

(d)    [Reserved];

(e)    [Reserved]; and

(f)    Anything in this <u>Section 14.1</u> to the contrary notwithstanding, (i) any amendment, modification, elimination, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of any Loan Party, shall not require consent by or the agreement of any Loan Party, (ii) any amendment, waiver, modification, elimination, or consent of or with respect to any provision of this Agreement or any other Loan Document may be entered into without the consent of, or over the objection of, any Defaulting Lender other than any of the matters governed by <u>Section 14.1(a)(i)</u> through <u>(iii)</u> that affect such Lender, and (iii) any amendment contemplated by <u>Section 2.12(a)(i)</u> of this Agreement in connection with a Benchmark Transition Event shall be effective as contemplated by such <u>Section 2.12(a)(i)</u> hereof.

14.2    **Replacement of Certain Lenders**.

(a)    If (i) any action to be taken by the Lender Group or Agent hereunder requires the consent, authorization, or agreement of all Lenders or all Lenders affected thereby and if such action has received the consent, authorization, or agreement of the Required Lenders but not of all Lenders or all Lenders affected thereby, or (ii) any Lender makes a claim for compensation under <u>Section 16</u>, then Borrowers or Agent, upon at least five Business Days prior irrevocable notice, may permanently replace any Lender (other than SLR) that failed to give its consent, authorization, or agreement (a "<u>Non-Consenting Lender</u>") or any Lender that made a claim for compensation (a "<u>Tax Lender</u>") with one or more Replacement Lenders, and the Non-Consenting Lender or Tax Lender, as applicable, shall have no right to refuse to be replaced hereunder. Such notice to replace the Non-Consenting Lender or Tax Lender, as applicable, shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

(b)    Prior to the effective date of such replacement, the Non-Consenting Lender or Tax Lender, as applicable, and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Non-Consenting Lender or Tax Lender, as applicable, being repaid in full its share of the outstanding Obligations (without any premium or penalty of any kind whatsoever, but including (i) all interest, fees and other amounts that may be due in payable in respect thereof and (ii) Funding Losses). If the Non-Consenting Lender or Tax Lender, as applicable, shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, Agent may, but shall not be required to, execute and deliver such Assignment and Acceptance in the name or and on behalf of the Non-Consenting Lender or Tax Lender, as applicable, and irrespective of whether Agent executes and delivers such Assignment and Acceptance, the Non-Consenting Lender or Tax Lender, as applicable, shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Non-Consenting Lender or Tax Lender, as applicable, shall be made in accordance with the terms of <u>Section 13.1</u>.  Until such time as one or more Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Non-Consenting Lender or Tax Lender, as applicable, hereunder and under the other Loan Documents, the Non-Consenting Lender or Tax Lender, as applicable, shall remain obligated to make the Non-Consenting Lender's or Tax Lender's, as applicable, Pro Rata Share of Revolving Loans.

14.3    **No Waivers; Cumulative Remedies**.  No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver thereof. No waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's and each Lender's rights thereafter to require strict performance by Borrowers of any provision of this Agreement. Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

15.    **AGENT; THE LENDER GROUP.**

15.1    **Appointment and Authorization of Agent**.

(a)    Each Lender hereby designates and appoints SLR as its agent under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Agent agrees

to act as agent for and on behalf of the Lenders on the conditions contained in this <u>Section 15</u>. Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the other Loan Documents, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Loan Documents with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties. Each Lender hereby further authorizes Agent to act as the secured party under each of the Loan Documents that create a Lien on any item of Collateral. Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, Lenders agree that Agent shall have the right to exercise the following powers as long as this Agreement remains in effect: (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, payments and proceeds of Collateral, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, or to take any other action with respect to any Collateral or Loan Documents which may be necessary to perfect, and maintain perfected, the security interests and Liens upon Collateral pursuant to the Loan Documents, (c) make the ~~Term Loan~~Loans, for itself or on behalf of Lenders, as provided in the Loan Documents, (d) exclusively receive, apply, and distribute payments and proceeds of the Collateral as provided in the Loan Documents, (e) open and maintain such bank accounts and cash management arrangements as Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to any Loan Party or its Subsidiaries, the Obligations, the Collateral, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

(b)    <u>Without limiting any other rights of the Agent under this Agreement, the Guaranty and Security Agreement or any other Loan Document and subject to the provisions of any other Loan Documents, with regard to and as contemplated by each of the Swiss Security Documents:</u>

(i)    <u>the Agent shall:</u>

(A)    <u>hold and administer any non-accessory security interest (*nicht-akzessorische Sicherheit*) governed by Swiss law as fiduciary (*treuhänderisch*) in its own name but for the benefit of each member of the Lender Group; and</u>

(B)    <u>hold and administer any accessory security interest (*akzessorische Sicherheit*) governed by Swiss law as direct representative</u>

(*direkter Stellvertreter*) in the name and on behalf of each member of the Lender Group;

(ii)    each existing and future Lender hereby appoints the Agent as its direct representative (*direkter Stellvertreter*) and authorizes the Agent (whether or not by or through employees or agents) to:

(A)    exercise such rights, remedies, powers and discretions as are specifically delegated to or conferred upon the Agent under the relevant Swiss Security Documents together with such powers and discretions as are reasonably incidental thereto;

(B)    take such action on its behalf as may from time to time be authorized under or in accordance with the relevant Swiss Security Documents; and

(C)    accept, enter into and execute as its direct representative (*direkter Stellvertreter*) any pledge or other creation of any accessory security right granted in favor of each member of the Lender Group in connection with the Loan Documents under Swiss law and to agree to and execute in its name and on its behalf as its direct representative (*direkter Stellvertreter*) any amendments, confirmations and/or alterations to any Swiss Security Document which creates a pledge or any other accessory security right (*akzessorische Sicherheit*) including the release or confirmation of release of such security interest.

15.2    **Delegation of Duties**.  Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

15.3    **Liability of Agent**.  None of the Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders  for any recital, statement, representation or warranty made by any Loan Party or any of its Subsidiaries or Affiliates, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of any Loan Party or its Subsidiaries or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lenders  to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of any Loan Party or its Subsidiaries. No Agent-Related Person shall have any liability to any Lender, and Loan Party or any of their respective Affiliates if any request for a Loan or other extension of credit was not authorized by the applicable Borrower. Agent shall not be required to take any action

that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable law or regulation.

15.4    **Reliance by Agent**.  Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrowers or counsel to any Lender), independent accountants and other experts selected by Agent. Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, Agent shall act, or refrain from acting, as it deems advisable. If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.

15.5    **Notice of Default or Event of Default**.  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Lenders and, except with respect to Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Lender or Borrowers referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default." Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge. If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Agent of such Event of Default. Each Lender shall be solely responsible for giving any notices to its Participants, if any. Subject to Section 15.4, Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with Section 9; provided, that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

15.6    **Credit Decision**.  Each Lender acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of any Loan Party and its Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender. Each Lender represents to Agent that it has, independently and without reliance upon any Agent-Related Person and based on such due diligence, documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of each Borrower or any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrowers. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of each Borrower or any other Person party to a Loan Document. Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or responsibility to provide any Lender

with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Borrower or any other Person party to a Loan Document that may come into the possession of any of the Agent-Related Persons. Each Lender acknowledges that Agent does not have any duty or responsibility, either initially or on a continuing basis (except to the extent, if any, that is expressly specified herein) to provide such Lender with any credit or other information with respect to any Borrower, its Affiliates or any of their respective business, legal, financial or other affairs, and irrespective of whether such information came into Agent's or its Affiliates' or representatives' possession before or after the date on which such Lender became a party to this Agreement.

15.7    **Costs and Expenses; Indemnification**.    Agent may incur and pay Lender Group Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys' fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Borrowers are obligated to reimburse Agent or Lenders for such expenses pursuant to this Agreement or otherwise. Agent is authorized and directed to deduct and retain sufficient amounts from payments or proceeds of the Collateral received by Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders. In the event Agent is not reimbursed for such costs and expenses by the Loan Parties and their Subsidiaries, each Lender hereby agrees that it is and shall be obligated to pay to Agent such Lender's ratable share thereof. Whether or not the transactions contemplated hereby are consummated, each of the Lenders, on a ratable basis, shall indemnify and defend the Agent-Related Persons (to the extent not reimbursed by or on behalf of Borrowers and without limiting the obligation of Borrowers to do so) from and against any and all Indemnified Liabilities; provided, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make any extension of credit hereunder. Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's ratable share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement or any other Loan Document to the extent that Agent is not reimbursed for such expenses by or on behalf of Borrowers. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

15.8    **Agent in Individual Capacity**.    SLR and its Affiliates may make loans to, accept deposits from, acquire Equity Interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Loan Party and its Subsidiaries and Affiliates and any other Person party to any Loan Document as though SLR were not Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group. The other members of the Lender Group acknowledge that, pursuant to such activities, SLR or its Affiliates may receive information regarding a Loan Party or its Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of such Loan Party or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Agent will use its reasonable best efforts to obtain), Agent shall not be under any obligation to provide such information to them. The terms "Lender" and "Lenders" include SLR in its individual capacity.

15.9   **Successor Agent**.  Agent may resign as Agent upon 30 days (ten days if an Event of Default has occurred and is continuing) prior written notice to the Lenders (unless such notice is waived by the Required Lenders) and Borrowers (unless such notice is waived by Borrowers or a Default or Event of Default has occurred and is continuing). If Agent resigns under this Agreement, the Required Lenders shall be entitled, with (so long as no Event of Default has occurred and is continuing) the consent of Borrowers (such consent not to be unreasonably withheld, delayed, or conditioned), appoint a successor Agent for the Lenders. If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders and Borrowers, a successor Agent. If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders with (so long as no Event of Default has occurred and is continuing) the consent of Borrowers (such consent not to be unreasonably withheld, delayed, or conditioned). In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor Agent has accepted appointment as Agent by the date which is 30 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above.

15.10   **Lender in Individual Capacity**.  Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, , acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Loan Party and its Subsidiaries and Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group. The other members of the Lender Group acknowledge that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding a Loan Party or its Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of such Loan Party or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

15.11   **Collateral Matters**.

(a)     The Lenders hereby irrevocably authorize Agent to release any Lien on any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full by the Loan Parties and their Subsidiaries of all of the Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if Borrowers certify to Agent that the sale or disposition is permitted under Section 6.4 (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which no Loan Party or any of its Subsidiaries owned any interest at the time Agent's Lien was granted nor at any time thereafter, (iv) constituting property leased or licensed to a Loan Party or its Subsidiaries under a lease or license that has expired or is terminated in a transaction permitted under this Agreement, or (v) in connection with a credit bid or purchase authorized under this Section 15.11. The Loan Parties and the Lenders hereby irrevocably authorize Agent, based upon the instruction of the Required Lenders, to (a) consent to the sale of, credit bid, or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or any other Debtor Relief Laws, (b) credit bid or purchase (either directly

or indirectly through one or more entities) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Code, including pursuant to Sections 9-610 or 9-620 of the Code, or the PSSA or (c) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any other sale or foreclosure conducted or consented to by Agent in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy. In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such contingent or unliquidated claims cannot be estimated without impairing or unduly delaying the ability of Agent to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the Collateral that is the subject of such credit bid or purchase) and the Lenders whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the Collateral that is the subject of such credit bid or purchase (or in the Equity Interests of the any entities that are used to consummate such credit bid or purchase), and (ii) Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by any entities used to consummate such credit bid or purchase and in connection therewith Agent may reduce the Obligations owed to the Lenders (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration. Except as provided above, Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders, or (z) otherwise, the Required Lenders. Upon request by Agent or Borrowers at any time, the Lenders will confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this <u>Section 15.11</u>; <u>provided</u>, that (1) anything to the contrary contained in any of the Loan Documents notwithstanding, Agent shall not be required to execute any document or take any action necessary to evidence such release on terms that, in Agent's opinion, could expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly released) upon (or obligations of Borrowers in respect of) any and all interests retained by any Borrower, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral. Each Lender further hereby irrevocably authorizes Agent, at its option and in its sole discretion, to subordinate (by contract or otherwise) any Lien granted to or held by Agent on any property under any Loan Document (a) to the holder of any Permitted Lien on such property if such Permitted Lien secures purchase money Indebtedness (including Capitalized Lease Obligations) which constitute Permitted Indebtedness and (b) to the extent Agent has the authority under this <u>Section 15.11</u> to release its Lien on such property. Notwithstanding the provisions of this <u>Section 15.11</u>, the Agent shall be authorized, without the consent of any Lender and without the requirement that an asset sale consisting of the sale, transfer or other disposition having occurred, to release any security interest in any building, structure or improvement located in an area determined by the Federal Emergency Management Agency to have special flood hazards provided that such building, structure or improvement has an immaterial fair market value.

(b)    Agent shall have no obligation whatsoever to any of the Lenders (i) to verify or assure that the Collateral exists or is owned by a Loan Party or any of its Subsidiaries or is cared for, protected, or insured or has been encumbered, (ii) to verify or assure that Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, (iii) to verify or assure that any particular items of Collateral meet the eligibility criteria applicable in respect thereof, (iv) to impose, maintain, increase, reduce, implement, or eliminate any particular reserve hereunder or to determine whether the amount of any reserve is appropriate or not,

or (v) to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as one of the Lenders and that Agent shall have no other duty or liability whatsoever to any Lender as to any of the foregoing, except as otherwise expressly provided herein.

15.12    **Restrictions on Actions by Lenders; Sharing of Payments**.

(a)    Each of the Lenders agrees that it shall not, without the express written consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Agent, set off against the Obligations, any amounts owing by such Lender to any Loan Party or its Subsidiaries or any deposit accounts of any Loan Party or its Subsidiaries now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Borrower or any Guarantor or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)    If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Agent pursuant to the terms of this Agreement, or (ii) payments from Agent in excess of such Lender's Pro Rata Share of all such distributions by Agent, such Lender promptly shall (A) turn the same over to Agent, in kind, and with such endorsements as may be required to negotiate the same to Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

15.13    **Agency for Perfection**.  Agent hereby appoints each other Lender as its agent (and each Lender hereby accepts such appointment) for the purpose of perfecting Agent's Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the Code, the PPSA or any other applicable law of the United States or Canada can be perfected by possession or control. Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

15.14    **Payments by Agent to the Lenders**.  All payments to be made by Agent to the Lenders shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Agent. Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

15.15    **Concerning the Collateral and Related Loan Documents**.  Each member of the Lender Group authorizes and directs Agent to enter into this Agreement and the other Loan Documents.

Each member of the Lender Group agrees that any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

15.16    **Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information**.  By becoming a party to this Agreement, each Lender:

(a)    is deemed to have requested that Agent furnish such Lender, promptly after it becomes available, a copy of each field examination report respecting any Loan Party or its Subsidiaries (each, a "Report") prepared by or at the request of Agent, and Agent shall so furnish each Lender with such Reports,

(b)    expressly agrees and acknowledges that Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or other party performing any field examination will inspect only specific information regarding the Loan Parties and their Subsidiaries and will rely significantly upon Borrowers' and their Subsidiaries' books and records, as well as on representations of Borrowers' personnel,

(d)    agrees to keep all Reports and other material, non-public information regarding the Loan Parties and their Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 17.9, and

(e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrowers, and (ii) to pay and protect, and indemnify, defend and hold Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys' fees and costs) incurred by Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

(f)    In addition to the foregoing, (x) any Lender may from time to time request of Agent in writing that Agent provide to such Lender a copy of any report or document provided by any Loan Party or its Subsidiaries to Agent that has not been contemporaneously provided by such Loan Party or such Subsidiary to such Lender, and, upon receipt of such request, Agent promptly shall provide a copy of same to such Lender, (y) to the extent that Agent is entitled, under any provision of the Loan Documents, to request additional reports or information from any Loan Party or its Subsidiaries, any Lender may, from time to time, reasonably request Agent to exercise such right as specified in such Lender's notice to Agent, whereupon Agent promptly shall request of Borrowers the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from such Loan Party or such Subsidiary, Agent promptly shall provide a copy of same to such Lender, and (z) any time that Agent

renders to Borrowers a statement regarding the Loan Account, Agent shall send a copy of such statement to each Lender.

15.17 **Several Obligations; No Liability**.  Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments. Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender. Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender. Except as provided in <u>Section 15.7</u>, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group. No Lender shall be responsible to any Borrower or any other Person for any failure by any other Lender to fulfill its obligations to make credit available hereunder, nor to advance for such Lender or on its behalf, nor to take any other action on behalf of such Lender hereunder or in connection with the financing contemplated herein.

15.18 **Appointment as Hypothecary Representative**.  Without limiting the powers of the Agent, for the purposes of holding any hypothec granted to the Attorney (as defined below) pursuant to the laws of the Province of Quebec to secure the prompt payment and performance of any and all Obligations by any Loan Party, each member of the Lender Group hereby irrevocably appoints and authorizes the Agent and, to the extent necessary, ratifies the appointment and authorization of the Agent, to act as the hypothecary representative of the creditors as contemplated under Article 2692 of the Civil Code of Quebec (in such capacity, the "<u>Attorney</u>"), and to enter into, to take and to hold on their behalf, and for their benefit, any hypothec, and to exercise such powers and duties that are conferred upon the Attorney under any related deed of hypothec. The Attorney shall: (a) have the sole and exclusive right and authority to exercise, except as may be otherwise specifically restricted by the terms hereof, all rights and remedies given to the Attorney pursuant to any such deed of hypothec and applicable law, and (b) benefit from and be subject to all provisions hereof with respect to the Agent mutatis mutandis, including, without limitation, all such provisions with respect to the liability or responsibility to and indemnification by the Lender Group and Loan Parties. Any person who becomes a member of the Lender Group shall, by its execution of an Assignment and Acceptance, be deemed to have consented to and confirmed the Attorney as the person acting as hypothecary representative holding the aforesaid hypothecs as aforesaid and to have ratified, as of the date it becomes a member of the Lender Group, all actions taken by the Attorney in such capacity. The substitution of the Agent pursuant to the provisions of this Section 15 also constitutes the substitution of the Attorney.

16.    **WITHHOLDING TAXES.**

16.1 **Payments**.  All payments made by any Loan Party under any Loan Document will be made free and clear of, and without deduction or withholding for, any Taxes, except as otherwise required by applicable law, and in the event any deduction or withholding of Taxes is required (as determined in the good faith discretion of an applicable withholding agent), the applicable Loan Party shall make the requisite withholding, promptly pay over to the applicable Governmental Authority the withheld Tax, and furnish to Agent as promptly as possible after the date the payment of any such Tax is due pursuant to applicable law, the original or certified copies of tax receipts evidencing such payment by the Loan Parties, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent. Furthermore, if any such Tax is an Indemnified Taxes or an

Indemnified Tax is so levied or imposed, the Loan Parties agree to pay the full amount of such Indemnified Taxes and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement, any note, or Loan Document, including any amount paid pursuant to this Section 16.1 after withholding or deduction for or on account of any Indemnified Taxes on any additional amounts payable hereunder, will not be less than the amount provided for herein. The Loan Parties will promptly pay any Other Taxes or reimburse Agent for such Other Taxes upon Agent's demand. The Loan Parties shall jointly and severally indemnify each Indemnified Person (as defined in Section 10.3) (collectively a "Tax Indemnitee") for the full amount of Indemnified Taxes arising in connection with this Agreement or any other Loan Document or breach thereof by any Loan Party (including any Indemnified Taxes imposed or asserted on, or attributable to, amounts payable under this Section 16) imposed on, or paid by, such Tax Indemnitee and all reasonable costs and expenses related thereto (including fees and disbursements of attorneys and other tax professionals), as and when they are incurred and irrespective of whether suit is brought, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. The obligations of the Loan Parties under this Section 16 shall survive the termination of this Agreement, the resignation and replacement of the Agent, and the repayment of the Obligations. A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

16.2    **Exemptions**.

(a)    If a Lender is entitled to claim an exemption or reduction from United States withholding tax, such Lender agrees with and in favor of Agent, to deliver to Agent and the Administrative Borrower on behalf of all Borrowers one of the following before receiving its first payment under this Agreement:

(i)    if such Lender is entitled to claim an exemption from United States withholding tax pursuant to the portfolio interest exception, (A) a statement of the Lender, signed under penalty of perjury, that it is not a (I) a "bank" as described in Section 881(c)(3)(A) of the IRC, (II) a 10% shareholder of any Borrower (within the meaning of Section 871(h)(3)(B) of the IRC), or (III) a controlled foreign corporation related to Borrowers within the meaning of Section 864(d)(4) of the IRC, and (B) a properly completed and executed IRS Form W-8BEN, Form W-8BEN-E or Form W-8IMY (with proper attachments as applicable);

(ii)    if such Lender is entitled to claim an exemption from, or a reduction of, withholding tax under a United States tax treaty, a properly completed and executed copy of IRS Form W-8BEN or Form W-8BEN-E, as applicable;

(iii)    if such Lender is entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of such Lender, a properly completed and executed copy of IRS Form W-8ECI;

(iv)    if such Lender is entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because such Lender serves as an intermediary, a properly completed and executed copy of IRS Form W-8IMY (including a withholding statement and copies of the tax certification documentation for its beneficial owner(s) of the income paid to the intermediary, if required based on its status provided on the Form W-8IMY); or

(v)     a properly completed and executed copy of any other form or forms, including IRS Form W-9, as may be required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding or backup withholding tax.

(b)     Each Lender shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and promptly notify Agent and Administrative Borrower of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(c)     If a Lender claims an exemption from withholding tax in a jurisdiction other than the United States, such Lender or such Participant agrees with and in favor of Agent and Borrowers, to deliver to Agent and Administrative Borrower (or, in the case of a Participant, to the Lender granting the participation only) any such form or forms, as may be required under the laws of such jurisdiction as a condition to exemption from, or reduction of, foreign withholding or backup withholding tax before receiving its first payment under this Agreement, but only if such Lender or such Participant is legally able to deliver such forms, or the providing of or delivery of such forms in the Lender's reasonable judgment would not subject such Lender to any material unreimbursed cost or expense or materially prejudice the legal or commercial position of such Lender (or its Affiliates); provided, further, that nothing in this Section 16.2(c) shall require a Lender to disclose any information that it deems to be confidential (including its tax returns). Each Lender shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and promptly notify Agent and Administrative Borrower of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(d)     Borrowers agree that each Participant shall be entitled to the benefits of this Section 16 with respect to its participation in any portion of the Commitments and the Obligations so long as such Participant complies with the obligations set forth in this Section 16 with respect thereto (it being understood that the documentation required pursuant to this Section 16.2 shall be delivered to the Lender granting the participation.

(e)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable due diligence and reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the IRC, as applicable), such Lender shall deliver to Agent at the time or times prescribed by law and at such time or times reasonably requested by Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the IRC) and such additional documentation reasonably requested by Agent as may be necessary for Agent or Borrowers to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

16.3    **Reductions**.

(a)     If a Lender is subject to an applicable withholding tax, Agent may withhold from any payment to such Lender an amount equivalent to the applicable withholding tax. If the forms or other documentation required by Section 16.2(a) or 16.2(c) are not delivered to Agent, then Agent may withhold from any payment to such Lender or such Participant not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

(b)      If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Lender due to a failure on the part of the Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify Agent of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or Lender failed to maintain the Participant Register, or for any other reason) such Lender shall indemnify and hold Agent harmless for all amounts paid, directly or indirectly, by Agent, as Tax or otherwise, including penalties and interest, and including any Taxes imposed by any jurisdiction on the amounts payable to Agent under this <u>Section 16</u>, together with all costs and expenses (including attorneys' fees and expenses), whether or not such taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this paragraph (b).  The obligation of the Lenders under this subsection shall survive the payment of all Obligations and the resignation or replacement of Agent.

16.4      <u>**Refunds**</u>.  If Agent or a Lender determines, in its sole discretion, that it has received a refund of any Indemnified Taxes to which the Loan Parties have paid additional amounts pursuant to this <u>Section 16</u>, so long as no Default or Event of Default has occurred and is continuing, it shall pay over such refund to the Administrative Borrower on behalf of the Loan Parties (but only to the extent of payments made, or additional amounts paid, by the Loan Parties under this <u>Section 16</u> with respect to Indemnified Taxes giving rise to such a refund), net of all out-of-pocket expenses of Agent or such Lender and without interest (other than any interest paid by the applicable Governmental Authority with respect to such a refund); <u>provided</u>, that the Loan Parties, upon the request of Agent or such Lender, agrees to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges, imposed by the applicable Governmental Authority) to Agent or such Lender in the event Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything in this Agreement to the contrary, this <u>Section 16</u> shall not be construed to require Agent or any Lender to make available its tax returns (or any other information which it deems confidential) to Loan Parties or any other Person or require Agent or any Lender to pay any amount to an indemnifying party pursuant to <u>Section 16.4</u>, the payment of which would place Agent or such Lender (or their Affiliates) in a less favorable net after-Tax position than such Person would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.

17.      **GENERAL PROVISIONS.**

17.1      <u>**Effectiveness**</u>.  Subject to <u>Section 3.1</u>, this Agreement shall be binding and deemed effective when executed by each Borrower, Agent, and each Lender whose signature is provided for on the signature pages hereof.

17.2      <u>**Section Headings**</u>.  Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

17.3      <u>**Interpretation**</u>.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lender Group or any Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and

interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

17.4    **Severability of Provisions**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

17.5    **[Intentionally Omitted]**.

17.6    **Debtor-Creditor Relationship**.  The relationship between the Lenders and Agent, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor. No member of the Lender Group has (or shall be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the members of the Lender Group, on the one hand, and the Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

17.7    **Counterparts; Electronic Execution**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

17.8    **Revival and Reinstatement of Obligations; Certain Waivers**.  If any member of the Lender Group repays, refunds, restores, or returns in whole or in part, any payment or property (including any proceeds of Collateral) previously paid or transferred to such member of the Lender Group in full or partial satisfaction of any Obligation or on account of any other obligation of any Loan Party under any Loan Document, because the payment, transfer, or the incurrence of the obligation so satisfied is asserted or declared to be void, voidable, or otherwise recoverable under any law relating to creditors' rights, including provisions of any applicable Debtor Relief Law relating to fraudulent transfers, preferences, transfers at undervalue, or other voidable or recoverable obligations or transfers (each, a "Voidable Transfer"), or because such member of the Lender Group elects to do so on the reasonable advice of its counsel in connection with a claim that the payment, transfer, or incurrence is or may be a Voidable Transfer, then, as to any such Voidable Transfer, or the amount thereof that such member of the Lender Group elects to repay, restore, or return (including pursuant to a settlement of any claim in respect thereof), and as to all reasonable costs, expenses, and attorneys' fees of such member of the Lender Group related thereto, (i) the liability of the Loan Parties with respect to the amount or property paid, refunded, restored, or returned will automatically and immediately be revived, reinstated, and restored and will exist, and (ii) Agent's Liens securing such liability shall be effective, revived, and remain in full force and effect, in each case, as fully as if such Voidable Transfer had never been made. If, prior to any of the foregoing, (A) Agent's Liens shall have been released or terminated, or (B) any provision of this Agreement shall have been terminated or cancelled, Agent's Liens, or such provision of this Agreement, shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligation of any Loan Party in

respect of such liability or any Collateral securing such liability. This provision shall survive the termination of this Agreement and the repayment in full of the Obligations.

17.9    **Confidentiality**.

(a)    Agent and Lenders each individually (and not jointly or jointly and severally) agree that material, non-public information regarding the Loan Parties and their Subsidiaries, their operations, assets, and existing and contemplated business plans ("Confidential Information") shall be treated by Agent and the Lenders in a confidential manner, and shall not be disclosed by Agent and the Lenders to Persons who are not parties to this Agreement, except: (i) to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group and to employees, directors, Affiliates, officers and any investment committee or financing or funding sources of any member of the Lender Group (the Persons in this clause (i), "Lender Group Representatives") on a "need to know" basis in connection with this Agreement and the transactions contemplated hereby and on a confidential basis, (ii) to Subsidiaries and Affiliates of any member of the Lender Group; provided, that any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this Section 17.9, (iii) as may be required by regulatory authorities so long as such authorities are informed of the confidential nature of such information, (iv) as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided, that (x) prior to any disclosure under this clause (iv), the disclosing party agrees to provide Borrowers with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Borrowers pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation and (y) any disclosure under this clause (iv) shall be limited to the portion of the Confidential Information as may be required by such statute, decision, or judicial or administrative order, rule, or regulation, (v) as may be agreed to in advance in writing by Borrowers, (vi) as requested or required by any Governmental Authority pursuant to any subpoena or other legal process; provided, that (x) prior to any disclosure under this clause (vi) the disclosing party agrees to provide Borrowers with prior written notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior written notice to Borrowers pursuant to the terms of the subpoena or other legal process and (y) any disclosure under this clause (vi) shall be limited to the portion of the Confidential Information as may be required by such Governmental Authority pursuant to such subpoena or other legal process, (vii) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent or the Lenders or the Lender Group Representatives), (viii) in connection with any assignment, participation or pledge of any Lender's interest under this Agreement or to any potential or prospective Lender; provided, that prior to receipt of Confidential Information any such assignee, participant, or pledgee or such potential or prospective Lender shall have agreed in writing to receive such Confidential Information either subject to the terms of this Section 17.9 or pursuant to confidentiality requirements substantially similar to those contained in this Section 17.9 (and such Person may disclose such Confidential Information to Persons employed or engaged by them as described in clause (i) above), (ix) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents; provided, that prior to any disclosure to any Person (other than any Loan Party, Agent, any Lender, any of their respective Affiliates, or their respective counsel) under this clause (ix) with respect to litigation involving any Person (other than any Borrower, Agent, any Lender, any of their respective Affiliates, or their respective counsel), the disclosing party agrees to provide Borrowers with prior written notice thereof, and (x) in connection with, and to the extent reasonably necessary for, the exercise of any secured creditor remedy under this Agreement or under any other Loan Document.

(b)    Anything in this Agreement to the contrary notwithstanding, Agent may disclose information concerning the terms and conditions of this Agreement and the other Loan Documents to

loan syndication and pricing reporting services or in its marketing or promotional materials, with such information to consist of deal terms and other information customarily found in such publications or marketing or promotional materials and may otherwise use the name, logos, and other insignia of any Borrower or the other Loan Parties and the Commitments provided hereunder in any "tombstone" or other advertisements, on its website or in other marketing materials of the Agent.

17.10  **Survival**.  All representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of, or any accrued interest on, any Loan or any fee or any other amount payable under this Agreement is outstanding or unpaid.

17.11  **Patriot Act; Due Diligence**.  Each Lender that is subject to the requirements of the Patriot Act and/or Canadian AML Legislation hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act and/or Canadian AML Legislation, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the Patriot Act and/or Canadian AML Legislation. In addition, Agent and each Lender shall have the right to periodically conduct due diligence on all Loan Parties, their senior management and key principals and legal and beneficial owners. Each Loan Party agrees to cooperate in respect of the conduct of such due diligence and further agrees that the reasonable costs and charges for any such due diligence by Agent shall constitute Lender Group Expenses hereunder and be for the account of Borrowers. If the Agent has ascertained the identity of any Canadian Loan Party or any authorized signatories of any Canadian Loan Party for the purposes of the Canadian AML Legislation, then the Agent:

(a)  shall be deemed to have done so as an agent for each Lender and this Agreement shall constitute a "written agreement" in such regard between each Lender and the Agent within the meaning of the applicable Canadian AML Legislation; and

(b)  shall provide to each Lender, copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

Notwithstanding the preceding sentence and except as may otherwise be agreed in writing, each Lender agrees that the Agent has no obligation to ascertain the identity of any Canadian Loan Party or any authorized signatories of a Canadian Loan Party on behalf of any Lender, or to confirm the completeness or accuracy of any information it obtains from any Canadian Loan Party or any such authorized signatory in doing so.

17.12  **Integration**.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the ~~date hereof~~Closing Date.

17.13  **~~Nautilus~~BowFlex as Agent for Borrowers**.  Each Borrower hereby irrevocably appoints ~~Nautilus~~BowFlex as the borrowing agent and attorney-in-fact for all Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until Agent shall have received prior written notice signed by each Borrower that such appointment has been

revoked and that another Borrower has been appointed Administrative Borrower. Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (a) to provide Agent with all notices with respect to the ~~Term Loan~~Loans obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and the other Loan Documents (and any notice or instruction provided by Administrative Borrower shall be deemed to be given by Borrowers hereunder and shall bind each Borrower), (b) to receive notices and instructions from members of the Lender Group (and any notice or instruction provided by any member of the Lender Group to the Administrative Borrower in accordance with the terms hereof shall be deemed to have been given to each Borrower), and (c) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain the ~~Term Loan~~Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement. It is understood that the handling of the Loan Account and Collateral in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Borrowers in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that Lender Group shall not incur liability to any Borrower as a result hereof. Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group. To induce the Lender Group to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify each member of the Lender Group and hold each member of the Lender Group harmless against any and all liability, expense, loss or claim of damage or injury, made against the Lender Group by any Borrower or by any third party whosoever, arising from or incurred by reason of (i) the handling of the Loan Account and Collateral of Borrowers as herein provided, or (ii) the Lender Group's relying on any instructions of the Administrative Borrower**,** except that Borrowers will have no liability to the relevant Agent-Related Person or Lender-Related Person under this <u>Section 17.13</u> with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of such Agent-Related Person or Lender-Related Person, as the case may be.

17.14 **<u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b) the effects of any Bail-in Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

17.15   **Acknowledgment Regarding Any Supported QFCs**.   To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States): In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

17.16   **Erroneous Payments**.

