**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**KELLEY DRYE & WARREN LLP**
James S. Carr, Esq.
Eric R. Wilson, Esq. (*pro hac vice* pending)
Maeghan J. McLoughlin, Esq. (*pro hac vice* pending)
Connie Y. Choe, Esq.
One Jefferson Road, 2nd Floor
Parsippany, NJ 07054
Tel: (973) 503-5900
Fax: (973) 503-5950
Email: jcarr@kelleydrye.com
ewilson@kelleydrye.com
mmcloughlin@kelleydrye.com
cchoe@kelleydrye.com

*Proposed Counsel to the Official Committee*
*of Unsecured Creditors*

---

| | |
|---|---|
| In re: | Chapter 11 |
| BOWFLEX INC., *et al.*, | Case No. 24-12364 (ABA) |
| Debtors.[1] | (Jointly Administered) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS TO DEBTORS' DIP FINANCING MOTION**

The Official Committee of Unsecured Creditors (the "Committee") of BowFlex Inc., *et al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its proposed undersigned counsel, hereby files this objection (the "Objection") to the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative*

---

[1] The Debtors in these chapter 11 cases are BowFlex Inc. and BowFlex New Jersey LLC.

*Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c), and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing the Debtors to Enter into Agreements with Crystal Financial LLC d/b/a SLR Credit Solutions; (D) Authorizing Debtors to Use Cash Collateral; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "<u>Motion</u>").[2]  In support of this Objection, the Committee respectfully states as follows:

## **<u>PRELIMINARY STATEMENT</u>**

1. The Committee is focused on facilitating an efficient, competitive sale process and implementing a prompt wind-down of these estates to maximize and preserve value. With a $37.5 million stalking horse bid in hand and only $16 million of prepetition secured debt, unsecured creditors owed at least $60 million are the fulcrum creditors.  Every dollar saved in this case is a dollar available to pay unsecured creditors.  Accordingly, the Committee fully appreciates the need to balance the goal of maximizing sale value with the costs of an extended stay in chapter 11.

2. While the Committee supports a DIP facility that will allow the Debtors to run a competitive sale process, the financing must be rationalized.  The proposed DIP Facility unnecessarily truncates the Committee's investigation period by more than 30 days to coincide with the April 15 sale hearing.  Notably, there is no need for a rushed investigation here because the stalking horse bid will satisfy SLR's debt in full.  Moreover, SLR does not intend to credit bid and, therefore, does not need its liens and claims validated to close the sale.  As such, there is no need or benefit to accelerate the investigation period in this case.

---

[2] Docket No. 37.  Unless otherwise indicated, capitalized terms not defined herein have the meanings ascribed in the Motion.

3. The DIP Facility also improperly limits the Committee's investigation budget to $25,000. Stakeholders and courts rely on the creditors' committee to investigate a debtor's prepetition secured debt before any claims, causes of action or challenges are released. The aggregate effect of the DIP Facility's temporal and monetary restrictions is to limit the Committee's ability to fulfill its statutory obligations and safeguard the interests of unsecured creditors.

4. Under the DIP Facility, all $16 million of SLR's prepetition debt has been rolled up and encumbers previously unencumbered assets that could provide a source of value for unsecured creditors. SLR's interests are already fully protected in this case as the stalking horse bid exceeds the amount of the prepetition secured debt and new money financing. The doctrine of marshaling should be preserved as there is no burden to requiring SLR to look first to prepetition collateral before looking to previously unencumbered collateral to satisfy its outstanding debt.

5. The Committee has been in active discussions with the Debtors and SLR's counsel regarding these limited issues. While the parties were unable to agree to a workable resolution before the objection deadline, the Committee is hopeful that the parties can negotiate a fair and reasonable DIP Facility prior to the hearing on the Motion.

