## Exhibit C

**FTI Engagement Letters**

PRIVATE & CONFIDENTIAL

December 20, 2023

Matthew Clemente
Sidley Austin LLP
1 S Dearborn St
Chicago, IL 60603

Re: Services as Company Financial Advisor

Dear Mr. Clemente:

1.    **Introduction**

This letter confirms that we, FTI Consulting, Inc. ("FTI"), have been retained by you, Sidley Austin LLP (the "Firm"), to provide certain financial advisory and consulting services (the "Services") set forth below in relation to your representation of Bowflex, Inc. (collectively, with its direct and indirect subsidiaries and affiliates, the "Company").  This letter of engagement (the "Engagement") and the related Standard Terms and Conditions constitute the engagement contract (the "Engagement Contract") pursuant to which the Services will be provided.

2.    **Scope of Services**

The Services, to be performed at your direction, are expected to include the following:

**Restructuring Services**
- Advise the Company on evaluating strategic alternatives, including but not limited to, financial advisory services associated with a potential Chapter 11 bankruptcy filing
- Manage diligence flow and communication with the Company's lenders and their advisors
- Support the Company and counsel in restructuring negotiations and communications with the Company's lenders and other stakeholders

**Cash Flow and Debtor in Possession ("DIP") Forecast**
- Evaluate existing liquidity forecast and methodology, as well as historical activity to determine major drivers of liquidity and cash flow
- Assist in refining the Company's 13-week cash flow forecast, if needed, and prepare cash flow budget to actual variance analysis
- If needed, develop a DIP forecast and support the Company in presenting the forecast and handling inquiries related to the forecast with internal and external stakeholders
- Assist the Company in managing, tracking, and reporting DIP forecast post Chapter 11 filing
- Identify cash flow enhancement opportunities, working capital efficiency, and cash conservation strategies and implement them as practical
- Understand and drive strategic initiatives implemented or identified by management to improve liquidity

BowFlex Inc.
December 20, 2023

## Transaction and Bankruptcy Strategy and Implementation
- In working with the Company and the Company's investment banker, advise on transaction strategies and associated implications
- Assist in developing and negotiating debtor-in-possession financing, restructuring support agreement, and preliminary plan of reorganization, and implications

## Chapter 11 Support
- Assist the Firm, on behalf of the Company, in connection with the preparation of documents and/or live testimony with respect to, and assisting the Company in connection with, any chapter 11 filing under title 11 of the U.S. Code (the "Bankruptcy Code") or any foreign insolvency regime. Such preparation and assistance will include:
  - Work with senior management to determine what areas of the business will be assisting in providing critical information;
  - Work closely and discretely with the designated parties to ensure that accurate and timely data is used in the filing documents;
  - Assist the Firm and the Company in the preparation of all required first day motions and petitions;
  - In the event the Company commences in-court chapter 11 cases, assist the Company and the Firm in the preparation of any required financial disclosures including, but not limited to, the preparation of schedules of assets and liabilities, statement of financial affairs, monthly operating reports or any other similar period reports, and any necessary or required financial disclosures in connection with any disclosure statement and/or chapter 11 plan;
  - Assist with other filings and analysis as requested by the Company or the Firm throughout the course of the case;
  - Assist the Company and the Firm in preparation of plan and disclosure statement documents and supporting materials;
  - Provide assistance in connection with any KEIP or KERP programs;
  - Provide testimony and other litigation support as the circumstances warrant;
- Attend meetings, presentations and negotiations as may be requested by the Company and the Firm;
- In the event that a bankruptcy filing is not made, assist the Company as requested in support of completing an out-of-court restructuring; and
- Other services as may be reasonably requested by the Company and the Firm, and are customary in this type of engagement.

All Services are to include the necessary communication to and engagement with the Company, the Firm, the Company's other advisors, and all other appropriate stakeholders.

The Services may be performed by FTI or by any subsidiary of FTI, as FTI shall determine. FTI may also provide Services through its or its subsidiaries' agents or independent contractors. References herein to FTI and its employees shall be deemed to apply also, unless the context shall otherwise indicate, to employees of each such subsidiary and to any such agents or independent contractors and their employees. Any such subsidiary, agent or independent contractor shall be bound by the confidentiality provisions of this Agreement.

The Services, as outlined above, are subject to change as mutually agreed between us.

BowFlex Inc.
December 20, 2023

FTI is engaged by you to provide financial advisory and consulting services only. Accordingly, while we may from time to time suggest options which may be available to you or the Company, and further give our professional evaluation of these options, the ultimate decision as to which, if any, of these options to implement rests with the Company, its management and board of directors. FTI and its employees will not make any management decisions for the Company and will not be responsible for communicating information concerning the Company to the public, the Company's shareholders or others.

As part of the Services, FTI may be requested to assist you or the Company (and its legal or other advisors) in negotiating with the Company's creditors and equity holders and with other interested parties. In the event that we participate in such negotiations, the representations made and the positions advanced will be those of the Company and its management, not FTI or its employees.

If cases under the Bankruptcy Code are commenced and our retention is approved, our role will include serving as principal bankruptcy financial advisors to the debtors and debtors in possession in those cases under a general retainer, subject to court approval.  Our role also will encompass all out-of-court planning and negotiations attendant to these tasks.

The services we will provide in connection with the Engagement will encompass all services normally and reasonably associated with this type of engagement that we are requested and are able to provide and that are consistent with our ethical obligations.  With respect to all matters of our Engagement, we will coordinate closely with the Company as to the nature of the services that we will render and the scope of our engagement.

As usual, our Engagement is to represent the Company and not its individual directors, officers, employees or shareholders.  However, we anticipate that in the course of that Engagement, we may provide information or advice to directors, officers or employees in their corporate capacities.

3.  **Privileged and Confidential Work Product**

To the extent possible, written reports, memoranda or status summaries that we prepare under this Engagement Contract will be maintained in accordance with our retention procedures and shall be prominently labeled "Privileged and Confidential". Except as may be required by law, regulation or valid judicial or administrative process, we will not disclose to anyone, without your permission, the content of any oral or written confidential communication received during the course of the Engagement or any information gained from the inspection or review of any records or documents provided by you that are identified as confidential.

4.  **Fees and Cash on Account**

Fees in connection with this Engagement will be based upon the time incurred providing the Services, multiplied by our standard hourly rates, summarized as follows:

**United States**

|  | Per Hour (USD) |
|---|---|
| Senior Managing Directors | $1,095 – 1,495 |
| Directors / Senior Directors / Managing Directors | 825 – 1,110 |
| Consultants/Senior Consultants | 450 – 790 |
| Administrative / Paraprofessionals | 185 – 370 |

BowFlex Inc.
December 20, 2023

Hourly rates are generally revised periodically. To the extent this engagement requires services of our International divisions or personnel, the time will be multiplied by our standard hourly rates applicable on International engagements. Note that we do not provide any assurance regarding the outcome of our work and our fees will not be contingent on the results of such work.

In addition to the fees outlined above, FTI will bill for reasonable allocated and direct expenses which are likely to be incurred on your behalf during this Engagement.  Allocated expenses include the cost of items which are not billed directly to the engagement, including administrative support and other overhead expenses that are not billed through as direct reimbursable expenses, and are calculated at 6.0% of FTI's standard professional rates.  Direct expenses include reasonable and customary out-of-pocket expenses which are billed directly to the engagement such as certain telephone, overnight mail, messenger, travel, meals, accommodations and other expenses specifically related to the engagement.  Further, if FTI and/or any of its employees are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to this matter, FTI will be compensated by you at its regular hourly rates and reimbursed for reasonable allocated and direct expenses (including counsel fees) with respect thereto.

Notwithstanding anything to the contrary in this Agreement, the Firm shall have no liability whatsoever to any person with respect to any amounts that are or become owed under this Agreement (whether on account of fees, expenses, indemnification or otherwise).  The Company shall be solely responsible for paying any amounts that are or become owed to FTI pursuant to this Agreement or in connection with FTI's engagement hereunder.

### **Cash on Account**

Initially, the Company will forward to us the amount of $300,000, which funds will be held "on account" to be applied to our professional fees, charges and disbursements for the Engagement (the "Initial Cash on Account").  To the extent that this amount exceeds our fees, charges and disbursements upon the completion of the Engagement, we will refund any unused portion.  The Company agrees to increase or supplement the Initial Cash on Account from time to time during the course of the Engagement in such amounts as the Company and we mutually shall agree are reasonably necessary to increase the Initial Cash on Account to a level that will be sufficient to fund Engagement fees, charges, and disbursements to be incurred.

