UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Richard L. Schepacarter, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Email: richard.schepacarter@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| BowFlex, Inc., *et al*.,[1] | : | Case No. 24-12364 (ABA) |
|  | : |  |
| Debtors. | : | The Honorable Andrew B. Altenberg |
|  | : |  |
|  | : | Hearing Date: August 19, 2024 at 10:00 a.m. |

**UNITED STATES TRUSTEE'S OBJECTION TO THE JOINT CHAPTER 11 PLAN OF
LIQUIDATION OF BOWFLEX, INC. AND ITS DEBTOR AFFILIATE (D.I. 467, 475)**

The United States Trustee (the "U.S. Trustee"), by and through counsel, in furtherance of his duties and responsibilities under 28 U.S.C. § 586(a)(3) and (5), hereby submits this objection (the "Objection") to confirmation of the *Joint Chapter 11 Plan of Liquidation of BowFlex, Inc. and its Debtor Affiliate* D.I. 467, 475,[2] (the "Plan") and respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: BowFlex Inc. (2667) and BowFlex New Jersey LLC (3679). The Debtors' service address is 17750 S.E. 6th Way, Vancouver, Washington 98683.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

1

## PRELIMINARY STATEMENT

1.      The Plan filed by BowFlex, Inc. and its related entity (collectively, the "Debtors") contains several provisions the U.S. Trustee finds objectionable.

2.      The Plan's third-party release provisions are objectionable because they impose releases on claimants without obtaining their affirmative consent, and they extend to an unknown number of unnamed and unidentifiable released parties.

3.      The Plan's exculpation provision is objectionable because it is not limited to fiduciaries of the Debtors' bankruptcy estate.

4.      The Plan contains a provision whereby the Plan as a whole, is treated as a settlement subject to tacit approval under Federal Rule of Bankruptcy Procedure 9019.

5.      And lastly, the Plan is objectionable because it contains an impermissible "gatekeeping provision."

6.      For these reasons, the Plan cannot be confirmed in its present form.

## JURISDICTION

7.      This Court has jurisdiction under 28 U.S.C. §§ 157(a) and (b) to hear and determine this Objection.

8.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with the administrative oversight of cases commenced under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  This duty is part of the U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts.  *See United States Trustee v. Columbia Gas Sys., Inc.* (*In re Columbia Gas Sys., Inc.*), 33 F.3d 294, 295-96 (3d Cir. 1994) (the U.S. Trustee has "public interest standing" under section 307, which goes beyond mere pecuniary

2

interest); *Morgenstern v. Revco D.S., Inc.* (*In re Revco D.S., Inc.*), 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

9.  Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor and comment on plans and disclosure statements filed in chapter 11 cases.

10.  Pursuant to 11 U.S.C. § 307, the U.S. Trustee has standing to be heard regarding this Objection.

## BACKGROUND

11.  On March 4, 2024, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  D.I. 1.

12.  On March 6, 2024, this Court entered an Order directing that these cases be jointly administered.  D.I. 58.

13.  The Debtors continue to operate their businesses as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

14.  No trustee or examiner has been appointed in these cases.

15.  The U.S. Trustee appointed a committee of unsecured creditors in these cases on March 15, 2024.  D.I. 116.

16.  On May 23, 2024, the Debtors filed the Plan.  D.I. 400.

17.  On June 18, 2024, the Debtors filed a revised Plan.  D.I. 467.  On June 21, 2024, the Debtors filed a solicitation version of the Plan. D.I. 475.

18.  The Plan places Holders of Claims and Equity Interests into 7 separate Classes. *Id*., Art. III. A. 1-7 at 17-19.  Of these, only Class 3 is deemed to vote on the Plan. *Id*. at 17.

19.     Classes 1 and 2 are presumed to have accepted the Plan, and so are not permitted to vote to accept or reject the Plan.  Classes 4 through 7 are deemed to have rejected the Plan (collectively the "Non-Voting Classes").  *Id*.

20.     On May 23, 2024, the Debtors filed their *Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Voting Procedures with Respect to Confirmation of the Proposed Joint Chapter 11 Plan of Liquidation of BowFlex Inc. and its Debtor Affiliate, (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* (the "Solicitation Procedures Motion"). D.I. 402.