(a)      Each Lender and any other party hereto hereby severally agrees that if (i) Agent notifies (which such notice shall be conclusive absent manifest error) such Lender (or the Lender which is an Affiliate of a Lender) or any other Person that has received funds from Agent or any of its Affiliates, either for its own account or on behalf of a Lender (each such recipient, a "Payment Recipient") that Agent has determined in its sole discretion that any funds received by such Payment Recipient were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient) or (ii) any Payment Recipient receives any payment from Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, or (z) that such Payment Recipient otherwise becomes aware was transmitted or received in error or by mistake (in whole or in part) then, in each case, an error in payment shall be presumed to have been made (any such amounts specified in clauses (i) or (ii) of this Section 17.16(a), whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise; individually and collectively, an "Erroneous Payment"), then, in each case, such Payment Recipient is deemed to have knowledge of such error at the time of its receipt of such Erroneous Payment; provided that nothing in this Section 17.16 shall require Agent to provide any of the notices specified in clauses (i) or (ii) above. Each Payment Recipient agrees that it shall not assert any right or claim to any Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any

demand, claim or counterclaim by Agent for the return of any Erroneous Payments, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(b)     Without limiting the immediately preceding clause (a), each Payment Recipient agrees that, in the case of clause (a)(ii) above, it shall promptly notify Agent in writing of such occurrence.

(c)     In the case of either clause (a)(i) or (a)(ii) above, such Erroneous Payment shall at all times remain the property of Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of Agent, and upon demand from Agent such Payment Recipient shall (or, shall cause any Person who received any portion of an Erroneous Payment on its behalf to), promptly, but in all events no later than one Business Day thereafter, return to Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds and in the currency so received, together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to Agent at the greater of the Federal Funds Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(d)     In the event that an Erroneous Payment (or portion thereof) is not recovered by Agent for any reason, after demand therefor by Agent in accordance with immediately preceding clause (c), from any Lender that is a Payment Recipient or an Affiliate of a Payment Recipient (such unrecovered amount as to such Lender, an "Erroneous Payment Return Deficiency"), then at the sole discretion of Agent and upon Agent's written notice to such Lender (i) such Lender shall be deemed to have made a cashless assignment of the full face amount of the portion of its Loans (but not its Commitments) with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Loans") to Agent or, at the option of Agent, Agent's applicable lending affiliate (such assignee, the "Agent Assignee") in an amount that is equal to the Erroneous Payment Return Deficiency (or such lesser amount as Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Loans, the "Erroneous Payment Deficiency Assignment") plus any accrued and unpaid interest on such assigned amount, without further consent or approval of any party hereto and without any payment by Agent Assignee as the assignee of such Erroneous Payment Deficiency Assignment. Without limitation of its rights hereunder, following the effectiveness of the Erroneous Payment Deficiency Assignment, Agent may make a cashless reassignment to the applicable assigning Lender of any Erroneous Payment Deficiency Assignment at any time by written notice to the applicable assigning Lender and upon such reassignment all of the Loans assigned pursuant to such Erroneous Payment Deficiency Assignment shall be reassigned to such Lender without any requirement for payment or other consideration. The parties hereto acknowledge and agree that (1) any assignment contemplated in this clause (d) shall be made without any requirement for any payment or other consideration paid by the applicable assignee or received by the assignor, (2) the provisions of this clause (d) shall govern in the event of any conflict with the terms and conditions of Section 13 and (3) Agent may reflect such assignments in the Register without further consent or action by any other Person.

(e)     Each party hereto hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, Agent (1) shall be subrogated to all the rights of such Payment Recipient and (2) is authorized to set off, net and apply any and all amounts at any time owing to such Payment Recipient under any Loan Document, or otherwise payable or distributable by Agent to such Payment Recipient from any source, against any amount due to Agent under this Section 17.16 or under the indemnification provisions of this Agreement, (y) the receipt of an Erroneous Payment by a Payment Recipient shall not for the purpose of this Agreement be treated as a payment, prepayment, repayment, discharge or other satisfaction of any Obligations owed by the Borrowers or any other Loan Party,

except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by Agent from the Borrowers or any other Loan Party for the purpose of making for a payment on the Obligations and (z) to the extent that an Erroneous Payment was in any way or at any time credited as payment or satisfaction of any of the Obligations, the Obligations or any part thereof that were so credited, and all rights of the Payment Recipient, as the case may be, shall be reinstated and continue in full force and effect as if such payment or satisfaction had never been received.

(f)     Each party's obligations under this Section 17.16 shall survive the resignation or replacement of Agent or any transfer of right or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

(g)     The provisions of this Section 17.16 to the contrary notwithstanding, (i) nothing in this Section 17.16 will constitute a waiver or release of any claim of any party hereunder arising from any Payment Recipient's receipt of an Erroneous Payment and (ii) there will only be deemed to be a recovery of the Erroneous Payment to the extent that Agent has received payment from the Payment Recipient in immediately available funds the Erroneous Payment Return Deficiency, whether directly from the Payment Recipient, as a result of the exercise by Agent of its rights of subrogation or set off as set forth above in clause (e) or as a result of the receipt by Agent Assignee of a payment of the outstanding principal balance of the Loans assigned to Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment, but excluding any other amounts in respect thereof (it being agreed that any payments of interest, fees, expenses or other amounts (other than principal) received by Agent Assignee in respect of the Loans assigned to Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment shall be the sole property of Agent Assignee and shall not constitute a recovery of the Erroneous Payment).

17.17 ~~Intercreditor Provisions~~Intentionally Omitted.

~~(a) Borrowers shall not, and shall not permit any Subsidiary or any other Person to, grant or permit any Liens on any asset or property to secure any ABL Obligations unless such Borrower or Subsidiary or such Person has granted a Lien on such asset or property to secure the Obligations.~~

~~(b) Each Borrower agrees to, and agrees to cause each of its respective Subsidiaries to, take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement and the Intercreditor Agreement.~~

~~(c) Each member of the Lender Group irrevocably appoints, designates and authorizes Agent to enter into the Intercreditor Agreement on its behalf and to take such action on its behalf pursuant to the provisions of the Intercreditor Agreement. Each member of the Lender Group agrees to be bound by the terms of the Intercreditor Agreement. In the event of any conflict between the terms of this Agreement and the terms of the Intercreditor Agreement, the terms of the Intercreditor Agreement shall govern.~~

~~(d) No reference to the Intercreditor Agreement or any other intercreditor or subordination agreement in this Agreement or any other Loan Documents shall be construed to provide that any Loan Party is a third party beneficiary of the provisions of the Intercreditor Agreement or such other agreement or may assert any rights, defense or claims on account of the Intercreditor Agreement or such other agreement or this Section 17.17, and each Loan Party agrees that nothing in the Intercreditor Agreement or such other agreement is intended or shall impair the obligation of any Loan Party to pay~~

the Obligations under this Agreement, or any other Loan Document as and when the same shall become due and payable in accordance with their respective terms, or to affect the relative rights of the creditors with respect to any Loan Party or, except as expressly otherwise provided in the Intercreditor Agreement or such other agreement as to a Loan Party's obligations, such Loan Party's properties.

17.18  **Canadian Interest Rate Limitation.**  In no event shall the aggregate "interest" (as defined in Section 347 of the Criminal Code (Canada), as the same shall be amended, replaced or re-enacted from time to time (the "Criminal Code Section")) payable (whether by way of payment, collection or demand) by any Loan Party to the Agent or the Lenders under this Agreement or any other Loan Document exceed the effective annual rate of interest on the "credit advanced" (as defined in that section) under this Agreement or such other Loan Document lawfully permitted under that section and, if any payment, collection or demand pursuant to this Agreement or any other Loan Document in respect of "interest" (as defined in that section) is determined to be contrary to the provisions of that section, such payment, collection or demand shall be deemed to have been made by the mutual mistake of the Agent, the Lenders and such Loan Party, with such "interest" deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by the Criminal Code Section, to result in a receipt by the Agent and the Lenders of interest at a rate not in contravention of the Criminal Code Section, such adjustment to be effected, to the extent necessary, as follows:  firstly, by reducing the amounts or rates of interest required to be paid to the Agent and the Lenders; and then, by reducing any fees, charges, commissions, premiums, expenses and other amounts required to be paid to the Agent or the Lenders which would constitute "interest" under the Criminal Code Section.  Notwithstanding the foregoing, and after giving effect to all such adjustments, if the Agent or the Lenders shall have received an amount in excess of the maximum permitted by the Criminal Code Section, then the applicable Canadian Loan Party shall be entitled, by notice in writing to the Agent, to obtain reimbursement from the Agent and the Lenders in an amount equal to such excess.

17.19  **Financing Orders.** In the event of any inconsistency between the terms of the Financing Orders and the Loan Documents, the terms of the Financing Orders shall control.

*[Remainder of Page Intentionally Left Blank; Signature Pages to Follow.]*

<u>Exhibit B</u>

Conformed Guaranty and Security Agreement

Please see attached.

*Conformed through Amendment No. 3*

# GUARANTY AND SECURITY AGREEMENT

This **GUARANTY AND SECURITY AGREEMENT** (this "Agreement"), dated as of November 30, 2022, by and among the Persons listed on the signature pages hereof as "Grantors" and those additional entities that hereafter become parties hereto by executing the form of Joinder attached hereto as Annex 1 (each, a "Grantor" and collectively, the "Grantors"), and **Crystal Financial LLC** d/b/a SLR Credit Solutions, a Delaware limited liability company ("SLR"), in its capacity as administrative agent for each member of the Lender Group (in such capacity, together with its successors and assigns in such capacity, "Agent").

## W I T N E S S E T H:

**WHEREAS**, pursuant to that certain Term Loan Credit Agreement, of even date herewith (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"), by and among BowFlex Inc. (f/k/a Nautilus, Inc.), a Washington corporation ("~~Nautilus~~BowFlex"), Nautilus Fitness Canada, Inc., a corporation organized under the laws of British Columbia ("Nautilus Canada"), and those additional entities that hereafter become parties to the Credit Agreement as "Borrowers" in accordance with the terms thereof (together with ~~Nautilus~~BowFlex and Nautilus Canada, each individually as a "Borrower" and individually and collectively, jointly and severally, as the "Borrowers"), the lenders party thereto as "Lenders" (each of such Lenders, together with its successors and permitted assigns, is referred to hereinafter as a "Lender"), and Agent, the Lender Group has agreed to make certain financial accommodations available to Borrowers from time to time pursuant to the terms and conditions thereof; and

**WHEREAS**, Agent has agreed to act as agent for the benefit of the Lender Group in connection with the transactions contemplated by the Credit Agreement and this Agreement;

**WHEREAS**, in order to induce the Lender Group to enter into the Credit Agreement and the other Loan Documents and to extend the Loans thereunder, and to induce the Lender Group to make financial accommodations to Borrowers as provided for in the Credit Agreement and the other Loan Documents, (a) each Grantor (other than any Borrower) has agreed to guaranty the Guarantied Obligations, and (b) each Grantor has agreed to grant to Agent, for the benefit of the Lender Group, a continuing security interest in and to the Collateral in order to secure the prompt and complete payment, observance and performance of, among other things, the Secured Obligations; and

**WHEREAS**, each Grantor (other than any Borrower) is an Affiliate or a Subsidiary of each Borrower and, as such, will benefit by virtue of the financial accommodations extended to Borrowers by the Lender Group, including, without limitation, centralized administrative services from the other Loan Parties, continued supply of inventory, intercompany funding, the seamless continuing cross-border operations of the Grantors and the other Loan Parties.

**NOW, THEREFORE**, for and in consideration of the recitals made above and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

DB1/ 133652908.7

1.        <u>Definitions; Construction</u>.

(a)        All initially capitalized terms used herein (including in the preamble and recitals hereof) without definition shall have the meanings ascribed thereto in the Credit Agreement.  Any terms (whether capitalized or lower case) used in this Agreement that are defined in the Code (including, without limitation, Chattel Paper, Commercial Tort Claims, Deposit Account, Drafts, Documents, Equipment, Farm Products, Fixtures, General Intangibles, Inventory, Investment Property, Instruments, Letters of Credit, Letter-of-Credit Rights, Promissory Notes, Proceeds, Securities Account and Supporting Obligations) shall be construed and defined as set forth in the Code unless otherwise defined herein or in the Credit Agreement; <u>provided</u>, that to the extent that the Code is used to define any term used herein and if such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.  In addition to those terms defined elsewhere in this Agreement, as used in this Agreement, the following terms shall have the following meanings:

(i)        "<u>Account</u>" has the meaning specified therefor in the Code.  For the avoidance of doubt, a Credit Card Receivable is an Account.

(ii)        "<u>Account Debtor</u>" has the meaning specified therefor in the Code.  For the avoidance of doubt, Credit Card Issuers and Credit Card Processors are Account Debtors.

(iii)        "<u>Acquisition Documents</u>" means the agreements, instruments and documents evidencing, or entered into in connection with, an Acquisition (including a Permitted Acquisition) by a Grantor.

(iv)        "<u>Activation Instruction</u>" has the meaning specified therefor in <u>Section 7(k)</u> hereof.

(v)        "<u>Agent</u>" has the meaning specified therefor in the preamble to this Agreement.

(vi)        "<u>Agreement</u>" has the meaning specified therefor in the preamble to this Agreement.

(vii)        "<u>Books</u>" means books and records (including each Grantor's Records indicating, summarizing, or evidencing such Grantor's assets (including the Collateral) or liabilities, each Grantor's Records relating to such Grantor's business operations or financial condition, and each Grantor's goods or General Intangibles related to such information).

(viii)        "<u>Borrower</u>" and "<u>Borrowers</u>" have the respective meanings specified therefor in the recitals to this Agreement.

(ix)        [Reserved]

(x)        [Reserved]

(ix) "Cash Dominion Event" means the occurrence of either of the following: (A) the occurrence and continuance of any Event of Default, or (B) ABL Availability is less than the greater of (x) 15% of the Combined Line Cap (without giving effect to the Term Pushdown Reserve), and (y) $16,250,000 for any time.

2

~~(x) "Cash Dominion Period" means the period commencing after the occurrence of a Cash Dominion Event and continuing until the date when (A) no Event of Default shall exist and be continuing, and (B) ABL Availability is greater than the greater of (x) 15% of the Combined Line Cap (without giving effect to the Term Pushdown Reserve), and (y) $16,250,000 for 30 consecutive days.~~

(xi)    "Code" means the New York Uniform Commercial Code, as in effect from time to time; provided, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to Agent's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies.

(xii)    "Collateral" has the meaning specified therefor in Section 3 hereof.

(xiii)    "Collection Account" means a Deposit Account of a Grantor which is used exclusively for deposits of collections and proceeds of Collateral and not as a disbursement or operating account upon which checks or other drafts may be drawn.

(xiv)    "Commercial Tort Claims" means commercial tort claims (as that term is defined in the Code), and includes those commercial tort claims listed on Schedule 1.

(xv)    "Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

(xvi)    "Controlled Account" has the meaning specified therefor in Section 7(k) hereof.

(xvii)    "Controlled Account Agreements" means those certain cash management agreements, in form and substance reasonably satisfactory to Agent, each of which is executed and delivered by a Grantor, Agent, and one of the Controlled Account Banks.

(xviii)    "Controlled Account Bank" has the meaning specified therefor in Section 7(k) hereof.

(xix)    "Copyright Security Agreement" means each Copyright Security Agreement executed and delivered by Grantors, or any of them, and Agent, in substantially the form of Exhibit A.

(xx)    "Copyrights" means any and all rights in any works of authorship, including (A) copyrights and moral rights, (B) copyright registrations and recordings thereof and all applications in connection therewith including those listed on Schedule 2, (C) income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (D) the right to sue for past, present, and future infringements thereof, and (E) all of each Grantor's rights corresponding thereto throughout the world.

(xxi)    "Credit Agreement" has the meaning specified therefor in the recitals to this Agreement.

3

(xxii)    "Excluded Accounts" means, collectively, (A) Deposit Accounts and Securities Accounts with an aggregate amount on deposit therein of not more than $100,000 individually or $250,000 in the aggregate at any one time for all such Deposit Accounts or Securities Accounts, or (B) Deposit Accounts specially and exclusively used for payroll, payroll funding, payroll taxes and other tax payments, other employee wage and benefit payments to or for any Grantor's employees (including flexible spending accounts), escrow or trust purposes, or other fiduciary purposes, (C) any the Deposit Account of a Loan Party BowFlex held at JPMorgan Chase Bank, N.A. with account # ending x8655, including the funds on deposit therein, that has been pledged to secure Indebtedness or other obligations, in each case to the extent such cash collateral is expressly permitted by clause (h), clause (i), clause (j) or clause (o) of "Permitted Indebtedness", and is exclusively used for such purpose, or (D) "zero balance accounts" (so long as any such zero balance account is used solely for disbursements and not for collections of payments from third parties). pursuant to clause (p) of the definition of Permitted Liens in support of letters of credit issued as Indebtedness permitted pursuant to clause (b) of the definition of Permitted Indebtedness; provided, however, such Deposit Account and the funds on deposit therein shall constitute Collateral and not an Excluded Account from and after release and termination of the pledge and lien thereon, and upon such release and termination, all amounts from such Deposit Account shall be transferred to the Term Loan Priority Account to be applied in accordance with the terms of the Credit Agreement, and (B) a Deposit Account of BowFlex New Jersey LLC held at Provident Bank with account # ending x4262 which shall hold an aggregate amount on deposit therein of not more than $50,000 at any one time.

(xxiii)    "Excluded Assets" has the meaning specified therefor in Section 3 hereof.

(xxiv)    "Excluded Swap Obligation" means, with respect to any Grantor, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Grantor of (including by virtue of the joint and several liability provisions of Section 2.15 of the Credit Agreement with respect to any Grantor that is a Borrower), or the grant by such Grantor of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Grantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guaranty of such Grantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guaranty or security interest is or becomes illegal.

(xxv)    [Reserved]

(xxvi)    (xxv) "Foreclosed Grantor" has the meaning specified therefor in Section 2(i)(iv) hereof.

(xxvii)    (xxvi) "General Intangibles" means general intangibles (as that term is defined in the Code), and includes payment intangibles, software, contract rights, rights to payment, rights under Hedge Agreements (including the right to receive payment on account of the termination (voluntarily or involuntarily) of such Hedge Agreements), rights arising under common law, statutes, or regulations, choses or things in action, goodwill, Intellectual Property, Intellectual Property Licenses, purchase orders, customer lists, route lists, rights to payment and other rights under Acquisition Documents, rights to payment and other rights under any royalty or licensing agreements, including Intellectual Property Licenses, infringement claims, monies due or recoverable from pension funds, pension plan refunds, pension plan refund claims, insurance premium rebates, tax refunds, and tax refund claims, interests in a partnership or limited liability company which do not constitute a security under Article 8 of the Code, and any other personal property other than Commercial Tort Claims, money, Accounts, Chattel Paper, Deposit

4

Accounts, goods, Investment Property, Negotiable Collateral, and oil, gas, or other minerals before extraction.

(xxviii)        (xxvii) "Grantor" and "Grantors" have the respective meanings specified therefor in the preamble to this Agreement.

(xxix)        (xxviii) "Guarantied Obligations" means all of the Obligations now or hereafter existing, whether for principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), fees (including the fees provided for in the Fee Letter), Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), or otherwise, and any and all reasonable expenses (including reasonable and documented counsel fees and expenses) incurred by Agent or any other member of the Lender Group (or any of them) in enforcing any rights under any of the Loan Documents. Without limiting the generality of the foregoing, Guarantied Obligations shall include all amounts that constitute part of the Guarantied Obligations and would be owed by any Borrower to Agent or any other member of the Lender Group but for the fact that they are unenforceable or not allowable, including due to the existence of a bankruptcy, reorganization, other Insolvency Proceeding or similar proceeding involving any Borrower or any guarantor; provided that, anything to the contrary contained in the foregoing notwithstanding, the Guarantied Obligations of any Grantor shall exclude any Excluded Swap Obligation.

(xxx)        (xxix) "Guarantor" means each Grantor other than Nautilus Canada.

(xxxi)        (xxx) "Guaranty" means the guaranty set forth in Section 2 hereof.

(xxxii)        (xxxi) "Intellectual Property" means any and all Patents, Copyrights, Trademarks, trade secrets, know-how, inventions (whether or not patentable), algorithms, software programs (including source code and object code), processes, product designs, industrial designs, blueprints, drawings, data, customer lists, URLs and domain names, specifications, documentations, reports, catalogs, literature, and any other forms of technology or proprietary information of any kind, including all rights therein and all applications for registration or registrations thereof.

(xxxiii)        (xxxii) "Intellectual Property Licenses" means, with respect to any Grantor, (A) any licenses or other similar rights provided to such Grantor in or with respect to Intellectual Property owned or controlled by any other Person, and (B) any licenses or other similar rights provided to any other Person in or with respect to Intellectual Property owned or controlled by such Grantor, in each case, including (x) any software license agreements (other than license agreements for commercially available off-the-shelf software that is generally available to the public which have been licensed to a Grantor pursuant to end-user licenses), (y) the license agreements listed on Schedule 3, and (z) the right to use any of the licenses or other similar rights described in this definition in connection with the enforcement of the Lender Group's rights under the Loan Documents.

(xxxiv)        (xxxiii) "Investment Property" means (A) any and all investment property, and (B) any and all of the following (regardless of whether classified as investment property under the Code):  all Pledged Interests, Pledged Operating Agreements, and Pledged Partnership Agreements.

(xxxv)        (xxxiv) "Joinder" means each Joinder to this Agreement executed and delivered by Agent and each of the other parties listed on the signature pages thereto, in substantially the form of Annex 1.

5

DB4/ 133652908.7

(xxxvi)        (xxxv) "Lender" and "Lenders" have the respective meanings specified therefor in the recitals to this Agreement.

(xxxvii)        (xxxvi) "Negotiable Collateral" means letters of credit, letter-of-credit rights, instruments, promissory notes, drafts and documents (as each such term is defined in the Code).

(xxxviii)        (xxxvii) "Patent Security Agreement" means each Patent Security Agreement executed and delivered by Grantors, or any of them, and Agent, in substantially the form of Exhibit B.

(xxxix)        (xxxviii) "Patents" means patents, patent applications, industrial designs and industrial design applications, including (A) the patents, patent applications, industrial designs and industrial design applications listed on Schedule 4, (B) all continuations, divisionals, continuations-in-part, re-examinations, reissues, and renewals thereof and improvements thereon, (C) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (D) the right to sue for past, present, and future infringements thereof, and (E) all of each Grantor's rights corresponding thereto throughout the world.

(xl)        (xxxix) "Pledged Collateral" means all Pledged Interests, Pledged Operating Agreements, and Pledged Partnership Agreements.

(xli)        (xl) "Pledged Companies" means each Person listed on Schedule 5 as a "Pledged Company", together with each other Person, all or a portion of whose Equity Interests are acquired or otherwise owned by a Grantor after the Closing Date and is required to be pledged pursuant to Section 5.11 of the Credit Agreement.

(xlii)        (xli) "Pledged Interests" means, subject to any applicable limitations under the Loan Documents (including limitations set forth in the definition of "Excluded Assets" and limitations set forth in Section 5.11 of the Credit Agreement), all of each Grantor's right, title and interest in and to all of the Equity Interests now owned or hereafter acquired by such Grantor, regardless of class or designation, including in each of the Pledged Companies, and all substitutions therefor and replacements thereof, all proceeds thereof and all rights relating thereto, also including any certificates representing the Equity Interests, the right to receive any certificates representing any of the Equity Interests, all warrants, options, share appreciation rights and other rights, contractual or otherwise, in respect thereof and the right to receive all dividends, distributions of income, profits, surplus, or other compensation by way of income or liquidating distributions, in cash or in kind, and all cash, instruments, and other property from time to time received, receivable, or otherwise distributed in respect of or in addition to, in substitution of, on account of, or in exchange for any or all of the foregoing.

(xliii)        (xlii) "Pledged Interests Addendum" means a Pledged Interests Addendum substantially in the form of Exhibit C.

(xliv)        (xliii) "Pledged Notes" has the meaning specified therefor in Section 6(i) hereof.

(xlv)        (xliv) "Pledged Operating Agreements" means all of each Grantor's rights, powers, and remedies under the limited liability company operating agreements of each of the Pledged Companies that are limited liability companies.

DB1/ 133652908.7

(xlvi)        (xlv) "Pledged Partnership Agreements" means all of each Grantor's rights, powers, and remedies under the partnership agreements of each of the Pledged Companies that are partnerships.

(xlvii)        (xlvi) "Proceeds" has the meaning specified therefor in Section 3 hereof.

(xlviii)        (xlvii) "PTO" means the United States Patent and Trademark Office.

(xlix)        (xlviii) "Qualified ECP Grantor" means, in respect of any Swap Obligation, each Grantor that has total assets exceeding $10,000,000 at the time the relevant guaranty, keepwell, or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

(l)        (xlix) "Real Property" means any estates or interests in real property now owned or hereafter acquired by any Grantor and the improvements thereto.

(li)        (l) "Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

(lii)        (li) "Rescission" has the meaning specified therefor in Section 7(k) hereof.

(liii)        (lii) "Secured Obligations" means each and all of the following: (A) all of the present and future obligations of each of the Grantors arising from, or owing under or pursuant to, this Agreement (including the Guaranty), the Credit Agreement, or any of the other Loan Documents and (B) all other Obligations of each Borrower and all other Guarantied Obligations of each Guarantor (including, in the case of each of clauses (A) and (B), Lender Group Expenses and any interest, fees, or expenses that accrue after the filing of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any Insolvency Proceeding); provided that, anything to the contrary contained in the foregoing notwithstanding, the Secured Obligations shall exclude any Excluded Swap Obligation.

(liv)        (liii) "Security Interest" has the meaning specified therefor in Section 3 hereof.

(lv)        (liv) "Supporting Obligations" means supporting obligations (as such term is defined in the Code), and includes letters of credit and guaranties issued in support of Accounts, Chattel Paper, documents, General Intangibles, instruments or Investment Property.

(lvi)        (lv) "Swap Obligation" means, with respect to any Grantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

(lvii)        (lvi) "Trademark Security Agreement" means each Trademark Security Agreement executed and delivered by Grantors, or any of them, and Agent, in substantially the form of Exhibit D.

(lviii)        (lvii) "Trademarks" means any and all trademarks, trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, including (A) the registered trademarks, trademark applications, registered service marks and service mark

7

DB1/ 133652908.7

applications listed on <u>Schedule 6</u>, (B) all renewals thereof, (C) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (D) the right to sue for past, present and future infringements and dilutions thereof, (E) the goodwill of each Grantor's business symbolized by the foregoing or connected therewith, and (F) all of each Grantor's rights corresponding thereto throughout the world.

(lix)    (lviii) "<u>URL</u>" means "uniform resource locator," an internet web address.

(b)    This Agreement shall be subject to the rules of construction set forth in Section 1.4 of the Credit Agreement, and such rules of construction are incorporated herein by this reference, *mutatis mutandis*.

(c)    All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

2.    <u>Guaranty</u>.

(a)    In recognition of the direct and indirect benefits to be received by Guarantors from the proceeds of the Term Loan and by virtue of the financial accommodations to be made to the Borrowers, each of the Guarantors, jointly and severally, hereby unconditionally and irrevocably guarantees as a primary obligor and not merely as a surety the full and prompt payment when due, whether upon maturity, acceleration, or otherwise, of all of the Guarantied Obligations. If any or all of the Obligations constituting Guarantied Obligations becomes due and payable, each of the Guarantors, unconditionally and irrevocably, and without the need for demand, protest, or any other notice or formality, promises to pay such indebtedness to Agent, for the benefit of the Lender Group, together with any and all reasonable and documented expenses (including Lender Group Expenses) that may be incurred by Agent or any other member of the Lender Group in demanding, enforcing, or collecting any of the Guarantied Obligations (including the enforcement of any collateral for such Guarantied Obligations or any collateral for the obligations of the Guarantors under this Guaranty). If any claim is ever made upon Agent or any other member of the Lender Group for repayment or recovery of any amount or amounts received in payment of or on account of any or all of the Guarantied Obligations and any of Agent or any other member of the Lender Group repays all or part of said amount by reason of (i) any judgment, decree, or order of any court or administrative body having jurisdiction over such payee or any of its property, or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including any Borrower or any Guarantor), then and in each such event, each of the Guarantors agrees that any such judgment, decree, order, settlement, or compromise shall be binding upon the Guarantors, notwithstanding any revocation (or purported revocation) of this Guaranty or other instrument evidencing any liability of any Grantor, and the Guarantors shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

(b)    Additionally, each of the Guarantors unconditionally and irrevocably guarantees the payment of any and all of the Guarantied Obligations to Agent, for the benefit of the Lender Group, whether or not due or payable by any Loan Party upon the occurrence of any of the events specified in Section 8.4 or 8.5 of the Credit Agreement, and irrevocably and unconditionally promises to pay such indebtedness to Agent, for the benefit of the Lender Group, without the requirement of demand, protest, or any other notice or other formality, in lawful money of the United States.

(c)    The liability of each of the Guarantors hereunder is primary, absolute, and unconditional, and is independent of any security for or other guaranty of the Guarantied Obligations, whether executed by any other Guarantor or by any other Person, and the liability of each of the Guarantors

8

hereunder shall not be affected or impaired by (i) any payment on, or in reduction of, any such other guaranty or undertaking (other than payment in full of the Guaranteed Obligations), (ii) any dissolution, termination, or increase, decrease, or change in personnel by any Grantor, (iii) any payment made to Agent, or any other member of the Lender Group on account of the Obligations which Agent or such other member of the Lender Group repays to any Grantor pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding (or any settlement or compromise of any claim made in such a proceeding relating to such payment), and each of the Guarantors waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (iv) any action or inaction by Agent or any other member of the Lender Group, or (v) any invalidity, irregularity, avoidability, or unenforceability of all or any part of the Guaranteed Obligations or of any security therefor.

(d)     This Guaranty includes all present and future Guaranteed Obligations including any under transactions continuing, compromising, extending, increasing, modifying, releasing, or renewing the Guaranteed Obligations, changing the interest rate, payment terms, or other terms and conditions thereof, or creating new or additional Guaranteed Obligations after prior Guaranteed Obligations have been satisfied in whole or in part.  To the maximum extent permitted by law, each Guarantor hereby waives any right to revoke this Guaranty as to future Guaranteed Obligations.  If such a revocation is effective notwithstanding the foregoing waiver, each Guarantor acknowledges and agrees that (i) no such revocation shall be effective until written notice thereof has been received by Agent, (ii) no such revocation shall apply to any Guaranteed Obligations in existence on the date of receipt by Agent of such written notice (including any subsequent continuation, extension, or renewal thereof, or change in the interest rate, payment terms, or other terms and conditions thereof), (iii) no such revocation shall apply to any Guaranteed Obligations made or created after such date to the extent made or created pursuant to a legally binding commitment of any member of the Lender Group in existence on the date of such revocation, (iv) no payment by any Guarantor, any Borrower, or from any other source, prior to the date of Agent's receipt of written notice of such revocation shall reduce the maximum obligation of such Guarantor hereunder, and (v) any payment by any Borrower or from any source other than such Guarantor subsequent to the date of such revocation shall first be applied to that portion of the Guaranteed Obligations as to which the revocation is effective and which are not, therefore, guaranteed hereunder, and to the extent so applied shall not reduce the maximum obligation of such Guarantor hereunder.  This Guaranty shall be binding upon each Guarantor, its successors and assigns and inure to the benefit of and be enforceable by Agent (for the benefit of the Lender Group) and its successors, transferees, or assigns.

(e)     The guaranty by each of the Guarantors hereunder is a guaranty of payment and not of collection.  The obligations of each of the Guarantors hereunder are independent of the obligations of any other Guarantor or Grantor or any other Person and a separate action or actions may be brought and prosecuted against one or more of the Guarantors whether or not action is brought against any other Guarantor or Grantor or any other Person and whether or not any other Guarantor or Grantor or any other Person be joined in any such action or actions.  Each of the Guarantors waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement hereof.  Any payment by any Grantor or other circumstance which operates to toll any statute of limitations as to any Grantor shall operate to toll the statute of limitations as to each of the Guarantors.

(f)     Each of the Guarantors authorizes Agent and the other members of the Lender Group without notice or demand (other than any notice expressly required to be provided hereunder or under any other Loan Document), and without affecting or impairing its liability hereunder, from time to time to:

(i)     change the manner, place, or terms of payment of, or change or extend the time of payment of, renew, increase, accelerate, or alter: (A) any of the Guaranteed Obligations (including

9

any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), or (B) any security therefor or any liability incurred directly or indirectly in respect thereof, and this Guaranty shall apply to the Guarantied Obligations as so changed, extended, renewed, or altered;

(ii)     take and hold security for the payment of the Obligations and sell, exchange, release, impair, surrender, realize upon, collect, settle, or otherwise deal with in any manner and in any order any property at any time pledged or mortgaged to secure the Obligations or any of the Guarantied Obligations (including any of the obligations of all or any of the Guarantors under this Guaranty) incurred directly or indirectly in respect thereof or hereof, or any offset on account thereof;

(iii)     exercise or refrain from exercising any rights against any Grantor;

(iv)     release or substitute any one or more endorsers, guarantors, any Grantor, or other obligors;

(v)     settle or compromise any of the Obligations, any security therefor, or any liability (including any of those of any of the Guarantors under this Guaranty) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of any Grantor to its creditors;

(vi)     apply any sums by whomever paid or however realized to any liability or liabilities of any Grantor to Agent or any other member of the Lender Group regardless of what liability or liabilities of such Grantor remain unpaid;

(vii)     consent to or waive any breach of, or any act, omission, or default under, this Agreement, any other Loan Document or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify, or supplement this Agreement, any other Loan Document or any of such other instruments or agreements; or

(viii)     take any other action that could, under otherwise applicable principles of law, give rise to a legal or equitable discharge of one or more of the Guarantors from all or part of its liabilities under this Guaranty (other than a defense of payment in full of the Guarantied Obligations).