## BACKGROUND

**I.    General Background**

6. On March 4, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court. Since the Petition Date, the Debtors have remained in possession of their assets and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. On March 15, 2024, the Office of the United States Trustee for Regions 3 and 9 appointed a three-member Committee consisting of: (i) Zhejiang Arcana Power Sports Tech. CO. Ltd.; (ii) Cerence Operating Company; and (iii) Core Health and Fitness, LLC.[3]

8. On March 19, 2024, the Committee selected Kelley Drye & Warren LLP as counsel. On March 21, 2024, the Committee selected Province LLC as financial advisor.

9. As of the Petition Date, the Debtors had approximately $16 million in outstanding secured debt (the "Prepetition Obligations") pursuant to the Term Loan Credit Agreement, dated November 30, 2022, with Crystal Financial LLC d/b/a SLR Credit Solutions ("SLR"), as administrative and collateral agent.[4] The Prepetition Obligations are purportedly secured by a first priority lien on substantially all assets of the Debtors and certain non-Debtor affiliates.[5]

10. The Debtors were founded in 1986 with a single strength training machine and grew over the years to become a household name in the health and fitness industry.[6] Over the past 30 years, the business waned in the face of increased market competition and advanced technology for home fitness products.

11. Like many other "at home" fitness companies, the Debtors experienced a short-term spike in sales as a result of the Covid-19 pandemic. However, as consumer preferences normalized post-pandemic, sales reverted to pre-pandemic levels. The Debtors, who

---

[3] Docket No. 116.

[4] *See Declaration of Aina Konold in Support of Chapter 11 Petitions and First Day Pleadings* (the "Konold Declaration") Docket no. 44, ¶¶ 20-22.

[5] *Id*. at ¶ 21.

[6] *Id.* at ¶ 7.

4

had ordered excessive amounts of inventory at above-market prices to meet demand, were left with an inventory glut and reduced revenue.[7]

12. In the summer of 2021, the Debtors hired Evercore Group, LLC ("Evercore") to explore strategic partners or additional sources of capital in an out-of-court transaction. While Evercore continued working on an out-of-court transaction, in January 2023, the Debtors retained FTI Consulting, Inc., as financial advisor. After a transaction fell apart at the end of 2023, the Debtors retained FTI Capital Advisors, LLC ("FTICA") as investment banker for an in-court sale process.[8]

13. Following FTICA's marketing process, the Debtors entered into an asset purchase agreement (the "Stalking Horse Bid") with Johnson Health Tech Retail, Inc. The Stalking Horse Bid includes a $37.5 million purchase price, subject to adjustment, assumption of liabilities, and the payment of cure costs.[9] The Stalking Horse Bid is subject to higher and better offers, with bids due April 5 and a sale hearing on April 15.[10]

## II. The DIP Facility

14. To fund the sale process, SLR is providing a DIP facility (the "DIP Facility"). While nominally $25 million, the DIP Facility includes a roll-up of the $16 million in Prepetition Obligations and up to $9 million in new money, subject to availability blocks that

---

[7] *Id.* at ¶¶ 7, 30.

[8] *Id.* at ¶¶ 28, 35.

[9] *See* Stalking Horse Agreement, Exh. B to Docket No. 35.

[10] *See Amended Order (I) Approving the Auction and Bidding Procedures, (II) Approving the Debtors' Entry Into the Stalking Horse Agreement and Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof and (V) Granting Related Relief.* Docket No. 131.

reduce access to the new money. On March 6, the Court entered an order approving the DIP Facility on an interim basis (the "Interim DIP Order").[11]

15. In exchange for providing the DIP Facility:

- SLR negotiated a truncated investigation period that provides the Committee until April 15, less than 30 days from the Committee's selection of its advisors, to complete its investigation, draft a complaint, and file a motion for standing;

- SLR will receive broad releases by the Debtors that include all conduct related to the Debtors;[12]

- the Committee's investigation budget is limited to $25,000;[13]

- The allocation under the budget for the Committee's professionals will be limited to $460,000, which is 16% of the $2.8 million allocated for the Debtors' counsel, financial advisors and investment bankers (excluding the investment bankers' success fee);

- SLR will receive first priority liens and superpriority claims on previously unencumbered property for the entire amount of the DIP Facility, including the roll-up, which includes not only prepetition unencumbered assets but also the proceeds of avoidance actions;[14]

- the estates will waive the equitable remedy of marshaling;[15] and

- the estates will be subject to case milestones, including an April 8 auction, April 15 entry of sale order, and April 22 close of sale.[16]

---

[11] Docket No. 61.