We will send the Company periodic invoices (not less frequently than monthly) for services rendered and charges and disbursements incurred on the basis discussed above, and in certain circumstances, an invoice may be for estimated fees, charges and disbursements through a date certain.  Each invoice constitutes a request for an interim payment against the fee to be determined at the conclusion of our Services.  Upon transmittal of the invoice, we may immediately draw upon the Initial Cash on Account (as replenished from time to time) in the amount of the invoice.  The Company agrees that invoices are due upon receipt and will promptly wire the invoice amount to us as replenishment of the Initial Cash on Account (together with any supplemental amount to which we and the Company mutually agree), without prejudice to the Company's right to advise us of any differences it may have with respect to such invoice.  We have the right to apply to any outstanding invoice (including

BowFlex Inc.
December 20, 2023

amounts billed prior to the date hereof), up to the remaining balance, if any, of the Initial Cash on Account (as may be supplemented from time to time) at any time subject to (and without prejudice to) the Company's opportunity to review our statements.

The Company agrees to promptly notify FTI if the Company or any of its subsidiaries or affiliates extends (or solicits the possible interest in receiving) an offer of employment to a principal or employee of FTI involved in this Engagement and agrees that FTI has earned and is entitled to a cash fee, upon hiring, equal to 150% of the aggregate first year's annualized compensation, including any guaranteed or target bonus and equity award, to be paid to FTI's former principal or employee that the Company or any of it subsidiaries or affiliates hires at any time up to one year subsequent to the date of the final invoice rendered by FTI with respect to this Engagement.

In a case under the Bankruptcy Code, fees and expenses may not be paid without the express prior approval of the bankruptcy court.  In most cases of this size and complexity, on request of a party in interest, the bankruptcy court permits the payment of interim fees during the case. The Company agrees that, if asked to do so by us, the Company will request the bankruptcy court to establish a procedure for the payment of interim fees during the case that would permit payment of interim fees.  If the bankruptcy court approves such a procedure, we will submit invoices on account against our final fee.  These interim invoices will be based on such percentage as the bankruptcy court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our representation.

In preparation for the filing of any cases under the Bankruptcy Code, we also may require an additional on account payment to supplement the Initial Cash on Account to cover fees, charges and disbursements to be incurred during the initial phase of the chapter 11 cases (the "Additional Cash on Account").  We will hold the Additional Cash on Account, as we have the Initial Cash on Account.  Of course, the reasonableness of the Additional Cash on Account remains subject to review by the court in any ensuing case.

If any of the Company's entities become a debtor in one or more cases under the Bankruptcy Code, some fees, charges, and disbursements (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the filing.  The unused portion, if any, of the Initial Cash on Account and the Additional Cash on Account will be applied to any such unpaid pre-petition fees, charges and disbursements.  Any requisite court permission will be obtained in advance.  We will then hold any portion of the Initial Cash on Account and the Additional Cash on Account not otherwise properly applied for the payment of any such unpaid pre-filing fees, charges and disbursements (whether or not billed) as on account cash to be applied to our final invoice in any case under the Bankruptcy Code.

Post-petition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court. The Company understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Company shall nevertheless remain liable for payment of court approved post-petition fees and expenses.  Such items are afforded administrative priority under 11 U.S.C. § 503(b)(l).  The Bankruptcy Code provides in pertinent part, at 11 U.S.C. § 1129(a)(9)(A), that a plan cannot be confirmed unless these priority claims are paid in full in cash on the effective date of any plan (unless the holders of such claims agree to different treatment).  It is agreed and understood that the unused portion,

BowFlex Inc.
December 20, 2023

if any, of the Initial Cash on Account (as may be supplemented from time to time) and the
Additional Cash on Account shall be held by us and applied against the final fee application
filed and approved by the court.

5.   **Terms and Conditions**

The attached Standard Terms and Conditions set forth the duties of each party with respect to
the Services. Further, this letter and the Standard Terms and Conditions attached comprise the
entire Engagement Contract for the provision of the Services to the exclusion of any other
express or implied terms, whether expressed orally or in writing, including any conditions,
warranties and representations, and shall supersede all previous proposals, letters of
engagement, undertakings, agreements, understandings, correspondence and other
communications, whether written or oral, regarding the Services.

6.   **Conflicts of Interest**

Based on the list of interested parties (the "Potentially Interested Parties"), provided by you,
we have undertaken a limited review of our records to determine FTI's professional
relationships with the Company, Wells Fargo, SLR Credit Solutions, Morgan Lewis Bockius
LLP, McGuireWoods LLP, Holland & Hart LLP, and Evercore.  As you may be aware, FTI is
regularly retained by the administrative agent and/or other members of your lending group (or
law firms retained by the administrative agent or lending group members).  However, such
representations are in matters unrelated to this engagement.

From the results of such review, we were not made aware of any conflicts of interest or
additional relationships that we believe would preclude us from performing the Services.
However, as you know, we are a large consulting firm with numerous offices globally.  We
are regularly engaged by new clients, which may include one or more of the Potentially
Interested Parties.  The FTI professionals providing services hereunder will not accept an
engagement that directly conflicts with this Engagement without your prior written consent.

7.   **Acknowledgement and Acceptance**

Please acknowledge your acceptance of the terms of this Engagement Contract by signing
both the confirmation below and the attached Standard Terms and Conditions and returning a
copy of each to us at the above address.

If you have any questions regarding this letter or the attached Standard Terms and Conditions, please
do not hesitate to contact Robert Del Genio at 212-813-1640.

Yours faithfully,

FTI CONSULTING, INC.

By:  _____
     Robert Del Genio
     Senior Managing Director

BowFlex Inc.
December 20, 2023

Attachment – As stated

BowFlex Inc.
December 20, 2023

Confirmation of Terms of Engagement

**We agree to engage FTI Consulting, Inc. upon the terms set forth herein and in the attached Standard Terms and Conditions.**

Sidley Austin LLP

By: _____
    Matthew Clemente
    Partner

Date:   12/21/2023
_____

BowFlex Inc.

By: _____
    Alan Chan
    Chief Legal Officer

Date:   12/21/2023
_____

### FTI CONSULTING, INC.

### STANDARD TERMS AND CONDITIONS

The following are the Standard Terms and Conditions on which we will provide the Services to you set forth within the attached letter of engagement with BowFlex Inc. dated December 20, 2023.   The Engagement letter and the Standard Terms and Conditions  (collectively the "Engagement Contract") form the entire agreement between us relating to the Services and replace and supersede any previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services.  The headings and titles in the Engagement Contract are included to make it easier to read but do not form part of the Engagement Contract.

**1.**      **Reports and Advice**

1.1      **Use and purpose of advice and reports** – Any advice given or report issued by us is provided solely for your use and benefit and only in connection with the purpose in respect of which the Services are provided. Unless required by law, you shall not provide any advice given or report issued by us to any third party, or refer to us or the Services, without our prior written consent, which shall be conditioned on the execution of a third party release letter in the form provided by FTI and attached hereto as Schedule A. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

**2.**      **Information and Assistance**

2.1      **Provision of information and assistance** – Our performance of the Services is dependent upon your providing us with such information and assistance as we may reasonably require from time to time.

2.2      **Punctual and accurate information** – You shall use reasonable skill, care and attention to ensure that all information we may reasonably require is provided on a timely basis and is accurate and complete and relevant for the purpose for which it is required.  You shall also notify us if you subsequently learn that the information provided is incorrect or inaccurate or otherwise should not be relied upon.

2.3      **No assurance on financial data** – While our work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof.  Company management will be responsible for any and all financial information they provide to us during the course of this Engagement, and we will not examine or compile or verify any such financial information.  Moreover, the circumstances of the Engagement may cause our advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period. Accordingly, as part of this Engagement, we will not express any opinion or other form of assurance on financial statements of the Company.

2.4      **Prospective financial information** - In the event the Services involve prospective financial information, our work will not constitute an examination or compilation, or apply agreed-upon procedures, in accordance with standards established by the American Institute of Certified Public Accountants or otherwise, and we will express no assurance of any kind on such information.  There will usually be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material.  We will take no responsibility for the achievability of results or events projected or anticipated by the management of the Company.

**3.   Additional Services**

3.1   **Responsibility for other parties** – You shall be solely responsible for the work and fees of any other party engaged by you to provide services in connection with the Engagement regardless of whether such party was introduced to you by us.  Except as provided in this Engagement Contract, we shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters.  Further, we acknowledge that we are not authorized under our Engagement Contract to engage any third party to provide services or advice to you, other than our agents or independent contractors engaged to provide Services, without your written authorization.

**4.   Confidentiality**

4.1   **Restrictions on confidential information** – Both parties agree that any confidential information received from the other party shall only be used for the purposes of providing or receiving Services under this or any other contract between us. Except as provided below, neither party will disclose the other party's confidential information to any third party without the other party's consent. Confidential information shall not include information that:

4.1.1   is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 4.1;

4.1.2   is acquired from a third party who, to the recipient party's knowledge, owes no obligation of confidence in respect of the information; or

4.1.3   is or has been independently developed by the recipient.