21.     On June 21, 2024, the Court entered an Order granting the Solicitation Procedures Motion.  D.I. 474.

22.     Pursuant to the Solicitation Procedures Motion, a solicitation package that included a *Ballot for Voting to Accept or Reject the Joint Chapter 11 Plan of Liquidation of BowFlex, Inc. and its Debtor Affiliate* (the "Ballot") was sent to members of the Voting Class, and various *Non-Voting Status Notices* (the "Notifications") were sent to members of the Non-Voting Classes.  *See* D.I. 474; Exh. 3 (Ballot) and Exhs. 7, 8, 9A and 9B (Notifications).

23.     The Ballot includes a separate check box for members of the Voting Class to indicate whether they "opt out"[3] of granting third-party releases.  D.I. 474 Exh. 3.  Although the Ballot and attached instructions explain the ramifications of failing to return a properly completed

---

[3] "Release Opt-Out" means the box included in each of the Ballots and Notice of Non-Voting Status Packages, which permit both those Holders of Claims and Interests entitled to vote on the Plan and those not entitled to vote on the Plan the right to opt out of the Third-Party Releases set forth in Section IX.B. D.I. 475, Art. I.A. 99 at 10-11.

Ballot for voting purposes, the failure to return a Ballot, or failing to check the "opt out" box on a returned Ballot will result in the grant of a third-party release. *Id*.

24. The Notifications include check boxes for members of the Non-Voting Classes to indicate whether they "opt out" of the so-called consensual third-party release. *Id*., Exhs. 7,8, 9A & 9B. And, just like the Ballot, the failure to return a Notification or failing to check the "opt out" box on a returned Notification results in the grant of third-party releases without any affirmative acknowledgement of consent. *Id*.

**ARGUMENT**

**I.   Confirmation Standard**

25. A chapter 11 plan cannot be confirmed unless this Court finds the plan complies with the provisions of 11 U.S.C. § 1129(a). *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 220-21 (Bankr. D.N.J. 2000). A plan proponent bears the burden of proof with respect to each element of section 1129(a). *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001).

26. For the following reasons, the Plan cannot be confirmed in its present form.

**II.   The Plan Cannot be Confirmed Because it Contains Third-Party Release Provisions that are Impermissible Under Applicable Law**

27. Complying with section 1129(a) requires that a plan not include improper release language. *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) ("Release . . . clauses have also been found to be subject to review pursuant to section 1129(a)(1).").

28. Article IX.B of the Plan provides that certain Releasing Parties[4] agree to conclusively, absolutely, unconditionally, irrevocably and forever release the Released Parties

---

[4] The Plan defines "Releasing Parties" as including ". . . each of, and in each case in its capacity as such: (i) the DIP Lender; (ii) the DIP Agent; (iii) all Holders of Claims or Interests that vote to accept the Plan; (iv) all Holders of Claims or Interests that are deemed to accept the Plan and who

from a laundry list of claims including Causes of Action, whether known or unknown, foreseen

or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or

otherwise, including derivative claims and certain Avoidance Actions.  D.I. 475, Art. IX.B. at 44-

45.  This includes claims that are "known or unknown" and claims that are currently "existing or

hereafter arising." *Id*.  And the Released Parties[5] as to which claims are being released include,

among others, "Related Parties"[6] which dragnets such entities' unidentified "predecessors,

"successors," "assigns," "heirs," and "nominees."

---

do not affirmatively opt out of the releases provided in the Plan; (v) all Holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (vi) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (vii) the Committee and its members, each in their capacities as such; and (viii) each Related Party of each Entity in clause (i) through clause (vii) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (i) through clause (vii); provided that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the Third-Party Releases; or (y) timely objects to the Third-Party Releases, either through (a) a formal objection Filed on the docket of the Chapter 11 Cases or (b) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before confirmation. "  D.I. 475, Art. I.A. 100 at 11.