(g)     It is not necessary for Agent or any other member of the Lender Group to inquire into the capacity or powers of any of the Guarantors or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

(h)     Each Guarantor jointly and severally guarantees that the Guarantied Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation, or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any member of the Lender Group with respect thereto.  The obligations of each Guarantor under this Guaranty are independent of the Guarantied Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any other Guarantor or whether any other Guarantor is joined in any such action or actions.  The liability of each Guarantor under this Guaranty shall be absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives, to the maximum extent permitted by law, any defense (other than payment in full of the Guarantied Obligations) it may now or hereafter have in any way relating to, any or all of the following:

10

(i)       any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(ii)       any change in the time, manner, or place of payment of, or in any other term of, all or any of the Guarantied Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including any increase in the Guarantied Obligations resulting from the extension of additional credit;

(iii)       any taking, exchange, release, or non-perfection of any Lien in and to any Collateral, or any taking, release, amendment, waiver, supplement, restatements, extension, novation, renewal, replacements, or continuation of, or consent to departure from any other guaranty, for all or any of the Guarantied Obligations;

(iv)       the existence of any claim, set-off, defense, or other right that any Guarantor may have at any time against any Person, including Agent or any other member of the Lender Group;

(v)       any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guarantied Obligations or any security therefor;

(vi)       any right or defense arising by reason of any claim or defense based upon an election of remedies by any member of the Lender Group including any defense based upon an impairment or elimination of such Guarantor's rights of subrogation, reimbursement, contribution, or indemnity of such Guarantor against any other Grantor or any other guarantors or sureties;

(vii)       any change, restructuring, or termination of the corporate, limited liability company, or partnership structure or existence of any Grantor; or

(viii)       any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Grantor or any other guarantor or surety.

(i)       Waivers.

(i)       Each of the Guarantors waives any right (except as shall be required by applicable statute and cannot be waived) to require Agent or any other member of the Lender Group to (i) proceed against any other Grantor or any other Person, (ii) proceed against or exhaust any security held from any other Grantor or any other Person, or (iii) protect, secure, perfect, or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any other Grantor, any other Person, or any collateral, or (iv) pursue any other remedy in any member of the Lender Group's power whatsoever. Each of the Guarantors waives, to the maximum extent permitted by law, any defense based on or arising out of any defense of any Grantor or any other Person, other than payment of the Guarantied Obligations to the extent of such payment, based on or arising out of the disability of any Grantor or any other Person, or the validity, legality, or unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any Grantor other than payment of the Obligations to the extent of such payment. Agent may, at the election of the Required Lenders and in accordance with the Loan Documents, foreclose upon any Collateral held by Agent by one or more judicial or non-judicial sales or other dispositions, whether or not every aspect of any such sale is commercially reasonable or otherwise fails to comply with applicable law or may exercise any other right or remedy Agent or any other member of the Lender Group may have against any Grantor or any other

Person, or any security, in each case, without affecting or impairing in any way the liability of any of the Guarantors hereunder except to the extent the Guarantied Obligations have been paid.

(ii)     Each of the Guarantors waives all presentments, demands for performance, protests and notices, including notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Guaranty, and notices of the existence, creation, or incurring of new or additional Obligations or other financial accommodations. Each of the Guarantors waives notice of any Default or Event of Default under any of the Loan Documents. Each of the Guarantors assumes all responsibility for being and keeping itself informed of each Grantor's financial condition and assets and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope, and extent of the risks which each of the Guarantors assumes and incurs hereunder, and agrees that neither Agent nor any of the other members of the Lender Group shall have any duty to advise any of the Guarantors of information known to them regarding such circumstances or risks.

(iii)     To the fullest extent permitted by applicable law, each Guarantor hereby waives: (A) any right to assert against any member of the Lender Group, any defense (legal or equitable) (other than the defense that all of the Guarantied Obligations have been paid in full), set-off, counterclaim, or claim which each Guarantor may now or at any time hereafter have against any Borrower or any other party liable to any member of the Lender Group, (B) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guarantied Obligations or any security therefor, (C) any right or defense arising by reason of any claim or defense based upon an election of remedies by any member of the Lender Group including any defense based upon an impairment or elimination of such Guarantor's rights of subrogation, reimbursement, contribution, or indemnity of such Guarantor against any Borrower or other guarantors or sureties, and (D) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Guarantied Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Guarantor's liability hereunder.

(iv)     No Guarantor will exercise any rights that it may now or hereafter acquire against any Grantor or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Guaranty, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of Agent or any other member of the Lender Group against any Grantor or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from any Grantor or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guarantied Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash and all of the Commitments have been terminated. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence, such amount shall be held in trust for the benefit of Agent, for the benefit of the Lender Group, and shall forthwith be paid to Agent to be credited and applied to the Guarantied Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Credit Agreement, or to be held as Collateral for any Guarantied Obligations or other amounts payable under this Guaranty thereafter arising. Notwithstanding anything to the contrary contained in this Guaranty, no Guarantor may exercise any rights of subrogation, contribution, indemnity, reimbursement or other similar rights against, and may not proceed or seek recourse against or with respect to any property or asset of, any other Grantor (the "Foreclosed Grantor"), including after payment in full of the Obligations, if all or any portion of the Obligations have been satisfied in connection with an exercise of remedies in respect of the Equity Interests of such Foreclosed Grantor whether pursuant to this Agreement or otherwise. Any

12

of the foregoing to the contrary notwithstanding, effective upon any sale, registration, assignment or transfer of or foreclosure on, or any other disposition or remedial action in respect of, any Equity Interests of any Borrower or other Loan Party by the Agent or the Lenders pursuant to the Loan Documents and/or applicable law, all such rights and claims of subrogation, contribution, exoneration, reimbursement and enforcement against any Borrower or any other Loan Party shall be, and hereby are, forever extinguished and indefeasibly waived and released by the Guarantors.

(v)      [Reserved]

(vi)      Each of the Guarantors represents, warrants, and agrees that each of the waivers set forth above is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law or public policy, such waivers shall be effective to the maximum extent permitted by law.

3.      Grant of Security.  Each Grantor has previously granted, collaterally assigned and pledged to the Agent, for the benefit of the Lender Group, to secure the Secured Obligations (whether then existing or thereafter arising) a continuing security interest in all of such Grantor's right, title and interest in and to the Collateral (as defined in this Agreement (immediately prior to the Amendment No. 3 Effective Date), and in furtherance thereof, each Grantor hereby unconditionally grants, collaterally assigns, and pledges to Agent, for the benefit of each member of the Lender Group, to secure the Secured Obligations (whether now existing or hereafter arising), subject to and upon the entry by the Bankruptcy Court of the Interim Financing Order (or, if applicable, the Final Financing Order), a continuing security interest (hereinafter referred to as the "Security Interest") in all of such Grantor's right, title, and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located (the "Collateral"):

(a)      all of such Grantor's Accounts (including, without limitation, all of such Grantor's Credit Card Receivables);

(b)      all of such Grantor's Books;

(c)      all of such Grantor's Chattel Paper (whether tangible or electronic);

(d)      all of such Grantor's Commercial Tort Claims;

(e)      all of such Grantor's Deposit Accounts;

(f)      all of such Grantor's Equipment;

(g)      all of such Grantor's Farm Products;

(h)      all of such Grantor's Fixtures;

(i)      all of such Grantor's General Intangibles;

(j)      all of such Grantor's Inventory;

(k)      all of such Grantor's Investment Property;

(l)      all of such Grantor's Intellectual Property and Intellectual Property Licenses;

DB4/ 133652908.7

(m)     all of such Grantor's Instruments and Negotiable Collateral (including all of such Grantor's Pledged Notes);

(n)     all of such Grantor's Pledged Interests (including all of such Grantor's Pledged Operating Agreements and Pledged Partnership Agreements);

(o)     all of such Grantor's Securities Accounts;

(p)     all of such Grantor's Supporting Obligations;

(q)     all of such Grantor's Goods;

(r)     all of such Grantor's Letters of Credit and Letter-of-Credit Rights;

(s)     all of such Grantor's Documents;

(t)     all of such Grantor's money, Cash Equivalents, or other assets of such Grantor that now or hereafter come into the possession, custody, or control of Agent (or its agent or designee) or any other member of the Lender Group;

(u)     all Insurance

(v)     all other personal property of such Grantor, whether tangible or intangible;

(w)     all of the Proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, Farm Products, Fixtures, General Intangibles, Inventory, Investment Property, Intellectual Property, Negotiable Collateral, Pledged Interests, Securities Accounts, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (the "Proceeds").  Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to any Grantor or Agent from time to time with respect to any of the Investment Property;

(x)     all proceeds of leases of Real Property;

(y)     effective upon entry of the Final Financing Order, all proceeds of claims or causes of action that the Grantors or causes of action that the Grantors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Grantors or the estates of the Grantors under Chapter 5 of the Bankruptcy Court or the applicable state law equivalent and any and all recoveries and settlements thereof;

(z)     effective upon entry of the Final Financing Order, each Grantor's rights under Section 506(c) and 552 of the Bankruptcy Code;

14

(aa)    any other asset that is unencumbered as of the Petition Date;

(bb)    all other "Collateral" (as defined in the Interim Financing Order or, if applicable, the Final Financing Order);

(cc)    (x) to the extent not otherwise included in clauses (a) through (wbb) of this Section, all Collateral Records, Collateral Support and Supporting Obligations in respect of any of the foregoing; and

(dd)    (y) to the extent not otherwise included in clauses (a) through (xcc) of this Section, all other property in which a security interest may be granted under the Uniform Commercial Code or which may be delivered and held by the Agent pursuant to the terms hereof.

Notwithstanding anything contained in this Agreement to the contrary, the term "Collateral" shall not include any of the following (individually and collectively, the "Excluded Assets"): (i) voting Equity Interests of any Foreign Subsidiary (other than Nautilus Canada or any other entity that is a Loan Party), solely to the extent that (A) such Equity Interests represent more than 65% of the outstanding voting Equity Interests of such Foreign Subsidiary and (B) pledging or hypothecating more than 65% of the total outstanding voting Equity Interests of such Foreign Subsidiary would result in material adverse tax consequences or the costs to the Grantors of providing such pledge are unreasonably excessive (as determined by Agent in consultation with Borrowers) in relation to the benefits to Agent and the other members of the Lender Group of the security afforded thereby, (ii) any rights or interest in any contract, lease, permit, license, or license agreement covering real or personal property of any Grantor if under the terms of such contract, lease, permit, license, or license agreement, or applicable law with respect thereto, the grant of a security interest or lien therein is prohibited as a matter of law or under the terms of such contract, lease, permit, license, or license agreement and such prohibition or restriction has not been waived or the consent of the other party to such contract, lease, permit, license, or license agreement has not been obtained (provided, that (A) the foregoing exclusions of this clause (ii) shall in no way be construed (1) to apply to the extent that any described prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408, or 9-409 of the Code or other applicable law, or (2) to apply to the extent that any consent or waiver has been obtained that would permit Agent's security interest or lien to attach notwithstanding the prohibition or restriction on the pledge of such contract, lease, permit, license, or license agreement and (B) the foregoing exclusions of clauses (i) and (ii) shall in no way be construed to limit, impair, or otherwise affect any of Agent's or any other member of the Lender Group's continuing security interests in and liens upon any rights or interests of any Grantor in or to (1) monies due or to become due under or in connection with any described contract, lease, permit, license, license agreement, or Equity Interests (including any Accounts or Equity Interests), or (2) any proceeds from the sale, license, lease, or other dispositions of any such contract, lease, permit, license, license agreement, or Equity Interests), (iii)(x) any United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law; provided, that upon submission and acceptance by the PTO of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision), such intent-to-use trademark application shall be considered Collateral, (iv) vehicles and other assets subject to a certificate of title, and (v) fixed or capital assets that are subject to a purchase money Lien or a Capital Lease in each case that constitutes a Permitted Lien, to the extent granting a security interest therein would be prohibited or require third party consent that cannot be obtained after use of commercially reasonable efforts. For the avoidance of doubt, the security interest granted under this Agreement shall not extend to, and the definition of "Collateral" and definitions of and references to asset categories in the definition of Collateral and elsewhere in this Agreement or any agreement entered into or pursuant to this Agreement shall not include, and (y) any Excluded Account (individually and collectively, the "Excluded Assets"); provided, further

that, if any aforementioned asset or the proceeds thereof no longer constitute Excluded Assets, such asset shall immediately constitute Collateral, and a Lien on such asset shall immediately attach thereto; provided, further, that notwithstanding anything to the contrary contained herein "Excluded Assets" shall not include (x) any assets of any Grantor included in the determination of the Domestic Borrowing Base, the Canadian Borrowing Base, the Aggregate Borrowing Base, or the ABL Borrowing Base or any Proceeds thereof or (y) any assets of any Grantor that secure the ABL Obligations or any refinancing or replacement thereof.

The security interest provided for herein has also been granted pursuant to the Financing Order.

Without in any way limiting the foregoing, each Grantor hereby acknowledges that any and all financing statements filed under the UCC in connection with the Pre-Petition Credit Agreement naming Agent, as secured party, and such Grantor, as debtor, shall be effective to perfect Agent's security interest granted by such Grantor pursuant to this Agreement to the extent such security interest may be perfected by the filing of financing statements under the UCC for the purposes of so perfecting the security interests granted by the Grantors hereunder and such pre-filings of financing statements are hereby ratified in all respects. Until all of the Obligations have been Paid in Full, the provisions of this paragraph shall continue to be effective and not subject to any right of termination in respect of the security interests granted herein.

     4.    <u>Security for Secured Obligations</u>.  The Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter.  Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to Agent, the Lender Group or any of them, but for the fact that they are unenforceable or not allowable (in whole or in part) as a claim in an Insolvency Proceeding involving any Grantor due to the existence of such Insolvency Proceeding.  Further, the Security Interest created hereby encumbers each Grantor's right, title, and interest in all Collateral, whether now owned by such Grantor or hereafter acquired, obtained, developed, or created by such Grantor and wherever located.

     5.    <u>Grantors Remain Liable</u>.  Anything herein to the contrary notwithstanding, (a) each of the Grantors shall remain liable under the contracts and agreements included in the Collateral, including the Pledged Operating Agreements and the Pledged Partnership Agreements, to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Agent or any other member of the Lender Group of any of the rights hereunder shall not release any Grantor from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) none of the members of the Lender Group shall have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement, nor shall any of the members of the Lender Group be obligated to perform any of the obligations or duties of any Grantors thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.  Until an Event of Default shall occur and be continuing, except as otherwise provided in this Agreement, the Credit Agreement, or any other Loan Document, Grantors shall have the right to possession and enjoyment of the Collateral for the purpose of conducting the ordinary course of their respective businesses, subject to and upon the terms hereof and of the Credit Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, it is the intention of the parties hereto that record and beneficial ownership of the Pledged Interests, including all voting, consensual, dividend, and distribution rights, shall remain in the applicable Grantor until (i) the occurrence and continuance of an Event of Default, and (ii) Agent has notified the applicable Grantor of Agent's election to exercise such rights with respect to the Pledged Interests pursuant to <u>Section 16</u>.

     6.    <u>Representations and Warranties</u>.  In order to induce Agent to enter into this Agreement for the benefit of the Lender Group, each Grantor makes the following representations and warranties to the

16

Lender Group which shall be true and correct, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Closing Date, and shall be true and correct, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the date of the making of each Additional Portion of the Term Loan (or other extension of credit) made thereafter, as though made on and as of the date of such Additional Portion of the Term Loan (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

(a)     The name (within the meaning of Section 9-503 of the Code) and jurisdiction of organization of each Grantor is set forth on Schedule 7 (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under the Loan Documents).

(b)     The chief executive office of each Grantor is located at the address indicated on Schedule 7 (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under the Loan Documents).

(c)     Each Grantor's tax identification numbers and organizational identification numbers (or, in each case, the equivalent), if any, are identified on Schedule 7 (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under the Loan Documents).

(d)     As of the Closing Date, no Grantor holds any Commercial Tort Claims that exceed $250,000 in amount, except as set forth on Schedule 1.

(e)     Set forth on Schedule 9 (as such Schedule may be updated from time to time subject to Section 7(k)(iii) with respect to Controlled Accounts and provided that Grantors comply with Section 7(c) hereof) is a listing of all of Grantors' Deposit Accounts and Securities Accounts, including, with respect to each bank or securities intermediary (i) the name and address of such Person, and (ii) the account numbers of the Deposit Accounts or Securities Accounts maintained with such Person.

(f)     Schedule 8 sets forth all Real Property owned by any of the Grantors as of the Closing Date.

(g)     As of the Closing Date: (i) Schedule 2 provides a complete and correct list of all registered Copyrights owned by any Grantor, all applications for registration of Copyrights owned by any Grantor, and all other Copyrights owned by any Grantor and material to the conduct of the business of any Grantor, (ii) Schedule 3 provides a complete and correct list of all Intellectual Property Licenses entered into by any Grantor pursuant to which (A) any Grantor has provided any license or other rights in Intellectual Property owned or controlled by such Grantor to any other Person (other than non-exclusive software licenses granted in the ordinary course of business), or (B) any Person has granted to any Grantor any license or other rights in Intellectual Property owned or controlled by such Person that is material to the business of such Grantor, including any Intellectual Property that is incorporated in any Inventory, software, or other product marketed, sold, licensed, or distributed by such Grantor (other than off-the-shelf, shrink-wrapped or "click to accept" software licenses or other licenses to generally commercially available software), (iii) Schedule 4 provides a complete and correct list of all Patents owned by any Grantor and all applications for Patents owned by any Grantor, and (iv) Schedule 6 provides a complete and correct list of

17

DB4/ 133652908.7

all registered Trademarks owned by any Grantor, and all applications for registration of Trademarks owned by any Grantor.

(h)      (i) (A) each Grantor owns or has a valid right to use all Intellectual Property that is necessary in or material to the conduct of its business, and (B) all employees and contractors of each Grantor, in each case, who were involved in the creation or development of any Intellectual Property for such Grantor that is necessary in or material to the business of such Grantor, have signed agreements containing assignment of Intellectual Property rights to such Grantor and obligations of confidentiality;

(ii)      to each Grantor's knowledge, no Person is currently infringing or misappropriating any Intellectual Property rights owned by such Grantor, in each case, that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect;

(iii)      (A) to each Grantor's knowledge, such Grantor is not currently infringing or misappropriating any Intellectual Property rights of any Person, except where such infringement either individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect, and (B) there are no infringement or misappropriation claims or proceedings pending, or to any Grantor's knowledge, threatened in writing against any Grantor, and no Grantor has received any written notice or other communication of any actual or alleged infringement or misappropriation of any Intellectual Property rights of any Person, in each case, except where such infringement either individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect;

(iv)      to each Grantor's knowledge, all registered Copyrights, registered Trademarks, and issued Patents that are owned by such Grantor and necessary in or material to the conduct of its business are valid, subsisting, enforceable, unexpired, and in full force and effect; and

(v)      each Grantor has taken reasonable steps to maintain the confidentiality of and otherwise protect and enforce its rights in all trade secrets owned by such Grantor that are necessary in or material to the conduct of the business of such Grantor.

(i)      ~~This~~ Subject to and upon entry of the applicable Financing Order, this Agreement creates a valid security interest in the Collateral of each Grantor, to the extent a security interest therein can be created under the Code, securing the payment of the Secured Obligations.  Except to the extent a security interest in the Collateral cannot be perfected by the filing of a financing statement under the Code, all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken or will have been taken upon the filing of financing statements listing each applicable Grantor, as a debtor, and Agent, as secured party, in the jurisdictions listed next to such Grantor's name on Schedule 11.  Upon the earlier of making of such filings and the entry of the applicable Financing Order by the Bankruptcy Court, Agent shall have a first priority (subject only to Permitted Liens) perfected security interest in the Collateral of each Grantor to the extent such security interest can be perfected by the filing of a financing statement under the Code.  Upon the earlier of filing of any Copyright Security Agreement with the United States Copyright Office or Canadian Intellectual Property Office, as applicable, filing of any Patent Security Agreement and any Trademark Security Agreement with the PTO or Canadian Intellectual Property Office, as applicable, and the filing of appropriate financing statements in the jurisdictions listed on Schedule 11, and, in each case, the entry of the applicable Financing Order by the Bankruptcy Court, all action necessary or desirable to protect and perfect the Security Interest in and on each Grantor's United States and Canadian issued and registered Patents, Trademarks, or Copyrights has been taken and such perfected Security Interest is enforceable as such as against any and all creditors of and purchasers from any Grantor.  All action by any Grantor necessary to protect and perfect such security interest on each item of Collateral has been duly taken.

18

(j)        (i) Except for the Security Interest created hereby, each Grantor is and will at all times be the sole holder of record and the legal and beneficial owner, free and clear of all Liens (other than Permitted Liens), of the Pledged Interests indicated on Schedule 5 as being owned by such Grantor and, when acquired by such Grantor, any Pledged Interests acquired after the Closing Date, (ii) all of the Pledged Interests are duly authorized, validly issued, fully paid and non-assessable and the Pledged Interests constitute or will constitute the percentage of the issued and outstanding Equity Interests of the Pledged Companies of such Grantor identified on Schedule 5 as supplemented or modified by any Pledged Interests Addendum or any Joinder to this Agreement, (iii) subject to and upon entry of the applicable Financing Order, such Grantor has the right and requisite authority to pledge, the Pledged Collateral pledged by such Grantor to Agent as provided herein, (iv) all actions necessary or desirable to perfect and establish the first priority (subject only to Permitted Liens) of, or otherwise protect, Agent's Liens in the Pledged Collateral, and the proceeds thereof, have been duly taken, upon (A) the execution and delivery of this Agreement, (B) the earlier of the entry of the applicable Financing Order by the Bankruptcy Court and the taking of possession by Agent (or its agent or designee) of any certificates representing the Pledged Interests, to the extent such Pledged Interests are represented by certificates, together with undated powers (or other documents of transfer acceptable to Agent) endorsed in blank by the applicable Grantor, (C) the earlier of the entry of the applicable Financing Order by the Bankruptcy Court and the filing of financing statements in the applicable jurisdiction set forth on Schedule 11 for such Grantor with respect to the Pledged Interests of such Grantor that are not represented by certificates, and (D) with respect to any Securities Accounts, the earlier of the delivery of Control Agreements with respect thereto or the entry of the applicable Financing Order or the Cash Management Order by the Bankruptcy Court, and (v) each Grantor has delivered to and deposited with Agent all certificates representing the Pledged Interests owned by such Grantor to the extent such Pledged Interests are represented by certificates, and undated powers (or other documents of transfer acceptable to Agent) endorsed in blank with respect to such certificates. None of the Pledged Interests owned or held by such Grantor has been issued or transferred in violation of any securities registration, securities disclosure, or similar laws of any jurisdiction to which such issuance or transfer may be subject.

(k)        No consent, approval, authorization, or other order or other action by, and no notice to or filing with, any Governmental Authority or any other Person is required (i) for the grant of a Security Interest by such Grantor in and to the Collateral pursuant to this Agreement or for the execution, delivery, or performance of this Agreement by such Grantor, or (ii) for the exercise by Agent of the voting or other rights provided for in this Agreement with respect to the Pledged Collateral or the remedies in respect of the Collateral pursuant to this Agreement, except (A) as may be required in connection with such disposition of Pledged Collateral by laws affecting the offering and sale of securities generally, (B) for consents, approvals, authorizations, or other orders or actions that have already been obtained or given (as applicable) and that are still in force, (C) the filing of financing statements and other filings necessary to perfect the Security Interests granted hereby, and (D) such other consents, approvals, authorizations, actions, notices, and filings as may be required in connection with the exercise by Agent of its remedies in respect of the Collateral and (E) the entry of the applicable Financing Order by the Bankruptcy Court.  No Intellectual Property License of any Grantor that is necessary in or material to the conduct of such Grantor's business requires any consent of any other Person that has not been obtained in order for such Grantor to grant the security interest granted hereunder in such Grantor's right, title or interest in or to such Intellectual Property License.

(l)        [reservedReserved]

(m)        There is no default, breach, violation, or event of acceleration existing under any promissory note (as defined in the Code) constituting Collateral and pledged hereunder (each a "Pledged Note") and no event has occurred or circumstance exists which, with the passage of time or the giving of

19

notice, or both, would constitute a default, breach, violation, or event of acceleration under any Pledged Note. No Grantor that is an obligee under a Pledged Note has waived any default, breach, violation, or event of acceleration under such Pledged Note.

(n)  As to all limited liability company or partnership interests, issued under any Pledged Operating Agreement or Pledged Partnership Agreement, each Grantor hereby represents and warrants that the Pledged Interests issued pursuant to such agreement (i) are not dealt in or traded on securities exchanges or in securities markets, (ii) do not constitute investment company securities, and (iii) are not held by such Grantor in a Securities Account. In addition, none of the Pledged Operating Agreements, the Pledged Partnership Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement or Pledged Partnership Agreement, provides that such Pledged Interests are securities governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction.

(o)  Without limiting subsections (i) and (j)(iv), and for the avoidance of doubt, the Interim Financing Order (and, when applicable, the Final Financing Order) shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of the Liens granted on the Collateral of the Debtors, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action to validate or perfect (in accordance with applicable non-bankruptcy law) such Liens, or to evidence or entitle the Agent or the Lender Group to the priorities granted under the applicable Financing Order.

7.  <u>Covenants</u>. Each Grantor, jointly and severally, covenants and agrees with Agent that from and after the date of this Agreement and until the date of termination of this Agreement in accordance with <u>Section 23</u>:

(a)  <u>Possession of Collateral</u>. In the event that any Collateral, including Proceeds, is evidenced by or consists of Negotiable Collateral, Investment Property, or Chattel Paper, having an aggregate value or face amount of $~~500,000~~100,000 or more for all such Negotiable Collateral, Investment Property, or Chattel Paper, the Grantors shall promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) after acquisition thereof), notify Agent thereof, and if and to the extent that perfection or priority of Agent's Security Interest is dependent on or enhanced by possession, the applicable Grantor, promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion)) after request by Agent, shall execute such other documents and instruments as shall be requested by Agent or, if applicable, endorse and deliver physical possession of such Negotiable Collateral, Investment Property, or Chattel Paper to Agent, together with such undated powers (or other relevant document of transfer acceptable to Agent) endorsed in blank as shall be requested by Agent, and shall do such other acts or things deemed necessary or desirable by Agent to protect Agent's Security Interest therein.

DB1/ 133652908.7

(b)      Chattel Paper.

(i)      Promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion)) after request by Agent, each Grantor shall take all steps reasonably necessary to grant Agent control of all electronic Chattel Paper constituting Collateral in accordance with the Code and all "transferable records" as that term is defined in Section 16 of the Uniform Electronic Transaction Act and Section 201 of the federal Electronic Signatures in Global and National Commerce Act as in effect in any relevant jurisdiction, to the extent that the aggregate value or face amount of such electronic Chattel Paper equals or exceeds $~~500,000~~100,000; and

(ii)      If any Grantor retains possession of any Chattel Paper or instruments constituting Collateral (which retention of possession shall be subject to the extent permitted hereby and by the Credit Agreement), promptly upon the request of Agent, such Chattel Paper and instruments shall be marked with the following legend: "This writing and the obligations evidenced or secured hereby are subject to the Security Interest of Crystal Financial LLC d/b/a SLR Credit Solutions, as Agent for the benefit of the Lender Group".

(c)      Control Agreements.

(i)      Subject to any applicable time periods provided under the Loan Documents, each Grantor shall obtain an authenticated Control Agreement (which may include a Controlled Account Agreement), from each bank maintaining a Deposit Account (other than any Excluded Account or as otherwise provided for in the Credit Agreement) or Securities Account for such Grantor ~~(other than with respect to any Excluded Accounts and any Deposit Accounts or Securities Accounts that constitute Excluded Assets)~~;

(ii)      Subject to any applicable time periods provided under the Loan Documents, each Grantor shall obtain an authenticated Control Agreement, from each issuer of uncertificated securities, securities intermediary, or commodities intermediary issuing or holding any financial assets or commodities to or for any Grantor, or maintaining a Securities Account for such Grantor ~~(other than with respect to any Excluded Accounts and any Securities Accounts that constitute Excluded Assets)~~; and

(iii)      Subject to Sections 7(h) and 9, each Grantor shall obtain an authenticated Control Agreement with respect to all of such Grantor's investment property constituting Collateral.

(d)      Letter-of-Credit Rights.  If the Grantors (or any of them) are or become the beneficiary of letters of credit constituting Collateral having a face amount or value of $~~500,000~~100,000 or more in the aggregate, then the applicable Grantor or Grantors shall promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) after becoming a beneficiary), notify Agent thereof and, promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion)) after request by Agent, enter into a tri-party agreement with Agent and the issuer or confirming bank with respect to letter-of-credit rights assigning such letter-of-credit rights to Agent and directing all payments thereunder to Agent's Account, all in form and substance reasonably satisfactory to Agent.

(e)      Commercial Tort Claims.  If the Grantors (or any of them) obtain Commercial Tort Claims constituting Collateral and having a value, or involving an asserted claim, ~~in the amount of $500,000 or more in the aggregate for all Commercial Tort Claims,~~ then the applicable Grantor or Grantors shall promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) of obtaining such Commercial Tort Claim), notify Agent upon incurring or

21

otherwise obtaining such Commercial Tort Claims and, promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion)) after request by Agent, amend Schedule 1 to describe such Commercial Tort Claims in a manner that reasonably identifies such Commercial Tort Claims and which is otherwise reasonably satisfactory to Agent, and hereby authorizes the filing of additional financing statements or amendments to existing financing statements describing such Commercial Tort Claims, and agrees to do such other acts or things deemed necessary or desirable by Agent to give Agent a first priority (subject only to Permitted Liens), perfected security interest in any such Commercial Tort Claim.

(f)      Government Contracts.   Other than Accounts and Chattel Paper the aggregate value of which does not at any one time exceed $~~500,000~~100,000, if any Account or Chattel Paper that arises out of a contract or contracts with the United States of America or Canada or any department, agency, or instrumentality thereof and that constitutes Collateral, Grantors shall promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) of the creation thereof) notify Agent thereof and, promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion)) after request by Agent, execute any instruments or take any steps reasonably required by Agent in order that all moneys due or to become due under such contract or contracts shall be assigned to Agent, for the benefit of the Lender Group, and shall provide written notice thereof under the Assignment of Claims Act or other applicable law.

(g)      Intellectual Property.

(i)      Upon the request of Agent, in order to facilitate filings with the PTO, the United States Copyright Office, Canadian Intellectual Property Office or any other similar filing office, as applicable, each Grantor shall execute and deliver to Agent one or more Copyright Security Agreements, Trademark Security Agreements, or Patent Security Agreements to further evidence Agent's Lien on such Grantor's issued and registered Patents, Trademarks, or Copyrights, and the General Intangibles of such Grantor relating thereto or represented thereby;

(ii)      Each Grantor shall have the duty, with respect to Intellectual Property that is necessary in or material to the conduct of such Grantor's business, to protect and diligently enforce and defend at such Grantor's expense its Intellectual Property, including (A) to diligently enforce and defend, including promptly suing for infringement, misappropriation, or dilution and to recover any and all damages for such infringement, misappropriation, or dilution, and filing for opposition, interference, and cancellation against conflicting Intellectual Property rights of any Person, (B) to prosecute diligently any trademark application or service mark application that is part of the Trademarks pending as of the date hereof or hereafter until the termination of this Agreement, (C) to prosecute diligently any patent application that is part of the Patents pending as of the date hereof or hereafter until the termination of this Agreement, (D) to take all reasonable and necessary action to preserve and maintain all such Trademarks, Patents, Copyrights, and Intellectual Property Licenses of such Grantor and its rights therein, including paying all maintenance fees and filing of applications for renewal, affidavits of use, and affidavits of noncontestability, and (E) to require all employees, consultants, and contractors of each Grantor, in each case who were involved in the creation or development of such Intellectual Property, to sign agreements containing assignment of Intellectual Property rights and obligations of confidentiality.  Each Grantor further agrees not to abandon any Intellectual Property or Intellectual Property License that is necessary in or material to the conduct of such Grantor's business.  Each Grantor hereby agrees to take the steps described in this Section 7(g)(ii) with respect to all new or acquired Intellectual Property to which it or any of its Subsidiaries is now or later becomes entitled that is necessary in or material to the conduct of such Grantor's business;

22

(iii)        Grantors acknowledge and agree that the Lender Group shall have no duties with respect to any Intellectual Property or Intellectual Property Licenses of any Grantor.  Without limiting the generality of this Section 7(g)(iii), Grantors acknowledge and agree that no member of the Lender Group shall be under any obligation to take any steps necessary to preserve rights in the Collateral consisting of Intellectual Property or Intellectual Property Licenses against any other Person, but any member of the Lender Group may do so at its option from and after the occurrence and during the continuance of an Event of Default, and all expenses incurred in connection therewith (including reasonable fees and expenses of attorneys and other professionals) shall be for the sole account of Borrowers and shall be chargeable to the Loan Account;

(iv)        On each date on which a Compliance Certificate is required to be delivered pursuant to Section 5.1 of the Credit Agreement (or, if an Event of Default has occurred and is continuing, more frequently if requested by Agent), each Grantor shall provide Agent with a written report of all new Patents, Trademarks or Copyrights that are registered or the subject of pending applications for registrations, and of all Intellectual Property Licenses that are material to the conduct of such Grantor's business, in each case, which were acquired, registered, or for which applications for registration were filed by any Grantor during the prior period and any statement of use or amendment to allege use with respect to intent-to-use trademark applications.  In the case of such registrations or applications therefor, which were acquired by any Grantor and are necessary in or material to the conduct of such Grantor's business, each such Grantor shall file the necessary documents with the appropriate Governmental Authority identifying the applicable Grantor as the owner (or as a co-owner thereof, if such is the case) of such Intellectual Property.  In each of the foregoing cases, in connection with the applicable Compliance Certificate, the applicable Grantor shall promptly cause to be prepared, executed, and delivered to Agent supplemental schedules to the applicable Loan Documents to identify such Patent, Trademark and Copyright registrations and applications therefor (with the exception of Trademark applications filed on an intent-to-use basis for which no statement of use or amendment to allege use has been filed) and Intellectual Property Licenses as being subject to the security interests created thereunder;

(v)        Upon receipt of notice of registration of any Copyright, each Grantor shall promptly (but in no event later than five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) following such receipt) notify (but without duplication of any notice required by Section 7(g)(v)) Agent of such registration by delivering, or causing to be delivered, to Agent, documentation sufficient for Agent to perfect Agent's Liens on such Copyright.  If any Grantor acquires from any Person any registered Copyright, or an application to register any Copyright, such Grantor shall promptly (but in no event later than five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) following such acquisition) notify Agent of such acquisition and deliver, or cause to be delivered, to Agent, documentation sufficient for Agent to perfect Agent's Liens on such Copyright.  In the case of such Copyright registrations or applications therefor which were acquired by any Grantor, each such Grantor shall promptly (but in no event later than five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) following such acquisition) file the necessary documents with the appropriate Governmental Authority identifying the applicable Grantor as the owner (or as a co-owner thereof, if such is the case) of such Copyrights;

(vi)        Each Grantor shall take reasonable steps to maintain the confidentiality of, and otherwise protect and enforce its rights in, the Intellectual Property that is necessary in or material to the conduct of such Grantor's business, including, as applicable (A) protecting the secrecy and confidentiality of its confidential information and trade secrets by having and enforcing a policy requiring all current employees, consultants, licensees, vendors and contractors with access to such information to execute appropriate confidentiality agreements, (B) taking actions reasonably necessary to ensure that no trade secret falls into the public domain, and (C) protecting the secrecy and confidentiality of the source

23

DB1/ 133652908.7

code of all software programs and applications of which it is the owner or licensee by having and enforcing a policy requiring any licensees (or sublicensees) of such source code to enter into license agreements with commercially reasonable use and non-disclosure restrictions; and

(vii)    No Grantor shall enter into any Intellectual Property License material to the conduct of the business to receive any license or rights in any Intellectual Property of any other Person unless such Grantor has used commercially reasonable efforts to permit the assignment of or grant of a security interest in such Intellectual Property License (and all rights of Grantor thereunder) to Agent (and any transferees of Agent).