[12] *Id.* at § 4.9.

[13] *Id*. at § 2.5.2.

[14] *See* Interim DIP Order § 5.22(b).

[15] *Id.* at § 5.9.

**OBJECTION**

16. To obtain postpetition financing under section 364(d) of the Bankruptcy Code, a debtor must prove: (i) it is unable to obtain unsecured credit; (ii) the proposed credit is necessary to preserve the assets of the estate; and (iii) the terms of the financing are fair, reasonable and adequate.[17] Financing provisions that "tilt the conduct of the bankruptcy case" or "prejudice, at the early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors" are disfavored.[18] Moreover, the Debtors must demonstrate that the proposed DIP Facility is "in the best interest of creditors generally."[19]

17. Without appropriate modifications to remedy the issues discussed below, the DIP Facility does not satisfy these standards, and the Motion should be denied.

A. **The DIP Facility Inappropriately Limits the Committee's Rights**

   (i) **The Committee's Challenge Rights are Inappropriately Limited**

18. SLR seeks to truncate the Committee's challenge period by more than 30 days. Such request not only contravenes this Court's General Order Adopting Guidelines for Financing Requests (the "General Order"), but is wholly unnecessary given the procedural posture and economics of this case. This is a sale case with a committed stalking horse bid in an amount that significantly exceeds SLR's maximum exposure under the DIP Facility. Under

---

[16] *Id.* at Exh. A, Schedule 5.21.

[17] *In re Ames Dept. Stores, Inc.,* 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).

[18] *Id.*; *accord In re Laffite's Harbor Dev. I, LP*, Case No. 17-36191, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018) (Brown, J.) (stating that "bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender").

[19] *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (citing *In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983)); *see also Tenney Village*, 104 B.R. at 569 ("The Debtor's pervading obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries").

7

these circumstances, neither the Debtors nor SLR have articulated any valid justification to limit the Committee's investigation.

19. On the other hand, the Committee has a fiduciary duty to investigate, *inter alia*, the Debtors, their assets, liabilities and financial affairs, including the amount of the Prepetition Obligations and the validity and extent of the liens securing them.[20] In this jurisdiction, the Committee is presumed to have at least 60 days from the entry of the order approving the appointment of counsel to the Committee to investigate and, if appropriate, bring proceedings.[21] That deadline is no earlier than May 18, 2024.[22]

20. The Motion provides no justification to shorten the 60-day period set forth in the General Order, nor can the Debtors and SLR provide one. The $37.5 million Stalking Horse Bid substantially exceeds the $25 million DIP Facility, including the $16 million roll-up of the Prepetition Obligations. That alone provides SLR with sufficient assurance that it will be repaid in full.

21. Importantly, the Debtors are not required to file their schedules of assets until April 8. This will leave the Committee with only five business days to review the schedules and assess the value of potentially unencumbered property in advance of the proposed challenge deadline.

---

[20] *See* 11 U.S.C. § 1103(c)(2).

[21] *See* General Order Adopting Guidelines for Financing Requests, at § II.A.3(a) ("(a) The Official Committee of Unsecured Creditors (the "Committee"), appointed under § 1102 of the Bankruptcy Code, has a minimum of 60 days (or such longer period as the Committee may obtain for cause shown before the expiration of such period) from the date of the order approving the appointment of counsel to the Committee to investigate the facts and bring any appropriate proceedings as representative of the estate").