4.2   **Disclosing confidential information** – Notwithstanding Clause 1.1 or 4.1 above, either party will be entitled to disclose confidential information of the other to a third party to the extent that this is required by valid legal process, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable not less than 2 business days' notice in writing is first given to the other party.

4.3   **Citation of engagement** – Without prejudice to Clause 4.1 and Clause 4.2 above, to the extent our engagement is or becomes known to the public, we may cite the performance of the Services to our clients and prospective clients as an indication of our experience, unless we and you specifically agree otherwise in writing.

4.4   **Internal quality reviews** – Notwithstanding the above, we may disclose any information referred to in this Clause 4 to any other FTI entity or use it for internal quality reviews.

4.5   **Maintenance of workpapers** – Notwithstanding the above, we may keep one archival set of our working papers from the Engagement, including working papers containing or reflecting confidential information, in accordance with our internal policies.

4.6   **Data Protection** - If this Engagement involves the processing of personal data (also referred to herein as personal information) (i) as governed by Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016, the terms of the EU Data Protection Schedule attached hereto as Schedule B shall apply to this engagement and it shall form an integral part of this Agreement and (ii) as governed by the California Consumer Privacy Act, the terms of the California Data Protection Schedule attached hereto as Schedule C shall apply to this engagement and it shall form an integral part of this Agreement. In the event of a conflict between the terms of this Agreement and the terms of Schedule B or Schedule C, the terms of Schedule B or Schedule C shall prevail in relation to the

processing of such personal data. If such personal data is processed in connection with this engagement, Client shall notify FTI in writing before any personal data is disclosed to FTI.

**5.   Termination**

5.1   **Termination of Engagement with notice** – Either party may terminate the Engagement Contract for whatever reason upon written notice to the other party. Upon receipt of such notice, we will stop all work immediately. You will be responsible for all fees and expenses incurred by us through the date termination notice is received.

5.2   **Continuation of terms** – The terms of the Engagement that by their context are intended to be performed after termination or expiration of this Engagement Contract, including but not limited to, Clauses 3 and 4 of the Engagement letter, and Clauses 1.1, 4, 6 and 7 of the Standard Terms and Conditions, are intended to survive such termination or expiration and shall continue to bind all parties.

**6.   Indemnification, Liability Limitation, and Other Matters**

6.1   **Indemnification** - The Company agrees to indemnify and hold harmless FTI and any of its subsidiaries and affiliates, officers, directors, principals, shareholders, agents, independent contactors and employees (collectively "Indemnified Persons") from and against any and all claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of or relating to your retention of FTI, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, except to the extent that any such claim, liability, obligation, damage, cost or expense shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Indemnified Person or Persons in respect of whom such liability is asserted  (an "Adverse Determination").  The Company shall pay damages and expenses, including reasonable legal fees and disbursements of counsel as incurred in advance.  FTI agrees that it will reimburse any amounts paid in advance to the extent they relate directly to an Adverse Determination.

6.2   **Limitation of liability -** You agree that no Indemnified Person shall be liable to you, or your successors, affiliates or assigns for damages in excess of the total amount of the fees paid to FTI under this Engagement Contract.  Without limiting the generality of the foregoing, in no event shall any Indemnified Person be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

**7.   Governing Law, Jurisdiction, WAIVER OF JURY TRIAL, and Compliance with Law**

7.1   **Governing Law -** The Engagement Contract shall be governed by and interpreted in accordance with the laws of the State of New York without giving effect to the choice of law provisions thereof.

7.2   **Jurisdiction** - The United States District Court for the Southern District of New York and the appropriate Courts of the State of New York sitting in the Borough of Manhattan, City of New York shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising from it. The Bankrutpcty Court having jurisdiction over the Client's Bankruptcy case shall have exclusive jurisdictrion in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising form it. The parties submit to the jurisdiction of such Courts and irrevocably waive any right they may have to object to any action being

brought in these Courts, to claim that the action has been brought in an inconvenient forum or to claim that those Courts do not have jurisdiction.

7.3    **WAIVER OF JURY TRIAL** – TO FACILITATE JUDICIAL RESOLUTION AND SAVE TIME AND EXPENSE, THE COMPANY AND FTI IRREVOCABLY AND UNCONDITIONALLY AGREE TO WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE SERVICES OR THIS ENGAGEMENT CONTRACT.

7.4    **Compliance with Laws** - The Company agrees that it will comply with all anti-corruption, anti-money laundering, anti-bribery and other economic sanctions laws and regulations of the United States, United Kingdom, European Union and United Nations (collectively, the "ABC/AML/Sanction Laws") in connection with this Engagement.  The Company further agrees that it shall not, and it shall procure its employees not to, pay or cause other person(s) to pay FTI using any funds that would result in a violation of any of the ABC/AML/Sanction Laws by either Company or FTI, or otherwise take any action that would result in a violation of any of the ABC/AML/Sanction Laws by either Company or FTI. The Company shall promptly notify FTI in the event of any violation or failure to comply with ABC/AML/Sanction Laws in connection with this Engagement, or allegations relating thereto, by the Company or its directors, officers, employees or agents.

FTI CONSULTING, INC

**Confirmation of Standard Terms and Conditions**

We agree to engage FTI Consulting, Inc. upon the terms set forth in these Standard Terms and Conditions as outlined above.

Sidley Austin LLP

By: _____

     Matthew Clemente
     Partner

Date:    1/4/2024
      _____

BowFlex Inc.

By: _____

     Alan Chan
     Chief Legal Officer

Date:    1/8/2024
      _____

**<u>SCHEDULE A</u>**

**STANDARD RELEASE LETTER**


**[Nonclient Recipient Letterhead]**

**[Date]**

FTI Consulting, Inc.

Dear Mr./Ms. _____:

_____ ("Client") has informed **[name of recipient]** that FTI Consulting, Inc. ("FTI") has performed certain procedures to assist Client in connection with the _____. We understand that the work performed by FTI was performed in accordance with instructions provided by Client and was performed exclusively for Client's sole benefit and use.

Client has requested that FTI provide **[name of recipient]** access to the report of its findings dated **[date]**. **[name of recipient]** acknowledges that this report was prepared at the direction of Client and may not include all procedures deemed necessary for the purposes of **[name of recipient]** and that certain findings and information may have been communicated to Client that are not reflected in the report. **[name of recipient]** further acknowledges that (a) the report is being provided for informational purposes only; (b) the report shall not constitute, either expressly or impliedly, any representation or affirmation by FTI as to the accuracy, completeness and/or fairness of presentation of the Report or any statements or information contained therein; and (c) **[name of recipient]** will make any decisions based on its own investigation, due diligence and analysis, independent of, and without reliance on or reference to, the contents of the report or any other opinions or conclusions of FTI.

In consideration of FTI allowing **[name of recipient]** access to the report and, if requested by **[name of recipient]**, discussing the report, **[name of recipient]** agrees that it does not acquire any rights as a result of such access that it would not otherwise have had and acknowledges that FTI does not assume any duties or obligations to **[name of recipient]** in connection with such access.

**[name of recipient]** agrees to release FTI and its personnel from any claim by **[name of recipient]** that arises as a result of FTI permitting **[name of recipient]** access to the report. Further, **[name of recipient]** agrees not to disclose or distribute the report, or information received, orally or in writing from FTI to any other parties without FTI's prior written consent.

Acknowledged by **[name of recipient]** representative:

By: _____
        (Name of Company official

Title: _____

Date: _____

**SCHEDULE B**

## FTI CONSULTING DATA PROTECTION SCHEDULE

This Data Protection Schedule ("**Schedule**") forms part of the contract for services to which it is an attachment (the "**Contract**") between the client party identified in the Contract (the "**Client**") and the relevant FTI Consulting group entity identified in the Contract ("**FTI**").

**1.      Definitions**

1.1      In this Schedule, unless otherwise defined herein, all defined terms shall have the meaning set out in the Contract.