[5] The Plan defines "Released Parties" as the (i) the Debtors and each of  the Debtors' Estates; (ii) the DIP Lender; (iii) the DIP Agent; (iv) the Committee and its members, each in their capacities as such; and (v) each Related Party of each Entity in clauses (i)–(iii); provided, that, in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the Third-Party Releases; or (y) timely objects to the Third-Party Releases, either through (a) a formal objection Filed on the docket of the Chapter 11 Cases or (b) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before confirmation. D.I. 475, Art. I.A.100 at 11.

[6] The Plan defines "Related Parties" as each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such person's or entity's respective heirs, executors, estates, and nominees. D.I. 475, Art. I.A.98 at 10.

**A.**     <u>**The Failure to Opt-Out Is Insufficient to Establish Consent to the Third-Party Releases**</u>

29.     The Plan's definition of Releasing Parties includes: (i) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided in the Plan; (ii) all Holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan.  D.I. 475, Art. I.A. 101 at 11.  This includes members of the Voting Class that vote for the Plan but fail to check the "opt-out" box on their Ballot; (ii) members of the Voting Class that "abstain" from voting and do not return a Ballot with the "opt out" box checked; and (iii) members of the Non-Voting Classes that do not return a Notification with the "opt out" box checked.  *Id*.

30.     As a result, the third-party release contained in Article IX.B of the Plan would bind all claimholders who—regardless of whether and how they vote on the Plan—do not check the "opt out" box on their Ballot or Notification; indeed, as proposed the release provisions would even bind claimholders that did not receive a solicitation package or Notification.

31.     The Supreme Court in *Purdue Pharma* did not "express a view on what qualifies as a consensual release."  *Id*. at *11.  But bankruptcy courts within this District and elsewhere within the Third Circuit have rendered decisions that provide guidance as to how the concept of "consent" should be cabined.  Under those decisions, the Plan's third-party release provisions must be stricken because they would allow such releases even where a so-called "Releasing Party" has not affirmatively agreed to them.

32.    As an initial matter, given the *Purdue Pharma* Court's emphasis on obtaining a claimant's consent before its claims are "bargained away" (*id*. at *8) or otherwise "extinguished" (*id*.), it is clear that merely voting for a plan is not sufficient to evince a claimant's affirmative consent to third-party releases.  Indeed, before the now-extinct "nonconsensual release" craze took hold, several bankruptcy judges in this District held exactly that.  *See, e.g.*, *In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) (Ferguson, J.) ("[T]his Court agrees with those courts that have held that a consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (Gindin, C.J.) ("[I]t is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan". . . . Thus, the court must ascertain whether the creditor unambiguously manifested assent to the release of the nondebtor from liability on its debt."); *In re Elsinore Shore Assocs.*, 91 B.R. 238, 247 (Bankr. D.N.J. 1988) (Gambardella, J.) ("'A creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings[.]'") (quoting *Union Carbide Corp. v. Newboles*, 86 F.2d 593, 595 (7th Cir. 1982)) (analyzing section 16 of the Bankruptcy Act of 1898, precursor to 11 U.S.C. § 524(e)); *id*. at 252 (holding that, as "[a] voluntary election to release non-debtors is not present in the present plan before the court . . . the release provisions in the Plan are prohibited by the Bankruptcy Code and relevant case law").

33.    Merely providing an "opt out" box, in and of itself, is not sufficient to establish "consent" to third-party releases by any of the Debtors' claimants that do not return a Ballot or Notification with the "opt out" box checked.

34.    In *Emerge Energy Services LP* the ballot and opt-out forms "provided conspicuous notice of how to opt-out *and the implication of the failure to do so*."  *Emerge Energy Services LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *17 (Bankr. D. Del. Dec. 5, 2019) (emphasis added).

8

The plan in that case provided that, "unless they complete a form . . . or ballot indicating their affirmative opt-out," holders of general unsecured claims (who were eligible to vote and received a ballot) and holders of equity interests (who were not entitled to vote and so received "opt out forms") "w[ould] be deemed to have consented to the release and waiver of current and future claims against the 'Released Parties.'" *Id*. The Honorable Karen B. Owens of the United States Bankruptcy Court for the District of Delaware rejected the debtors' argument that deeming consent from silence "should be approved as typical, customary, and routine." *Id*. at *18. Instead, Judge Owens found that "it cannot be said with certainty that those failing to return a ballot or Opt-Out Form did so intentionally to give the third-party release[.]" *Id*. As a result, Judge Owens determined that, "while the Debtors included on the ballot and Opt-Out Form notice to the recipients of the implications of the failure to opt-out, the Court cannot on the record before it find that the failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested their intent to provide a release." *Id*. After all, "[c]arelessness, inattentiveness, or mistake are three reasonable alternative explanations." *Id*. Thus, Judge Owens held that "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" to treat "a party's silence or inaction" as the necessary "affirmative consent." *Id*.