(h)    <u>Investment Property</u>.

(i)    If any Grantor shall acquire, obtain, receive or become entitled to receive any Pledged Interests after the Closing Date, or shall otherwise be required to pledge Pledged Interests after the Closing Date pursuant to the terms of any Loan Documents, it shall promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) of acquiring or obtaining such Pledged Collateral) deliver to Agent a duly executed Pledged Interests Addendum identifying such Pledged Interests;

(ii) Upon the occurrence and during the continuance of an Event of Default, following the request of Agent, all sums of money and property paid or distributed in respect of the Investment Property constituting Collateral that are received by any Grantor shall be held by the Grantors in trust for the benefit of Agent segregated from such Grantor's other property, and such Grantor shall deliver it forthwith to Agent in the exact form received;

(ii)    All rights of each Grantor to receive and retain any and all dividends, interest, principal and other distributions (the "Distributions") paid on or distributed in respect of the Pledged Interests are hereby terminated and all such rights are hereby vested in the Agent, which shall have the sole right to receive and hold as Collateral all such Distributions and apply such Distributions to the Obligations, in all cases, in accordance with the Credit Agreement or as otherwise provided in the Financing Order.  All Distributions received by any Grantor contrary to the provisions of this clause (ii) shall be held in trust for the benefit of the Agent, shall be segregated from other property or funds of such Grantor and shall be forthwith delivered to the Agent upon demand in the same form as so received (with any necessary endorsement reasonably requested by the Agent). Any and all money and other property paid over to or received by the Agent pursuant to the provisions of this subsection shall be applied, unless otherwise determined by the Agent in its sole discretion, *first* to reduce the balance of the Revolving Loans outstanding and *second* for deposit into the Eligible Cash Account, in all cases, in accordance with the Credit Agreement or as otherwise provided in the Financing Order;

(iii)    Each Grantor shall promptly deliver to Agent a copy of each material notice or other material communication received by it in respect of any Pledged Interests;

(iv)    No Grantor shall make or consent to any amendment or other modification or waiver with respect to any Pledged Interests, Pledged Operating Agreement, or Pledged Partnership Agreement, or enter into any agreement or permit to exist any restriction with respect to any Pledged Interests if the same is prohibited pursuant to the Loan Documents;

(v)    Each Grantor agrees that it will cooperate with Agent in obtaining all necessary approvals and making all necessary filings under federal, state, local, or foreign law to effect the perfection of the Security Interest on the Investment Property or, subject to the other terms and conditions of this Agreement and the other Loan Documents, as applicable, to effect any sale or transfer thereof; and

24

(vi)        As to all limited liability company or partnership interests owned by such Grantor and issued under any Pledged Operating Agreement or Pledged Partnership Agreement, each Grantor hereby covenants that the Pledged Interests issued pursuant to such agreement (A) are not and shall not be dealt in or traded on securities exchanges or in securities markets, (B) do not and will not constitute investment company securities, and (C) are not and will not be held by such Grantor in a securities account. In addition, none of the Pledged Operating Agreements, the Pledged Partnership Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement or Pledged Partnership Agreement, provides or shall provide that such Pledged Interests are securities governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction; and

(vii)        With regard to any Pledged Interests that are not certificated, any such Grantor of such non-certificated Pledged Interests (i) agrees promptly to note on its books the security interests granted to Agent and confirmed under this Agreement, (ii) agrees that after the occurrence and during the continuation of an Event of Default, it will comply with instructions of Agent or its nominee with respect to the applicable Pledged Interests without further consent by the applicable Grantor, (iii) to the extent permitted by law, agrees that the "issuer's jurisdiction" (as defined in Section 8-110 of the UCC) is the State of New York, (iv) agrees to notify Agent upon obtaining knowledge of any interest in favor of any person in the applicable Pledged Interests that is materially adverse to the interest of the Agent therein, other than any Permitted Liens and (v) waives any right or requirement at any time hereafter to receive a copy of this Agreement in connection with the registration of any Pledged Interests hereunder in the name of Agent or its nominee or the exercise of voting rights by Agent or its nominee.

(i)        <u>Real Property; Fixtures.</u>  Each Grantor covenants and agrees that upon the acquisition of any fee interest in Real Property ~~having a fair market value in excess of $500,000~~ it will promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) of acquisition) notify Agent of the acquisition of such Real Property and will grant to Agent, for the benefit of the Lender Group, a first priority (subject only to Permitted Liens) Mortgage on each fee interest in Real Property now or hereafter owned by such Grantor and shall deliver such other documentation and opinions, in form and substance satisfactory to Agent, in connection with the grant of such Mortgage as Agent shall request in its Permitted Discretion, including title insurance policies, financing statements, fixture filings and environmental audits and such Grantor shall pay all recording costs, intangible taxes and other fees and costs (including reasonable attorneys' fees and expenses) incurred in connection therewith.  Each Grantor acknowledges and agrees that, to the extent permitted by applicable law, all of the Collateral shall remain personal property regardless of the manner of its attachment or affixation to real property.

(j)        <u>Transfers and Other Liens.</u>  Grantors shall not (i) sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, any of the Collateral, except as expressly permitted by the Credit Agreement, or (ii) create or permit to exist any Lien upon or with respect to any of the Collateral of any Grantor, except for Permitted Liens.  The inclusion of Proceeds in the Collateral shall not be deemed to constitute Agent's consent to any sale or other disposition of any of the Collateral except as expressly permitted in this Agreement or the other Loan Documents.

(k)        <u>Controlled Accounts; Controlled Investments.</u>

(i)        Subject to any applicable time periods provided under the Loan Documents, each Grantor shall (A) establish and maintain cash management services of a type and on terms reasonably satisfactory to Agent at ~~Wells Fargo Bank, National Association or~~ one or more of the other banks set forth on <u>Schedule 10</u> <u>or, with the Agent's prior written consent after the Amendment No. 3 Effective Date, one or more of the other banks</u> (each a "<u>Controlled Account Bank</u>"), and shall take

25

reasonable steps to ensure that all of its Account Debtors (including, without limitation, all Credit Card Issuers and Credit Card Processors) forward payment of the amounts owed by them directly to a Collection Account (which shall not be an Excluded Account) at such Controlled Account Bank that is not an Excluded Account or an Excluded Asset ((each, a "Controlled Account") (by wire transfer to the applicable Controlled Account Bank or to a lockbox maintained by the applicable Controlled Account Bank for deposit into such Collection Account), and (B) deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all of their Collections (including those sent directly by their Account Debtors to a Grantor) and proceeds of Collateral into a Controlled Account;

(ii)    Subject to any applicable time periods provided under the Loan Documents, eachEach Grantor shall establish and maintain Controlled Account Agreements with Agent and the applicable Controlled Account Bank, in form and substance reasonably acceptable to Agent. Each such Controlled Account Agreement shall provide, among other things, that (A) the Controlled Account Bank will comply with any instructions originated by Agent directing the disposition of the funds in each applicable Controlled Account without further consent by the applicable Grantor, (B) the Controlled Account Bank waives, subordinates, or agrees not to exercise any rights of setoff or recoupment or any other claim against each applicable Controlled Account other than for payment of its service fees and other charges directly related to the administration of such Controlled Account and for returned checks or other items of payment, and (C) upon the instruction of Agent (an "Activation Instruction"). the Controlled Account Bank will forward by daily sweep all amounts in each applicable Controlled Account to the Agent's Account. Agent agrees not to issue an Activation Instruction with respect to the Controlled Accounts unless a Cash Dominion Period is in effect at the time such Activation Instruction is issued. Agent agrees to use commercially reasonable efforts to rescind an Activation Instruction (the "Rescission") after any Cash Dominion Period has ended;;

(iii)    So long as no Default or Event of Default has occurred and is continuing or would result therefrom, Borrowers may amend Schedule 10 to add or replace a Controlled Account Bank or Controlled Account and shall upon such addition or replacement provide to Agent an amended Schedule 10; provided, that (A) such prospective Controlled Account Bank shall be reasonably satisfactory to Agent, and (B) prior to the time of the opening of such Controlled Account, the applicable Grantor and such prospective Controlled Account Bank shall have executed and delivered to Agent a Controlled Account Agreement. Each Grantor shall close any of its Controlled Accounts (and establish replacement Controlled Account accounts in accordance with the foregoing sentence) as promptly as practicable and in any event within 45 days after notice from Agent that the operating performance, funds transfer, or availability procedures or performance of the Controlled Account Bank with respect to Controlled Account Accounts or Agent's liability under any Controlled Account Agreement with such Controlled Account Bank is no longer acceptable in Agent's reasonable judgment; and

(iv)    Other than with respect to the Excluded Accounts or as otherwise agreed to by Agent in writing in its sole discretion, no Grantor (including, without limitation, any Foreign Loan Party) will, and no such Grantor will permit its Subsidiaries to, make, acquire, or permit to exist Permitted Investments consisting of cash, Cash Equivalents, or amounts credited to Deposit Accounts or Securities Accounts unless Grantor or its Subsidiary, as applicable, and the applicable bank or securities intermediary have entered into Control Agreements with Agent in order to perfect (or further establish) Agent's Liens in such Permitted Investments.

(l)    Name, Etc. No Grantor will change its name, chief executive office, organizational identification number, jurisdiction of organization or organizational identity; provided, that any Grantor may change its name or chief executive office upon at least ten days prior written notice to Agent of such change.

DB4/ 133652908.7

(m)    <u>Account Verification</u>.  Each Grantor will, and will cause each of its Subsidiaries to, permit Agent, in Agent's name or in the name or a nominee of Agent, to verify the validity, amount or any other matter relating to any Account constituting Collateral, by mail, telephone, facsimile transmission or other electronic means of transmission or otherwise.  Further, at the request of Agent, each Grantor will, and will cause each of its Subsidiaries to, send requests for verification of Accounts or, after the occurrence and during the continuance of an Event of Default, send notices of assignment of Accounts to Account Debtors and other obligors.

(n)    [Reserved]

(o)    <u>Pledged Notes</u>.   Grantors (i) without the prior written consent of Agent, will not (A) waive or release any obligation of any Person that is obligated under any of the Pledged Notes, (B) take or omit to take any action or knowingly suffer or permit any action to be omitted or taken, the taking or omission of which would result in any right of offset against sums payable under the Pledged Notes, or (C) other than Permitted Dispositions, assign or surrender their rights and interests under any of the Pledged Notes or terminate, cancel, modify, change, supplement or amend the Pledged Notes, and (ii) shall provide to Agent copies of all material written notices (including notices of default) given or received with respect to the Pledged Notes promptly after giving or receiving such notice.

(p)    <u>Keepwell</u>.  Each Qualified ECP Grantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to guaranty and otherwise honor all Obligations in respect of Swap Obligations.  The obligations of each Qualified ECP Grantor under this Section shall remain in full force and effect until payment in full of the Obligations.  Each Qualified ECP Grantor intends that this <u>Section 7(p)</u> constitute, and this <u>Section 7(p)</u> shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Grantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

8.    <u>Relation to Other Security Documents</u>.  The provisions of this Agreement shall be read and construed with the other Loan Documents referred to below in the manner so indicated.

(a)    <u>Credit Agreement</u>. In the event of any conflict between any provision in this Agreement and a provision in the Credit Agreement, such provision of the Credit Agreement shall control.

(b)    <u>Patent, Trademark, Copyright Security Agreements</u>.   The provisions of the Copyright Security Agreements, Trademark Security Agreements, and Patent Security Agreements are supplemental to the provisions of this Agreement, and nothing contained in the Copyright Security Agreements, Trademark Security Agreements, or the Patent Security Agreements shall limit any of the rights or remedies of Agent hereunder.  In the event of any conflict between any provision in this Agreement and a provision in a Copyright Security Agreement, Trademark Security Agreement or Patent Security Agreement, such provision of this Agreement shall control.

(c)    Financing Order.  This Agreement supplements each Financing Order without in any way diminishing or limiting the effects of the applicable Financing Order or any Lien, claim or security interest granted thereunder.   In the event of a conflict between the terms of this Agreement and any Financing Order, the terms of the applicable Financing Order shall control.

27

9.    <u>Further Assurances</u>.

(a)    Subject to the other terms and conditions of this Agreement and the other Loan Documents, as applicable, each Grantor agrees that from time to time, at its own expense, such Grantor will promptly execute and deliver all further instruments and documents, and take all further action, that Agent may reasonably request, in order to perfect and protect the Security Interest granted hereby, to create, perfect or protect the Security Interest purported to be granted hereby or to enable Agent to exercise and enforce its rights and remedies hereunder with respect to any of the Collateral.

(b)    Each Grantor authorizes the filing by Agent of financing or continuation statements, or amendments thereto as are necessary or desirable to perfect and preserve the Security Interest granted or purported to be granted hereby, and such Grantor will execute and deliver to Agent such other instruments or notices, as Agent may reasonably request, in order to perfect and preserve the Security Interest granted or purported to be granted hereby.

(c)    ~~Each~~Subject to and upon entry of the applicable Financing Order, each Grantor authorizes Agent at any time and from time to time to file, transmit, or communicate, as applicable, financing statements and amendments (i) describing the Collateral as "all personal property of debtor" or "all assets of debtor" or words of similar effect, (ii) describing the Collateral as being of equal or lesser scope or with greater detail, or (iii) that contain any information required by part 5 of Article 9 of the Code for the sufficiency or filing office acceptance. Each Grantor also hereby ratifies any and all financing statements or amendments previously filed by Agent in any jurisdiction.

(d)    Each Grantor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement filed in connection with this Agreement without the prior written consent of Agent, subject to such Grantor's rights under Section 9-509(d)(2) of the Code.

10.    <u>Agent's Right to Perform Contracts, Exercise Rights, etc</u>.  Upon the occurrence and during the continuance of an Event of Default, Agent (or its designee) (a) may proceed to perform any and all of the obligations of any Grantor contained in any contract, lease, or other agreement and exercise any and all rights of any Grantor therein contained as fully as such Grantor itself could, (b) shall have the right (subject to <u>Section 17(b)</u>) to use any Grantor's rights under Intellectual Property Licenses in connection with the enforcement of Agent's rights hereunder, including the right to prepare for sale and sell any and all Inventory and Equipment now or hereafter owned by any Grantor and now or hereafter covered by such licenses, and (c) shall have the right to request that any Equity Interests that are pledged hereunder be registered in the name of Agent or any of its nominees.

11.    <u>Agent Appointed Attorney-in-Fact</u>.  ~~Each~~Subject to the entry of the Interim Financing Order, each Grantor hereby irrevocably appoints Agent its attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, at such time as an Event of Default has occurred and is continuing under the Credit Agreement, to take any action and to execute any instrument which Agent may reasonably deem necessary or advisable to accomplish the purposes of this Agreement, including:

(a)    to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the Accounts or any other Collateral of such Grantor;

(b)    to receive and open all mail addressed to such Grantor and to notify postal authorities to change the address for the delivery of mail to such Grantor to that of Agent;

28

(c)    to receive, indorse, and collect any Collateral consisting of drafts or other instruments, documents, Negotiable Collateral or Chattel Paper of any Grantor subject to terms of the Financing Orders;

(d)    to file any claims or take any action or institute any proceedings which Agent may deem necessary or desirable for the collection of any of the Collateral of such Grantor or otherwise to enforce the rights of Agent with respect to any of the Collateral;

(e)    to repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any Person obligated to such Grantor in respect of any Account of such Grantor;

(f)    to use any Intellectual Property or Intellectual Property Licenses (to the extent that such use (i) does not violate in any material respect the express terms of any agreement between such Grantor and a third party governing such Grantor's use of such Intellectual Property and (ii) is not prohibited by applicable law) of such Grantor, including but not limited to any labels, Patents, Trademarks, trade names, URLs, domain names, industrial designs, Copyrights, or advertising matter, in preparing for sale, advertising for sale, or selling Inventory or other Collateral and to collect any amounts due under Accounts, contracts or Negotiable Collateral of such Grantor; and

(g)    Agent, on behalf of the Lender Group, shall have the right, but shall not be obligated, to bring suit in its own name to enforce the Intellectual Property and Intellectual Property Licenses (to the extent permitted under the applicable licenses) and, if Agent shall commence any such suit, the appropriate Grantor shall, at the request of Agent, do any and all lawful acts and execute any and all proper documents reasonably required by Agent in aid of such enforcement.

To the extent permitted by law, each Grantor hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof.  This power of attorney is coupled with an interest and shall be irrevocable until this Agreement is terminated.

12.    <u>Agent May Perform</u>.  If any Grantor fails to perform any agreement contained herein, Agent may itself perform, or cause performance of, such agreement, and the reasonable and documented expenses of Agent incurred in connection therewith shall be payable, jointly and severally, by Grantors in accordance with the terms of the Credit Agreement.

13.    <u>Agent's Duties</u>.  The powers conferred on Agent hereunder are solely to protect Agent's interest in the Collateral, for the benefit of the Lender Group, and shall not impose any duty upon Agent to exercise any such powers.  Except for the safe custody of any Collateral in its actual possession and the accounting for moneys actually received by it hereunder, Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.  Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its actual possession if such Collateral is accorded treatment substantially equal to that which Agent accords its own property.

14.    <u>Collection of Accounts, General Intangibles and Negotiable Collateral</u>.  At any time upon the occurrence and during the continuance of an Event of Default, Agent or Agent's designee may (a) make direct verification from Account Debtors (including, without limitation, Credit Card Issuers and Credit Card Processors) with respect to any or all Accounts that are part of the Collateral, (b) notify Account Debtors of any Grantor that the Accounts, General Intangibles, Chattel Paper or Negotiable Collateral of such Grantor have been collaterally assigned to Agent, for the benefit of the Lender Group, or that Agent has a security interest therein, or (c) collect the Accounts, General Intangibles and Negotiable Collateral of any

DB4/ 133652908.7

Grantor directly, and any collection costs and expenses shall constitute part of such Grantor's Secured Obligations under the Loan Documents.

15.     <u>Disposition of Pledged Interests by Agent</u>.  None of the Pledged Interests existing as of the date of this Agreement are, and none of the Pledged Interests hereafter acquired on the date of acquisition thereof will be, registered or qualified under the various federal or state securities laws of the United States and disposition thereof after an Event of Default has occurred and is continuing may be restricted to one or more private (instead of public) sales in view of the lack of such registration.  Each Grantor understands that in connection with such disposition, Agent may approach only a restricted number of potential purchasers and further understands that a sale under such circumstances may yield a lower price for the Pledged Interests than if the Pledged Interests were registered and qualified pursuant to federal and state securities laws and sold on the open market.  Each Grantor, therefore, agrees that: (a) if Agent shall, pursuant to the terms of this Agreement, sell or cause the Pledged Interests or any portion thereof to be sold at a private sale, Agent shall have the right to rely upon the advice and opinion of any nationally recognized brokerage or investment firm (but shall not be obligated to seek such advice and the failure to do so shall not be considered in determining the commercial reasonableness of such action) as to the best manner in which to offer the Pledged Interest or any portion thereof for sale and as to the best price reasonably obtainable at the private sale thereof, and (b) such reliance shall be conclusive evidence that Agent has handled the disposition in a commercially reasonable manner.

16.     <u>Voting and Other Rights in Respect of Pledged Interests</u>.

        (a)     Upon the occurrence and during the continuation of an Event of Default, (i) Agent may, at its option, ~~and with one Business Day prior notice to any Grantor (unless such Event of Default is an Event of Default specified in Section 8.1(a), 8.4 or 8.5 of the Credit Agreement, in which case no such notice need be given)~~, and in addition to all rights and remedies available to Agent under any other agreement, at law, in equity, or otherwise, exercise all voting rights, or any other ownership or consensual rights (including any dividend or distribution rights) in respect of the Pledged Interests owned by such Grantor, but under no circumstances is Agent obligated by the terms of this Agreement to exercise such rights, and (ii) if Agent duly exercises its right to vote any of such Pledged Interests, each Grantor hereby appoints Agent, such Grantor's true and lawful attorney-in-fact and IRREVOCABLE PROXY to vote such Pledged Interests in any manner Agent deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, as the case may be.  The power-of-attorney and proxy granted hereby is coupled with an interest and shall be irrevocable.

        (b)     For so long as any Grantor shall have the right to vote the Pledged Interests owned by it, such Grantor covenants and agrees that it will not, without the prior written consent of Agent, vote or take any consensual action with respect to such Pledged Interests which would materially adversely affect the rights of Agent or the other members of the Lender Group, or the value of the Pledged Interests.

17.     <u>Remedies</u>.  Upon the occurrence and during the continuance of an Event of Default:

        (a)     Agent may, and, at the instruction of the Required Lenders, shall exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, in the other Loan Documents, <u>the Financing Orders</u> or otherwise available to it, all the rights and remedies of a secured party on default under the Code or any other applicable law.  Without limiting the generality of the foregoing, each Grantor expressly agrees that, in any such event, Agent without demand of performance or other demand, advertisement or notice of any kind (except a notice specified below of time and place of public or private sale) to or upon any Grantor or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the Code or any other

30

applicable law), may take immediate possession of all or any portion of the Collateral and (i) require Grantors to, and each Grantor hereby agrees that it will at its own expense and upon request of Agent forthwith, assemble all or part of the Collateral as directed by Agent and make it available to Agent at one or more locations where such Grantor regularly maintains Inventory, and (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Agent's offices or elsewhere, for cash, on credit, and upon such other terms as Agent may deem commercially reasonable.  Each Grantor agrees that, to the extent notification of sale shall be required by law, at least ten days (or such shorter period as approved by the Bankruptcy Court) notification by mail to the applicable Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification and specifically such notification shall constitute a reasonable "authenticated notification of disposition" within the meaning of Section 9-611 of the Code. Agent shall not be obligated to make any sale of Collateral regardless of notification of sale having been given.  Agent may adjourn any public sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.  Each Grantor agrees that (A) the internet shall constitute a "place" for purposes of Section 9-610(b) of the Code, and (B) to the extent notification of sale shall be required by law, notification by mail of the URL where a sale will occur and the time when a sale will commence at least ten days prior to the sale (or such shorter time period as approved by the Bankruptcy Court)  shall constitute a reasonable notification for purposes of Section 9-611(b) of the Code.  Each Grantor agrees that any sale of Collateral to a licensor pursuant to the terms of a license agreement between such licensor and a Grantor is sufficient to constitute a commercially reasonable sale (including as to method, terms, manner, and time) within the meaning of Section 9-610 of the Code.

(b)     For the purpose of enabling Agent to exercise rights and remedies under this Section 17 (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, assign, convey, transfer or grant options to purchase any Collateral, including, without limitation, Intellectual Property Licenses constituting Collateral) at such time as Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to Agent, for the benefit of the Lender Group and to the extent of such Grantor's rights therein and to the extent permitted by the applicable licenses or other agreements related thereto, an irrevocable, nonexclusive, worldwide license to such Grantor's Intellectual Property (exercisable without payment of royalty or other compensation to such Grantor), to, use and practice and sublicense any Intellectual Property included in the Collateral now owned or hereafter acquired by such Grantor, including access to all media in which any of the licensed items may be recorded or stored and to all software and programs used for the compilation or printout thereof (in each case to the extent that such Grantor is permitted to grant such license and access under the applicable licenses or other agreements related thereto).

(c)     Agent may, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it under applicable law and without the requirement of notice to or upon any Grantor or any other Person (which notice is hereby expressly waived to the maximum extent permitted by the Code or any other applicable law), (i) with respect to any Grantor's Deposit Accounts in which Agent's Liens are perfected by control under Section 9-104 of the Code, instruct the bank maintaining such Deposit Account for the applicable Grantor to pay the balance of such Deposit Account to or for the benefit of Agent, and (ii) with respect to any Grantor's Securities Accounts in which Agent's Liens are perfected by control under Section 9-106 of the Code, instruct the securities intermediary maintaining such Securities Account for the applicable Grantor to (A) transfer any cash in such Securities Account to or for the benefit of Agent, or (B) liquidate any financial assets in such Securities Account that are customarily sold on a recognized market and transfer the cash proceeds thereof to or for the benefit of Agent.

DB4/ 133652908.7

(d)     Any cash held by Agent as Collateral and all cash proceeds received by Agent in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied against the Secured Obligations in the order set forth in the Credit Agreement.   In the event the proceeds of Collateral are insufficient to satisfy all of the Secured Obligations in full, each Grantor shall remain jointly and severally liable for any such deficiency.

(e)     Each Grantor hereby acknowledges that the Secured Obligations arise out of a commercial transaction, and agrees that if an Event of Default shall occur and be continuing Agent shall have the right to an immediate writ of possession without notice of a hearing.  Agent shall have the right to the appointment of a receiver for the properties and assets of each Grantor, and each Grantor hereby consents to such rights and such appointment and hereby waives any objection such Grantor may have thereto or the right to have a bond or other security posted by Agent.

18.     <u>Remedies Cumulative</u>.  Each right, power, and remedy of Agent, any other member of the Lender Group as provided for in this Agreement or the other Loan Documents now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy provided for in this Agreement and the other Loan Documents or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Agent or any other member of the Lender Group of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by Agent or such other member of the Lender Group of any or all such other rights, powers, or remedies.

19.     <u>Marshaling</u>. Agent shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, each Grantor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Agent's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

20.     <u>Indemnity</u>.  Each Grantor agrees to indemnify Agent and the other members of the Lender Group from and against all claims, lawsuits and liabilities (including reasonable attorneys' fees) arising out of or resulting from this Agreement (including enforcement of this Agreement) or any other Loan Document to which such Grantor is a party in accordance with and to the extent set forth in Section 10.3 of the Credit Agreement.  This provision shall survive the termination of this Agreement and the Credit Agreement and the repayment of the Secured Obligations.

21.     <u>Merger, Amendments; Etc.</u>  THIS AGREEMENT, TOGETHER WITH THE OTHER LOAN DOCUMENTS, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.  No waiver of any provision of this Agreement, and no consent to any departure by any Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No amendment of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Agent and each Grantor to which such amendment applies.

32

22.    <u>Addresses for Notices</u>.  All notices and other communications provided for hereunder shall be given in the form and manner and delivered to Agent at its address specified in the Credit Agreement, and to any of the Grantors at the notice address specified for Borrowers in the Credit Agreement, or as to any party, at such other address as shall be designated by such party in a written notice to the other party.

23.    <u>Continuing Security Interest: Assignments under Credit Agreement.</u>

(a)    This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until the Secured Obligations have been paid in full in accordance with the provisions of the Credit Agreement and the Commitments have expired or have been terminated, (ii) be binding upon each Grantor, and their respective successors and assigns, and (iii) inure to the benefit of, and be enforceable by, Agent, and its successors, transferees and assigns.  Without limiting the generality of the foregoing clause (iii), any Lender may, in accordance with the provisions of the Credit Agreement, assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Lender herein or otherwise.  Upon payment in full of the Secured Obligations in accordance with the provisions of the Credit Agreement and the expiration or termination of the Commitments, the Guaranty made and the Security Interest granted hereby and any powers of attorney contained herein shall automatically terminate and all rights to the Collateral shall revert to Grantors or any other Person entitled thereto.  At such time, upon Borrowers' request, Agent will authorize the filing of appropriate termination statements or other release documentation to terminate such Security Interest by each Grantor or its designees and Agent shall take, at Grantors' expense, such other actions reasonably requested by any Grantor to terminate or evidence the termination of such Guaranty and Security Interest.  No transfer or renewal, extension, assignment, or termination of this Agreement or of the Credit Agreement, any other Loan Document, or any other instrument or document executed and delivered by any Grantor to Agent nor any additional Loans (including any Additional Portion of the Term Loan) or other loans made by any Lender to any Borrower, nor the taking of further security, nor the retaking or re-delivery of the Collateral to Grantors, or any of them, by Agent, nor any other act of the Lender Group, or any of them, shall release any Grantor from any obligation, except a release or discharge executed in writing by Agent in accordance with the provisions of the Credit Agreement.  Agent shall not by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by Agent and then only to the extent therein set forth.  A waiver by Agent of any right or remedy on any occasion shall not be construed as a bar to the exercise of any such right or remedy which Agent would otherwise have had on any other occasion.

(b)    If any member of the Lender Group repays, refunds, restores, or returns in whole or in part, any payment or property (including any proceeds of Collateral) previously paid or transferred to such member of the Lender Group in full or partial satisfaction of any Secured Obligation or on account of any other obligation of any Loan Party under any Loan Document, because the payment, transfer, or the incurrence of the obligation so satisfied is asserted or declared to be void, voidable, or otherwise recoverable under any law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent transfers, preferences, or other voidable or recoverable obligations or transfers (each, a "<u>Voidable Transfer</u>"), or because such member of the Lender Group elects to do so on the reasonable advice of its counsel in connection with a claim that the payment, transfer, or incurrence is or may be a Voidable Transfer, then, as to any such Voidable Transfer, or the amount thereof that such member of the Lender Group elects to repay, restore, or return (including pursuant to a settlement of any claim in respect thereof), and as to all reasonable costs, expenses, and attorneys' fees of such member of the Lender Group related thereto, (i) the liability of the Loan Parties with respect to the amount or property paid, refunded, restored, or returned will automatically and immediately be revived, reinstated, and restored and will exist, and (ii) Agent's Liens securing such liability shall be effective, revived, and remain in full

33

force and effect, in each case, as fully as if such Voidable Transfer had never been made. If, prior to any of the foregoing, (A) Agent's Liens shall have been released or terminated, or (B) any provision of this Agreement shall have been terminated or cancelled, Agent's Liens, or such provision of this Agreement, shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligation of any Loan Party in respect of such liability or any Collateral securing such liability.

24.    Survival. All representations and warranties made by the Grantors in this Agreement and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect as long as the principal of or any accrued interest on any loan or any fee or any other amount payable under the Credit Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.

25.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE PROVISION.

(a)    THE VALIDITY OF THIS AGREEMENT, THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF, THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR RELATED HERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR RELATED HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK COUNTY, STATE OF NEW YORK OR, TO THE EXTENT APPLICABLE, THE BANKRUPTCY COURT; PROVIDED, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH GRANTOR AND AGENT WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 25(b).

(c)    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH GRANTOR AND AGENT HEREBY WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "CLAIM"). EACH GRANTOR AND AGENT REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF

34

LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(d)    EACH GRANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK COUNTY AND THE STATE OF NEW YORK, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(e)    NO CLAIM MAY BE MADE BY ANY GRANTOR AGAINST THE AGENT, OR ANY LENDER,, OR ANY AFFILIATE, DIRECTOR, OFFICER, EMPLOYEE, COUNSEL, REPRESENTATIVE, AGENT, OR ATTORNEY-IN-FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION HEREWITH, AND EACH GRANTOR HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

26.    <u>New Subsidiaries</u>.  Pursuant to Section 5.11 of the Credit Agreement (and subject to any limitations set forth therein), certain Subsidiaries (whether by acquisition or creation) of any Grantor are required to enter into this Agreement by executing and delivering in favor of Agent a Joinder to this Agreement in substantially the form of <u>Annex 1</u>.  Upon the execution and delivery of <u>Annex 1</u> by any such new Subsidiary, such Subsidiary shall become a Guarantor and/or Grantor hereunder with the same force and effect as if originally named as a Guarantor and/or Grantor herein.  The execution and delivery of any instrument adding an additional Guarantor or Grantor as a party to this Agreement shall not require the consent of any Guarantor or Grantor hereunder.  The rights and obligations of each Guarantor and Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Guarantor or Grantor hereunder.