[22] On March 19, 2024, the Committee selected Kelley Drye & Warren LLP as counsel. May 18, 2024 is 60 days out from this selection. However, the General Order provides that the challenge period must run from the "date of the order approving the appointment of counsel", not the "date of selection," or an even longer period "for cause shown."

8

22. The Committee is committed to quickly complete its investigation of SLR and the Prepetition Obligations. To the extent the investigation reveals that there are no actionable claims with respect to SLR, the Committee will agree to terminate the challenge period early. However, the Committee, representing unsecured creditors owed at least $60 million, should not be prejudiced through the imposition of an artificial and unnecessary deadline.

23. The Committee's challenge period should be no earlier than May 18, subject to the right to seek an extension. The Committee expects SLR will seek an immediate pay down of the DIP Facility from the sale proceeds upon the sale closing. The Committee reserves the right to argue that all sale proceeds should be escrowed until at least the conclusion of the Committee's investigation in connection with the approval of the sale. In the meantime, the final order approving the DIP Facility (the "Final DIP Order") should provide the Committee with the right to claw back any amounts paid to SLR in the event of a successful challenge.

**(ii)    The Committee's Budget is Inappropriate**

24. The Interim DIP Order provides the Committee only $25,000 to investigate the prepetition liens and claims of SLR. This amount is insufficient and should be increased to $75,000.

25. Similarly, the Committee professionals are allocated only $460,000, which is approximately 16% of the $2.8 million allocated for the Debtors' legal advisors, financial advisors, and investment bankers (excluding the success fee payable to the investment bankers).

Not only does this allocation ensure the disparate treatment of similarly situated creditors, it prevents the Committee from fulfilling its statutory duties to the unsecured creditors.[23]

26. Since being retained, the Committee's counsel has (a) analyzed (i) the first day motions; (ii) the current DIP financing request; (iii) the bid procedures and sale process, and (b) engaged in discussions with counsel to the Debtors, SLR, and the Committee members. Under the current schedule, by April 15, the Committee will need to: (i) analyze the Stalking Horse Bid, competing bids, and sale order; (ii) investigate, and potentially challenge, the liens and claims of SLR; (iii) analyze the assets and liabilities of the Debtors; and (iv) assess and negotiate an appropriate wind-down of the estates following the sale closing.

27. The Committee professionals need an appropriate budget to accomplish these tasks. To the extent the parties cannot reach consensus on the budget, the Committee requests that this Court disregard the existing professional budget allocation and require all estate-retained professionals to share pro rata in the amount designated to pay such professionals.

B. **Liens on Previously Unencumbered Assets and Marshaling**

28. In connection with the DIP Facility, SLR seeks (i) new liens on all of the Debtors assets, including for the $16 million roll-up of the Prepetition Obligations; and (ii) the estates' waiver of the doctrine of marshaling. In other cases this Committee might seek to challenge the roll-up. However, given the economics of this case, the Committee instead requests that the Court deny the waiver of marshaling.

---

[23] *See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (unsecured creditors' committees have a fiduciary duty to maximize unsecured creditor recoveries for the debtor's estate); *Value Prop. Trust v. Zim Co. (In re Mortg. & Realty Trust)*, 212 B.R. 649, 653 (Bankr. C.D. Cal. 1997) (noting that the committee has many functions . . . "it investigates, it appears, it negotiates, it may litigate, and it is at all times intimately involved in the reorganization").

29. The right to invoke the doctrine of marshaling against SLR should be preserved.[24] Marshaling requires a secured creditor to first seek recovery from assets against which other creditors do not have a claim before looking to common assets.[25] It "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security."[26] It is well settled that bankruptcy courts can marshal a debtor's assets to effectuate an equitable distribution to creditors.[27]

30. Where, as here, the Stalking Horse Bid exceeds the $25 million DIP Facility, SLR has no need to resort to previously unencumbered assets as a source of recovery. While unsecured creditors should receive a recovery in this case given the numbers put forward by the Debtors, there are at least $60 million in general unsecured claims and it is not certain how much of the purchase price will be left to distribute. As a result, previously unencumbered assets may provide a meaningful source of recovery. Conversely, there is minimal burden to SLR by requiring it to first look to prepetition collateral to satisfy pre-petition secured debt.