1.2      In this Schedule, the following terms shall have the meanings set out below:

      1.2.1      "**Data Protection Laws**" means all legislation protecting the personal data of natural persons that is applicable to the processing of Personal Data under this Schedule, including (without limitation) the GDPR and any national legislation which supplements the GDPR, and the data protection laws of any other country, state or territory which apply to such processing*;*

      1.2.2      "**EEA Standard Contractual Clauses**" means the Standard Contractual Clauses set out in the European Implementing Decision (EU) 2021/914 on standard contractual clauses for the transfer of personal data to third countries pursuant to Regulation (EU) 2016/679, as updated, amended, replaced or superseded from time to time by the European Commission;

      1.2.3      "**GDPR**" means the General Data Protection Regulation (EU) 2016/679;

      1.2.4      "**Restricted Transfer**" means a transfer of Personal Data from Client to FTI in circumstances where such transfer would be prohibited by Data Protection Laws in the absence of the EEA or UK Standard Contractual Clauses;

      1.2.5      "**Standard Contractual Clauses**" means either the EEA or UK Standard Contractual Clauses, as applicable to a Restricted Transfer;

      1.2.6      "**UK Standard Contractual Clauses**" means the standard contractual clauses for the transfer of personal data to Processors established in third countries which do not ensure an adequate level of protection as set out in Commission Decision 2010/87/EU, as updated, amended, replaced or superseded from time to time by the UK government; "**UK GDPR**" means the GDPR as transposed into United Kingdom national law by operation of section 3 of the European Union (Withdrawal) Act 2018 and as amended by the Data Protection, Privacy and Electronic Communications (Amendments etc.) (EU Exit) Regulations 2019; and

      1.2.7      "**Personal Data**", "**Process**", "**Controller**", "**Processor**", "**Data Subject**", "**Supervisory Authority**" and "**Personal Data Breach**" shall have the meanings given to them in the Data Protection Laws.

**2.      Controller Terms**

2.1      FTI and the Client will each act as separate and individual Controllers in relation to any Personal Data (including, without limitation, Personal Data relating to any of the Client's workers, FTI's workers, any litigation or arbitration opponent or customer or vendor or transaction partner) Processed by the Client or FTI to deliver the services set out under the Contract.

2.2      FTI and the Client will each comply with its own respective obligations under the Data Protection Laws in relation to their Processing of Personal Data under the Contract. In particular, the Client will ensure that any disclosures of Personal Data to FTI are lawful, and, in each case where necessary under the Data Protection Laws, the Client has notified and secured the consent of the relevant Data Subjects.

2.3      FTI may appoint Processors as required to deliver the services, who will process the Personal Data on FTI's behalf and at FTI's direction. Further, FTI may disclose Personal Data to other Controllers:

2.3.1      where necessary to deliver the services (including, but without limitation, law firms, accountants, other third party experts and any member of FTI's group of companies); or

2.3.2      pursuant to a legally binding written request, an order or request of a court of competent jurisdiction or any governmental or regulatory authority or where disclosure is required by applicable law or regulation ("**Legal Process**"). In relation to any Legal Process, FTI shall assess the lawfulness of the request before responding, and shall take any steps required by Data Protection Laws to protect Personal Data prior to its disclosure (including, without limitation, with respect to data minimization and data security);

2.4      In respect of any Restricted Transfer subject to the GDPR, the parties hereby enter into Module 1 of the EEA Standard Contractual Clauses (with Client as data exporter and FTI as data importer), which is hereby incorporated by reference into this Schedule and which shall come into effect upon the commencement of a Restricted Transfer.  The parties make the following selections for the purposes of Module 1:

2.4.1      Clause 7 – *Docking clause* shall apply;

2.4.2      Clause 11(a) – *Redress* the optional language shall not apply;

2.4.3      Clause 13(a) – *Supervision*

2.4.3.1      Where Client is established in an EU Member State, the following shall apply: "The supervisory authority with responsibility for ensuring compliance by the data exporter with Regulation (EU) 2016/679 as regards the data transfer shall be the supervisory authority of the Member State in which Client is established or (if different) the lead supervisory authority of the Client in respect of a cross-border processing activity". *OR*

2.4.3.2      Where Client is not established in an EU Member State, but falls within the territorial scope of application of the GDPR in accordance with Article 3(2) and has appointed a representative pursuant to Article 27(1) of the GDPR the following shall apply: "*The supervisory authority of the Member State in which the representative within the meaning of Article 27(1) of Regulation (EU) 2016/679 is established, shall act as competent supervisory authority.*" OR

2.4.3.3      Where Client is not established in an EU Member State, but falls within the territorial scope of application of the GDPR in accordance with Article 3(2) without however having to appoint a representative the following shall apply: "*The supervisory authority of one of the Member States in which the data subjects whose personal*

*data is transferred under these Clauses in relation to the offering of goods or services to them, or whose
behaviour is monitored, are located, as indicated in Annex I.C, shall act as competent supervisory authority*."

2.4.4    Clause 17 – *Governing law* "Option 1" shall apply and the "Member State" shall be the Republic of
Ireland;

2.4.5    Clause 18 – *Choice of forum and jurisdiction* the Member State shall be the Republic of Ireland;

2.4.6    Annex 1 – the data exporter is Client and the data importer is FTI (in each case as identified, including in
relation to their places of establishment, in the Principal Agreement) and the description of transfer is deemed
to be as described in Annex 1 to this Schedule;

2.4.7    Annex 2 – the technical and organizational security measures are deemed to be as described in Annex 2
to this Schedule; and

2.4.8    Annex 3 – not applicable.

2.5    In respect of any Restricted Transfer subject to the UK GDPR, the parties hereby enter into the UK Standard
Contractual Clauses (with Client as data exporter and FTI as data importer), which are incorporated by
reference into this Schedule and which shall come into effect upon the commencement of a Restricted
Transfer. For the purposes of clause II h) of the UK Standard Contractual Clauses, the Parties shall be deemed
to have selected option (iii).  Annex 2 to the UK Standard Contractual Clauses shall be deemed to be
prepopulated with the relevant sections of the Annex to this Schedule.  If at any time the UK government
approves the EEA Standard Contractual Clauses for use under the UK GDPR, the provisions of paragraph 2.4
shall apply in place of this paragraph 2.5 in respect of Restricted Transfers subject to the UK GDPR, subject
to any modifications to the EEA Standard Contractual Clauses required by the UK GDPR (and subject to the
governing law of the EEA Standard Contractual Clauses being English law).

2.6    The Client acknowledges and agrees that certain Processors or Controllers engaged by FTI under
paragraph 2.3 may be located in places that may require cross-border transfers of Personal Data. In respect
of transfers by FTI to such Controllers or Processors, FTI will take steps in accordance with the Data
Protection Laws to ensure an adequate level of protection for the Personal Data Processed by such
Processors or Controllers.  Where such a Controller or Processor notifies FTI that it may no longer be
able to provide an adequate level of protection in accordance with Data Protection Laws, FTI shall
independently assess the level of protection provided and, where necessary, shall take mitigating steps to
improve the level of protection or, where this is not possible, terminate the transfer.

2.7    The Client acknowledges that FTI's email records are replicated onto a Microsoft 365 Cloud system in
the United States of America and the Client hereby consents that any Personal Data that is provided to
FTI by email will be replicated accordingly. To the extent that the Client wishes to transmit certain
information or data to FTI and the Client objects to that data being replicated in accordance with this
paragraph, the Client will use a communication or transmission method other than e-mail or will use an
alternative e-mail system.

**SCHEDULE C**

## <u>FTI CONSULTING CALIFORNIA DATA PROTECTION SCHEDULE</u>

This California Data Protection Schedule ("Schedule") forms part of the contract for services to which it is an attachment (the "Contract") between the client party identified in the Contract (the "Client") and the relevant FTI Consulting group entity identified in the Contract ("FTI"). FTI will be functioning as a service provider.

1. Processing of Personal Information.
   In connection with FTI's provision of services to Client under the Contract, if FTI receives any personal information (as such term is defined under the California Consumer Privacy Act) from or on behalf of Customer, then FTI:

   (a) will only process such personal information for the purpose of providing the services;

   (b) will not retain, use, or disclose such personal information for any purpose other than to perform the services or outside of the direct business relationship between FTI and Client;

   (c) will not sell, rent, release, disclose, disseminate, make available, transfer or otherwise communicate such personal information to any third party for monetary or other valuable consideration; and

   (d) certifies that it understands the restrictions on its processing of such personal information as set forth in this sentence, and will comply with them.

FTI may disclose personal information to FTI's service providers in connection with such service providers providing services to FTI, and FTI may permit such service providers to process personal information as necessary for FTI to provide the services to Client.

<u>**Annex 1: Description of Personal Data Processing**</u>

<u>This Annex includes certain details of the Processing of Personal Data by FTI under the Principal Agreement.</u>

1.  <u>**Subject matter and duration of the Processing of the Personal Data**</u>
    <u>The subject matter and duration of the Processing of the Personal Data are set out in the Principal Agreement and this Schedule.</u>

2.  <u>**The nature and purpose of the Processing of the Personal Data**</u>
    <u>FTI is engaged to provide Services to Client which involve the Processing of Personal Data.  The scope of the Services are set out in the Principal Agreement, and the Client Personal Data will be Processed by FTI for purposes determined by it, in connection with the delivery of those Services and compliance with the terms of the Principal Agreement, including this Addendum, as well as applicable laws.</u>

3.  <u>**The types of the Personal Data to be Processed**</u>
    Client customer or employee information which may be collected in the course of delivering consulting and advisory services to Client, including name, title, gender, personal contact details (address, telephone number, email address), work address, work email, work telephone numbers, job title, and other types of Personal Data supplied by the Client to FTI pursuant to the Principal Agreement.