35.    Even if voting to accept the Plan without opting out was sufficient to evince affirmative consent to a plan's third-party release provisions—which it is not—"consent" cannot be adduced by a Voting Class member's decision to abstain from voting without returning the Ballot with the opt-out box checked, or by a Non-Voting Class member's failure to return the Notification with the opt-out box checked. *See, e.g.*, *In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) ("[T]he opt out mechanism is not sufficient to support the third party

9

releases. . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place).  Failing to return a ballot is not a sufficient manifestation of consent to a third party release."); *see also Arrowmill Dev Corp.*, 211 B.R. at 507 (holding that "it is not enough for a creditor to abstain from voting for a plan," and requiring "creditor [to have] unambiguously manifested assent to the release").

36.     In addition, the Ballots sent to members of the Voting Class provide a box that, when checked, indicates an affirmative intent to opt out of the proposed releases.  As a result, a member of the Voting Classes who returns a Ballot on which it checked the box to accept the Plan but also checked the opt out box is apparently indicating that it approves of everything in the Plan *other than* the supposed consensual third-party releases.  That is a valid choice a claimant could make based on the opportunity afforded by the Ballot to check, or not check, the opt out box.  However, parties that "abstain" or otherwise do not return a ballot, for whatever reason, will be invariably bound by the Third-Party Release despite the obvious absence of affirmative consent.

37.     As presented, to the extent their treatment of members of the Voting Classes and Non-Voting Classes is clear, the Plan's third-party release provisions essentially discharge  Claims for the benefit of nondebtors.  Calling such protections by another name is merely "word games." *See Purdue Pharma*, 2024 WL 3187799, at \*15-16.  As *Purdue Pharma* makes clear, 11 U.S.C. § 524(e) means what it says:  a discharge of claims for the benefit of the debtor does not extend to any other entity.  *Id*. at \*7.

38.     In light of the foregoing, the Plan cannot be confirmed unless the release provision contained in Article IX. B is stricken from the Plan.

10

B.      **The Plan's Third-Party Releases Extend to an Unknown Number of Unnamed Released Parties**

39.     The Plan's imposition of such third-party release provisions without requiring the parties' affirmative consent to the releases is particularly problematic because the release provisions do not enable a reader of the Plan to discern precisely what claims are being released, or exactly who is receiving the releases.

40.     The expansiveness of the defined term "Released Parties" extends to the "Related Parties,"[7] which throws the proposed third-party release into the unknown—indeed, the unknowable—regarding the entities that will be receiving releases.  This Court cannot find that a creditor is granting a "consensual" release to an existing or past person or entity that is not even identified in the Plan, much less one that does not yet exist.

41.     Accordingly, to the extent any release is considered for approval, it must be consensual and limited to parties that are clearly and expressly identified in the Plan.

III.    **The Plan Cannot be Confirmed Because it Contains an Impermissibly Broad Exculpation Provision**

42.     Complying with section 1129(a) requires that a plan not include improper exculpation language.  *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) ("[E]xculpation clauses have also been found to be subject to review pursuant to section 1129(a)(1).").

43.     The Plan's exculpation provision is impermissibly broad under controlling case law because it is not limited to estate fiduciaries.  *See* D.I. 475, Art. I.A. 51 at 6.

44.     The Plan defines "Exculpated Parties" as, "collectively, and in each case, in its capacity as such: (i) the Debtors; (ii) each of the Debtors' Estates (if applicable); (iii) the

---

[7] D.I. 475, Plan Art. I.A.98 at 10.

11

Committee; and (iv) the members of the Committee, in their capacity as such; and (v) ***each Related Party of each Entity in clauses (i) through (iii)***.[8] Plan at Art. I.A. 51 at 6. (Emphasis added).