27.    <u>Agent</u>.  Each reference herein to any right granted to, benefit conferred upon or power exercisable by the "Agent" shall be a reference to Agent, for the benefit of each member of the Lender Group.

28.    <u>Miscellaneous</u>.

(a)    This Agreement is a Loan Document.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity,

35

enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

(b)     Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

(c)     Headings and numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

(d)     Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against any member of the Lender Group or any Grantor, whether under any rule of construction or otherwise.  This Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

***

29. Intercreditor Agreement.  Notwithstanding anything herein to the contrary:

(a) the Liens and security interests granted to the Agent pursuant to this Agreement, and the exercise of any right or remedy by the Agent hereunder, are subject to the provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, (i) as between the Agent, on one hand, and the Grantors, on the other hand, the terms of this Agreement shall govern and control, and (ii) as between the Agent, on one hand, and the ABL Agent, on the other hand, the terms of the Intercreditor Agreement shall govern and control.

(b) Notwithstanding anything to the contrary in this Agreement, prior to the Discharge of ABL Obligations, any obligation of any Grantor in this Agreement that requires delivery of Collateral constituting ABL Priority Collateral to, possession or control of such Collateral with, the pledge, assignment, endorsement or transfer of such Collateral to or the registration of such Collateral in the name of, the Agent shall be deemed complied with and satisfied if such delivery of such Collateral is made to, such possession or control of such Collateral is with, or such Collateral is pledged, assigned, endorsed or transferred to or registered in the name of the ABL Agent. To the extent that any covenants, representations or warranties set forth in this Agreement are untrue or incorrect solely as a result of the delivery to, or grant of possession or control to, the pledge, assignment, endorsement or transfer or such Collateral to or the registration of such Collateral in the name of, the ABL Agent in accordance with this Section 29, such covenant, representation or warranty shall not be deemed to be untrue or incorrect for purposes of any Loan Document.  Furthermore, subject to the terms of the Intercreditor Agreement, at all times prior to the Discharge of ABL Obligations, the Agent is authorized by the parties hereto and the Lender Group to effect transfers of ABL Priority Collateral at any time in its possession (and any "control" or similar agreements with respect to ABL Priority Collateral) to the ABL Agent if and to the extent required under the ABL Loan Documents.

[Signature pages follow]

36

<u>Exhibit B-1</u>

Form of Borrowing Base Certificate

Please see attached.

**BowFlex, Inc.**

Confidential

| BowFlex, Inc | | |
|---|---|---|
| **Borrowing Base Certificate** | | |

| | Domestic Borrowing Base | Canadian Borrowing Base | Aggregate Borrowing Base |
|---|---|---|---|
| **Date** | | | |
| **Collateral as of Date** | | | |
| **Gross Accounts Receivable** | | | |
| *Less: Past Due* | | | |
| *Less: Past Due Credits* | | | |
| *Less: Cross Age* | | | |
| *Less: Foreign* | | | |
| *Less: Government* | | | |
| *Less: COD* | | | |
| *Less: Debit Memo* | | | |
| *Less: Direct AR* | | | |
| *Less: Contra* | | | |
| *Less: Concentrations* | | | |
| *Less: Extended Terms* | | | |
| *Less: Other per Credit Agreement* | | | |
| **Eligible Accounts Receivable** | | | |
| *Advance Rate* | | | |
| Pre-Dilution Reserve Available Accounts Receivable | | | |
| *Dilution Reserve* | | | |
| **Available Accounts Receivable** | | | |
| | | | |
| **Gross Credit Cards Receivable** | | | |
| *Less: Past Due* | | | |
| *Less: Accrued Fees* | | | |
| **Eligible Credit Cards Receivable** | | | |
| *Advance Rate* | | | |
| **Available Credit Cards Receivable** | | | |
| | | | |
| **Finished Goods On-Hand** | | | |
| *Less: Quality/Returns* | | | |
| *Less: Small Locations* | | | |
| *Less: Nautilus Branded Goods* | | | |
| *Less: Mismatch Inventories* | | | |
| *Less: Inventory Royalty Reserve* | | | |
| *Less: Shrink* | | | |
| *Less: Other* | | | |
| **Eligible Finished Goods Inventory** | | | |
| *Appraised Value* | | | |
| *Inventory Advance Rate* | | | |
| **Available Finished Goods Inventory** | | | |
| **In-Transit Inventory** | | | |
| *Less: On the water goods* | | | |
| *Less: Small Locations* | | | |
| *Less: Other* | | | |
| **Eligible In-Transit Inventory** | | | |
| *Appraised Value* | | | |
| *Inventory Advance Rate* | | | |
| **Available In-Transit Inventory** | | | |
| **Parts Inventory** | | | |
| *Less: Quality/Returns* | | | |
| *Less: Nautilus Branded Goods* | | | |
| *Less: Brochures/Manuals/Decals* | | | |
| *Less: Other* | | | |
| **Eligible Parts Inventory** | | | |
| *Appraised Value* | | | |
| *Inventory Advance Rate* | | | |
| **Available Parts Inventory** | | | |
| | | | |
| **Eligible Intellectual Property** | | | |
| *Advance Rate* | | | |
| **Available Eligible Cash** | | | |
| | | | |
| **Less: Reserves** | | | |
| AR Royalty Reserve | | | |
| Rent Reserve | | | |
| Carve Out Expenses Reserve | | | |
| Other | | | |
| **Total Reserves** | | | |
| **Gross Borrowing Base** | | | |
| | | | |
| **Starting Eligible Cash Balance** | | | |
| *Plus Deposits* | | | |
| *Less Drawdowns* | | | |
| **Ending Eligible Cash Balance** | | | |
| *Advance Rate* | | | |
| **Available Eligible Cash** | | | |
| | | | |
| **Less: Availability Block** | | | |
| **Aggregate Borrowing Base** | | | $0 |

Confidential

**BowFlex, Inc.**

| BowFlex, Inc | |
| :--: | :--: |
| **Borrowing Base Certificate** | |
| **Date** | |
| **Collateral as of Date** | |

| **Aggregate Borrowing Base** | |
| :-- | --: |

| **Loan Activity** | | |
| :-- | :--: | --: |
| Beginning Revolver Outstandings | 1/0/1900 | $0 |
| Revolver Borrowing | 1/0/1900 | $0 |
| Revolver Repayment | 1/0/1900 | $0 |
| **Ending Revolver Credit Outstandings** | **1/0/1900** | **$0** |

| **Term Loan Outstanding** | **$15,999,235** |
| :-- | --: |

| Aggregate Revolving Credit Commitments | $9,000,000 |
| :-- | --: |
| Total Term Loan Outstandings | $15,999,235 |

| **Aggregate Loan Cap** | |
| :-- | --: |

| **Total Outstandings** | |
| :-- | --: |

| **Availability** | |
| :-- | --: |

The undersigned, on behalf of BowFlex, Inc., a Washington corporation ("BowFlex"), as Administrative Borrower on behalf of the other Borrowers, pursuant to that certain Term Loan Credit Agreement dated as of 11/30/22 (as amended, restated, modified, supplemented, refinanced, renewed, or extended from time to time, the "Credit Agreement"), entered into among BowFlex, Nautilus Fitness Canada, Inc., a British Columbia company, and those additional Persons that are joined as a "Borrower" thereto from time to time (collectively, the "Borrowers" and each a "Borrower"), the lenders parties thereto, Crystal Financial LLC d/b/a SLR Credit Solutions, as administrative agent (in such capacity, together with its successors and assigns in such capacity, "Agent"), hereby (a) certifies to Agent that the foregoing items, calculated in accordance with the terms and definitions set forth in the Credit Agreement, are true and correct, and that each Borrower is in compliance with and, after giving effect to any currently requested extensions of credit under the Credit Agreement, will be in compliance with, the terms, conditions, and provisions of the Credit Agreement and (b) certifies and represents and warrants to the Lender Group that (i) the preparation and delivery of this certificate have been duly authorized by all necessary action on the part of each Borrower, (ii) the representations and warranties of each Loan Party or its Subsidiaries contained in the Credit Agreement or in the other Loan Documents is true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of this certificate, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties is true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date); (iii) no Default or Event of Default (as such terms are defined in the Credit Agreement) has occurred and is continuing on the date hereof, (iv) all of the foregoing is true and correct as of the effective date of the calculations set forth above, and (v) this certificate is a Loan Document (as defined in the Credit Agreement).

BORROWER: BOWFLEX, INC.

AUTHORIZED SIGNATURE:


Name:
Title:

<u>Exhibit C</u>

Conformed Canadian Guaranty and Security Agreement

Please see attached.

Execution Copy *Conformed to Amendment No. 3*


**CANADIAN GUARANTY AND SECURITY AGREEMENT**


This **CANADIAN GUARANTY AND SECURITY AGREEMENT** (this "Agreement"), dated as of November 30, 2022, by and among **Nautilus Fitness Canada, Inc.**, a corporation organized under the laws of British Columbia ("Nautilus Canada"), as a "Grantor" and any additional entities that hereafter become parties hereto by executing the form of Joinder attached hereto as Annex 1 (such additional entities, together with Nautilus Canada, each, a "Grantor" and collectively, the "Grantors"), and **Crystal Financial LLC** d/b/a SLR Credit Solutions, a Delaware limited liability company ("SLR"), in its capacity as administrative agent for each member of the Lender Group (in such capacity, together with its successors and assigns in such capacity, "Agent").


**W I T N E S S E T H :**


**WHEREAS**, pursuant to that certain Term Loan Credit Agreement, of even date herewith (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"), by and among BowFlex, Inc. (f/k/a Nautilus, Inc.), a Washington corporation ("~~Nautilus~~BowFlex"), Nautilus Canada, and those additional entities that hereafter become parties to the Credit Agreement as "Borrowers" in accordance with the terms thereof (together with ~~Nautilus~~BowFlex and Nautilus Canada, each individually as a "Borrower" and individually and collectively, jointly and severally, as the "Borrowers"), the lenders party thereto as "Lenders" (each of such Lenders, together with its successors and permitted assigns, is referred to hereinafter as a "Lender"), and Agent, the Lender Group has agreed to make certain financial accommodations available to Borrowers from time to time pursuant to the terms and conditions thereof;


**WHEREAS**, Agent has agreed to act as agent for the benefit of the Lender Group in connection with the transactions contemplated by the Credit Agreement and this Agreement;


**WHEREAS**, in order to induce the Lender Group to enter into the Credit Agreement and the other Loan Documents and to extend the Loans thereunder, and to induce the Lender Group to make financial accommodations to Borrowers as provided for in the Credit Agreement and the other Loan Documents, (a) each Grantor (other than any Borrower) has agreed to guaranty the Guaranteed Obligations, and (b) each Grantor has agreed to grant to Agent, for the benefit of the Lender Group, a continuing security interest in and to the Collateral in order to secure the prompt and complete payment, observance and performance of, among other things, the Secured Obligations; and


**WHEREAS**, each Grantor (other than any Borrower) is an Affiliate or a Subsidiary of each Borrower and, as such, will benefit by virtue of the financial accommodations extended to Borrowers by the Lender Group, including, without limitation, centralized administrative services from the other Loan Parties, continued supply of inventory, intercompany funding and the seamless continuing cross-border operations of the Grantor and the other Loan Parties.


**NOW, THEREFORE**, for and in consideration of the recitals made above and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.      <u>Definitions; Construction</u>.

(a)      All initially capitalized terms used herein (including in the preamble and recitals hereof) without definition shall have the meanings ascribed thereto in the Credit Agreement.  Any terms (whether capitalized or lower case) used in this Agreement that are defined in the PPSA (including, without limitation, Account, Chattel Paper, Documents of Title, Equipment, Intangibles, Goods, Instruments, Inventory, Investment Property and Proceeds) or STA (including, without limitation, Security, Securities Account and Uncertificated Security) shall be construed and defined as set forth in the PPSA or STA unless otherwise defined herein or in the Credit Agreement; <u>provided</u>, that to the extent that the PPSA or STA are used to define any term used herein and if such term is defined differently in different sections of the PPSA or STA, the definition of such term contained in the PPSA or STA shall govern.  In addition to those terms defined elsewhere in this Agreement, as used in this Agreement, the following terms shall have the following meanings:

(i)      "<u>Account</u>" has the meaning specified therefor in the PPSA.  For the avoidance of doubt, a Credit Card Receivable is an Account.

(ii)      "<u>Account Debtor</u>" means a Person obligated on an Account, Chattel Paper or Intangible.  For the avoidance of doubt, Credit Card Issuers and Credit Card Processors are Account Debtors.

(iii)      "<u>Acquisition Documents</u>" means the agreements, instruments and documents evidencing, or entered into in connection with, an Acquisition ~~(including a Permitted Acquisition)~~ by a Grantor.

(iv)      "<u>Activation Instruction</u>" has the meaning specified therefor in <u>Section 7(k)</u> hereof.

(v)      "<u>Agent</u>" has the meaning specified therefor in the preamble to this Agreement.

(vi)      "<u>Agreement</u>" has the meaning specified therefor in the preamble to this Agreement.

(vii)      "<u>Books</u>" means books and records (including each Grantor's Records indicating, summarizing, or evidencing such Grantor's assets (including the Collateral) or liabilities, each Grantor's Records relating to such Grantor's business operations or financial condition, and each Grantor's goods or Intangibles related to such information).

(viii)      "<u>Borrower</u>" and "<u>Borrowers</u>" have the respective meanings specified therefor in the recitals to this Agreement.

(ix)      [reserved].

(x)      [reserved].

~~(ix) "Cash Dominion Event" means the occurrence of either of the following: (A) the occurrence and continuance of any Event of Default, or (B) ABL Availability is less than the greater of (x) 15% of the Combined Line Cap (without giving effect to the Term Pushdown Reserve), and (y) US$16,250,000 for any time.~~

(x) ~~"Cash Dominion Period" means the period commencing after the occurrence of a Cash Dominion Event and continuing until the date when (A) no Event of Default shall exist and be continuing, and (B) ABL Availability is greater than the greater of (x) 15% of the Combined Line Cap (without giving effect to the Term Pushdown Reserve), and (y) US$16,250,000 for 30 consecutive days.~~

(xi)    "Collateral" has the meaning specified therefor in Section 3 hereof.

(xii)    "Collection Account" means a Deposit Account of a Grantor which is used exclusively for deposits of collections and proceeds of Collateral and not as a disbursement or operating account upon which cheques or other drafts may be drawn.

(xiii)    "Control" means, with respect to a specified form of Investment Property, "control" as defined in sections 23 through 26 of the STA as applicable to such form of Investment Property.

(xiv)    "Controlled Account" has the meaning specified therefor in Section 7(k) hereof.

(xv)    "Controlled Account Agreements" means those certain cash management agreements, in form and substance reasonably satisfactory to Agent, each of which is executed and delivered by a Grantor, Agent, and one of the Controlled Account Banks.

(xvi)    "Controlled Account Bank" has the meaning specified therefor in Section 7(k) hereof.

(xvii)    "Copyright Security Agreement" means each Copyright Security Agreement executed and delivered by Grantors, or any of them, and Agent, in substantially the form of Exhibit A.

(xviii)    "Copyrights" means any and all rights in any works of authorship, including (A) copyrights and moral rights, (B) copyright registrations and recordings thereof and all applications in connection therewith including those listed on Schedule 2, (C) income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (D) the right to sue for past, present, and future infringements thereof, and (E) all of each Grantor's rights corresponding thereto throughout the world.

(xix)    "Credit Agreement" has the meaning specified therefor in the recitals to this Agreement.

(xx)    "Deposit Accounts" means all demand, time, saving, chequing or deposit accounts, collection accounts, lockboxes or other accounts having a depository function maintained with any financial institution.

(xxi) ~~"Excluded Accounts" means (A) Deposit Accounts and Securities Accounts with an aggregate amount on deposit therein of not more than US$100,000 individually or $250,000 in the aggregate at any one time for all such Deposit Accounts or Securities Accounts , or (B) Deposit Accounts specially and exclusively used for payroll, payroll funding, payroll taxes and other tax payments, other employee wage and benefit payments to or for any Grantor's employees (including flexible spending accounts), escrow or trust purposes, or other fiduciary purposes, (C) any Deposit~~

~~Account of a Loan Party, including the funds on deposit therein, that has been pledged to secure Indebtedness or other obligations, in each case to the extent such cash collateral is expressly permitted by clause (h), clause (i), clause (j) or clause (o) of "Permitted Indebtedness", and is exclusively used for such purpose, or (D) "zero balance accounts" (so long as any such zero balance account is used solely for disbursements and not for collections of payments from third parties).~~

(xxi)  [reserved].

(xxii) "Excluded Assets" has the meaning specified therefor in Section 3 hereof.

(xxiii)~~[reserved]~~"Financing Order" means the Interim Financing Order or the Final Financing Order, as the context may require.

(xxiv) "Foreclosed Grantor" has the meaning specified therefor in Section 2(i)(iv) hereof.

(xxv)  "Grantor" and "Grantors" have the respective meanings specified therefor in the preamble to this Agreement.

(xxvi) "Guaranteed Obligations" means all of the Obligations now or hereafter existing, whether for principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), fees (including the fees provided for in the Fee Letter), Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), or otherwise, and any and all reasonable expenses (including reasonable and documented counsel fees and expenses) incurred by Agent or any other member of the Lender Group (or any of them) in enforcing any rights under any of the Loan Documents.  Without limiting the generality of the foregoing, Guaranteed Obligations shall include all amounts that constitute part of the Guaranteed Obligations and would be owed by any Borrower to Agent or any other member of the Lender Group but for the fact that they are unenforceable or not allowable, including due to the existence of a bankruptcy, reorganization, other Insolvency Proceeding or similar proceeding involving any Borrower or any guarantor; provided that, anything to the contrary contained in the foregoing notwithstanding, the Guaranteed Obligations of any Grantor shall exclude any Excluded Swap Obligation.

(xxvii)      "Guarantor" means each Grantor.

(xxviii)      "Guaranty" means the guaranty set forth in Section 2 hereof.

(xxix) "Industrial Design" means all right, title and interest in and to the following: (a) all industrial designs and intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications listed on Schedule 12 and in the Canadian Intellectual Property Office or in any similar office or agency in any other country or any political subdivision thereof, and (b) all reissues, extensions or renewals thereof.

(xxx)  "Industrial Design Security Agreement" means each Copyright Security Agreement executed and delivered by Grantors, or any of them, and Agent, in substantially the form of Exhibit E.

(xxxi) "Intangibles" means general intangibles (as that term is defined in the PPSA), and includes payment intangibles, software, contract rights, rights to payment, rights under Hedge Agreements (including the right to receive payment on account of the termination (voluntarily or involuntarily) of such Hedge Agreements), rights arising under common law, statutes, or regulations, choses or things in action, goodwill, Intellectual Property, Intellectual Property Licenses, purchase orders, customer lists, route lists, rights to payment and other rights under Acquisition Documents, rights to payment and other rights under any royalty or licensing agreements, including Intellectual Property Licenses, infringement claims, monies due or recoverable from pension funds, pension plan refunds, pension plan refund claims, insurance premium rebates, tax refunds, and tax refund claims, interests in a partnership or limited liability company which do not constitute a security under the STA, and any other personal property other than money, Accounts, Chattel Paper, Deposit Accounts, goods, Investment Property, Negotiable Collateral, and oil, gas, or other minerals before extraction.

(xxxii) "Intellectual Property" means any and all Patents, Copyrights, Trademarks, Industrial Designs, trade secrets, know-how, inventions (whether or not patentable), algorithms, software programs (including source code and object code), processes, product designs, blueprints, drawings, data, customer lists, URLs and domain names, specifications, documentations, reports, catalogs, literature, and any other forms of technology or proprietary information of any kind, including all rights therein and all applications for registration or registrations thereof.

(xxxiii) "Intellectual Property Licenses" means, with respect to any Grantor, (A) any licenses or other similar rights provided to such Grantor in or with respect to Intellectual Property owned or controlled by any other Person, and (B) any licenses or other similar rights provided to any other Person in or with respect to Intellectual Property owned or controlled by such Grantor, in each case, including (x) any software license agreements (other than license agreements for commercially available off-the-shelf software that is generally available to the public which have been licensed to a Grantor pursuant to end-user licenses), (y) the license agreements listed on Schedule 3, and (z) the right to use any of the licenses or other similar rights described in this definition in connection with the enforcement of the Lender Group's rights under the Loan Documents.

(xxxiv) "Investment Property" means (A) any and all investment property, and (B) any and all of the following (regardless of whether classified as investment property under the PPSA):  all Pledged Interests, Pledged Operating Agreements, and Pledged Partnership Agreements.

(xxxv) "Joinder" means each Joinder to this Agreement executed and delivered by Agent and each of the other parties listed on the signature pages thereto, in substantially the form of Annex 1.

(xxxvi) "Lender" and "Lenders" have the respective meanings specified therefor in the recitals to this Agreement.

(xxxvii) "Letter-of-Credit Rights" means a right to payment or performance under a letter-of-credit, whether or not the beneficiary has demanded or is at the relevant time entitled to demand payment or performance.

(xxxviii) "Negotiable Collateral" means letters of credit, letter-of-credit rights, instruments, promissory notes, drafts and documents (as each such term is defined in the PPSA).

(xxxix)    "Patent Security Agreement" means each Patent Security Agreement executed and delivered by Grantors, or any of them, and Agent, in substantially the form of Exhibit B.

(xl)    "Patents" means patents and patent applications, including (A) the patents and patent applications listed on Schedule 4, (B) all continuations, divisionals, continuations-in-part, re-examinations, reissues, and renewals thereof and improvements thereon, (C) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (D) the right to sue for past, present, and future infringements thereof, and (E) all of each Grantor's rights corresponding thereto throughout the world.

(xli)    "Pledged Collateral" means all Pledged Interests, Pledged Operating Agreements, and Pledged Partnership Agreements.

(xlii)    "Pledged Companies" means each Person listed on Schedule 5 as a "Pledged Company", together with each other Person, all or a portion of whose Equity Interests are acquired or otherwise owned by a Grantor after the Closing Date and is required to be pledged pursuant to Section 5.11 of the Credit Agreement.

(xliii)    "Pledged Interests" means, subject to any applicable limitations under the Loan Documents (including limitations set forth in the definition of "Excluded Assets" and limitations set forth in Section 5.11 of the Credit Agreement), all of each Grantor's right, title and interest in and to all of the Equity Interests now owned or hereafter acquired by such Grantor, regardless of class or designation, including in each of the Pledged Companies, and all substitutions therefor and replacements thereof, all proceeds thereof and all rights relating thereto, also including any certificates representing the Equity Interests, the right to receive any certificates representing any of the Equity Interests, all warrants, options, share appreciation rights and other rights, contractual or otherwise, in respect thereof and the right to receive all dividends, distributions of income, profits, surplus, or other compensation by way of income or liquidating distributions, in cash or in kind, and all cash, instruments, and other property from time to time received, receivable, or otherwise distributed in respect of or in addition to, in substitution of, on account of, or in exchange for any or all of the foregoing.

(xliv)    "Pledged Interests Addendum" means a Pledged Interests Addendum substantially in the form of Exhibit C.

(xlv)    "Pledged Notes" has the meaning specified therefor in Section 6(i) hereof.

(xlvi)    "Pledged Operating Agreements" means all of each Grantor's rights, powers, and remedies under the limited liability company operating agreements of each of the Pledged Companies that are limited liability companies.

(xlvii)    "Pledged Partnership Agreements" means all of each Grantor's rights, powers, and remedies under the partnership agreements of each of the Pledged Companies that are partnerships.

(xlviii)        "Pledged ULC Shares" shall mean the Pledged Interests which are shares in the capital stock of a ULC.

(xlix) "PPSA" means the *Personal Property Security Act* (Ontario), including the regulations thereto; provided, that, if perfection or the effect of perfection or non-perfection or the priority of any Lien created hereunder or under any other Loan Document on the Collateral is governed by the personal property security legislation or other applicable legislation with respect to personal property security in effect in a jurisdiction in Canada other than the Province of Ontario, "PPSA" means the Personal Property Security Act or such other applicable legislation (including the Civil Code of Quebec and the regulations respecting the register of personal and movable real rights thereunder) in effect from time to time in such other jurisdiction in Canada for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

(l)        "Proceeds" has the meaning specified therefor in Section 3 hereof.

(li)        [reserved].

(lii)        "Real Property" means any estates or interests in real property now owned or hereafter acquired by any Grantor and the improvements thereto.

(liii)        "Receiver" shall have the meaning set forth in Section 17(e).

(liv)        "Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

(lv)        "Rescission" has the meaning specified therefor in Section 7(k) hereof.

(lvi)        "Secured Obligations" means each and all of the following: (A) all of the present and future obligations of each of the Grantors arising from, or owing under or pursuant to, this Agreement (including the Guaranty), the Credit Agreement, or any of the other Loan Documents and (B) all other Obligations of each Borrower and all other Guaranteed Obligations of each Guarantor (including, in the case of each of clauses (A) and (B), Lender Group Expenses and any interest, fees, or expenses that accrue after the filing of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any Insolvency Proceeding); provided that, anything to the contrary contained in the foregoing notwithstanding, the Secured Obligations shall exclude any Excluded Swap Obligation.

(lvii) "Security Interest" has the meaning specified therefor in Section 3 hereof.

(lviii) "STA" means the *Securities Transfer Act, 2006* (Ontario) or, to the extent applicable, similar legislation of any other jurisdictions, as such legislation may be amended, renamed or replaced from time to time, and includes all regulations from time to time made under such legislation.

(lix) "Supporting Obligations" means supporting obligations, and includes Letter-of-Credit Rights or secondary obligations that support the payment of Accounts, Chattel Paper, Documents of Title, Intangibles, Instruments or Investment Property.

(lx)        [reserved].

(lxi) "Trademark Security Agreement" means each Trademark Security Agreement executed and delivered by Grantors, or any of them, and Agent, in substantially the form of Exhibit D.

(lxii) "Trademarks" means any and all trademarks, trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, including (A) the registered trademarks, trademark applications, registered service marks and service mark applications listed on Schedule 6, (B) all renewals thereof, (C) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (D) the right to sue for past, present and future infringements and dilutions thereof, (E) the goodwill of each Grantor's business symbolized by the foregoing or connected therewith, and (F) all of each Grantor's rights corresponding thereto throughout the world.

(lxiii) "ULC" means any unlimited company, unlimited liability company or unlimited liability corporation or any similar entity existing under the laws of any province or territory of Canada and any successor to any such entity.

(lxiv) "ULC Shares" means shares in the capital stock of, or other equity interests in, a ULC.

(lxv) "Uncertificated Security" shall have the meaning set forth in the STA.

(lxvi) "URL" means "uniform resource locator," an internet web address.

(b)      This Agreement shall be subject to the rules of construction set forth in Section 1.4 of the Credit Agreement, and such rules of construction are incorporated herein by this reference, *mutatis mutandis*.

(c)      All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

2.      Guaranty.

(a)      In recognition of the direct and indirect benefits to be received by Guarantors from the proceeds of the Term Loan and by virtue of the financial accommodations to be made to the Borrowers, each of the Guarantors, jointly and severally, hereby unconditionally and irrevocably guarantees as a primary obligor and not merely as a surety the full and prompt payment when due, whether upon maturity, acceleration, or otherwise, of all of the Guaranteed Obligations. If any or all of the Obligations constituting Guaranteed Obligations becomes due and payable, each of the Guarantors, unconditionally and irrevocably, and without the need for demand, protest, or any other notice or formality, promises to pay such indebtedness to Agent, for the benefit of the Lender Group, together with any and all reasonable and documented expenses (including Lender Group Expenses) that may be incurred by Agent or any other member of the Lender Group in demanding, enforcing, or collecting any of the Guaranteed Obligations (including the enforcement of any collateral for such Guaranteed Obligations or any collateral for the obligations of the Guarantors under this Guaranty). If any claim is ever made upon Agent or any other member of the Lender Group for repayment or recovery of any amount or amounts received in payment of or on account of any or all of the Guaranteed Obligations and any of Agent or any other member of the Lender Group repays all or part of said amount by reason of (i) any judgment, decree, or order of any court or administrative body having jurisdiction over such payee or

any of its property, or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including any Borrower or any Guarantor), then and in each such event, each of the Guarantors agrees that any such judgment, decree, order, settlement, or compromise shall be binding upon the Guarantors, notwithstanding any revocation (or purported revocation) of this Guaranty or other instrument evidencing any liability of any Grantor, and the Guarantors shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

(b)      Additionally, each of the Guarantors unconditionally and irrevocably guarantees the payment of any and all of the Guaranteed Obligations to Agent, for the benefit of the Lender Group, whether or not due or payable by any Loan Party upon the occurrence of any of the events specified in Section 8.4 or 8.5 of the Credit Agreement, and irrevocably and unconditionally promises to pay such indebtedness to Agent, for the benefit of the Lender Group, without the requirement of demand, protest, or any other notice or other formality, in lawful money of the United States.

(c)      The liability of each of the Guarantors hereunder is primary, absolute, and unconditional, and is independent of any security for or other guaranty of the Guaranteed Obligations, whether executed by any other Guarantor or by any other Person, and the liability of each of the Guarantors hereunder shall not be affected or impaired by (i) any payment on, or in reduction of, any such other guaranty or undertaking (other than payment in full of the Guaranteed Obligations), (ii) any dissolution, termination, or increase, decrease, or change in personnel by any Grantor, (iii) any payment made to Agent, or any other member of the Lender Group on account of the Obligations which Agent or such other member of the Lender Group repays to any Grantor pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding (or any settlement or compromise of any claim made in such a proceeding relating to such payment), and each of the Guarantors waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (iv) any action or inaction by Agent or any other member of the Lender Group, or (v) any invalidity, irregularity, avoidability, or unenforceability of all or any part of the Guaranteed Obligations or of any security therefor.

(d)      This Guaranty includes all present and future Guaranteed Obligations including any under transactions continuing, compromising, extending, increasing, modifying, releasing, or renewing the Guaranteed Obligations, changing the interest rate, payment terms, or other terms and conditions thereof, or creating new or additional Guaranteed Obligations after prior Guaranteed Obligations have been satisfied in whole or in part.  To the maximum extent permitted by law, each Guarantor hereby waives any right to revoke this Guaranty as to future Guaranteed Obligations.  If such a revocation is effective notwithstanding the foregoing waiver, each Guarantor acknowledges and agrees that (i) no such revocation shall be effective until written notice thereof has been received by Agent, (ii) no such revocation shall apply to any Guaranteed Obligations in existence on the date of receipt by Agent of such written notice (including any subsequent continuation, extension, or renewal thereof, or change in the interest rate, payment terms, or other terms and conditions thereof), (iii) no such revocation shall apply to any Guaranteed Obligations made or created after such date to the extent made or created pursuant to a legally binding commitment of any member of the Lender Group in existence on the date of such revocation, (iv) no payment by any Guarantor, any Borrower, or from any other source, prior to the date of Agent's receipt of written notice of such revocation shall reduce the maximum obligation of such Guarantor hereunder, and (v) any payment by any Borrower or from any source other than such Guarantor subsequent to the date of such revocation shall first be applied to that portion of the Guaranteed Obligations as to which the revocation is effective and which are not, therefore, guaranteed hereunder, and to the extent so applied shall not reduce the maximum obligation of such Guarantor hereunder.  This Guaranty shall be binding upon each Guarantor, its successors and assigns and enure to

the benefit of and be enforceable by Agent (for the benefit of the Lender Group) and its successors, transferees, or assigns.

(e)     The guaranty by each of the Guarantors hereunder is a guaranty of payment and not of collection.  The obligations of each of the Guarantors hereunder are independent of the obligations of any other Guarantor or Grantor or any other Person and a separate action or actions may be brought and prosecuted against one or more of the Guarantors whether or not action is brought against any other Guarantor or Grantor or any other Person and whether or not any other Guarantor or Grantor or any other Person be joined in any such action or actions.  Each of the Guarantors waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement hereof.  Any payment by any Grantor or other circumstance which operates to toll any statute of limitations as to any Grantor shall operate to toll the statute of limitations as to each of the Guarantors.

(f)     Each of the Guarantors authorizes Agent and the other members of the Lender Group without notice or demand (other than any notice expressly required to be provided hereunder or under any other Loan Document), and without affecting or impairing its liability hereunder, from time to time to:

(i)     change the manner, place, or terms of payment of, or change or extend the time of payment of, renew, increase, accelerate, or alter:  (A) any of the Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), or (B) any security therefor or any liability incurred directly or indirectly in respect thereof, and this Guaranty shall apply to the Guaranteed Obligations as so changed, extended, renewed, or altered;

(ii)     take and hold security for the payment of the Obligations and sell, exchange, release, impair, surrender, realize upon, collect, settle, or otherwise deal with in any manner and in any order any property at any time pledged or mortgaged to secure the Obligations or any of the Guaranteed Obligations (including any of the obligations of all or any of the Guarantors under this Guaranty) incurred directly or indirectly in respect thereof or hereof, or any offset on account thereof;

(iii)     exercise or refrain from exercising any rights against any Grantor;

(iv)     release or substitute any one or more endorsers, guarantors, any Grantor, or other obligors;

(v)     settle or compromise any of the Obligations, any security therefor, or any liability (including any of those of any of the Guarantors under this Guaranty) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of any Grantor to its creditors;

(vi)     apply any sums by whomever paid or however realized to any liability or liabilities of any Grantor to Agent or any other member of the Lender Group regardless of what liability or liabilities of such Grantor remain unpaid;

(vii)     consent to or waive any breach of, or any act, omission, or default under, this Agreement, any other Loan Document or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify, or supplement this Agreement, any other Loan Document or any of such other instruments or agreements; or

(viii)  take any other action that could, under otherwise applicable principles of law, give rise to a legal or equitable discharge of one or more of the Guarantors from all or part of its liabilities under this Guaranty (other than a defence of payment in full of the Guaranteed Obligations).