C. **Additional Objectionable Provisions**

31. In addition, the following provisions of the DIP Facililty and Final DIP Order are objectionable for the reasons stated below:

---

[24] *See In re America's Hobby Center, Inc.*, 223 B.R. 275 (Bankr. S.D.N.Y. 1998) (creditors' committee permitted to seek to assert marshaling defense against secured creditor on behalf of the debtor's estate).

[25] *In re Advanced Marketing Servs., Inc.*, 360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007) ("[Marshaling] requires the senior secured creditor to first collect its debt against the collateral other than that in which the junior secured creditor holds an interest, thereby leaving that collateral for the junior secured creditor's benefit.") (citation omitted); *see also In re Tampa Chain Co.*, 53 B.R. 772, 777 (Bankr. S.D.N.Y. 1985) (*citing* 2 J. Story, *Commentaries on Equity* Jurisprudence 230 (1884)); *Cannon v. Hudson*, 5 Del Ch. 112, 116 (Del. Ch. 1876).

[26] *See Meyer v. United States*, 375 U.S. 233, 236 (1963).

[27] *See Tampa Chain Co.*, 53 B.R. at 777.

- <u>Releases</u>: The releases are overbroad because they extend to any event "with respect to the Debtors" and are not subject to the Committee's challenge rights.[28] As drafted, the releases would be approved upon entry of the final DIP order, which effectively guts the challenge provisions in Section 4.1 of the final DIP Order. If approved, the releases should be limited to SLR solely in its capacity as prepetition lender in connection with the prepetition loans.

- <u>DIP Fees/Interest</u>: The Committee engaged a financial advisor shortly before the filing of this Objection and, therefore, reserves all rights to object to the DIP fees and interest following an analysis.

- <u>DIP Milestones</u>: The Committee is still analyzing the sale process. While the Committee is not currently seeking to extend the sale deadline, the Committee reserves its right to do so. The DIP Facility should not serve as a barrier to this Court extending the sale timeline if it determines it is necessary upon motion by the Committee or any other party in interest.

- <u>Adequate Protection Liens/Superpriority Claims</u>: Must be limited to a *proven* diminution in value of SLR's collateral.

- <u>Non-Consensual Cash Collateral Use</u>: Sections 3.5 and 4.6 of the Final DIP Order waive the Debtors' ability to seek to use cash collateral other than as expressly provided for in the Final DIP Order, irrespective of whether an event of default has occurred. These provisions must be revised to, at a minimum, allow the Debtors to consummate the sale if no default has occurred, or provide the Committee with the ability to seek the non-consensual use of cash collateral.

- <u>Committee Notices</u>: The Final DIP Order must require the Debtors to provide the Committee with simultaneous copies of all financial reports, forecasts, budget to actuals, variance reports, and all other documents delivered to SLR.

---

[28] *See* Interim DIP Order at § 4.9.1.

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court (i) deny the Motion unless the DIP Facility and Final DIP Order are modified as set forth herein; and (ii) grant such other and further relief as the Court deems just and proper.

Dated: March 25, 2024

                                          */s/          James S. Carr*
James S. Carr, Esq.
Eric R. Wilson, Esq. (*pro hac vice* pending)
Maeghan J. McLoughlin, Esq. (*pro hac vice* pending)
Connie Y. Choe, Esq.
**KELLEY DRYE & WARREN LLP**
One Jefferson Road, 2nd Floor
Parsippany, NJ 07054
Tel: (973) 503-5900
Fax: (973) 503-5950
Email: jcarr@kelleydrye.com
        ewilson@kelleydrye.com
        mmcloughlin@kelleydrye.com
        cchoe@kelleydrye.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*