4.  **The categories of Data Subject to whom the Personal Data relates**

    The categories of Data Subjects are determined by the nature of the client engagement, the details of which are covered in the Principal Agreement.

5.  **The obligations and rights of Client**

    The obligations and rights of Client are set out in the Principal Agreement and this Schedule.

6.  **Frequency of Restricted Transfers (where applicable):**

    As necessary to deliver Services for the duration of the Principal Agreement.

7.  **The period for which Personal Data subject to Restricted Transfers will be retained (where applicable):**

    In accordance with FTI's data retention policies, copies of which are available upon request.

<u>**Annex 2: Technical and Organizational Security Measures**</u>

FTI Consulting maintains the following technical and organizational security measures when processing Personal Data for its clients.

- Measures of pseudonymisation and encryption of personal data

When data at rest leaves our direct control (such as backup tapes, removable hard drives, etc.) the data is encrypted using AES 256-bit encryption. All laptops utilize full disk encryption. Data that is in transit over public circuits is encrypted in transit using SSL. FTI Consulting additionally deploys firewalls throughout its networks to allow and deny specific network traffic using key indicators such as source/destination address, source/destination port, etc.

- Measures for ensuring ongoing confidentiality, integrity, availability and resilience of processing systems and services Measures for ensuring the ability to restore the availability and access to personal data in a timely manner in the event of a physical or technical incident

FTI requires new employees/contractors to acknowledge receipt of the following policies including: Code of Ethics and Business Conduct, Anti-Corruption Policy,
Acceptable Use of Technology Resources, Confidentiality Agreement, Employee Handbook
Policy on Inside Information & Insider Trading, and Time Recording Policy.

FTI Consulting has a documented policy for business continuity and disaster recovery that has been approved by management, communicated properly and is maintained and reviewed. The general details are reflected in the FTI Consulting Information Security Policy.  The recovery point objective exceeds 4 hours and the recovery time objective exceeds 24 hours.  The specific tools used for backups vary by region.

- Processes for regularly testing, assessing and evaluating the effectiveness of technical and organisational measures in order to ensure the security of the processing

FTI has access to all major vendor security bulletins and have controls over identifying, scheduling, testing, and deploying patches. The deployment time is 14 days for high and within 24 hours for critical/emergency patches.

FTI has controls over identification of vulnerabilities, risk ranking, reporting, and remediation.  This includes perimeter vulnerability scans that must be performed at least quarterly and semi-annual internal vulnerability scans that cover workstations, servers, and network devices.

FTI performs internal penetration test to identify flaws in the internal security controls that could allow an attacker to surreptitiously gain access to sensitive data and/or disrupt critical business systems.  The organization must also perform external network penetration test to identify potential vulnerabilities which could be exploited to gain access to systems and data or to establish a foothold into internal network from which to launch further attacks.

FT's cybersecurity team tracks the resolution of vulnerabilities. Vulnerabilities that are not resolved as part of patching cycles must be tracked on a vulnerability log or similar mechanism.

- Measures for user identification and authorization

FTI uses unique IDs and if generic IDs should be disabled unless there is an approved security exception.  FTI users authenticate through Active Directory (AD), SSO used when possible, and remote connection requires two factor authentication and leverages FTI's Corporate DUO two factor technology. Duo Security generates passcodes (similar to a PIN Code) to mobile devices for login and can receive push notifications for easy

updates. Duo Security is integrated with OneLogin (our SSO platform) providing a unified authentication solution.

Privileged and remote access must include multi-factor authentication and secure mechanisms (e.g., TACACs+, RADIUS) must be used on all network devices.

FTI password complexity (i.e. characters, length), lockout settings, expiration settings meets the following requirements:

.   Contain both upper and lower case characters (e.g., a-z, A-Z)
·   Have digits and punctuation characters as well as letters e.g., 0-9,!@#$%^&*()_+|~-=\`{}[]:";'<>?,./)
·   Contains at least 12 characters for standards accounts and 15 characters in length for admin accounts
·   Must be changed at least every 90 days
·   Are not words in any language, slang, dialect, jargon, etc.
·   Are not based on Confidential Information, names of family, etc.
·   User accounts are locked after 10 unsuccessful logins. Account lockout for 30 mins. Reset after 30 mins.
·   Password history - 24 passwords remembered

Passwords are stored protected in an encrypted format.

- Measures for the protection of data during transmission and measures for the protection of data during storage

FTI has Data Loss Prevention (DLP) and extrusion prevention tools that restrict sending sensitive data over unsecure mail.  Anomalies that exceed the normal traffic patterns are noted and appropriate action is taken to address them.

FTI protects data in transmission which include the following acceptable methods:

- Email: Transport Layer Security ("TLS") Internet protocol, which provides security for all email transmissions over the public Internet may be setup with using opportunistic or mandatory TLS connections.  Only TLS 1.2 or TLS 1.3 is acceptable.

- "Mailbox to mailbox" encryption that secures email messages and electronic files (using 256-bit AES encryption).

- Secure FTP:  FTP utilizes TLS or SSH to allow us to share data with clients securely over the Internet.  Only TLS 1.2 or TLS 1.3 is acceptable.

- External Encrypted Drive:  Must use FIPS 140-2/AES 256-bit encryption or stronger.

- File Stores:  Matter/Engagement related files stored centrally on the network are secured so that only those explicitly authorized can access the files.

FTI stores data in an environment that is not internet facing and segregated from the demilitarized zone by a firewall. The data must be logically segregated from other client or corporate data. Different tools may be employed depending upon the nature and/or location of the work.

- Measures for ensuring physical security of locations at which personal data are processed

Specific physical security provisions vary depending on office location, however, as per the Information Security policy, access to company premises, including delivery and loading areas, must require badge access.  Badge

access is managed by local facilities or ITG, who use a badge kiosk to produce access badges. All badge issuances and updates require management approval.

- Measures for ensuring events logging

FTI logs activity which is stored for 7 years. Data is logged at sufficient level (i.e. user ID, activity) and logging is enabled for the entire environment. The logging must provide relevant information (i.e. authorized & unauthorized attempts, remote access). System event and audit logs should capture the following events as applicable:
- Authentication failures
- Software or service failures
- Logon and use of privileged IDs
- Database changes
- Adding/deleting users
- Password Changes
- Adding/deleting groups and/or users associated with groups
- Changing audit log configuration or disabling audit subsystem

FTI uses SecureWorks which provides a Security Incident and Event Management (SIEM). The foundation of the SIEM includes Red Cloak endpoint event logs analysis, which includes an industry-leading assessment of current and zero-day threats and vulnerabilities.

- Measures for ensuring system configuration, including default configuration Measures for internal IT and IT security governance and management

FTI has processes in place to confirm compliance with configuration standards. This includes a process for newly created device (i.e., checklist), at least annual reviews and hardening, removal of unnecessary / insecure services, and alarms set for key events (i.e. change in security group, configuration).

- Measures for certification/assurance of processes and products

FTI holds the Certified Enterprise designation from Verizon Cybertrust and participates in their Security Management Program (SMP). The SMP is a comprehensive security risk reduction and certification program that addresses all aspects of proactive information security, from network and system analysis to physical and policy inspection. The cornerstone of SMP is the International Standards Organization (ISO) standard 27002.

As part of the Cybertrust Third Party assessment schedule, FTI Consulting's Global Cybersecurity and Privacy function undergoes the following reviews by the Verizon Security Certification organization:

- Policy Review — evaluates the documentation and inspects the contents of key security policies — Annually.
- Process and Procedure Validation — Annually.
- Physical Inspection — evaluates the implementation of security controls in the physical environment surrounding critical network infrastructure, including doors, HVAC, entry logs, power redundancy, etc. — Annually.
- External Risk Assessments (Network and System-level scans) — Quarterly identifies possible risk areas in an organization's external network infrastructure and assesses its consistency with key controls.
- Penetration testing (External and Internal – Network and System-level) is conducted by a separate third-party — Annually.

Individual business units may hold additional certifications or use tools that are supported by additional certifications.

- Measures for ensuring data minimisation

FTI only acquires data for the intended purpose by working with the client or business partner to ensure only the minimum amount of necessary data is obtained.

- Measures for ensuring data quality

FTI Consulting is dedicated to providing its clients with high quality services that meet our standards of excellence and integrity.  The quality of the work for each of our clients is monitored by the Senior Managing Directors responsible for each engagement along with the highly qualified colleagues in their practice teams and business segments.  On a broader level, FTI sets the tone for our global organization in our Code of Conduct (https://www.fticonsulting.com/~/media/Files/us-files/our-firm/guidelines/fti-code-of-conduct.pdf) which discusses our commitment to quality throughout, and in particular in our Statement of Values.