45.     In *PWS Holding Corp.*, the Third Circuit considered whether an official committee of unsecured creditors could be exculpated and held that 11 U.S.C. § 1103(c) implies both a fiduciary duty and a limited grant of immunity to members of the unsecured creditors' committee. *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000). As a result, an "exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceedings: estate professionals, the Committees and their members, and the Debtors' directors and officers." *Wash. Mut.*, 442 B.R. at 350-51; *see also In re Diocese of Camden, N.J.*, 653 B.R. 309, 359 (Bankr. D.N.J. 2023) ("[T]he estate itself cannot be granted immunity, nor can consultative bodies that do not qualify as 'fiduciaries' under the Bankruptcy Code."); *In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011) (holding that exculpation clause in Tribune "must exclude non-fiduciaries")

46.     Contrary to these limits, the Plan includes as "Exculpated Parties"—and within that definition "Related Parties"—numerous entities that are not fiduciaries of the estate. The Exculpated Parties must be limited to estate fiduciaries. As such, the Plan cannot be confirmed unless its definition of Exculpated Parties is limited to: (i) the Debtors; (ii) the directors and officers of the Debtors who served during any portion of the cases prior to the Effective Date, (iii) the Committee and its members; and (iv) the professionals retained in these cases by the Debtors. *See Wash. Mut., 442 B.R. at 350-51* ("The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their

---

[8] D.I. 475, Plan Art. I.A.98 at 10.

members, and the Debtors' directors and officers."). Accordingly, the Plan cannot be confirmed unless the exculpation provision is limited to estate fiduciaries.

**IV.    The Plan Cannot be Confirmed Because it is Not a Settlement Subject to Approval Under Bankruptcy Rule 9019**

47.    The Plan also cannot be confirmed because it purports to contain "settlements," and to be itself a "settlement," with Releasing Parties that have no formal agreements with the Debtors or the many non-debtors receiving releases.[9]

48.    A "settlement" is "an agreement ending a dispute or lawsuit." Black's Law Dictionary (12th ed. 2024). An "agreement" is "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." *Id.*

49.    Under 11 U.S.C. § 1123(b)(3)(A), a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." But section 1123(b)(3) only allows a debtor to settle claims it has against others (*i.e.*, those "belonging to the debtor or to the estate"). It does not authorize a debtor to "settle" claims that its creditors and equity security holders hold against non-debtor third parties.

---

[9] Article IV.A. entitled "General Settlement of Claims and Controversies" states that [t]o the greatest extent permissible under the Bankruptcy Code and the Bankruptcy Rules, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and other controversies released, settled, compromised, satisfied, or otherwise resolved pursuant to this Plan. This Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and other controversies, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI hereof, all Plan Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final. Plan at Art. IV. A.

13

50.      In addition, while a plan may incorporate one or more negotiated settlements, a plan is not itself a settlement.  What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" is different from what may be permissible under a plan, which is subject to the requirements of sections 1123 and 1129 of the Bankruptcy Code.  *See, e.g., Tribune*, 464 B.R. at 176 (concluding at confirmation stage that a negotiated settlement could be approved because it was fair, reasonable and in the best interest of the Debtors' estates and making an express finding that the settlement was properly part of the plan pursuant to section 1123(b)(3)(A)).

51.      Articles IV.A. and IX.B. implicitly invokes Federal Bankruptcy Rule of Bankruptcy Procedure 9019, which confers discretion on this Court to approve a compromise or settlement on motion after notice and a hearing.  Fed. R. Bankr. P. 9019(a).  "In making its evaluation, the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" *Wash. Mut.*, 442 B.R. at 328 (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).

52.      The standard for approval of a settlement under Rule 9019 is guided by the following criteria: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (citations omitted).

53.      Because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing generalized "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" any claim.

14

54.     Here, these provisions would have this Court approve the Plan's third-party release provisions as a settlement presumably under Rule 9019.  But there is no privity between the Released Parties and the creditors who are being forced into the Plan's third-party release provisions without their consent.  Accordingly, the proposal that the third-party releases be approved as a settlement must be stricken from the Plan.