(g)     It is not necessary for Agent or any other member of the Lender Group to inquire into the capacity or powers of any of the Guarantors or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

(h)     Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation, or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any member of the Lender Group with respect thereto.  The obligations of each Guarantor under this Guaranty are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any other Guarantor or whether any other Guarantor is joined in any such action or actions.  The liability of each Guarantor under this Guaranty shall be absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives, to the maximum extent permitted by law, any defence (other than payment in full of the Guaranteed Obligations) it may now or hereafter have in any way relating to, any or all of the following:

(i)      any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(ii)     any change in the time, manner, or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit;

(iii)    any taking, exchange, release, or non-perfection of any Lien in and to any Collateral, or any taking, release, amendment, waiver, supplement, restatements, extension, novation, renewal, replacements, or continuation of, or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(iv)    the existence of any claim, set-off, defence (other than a defence of payment or performance), or other right that any Guarantor may have at any time against any Person, including Agent or any other member of the Lender Group;

(v)     any defence, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guaranteed Obligations or any security therefor;

(vi)    any right or defence arising by reason of any claim or defence based upon an election of remedies by any member of the Lender Group including any defence based upon an impairment or elimination of such Guarantor's rights of subrogation, reimbursement, contribution, or indemnity of such Guarantor against any other Grantor or any other guarantors or sureties;

(vii)   any change, restructuring, or termination of the corporate, limited liability company, or partnership structure or existence of any Grantor; or

(viii)    any other circumstance that might otherwise constitute a defence available to, or a discharge of, any Grantor or any other guarantor or surety.

(i)    Waivers.

(i)    Each of the Guarantors waives any right (except as shall be required by applicable statute and cannot be waived) to require Agent or any other member of the Lender Group to (i) proceed against any other Grantor or any other Person, (ii) proceed against or exhaust any security held from any other Grantor or any other Person, or (iii) protect, secure, perfect, or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any other Grantor, any other Person, or any collateral, or (iv) pursue any other remedy in any member of the Lender Group's power whatsoever.  Each of the Guarantors waives, to the maximum extent permitted by law, any defence based on or arising out of any defence of any Grantor or any other Person, other than payment of the Guaranteed Obligations to the extent of such payment, based on or arising out of the disability of any Grantor or any other Person, or the validity, legality, or unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any Grantor other than payment of the Obligations to the extent of such payment.  Agent may, at the election of the Required Lenders and in accordance with the Loan Documents, foreclose upon any Collateral held by Agent by one or more judicial or non-judicial sales or other dispositions, whether or not every aspect of any such sale is commercially reasonable or otherwise fails to comply with applicable law or may exercise any other right or remedy Agent or any other member of the Lender Group may have against any Grantor or any other Person, or any security, in each case, without affecting or impairing in any way the liability of any of the Guarantors hereunder except to the extent the Guaranteed Obligations have been paid.

(ii)    Each of the Guarantors waives all presentments, demands for performance, protests and notices, including notices of nonperformance, notices of protest, notices of dishonour, notices of acceptance of this Guaranty, and notices of the existence, creation, or incurring of new or additional Obligations or other financial accommodations.  Each of the Guarantors waives notice of any Default or Event of Default under any of the Loan Documents.  Each of the Guarantors assumes all responsibility for being and keeping itself informed of each Grantor's financial condition and assets and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope, and extent of the risks which each of the Guarantors assumes and incurs hereunder, and agrees that neither Agent nor any of the other members of the Lender Group shall have any duty to advise any of the Guarantors of information known to them regarding such circumstances or risks.

(iii)    To the fullest extent permitted by applicable law, each Guarantor hereby waives:  (A) any right to assert against any member of the Lender Group, any defence (legal or equitable) (other than the defence that all of the Guaranteed Obligations have been performed or paid in full), set-off, counterclaim, or claim which each Guarantor may now or at any time hereafter have against any Borrower or any other party liable to any member of the Lender Group, (B) any defence, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guaranteed Obligations or any security therefor, (C) any right or defence arising by reason of any claim or defence based upon an election of remedies by any member of the Lender Group including any defence based upon an impairment or elimination of such Guarantor's rights of subrogation, reimbursement, contribution, or indemnity of such Guarantor against any Borrower or other guarantors or sureties, and (D) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Guaranteed Obligations

shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Guarantor's liability hereunder.

(iv)    No Guarantor will exercise any rights that it may now or hereafter acquire against any Grantor or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Guaranty, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of Agent or any other member of the Lender Group against any Grantor or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from any Grantor or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash and all of the Commitments have been terminated.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence, such amount shall be held in trust for the benefit of Agent, for the benefit of the Lender Group, and shall forthwith be paid to Agent to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Credit Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising.  Notwithstanding anything to the contrary contained in this Guaranty, no Guarantor may exercise any rights of subrogation, contribution, indemnity, reimbursement or other similar rights against, and may not proceed or seek recourse against or with respect to any property or asset of, any other Grantor (the "Foreclosed Grantor"), including after payment in full of the Obligations, if all or any portion of the Obligations have been satisfied in connection with an exercise of remedies in respect of the Equity Interests of such Foreclosed Grantor whether pursuant to this Agreement or otherwise.  Any of the foregoing to the contrary notwithstanding, effective upon any sale, registration, assignment or transfer of or foreclosure on, or any other disposition or remedial action in respect of, any Equity Interests of any Borrower or other Loan Party by the Agent or the Lenders pursuant to the Loan Documents and/or applicable law, all such rights and claims of subrogation, contribution, exoneration, reimbursement and enforcement against any Borrower or any other Loan Party shall be, and hereby are, forever extinguished and indefeasibly waived and released by the Guarantors.

(v)    [reserved].

(vi)    Each of the Guarantors represents, warrants, and agrees that each of the waivers set forth above is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law or public policy, such waivers shall be effective to the maximum extent permitted by law.

3.    <u>Grant of Security</u>.  Each Grantor has previously granted, collaterally assigned and pledged to the Agent, for the benefit of the Lender Group, to secure the Secured Obligations (whether then existing or thereafter arising) a continuing security interest in all of such Grantor's right, title and interest in and to the Collateral (as defined in this Agreement immediately prior to the Amendment No. 3 Effective Date), and in furtherance thereof, each hereby unconditionally grants, collaterally assigns, and pledges to Agent, for the benefit of each member of the Lender Group, to secure the Secured Obligations (whether now existing or hereafter arising), a continuing security interest (hereinafter referred to as the "<u>Security Interest</u>") in all of such Grantor's present and after-acquired personal property including, without limitation all of such Grantor's right, title, and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located (the "<u>Collateral</u>"):

(a)     all of such Grantor's Accounts (including, without limitation, all of such Grantor's Credit Card Receivables);

(b)     all of such Grantor's Books;

(c)     all of such Grantor's Chattel Paper (whether tangible or electronic);

(d)     [reserved];

(e)     all of such Grantor's Deposit Accounts;

(f)     all of such Grantor's Equipment;

(g)     [reserved];

(h)     all of such Grantor's fixtures;

(i)     all of such Grantor's Intangibles;

(j)     all of such Grantor's Inventory;

(k)     all of such Grantor's Investment Property;

(l)     all of such Grantor's Intellectual Property and Intellectual Property Licenses;

(m)     all of such Grantor's Instruments and Negotiable Collateral (including all of such Grantor's Pledged Notes);

(n)     all of such Grantor's Pledged Interests (including all of such Grantor's Pledged Operating Agreements and Pledged Partnership Agreements);

(o)     all of such Grantor's Securities Accounts;

(p)     all of such Grantor's Supporting Obligations;

(q)     all of such Grantor's Goods;

(r)     all of such Grantor's letters of credit and Letter-of-Credit Rights;

(s)     all of such Grantor's Documents of Title;

(t)     all of such Grantor's money, Cash Equivalents, or other assets of such Grantor that now or hereafter come into the possession, custody, or control of Agent (or its agent or designee) or any other member of the Lender Group;

(u)     all Insurance

(v)     all other personal property of such Grantor, whether tangible or intangible;

(w)     all of the Proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering or relating to any or all of the foregoing, and any and

all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, fixtures, Intangibles, Inventory, Investment Property, Intellectual Property, Negotiable Collateral, Pledged Interests, Securities Accounts, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (the "Proceeds").  Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to any Grantor or Agent from time to time with respect to any of the Investment Property;

(x)   all proceeds of leases of Real Property;

(y)   (x) to the extent not otherwise included in clauses (a) through (wx) of this Section, all Collateral Records, Collateral Support and Supporting Obligations in respect of any of the foregoing; and

(z)   (y) to the extent not otherwise included in clauses (a) through (xy) of this Section, all other property in which a security interest may be granted under the PPSA or STA or which may be delivered and held by the Agent pursuant to the terms hereof.

Notwithstanding anything contained in this Agreement to the contrary, the term "Collateral" shall not include any of the following (individually and collectively, the "Excluded Assets"): (i) [reserved], (ii) any rights or interest in any contract, lease, permit, license, or license agreement covering real or personal property of any Grantor if under the terms of such contract, lease, permit, license, or license agreement, or applicable law with respect thereto, the grant of a security interest or lien therein is prohibited as a matter of law or under the terms of such contract, lease, permit, license, or license agreement and such prohibition or restriction has not been waived or the consent of the other party to such contract, lease, permit, license, or license agreement has not been obtained (provided, that (A) the foregoing exclusions of this clause (ii) shall in no way be construed (1) to apply to the extent that any described prohibition or restriction is ineffective under the PPSA or any other applicable law, or (2) to apply to the extent that any consent or waiver has been obtained that would permit Agent's security interest or lien to attach notwithstanding the prohibition or restriction on the pledge of such contract, lease, permit, license, or license agreement and (B) the foregoing exclusions of clause (ii) shall in no way be construed to limit, impair, or otherwise affect any of Agent's or any other member of the Lender Group's continuing security interests in and liens upon any rights or interests of any Grantor in or to (1) monies due or to become due under or in connection with any described contract, lease, permit, license, license agreement, or Equity Interests (including any Accounts or Equity Interests), or (2) any proceeds from the sale, license, lease, or other dispositions of any such contract, lease, permit, license, license agreement, or Equity Interests), i) consumer goods (as defined in the PPSA), (ii) last day of the term of any lease or sublease of real property or any agreement for a lease or sublease of real property, now held or hereafter acquired by any Grantor, provided such Grantor will stand possessed of any such last day upon trust to assign and dispose of it as the Agent may direct, or (iii) any United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law; provided, that upon submission and acceptance by the PTO of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision), such

intent-to-use trademark application shall be considered Collateral~~, (iv) vehicles and other assets subject to a certificate of title, (v) fixed or capital assets that are subject to a purchase-money Lien or a Capital Lease in each case that constitutes a Permitted Lien, to the extent granting a security interest therein would be prohibited or require third party consent that cannot be obtained after use of commercially reasonable efforts, (vi) *consumer goods (as defined in the PPSA*, and (vii)* *last day of the term of any lease or sublease of real property or any agreement for a lease or sublease of real property, now held or hereafter acquired by any Grantor, provided such Grantor will stand possessed of any such last day upon trust to assign and dispose of it as the Agent may direct. For the avoidance of doubt, the security interest granted under this Agreement shall not extend to, and the definition of "Collateral" and definitions of and references to asset categories in the definition of Collateral and elsewhere in this Agreement or any agreement entered into or pursuant to this Agreement shall not include~~ <u>individually and collectively, the "</u>Excluded Assets<u>")</u>; provided<u>, further</u> that, if any aforementioned asset or the proceeds thereof no longer constitute Excluded Assets, such asset shall immediately constitute Collateral, and a Lien on such asset shall immediately attach thereto; provided, further, that notwithstanding anything to the contrary contained herein "Excluded Assets" shall not include ~~(x)~~ any assets of any Grantor included in the determination of the Domestic Borrowing Base, the Canadian Borrowing Base, the Aggregate Borrowing Base~~, or the ABL Borrowing Base~~ or any Proceeds thereof~~ or (y) any assets of any Grantor that secure the ABL Obligations or any refinancing or replacement thereof~~.

<u>Without in any way limiting the foregoing, each Grantor hereby acknowledges that any and all financing statements filed under the PPSA in connection with the Pre-Petition Credit Agreement, naming Agent as secured party, and such Grantor, as debtor, shall be effective to perfect Agent's security interest granted by such Grantor pursuant to this Agreement to the extent such security interest may be perfected by the filing of financing statements under the PPSA for the purposes of so perfecting the security interests granted by the Grantors hereunder and such pre-filings of financing statements are hereby ratified in all respects. Until all of the Obligations have been Paid in Full, the provisions of this paragraph shall continue to be effective and not subject to any right of termination in respect of the security interests granted herein.</u>

The security interest created hereby is intended to attach, in respect of the Collateral in which any Grantor has rights at the time this Agreement is signed by such Grantor and delivered to the Agent and, in respect of Collateral in which any Grantor subsequently acquires rights, at the time such Grantor subsequently acquires such rights. The Grantors acknowledge and confirm that (a) the Agent and the members of the Lender Group have given value to the Grantors in respect of the security interests granted herein; (b) such Grantor has (or, in the case of any after-acquired property, will have at the time of acquisition) rights in the Collateral in which it has granted a security interest; and (c) this Agreement constitutes a security agreement as that term is defined in the PPSA.

Notwithstanding any provisions to the contrary contained in this Agreement, the Credit Agreement or any of the other Loan Documents or any other document or agreement among all or some of the parties hereto, each Grantor is as of the date of this Agreement the sole registered and beneficial owner of all ULC Shares, if any, which form part of the Collateral (the "Pledged ULC Shares"), and will remain so until such time as such Pledged ULC Shares are fully and effectively transferred into the name of the Agent, or any other Person on the books and records of such ULC. Nothing in this Agreement, any Loan Document or any other document or agreement delivered among all or some of the parties hereto is intended or shall constitute the Agent, or any Person other than a Grantor to be a member or shareholder of any ULC until such time as written notice is given to the applicable Grantor and all further steps are taken so as to register the Agent, or other Person as holder of all Pledged ULC Shares. The granting of the security interest pursuant to this Article II does not make the Agent a successor to any Grantor as a member or shareholder of any ULC, and neither the Agent, nor any of its respective successors and

assigns hereunder shall be deemed to become a member or shareholder of any ULC by accepting this Agreement or exercising any right granted herein unless and until such time, if any, when the Agent, or any successor or assign expressly becomes a registered member or shareholder of any ULC. Each Grantor shall be entitled to receive and retain for its own account any dividends or other distributions, if any, in respect of the Collateral, and shall have the right to vote such Pledged ULC Shares and to control the direction, management and policies of the ULC issuing such Pledged ULC Shares to the same extent as such Grantor would if such Pledged ULC Shares were not pledged to the Administrative. To the extent any provision hereof would have the effect of constituting the Agent to be a member or shareholder of the ULC prior to such time, such provision shall be severed herefrom and be ineffective with respect to the relevant Pledged ULC Shares without otherwise invalidating or rendering unenforceable this Agreement or invalidating or rendering unenforceable such provision insofar as it relates to Collateral other than Pledged ULC Shares. Notwithstanding anything herein to the contrary (except to the extent, if any, that the Agent, or any of its respective successors or assigns hereafter expressly becomes a registered member or shareholder of any ULC), neither the Agent, nor any of its respective successors or assigns shall be deemed to have assumed or otherwise become liable for any debts or obligations of any ULC. Except upon the exercise by the Agent or other Persons, of rights to sell or otherwise dispose of Pledged ULC Shares or other remedies following the occurrence and during the continuance of an Event of Default, each Grantor shall not cause or permit, or enable any ULC in which it holds Pledged ULC Shares to cause or permit, the Agent to: (a) be registered as a member or shareholder of such ULC, (b) have any notation entered in its favour in the share register of such ULC, (c) be held out as a member or shareholder of such ULC or (d) receive, directly or indirectly, any dividends, property or other distributions from such ULC by reason of the Agent holding a security interest in the Pledged ULC Shares.

Notwithstanding any provisions to the contrary contained in this Agreement, the Credit Agreement or any of the other Loan Documents or any other document or agreement among all or some of the parties hereto, the security interest with respect to Trademarks constitutes a security interest in, and a charge, hypothecation and pledge of, such Collateral in favour of Agent, for the benefit of each member of the Lender Group, but does not constitute an assignment of such Collateral to the Agent.

4.      Security for Secured Obligations.  The Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to Agent, the Lender Group or any of them, but for the fact that they are unenforceable or not allowable (in whole or in part) as a claim in an Insolvency Proceeding involving any Grantor due to the existence of such Insolvency Proceeding.  Further, the Security Interest created hereby encumbers each Grantor's right, title, and interest in all Collateral, whether now owned by such Grantor or hereafter acquired, obtained, developed, or created by such Grantor and wherever located.

5.      Grantors Remain Liable.  Anything herein to the contrary notwithstanding, (a) each of the Grantors shall remain liable under the contracts and agreements included in the Collateral, including the Pledged Operating Agreements and the Pledged Partnership Agreements, to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Agent or any other member of the Lender Group of any of the rights hereunder shall not release any Grantor from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) none of the members of the Lender Group shall have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement, nor shall any of the members of the Lender Group be obligated to perform any of the obligations or duties of any Grantors thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

Until an Event of Default shall occur and be continuing, except as otherwise provided in this Agreement, the Credit Agreement, or any other Loan Document, Grantors shall have the right to possession and enjoyment of the Collateral for the purpose of conducting the ordinary course of their respective businesses, subject to and upon the terms hereof and of the Credit Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, it is the intention of the parties hereto that record and beneficial ownership of the Pledged Interests, including all voting, consensual, dividend, and distribution rights, shall remain in the applicable Grantor until (i) the occurrence and continuance of an Event of Default, and (ii) Agent has notified the applicable Grantor of Agent's election to exercise such rights with respect to the Pledged Interests pursuant to Section 16.

6.      Representations and Warranties.  In order to induce Agent to enter into this Agreement for the benefit of the Lender Group, each Grantor makes the following representations and warranties to the Lender Group which shall be true and correct, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Closing Date, and shall be true and correct, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the date of the making of each Additional Portion of the Term Loan (or other extension of credit) made thereafter, as though made on and as of the date of such Additional Portion of the Term Loan (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

(a)      The name and jurisdiction of organization of each Grantor is set forth on Schedule 7 (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under the Loan Documents).

(b)      The chief executive office of each Grantor is located at the address indicated on Schedule 7 (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under the Loan Documents).

(c)      Each Grantor's organizational identification numbers (or, in each case, the equivalent), if any, are identified on Schedule 7 (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under the Loan Documents).

(d)      [reserved].

(e)      Set forth on Schedule 9 (as such Schedule may be updated from time to time subject to Section 7(k)(iii) with respect to Controlled Accounts and provided that Grantors comply with Section 7(c) hereof) is a listing of all of Grantors' Deposit Accounts and Securities Accounts, including, with respect to each bank or securities intermediary (i) the name and address of such Person, and (ii) the account numbers of the Deposit Accounts or Securities Accounts maintained with such Person.

(f)      Schedule 8 sets forth all Real Property owned by any of the Grantors as of the Closing Date.

(g)      As of the Closing Date: (i) Schedule 2 provides a complete and correct list of all registered Copyrights owned by any Grantor, all applications for registration of Copyrights owned by any

Grantor, and all other Copyrights owned by any Grantor and material to the conduct of the business of any Grantor, (ii) Schedule 3 provides a complete and correct list of all Intellectual Property Licenses entered into by any Grantor pursuant to which (A) any Grantor has provided any license or other rights in Intellectual Property owned or controlled by such Grantor to any other Person (other than non-exclusive software licenses granted in the ordinary course of business), or (B) any Person has granted to any Grantor any license or other rights in Intellectual Property owned or controlled by such Person that is material to the business of such Grantor, including any Intellectual Property that is incorporated in any Inventory, software, or other product marketed, sold, licensed, or distributed by such Grantor (other than off-the-shelf, shrink-wrapped or "click to accept" software licenses or other licenses to generally commercially available software), (iii) Schedule 4 provides a complete and correct list of all Patents owned by any Grantor and all applications for Patents owned by any Grantor, (iv) Schedule 6 provides a complete and correct list of all registered Trademarks owned by any Grantor, and all applications for registration of Trademarks owned by any Grantor, and (v) Schedule 12 provides a complete and correct list of all registered Industrial Designs owned by any Grantor, and all applications for registration of Industrial Designs owned by any Grantor.

(h)     (i) (A) each Grantor owns or has a valid right to use all Intellectual Property that is necessary in or material to the conduct of its business, and (B) all employees and contractors of each Grantor, in each case, who were involved in the creation or development of any Intellectual Property for such Grantor that is necessary in or material to the business of such Grantor, have signed agreements containing assignment of Intellectual Property rights to such Grantor and obligations of confidentiality;

(ii)     to each Grantor's knowledge, no Person is currently infringing or misappropriating any Intellectual Property rights owned by such Grantor, in each case, that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect;

(iii)     (A) to each Grantor's knowledge, such Grantor is not currently infringing or misappropriating any Intellectual Property rights of any Person, except where such infringement either individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect, and (B) there are no infringement or misappropriation claims or proceedings pending, or to any Grantor's knowledge, threatened in writing against any Grantor, and no Grantor has received any written notice or other communication of any actual or alleged infringement or misappropriation of any Intellectual Property rights of any Person, in each case, except where such infringement either individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect;

(iv)     to each Grantor's knowledge, all registered Copyrights, registered Trademarks, registered Industrial Designs and issued Patents that are owned by such Grantor and necessary in or material to the conduct of its business are valid, subsisting, enforceable, unexpired, and in full force and effect; and

(v)     each Grantor has taken reasonable steps to maintain the confidentiality of and otherwise protect and enforce its rights in all trade secrets owned by such Grantor that are necessary in or material to the conduct of the business of such Grantor.

(i)     This Agreement creates a valid security interest in the Collateral of each Grantor, to the extent a security interest therein can be created under the PPSA, securing the payment of the Secured Obligations. Except to the extent a security interest in the Collateral cannot be perfected by the filing of a financing statement under the PPSA, all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken or will have been taken upon the filing of

financing statements listing each applicable Grantor, as a debtor, and Agent, as secured party, in the jurisdictions listed next to such Grantor's name on Schedule 11. Upon the making of such filings, Agent shall have a first priority (subject only to Permitted Liens) perfected security interest in the Collateral of each Grantor to the extent such security interest can be perfected by the filing of a financing statement under the PPSA. Upon filing of any Copyright Security Agreement with the United States Copyright Office or Canadian Intellectual Property Office, as applicable, filing of any Patent Security Agreement and any Trademark Security Agreement with the PTO or Canadian Intellectual Property Office, as applicable, and the filing of appropriate financing statements in the jurisdictions listed on Schedule 11, all action necessary or desirable to protect and perfect the Security Interest in and on each Grantor's United States and Canadian issued and registered Patents, Trademarks, Industrial Designs or Copyrights has been taken and such perfected Security Interest is enforceable as such as against any and all creditors of and purchasers from any Grantor. All action by any Grantor necessary to protect and perfect such security interest on each item of Collateral has been duly taken.

(j)        (i) Except for the Security Interest created hereby, each Grantor is and will at all times be the sole holder of record and the legal and beneficial owner, free and clear of all Liens (other than Permitted Liens), of the Pledged Interests indicated on Schedule 5 as being owned by such Grantor and, when acquired by such Grantor, any Pledged Interests acquired after the Closing Date, (ii) all of the Pledged Interests are duly authorized, validly issued, fully paid and non-assessable and the Pledged Interests constitute or will constitute the percentage of the issued and outstanding Equity Interests of the Pledged Companies of such Grantor identified on Schedule 5 as supplemented or modified by any Pledged Interests Addendum or any Joinder to this Agreement, (iii) such Grantor has the right and requisite authority to pledge, the Pledged Collateral pledged by such Grantor to Agent as provided herein, (iv) all actions necessary or desirable to perfect and establish the first priority (subject only to Permitted Liens) of, or otherwise protect, Agent's Liens in the Pledged Collateral, and the proceeds thereof, have been duly taken, upon (A) the execution and delivery of this Agreement, (B) the taking of possession by Agent (or its agent or designee) of any certificates representing the Pledged Interests, to the extent such Pledged Interests are represented by certificates, together with undated powers (or other effective endorsement acceptable to Agent) endorsed in blank by the applicable Grantor, (C) the filing of financing statements in the applicable jurisdiction set forth on Schedule 11 for such Grantor with respect to the Pledged Interests of such Grantor that are not represented by certificates, and (D) with respect to any Securities Accounts, the delivery of Control Agreements with respect thereto, and (v) each Grantor has delivered to and deposited with Agent all certificates representing the Pledged Interests owned by such Grantor to the extent such Pledged Interests are represented by certificates, and undated powers (or other effective endorsements acceptable to Agent) endorsed in blank with respect to such certificates. None of the Pledged Interests owned or held by such Grantor has been issued or transferred in violation of any securities registration, securities disclosure, or similar laws of any jurisdiction to which such issuance or transfer may be subject.

(k)        No consent, approval, authorization, or other order or other action by, and no notice to or filing with, any Governmental Authority or any other Person is required (i) for the grant of a Security Interest by such Grantor in and to the Collateral pursuant to this Agreement or for the execution, delivery, or performance of this Agreement by such Grantor, or (ii) for the exercise by Agent of the voting or other rights provided for in this Agreement with respect to the Pledged Collateral or the remedies in respect of the Collateral pursuant to this Agreement, except (A) as may be required in connection with such disposition of Pledged Collateral by laws affecting the offering and sale of securities generally, (B) for consents, approvals, authorizations, or other orders or actions that have already been obtained or given (as applicable) and that are still in force, (C) the filing of financing statements and other filings necessary to perfect the Security Interests granted hereby, and (D) such other consents, approvals, authorizations, actions, notices, and filings as may be required in connection with

the exercise by Agent of its remedies in respect of the Collateral.  No Intellectual Property License of any Grantor that is necessary in or material to the conduct of such Grantor's business requires any consent of any other Person that has not been obtained in order for such Grantor to grant the security interest granted hereunder in such Grantor's right, title or interest in or to such Intellectual Property License.

(l)        [reserved].

(m)        There is no default, breach, violation, or event of acceleration existing under any promissory note (as defined in the PPSA) constituting Collateral and pledged hereunder (each a "<u>Pledged Note</u>") and no event has occurred or circumstance exists which, with the passage of time or the giving of notice, or both, would constitute a default, breach, violation, or event of acceleration under any Pledged Note.  No Grantor that is an obligee under a Pledged Note has waived any default, breach, violation, or event of acceleration under such Pledged Note.

(n)        As to all limited liability company or partnership interests, issued under any Pledged Operating Agreement or Pledged Partnership Agreement, each Grantor hereby represents and warrants that the Pledged Interests issued pursuant to such agreement (i) are not dealt in or traded on securities exchanges or in securities markets, (ii) do not constitute investment company securities, and (iii) are not held by such Grantor in a Securities Account.  In addition, none of the Pledged Operating Agreements, the Pledged Partnership Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement or Pledged Partnership Agreement, provides that such Pledged Interests are securities governed by the STA as in effect in any relevant jurisdiction.

7.        <u>Covenants</u>.  Each Grantor, jointly and severally, covenants and agrees with Agent that from and after the date of this Agreement and until the date of termination of this Agreement in accordance with <u>Section 23</u>:

(a)        <u>Possession of Collateral</u>.  In the event that any Collateral, including Proceeds, is evidenced by or consists of Negotiable Collateral, Investment Property, or Chattel Paper having an aggregate value or face amount of US$$100,000 or more for all such Negotiable Collateral, Investment Property, or Chattel Paper, the Grantors shall promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) after acquisition thereof), notify Agent thereof, and if and to the extent that perfection or priority of Agent's Security Interest is dependent on or enhanced by possession, the applicable Grantor, promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion)) after request by Agent, shall execute such other documents and instruments as shall be requested by Agent or, if applicable, endorse and deliver physical possession of such Negotiable Collateral, Investment Property, or Chattel Paper to Agent, together with such undated powers (or other relevant document of transfer acceptable to Agent) endorsed in blank as shall be requested by Agent, and shall do such other acts or things deemed necessary or desirable by Agent to protect Agent's Security Interest therein.

(b)    Chattel Paper.

(i)    Promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion)) after request by Agent, each Grantor shall take all steps reasonably necessary to grant Agent control of all electronic Chattel Paper constituting Collateral in accordance with the PPSA as in effect in any relevant jurisdiction, to the extent that the aggregate value or face amount of such electronic Chattel Paper equals or exceeds US$~~5~~100,000; and

(ii)    If any Grantor retains possession of any Chattel Paper or instruments constituting Collateral (which retention of possession shall be subject to the extent permitted hereby and by the Credit Agreement), promptly upon the request of Agent, such Chattel Paper and instruments shall be marked with the following legend: "This writing and the obligations evidenced or secured hereby are subject to the Security Interest of Crystal Financial LLC d/b/a SLR Credit Solutions, as Agent for the benefit of the Lender Group".

(c)    Control Agreements.

(i)    Subject to any applicable time periods provided under the Loan Documents, each Grantor shall obtain an authenticated Control Agreement (which may include a Controlled Account Agreement), from each bank maintaining a Deposit Account or Securities Account for such Grantor ~~(other than with respect to any Excluded Accounts and any Deposit Accounts or Securities Accounts that constitute Excluded Assets)~~;

(ii)    Subject to any applicable time periods provided under the Loan Documents, each Grantor shall obtain an authenticated Control Agreement, from each issuer of Uncertificated Securities, securities intermediary, or futures intermediary issuing or holding any financial assets or futures to or for any Grantor, or maintaining a Securities Account for such Grantor ~~(other than with respect to any Excluded Accounts and any Securities Accounts that constitute Excluded Assets)~~; and

(iii)    Subject to Sections 7(h) and 9, each Grantor shall obtain an authenticated Control Agreement with respect to all of such Grantor's investment property constituting Collateral.

(d)    Letter-of-Credit Rights.  If the Grantors (or any of them) are or become the beneficiary of letters of credit constituting Collateral, having a face amount or value of US$~~5~~100,000 or more in the aggregate, then the applicable Grantor or Grantors shall promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) after becoming a beneficiary), notify Agent thereof and, promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion)) after request by Agent, enter into a tri-party agreement with Agent and the issuer or confirming bank with respect to Letter-of-Credit Rights assigning such Letter-of-Credit Rights to Agent and directing all payments thereunder to Agent's Account, all in form and substance reasonably satisfactory to Agent.

(e)    [reserved].

(f)    Government Contracts.  Other than Accounts and Chattel Paper the aggregate value of which does not at any one time exceed US$~~5~~100,000, if any Account or Chattel Paper that arises out of a contract or contracts with the United States of America or Canada or any department, agency, or instrumentality thereof and that constitutes Collateral, Grantors shall promptly (and in any event within

five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) of the creation thereof) notify Agent thereof and, promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion)) after request by Agent, execute any instruments or take any steps reasonably required by Agent in order that all moneys due or to become due under such contract or contracts shall be assigned to Agent, for the benefit of the Lender Group, and in that respect shall use commercially reasonable efforts to comply with all applicable requirements of the Financial Administration Act (Canada) or other applicable law.

(g)    Intellectual Property.