FTI takes into account the principle of purpose limitation, while making sure that the data is adequate, relevant and not excessive for the legitimate purpose. FTI enables data subjects to exercise their rights, including the rights of access and, as appropriate, the rectification, erasure or blocking of Personal data and keep data accurate, and not retain it any longer than necessary.

- Measures for ensuring limited data retention

FTI has a records retention policy that ensures records are retained for required and necessary periods of time; providing that records which are no longer useful are properly destroyed; and providing that records to be retained are stored methodically and economically.  FTI uses their reasonable and best efforts to prevent the premature destruction of Records. The organization must have processes to return data upon end of contract and destroy data using appropriate mechanisms upon Department of Defense (DoD) and National Institute of Standards and Technology (NIST) standards for all data bearing devices.

- Measures for ensuring accountability

FTI has a defined process to resolve complaints about privacy and its collection or use of personal information in compliance with the EU-US Privacy Shield Principles.  FTI has measures in place to ensure complaints are resolved within 1 month.   Unless otherwise dictated by local law, the exact number of days to comply with a request varies, depending on the month in which the request was made and is calculated based on the day the request is received plus one (regardless of whether the day is a working day or not) until the corresponding calendar date in the next month.

- Measures for allowing data portability and ensuring erasure

FTI receives requested Personal Data directly or provide access to a tool which allows the requestor to extract the information themselves using a self-service type model.

The Personal Data requested is required to be provided in a format and structure which is commonly used and machine-readable. The following machine-readable formats:

- CSV: (Comma separated values) a format that stores tabular data (numbers and text) in plain-text form;
- PDF: (Portable Document Format) a file format used mainly to represent documents such that layout will stay the same independent of the system environment;

- XML: (eXtensible Markup Language) a markup language that defines a set of rules for encoding documents in a format that can be both human and machine readable;
- JSON: (JavaScript Object Notation) a machine-readable data format derived from the JavaScript language used for representing simple data structures and associative arrays; or
- HTML: (HyperText Markup Language) the main markup language for displaying web pages and other information in a web browser.

FTI has a data erasure process in place to track and manage responses, and, as necessary, provide updates to the relevant regulatory authority and/or input into management reports.  The organization must verify the identity of the data subject before disclosing any personal information.  The organization should only refuse to comply with an erasure request if it is "manifestly unfounded or excessive" or, alternatively may elect to charge a "reasonable fee."  The response is in written communication together with the documents containing the proper erasure of data.

**F T I**

**CAPITAL ADVISORS**

1166 Avenue of the
Americas, 15ᵗʰ Floor
New York, NY 10036

FTI Capital Advisors, LLC is a member of FINRA/SIPC.    fticonsulting.com

**CONFIDENTIAL**

December 20, 2023

Matthew Clemente
Sidley Austin LLP
1 S Dearborn St.
Chicago, IL 60603

Subject: **Engagement of FTI Capital Advisors, LLC**

Dear Mr. Clemente:

This letter ("Agreement") confirms our understanding of the basis upon which we, FTI Capital Advisors, LLC ("FTICA"), have been retained by you, Sidley Austin LLP (the "Firm"), to act as exclusive financial advisor to Bowflex, Inc. (collectively, with its direct and indirect subsidiaries and affiliates, the "Company") in connection with any merger, consolidation, business combination, investment in the Company, exchange, sale, transfer or other disposition pursuant to which all or any portion of the business, assets, divisions, subsidiaries or securities of the Company is sold, combined with, foreclosed, invested in, or transferred to a party (the "Transaction" and any potential purchaser, a "Potential Purchaser"). For purposes hereof, the term "Transaction" includes, one or a series of transactions which is completed directly or indirectly. The Company and FTICA agree that the appendix attached hereto (the "Appendix") is an integral part of this Agreement and its terms are hereby incorporated herein by reference in their entirety.

I.      **Services**. In connection with this engagement and subject to the ongoing direction of the Company, FTICA will provide the Company with financial advice and assistance in connection with a Transaction as is customary and appropriate in transactions of this type and as mutually agreed upon by the Company and FTICA. To the extent relevant, and as the Company shall direct, FTICA's services may include:

a)  In consultation with the Company's senior management, advising the Company in performing customary financial analyses of the Company and, to the extent appropriate, a Potential Purchaser;

b)  Providing financial advice to the Company with respect to the form or structure of a Transaction;

c)  Assisting the Company in the preparation of materials concerning a proposed Transaction, including familiarizing itself to the extent appropriate and feasible with the businesses, operations, financial condition and prospects of the Company and a Potential Purchaser;

d)  Assisting the Company in identifying and contacting Potential Purchasers to ascertain their interests in a potential Transaction;

e)  Assisting the Company as to strategy and tactics in connection with its negotiations with respect to the Transaction;

f)  Upon request, providing timely reporting to the Company on the status and progress of the Transaction; and

g)  Assisting the Company and its advisors on any closing procedures.

In order to coordinate our efforts in respect of a Transaction, the Company will promptly inform FTICA of any discussions with, or inquiries that the Company receives from (or has received prior to the date of this Agreement), a third party with respect to a potential Transaction.

**II.**     **Fees**. As compensation for services rendered by FTICA under this Agreement, the Company agrees to pay FTICA certain cash fees on the terms outlined below.

A.     *Work Fee*.  Upon the execution of this Agreement and monthly thereafter, the Company shall pay FTICA a non-refundable "Work Fee" of $50,000.  FTICA shall credit the first three (3) months of Work Fees paid against any Success Fees earned.

B.     *Success Fee*.  In the event the Company closes on one or more Transactions during the term of this Agreement, then FTICA shall earn a fee (the "Success Fee") equal to 2.0% of the Aggregate Value of each Transaction; provided that such Success Fee shall in no event be less than $750,000 ("Minimum Success Fee"). The Success Fee is due and payable to FTICA on the date of the closing of each Transaction from any proceeds received. In addition, FTICA shall be entitled to the Success Fee following the expiration or termination of this Agreement as provided in Section IV entitled "Term." For purposes of this Agreement, the term "Aggregate Value" shall mean the full transaction value of any Transaction, including, without limitation, (1) the total value of all cash, securities and other property contributed, paid or payable, directly or indirectly, by an acquirer to a seller or sellers or joint venturer in connection with a Transaction (including, without limitation, amounts paid, distributed or issued, or to be paid, distributed or issued, to holders of common stock, preferred stock, convertible securities, warrants, stock appreciation rights, options or similar rights or securities), plus (2) the aggregate principal amount of all indebtedness for borrowed money (including, without limitation, capitalized leases, trade credits and preferred stock obligations) outstanding immediately prior to consummation of a Transaction or otherwise, directly or indirectly, assumed, refinanced (including any premiums paid), forgiven, extinguished or consolidated in connection with such Transaction, plus (3) any assets transferred as a form of consideration (i.e. Accounts Receivable).  Aggregate Value shall include all amounts paid into escrow and payments related to future events (contingent or otherwise), which shall be calculated based on the present value of such payments as mutually agreed upon in good faith by FTICA.  The value of any such securities (other than indebtedness) or other property or items of value shall be valued at the time of closing without regard to any restrictions on transferability and determined as follows: (i) if such securities are traded on a stock exchange, the value of securities in an established public market shall be the last closing market price of such securities prior to consummation of the Transaction; and (ii) if such securities have no established public market, or if the consideration utilized consists of property other than securities, the value of such securities or other property shall be the fair market value thereof as determined by FTICA in good faith. If any consideration to be paid is computed in a foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. Dollars at the prevailing exchange rate on the date or dates on which such consideration is paid.

In the event of multiple Transactions, a separate Success Fee will be payable with respect to each Transaction. All amounts herein are stated in U.S. dollars and all payments to FTICA shall be paid in immediately available funds in U.S. dollars, free and clear of any tax, assessment or other governmental charge (with appropriate gross-up for withholding taxes).

**III.**     **Expense Reimbursement**. In addition to the compensation described above, the Company will pay or reimburse, whether or not a Transaction is proposed or completed, all of FTICA's reasonable out-of-pocket expenses incurred in connection with this Agreement, including but not limited to any document and presentation material expenses, translation costs and any reasonable fees and disbursements of counsel. The total amount of such out-of-pocket expenses incurred by FTICA and other covered expenses are due and payable within thirty (30) days of the date of any invoice relating thereto that is provided to the Company.

Notwithstanding anything to the contrary in this Agreement, the Firm shall have no liability whatsoever to any person with respect to any amounts that are or become owed under this Agreement (whether on account of fees, expenses, indemnification or otherwise).  The Company shall be solely responsible for paying any amounts that are or become owed to FTICA pursuant to this Agreement or in connection with FTICA's engagement hereunder.