55.     The Plan's language in Articles IV.A. and IX.B. suggest that the Plan itself is a settlement agreement presumably subject to approval under Rule 9019.  But sending a plan to impaired creditors for a vote is not the same thing as parties negotiating and executing a settlement between and among themselves.

56.     Further, these cited Plan provisions do not appear limited to the settlement of claims belonging to the Debtors or the estates and is therefore not permissible under section 1123(b)(3)(A).  For a plan to incorporate a settlement of claims or causes of action of other parties, those parties must have expressly agreed to settle or compromise those items.

57.     Article IV. A also purports to treat the distributive provisions of the Plan as if they were a Rule 9019 "settlement."  Here, the Debtors have not articulated any justification for the request for additional relief under Rule 9019.

58.     In light of the foregoing, the Plan cannot be confirmed unless the provisions seeking to approve confirmation of the Plan as a whole as a "settlement" (under Rule 9019) are stricken.

**V.     <u>The Plan Cannot be Confirmed Because it Contains a Gatekeeping Provision</u>**

59.     Article IX. G.  of the Plan (the "Gatekeeping Provision") provides that "[n]o party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Cause of Action of any kind against the Debtors, the Liquidating Trust, the Exculpated Parties, or the Released Parties, and, in

each case, each of their Related Parties, without first (1) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against a Debtor, Liquidating Trust, Exculpated Party, or Released Party and is not a Claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (2) obtaining from the Bankruptcy Court specific authorization for such party to bring such Cause of Action against any such Debtor, Liquidating Trust, Exculpated Party, or Released Party.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action.  Plan at Art. IX. G.

60.     This language creates a "gatekeeper" role for this Court that forces a nondebtor who wishes to pursue a claim or cause of action against another nondebtor to come to this Court—and only this Court—for a determination of whether such claim or cause of action is released.  By specifying that this Court "shall determine" whether a claimant can proceed, the Plan's Gatekeeping Provision effectively grants this Court exclusive jurisdiction to adjudicate the claim or cause of action.  The Gatekeeping Provision would apply even after the Debtors' bankruptcy cases have been closed, which would require a nondebtor seeking to pursue a claim against another nondebtor to first move to reopen the bankruptcy cases.

16

61.     The procedure proposed by the Gatekeeping Provision—which is akin to that to be followed prior to suing a bankruptcy trustee under *Barton v. Barbour*, 104 U.S. 126 (1881)— is unnecessary and burdensome and should not be permitted.  The defense of "release" is an affirmative defense to a cause of action asserted in a court of law or other tribunal.  Affirmative defenses cannot be adjudicated prior to the filing of the action to which they relate.  Moreover, as to claims between nondebtors, there is no reason why the court in which the relevant action has been filed cannot determine whether the claim was released under the Plan.

62.     A similar provision was rejected by Judge Owens in the Bankruptcy Court for the District of Delaware in *In re Gulf Coast Health Care, LLC*, where she noted "the plan says what it says, and other courts should be entitled to exercise their authority to interpret it," and "[i]mposing such a requirement could also impose an unnecessary administrative hurdle and cost the parties when these cases are closed."  *Gulf Coast Health Care, LLC*, No. 21-11336 (KBO), D.I. 1236, Transcript of May 4, 2022, Confirmation Hearing at 30:18-23.  And to the extent the Debtors do not need to enforce any of the Plan's provisions after the Effective Date, the Bankruptcy Court retains jurisdiction to do so. Plan at Art. X. at 48-50

63.     In light of the foregoing, the Gatekeeping Provision should be stricken from the Plan.

## RESERVATION OF RIGHTS

64.     The U.S. Trustee leaves the Debtors to meet their burden and reserves all rights, remedies, and obligations to, *inter alia*, complement, supplement, augment, amplify, alter, or modify this Objection.

17

**CONCLUSION**

For the reasons set forth above, the U.S. Trustee respectfully requests that the Court deny

confirmation of the Plan and grant such other relief as the Court deems just and proper.

Respectfully submitted,

ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 & 9

*/s/ Richard L. Schepacarter*
Richard L. Schepacarter
Trial Attorney

Dated: July 30, 2024