(i)    Upon the request of Agent, in order to facilitate filings with the PTO, the United States Copyright Office, Canadian Intellectual Property Office or any other similar filing office, as applicable, each Grantor shall execute and deliver to Agent one or more Copyright Security Agreements, Trademark Security Agreements, or Patent Security Agreements to further evidence Agent's Lien on such Grantor's issued and registered Patents, Trademarks, Industrial Designs, Copyrights, and the Intangibles of such Grantor relating thereto or represented thereby;

(ii)    Each Grantor shall have the duty, with respect to Intellectual Property that is necessary in or material to the conduct of such Grantor's business, to protect and diligently enforce and defend at such Grantor's expense its Intellectual Property, including (A) to diligently enforce and defend, including promptly suing for infringement, misappropriation, or dilution and to recover any and all damages for such infringement, misappropriation, or dilution, and filing for opposition, interference, and cancellation against conflicting Intellectual Property rights of any Person, (B) to prosecute diligently any trademark application or service mark application that is part of the Trademarks pending as of the date hereof or hereafter until the termination of this Agreement, (C) to prosecute diligently any patent application that is part of the Patents pending as of the date hereof or hereafter until the termination of this Agreement, (D) to take all reasonable and necessary action to preserve and maintain all such Trademarks, Patents, Copyrights, Industrial Designs and Intellectual Property Licenses of such Grantor and its rights therein, including paying all maintenance fees and filing of applications for renewal, affidavits of use, and affidavits of noncontestability, and (E) to require all employees, consultants, and contractors of each Grantor, in each case who were involved in the creation or development of such Intellectual Property, to sign agreements containing assignment of Intellectual Property rights and obligations of confidentiality.  Each Grantor further agrees not to abandon any Intellectual Property or Intellectual Property License that is necessary in or material to the conduct of such Grantor's business.  Each Grantor hereby agrees to take the steps described in this Section 7(g)(ii) with respect to all new or acquired Intellectual Property to which it or any of its Subsidiaries is now or later becomes entitled that is necessary in or material to the conduct of such Grantor's business;

(iii)    Grantors acknowledge and agree that the Lender Group shall have no duties with respect to any Intellectual Property or Intellectual Property Licenses of any Grantor.  Without limiting the generality of this Section 7(g)(iii), Grantors acknowledge and agree that no member of the Lender Group shall be under any obligation to take any steps necessary to preserve rights in the Collateral consisting of Intellectual Property or Intellectual Property Licenses against any other Person, but any member of the Lender Group may do so at its option from and after the occurrence and during the continuance of an Event of Default, and all expenses incurred in connection therewith (including reasonable fees and expenses of lawyers and other professionals) shall be for the sole account of Borrowers and shall be chargeable to the Loan Account;

(iv)    On each date on which a Compliance Certificate is required to be delivered pursuant to Section 5.1 of the Credit Agreement (or, if an Event of Default has occurred and is

continuing, more frequently if requested by Agent), each Grantor shall provide Agent with a written report of all new Patents, Trademarks, Industrial Designs or Copyrights that are registered or the subject of pending applications for registrations, and of all Intellectual Property Licenses that are material to the conduct of such Grantor's business, in each case, which were acquired, registered, or for which applications for registration were filed by any Grantor during the prior period and any statement of use or amendment to allege use with respect to intent-to-use trademark applications. In the case of such registrations or applications therefor, which were acquired by any Grantor and are necessary in or material to the conduct of such Grantor's business, each such Grantor shall file the necessary documents with the appropriate Governmental Authority identifying the applicable Grantor as the owner (or as a co-owner thereof, if such is the case) of such Intellectual Property. In each of the foregoing cases, in connection with the applicable Compliance Certificate, the applicable Grantor shall promptly cause to be prepared, executed, and delivered to Agent supplemental schedules to the applicable Loan Documents to identify such Patent, Trademark and Copyright registrations and applications therefor (with the exception of Trademark applications filed on an intent-to-use basis for which no statement of use or amendment to allege use has been filed) and Intellectual Property Licenses as being subject to the security interests created thereunder;

(v)    Upon receipt of notice of registration of any Copyright, each Grantor shall promptly (but in no event later than five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) following such receipt) notify (but without duplication of any notice required by Section 7(g)(v)) Agent of such registration by delivering, or causing to be delivered, to Agent, documentation sufficient for Agent to perfect Agent's Liens on such Copyright. If any Grantor acquires from any Person any registered Copyright, or an application to register any Copyright, such Grantor shall promptly (but in no event later than five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) following such acquisition) notify Agent of such acquisition and deliver, or cause to be delivered, to Agent, documentation sufficient for Agent to perfect Agent's Liens on such Copyright. In the case of such Copyright registrations or applications therefor which were acquired by any Grantor, each such Grantor shall promptly (but in no event later than five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) following such acquisition) file the necessary documents with the appropriate Governmental Authority identifying the applicable Grantor as the owner (or as a co-owner thereof, if such is the case) of such Copyrights;

(vi)    Each Grantor shall take reasonable steps to maintain the confidentiality of, and otherwise protect and enforce its rights in, the Intellectual Property that is necessary in or material to the conduct of such Grantor's business, including, as applicable (A) protecting the secrecy and confidentiality of its confidential information and trade secrets by having and enforcing a policy requiring all current employees, consultants, licensees, vendors and contractors with access to such information to execute appropriate confidentiality agreements, (B) taking actions reasonably necessary to ensure that no trade secret falls into the public domain, and (C) protecting the secrecy and confidentiality of the source code of all software programs and applications of which it is the owner or licensee by having and enforcing a policy requiring any licensees (or sublicensees) of such source code to enter into license agreements with commercially reasonable use and non-disclosure restrictions; and

(vii)    No Grantor shall enter into any Intellectual Property License material to the conduct of the business to receive any license or rights in any Intellectual Property of any other Person unless such Grantor has used commercially reasonable efforts to permit the assignment of or grant of a security interest in such Intellectual Property License (and all rights of Grantor thereunder) to Agent (and any transferees of Agent).

       (h)    <u>Investment Property</u>.

       (i)    If any Grantor shall acquire, obtain, receive or become entitled to receive any Pledged Interests after the Closing Date, or shall otherwise be required to pledge additional Pledged Interests after the Closing Date pursuant to the terms of any Loan Document, it shall promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) of acquiring or obtaining such Pledged Collateral) deliver to Agent a duly executed Pledged Interests Addendum identifying such Pledged Interests;

~~(ii) Upon the occurrence and during the continuance of an Event of Default, following the request of Agent, all sums of money and property paid or distributed in respect of the Investment Property constituting Collateral that are received by any Grantor shall be held by the Grantors in trust for the benefit of Agent segregated from such Grantor's other property, and such Grantor shall deliver it forthwith to Agent in the exact form received;~~

       <u>(ii)</u>    <u>All rights of each Grantor to receive and retain any and all dividends, interest, principal and other distributions (the "Distributions") paid on or distributed in respect of the Pledged Interests are hereby terminated and all such rights are hereby vested in the Agent, which shall have the sole right to receive and hold as Collateral all such Distributions and apply such Distributions to the Obligations, in all cases, in accordance with the Credit Agreement or as otherwise provided in the applicable Financing Order. All Distributions received by any Grantor contrary to the provisions *of this clause (ii) shall* be held in trust for the benefit of the Agent, shall be segregated from other property or funds of such Grantor and shall be forthwith delivered to the Agent upon demand in the same form as so received (with any necessary endorsement reasonably requested by the Agent). Any and all money and other property paid over to or received by the Agent pursuant to the provisions of this subsection shall be applied, unless otherwise determined by the Agent in its sole discretion, *first* to reduce the balance of the Revolving Loans outstanding and *second* for deposit into the Eligible Cash Account, in all cases, in accordance with the Credit Agreement or as otherwise provided in the applicable Financing Order;</u>

       (iii)    Each Grantor shall promptly deliver to Agent a copy of each material notice or other material communication received by it in respect of any Pledged Interests;

       (iv)    No Grantor shall make or consent to any amendment or other modification or waiver with respect to any Pledged Interests, Pledged Operating Agreement, or Pledged Partnership Agreement, or enter into any agreement or permit to exist any restriction with respect to any Pledged Interests if the same is prohibited pursuant to the Loan Documents;

       (v)    Each Grantor agrees that it will cooperate with Agent in obtaining all necessary approvals and making all necessary filings under federal, state, provincial, territorial, local, or foreign law to effect the perfection of the Security Interest on the Investment Property or, subject to the other terms and conditions of this Agreement and the other Loan Documents, as applicable, to effect any sale or transfer thereof;

       (vi)    As to all limited liability company or partnership interests owned by such Grantor and issued under any Pledged Operating Agreement or Pledged Partnership Agreement, each Grantor hereby covenants that the Pledged Interests issued pursuant to such agreement (A) are not and shall not be dealt in or traded on securities exchanges or in securities markets, (B) do not and will not constitute investment company securities, and (C) are not and will not be held by such Grantor in a securities account. In addition, none of the Pledged Operating Agreements, the Pledged Partnership Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged

Operating Agreement or Pledged Partnership Agreement, provides or shall provide that such Pledged Interests are securities governed by the STA as in effect in any relevant jurisdiction; and

(vii)   With regard to any Pledged Interests that are not certificated, any such Grantor of such non-certificated Pledged Interests (i) agrees promptly to note on its books the security interests granted to Agent and confirmed under this Agreement, (ii) agrees that after the occurrence and during the continuation of an Event of Default, it will comply with instructions of Agent or its nominee with respect to the applicable Pledged Interests without further consent by the applicable Grantor, (iii) to the extent permitted by law, agrees that the "issuer's jurisdiction" for purposes of the PPSA and STA is the Province of British Columbia, (iv) agrees to notify Agent upon obtaining knowledge of any interest in favour of any person in the applicable Pledged Interests that is materially adverse to the interest of the Agent therein, other than any Permitted Liens and (v) waives any right or requirement at any time hereafter to receive a copy of this Agreement in connection with the registration of any Pledged Interests hereunder in the name of Agent or its nominee or the exercise of voting rights by Agent or its nominee.

(i)   Real Property; Fixtures.   Each Grantor covenants and agrees that upon the acquisition of any fee interest in Real Property ~~having a fair market value in excess of US$500,000~~ it will promptly (and in any event within five Business Days (or such longer period as agreed to by Agent in writing in its sole discretion) of acquisition) notify Agent of the acquisition of such Real Property and will grant to Agent, for the benefit of the Lender Group, a first priority (subject only to Permitted Liens) Mortgage on each fee interest in Real Property now or hereafter owned by such Grantor and shall deliver such other documentation and opinions, in form and substance satisfactory to Agent, in connection with the grant of such Mortgage as Agent shall request in its Permitted Discretion, including title insurance policies, financing statements, fixture filings and environmental audits and such Grantor shall pay all recording costs, intangible taxes and other fees and costs (including reasonable legal fees and expenses) incurred in connection therewith.  Each Grantor acknowledges and agrees that, to the extent permitted by applicable law, all of the Collateral shall remain personal property regardless of the manner of its attachment or affixation to real property.

(j)   Transfers and Other Liens.   Grantors shall not (i) sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, any of the Collateral, except as expressly permitted by the Credit Agreement, or (ii) create or permit to exist any Lien upon or with respect to any of the Collateral of any Grantor, except for Permitted Liens.  The inclusion of Proceeds in the Collateral shall not be deemed to constitute Agent's consent to any sale or other disposition of any of the Collateral except as expressly permitted in this Agreement or the other Loan Documents.

(k)   Controlled Accounts; Controlled Investments.

(i)   Subject to any applicable time periods provided under the Loan Documents, each Grantor shall (A) establish and maintain cash management services of a type and on terms reasonably satisfactory to Agent at ~~Wells Fargo Bank, National Association or~~ one or more of the other banks set forth on Schedule 10 or, with the Agent's prior written consent after the Amendment No. 3 Effective Date, one or more of the other banks (each a "Controlled Account Bank"), and shall take reasonable steps to ensure that all of its Account Debtors (including, without limitation, all Credit Card Issuers and Credit Card Processors) forward payment of the amounts owed by them directly to a Collection Account at such Controlled Account Bank ~~that is not an Excluded Account or an Excluded Asset~~ (each, a "Controlled Account") (by wire transfer to the applicable Controlled Account Bank or to a lockbox maintained by the applicable Controlled Account Bank for deposit into such Collection Account), and (B) deposit or cause to be deposited promptly, and in any event no later than the first

Business Day after the date of receipt thereof, all of their Collections (including those sent directly by their Account Debtors to a Grantor) and proceeds of Collateral into a Controlled Account;

(ii)    ~~Subject to any applicable time periods provided under the Loan Documents, e~~Each Grantor shall establish and maintain Controlled Account Agreements with Agent and the applicable Controlled Account Bank, in form and substance reasonably acceptable to Agent. Each such Controlled Account Agreement shall provide, among other things, that (A) the Controlled Account Bank will comply with any instructions originated by Agent directing the disposition of the funds in each applicable Controlled Account without further consent by the applicable Grantor, (B) the Controlled Account Bank waives, subordinates, or agrees not to exercise any rights of setoff or recoupment or any other claim against each applicable Controlled Account other than for payment of its service fees and other charges directly related to the administration of such Controlled Account and for returned cheques or other items of payment, and (C) ~~upon the instruction of Agent (an "Activation Instruction")~~ *subject to the terms of the* Foreign Account Letter Agreements, the Controlled Account Bank will forward by daily sweep all amounts in each applicable Controlled Account to the Agent's Account. ~~Agent agrees not to issue an Activation Instruction with respect to the Controlled Accounts unless a Cash Dominion Period is in effect at the time such Activation Instruction is issued. Agent agrees to use commercially reasonable efforts to rescind an Activation Instruction (the "Rescission") after any Cash Dominion Period has ended;~~.

(iii)    ~~So long as no Default or Event of Default has occurred and is continuing or would result therefrom, Borrowers may amend Schedule 10 to add or replace a Controlled Account Bank or Controlled Account and shall upon such addition or replacement provide to Agent an amended Schedule 10; provided, that (A) such prospective Controlled Account Bank shall be reasonably satisfactory to Agent, and (B) prior to the time of the opening of such Controlled Account, the applicable Grantor and such prospective Controlled Account Bank shall have executed and delivered to Agent a Controlled Account Agreement.~~ Each Grantor shall close any of its Controlled Accounts (and establish replacement Controlled Account accounts in accordance with the foregoing sentence) as promptly as practicable and in any event within 45 days after notice from Agent that the operating performance, funds transfer, or availability procedures or performance of the Controlled Account Bank with respect to Controlled Account Accounts or Agent's liability under any Controlled Account Agreement with such Controlled Account Bank is no longer acceptable in Agent's reasonable judgment; and

(iv)    ~~Other than with respect to Excluded Accounts, no~~No Grantor (including, without limitation, any Foreign Loan Party) will, and no ~~such~~ Grantor will permit its Subsidiaries to, make, acquire, or permit to exist Permitted Investments consisting of cash, Cash Equivalents, or amounts credited to Deposit Accounts or Securities Accounts unless Grantor or its Subsidiary, as applicable, and the applicable bank or securities intermediary have entered into Control Agreements with Agent in order to perfect (or further establish) Agent's Liens in such Permitted Investments.

(l)    <u>Name, Etc</u>.    No Grantor will change its name, chief executive office, organizational identification number, jurisdiction of organization or organizational identity; provided, that any Grantor may change its name or chief executive office upon at least ten days prior written notice to Agent of such change.

(m)    <u>Account Verification</u>. Each Grantor will, and will cause each of its Subsidiaries to, permit Agent, in Agent's name or in the name or a nominee of Agent, to verify the validity, amount or any other matter relating to any Account constituting Collateral, by mail, telephone, facsimile transmission or other electronic means of transmission or otherwise. Further, at the request of Agent, each Grantor will, and will cause each of its Subsidiaries to, send requests for verification of Accounts

or, after the occurrence and during the continuance of an Event of Default, send notices of assignment of Accounts to Account Debtors and other obligors.

(n)      [reserved].

(o)      Pledged Notes.  Grantors (i) without the prior written consent of Agent, will not (A) waive or release any obligation of any Person that is obligated under any of the Pledged Notes, (B) take or omit to take any action or knowingly suffer or permit any action to be omitted or taken, the taking or omission of which would result in any right of offset against sums payable under the Pledged Notes, or (C) other than Permitted Dispositions, assign or surrender their rights and interests under any of the Pledged Notes or terminate, cancel, modify, change, supplement or amend the Pledged Notes, and (ii) shall provide to Agent copies of all material written notices (including notices of default) given or received with respect to the Pledged Notes promptly after giving or receiving such notice.

(p)      [reserved].

8.      Relation to Other Security Documents.  The provisions of this Agreement shall be read and construed with the other Loan Documents referred to below in the manner so indicated.

(a)      Credit Agreement. In the event of any conflict between any provision in this Agreement and a provision in the Credit Agreement, such provision of the Credit Agreement shall control.

(b)      Patent, Trademark, Copyright Security Agreements.  The provisions of the Copyright Security Agreements, Trademark Security Agreements, and Patent Security Agreements are supplemental to the provisions of this Agreement, and nothing contained in the Copyright Security Agreements, Trademark Security Agreements, or the Patent Security Agreements shall limit any of the rights or remedies of Agent hereunder.  In the event of any conflict between any provision in this Agreement and a provision in a Copyright Security Agreement, Trademark Security Agreement or Patent Security Agreement, such provision of this Agreement shall control.

9.      Further Assurances.

(a)      Subject to the other terms and conditions of this Agreement and the other Loan Documents, as applicable, each Grantor agrees that from time to time, at its own expense, such Grantor will promptly execute and deliver all further instruments and documents, and take all further action, that Agent may reasonably request, in order to perfect and protect the Security Interest granted hereby, to create, perfect or protect the Security Interest purported to be granted hereby or to enable Agent to exercise and enforce its rights and remedies hereunder with respect to any of the Collateral.

(b)      Each Grantor authorizes the filing by Agent of financing statements or amendments (including financing change statements) thereto as are necessary or desirable to perfect and preserve the Security Interest granted or purported to be granted hereby, and such Grantor will execute and deliver to Agent such other instruments or notices, as Agent may reasonably request, in order to perfect and preserve the Security Interest granted or purported to be granted hereby.

(c)      Each Grantor authorizes Agent at any time and from time to time to file, transmit, or communicate, as applicable, financing statements and amendments (i) describing the Collateral as "all present and after-acquired personal property of debtor" or "all assets of debtor" or words of similar effect, (ii) describing the Collateral as being of equal or lesser scope or with greater

detail, or (iii) that contain any information required by the PPSA for the sufficiency or filing office acceptance. Each Grantor also hereby ratifies any and all financing statements or amendments previously filed by Agent in any jurisdiction. To the extent permitted by law, each Grantor hereby waives its right to receive a copy of any financing statement, financing change statement or verification statement filed or received by or on behalf of the Agent in connection with the Security Interest in the Collateral.

(d)      Each Grantor acknowledges that it is not authorized to file any financing statement or financing change statement with respect to any financing statement filed in connection with this Agreement without the prior written consent of Agent, subject to such Grantor's rights under the PPSA.

10.      <u>Agent's Right to Perform Contracts, Exercise Rights, etc</u>. Upon the occurrence and during the continuance of an Event of Default, Agent (or its designee) (a) may proceed to perform any and all of the obligations of any Grantor contained in any contract, lease, or other agreement and exercise any and all rights of any Grantor therein contained as fully as such Grantor itself could, (b) shall have the right (subject to <u>Section 17(b)</u>) to use any Grantor's rights under Intellectual Property Licenses in connection with the enforcement of Agent's rights hereunder, including the right to prepare for sale and sell any and all Inventory and Equipment now or hereafter owned by any Grantor and now or hereafter covered by such licenses, and (c) shall have the right to request that any Equity Interests that are pledged hereunder be registered in the name of Agent or any of its nominees.

11.      <u>Agent Appointed Attorney-in-Fact</u>. Each Grantor hereby irrevocably appoints Agent its attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, at such time as an Event of Default has occurred and is continuing under the Credit Agreement, to take any action and to execute any instrument which Agent may reasonably deem necessary or advisable to accomplish the purposes of this Agreement, including:

(a)      to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the Accounts or any other Collateral of such Grantor;

(b)      to receive and open all mail addressed to such Grantor and to notify postal authorities to change the address for the delivery of mail to such Grantor to that of Agent;

(c)      to receive, endorse, and collect any Collateral consisting of drafts or other instruments, documents, Negotiable Collateral or Chattel Paper of any Grantor;

(d)      to file any claims or take any action or institute any proceedings which Agent may deem necessary or desirable for the collection of any of the Collateral of such Grantor or otherwise to enforce the rights of Agent with respect to any of the Collateral;

(e)      to repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any Person obligated to such Grantor in respect of any Account of such Grantor;

(f)      to use any Intellectual Property or Intellectual Property Licenses (to the extent that such use (i) does not violate in any material respect the express terms of any agreement between such Grantor and a third party governing such Grantor's use of such Intellectual Property and (ii) is not prohibited by applicable law) of such Grantor, including but not limited to any labels, Patents, Trademarks, trade names, URLs, domain names, Industrial Designs, Copyrights, or advertising matter, in

preparing for sale, advertising for sale, or selling Inventory or other Collateral and to collect any amounts due under Accounts, contracts or Negotiable Collateral of such Grantor; and

(g)    Agent, on behalf of the Lender Group, shall have the right, but shall not be obligated, to bring suit in its own name to enforce the Intellectual Property and Intellectual Property Licenses (to the extent permitted under the applicable licenses) and, if Agent shall commence any such suit, the appropriate Grantor shall, at the request of Agent, do any and all lawful acts and execute any and all proper documents reasonably required by Agent in aid of such enforcement.

To the extent permitted by law, each Grantor hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof.  This power of attorney is coupled with an interest and shall be irrevocable until this Agreement is terminated.

12.    <u>Agent May Perform</u>.  If any Grantor fails to perform any agreement contained herein, Agent may itself perform, or cause performance of, such agreement, and the reasonable and documented expenses of Agent incurred in connection therewith shall be payable, jointly and severally, by Grantors in accordance with the terms of the Credit Agreement.

13.    <u>Agent's Duties</u>.  The powers conferred on Agent hereunder are solely to protect Agent's interest in the Collateral, for the benefit of the Lender Group, and shall not impose any duty upon Agent to exercise any such powers.  Except for the safe custody of any Collateral in its actual possession and the accounting for moneys actually received by it hereunder, Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.  Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its actual possession if such Collateral is accorded treatment substantially equal to that which Agent accords its own property.

14.    <u>Collection of Accounts, Intangibles and Negotiable Collateral</u>.  At any time upon the occurrence and during the continuance of an Event of Default, Agent or Agent's designee may (a) make direct verification from Account Debtors (including, without limitation, Credit Card Issuers and Credit Card Processors) with respect to any or all Accounts that are part of the Collateral, (b) notify Account Debtors of any Grantor that the Accounts, Intangibles, Chattel Paper or Negotiable Collateral of such Grantor have been collaterally assigned to Agent, for the benefit of the Lender Group, or that Agent has a security interest therein, or (c) collect the Accounts, Intangibles and Negotiable Collateral of any Grantor directly, and any collection costs and expenses shall constitute part of such Grantor's Secured Obligations under the Loan Documents.

15.    <u>Disposition of Pledged Interests by Agent</u>.  None of the Pledged Interests existing as of the date of this Agreement are, and none of the Pledged Interests hereafter acquired on the date of acquisition thereof will be, registered or qualified under the various federal or provincial securities laws of Canada and disposition thereof after an Event of Default has occurred and is continuing may be restricted to one or more private (instead of public) sales in view of the lack of such registration.  Each Grantor understands that in connection with such disposition, Agent may approach only a restricted number of potential purchasers and further understands that a sale under such circumstances may yield a lower price for the Pledged Interests than if the Pledged Interests were registered and qualified pursuant to applicable securities laws and sold on the open market.  Each Grantor, therefore, agrees that: (a) if Agent shall, pursuant to the terms of this Agreement, sell or cause the Pledged Interests or any portion thereof to be sold at a private sale, Agent shall have the right to rely upon the advice and opinion of any nationally recognized brokerage or investment firm (but shall not be obligated to seek such advice and the failure to do so shall not be considered in determining the commercial reasonableness of such action)

as to the best manner in which to offer the Pledged Interest or any portion thereof for sale and as to the best price reasonably obtainable at the private sale thereof, and (b) such reliance shall be conclusive evidence that Agent has handled the disposition in a commercially reasonable manner.

16.    Voting and Other Rights in Respect of Pledged Interests.

(a)    Upon the occurrence and during the continuation of an Event of Default, (i) Agent may, at its option, and with one Business Day prior notice to any Grantor (unless such Event of Default is an Event of Default specified in Section 8.1(a), 8.4 or 8.5 of the Credit Agreement, in which case no such notice need be given) and in addition to all rights and remedies available to Agent under any other agreement, at law, in equity, or otherwise, exercise all voting rights, or any other ownership or consensual rights (including any dividend or distribution rights) in respect of the Pledged Interests owned by such Grantor, but under no circumstances is Agent obligated by the terms of this Agreement to exercise such rights, and (ii) if Agent duly exercises its right to vote any of such Pledged Interests, each Grantor hereby appoints Agent, such Grantor's true and lawful attorney-in-fact and IRREVOCABLE PROXY to vote such Pledged Interests in any manner Agent deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, as the case may be. The power-of-attorney and proxy granted hereby is coupled with an interest and shall be irrevocable.

(b)    For so long as any Grantor shall have the right to vote the Pledged Interests owned by it, such Grantor covenants and agrees that it will not, without the prior written consent of Agent, vote or take any consensual action with respect to such Pledged Interests which would materially adversely affect the rights of Agent or the other members of the Lender Group, or the value of the Pledged Interests.

17.    Remedies.  Upon the occurrence and during the continuance of an Event of Default:

(a)    Agent may, and, at the instruction of the Required Lenders, shall exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it, all the rights and remedies of a secured party on default under the PPSA or any other applicable law.  Without limiting the generality of the foregoing, each Grantor expressly agrees that, in any such event, Agent without demand of performance or other demand, advertisement or notice of any kind (except a notice specified below of time and place of public or private sale) to or upon any Grantor or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the PPSA, STA or any other applicable law), may take immediate possession of all or any portion of the Collateral and (i) require Grantors to, and each Grantor hereby agrees that it will at its own expense and upon request of Agent forthwith, assemble all or part of the Collateral as directed by Agent and make it available to Agent at one or more locations where such Grantor regularly maintains Inventory, and (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Agent's offices or elsewhere, for cash, on credit, and upon such other terms as Agent may deem commercially reasonable.  Each Grantor agrees that, to the extent notification of sale shall be required by law, at least fifteen days (or such shorter period as approved by any court of competent jurisdiction) notification by mail to the applicable Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification.  Agent shall not be obligated to make any sale of Collateral regardless of notification of sale having been given. Agent may adjourn any public sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.  Each Grantor agrees that to the extent notification of sale shall be require by law, notification by mail of the URL where a sale will occur and the time when a sale will commence at least fifteen days

prior to the sale (or such shorter time period as approved by any court of competent jurisdiction) shall constitute a reasonable notification for purposes of the PPSA. Each Grantor agrees that any sale of Collateral to a licensor pursuant to the terms of a license agreement between such licensor and a Grantor is sufficient to constitute a commercially reasonable sale (including as to method, terms, manner, and time) within the meaning of the PPSA.

(b)    For the purpose of enabling Agent to exercise rights and remedies under this Section 17 (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, assign, convey, transfer or grant options to purchase any Collateral, including, without limitation, Intellectual Property Licenses constituting Collateral) at such time as Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to Agent, for the benefit of the Lender Group and to the extent of such Grantor's rights therein and to the extent permitted by the applicable licenses or other agreements related thereto, an irrevocable, nonexclusive, worldwide license to such Grantor's Intellectual Property (exercisable without payment of royalty or other compensation to such Grantor), to, use and practice and sublicense any Intellectual Property included in the Collateral now owned or hereafter acquired by such Grantor, including access to all media in which any of the licensed items may be recorded or stored and to all software and programs used for the compilation or printout thereof (in each case to the extent that such Grantor is permitted to grant such license and access under the applicable licenses or other agreements related thereto).

(c)    Agent may, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it under applicable law and without the requirement of notice to or upon any Grantor or any other Person (which notice is hereby expressly waived to the maximum extent permitted by the PPSA, STA or any other applicable law), (i) with respect to any Grantor's Deposit Accounts subject to a Controlled Accounts Agreement, instruct the bank maintaining such Deposit Account for the applicable Grantor to pay the balance of such Deposit Account to or for the benefit of Agent, and (ii) with respect to any Grantor's Securities Accounts in which Agent's Liens are perfected by control under the PPSA, instruct the securities intermediary maintaining such Securities Account for the applicable Grantor to (A) transfer any cash in such Securities Account to or for the benefit of Agent, or (B) liquidate any financial assets in such Securities Account that are customarily sold on a recognized market and transfer the cash proceeds thereof to or for the benefit of Agent.

(d)    Any cash held by Agent as Collateral and all cash proceeds received by Agent in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied against the Secured Obligations in the order set forth in the Credit Agreement.   In the event the proceeds of Collateral are insufficient to satisfy all of the Secured Obligations in full, each Grantor shall remain jointly and severally liable for any such deficiency.

(e)    Each Grantor hereby acknowledges that the Secured Obligations arise out of a commercial transaction, and agrees that if an Event of Default shall occur and be continuing Agent shall have the right to an immediate writ of possession without notice of a hearing.  Agent shall have the right to the appointment or reappointment by instrument in writing, any Person or Persons, whether an officer or officers or an employee or employees of such Grantor or not, to be an interim receiver, receiver, manager, or receivers (hereinafter called a "Receiver", which term when used herein shall include a receiver and manager) to take possession of the properties and assets of each Grantor, and to enforce any of the remedies (for the benefit of the Agent and each member of the Lender Group) and each Grantor hereby consents to such rights and such appointment and hereby waives any objection such Grantor may have thereto or the right to have a bond or other security posted by Agent.

(f)    The Agent may remove any Receiver so appointed and appoint another in its stead. Any such Receiver shall, to the extent permitted by applicable law, so far as concerns responsibility for its acts, be deemed the agent of such Grantor and not of the Agent, and the Agent shall not be in any way responsible for any misconduct, negligence or nonfeasance on the part of any such Receiver or its servants, agents or employees. Subject to the provisions of the instrument appointing a Receiver, any such Receiver shall (i) have such powers as have been granted to the  Agent under this Section 17, and (ii) shall be entitled to exercise such powers at any time that such powers would otherwise be exercisable by the Agent under this Section 17, which powers shall include the power to take possession of the Collateral, to preserve the Collateral or its value, to carry on or concur in carrying on all or any part of the business of such Grantor and to sell, lease, license or otherwise dispose of or concur in selling, leasing, licensing or otherwise disposing of the Collateral. To facilitate the foregoing powers, any such Receiver may, to the exclusion of all others, including any Grantor, enter upon, use and occupy all premises owned or occupied by such Grantor wherein the Collateral may be situated, maintain the Collateral upon such premises, borrow money on a secured or unsecured basis and use the Collateral directly in carrying on such Grantor's business or as security for loans or advances to enable the Receiver to carry on such Grantor's business or otherwise, as such Receiver shall, in its reasonable discretion, determine. Except as may be otherwise directed by the Agent, all money received from time to time by such Receiver in carrying out its appointment shall be received in trust for and be paid over to the Agent, and any surplus shall be applied in accordance with requirements of law. Every such Receiver may, in the discretion of the Agent, be vested with all or any of the rights and powers of the Agent.

(g) [reserved].

18.    Remedies Cumulative.  Each right, power, and remedy of Agent, any other member of the Lender Group as provided for in this Agreement or the other Loan Documents now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy provided for in this Agreement and the other Loan Documents or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Agent or any other member of the Lender Group of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by Agent or such other member of the Lender Group of any or all such other rights, powers, or remedies.

19.    Marshaling. Agent shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising.  To the extent that it lawfully may, each Grantor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Agent's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

20.    Indemnity.  Each Grantor agrees to indemnify the Agent, or any Receiver or any nominee or agent of the Agent, and the other members of the Lender Group from and against all claims, lawsuits and liabilities (including reasonable legal fees) arising out of or resulting from this Agreement (including enforcement of this Agreement) or any other Loan Document to which such Grantor is a party in accordance with and to the extent set forth in Section 10.3 of the Credit Agreement.  This provision shall

survive the termination of this Agreement and the Credit Agreement and the repayment of the Secured Obligations.

21.    Merger, Amendments; Etc.  THIS AGREEMENT, TOGETHER WITH THE OTHER LOAN DOCUMENTS, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.  No waiver of any provision of this Agreement, and no consent to any departure by any Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No amendment of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Agent and each Grantor to which such amendment applies.

22.    Addresses for Notices.  All notices and other communications provided for hereunder shall be given in the form and manner and delivered to Agent at its address specified in the Credit Agreement, and to any of the Grantors at the notice address specified for Borrowers in the Credit Agreement, or as to any party, at such other address as shall be designated by such party in a written notice to the other party.

23.    Continuing Security Interest: Assignments under Credit Agreement.

(a)    This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until the Secured Obligations have been paid in full in accordance with the provisions of the Credit Agreement and the Commitments have expired or have been terminated, (ii) be binding upon each Grantor, and their respective successors and assigns, and (iii) enure to the benefit of, and be enforceable by, Agent, and its successors, transferees and assigns.  Without limiting the generality of the foregoing clause (iii), any Lender may, in accordance with the provisions of the Credit Agreement, assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Lender herein or otherwise.  Upon payment in full of the Secured Obligations in accordance with the provisions of the Credit Agreement and the expiration or termination of the Commitments, the Guaranty made and the Security Interest granted hereby and any powers of attorney contained herein shall automatically terminate and all rights to the Collateral shall revert to Grantors or any other Person entitled thereto.  At such time, upon Borrowers' request, Agent will authorize the filing of appropriate termination statements or other release documentation to terminate such Security Interest by each Grantor or its designees and Agent shall take, at Grantors' expense, such other actions reasonably requested by any Grantor to terminate or evidence the termination of such Guaranty and Security Interest.  No transfer or renewal, extension, assignment, or termination of this Agreement or of the Credit Agreement, any other Loan Document, or any other instrument or document executed and delivered by any Grantor to Agent nor any additional Loans (including any Additional Portion of the Term Loan) or other loans made by any Lender to any Borrower, nor the taking of further security, nor the retaking or re-delivery of the Collateral to Grantors, or any of them, by Agent, nor any other act of the Lender Group, or any of them, shall release any Grantor from any obligation, except a release or discharge executed in writing by Agent in accordance with the provisions of the Credit Agreement.  Agent shall not by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by Agent and then only to the extent therein set forth.  A waiver by Agent of any right or remedy on any occasion shall not be construed as a bar to the exercise of any such right or remedy which Agent would otherwise have had on any other occasion.

If any member of the Lender Group repays, refunds, restores, or returns in whole or in part, any payment or property (including any proceeds of Collateral) previously paid or transferred to such member of the Lender Group in full or partial satisfaction of any Secured Obligation or on account of any other obligation of any Loan Party under any Loan Document, because the payment, transfer, or the incurrence of the obligation so satisfied is asserted or declared to be void, voidable, or otherwise recoverable under any Debtor Relief Laws or any other laws relating to fraudulent transfers, preferences, or other voidable or recoverable obligations or transfers (each, a "Voidable Transfer"), or because such member of the Lender Group elects to do so on the reasonable advice of its counsel in connection with a claim that the payment, transfer, or incurrence is or may be a Voidable Transfer, then, as to any such Voidable Transfer, or the amount thereof that such member of the Lender Group elects to repay, restore, or return (including pursuant to a settlement of any claim in respect thereof), and as to all reasonable costs, expenses, and legal fees of such member of the Lender Group related thereto, (i) the liability of the Loan Parties with respect to the amount or property paid, refunded, restored, or returned will automatically and immediately be revived, reinstated, and restored and will exist, and (ii) Agent's Liens securing such liability shall be effective, revived, and remain in full force and effect, in each case, as fully as if such Voidable Transfer had never been made. If, prior to any of the foregoing, (A) Agent's Liens shall have been released or terminated, or (B) any provision of this Agreement shall have been terminated or cancelled, Agent's Liens, or such provision of this Agreement, shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligation of any Loan Party in respect of such liability or any Collateral securing such liability.