**IV.**     **Term**. The initial term of the engagement under this Agreement shall be six (6) months. This Agreement shall be renewed automatically for succeeding terms of one (1) month unless earlier terminated by either the Company or FTICA.  Either party may terminate FTICA's engagement hereunder for any reason or no reason at any time by giving the other party at least thirty (30) days prior written notice. The provisions set forth in the Appendix shall

2

survive any termination. Any termination shall not affect the Company's obligations to pay to FTICA unpaid fees and to reimburse FTICA for expenses as set forth herein. In addition and notwithstanding the foregoing, it is expressly understood that FTICA shall be entitled to receive the Success Fee if a Transaction is consummated within twenty-four (24) months after termination of this Agreement by any party for any reason (the "Tail Period") or if an agreement for a Transaction is entered into before termination of the engagement hereunder or within the Tail Period, in each case, which subsequently results in a consummated Transaction.

**V.      Notice.**  Any notice required or permitted by this Agreement will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed below, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed below, as subsequently modified by written notice.

| If to FTICA: | If to the Company: |
|---|---|
| Address: FTI Capital Advisors, LLC<br>        1166 Avenue of the Americas, 15th Floor<br>        New York, NY 10036<br>E-mail:   Glenn.Tobias@FTICapitalAdvisors.com<br>Attn.:    Glenn Tobias | Address: Bowflex, Inc.<br>        17750 SE 6th Way<br>        Vancouver, WA 98683<br>E-mail:   achan@bowflex.com<br>Attn.:    Alan Chan |

If the foregoing correctly sets forth the entire understanding and agreement between FTICA and the Company, please so indicate in the space provided for that purpose below and return an executed copy to us, whereupon this letter shall constitute a binding agreement as of the date first above written.

Sincerely,


**FTI Capital Advisors, LLC**

By: Glenn Tobias
        Senior Managing Director



AGREED:

Sidley Austin LLP

By: _____
        Matthew Clemente
        Partner



AGREED:

BowFlex Inc.

By: _____
        Alan Chan
        Chief Legal Officer

**Appendix**

**FTI CAPITAL ADVISORS, LLC**

**STANDARD TERMS AND CONDITIONS**

The following terms and conditions are incorporated by reference into the Agreement between the Company and FTICA to which these standard terms and conditions are attached.

1. **Information**.  The Company will furnish FTICA with all information and material which FTICA requests in connection with the performance of its obligations hereunder, including information and materials regarding a Potential Purchaser and will update (and request such Potential Purchaser to update) such information and material as appropriate.  The Company represents and warrants that all information to be made available to FTICA by the Company or contained in any documents provided by the Company to FTICA will, at all times during the period of the engagement of FTICA hereunder and to the best of its knowledge, be complete and correct in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made.  The Company further represents and warrants that any forecasts and projections provided to FTICA or contained in any documents in the context of the Transaction will have been prepared in good faith and will be based upon assumptions which, in light of the circumstances under which they are made, are reasonable and will be reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the management of the Company or a Potential Purchaser, as the case may be, as to the matters covered thereby. The Company acknowledges and agrees that in rendering its services hereunder, FTICA will be using and relying on all information that is or will be furnished to FTICA by or on behalf of the Company, that as to any such information FTICA may not make any independent investigation or verification thereof,  and that FTICA will not in any respect be responsible for the accuracy or completeness of any of the foregoing kinds of information, and that FTICA may not undertake to make an independent appraisal of any of the assets of the Company.  The Company understands that in rendering services hereunder FTICA will also rely upon the advice of counsel to the Company and other advisors to the Company as to legal, tax and other matters relating to the Transaction, or any other transaction contemplated by the Agreement. The Company will notify FTICA promptly if it learns of any material change in any information previously made available to FTICA by or on behalf of the Company or a Potential Purchaser.

2. **Confidentiality**.  For a period of 12 months from the date of the Agreement, FTICA will keep confidential any material non-public information of the Company made available to FTICA by the Company in connection with its engagement hereunder; provided that, such confidential information shall not include information that (i) was already known to or in possession of FTICA; (ii) is obtained by FTICA from a third party who is not known by FTICA to be prohibited from disclosing the information; (iii) is or becomes publicly available; or (iv) is independently developed, discovered or arrived at by FTICA; and provided further, that such confidential information may be disclosed (a) to FTICA's affiliates and its and their respective employees, officers, directors, agents, consultants, legal counsel, accountants, auditors and other representatives and advisors so long as such parties are instructed to treat such information confidentially; (b) to any potential counterparty which has signed a confidentiality agreement with the Company or any other person with the consent of the Company; (c) to any governmental agency or regulatory body having or claiming to have authority to regulate or oversee any aspect of FTICA's business; or (d) if such disclosure is deemed necessary by FTICA in litigation or any other proceeding. This paragraph supersedes any prior agreement between the Company and FTICA respecting confidentiality in connection with a Transaction.

3. **Engagement for the Benefit of the Company**.  FTICA is being retained to act as an independent contractor to serve as financial advisor solely to the Company, and it is agreed that the engagement of FTICA is not, and shall not be deemed to be, on behalf of, and is not intended to, and will not, confer rights or benefits

upon, or create duties of FTICA to any shareholder or creditor of the Company or upon any other person or entity. No one other than the Company is authorized to rely upon this engagement of FTICA or any statements, conduct or advice of FTICA, and no one other than the Company is intended to be a beneficiary of this engagement. All opinions, advice or other assistance (whether written or oral) given by FTICA in connection with this engagement are intended solely for the benefit and use of the Company and will be treated by the Company as confidential, and no opinion, advice or other assistance of FTICA shall be used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose, nor shall any public or other references to FTICA (or to such opinions, advice or other assistance) be made without the express prior written consent of FTICA.

4. **No Fiduciary Obligations**. The Company also acknowledges and agrees that (i) in providing the services contemplated by the Agreement, FTICA will be acting as an independent contractor on an arms-length basis under the Agreement with duties solely to the Company, (ii) nothing contained in the Agreement or the nature of FTICA's services hereunder is intended to create or shall be construed as creating an agency or fiduciary relationship between FTICA (or any of its affiliates) and the Company or any other party, and (iii) FTICA is not assuming any duties or obligations other than those expressly set forth in the Agreement. Accordingly, the Company expressly disclaims any agency or fiduciary relationship with FTICA or any of its affiliates hereunder. The Company understands that FTICA and its affiliates are not providing (nor is the Company relying on them for) tax, regulatory, legal or accounting advice and that FTICA's role in any due diligence will be limited to performing such review as it shall deem necessary to support its own advice and analysis and shall not be on behalf of the Company. The rights and obligations that the Company may have to FTICA or its affiliates under any credit or other agreement are separate from the Company's rights and obligations under the Agreement and will not be affected in any way by the Agreement. The Company agrees that any agreements documenting the Transaction as contemplated by the Agreement shall include provisions reasonably acceptable to FTICA in which the parties thereto disclaim and disavow any reliance upon FTICA in connection therewith. Any such agreements also shall contain provisions, in a form reasonably acceptable to FTICA, which reflect that the parties thereto relied solely upon their own independent investigation and counsel before deciding to enter into the Transaction.

5. **No Conflicts**. Please be advised that FTI Consulting, Inc. ("FTI") is a global conglomerate engaged in the provision of several activities, services and products to a wide range of companies, governments and individuals from which conflicting interests or duties, or a perception thereof, may arise. The Company expressly acknowledges and agrees that, in the ordinary course of business, FTICA and other parts of FTI may be involved in other services, transactions or dealings involving a Potential Purchaser or financing parties. Although information may be acquired in the course of providing services to parties other than the Company, or otherwise carrying out its business, neither FTICA nor any other part of the FTI shall have any obligation to disclose such information, or the fact that it or any other part of FTI is in possession of such information, to the Company or to use such information for the benefit of the Company. In addition, the Company acknowledges that neither this engagement nor the receipt by FTICA of confidential information nor any other matter shall restrict or prevent FTI from undertaking any business activity, acting on behalf of its own account, or acting on behalf of, or providing any services to, other clients and FTI may undertake any business activity or provide any services without further notification to the Company.

6. **Public Announcement**. After the public announcement of any Transaction, the Company acknowledges that FTICA may, at its option and expense, place a customary announcement in such newspapers, periodicals and electronic media as it may choose, stating that FTICA has acted as the financial advisor to the Company in connection with the Transaction. If requested by FTICA (and to the extent permitted under applicable securities law), the Company will include a reference to FTICA as its financial advisor in any press release or public announcement with respect to the Transaction.

7. **Compensation Owed to other Representatives or Agents**. The Company represents and warrants that there are no brokers, representatives or other persons who have an interest in any compensation due to FTICA from any transaction contemplated herein who may be due a fee if a transaction contemplated by the Agreement is completed.