24.    Survival.  All representations and warranties made by the Grantors in this Agreement and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect as long as the principal of or any accrued interest on any loan or any fee or any other amount payable under the Credit Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.

25.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE PROVISION.

(a)    THE VALIDITY OF THIS AGREEMENT, THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF, THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR RELATED HERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR RELATED HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE PROVINCE OF ONTARIO AND THE FEDERAL LAWS OF CANADA APPLICABLE HEREIN.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED IN THE PROVINCIAL AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE CITY OF TORONTO, PROVINCE OF ONTARIO; PROVIDED, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER

PROPERTY MAY BE FOUND. EACH GRANTOR AND AGENT WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 25(b).

(c)      TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH GRANTOR AND AGENT HEREBY WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "CLAIM"). EACH GRANTOR AND AGENT REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(d)      EACH GRANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE PROVINCIAL AND FEDERAL COURTS LOCATED IN THE CITY OF TORONTO AND THE PROVINCE OF ONTARIO, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(e)      NO CLAIM MAY BE MADE BY ANY GRANTOR AGAINST THE AGENT OR ANY LENDER, OR ANY AFFILIATE, DIRECTOR, OFFICER, EMPLOYEE, COUNSEL, REPRESENTATIVE, AGENT, OR ATTORNEY-IN-FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION HEREWITH, AND EACH GRANTOR HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOUR.

26.      New Subsidiaries. Pursuant to Section 5.11 of the Credit Agreement (and subject to any limitations set forth therein), certain Subsidiaries (whether by acquisition or creation) of any Grantor are required to enter into this Agreement by executing and delivering in favour of Agent a Joinder to this Agreement in substantially the form of Annex 1. Upon the execution and delivery of Annex 1 by any such new Subsidiary, such Subsidiary shall become a Guarantor and/or Grantor hereunder with the same force and effect as if originally named as a Guarantor and/or Grantor herein. The execution and delivery of any instrument adding an additional Guarantor or Grantor as a party to this Agreement shall not require the consent of any Guarantor or Grantor hereunder. The rights and obligations of each Guarantor and Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Guarantor or Grantor hereunder.

27.    <u>Agent</u>.  Each reference herein to any right granted to, benefit conferred upon or power exercisable by the "Agent" shall be a reference to Agent, for the benefit of each member of the Lender Group.

28.    <u>Miscellaneous</u>.

(a)    This Agreement is a Loan Document.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

(b)    Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

(c)    Headings and numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

(d)    Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against any member of the Lender Group or any Grantor, whether under any rule of construction or otherwise.  This Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

(e)    If, for the purposes of enforcing judgment in any court or for any other purpose hereunder or in connection herewith, it is necessary to convert a sum due hereunder in any currency into another currency, such conversion should be carried out to the extent and in the manner provided in the Credit Agreement.

(f)    In the event a Grantor amalgamates with any other corporation or corporations, it is the intention of the parties that the security interest created by this Agreement will (a) extend to all of the property and assets that (i) any of the amalgamating corporations own, or (ii) the amalgamated corporation thereafter acquires, and (b) secure the payment and performance of all of such Grantor's Secured Obligations owing by or otherwise payable by any of the amalgamating corporations and the amalgamated corporation to the Agent and the secured parties in any currency, however or wherever incurred, and whether incurred alone or jointly with another or others and whether as principal, guarantor or surety and whether incurred prior to, at the time of, or subsequent to, the amalgamation. The security interest will attach to the property and assets of the amalgamating corporations not previously subject to this Agreement at the time of amalgamation and to any property or assets thereafter owned or acquired by the amalgamated corporation when same becomes owned or is acquired. Upon any such amalgamation, the defined term Grantor means, collectively, each of the amalgamating corporations and the

amalgamated corporation, the defined term Collateral means all of the property, assets and undertaking and interests described in (a) above, and the defined term Secured Obligations means the obligations described in (b) above.

29. Intercreditor Agreement.  Notwithstanding anything herein to the contrary:

(a) the Liens and security interests granted to the Agent pursuant to this Agreement, and the exercise of any right or remedy by the Agent hereunder, are subject to the provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, (i) as between the Agent, on one hand, and the Grantors, on the other hand, the terms of this Agreement shall govern and control, and (ii) as between the Agent, on one hand, and the ABL Agent, on the other hand, the terms of the Intercreditor Agreement shall govern and control.

(b) Notwithstanding  anything to the contrary in this Agreement, prior to the Discharge of ABL Obligations, any obligation of any Grantor in this Agreement that requires delivery of Collateral constituting ABL Priority Collateral to, possession or control of such Collateral with, the pledge, assignment, endorsement or transfer of such Collateral to or the registration of such Collateral in the name of, the Agent shall be deemed complied with and satisfied if such delivery of such Collateral is made to, such possession or control of such Collateral is with, or such Collateral is pledged, assigned, endorsed or transferred to or registered in the name of the ABL Agent. To the extent that any covenants, representations or warranties set forth in this Agreement are untrue or incorrect solely as a result of the delivery to, or grant of possession or control to, the pledge, assignment, endorsement or transfer or such Collateral to or the registration of such Collateral in the name of, the ABL Agent in accordance with this Section 29, such covenant, representation or warranty shall not be deemed to be untrue or incorrect for purposes of any Loan Document.  Furthermore, *subject to the terms of the* Intercreditor Agreement, at all times prior to the Discharge of ABL Obligations, the Agent is authorized by the parties hereto and the Lender Group to effect transfers of ABL Priority Collateral at any time in its possession (and any "control" or similar agreements with respect to ABL Priority Collateral) to the ABL Agent if and to the extent required under the ABL Loan Documents.

[Signature pages follow]

<u>Exhibit C-1</u>

Form of Compliance Certificate

Please see attached.

## EXHIBIT C-1

## FORM OF COMPLIANCE CERTIFICATE

[on Administrative Borrower's letterhead]

To:    Crystal Financial LLC d/b/a SLR Credit Solutions
Two International Place, 17th Floor
Boston, MA 02110
Attn: Michael Stavrakos

Re:    Compliance Certificate dated _____ __, 20__

Ladies and Gentlemen:

Reference is hereby made to that certain Term Loan Credit Agreement, dated as of November 30, 2022 (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"), by and among BowFlex, Inc. (f/k/a Nautilus, Inc.), a Washington corporation, Nautilus Fitness Canada, Inc., a British Columbia company, and those additional entities that become parties thereto as Borrowers in accordance with the terms thereof by executing the form of Joinder attached thereto as Exhibit J-1 (each, a "Borrower" and individually and collectively, jointly and severally, the "Borrowers"), the lenders identified on the signature pages thereof (each of such lenders, together with its successors and permitted assigns, is referred to hereinafter as a "Lender" and, collectively, the "Lenders"), and Crystal Financial LLC d/b/a SLR Credit Solutions ("SLR"), as agent for each member of the Lender Group (in such capacity, together with its successors and assigns in such capacity "Agent"). Capitalized terms used herein, but not specifically defined herein, shall have the meanings ascribed to them in the Credit Agreement.

Pursuant to Section 5.1 of the Credit Agreement, the undersigned officer of Administrative Borrower hereby certifies as of the date hereof that:

1.    The financial information of Borrowers and their Subsidiaries furnished in Schedule 1 attached hereto has been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for year-end audit adjustments and the lack of footnotes), and fairly presents in all material respects the financial condition of Borrowers and their Subsidiaries as of the date set forth therein.

2.    Such officer has reviewed the terms of the Credit Agreement and has made, or caused to be made under his/her supervision, a review in reasonable detail of the transactions and financial condition of Borrowers and their Subsidiaries during the accounting period covered by the financial statements delivered pursuant to Section 5.1 of the Credit Agreement.

3.    Such review has not disclosed the existence on and as of the date hereof, and the undersigned does not have knowledge of the existence as of the date hereof, of any event or condition that constitutes a Default or Event of Default, except for such conditions or events listed on Schedule 2 attached hereto, in each case specifying the nature and period of existence thereof and what action Borrowers and/or their Subsidiaries have taken, are taking, or propose to take with respect thereto.

4.    [The Loan Parties are in compliance with Section 7(b) of the Credit Agreement. Specifically, measured on a cumulative basis, the Loan Parties have not permitted (i) Actual Cash Receipts for the Cumulative Two-Week Period or the Cumulative Period, as at the end of this week to be less than 90% of the Budgeted Cash Receipts for the corresponding period, or (ii) the Actual Operating Disbursement

Exhibit C-1

Page 1 of 6

Amount for the Cumulative Two-Week Period or the Cumulative Period, as at the end of this week, to exceed 110% of the Budgeted Operating Disbursement Amount for the corresponding period.]

        4.      [The Loan Parties have failed to comply with the following provision of Section 7(b) of the Credit Agreement: _____.]

        5.      Attached as <u>Exhibit A</u> is the Approved Budget Variance Report required by Section 7 of the Credit Agreement, prepared by the Administrative Borrower through the last day of the Prior Week, the Cumulative Two-Week Period and the Cumulative Period noting therein all variances, on a line-item and cumulative basis, from amounts set forth for such period in the Approved Budget, and shall include explanations for all variances in excess of $100,000.

        6.      Attached to this Compliance Certificate are true, complete, and correct copies of (a) each Material Contract entered into since the delivery of the previous Compliance Certificate, and (b) each material amendment or modification of any Material Contract entered into since the delivery of the previous Compliance Certificate.

        7.      Attached to this Compliance Certificate is a written report of all new Patents, Trademarks, Copyrights and industrial designs that are registered or the subject of pending applications for registrations, and of all Intellectual Property Licenses that are material to the conduct of each Loan Party's business, in each case, which were acquired, registered, or for which applications for registration were filed by any Loan Party since the delivery of the previous Compliance Certificate and any statement of use or amendment to allege use with respect to intent-to-use trademark applications.

[Signature page follows.]

Exhibit C-1
Page 2 of 6

**IN WITNESS WHEREOF**, this Compliance Certificate is executed by the undersigned this _____ day of _____, 20___.

**BOWFLEX, INC.**,
a Washington corporation, as Administrative Borrower

By:_____
Name:_____
Title:_____

Exhibit C-1
Page 3 of 6

DB1/ 144790078.3

## **SCHEDULE 1**

**Financial Information**

## **SCHEDULE 2**

**Default or Event of Default**

## EXHIBIT A

**Approved Budget Variance Report**

<u>Exhibit D</u>

Initial Budget

[On file with Debtor's  counsel]

<u>Exhibit D-1</u>

Form of Borrowing Request

Please see attached.

# EXHIBIT D-1

## FORM OF BORROWING REQUEST

[Date]

Crystal Financial LLC d/b/a SLR Credit Solutions
as Administrative Agent
Two International Place, 17th Floor
Boston, MA 0211
Attn: Michael Stavrakos
E-mail: mstavrakos@SLRCreditSolutions.com

Ladies and Gentlemen:

Reference is hereby made to that certain Term Loan Credit Agreement, dated as of November 30, 2022 (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"), by and among BowFlex, Inc. (f/k/a Nautilus, Inc.), a Washington corporation, Nautilus Fitness Canada, Inc., a British Columbia company, and those additional entities that become parties thereto as Borrowers in accordance with the terms thereof by executing the form of Joinder attached thereto as Exhibit J-1 (each, a "Borrower" and individually and collectively, jointly and severally, the "Borrowers"), the lenders identified on the signature pages thereof (each of such lenders, together with its successors and permitted assigns, is referred to hereinafter as a "Lender" and, collectively, the "Lenders"), and Crystal Financial LLC d/b/a SLR Credit Solutions ("SLR"), as agent for each member of the Lender Group (in such capacity, together with its successors and assigns in such capacity "Agent"). Capitalized terms used herein, but not specifically defined herein, shall have the meanings ascribed to them in the Credit Agreement.

1.       Borrowings. Pursuant to Section 2.2 of the Credit Agreement, the Administrative Borrower hereby irrevocably requests the following Borrowing[s] under the Credit Agreement and sets forth below the information relating to such Borrowing[s] (the "Proposed Borrowing") as required by Section 2.2 of the Credit Agreement:

(a)      The Business Day of the Proposed Borrowing is [_____], 20[__].[1]

(b)      The amount of the Proposed Borrowing is $[_____], which is comprised of Revolving Loans.

2.       Certifications with respect to all Borrowings. The Administrative Borrower hereby certifies that (a) the representations and warranties of each Loan Party or its Subsidiaries contained in the Credit Agreement or in the other Loan Documents are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date hereof, as though made on and as of such date (except to the extent that such representations and warranties

---

[1] Each Borrowing Request must be received by the Agent not later than 1:00 p.m. two (2) Business Days in advance of the date of the Proposed Borrowing.

relate solely to an earlier date, in which case such representations and warranties are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date), (b) no Default or Event of Default has occurred and is continuing on the date hereof, nor shall either result from the making of the Proposed Borrowing nor from the application of the proceeds therefrom, (c) the Revolving Loans comprising the Proposed Borrowing are made in accordance with the Approved Budget, (d) (i) the Interim Financing Order has been entered or the Final Financing Order has been entered following the expiration of the Interim Financing Order; (ii) the Interim Financing Order or the Final Financing Order, as applicable, has not been vacated, stayed, reversed, modified, or amended without the Agent's consent and is otherwise in full force and effect; (iii) no motion for reconsideration of the Interim Financing Order or the Final Financing Order, as applicable, has been timely filed by a Debtor, any other Loan Party or any of any of its Subsidiaries; and (iv) no appeal of the Interim Financing Order or the Final Financing Order, as applicable, has been timely filed, (e) after giving effect to the Proposed Borrowing, (i) the Total Revolving Outstandings does not exceed the Revolving Line Cap in effect on the date hereof and (ii) the Total Outstandings (other than any Overadvances or Protective Advances to the extent permitted by the Agent in its sole and absolute discretion) does not exceed the Line Cap in effect on the date hereof, and (f) immediately prior to giving effect to such Proposed Borrowing, the amount of cash, Cash Equivalents, Collections or amounts credited to all DDAs or Securities Accounts of the Domestic Loan Parties and their Domestic Subsidiaries (for the avoidance of doubt, other than the Eligible Cash Account) does not exceed $1,500,000 for all such DDAs and Securities Accounts.

Delivery of an executed counterpart of this Borrowing Request by facsimile or other electronic method of transmission shall be effective as delivery of an original executed counterpart of this Borrowing Request.

[Remainder of Page Intentionally Left Blank; Signature Page Follows.]

IN WITNESS WHEREOF, the Borrower Agent has caused this Borrowing Request to be executed as of the date and year first written above.

**BOWFLEX, INC.**, a Washington corporation


By: _____
Name:
Title:

<u>Exhibit E</u>

Stalking Horse Purchase Agreement

[On file with Debtor's counsel]

<u>Schedule C-1</u>

Please see attached.

**SCHEDULE C-1**

**Commitments**

| Lender | Revolving Commitment |
|---|---|
| Crystal Financial LLC | $9,000,000.00 |
| **TOTAL** | $9,000,000.00 |

Schedule 4.1(c)

Please see attached.

**SCHEDULE 4.1(c)**

**Capitalization of Loan Parties' Subsidiaries**

| Current Legal Entities Owned | Record Owner | Certificate No. | No. Shares/Interest | Percent Pledged |
|---|---|---|---|---|
| Nautilus Fitness Canada, Inc. | BowFlex Inc. | R4 | 65 (common stock) | 100% |
| Nautilus Fitness Canada, Inc. | BowFlex Inc. | 4 | 35 (common stock) | 100% |
| Nautilus (Shanghai) Fitness Equipments Co., Ltd. | BowFlex Inc. | 1 | 1 (Certificate) | 100% |
| Nautilus (Shanghai) Fitness Co., Ltd. | BowFlex Inc. | Unknown | Unknown | 65% |
| Nautilus Fitness International B.V. (f/k/a Octane Fitness International B.V.) | BowFlex Inc. | N/A - register entry | 75,000 | 100% |
| Nautilus Fitness UK, Ltd. (f/k/a Octane Fitness UK Limited) | Nautilus Fitness International B.V. (f/k/a Octane Fitness International B.V.) | 1 | 1 | 100% |
| Nautilus Switzerland AG (f/k/a VAY AG) | BowFlex Inc. | 1 | 1,000,000 | 100% |
| BowFlex Delaware LLC | BowFlex Inc. | N/A | LLC Interests | 100% |
| BowFlex New Jersey LLC | BowFlex Inc. | N/A | LLC Interests | 100% |

<u>Schedule 4.14(a)</u>

Please see attached.

## SCHEDULE 4.14(a)

### Existing Permitted Purchase Money Indebtedness

- Capital Lease Obligations arising under that certain Lease Agreement – 1.00 Purchase Option (Agreement Number 61974) dated September 23, 2021 by and between BowFlex Inc. (f/k/a Nautilus, Inc.) and BFG Corporation (d/b/a Byline Financial Group) in an aggregate amount owed of approximately $320,000 as of the Amendment No. 3 Effective Date.

- Financing lease liabilities existing on the Amendment No. 3 Effective Date with respect to printers, computers and other office equipment in an aggregate amount owed of approximately $144,000 as of the Amendment No. 3 Effective Date.

Schedule 5.1

Please see attached.

## SCHEDULE 5.1

### Financial Statements, Reports, Certificates

Deliver to Agent (and if so requested by Agent, with copies for each Lender) each of the financial statements, reports, or other items set forth below at the following times in form satisfactory to Agent:

| | |
|---|---|
| as soon as available, but in any event on or before 12:00 p.m. Eastern Time on Thursday of each week | (a)  Compliance Certificate attaching an Approved Budget Variance Report. |
| as soon as available, but in any event, within 30 days (45 days in the case of a month that is the end of one of Borrowers' fiscal quarters) after the end of each month during each of Borrowers' fiscal years, | (b) an unaudited consolidated and consolidating balance sheet, income statement, statement of cash flow, and statement of shareholder's equity covering Borrowers' and their Subsidiaries' operations during such period and compared to the prior period and plan, together with a corresponding discussion and analysis of results from management, and<br><br>(c) a Compliance Certificate attaching an Approved Budget Variance Report. |
| as soon as available, but in any event, within 90 days after the end of each of Borrowers' fiscal years, | (d) consolidated and consolidating financial statements of Borrowers and their Subsidiaries for each such fiscal year, audited by independent certified public accountants reasonably acceptable to Agent and certified, without any qualifications (including any qualification or exception as to the scope of such audit), and<br><br>(e) a Compliance Certificate attaching an Approved Budget Variance Report. |
| as soon as available, but in any event, within 30 days prior to the start of each of Borrowers' fiscal years, | (f) copies of Borrowers' Projections, in form and substance (including as to scope and underlying assumptions) satisfactory to Agent, in its Permitted Discretion, for the forthcoming three years, year by year, and for the forthcoming fiscal year, month by month, certified by the chief financial officer or treasurer of Administrative Borrower as being such officer's good faith estimate of the financial performance of Borrowers and their Subsidiaries during the period covered thereby. |
| if and when filed by Administrative Borrower, | (g) Form 10-Q quarterly reports, Form 10-K annual reports, and Form 8-K current reports,<br><br>(h) any other filings made by any Borrower with the SEC, and<br><br>(i)  any other information that is provided by any Borrower to its shareholders generally. |

| | |
|---|---|
| promptly, but in any event within 5 days after any Borrower has knowledge of any event or condition that constitutes a Default or an Event of Default, | (j)  notice of such event or condition and a statement of the curative action that Borrowers propose to take with respect thereto. |
| promptly after the commencement thereof, but in any event within 5 days after the service of process with respect thereto on any Loan Party or any of its Subsidiaries, | (k)  notice of all actions, suits, or proceedings brought by or against any Loan Party or any of its Subsidiaries before any Governmental Authority which reasonably could be expected to result in a Material Adverse Effect. |
| upon the request of Agent, | (l)  any other information reasonably requested relating to the financial condition of any Borrower or its Subsidiaries. |

2

<u>Schedule 5.2</u>

Please see attached.

**SCHEDULE 5.2**

**Collateral Reporting**

Provide Agent (and if so requested by Agent, with copies for each Lender) with each of the documents set forth below at the following times in form satisfactory to Agent:

| Weekly (no later than Wednesday of each week, commencing with the first such day to occur after the Amendment No. 3 Effective Date), | (a) a completed Borrowing Base Certificate (which such Borrowing Base Certificate shall be delivered in accordance with the provisions of Section 5.2 of this Agreement),<br><br>(a) a detailed aging, by total, of each Borrower's Accounts and Credit Card Receivables, together with a reconciliation and supporting documentation for any reconciling items noted,<br><br>(b) (i) a monthly Account roll-forward, in a format acceptable to Agent in its discretion, tied to the beginning and ending account receivable balances of Borrowers' general ledger, and (ii) a monthly Credit Card Receivables roll-forward, in a format acceptable to Agent in its discretion, tied to the beginning and ending account receivable balances of Borrowers' general ledger<br><br>(c) a detailed calculation of those Accounts and Credit Card Receivables that are not eligible for the Borrowing Base,<br><br>(d) (i) notice of all claims, offsets, or disputes asserted by Account Debtors with respect to each Borrower's Accounts, and (ii) notice of all claims, offsets, or disputes asserted by Account Debtors (including Credit Card Issuers and Credit Card Processors) with respect to each Borrower's Credit Card Receivables,<br><br>(e) Inventory system/perpetual reports specifying the cost and the wholesale market value of each Borrower's Inventory, by category, with additional detail showing additions to and deletions therefrom, together with a reconciliation to Borrowers' general ledger,<br><br>(f) a detailed calculation of Inventory categories that are not eligible for the Borrowing Base,<br><br>(g) a summary aging, by vendor, of each Loan Party's accounts payable and any book overdraft and an aging, by vendor, of any held checks, and<br><br>(h) a detailed report regarding each Loan Party's and its Subsidiaries' cash and Cash Equivalents. |

| Monthly (no later than the 30th day of each month), | (i)      a reconciliation of Accounts, Credit Card Receivables, accounts payable, and Inventory of Borrowers' general ledger to its monthly financial statements, including any book reserves related to each category, |
| | (j)      a report regarding each Loan Party's and its Subsidiaries' accrued, but unpaid, ad valorem taxes, |
| | (k)      a Perfection Certificate or a supplement to the Perfection Certificate, and |
| | (l)      a detailed list of each Loan Party's and its Subsidiaries' customers, with address and contact information. |
| promptly but in any event within 2 days after any Loan Party acquires any Margin Stock, | (m)      notice of such acquisition, together with a description of the Margin Stock and a Form U-1 (with sufficient additional originals thereof for each Lender) duly executed and delivered by the Borrowers, together with such other documentation as Agent shall reasonably request, in order to enable Agent and the Lenders to comply with any of the requirements under Regulations T, U or X of the Federal Reserve Board. |
| Upon request by Agent | (n)      copies of purchase orders and invoices for Inventory and Equipment acquired by any Loan Party or its Subsidiaries, |
| | (o)      copies of invoices together with corresponding shipping and delivery documents, and credit memos together with corresponding supporting documentation, with respect to invoices and credit memos in excess of an amount determined in the sole discretion of Agent, from time to time, |
| | (p)      any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification, and |
| | (q)      such other reports as to the Collateral of any Loan Party and its Subsidiaries, as Agent may reasonably request. |
| promptly but in any event within 5 days of any Loan Party gaining knowledge | (r)      the assertion of any claim against IP that would reasonably be expected to have a Material Adverse Effect or otherwise could reasonably be expected to result in a liability of the Loan Parties in excess of $100,000. |

4

| | |
|---|---|
| (a) as soon as practicable but in any event within 1 day in advance of filing with the Court or (b) in the case of any emergency filing if the need for such emergency filing is determined less than 1 day prior to filing, substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee as the case may be | (s)      all other material proposed orders and pleadings related to the Chapter 11 Cases, the Pre-Petition Credit Agreement, this Agreement and the credit facilities contemplated thereby and any Plan of Reorganization and/or any disclosure statement related thereto. |
| substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee as the case may be | (t)      monthly operating reports and all other notices, filings, motions, or pleadings concerning the financial condition of the Loan Parties or their Subsidiaries or the Chapter 11 Cases that may be filed with the Court or delivered to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee. |

5

Schedule 5.21

Milestones

The Debtors and other Loan Parties covenant and agree to satisfy each of the following:

1.      Not later than twenty-four (24) hours after the Petition Date, the Debtors shall have filed a motion or pleading, in each case in form and substance satisfactory to Agent seeking entry of the Interim Financing Order and the Final Financing Order.

2.      Not later than twenty-four (24) hours after the Petition Date, the Debtors shall have filed motion or pleading (the "Sale Motion"), in each case in form and substance satisfactory to Agent, (i) seeking approval of the bidding procedures for the sale of all or substantially all of the Debtors' assets in accordance with section 363 of the Bankruptcy Code (the "Sale"); and (ii) providing that all cash proceeds generated by such Sale(s), less reasonable out of pocket fees, costs and expenses directly arising from, and required to be paid by the Loan Parties in connection with, such Sale(s), including without limitation, reasonable broker's and/or investment banker's fees incurred with respect to the Sale(s), in each case pursuant to a retention agreement in form and substance acceptable to Agent, shall be remitted to Agent for application against, and in permanent reduction of, the Obligations (both Pre-Petition Obligations and Post-Petition Obligations) within one (1) Business Day of the closing of the sale.

3.      Not later than three (3) Business Days after the Petition Date, the Interim Financing Order shall have been entered by the Bankruptcy Court authorizing the secured financing under the Credit Facility on the terms and conditions contemplated by this Agreement and otherwise on terms acceptable to Agent and Lenders, and, inter alia, modifying the automatic stay, authorizing and granting the super-priority security interests and liens described herein and in the other Loan Documents, and granting a super-priority administrative expense claim to Agent and Lenders with respect to all obligations to Agent and Lenders (including the Obligations and including that the Pre-Petition Term Loan is determined to be a Post-Petition Obligation), subject to no priority claim or administrative expenses of the Chapter 11 Cases (but subject to the Carve Out Expenses).

4.      Not later than ten (10) days after the Petition Date, the Debtors shall have filed a motion requesting the entry of an order to be entered not later than thirty (30) days after the Petition Date, extending the Debtors' non-residential real property lease assumption/rejection period such that the Debtors' non-residential real property lease assumption/rejection period shall be 210 days from the Petition Date (the "Lease Assumption/Rejection Period").

5.      Not later than fifteen (15) days after the Petition Date, the Debtors shall obtain the entry of an order of the Bankruptcy Court, in form and substance satisfactory to Agent, approving bid procedures, including, without limitation, an acceptable form of asset purchase agreement to be used for the Sale (the "Bid Procedures Order").

6.      Not later than thirty (30) days after the Petition Date, the Final Financing Order shall have been entered by the Bankruptcy Court.

7.      Not later than thirty (30) days after the Petition Date, the Debtors shall have obtained an order of the Bankruptcy Court extending the Debtors' Lease Assumption/Rejection Period such that the Debtors' Lease Assumption/Rejection Period shall be 210 days from the Petition Date.

8.      Not later thirty-five (35) days after the Petition Date, the Debtors shall conduct an auction (the "<u>Auction</u>") in accordance with the Bid Procedures Order to select the highest and best bid(s) for the sale of all or substantially all of the Debtors' assets in accordance with the Bid Procedures Order, which bid shall provide for, among other things, a minimum cash amount not less than the amount required to satisfy the Obligations owed to Agent and Lenders in full in cash, and copies of which shall be provided to Agent.

9.      Not later than forty-two (42) days after the Petition Date, an order, in form and substance satisfactory to Agent, shall have been entered by the Bankruptcy Court approving the Sale(s) (the "<u>Sale Order</u>").

10.     Not later than forty-nine (49) days after the Petition Date, the closing of the Bankruptcy Court-approved Sale(s) shall have occurred.

11.     Not later than forty-nine (49)  days after the Petition Date, the Obligations shall have been paid in full.

The Debtors confirm, acknowledge and agree that notwithstanding anything to the contrary contained in the Agreement, any failure to comply with the requirements set forth in this <u>Schedule 5.21</u> shall constitute an additional immediate Event of Default.

**Bowflex, Inc. (et. al.)**
*DIP Budget*

| USD$000's | Week 1 Forecast[1] | Week 2 Forecast | Week 3 Forecast | Week 4 Forecast | Week 5 Forecast | Week 6 Forecast | Week 7 Forecast | 7 Week Total |
|---|---|---|---|---|---|---|---|---|
| Week ending | 8-Mar-24 | 15-Mar-24 | 22-Mar-24 | 29-Mar-24 | 5-Apr-24 | 12-Apr-24 | 19-Apr-24 | |
| **Total Receipts** | $ 1,322 | $ 1,426 | $ 1,744 | $ 1,953 | $ 1,561 | $ 1,191 | $ 1,325 | $ 10,523 |
| **Disbursements** | | | | | | | | |
| Payroll & Benefits | (1,361) | (450) | (1,400) | - | (1,400) | (450) | (1,400) | (6,461) |
| Freight | (412) | (421) | (266) | (266) | (255) | (269) | (234) | (2,124) |
| Contract Labor | (42) | (94) | (109) | (72) | (51) | (102) | (51) | (520) |
| Tax and Government Agencies | (65) | - | (479) | - | - | - | - | (544) |
| US Customs | - | (149) | (55) | - | - | (500) | - | (704) |
| Software License | (78) | (328) | (50) | (190) | - | (47) | - | (693) |
| Rent | (364) | (2) | (2) | (0) | (539) | - | - | (906) |
| Other Disbursements | (354) | (1,325) | (29) | (1,386) | (543) | (2,070) | (58) | (5,763) |
| **Total Operating Disbursements** | $ (2,674) | $ (2,620) | $ (2,484) | $ (1,969) | $ (2,788) | $ (3,438) | $ (1,743) | $ (17,715) |
| **Operating Cash Flow** | $ (1,352) | $ (1,193) | $ (740) | $ (16) | $ (1,227) | $ (2,246) | $ (418) | $ (7,192) |
| **Non-Operating Disbursements** | | | | | | | | |
| Interest, Amort and Fees | (937) | - | - | - | (199) | - | - | (1,137) |
| Restructuring and Other Advisory | (27) | - | - | - | - | - | - | (27) |
| Utilities Deposit Funding | (19) | - | - | - | - | - | - | (19) |
| **Total Non-Operating Disbursements** | $ (983) | $ - | $ - | $ - | $ (199) | $ - | $ - | $ (1,182) |
| **Total Disbursements** | $ (3,657) | $ (2,620) | $ (2,484) | $ (1,969) | $ (2,987) | $ (3,438) | $ (1,743) | $ (18,897) |
| **Net Cash Flow** | $ (2,335) | $ (1,193) | $ (740) | $ (16) | $ (1,426) | $ (2,246) | $ (418) | $ (8,375) |
| **Beginning US Cash** | $ 6,792 | $ 2,682 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | 6,792 |
| (+/−) Net Cash Flow | (2,335) | (1,193) | (740) | (16) | (1,426) | (2,246) | (418) | (8,375) |
| (−) Revolver Cash Receipt Sweep | - | - | - | - | - | (418) | (1,325) | (1,743) |
| (+/−) DIP Revolver Draw / Repay | - | - | - | - | 418 | 2,664 | 1,743 | 4,825 |
| (+/−) TL DIP Draw / Repay | (15,999) | - | - | - | - | - | - | (15,999) |
| (+/−) DIP TL Draw / Repay | 15,999 | - | - | - | - | - | - | 15,999 |
| (+/−) Eligible Cash Account Funding | (1,775) | (1,426) | (1,744) | (1,953) | (1,561) | - | - | (8,459) |
| (+/−) Eligible Cash Account Draw | - | 1,437 | 2,484 | 1,969 | 2,569 | - | - | 8,459 |
| **Ending US Cash** | $ 2,682 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 |
| Restricted Cash[2] | 5,120 | 5,120 | 5,120 | 5,120 | 5,120 | 5,120 | 5,120 | 5,120 |
| Restricted Cash (Eligible Cash Account) | 1,775 | 1,764 | 1,024 | 1,008 | - | - | - | - |
| **Total Ending US Cash (incl. Restricted Cash)** | $ 9,577 | $ 8,384 | $ 7,644 | $ 7,628 | $ 6,620 | $ 6,620 | $ 6,620 | $ 6,620 |
| Ending US Cash | $ 2,682 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 |
| (+/−) Loan Availability | 6,992 | 6,277 | 4,620 | 3,425 | 4,088 | 1,624 | 1,036 | 1,036 |
| **US Liquidity** | $ 9,675 | $ 7,777 | $ 6,120 | $ 4,925 | $ 5,588 | $ 3,124 | $ 2,536 | $ 2,536 |
| Beginning DIP Revolver Balance | $ - | $ - | $ - | $ - | $ - | 418 | 2,664 | - |
| (−) DIP Revolver Cash Receipt Sweep | - | - | - | - | - | (418) | (1,325) | (1,743) |
| (+/−) DIP Revolver Draw / Repay | - | - | - | - | 418 | 2,664 | 1,743 | 4,825 |
| **Ending DIP Revolver Balance** | $ - | $ - | $ - | $ - | 418 | 2,664 | 3,082 | 3,082 |
| Beginning Pre-Petition / DIP TL Balance | $ - | 15,999 | 15,999 | 15,999 | 15,999 | 15,999 | 15,999 | - |
| (+/−) Pre-Petition Draw / Repay | (15,999) | - | - | - | - | - | - | (15,999) |
| (+) TL DIP Funding | 15,999 | - | - | - | - | - | - | 15,999 |
| **Ending Pre-Petition / DIP TL Balance** | $ 15,999 | 15,999 | 15,999 | 15,999 | 15,999 | 15,999 | 15,999 | 15,999 |

Notes:
1. Beginning cash balance in Week 1 reperesents forecasted amount.
2. Restricted cash includes utilities adequate assurance deposit and collateralized cash pledged to other institutions on behalf of customs and merchant services.