8. **Money Laundering Activities**. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all broker dealers to obtain, verify, and record information that identifies each entity that becomes a new client of FTICA.  In establishing a new client relationship with the Company, FTICA is required to ask for certain information including but not limited to its employer identification number(s), (EIN) certified articles of incorporation, government issued business license, a partnership agreement or a trust agreement and other corporate documents that will allow FTICA to identify the legal existence of the Company.

9. **Choice of Law and Jurisdiction**.  The Agreement and any matters relating to, arising in any manner out of or in connection with the Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to such state's principles of conflicts of laws. Any litigation with respect to the Agreement, and any matters relating to, arising in any manner out of or in connection with the Agreement or the services provided by FTICA to the Company must be instituted in the United States District Court for the Southern District of New York or the Supreme Court of the State of New York for the County of New York, United States of America.

10. **WAIVER OF JURY TRIAL**. TO FACILITATE JUDICIAL RESOLUTION AND SAVE TIME AND EXPENSE, THE COMPANY AND FTICA IRREVOCABLY AND UNCONDITIONALLY AGREE TO WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM IN ANY MATTERS RELATING TO, ARISING IN ANY MANNER OUT OF OR IN CONNECTION WITH THE AGREEMENT OR THE SERVICES PROVIDED BY FTICA TO THE COMPANY.

11. **Data Protection and Privacy**. The parties agree that in connection with the services provided under the Agreement, FTICA may receive Personal Data, which means any information that relates to an identified or identifiable natural person, or as otherwise defined by applicable "Data Protection Laws" including the California Consumer Privacy Act or "CCPA," Regulation (EU) 2016/679 (EU General Data Protection Regulation, or "GDPR") or any similar data protection or privacy laws in any relevant jurisdiction. FTICA and the Company acknowledge and agree that, in the context of the Agreement, each is and will each be an independent controller in respect of any Personal Data processed under the Agreement under applicable Data Protection Laws, with the exception of the CCPA, where FTICA will be functioning as a service provider. FTICA and the Company will each be separately responsible for complying with its respective obligations under all applicable Data Protection Laws.  Each party will in place appropriate technical and organizational measures to protect the Personal Data against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access, and which provide a level of security appropriate to the risk represented by the processing and the nature of the personal data to be protected. The Company acknowledges that FTICA may: (i) appoint third party or FTICA's affiliate service providers (processors) as required to deliver the services hereunder; (ii) disclose Personal Data to other controllers where necessary to deliver the services hereunder (including, but without limitation, law firms, accountants, other third party experts) and any of its affiliates; and (iii) transfer Personal Data outside of the European Economic Area, subject to implementing appropriate safeguards in accordance with Data Protection Laws. The Company warrants that it has a lawful basis or has obtained all consents, licenses, and authorizations necessary for the transfer, sharing, accessing, and processing of data to, with, and by the Company and FTICA as contemplated under the Agreement. The Company does not anticipate that this engagement will require it to engage in any cross-border transfers of Personal Data outside of its country of origin.  Should this engagement potentially involve any such cross-border transfers of Personal data, the parties agree to enter into appropriate data transfer agreements including, as applicable, the current EU Standard Contractual Clauses or the equivalent transfer agreement terms promulgated by the government of the exporting country in question.

12. **Indemnification**.

A. *Indemnifiable Losses.*  The Company and its successors and assigns (collectively, the "Indemnifying Persons") shall indemnify FTICA, its controlling person(s) and each of their respective directors, officers, members, agents, representatives, employees and any affiliate (collectively, the "Indemnified Persons") for any and all claims, liabilities, losses, damages (and all costs, fees or other expenses resulting from any

A-3

actions, mediations, arbitrations, and administration, regulatory or other proceedings, inquiry or investigation in respect thereof), whether joint or several (each a "Loss" and collectively, the "Losses") incurred by an Indemnified Person and related to or arising in any manner from, or based upon any Transaction or proposed Transaction contemplated by the Agreement, any actions taken or omitted to be taken by any Indemnified Person in connection with the Agreement, or the Agreement.  The Company further agrees that no Indemnified Person shall incur or be responsible for any Loss (whether direct or indirect, in contract or tort or otherwise) to the Company or any person asserting claims on behalf of or in right of the Company relating to, arising in any manner out of or in connection with the rendering of services pursuant to the Agreement (including any related activities and services rendered prior to the date hereof), any Transaction or an Indemnified Person's role in connection therewith. Notwithstanding the foregoing, the Company shall not be responsible for any Loss to the extent the same is finally determined in a judgment by a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of any Indemnified Person.

B.   ***Limitation of liability***. The Company agrees that no Indemnified Person shall be liable to the Company, or its successors, affiliates or assigns for damages in excess of the total amount of the fees actually received by FTICA under the Agreement.  Without limiting the generality of the foregoing, in no event shall any Indemnified Person be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

C.   ***Reimbursement***. The Company shall also promptly (but no later than ten days of receipt of a reimbursement request) reimburse any Indemnified Person for all reasonable out-of-pocket expenses, including, without limitation, any reasonable legal and other reasonable fees or expenses (the "Expenses"), as incurred in connection with or relating to investigating, preparing to defend or defending, responding to third party subpoenas, preparing to serve or serving as a witness with respect to, providing evidence in, or otherwise relating to any pending or threatened actions, claims or other proceedings (including any administrative or other investigation or inquiry) (each and collectively, an "Action") related to or arising out of any Transaction or the services performed by FTICA pursuant to the Agreement (including any related activities and services prior to the date hereof) whether or not such Indemnified Person is a named party in such proceeding.

D.   ***Settlement***. The Company, without FTICA's prior written consent, shall not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification could be sought hereunder (whether or not FTICA or any other Indemnified Person is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent (i) includes an unconditional release of each Indemnified Person from all liability arising out of such claim, action or proceeding; and (ii) does not include a statement as to an admission of fault, culpability, or a failure to act, by or on behalf of any Indemnified Person; and the parties agree that the terms of such settlement shall remain confidential.

E.   ***Contribution***. If the foregoing indemnification or reimbursement is unavailable for any reason, then the Company and FTICA shall contribute to the Losses for which such indemnification or reimbursement is unavailable in such proportion as is appropriate to reflect the relative benefits to the Company, on the one hand, and FTICA, on the other hand, in connection with the transactions to which such indemnification or reimbursement relates and also the relative fault of the Company, on the one hand, and FTICA, on the other hand, as well as any other relevant equitable considerations; provided that, in no event shall the amount to be contributed by FTICA pursuant to this paragraph exceed the fees actually received by FTICA as a financial advisor under the Agreement.  For the purposes of this indemnification provision, the relative benefits to the Company and FTICA of a Transaction shall be deemed to be in the same proportion as (x) the total value paid or contemplated to be paid or received or contemplated to be received by the Company or its security holders, as the case may be, in connection with such Transaction, whether or not any such Transaction is consummated, bears to (y) the fees paid to FTICA as financial advisor under the Agreement.

A-4

F. ***General***. The indemnity, reimbursement and contribution obligations of the Company shall be binding upon and inure to the benefit of successors, assigns, heirs and personal representatives of the Company and any Indemnified Person. The Company's obligations hereunder shall be in addition to any rights that any Indemnified Person may have at common law or otherwise.

13. **Binding Agreement**. The Agreement has been duly authorized and represents the legal, valid, binding and enforceable obligation of the Company and neither the Agreement nor the consummation of the transactions contemplated hereby requires the approval or consent of any governmental or regulatory agency or violates any law, regulation, contract or order binding on the Company. The Company further represents and warrants that the Company is in all respects qualified and authorized (subject to Board approval of any specific Transaction) to enter into Transactions of the type contemplated hereby. The Agreement and any rights, duties and obligations hereunder may not be waived, amended, modified or assigned, in any way, in whole or in part, without the prior written consent of each of the parties hereto and shall inure to the benefit of and be binding upon the successors, assigns and personal representatives of each of the parties hereto. The Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof, supersedes all prior agreements and undertakings (both written and oral) with respect thereto, has been duly authorized and executed by each of the parties hereto and constitutes the legal, binding obligation of each such party. The invalidity or enforceability of any provision of the Agreement shall not affect the validity or enforceability of any other provisions of the Agreement, which shall remain in full force and effect. The Agreement may be executed in two or more counterparts and delivered by facsimile or in electronic form, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.

14. **Survival.** The provisions of Section II entitled "Fees" and Section V entitled "Notice" of the Agreement and Section 2 entitled "Confidentiality;" Section 3 entitled "Engagement for the Benefit of the Company;" Section 6 entitled "Public Announcement;" Section 9 entitled "Choice of Law and Jurisdiction"; Section 10 entitled "Waiver of Jury Trial"; Section 12 entitled "Indemnification" and Section 13 entitled Binding Agreement of the Appendix and any other provisions of the Agreement or the Appendix which expressly state that they continue for a period of time following such termination or expiration shall survive any expiration or termination of the Agreement.

A-5